

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

GAS NATURAL APROVISIONAMIENTOS
SDG, S.A.,

              Petitioner,

             -against-

ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO,

              Respondent.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Case No.

**DECLARATION IN SUPPORT OF
PETITION FOR ORDER
RECOGNIZING AND ENFORCING
ARBITRATION AWARD AND
SUPPORTING MEMORANDUM OF
LAW**

George M. von Mehren declares as follows:

1.     I am a partner of the law firm of Squire, Sanders & Dempsey L.L.P and an

attorney for Gas Natural Aprovisionamientos SDG, S.A. ("GNA"), the petitioners in the above-

captioned proceeding. Except as otherwise indicated herein, I have personal knowledge of the

facts set forth herein, and if called as a witness, could and would testify competently thereto. As

to certain facts, as indicated, I am informed and believe them to be true.

## BACKROUND

2.     GNA petitions this Court to recognize and enforce the binding Final Award

unanimously rendered by a duly constituted Arbitral Tribunal on January 17, 2008 in *In the*

*Matter of the UNCITRAL Arbitration between Atlantic LNG Company of Trinidad & Tobago*

("Atlantic") *and Gas Natural Aprovisionamientos SDG, S.A.* ("GNA") pursuant to the

UNCITRAL Arbitration Rules (the "Award"). A true and correct copy of the Award is attached

hereto as Exhibit A.

3.      Atlantic and GNA are parties to an LNG[1] Sales Contract dated July 27, 1995

("Contract"),[2] which, in essence, provides for deliveries of 40% of the LNG produced by the

Train 1[3] LNG Facility operated by Atlantic at Point Fortin, Trinidad and Tobago for a term of 20

years from the commencement of deliveries in 1999.  A true and correct copy of the Contract is

attached hereto as Exhibit B.

4.      The Contract provides an arithmetic formula by means of which the parties

calculate a quarterly adjusted price per MMBtu[4] for LNG sold by Atlantic to GNA under a fixed

Contract Price formula provided in Article 8 of the Contract (the "Contract Price").  The

Contract Price formula may also be changed from time to time under the limited circumstances

set forth in Article 8.5 of the Contract, either by negotiation between the parties or through a

"price reopener" arbitration initiated by one of the parties.

5.      On April 21, 2005, Atlantic sought to initiate a Contract price reopener and

delivered a Price Reopener Notice (the "Reopener Notice") to GNA.  That Reopener Notice did

not specify the quantitative change to the Contract Price sought by Atlantic.  After several

meetings between the parties, Atlantic delivered its Demand for Arbitration to GNA in a letter

dated October 21, 2005.  The Demand for Arbitration sought an upward revision of the Contract

Price.

---

[1]      "LNG" (liquefied natural gas) is natural gas cooled to minus 260 degrees F and thus
transformed into a liquid, permitting it to be transported by specially designed LNG tankers.

[2]      Enagas, S.A. was the original purchasing party, but assigned its interest to GNA on
January 1, 2001 as part of the reorganization of the Spanish gas industry as part of the Government led
liberalization process.

[3]      An LNG "train" is a single sequence of machinery utilized to transform natural gas into
LNG.  Sales of LNG are typically tied to specific "trains" when a producer, such as Atlantic, has multiple
production facilities (Train 1, Train 2, etc.).

[4]      An MMBtu (one million British thermal units) of LNG is a common unit of measure
based on the heating value of the commodity.

6.      Atlantic then filed its Statement of Claim, and GNA responded by both opposing Atlantic's request for a higher Contract Price and seeking a reduced Contract Price based on decreasing natural gas prices in the Spanish market.

7.      In accordance with the Contract and the UNCITRAL Arbitration Rules, a highly experienced and distinguished three-member Arbitral Tribunal was selected to preside over and resolve the parties' dispute.  Specifically, Atlantic nominated Ben H. Sheppard, Jr., a faculty member at the University of Houston Law Center and director of its dispute resolution program, to serve as its party-appointed arbitrator, and GNA nominated Eugene A. Massey, a senior partner at a prominent Washington D.C. law firm, to serve as its party-appointed arbitrator. Gerald Aksen, an internationally renowned arbitrator of commercial disputes, was then appointed to serve as Chairman of the Arbitral Tribunal.  Neither party challenged the appointment of the arbitrators.  These three arbitrators participated in the proceedings and unanimously issued the Final Award that GNA now petitions this Court to recognize and enforce.

8.      After due notice to both parties and pursuant to an agreed schedule governing pre-hearing matters and the hearing, the Arbitral Tribunal conducted Evidentiary Hearings in New York City, New York on April 17, 2007 and continued on April 18-20, 2007, April 24-27, 2007, May 1 and 2, 2007, and on June 7 and 8, 2007.  The Arbitral Tribunal further held Closing Arguments on November 14 and 15, 2007.  After a full hearing on the merits at which both parties participated and presented evidence in support of their respective claims and defenses, the Arbitral Tribunal rendered its Final Award in writing on January 17, 2008, and caused it to be delivered to both parties in accordance with the UNCITRAL Arbitration Rules.  The Final Award made numerous determinations of law and fact; some in favor of GNA and others in

favor of Atlantic. The Tribunal expressly determined that, for purposes of assessing costs and fees against either party, both parties had been successful and neither was taxed with costs and fees incurred by the other.

9.    The Final Award also required, among other things, that the all Train 1 LNG sales to GNA from April 21, 2005 through the date of the Final Award (the "Reopener Period") were to be repriced by the parties according to the revised Contract Price formula set forth in the Final Award, with the resulting net balancing payment paid as required to bring the parties current for all LNG purchases during the Reopener Period on or before April 15, 2008. The revised Contract Price that applied during the Reopener Period was sometimes greater than, and sometimes less than, the previously used Contract Price. GNA therefore calculated the correct revised Contract Price for each cargo purchased during the Reopener Period and then calculated the resulting balancing payment called for in the Final Award. Since GNA was owed a retroactive payment, it invoiced Atlantic for the balancing payment in accordance with the Award and provided supporting calculations by facsimile dated January 21, 2008. A true and correct copy of that facsimile is attached hereto as Exhibit C.

████████████████████████████████████████████████

████████████████████████████  True and correct copies of these invoices are attached hereto as

Exhibits E, F, and G.  I am informed that GNA repeatedly requested that Atlantic correct this

calculation or explain its basis for refusing to obey the Final Award.  True and correct copies of

those letters are attached hereto as Exhibits H, I, and J.  I am informed that, to date, Atlantic has

refused to respond to GNA's requests.  GNA has indicated to Atlantic that it is therefore paying

the first of these invoices for a January 20, 2008 shipment (and will continue to pay for first

quarter 2008 shipments) provisionally and under protest, pending appropriate relief from this

Court.  A true and correct copy of the payment under protest is attached hereto as Exhibit K.

<u>**IT IS NECESSARY TO FILE THE PETITION AND**</u>
<u>**SUPPORTING PAPERS UNDER SEAL**</u>

11.    The materials filed with the Petition for Order Recognizing and Enforcing

Arbitration Award should be filed under seal for two independent but mutually compelling

reasons.  <u>First</u>, pursuant to Article 32(5) of the UNCITRAL Arbitration Rules (attached hereto as

Exhibit L), the Award issued by the Arbitral Tribunal is confidential and may not be made public

without the consent of both parties.  UNCITRAL art. 32(5) ("The award may be made public

only with the consent of both parties.").  Atlantic has not agreed to make public the Award.

Similarly, the Petition for Order Recognizing and Enforcing Arbitration Award, together with

this declaration and the exhibits thereto, should also be filed under seal because they are

predicated on, and thus disclose information about, the confidential Award.

12.    <u>Second</u>, Article 20 of the Contract (attached hereto as Exhibit B) provides that

"the provisions of this Contract and all information or documents which come into the

possession of the Parties in connection with the performance of this Contract may not be used or

communicated to third parties without mutual agreement of the Parties."  Contract at p. 91.  The

arbitral proceedings were conducted pursuant to the Contract, and the Parties' participation in it is part of their "performance of the Contract." The Arbitral Tribunal agreed that the proceeding was confidential in Procedural Order No. 8, stating that "this arbitration is a confidential proceeding." Procedural Order No. 8 at p. 2 (attached hereto as Exhibit M). Accordingly, all materials filed with this Petition for Order Recognizing and Enforcing Arbitration Award, including the petition itself, should be filed under seal.

## CONCLUSION

13.     For all of the foregoing reasons, GNA respectfully moves the Court to an Order recognizing and enforcing the Final Award and for such other and further relief as set forth in the Petition.

I declare under the penalty of perjury that the foregoing is true and correct and was executed this 1st day of February, 2008 at Cleveland, Ohio.

George M. von Mehren

# EXHIBIT A

# GERALD AKSEN, ESQ.

Arbitrator & Mediator

875 Third Avenue • 10th Floor
New York, NY 10022-6225
Tel. (212) 603-2174
Fax (212) 829-2001
E.Mail gaksen@thelen.com

January 17, 2008

Michael L. Hirschfeld, Esq.
Milbank Tweed, Hadley & McCloy, LLP
One Chase Manhattan Plaza
New York, New York 10005-1413

George M. von Mehren, Esq.
Squire Sanders & Dempsey, L.L.P.
127 Public Square
Cleveland, Ohio 44114-1304

Re:  **In the Matter of UNCITRAL Arbitration between
      Atlantic LNG Company of Trinidad and Tobago
      and Gas Natural Aprovisionamientos SDG, S.A.**

Dear Mr. Hirschfeld and Mr. von Mehren:

Attached is the Tribunal's Final Award in the above case.

Also attached is a copy of the Tribunal Pricing Data Worksheet, showing the method that the Tribunal applied in calculating the numbers used to arrive at the new Contract Price. Although not a part of the Final Award, we thought it helpful to separately send you the Worksheet so that you might more easily follow the Tribunal's analysis.

Kindly remit the remaining sums due which are itemized in the Award to the Escrow Account, as follows:

>          Account Name:  Thelen Reid Brown Raysman & Steiner LLP
>          Account Number: 49208689
>          ABA: 021-000-089
>          SWIFT Code: Citi US33
>          Bank Name: Citibank, N.A., New York, NY 10103
>          Ref: Aksen – UNCITRAL Arbitration

Messrs. Hirschfeld and von Mehren
January 17, 2008
Page 2


Originals of this letter and attachments are being sent to each of you today via overnight courier.

Sincerely,

Gerald Aksen
For the Tribunal

GA:dr
Enclosures

cc:   Eugene A. Massey, Esq.
      Ben H. Sheppard, Jr., Esq.

| TRIBUNAL PRICING DATA WORKSHEET | 2000 – 2004 avg. | 2005 | 2006 | 1st Q 2007 | 2005 – 2007 avg. |
|---|---|---|---|---|---|
| **Revised Spanish Price** | | | | | |
| 1. ATL/GNA Contract Price (with percentage increase from 1995 price ▮ | | | | | |
| 2. ▮ (with percentage change based on 1995 value ▮ | | | | | |
| 3. 1995 Contract Price ( ▮ X percentage increase in ▮ (Row 2) | | | | | |
| 4. TT – Spain Shipping Costs | | | | | |
| 5. Theoretical GNA Net Margin (2-3-4) | | | | | |
| 6. Ratio of ▮ escalated Contract Price to existing Contract Price (3/1) | | | | | |
| ▮ **Price Calculation** | | | | | |
| 7. ▮ | | | | | |
| 8. Estimated pipeline cost, terminal costs, and ▮ netback price differentials | | | | | |
| 9. ▮ (with percentage increase compared to 1995 Spanish value of $ ▮ | | | | | |
| 10. Contract Price based on ▮ – 1995 Contract Price ▮ X percentage increase in ▮ value (Row 9) | | | | | |
| 11. Ratio of ▮ price to ▮ | | | | | |
| 12. ▮ | | | | | |
| 13. ▮ | | | | | |
| 14. ▮ | | | | | |

**Notes**:

Averages for 2000 – 2004 were calculated by the arithmetic sum of the value for each calendar year divided by 5. In the case of 2005 – 2007, the values for 2005 and 2006 were multiplied by 4 and added to the 1st Q 2007 value and the total divided by 9.

**Row 1**     The parties agreed on the base data. The percentage is based on relationship to the March 1995 price - $ ▮

**Row 2**     This row sets out the ▮ levels for the various periods and percentage increases since 1995. Prior to 2002, the ▮ was not published and it is necessary to derive a proxy. The differences between the parties for the years 2000 – 2001 relate to the calculation of the ▮

▮ ▮ has been reconciled to ▮

based on GNA 1995 Annual Report – See Atlantic's June 6, 2007 submission, attaching Poyry's revised Note. Based on this reconciliation, the █████████████████████ have derived as follows:



**Row 3**    This row calculates a ██████████████████████████████████ ████ (The percentages calculated in Row 2 times the March 1995 Contract Price).

**Row 4**    GNA's figures for shipping costs. These are theoretical costs, based on the actual shipping fleet that GNA arranged for the Contract.

**Row 5**    This row calculates GNA's margin on sales in Spain ███████████████████

**Row 6**    This row calculates the ratio between the price paid under the existing formula (Row 1) and the price calculated under Row 3.

**Row 7**    These figures come from the Atlantic Chart Submission, May 29, 2007, Tab 8.

**Row 8**    These figures are estimates based on data in the Navigant Report, December 29, 2006, ¶ 67, Table 11, data submitted by Atlantic related to the "Value Chart" on May 29, 2007, Tab 8 and estimates of the differential between the prices reported by ███ to Atlantic and ██████████████ █████████████████████████

**Row 9**    This Row calculates the █████████████ by subtracting the Row 8 costs from the ████ . This figure can then be compared ████████████████████ to compare gas values in the two markets.

**Row 10**    This Row converts ██████████████████ into a Contract Price based on the assumption that GNA was able to sell LNG ex ship in Spain ████████████████████ This conversion is accomplished by applying the percentage increase in the ████████████████ ████████████████████ to the 1995 Contract Price.

**Row 11**    This calculates the ████████████████ using the ratio of a █████████ Contract Price ███████████████ to the ████████████

**Row 12**    This formula applies the ██████████████████ for the various time periods under review.

**Row 13**    This Row sets out the ████████ resale price (June 22, 2007 Chart, Row 4)

**Row 14**    This Row calculates the profits that GNA would have made had the ████████████ ███ formula been in effect and the terms of the ███████ contract unchanged.

| Impact of Changes to ▮ Index Weightings | | | | Weighted Avg. |
|---|---|---|---|---|
| 1. | ▮ Index Values – 1Q 2007 | | | |
| 2. | Original weighting | | | |
| 3. | Atlantic weighting proposal | | | |
| 4. | ▮ eliminated, but other weightings unchanged. | | | |
| 5. | ▮ weighting added to ▮ | | | |
| 6. | Ratio of pricing change | | | Ratio |
| | a. 3/2 | | | |
| | b. 4/2 | | | |
| | c. 5/2 | | | |

## IN THE MATTER OF THE UNCITRAL ARBITRATION

---

### ATLANTIC LNG COMPANY
### OF TRINIDAD AND TOBAGO

**Claimant,**

- against –

### GAS NATURAL APROVISIONAMIENTOS SDG, S.A.

**Respondent.**

---

## FINAL AWARD

Arbitral Tribunal
Gerald Aksen, Esq. (Chairman)
Eugene A. Massey, Esq.
Ben H. Sheppard, Jr., Esq.

## Table of Contents

Page

I.    INTRODUCTION ...................................................................................................1

      A.    Factual Background..................................................................................1
            1.    The Parties ....................................................................................1
            2.    The Train 1 LNG sales contracts ................................................1
            3.    The price reopener clause ............................................................2
            4.    GNA request for price reduction -- 2000....................................4
            5.    GNA sales history ███████████ ..........................................4
            6.    Atlantic request for price adjustment ████████████████......5
      B.    History of the Arbitration.......................................................................7
      C.    Authority of the Tribunal........................................................................8

II.   FINDINGS AND OPINION .................................................................................9

      A.    Interpretation of the Relevant Contract Clauses.....................................9
            1.    Article 8.1 ....................................................................................9
            2.    Article 8.5(a)...............................................................................10
            3.    Article 8.5(b) ..............................................................................10
            4.    Article 8.5(c)...............................................................................11
            5.    Article 8.5(e)...............................................................................12
            6.    Article 8.5(f)...............................................................................12
            7.    Article 2.6 ...................................................................................12
      B.    Application of Contract Provisions to the Issues Raised in this Proceeding.........13
            1.    The requirements for a price reopener under Article 8.5(a) have been met.
                  ...................................................................................................13
            2.    "Buyer's end user market" is the market in which the LNG purchased by
                  Buyer reaches the end users...................................................................14
            3.    ███████████████████████████████████████████
                  ████████████████████████████████████████...16
            4.    Calculation of a revised Contract Price ................................................20
                  (a)    Revised Spanish price ........................................................21
                  (b)    ███████████████████████████.................24
                  (c)    ████████████████████████████████████..27
            5.    Application of the reasonable rate of return requirement of Article 8.5(c).
                  ...................................................................................................28
            6.    Interest .......................................................................................30
            7.    Effective date of the Award........................................................29
            8.    The cost submissions of the parties ...........................................30

III.  AWARD....................................................................................................................31

## I.    INTRODUCTION

### A.    Factual Background

#### 1.    The Parties

1.              The parties to this Proceeding are Atlantic LNG Company of Trinidad and Tobago ("Atlantic") (Claimant) and Gas Natural Aprovisionamientos SDG, S.A. ("GNA") (Respondent).  Claimant has been represented in this Proceeding by Milbank Tweed Hadley and McCloy LLP (Michael L. Hirschfeld, James G. Cavoli, Robert J. Liubicic, Kyung M. Lee, and John White) and Respondent by Squire, Sanders & Dempsey LLP (George M. von Mehren, Stephen P. Anway, Steven B. Harris, and Lisa G. Henneberry).

#### 2.    The Train 1 LNG sales contracts

2.              Atlantic and GNA are parties to an LNG[1] Sales Contract dated July 27, 1995 ("Contract"),[2] which provides for deliveries of 40% of the LNG produced by the Train 1 LNG Facility at Point Fortin, Trinidad and Tobago for a term of 20 years from the commencement of deliveries in 1999.   The Contract was negotiated in parallel with a contract between Atlantic and ███████████████████████ for the balance of 60% of the production of Train 1 ███████████████████ an LNG receiving facility ███████████      In the mid-1990's███  sought out another buyer of LNG to join with it to create enough volume to support an LNG project in Trinidad and Tobago, and approached GNA. ████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████ and GNA accepted this approach and parallel but separate negotiations were conducted with Atlantic.  Substantial agreement was reached between Atlantic and GNA in March of 1995, but the negotiations with ████ continued a little longer.  After both contracts were agreed upon, they were formally executed on the same day, July 27, 1995.

---

[1]       LNG (liquid natural gas) is natural gas cooled to minus 260 degrees F and thus transformed into a liquid, permitting it to be transported by specially designed LNG tankers.

[2]       Enagas, S.A. was the original purchasing party, but assigned its interest to GNA on January 1, 2001 as part of the reorganization of the Spanish gas industry as part of the Government led liberalization process.

[3]       ███████████████████████████████████████
███████████████████████████

(1)

### 3.     The price reopener clause

3.          One of the Contract provisions requested by GNA was a price reopener. The parties agreed to the inclusion of Article 8.5 "Contract Price Reopener" based on text proposed by GNA that was modeled on ███████████. Article 8.5 reads as follows:

4.                    8.5 Contract Price Reopener

(a)     If at any time either Party considers ████ ████████████████ beyond the control of the Parties, while exercising due diligence, have substantially changed as compared to what it reasonably expected when entering into this Contract or, after the first Contract Price revision under this Article 8.5, at the time of the latest Contract Price revision under this Article 8.5, and the Contract Price resulting from application of the formula set forth in Article 8.1 does not reflect the value of Natural Gas in the Buyer's end user market, then such Party may, by notifying the other Party in writing and giving with such notice information supporting its belief, request that the Parties should forthwith enter into negotiations to determine whether or not such changed circumstances exist and justify a revision of the Contract Price provisions and, if so, to seek agreement on a fair and equitable revision of the above-mentioned Contract Price provisions in accordance with the remaining provisions of this Article 8.5.

(b)     In reviewing the Contract Price in accordance with a request pursuant to sub-Article 8.5(a) above the Parties shall take into account levels and trends in the price of supplies of LNG and Natural Gas ████████████████████ such supplies being sold under commercial contracts currently in force on arm's length terms, and having due regard to all characteristics of such supplies (including, but not limited to quality, quantity, interruptibility, flexibility of deliveries and term of supply).

(c)     The Contract Price as revised in accordance with this Article, shall in any event, allow the Buyer to market the LNG supplied hereunder in competition with all competing sources or forms of energy (including, but not limited to, natural gas, fuel oil, gasoil, coal, LPG, district heating and electricity) in the market of the Buyer at the point of consumption, taking into account, inter alia, all appropriate operations, services and risks which are usual within the Natural Gas industry from the points of import for handling and marketing the Natural Gas in all market segments when due regard is given to all characteristics of the LNG supplied under this Agreement (including, but not limited to, delivery point, quality, continuity, flexibility of deliveries and term of supply) and on the basis that sound

marketing practices and efficient operations on the part of the Buyer are assumed and such Contract Price shall allow the Buyer to achieve a reasonable rate of return on the LNG delivered hereunder.

(d)    Neither Party shall request a Contract Price revision to be effective as of the date which is earlier than twelve (12) Months following the Date of First Commercial Supply and no Party shall request any further revision to be effective as of a date which is earlier than three (3) Calendar Years after the date as of which such Party has last requested a revision to be effective.

(e)    Unless the Parties agree otherwise, no price revision shall be effective:

(i)    earlier than provided for in (d) above;

(ii)    retroactively before the date of notification of the request of such revision; or

(iii)    earlier than six (6) months before the date on which agreement is reached or arbitration proceedings are initiated on such revision, whichever is the latest.

(f)    If agreement is not reached within six (6) months from the date of notifying the request for Contract Price revision, either Party may submit the matter to arbitration for decision in accordance with the criteria set out in sub-Articles (b) and (c) above.

(g)    While, and notwithstanding, the Parties have not reached agreement and no arbitration award is effective, this Contract shall remain in full force and effect and the rights and obligations of the Parties, including, without limitation, the obligations of the Seller to sell and deliver and the obligations of the Buyer to take and/or pay r LNG at the Contract Price shall remain in effect.

(h)    Each Party shall provide all necessary formation to substantiate its own claim. No Party shall be required disclose any business secrets or breach any confidentiality undertaking nor to provide such information as the other Party may need to substantiate its claim.

(3)

5.          Article 8.5(a) entitles either party to request a revision to the price formula where "█████████████████...have substantially changed compared to what [was] reasonably expected," resulting in the formula no longer reflecting "the value of Natural Gas in the Buyer's end user market." Since the inception of deliveries under the Contract, the issue of revising the price formula has been under discussion between the parties, with GNA requesting a price reduction from 2000 through 2004, based on the low prices ██████ and Atlantic requesting an increase starting in April 2005, to reflect the higher prices received by GNA for its sales ███████████████████

### 4.    GNA request for price reduction -- 2000

6.          Based on Article 8.5, GNA filed a Price Reopener Request with Atlantic on July 28, 2000, claiming that it met the criteria for a price reduction under Article 8.5. Atlantic and GNA could not agree on a revised price. After over four years of discussions, Atlantic and GNA reached a settlement on November 8, 2004 in which GNA agreed to withdraw the Price Reopener Request and Atlantic, which had initially taken the position that the Price Reopener Request was insufficient, agreed that the Price Reopener Request satisfied the conditions of Article 8.5(a).

### 5.    GNA sales history ████████

7.  ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ Right from the inception of deliveries of
Train 1 LNG, GNA ███████████ ████████████████ under both swap
arrangements and resales.

8.  ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

4   ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

5       Exhibit R 335.

**6.     Atlantic request for price adjustment based on** ███████

9.          The Contract was negotiated on the assumption that the LNG would be delivered to and sold in Spain. This is reflected in many provisions of the Contract, which contain specific reference to Spain. In addition, the pricing provision was negotiated in the context of the Spanish market, focusing on the Spanish tariff structure and the price of competing fuels. ████████████████████████████████████████

10.    The conjunction of higher prices ███████████ and lower prices in Spain has resulted in a significant volume of LNG being delivered ███████████ with almost all of GNA's Train 1 LNG being delivered ███████ since 2003, a situation that is expected to continue at least until March of 2009.

11.    Under Article 8.5(f), the parties are entitled to refer their request for a price adjustment to arbitration if they cannot reach agreement.  The arbitration clause contained in Article 18 provides that:

> Any dispute, controversy or claim arising out of or relating to this Contract, or the breach, termination or invalidity thereof (except for those disputes relating to technical matters that are to be submitted to an Expert for resolution in accordance with Article 16), shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules in effect on the date of this Contract.  The appointing authority shall be the American Arbitration Association.  Arbitration shall be conducted in the English language and shall be held at New York, New York, United States of America, unless another location is selected by mutual agreement of the parties.  The award rendered by the arbitrators shall be final and binding upon the Parties.



12.               Pursuant to this provision, Atlantic instituted this proceeding on October 21, 2005, requesting a determination that ███████████ is now the "Buyer's end user market" and a revision to the Contract Price based on ████████████████ formula. In the alternative, Atlantic requested a recalculated Spanish based price with a factor added to reflect the current value of GNA's ████ to resell cargoes into ████████████████ GNA defended, claiming that "Buyer's end user market" is always Spain, and counterclaimed for a reduced price based on the Spanish market.

## B.      History of the Arbitration

13.               The full Tribunal was formed on June 21, 2006. A preliminary conference was held in New York, New York on July 26, 2006, and attended by the parties, their counsel and the members of the Tribunal to establish a schedule for the proceedings. Counsel for the parties thereafter jointly submitted a proposed procedural order containing a detailed schedule for, among other things, the submission of pleadings, documentary exhibits, witness statements and expert statements, and the evidentiary hearing, which the Tribunal signed without material modification on August 3, 2006.

14.               By subsequent procedural order, the Tribunal established a separate schedule to deal with GNA's motion to dismiss Atlantic's price reopener claim. Following review of the submissions of both parties, the Tribunal denied GNA's motion to dismiss on October 30, 2006.

15.               The evidentiary hearing commenced as scheduled in New York, New York on April 17, 2007 and continued on April 18-20, 2007, April 24-27, 2007 and May 1 and 2, 2007. During those hearings, the Tribunal denied Atlantic's motion to dismiss GNA's counterclaim seeking a lower price adjustment. In addition, the Tribunal submitted a chart that the Tribunal requested the parties complete with identified cost and pricing data. Further hearings were conducted on June 7 and 8, 2007 to discuss the pricing and cost data that the parties had developed in response to the chart. On June 22, 2007, the parties submitted their "Second Revised Composite Comparison Chart" setting forth the positions of the parties with respect to the pricing and cost data that the Tribunal had requested.

16.               The parties simultaneously submitted their first and second post-hearing submissions in writing on August 24, 2007 and October 12, 2007, respectively. The Tribunal, in consultation with counsel, scheduled post-hearing arguments for November 14th and 15th. In advance of the argument, the Tribunal submitted a detailed list of questions to both parties and also requested the parties to submit the specific language of proposed price revisions.

17.               The post-hearing arguments were conducted as scheduled on November 14 and 15, 2007 in New York, New York.

18.               Pursuant to the schedule established by the Tribunal, the parties simultaneously issued their respective submissions of costs on December 7, 2007. On December 13, 2007, GNA objected to certain costs in Atlantic's December 7, 2007 submission of costs and, subject to those objections, conditionally attached an additional

amount to its own cost submission. Pursuant to the Tribunal's invitation, Atlantic responded by letter dated December 19, 2007 in which Atlantic raised no objection to GNA's additional cost submission. The Tribunal also accepted GNA's unsolicited letter of December 20, 2007 responding to some of the points raised in Atlantic's December 19, 2007 letter.

19.          The Tribunal closed the proceedings on December 21, 2007.

### C.      Authority of the Tribunal

20.          A price reopener proceeding imposes on the Tribunal obligations that are broader than a traditional arbitration proceeding because the Tribunal is instructed to make commercial decisions based on very general standards and criteria. The Tribunal is required not just to determine whether there is a basis to reopen the price, but to actually decide what the new price should be – in effect revising a key provision of the Contract. Article 8.5(f) expressly requires the Tribunal's decision to be "in accordance with the criteria set out in sub-Articles (b)                                            and (c) [reasonable rate of return for GNA] above." In addition, the Tribunal believes that its decision must give effect to all of the guidance contained in Article 8.5, including sub-Articles (a), (d), (e), (g), and (h). In particular, both parties have acknowledged that any new price should satisfy the "fair and equitable" standard contained in Article 8.5(a). Finally, the Tribunal believes that it should honor the original intent of the parties in 1995, to the extent that such intent can be deduced from the language chosen at that time, as clarified during the hearings.

21.          The Tribunal interprets Article 8.5(f) as authorizing it to revise the price provisions of Article 8, but does not believe that it is empowered to revise any of the other provisions of the Contract. Implicit in this limited approach to this dispute is the obligation to ensure that any revision to the pricing mechanism would not have significant adverse implications under any of the other provisions of the Contract, including the future operation of Article 8.5 itself.

## II.    FINDINGS AND OPINION

### A.    Interpretation of the Relevant Contract Clauses.

22.        The Tribunal sets out below its view on the meaning of, and interrelationship between, the relevant contract clauses.  Application of these clauses to the facts is covered in Part B.

#### 1.    Article 8.1[7]

23.        Article 8.1 establishes the Contract Price through a formula composed of a base price and an escalation based on █████product index.  The escalation formula uses the

---

[7]        Article 8.1  Contract Price

The Contract Price, P, applicable to each██████████████████████████████████ █████████████████████████████████████████████ in US Dollars per MMBtu in accordance with the formula:



██████████████████are the base values of ████████████ respectively, and have the following values:

The Contract Price so calculated shall remain in force for the duration ████████████ ██████████████████████████



Both the composition of the index itself, ▮ its ▮▮▮▮▮▮ suggest that the parties expected that the escalation formula would produce a FOB Contract Price for LNG that tracked the price of natural gas in Spain. In other words, a 100% increase in the ▮▮▮▮▮▮ would correlate with a 100% increase in the value of Spanish natural gas, which would correlate with a 100% increase in the Contract Price.

### 2.    Article 8.5(a)

24.        A party is entitled to a revised price under Article 8.5(a) reopener where ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ..have substantially changed compared to what [was] reasonably expected," resulting in the price formula in Article 8.1 no longer reflecting "the value of Natural Gas in the Buyer's end user market." Both parties have taken somewhat contradictory positions on whether this threshold requirement has been met. GNA claims that Atlantic should have expected ▮▮▮ the impact of liberalization in Spain ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮and thus is not entitled to an adjustment based on these ▮▮▮▮▮▮▮▮ Atlantic responded that the fast pace of liberalization could not have been anticipated in 1995 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, with respect to GNA's counterclaim, Atlantic claims that GNA should have expected liberalization and, thus, there are no ▮▮▮▮▮▮

25.        The Tribunal believes that both parties are suggesting too narrow a reading of the Article 8.5 test. The Tribunal concludes that the parties expected that the formula chosen in Article 8.1 would adjust the Contract Price proportionally to the change in the value of natural gas. If the actual operation of the Article 8.1 price formula and the value of natural gas had moved in parallel, then there would be no basis for an adjustment to the formula. However, a meaningful departure from the relationship between the Contract Price and the price of natural gas in the Buyer's end user market would constitute the type of change that Article 8.5(a) was intended to address.

26.        Since Article 8.5(a) is premised on a "substantial" change, the Tribunal concludes that the price formula should be adjusted only where the departure between actual and expected prices is material, has occurred consistently over a meaningful time period, and is reasonably anticipated to persist.

### 3.    Article 8.5(b)

27.        Article 8.5(b) provides guidance on the standards and criteria for a price adjustment. It requires that a revised price take into account the expected gas-on-gas competition and specifically mentions ▮▮▮▮▮▮▮▮ gas as a measure of this competition. The Tribunal views the reference to ▮▮▮▮▮▮ gas in ▮▮▮▮ 8.5(b) as based on the parties' assumption that the LNG would be going ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█ market would be impacted by prices in the geographically proximate area █
█ It also appears that the language of Article 8.5 was suggested by GNA based on language that is commonly used in contracts for the sale of natural gas █ [8] It is also possible that the reference in Article 8.5(b) to █ is a carryover from the origin of the reopener clause in █

28.        In any event, the basic concept of Article 8.5 requires a determination of the "value" of LNG sold under the Contract, based on prices of other LNG and natural gas supplied to the Buyer's end user market on similar terms. Although prices in other geographic areas can be relevant, particularly as there has been some convergence of natural gas prices in the Atlantic Basin,[9] the most relevant data will come from the Buyer's end user market. In the view of the Tribunal, nothing in Article 8.5(b), including the reference to █ should be read as overriding the basic thrust of Article 8.5(a) to focus on the "value of Natural Gas in the Buyer's end user market."

**4.    Article 8.5(c)**

29.        Article 8.5(c) establishes two basic tests for a revised price: (i) to allow GNA to market the LNG in competition with all competing forms of energy and (ii) to allow GNA "to achieve a reasonable rate of return on the LNG delivered hereunder."

30.        There are two aspects of this clause that are at issue: (i) what guarantee is given to GNA (and does it provide any protection for Atlantic) and (ii) what is a "reasonable rate of return."

31.        The ability to "market LNG in competition with other fuels" extends the concept of Article 8.5(b), which mentions only expected gas-on-gas competition, to oil and coal. The assumption of this sentence is that the LNG should be marketable in all markets, but this is difficult to apply, especially in comparison to a fuel like coal. The concept is further clouded by the addition of adjusting factors, such as "delivery point, quality, continuity, flexibility of deliveries, and term of supply." The Tribunal's view is that these other factors need to be considered by comparing them to the comparable factors for the competing fuels to determine whether the LNG is competitive "at the point of consumption." Consequently, to the extent that these adjusting factors are to be considered in determining the competitive price of LNG, they relate to the terms of GNA's resale arrangements, not to the terms of the purchase arrangements under the Contract.

32.        However, the protection afforded GNA is only to "allow" it to market in competition on the basis of sound marketing practices and efficient operations. Thus, GNA is not guaranteed a price that will be competitive under all conditions, but only under conditions of sound marketing and efficient operations.

---

[8]    Atlantic First Post –Hearing Memorandum ("A1PHM"), ¶ 50.

[9]    A1PHM ¶ ¶ 23 - 27.

33.         A similar limit applies to the "reasonable rate of return." A reasonable rate of return must take into account the totality of the circumstances, including the commercial bargain that is implicit in the original contract. The Tribunal considered whether the reasonable rate of return acts as a ceiling on the margins that GNA is entitled to earn, or only as a floor. Although the language is not clear, we are of the view that the intent of Article 8.5 was to adjust the price based on the change in the value of natural gas, taking into consideration the anticipated gas-on-gas competition. If, after applying an adjustment to reflect that change in value (presumably lower), the price remained too high to satisfy the requirements of Article 8.5(c), then the price would be reduced to the extent necessary to permit a "reasonable rate of return." However, if the basic adjustment produced a price low enough to meet the requirements of Article 8.5(c), no further reductions would be required.

34.         In assessing whether GNA is "allowed" to earn a reasonable rate of return as required by Article 8.5(c), a detailed netback calculation would be required and in this context the marketing and operating performance by GNA would need to be considered.

##### 5.    Article 8.5(e)

35.         Article 8.5(e) provides limits on the retroactive application of a revised price, precluding the Tribunal from awarding price relief for periods before the reopener notification (8.5(e)(ii)). Since the reopener notice was dated April 21, 2005, the Tribunal is not empowered to adjust the price for periods prior to that date. However, there is no requirement in Article 8.5(e) that relief be retroactive to the reopener notice. Thus, the Tribunal may adjust the price beginning at any time subsequent to April 20, 2005.

##### 6.    Article 8.5(f)

36.         Article 8.5(f) permits either party to initiate arbitration. A party does not have to be the one that filed the Reopener Notice in order to pursue arbitration. Once discussion of a Price Reopener commences, the outcome is to be determined by the application of the standards contained in Article 8.5 of the Contract. If application of those standards requires a lower rather than a higher price, the Tribunal is required to act in accordance with Article 8.5.

##### 7.    Article 2.6

37.



38.

---

[10]      See text of Article 2.6 at footnote 4 *supra*.



39

40.     ████████████████████████ the Tribunal interprets the phrase "Buyer's end user market" in Article 8.5 as requiring an analysis of the total distribution system, comparable to a netback calculation, rather than an effort to pinpoint geographically a defined market. In circumstances where the LNG is being delivered ████████ on a sustained basis, the "Buyer's end user market," for the purpose of performing a netback calculation under the standards of Article 8.5, is the ████████████████.

**B.      Application of Contract Provisions to the Issues Raised in this Proceeding**

41.     The parties, at the request of the Tribunal, prepared a joint chart dated June 22, 2007, setting out pricing and cost data related to the price reopener. Based on that chart, the relevant documents and testimony presented at the hearings, and the interpretation of the relevant Contract provisions set out above, the Tribunal has reached the following conclusions on the issues raised in this Arbitration.

**1.      The requirements for a price reopener under Article 8.5(a) have been met.**

42.     The Tribunal finds that the change in the "value of natural gas" since 1995 when the Contract was signed has not been in accord with what either party expected. Although the parties have based their arguments on the degree to which liberalization was expected, the speed with which it was to be applied, and the scope of its impact, the Tribunal believes that the crucial test is whether the formula agreed in 1995 continues to track the value of natural gas. Whether the "value of natural gas" is measured in ████████████ or ████████ its change in value has not been proportionate to the change in the value of the index in the formula used in Article 8.1.

43.     A comparison of the hypothetical value of gas in Spain ████████████████ assuming it had increased at the same rate as the Contract Price, on the one hand, to the actual value of natural gas in Spain and ████████████ on the other hand, demonstrates a significant discrepancy between the change in the index value and the change in actual (market) value of natural gas.

(13)

44.          At the time the Contract was signed in 1995, Spain priced natural gas ███████
████████████████████████████████████ The price formula was structured around the
Spanish market with the expectation that Spain would be the primary market for the Train 1
LNG. It was reasonable for the parties in 1995 to expect that this formula would continue to
function appropriately, but in light of the possible changes in market conditions that GNA
was concerned about, Article 8.5 was added to permit the price to be revised to reflect major
changes in the market. Although the liberalized market was foreseen by both sides, the real
test is whether those developments significantly disrupted the expected relationship between
the Contract Price and the value of natural gas.

45.          Several significant changes have occurred since 1995. First, the Spanish
natural gas market has been substantially liberalized, resulting in natural gas prices rising at a
slower rate than oil prices. Second, because of the attractiveness of the ████████████████
GNA has entered into ████████ resales contracts ████████ The value of natural gas in
████████████████ has never correlated directly with the price ████ As a result, changes in
Article 8.1 index values are significantly different from changes in the actual value of natural
gas ████████████████

46.          Consequently, whether the "Buyer's end user market" is considered to be ████
████████████ Spain, the basic requirement of Article 8.5(a), that the formula in Article 8.1 does
not reflect "the value of Natural Gas in the Buyer's end user market," has been met.

    **2.     "Buyer's end user market" is the market in which the LNG purchased by
            Buyer reaches the end users.**

47.          Atlantic claims that, although the Buyer's end user market was originally
Spain when the Contract was signed, the Buyer's end user market is now ████████████ by
virtue of the ████████ arrangements that GNA has made to sell ████████████████
LNG ████████████████████████████████ where it is then
commingled with other LNG purchased ████ and sold to consumers in ████████████
Atlantic stresses that, for the purpose of a price reopener, the relevant market is the point of
consumption of the Train 1 LNG.

48.          GNA, on the other hand, focuses on where it is authorized or capable of
serving end users, claiming that it has no such capability ████████████████ controls
████████ does not permit GNA to market LNG directly ████████████

49.          The Tribunal, after studying both sides' arguments and paying close attention
to the actual language of Article 8.5, agrees with Atlantic's position. If the LNG is delivered
to Spain and commingled with other natural gas, the Buyer's end user market is the market
served by the commingled natural gas. On the other hand, if the LNG is delivered ████
████████████████████████████ the end user market is ████████ customers.

50.          This view of "end user markets" was supported by Atlantic's expert witness,
Mr. Lapuerta, and GNA did not provide convincing rebuttal on this point. Mr. Lapuerta
made the following points in his March 2007 Witness Statement (¶¶4 and7):

"Many European gas buyers have signed long-term import contracts that contain the language 'buyer's end-user market' even though they do not deal directly with end-users."

"The practice of referring to 'end-users' was necessary in Europe to value gas accurately, even for buyers who sold to intermediaries."

51.         And then, after a discussion of the specifics that supported these general statements, Mr. Lapuerta concluded:

"In conclusion, the term "buyer's end-user market" is a way of focusing the analysis of value on the end-user who burns the gas.... The concept works with and without intermediaries, and whether the people who burn the gas happen to be in one country or two.  However, when a Buyer sells LNG in two different countries, it becomes possible to distinguish between the buyer's end-user markets in the two countries, and to determine different values of gas for particular LNG supplies."(¶22)

52.         Although there are many factors supporting the Tribunal's conclusion,[11] including the plain meaning of the words "end user," two points are of note:

53.

(a)    The principle of "fair and equitable," which is an overriding criterion for the Tribunal, requires that the actual market for the Train 1 LNG be considered.  It is difficult to accept GNA's claim that it is entitled to a Spanish based price when it is not selling Train 1 LNG in Spain.

54.

(b)    Article 8.5(c) entitles GNA to "a reasonable rate of return on the LNG delivered hereunder."  The test to be applied under Article 8.5(c) requires that the actual sales price of the "LNG delivered hereunder" be taken all into account, along with the all the distribution costs related to those sales, in determining whether GNA has obtained a reasonable rate of return.  In the case of commingled supplies, the average sales price for such supplies would be a reasonable basis to determine the sales price of the LNG.  Where the LNG is delivered ▮▮▮▮▮ it is the market price ▮▮▮▮▮ that is relevant in making a determination under Article 8.5(c) of whether GNA is allowed to achieve a "reasonable rate of return."

---

[11]    Atlantic's expert testimony supports the view that the phrase "Buyer's end user market" is common in natural gas contracts and is understood to mean where the natural gas is consumed. See A1PHM ¶ ¶ 87 – 88.

(15)

55.         The Tribunal also considered the potential effect of this interpretation on the other delivery provisions of the Contract and found no adverse impact. ████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

56. ████████████ Thus, because of the ████████████████████████████████████ commonly understood meaning of "Buyer's end user market" as the ultimate destination for the LNG in question without regard to the number or nature of intermediaries, the Tribunal finds that Buyer's end user market is either Spain or ████████████ depending on where the LNG is delivered.

**3.    Establishing a price that takes into account both the ████████████ the Spanish markets.**

57.         Atlantic claims that "Buyer's end user market" has now moved to ████████████ and that the Contract Price should be based on the value of natural gas in the ████ ████████ market. Atlantic recognized that it was possible that the Train 1 LNG could be delivered to Spain ████████████████████, and suggested that GNA could request another price reopener under Article 8.5 if the ████████████ based price was not reflective of the value of natural gas in Spain.

58.         GNA found the Atlantic suggested approach of a second reopener unsatisfactory on two counts: (i) since Article 8.5(a) requires a change ████████ to trigger the right to a reopener, there may be no change ████████████████████████████████████████ "change" would have to occur after this reopener, as Article 8.5(a) specifically limits the reopener to changes occurring after the "latest Contract Price revision under this Article 8.5."

59.         GNA's defense and counterclaim maintained that only a Spanish based price was consistent with the provisions of the Contract. The Tribunal agrees that the Contract was drafted on the premise that the LNG would be delivered to and consumed in Spain. However, the price risk-sharing principle of Article 8.5, along with the agreed principle of "fair and equitable," requires that some recognition be given to the actual market destination and price received for the LNG.

60.         The Tribunal has concluded that the revised price should be constructed in a manner that will be adaptable depending on the Buyer's end user market at the time. The Tribunal's starting position is that the Contract was clearly intended to be Spanish based, and that it should always have a Spanish based price that meets the requirements of Article 8.5. The Tribunal also concludes that, since ████████████ should be the basis for determining the value of natural gas when the Train 1 LNG is being sold ████████████████ on a sustained basis, ████████████████████████████████████████████████████

61.          Atlantic initially objected to the continued use of a Spanish price on two grounds: (i) that it is unnecessary since the ███████████████████████████ ███████████ reopener clause will permit the price to be reopened as early as April 2008, so, whatever the destination of the LNG ██████ it could be repriced if necessary under a second reopener, and (ii) that a Spanish price set today is irrelevant and likely to be out of date ██████    However, on the final day of post-hearing argument, counsel for Atlantic suggested that a Spanish based price with a factor ███████████ would be acceptable.

62.          Although both of these objections raise some concern, the Tribunal believes that, on balance, they are not justification for abandoning the basic structure of the Contract, which contemplates deliveries to Spain. Although it is possible to limit our price horizon to a three-year period, the Tribunal, conscious of the substantial cost and effort involved in a reopener,[12] to say nothing of the potential commercial uncertainty affecting the parties during the many months required to complete a reopener proceeding, believes that it should fashion a remedy that takes into account all the known factors today.

63.          Establishing a revised Spanish price also responds to GNA's concern about the availability of future price reopeners if a ███████████ price is adopted. By establishing a Spanish price at this time, based on the current circumstances, both Atlantic's and GNA's rights to a reopener will be preserved with respect to any future changes in the Spanish market.

64.          GNA objects to a ███████████ price on the grounds that: (i) it would fundamentally alter the Contract structure, ███████████ (ii) it would defeat future reopeners, (iii) it would be inconsistent with the Contract structure ███████████ ███████████ for Train 1 LNG, and (iv) in any event, maintains that swaps should be excluded.

65.          The Tribunal considers each of these:

66.          First, the Tribunal has considered the scope and intention of Article 2.6 and has concluded that ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ In fact, the basis for GNA's counterclaim is that a change in the value of natural gas in the Spanish end user market requires a price adjustment. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ In the Tribunal's view, if the price level received by GNA in Spain would justify a change in price under Article 8.5, receiving the same price in ███████████ would require a similar price adjustment. For GNA to claim that sales through the Spanish facilities can be considered in a

---

[12]          This price reopener Arbitration has cost the parties almost ███████████.

(17)

price reopener but sales through ████████ cannot is ████████████████
████████████████████████

67. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

68.          Thus, the Tribunal finds no inconsistency between a ████████████
Adjustment and the basic structure of the Contract, ████████████

69.          Second, GNA objects to a ████████████ price on the ground that such a price
could not be reopened under Article 8.5(a) in the future because a change in ████████████
would not satisfy the Article 8.5(a) requirement of a change ████████ Because of that limit
on further price reopeners, GNA claims that, if and when it resumes Spanish deliveries, it
would not be in a position to reopen the price based on Spanish market conditions at that
time.  GNA's concern is unfounded in light of the Tribunal's decision to also establish a
revised Spanish price at this time.  The newly established Spanish price will be based on
████████████████████████████ a reopener will
be permitted.  Whether a reopener of the price specified in this Award may also be made on
the basis of changed economic circumstances in ████████████████████████████ is
not before this Tribunal and we express no opinion on that issue.

70.          With respect to the ████████████████ Adjustment, it is anticipated that a
████████ based price will continue to reflect the ████████████ market.  It is noteworthy that
the ████████████████████ that was drafted contemporaneously with the
GNA/Atlantic Contract ████████████████
████████████████ where a formula tied to actual market prices is applied, and
automatically adjusts to market conditions.  Atlantic has expressly adopted this view[13] and
consequently agrees that if a ████████████ price is adopted no further reopeners would be
necessary because the Contract Price would automatically adjust to market conditions.

71.          Third, GNA's claim of internal Contract inconsistency and inconsistency with
the ████████████ Train 1 Contract is composed of several points:

72.

          (i)     GNA claims that establishing a ████████████ based price would somehow
impair its Force Majeure rights.  GNA reasoning is difficult to follow.  GNA
claims that Atlantic denied its Force Majeure claim when ████████ was out of
service, ████████████████████████ The
Tribunal finds nothing inappropriate about Atlantic's position — traditionally,
Force Majeure excuse is available only when a party is prevented from

---

[13]     A1PHM ¶ 59.

performing and any ability of GNA to perform ██████████ would negate a traditional Force Majeure claim. But even apart from the scope of Force Majeure protection ███████████████████████████████████████████ ██████████ the Tribunal can see no reason how a change in the pricing formula for such sales would impact GNA's Force Majeure rights.

73. 

74. (iii)    Finally, GNA claims that the original arrangement ██████████ GNA and Atlantic created a two market 60/40 hedge, and this original hedge should not be



disturbed by pricing any portion of GNA quantities using ███████ prices. The Tribunal finds no language in the Contract referring to this hedging relationship and, at most, finds it to be a concept that might have been discussed but was not reflected directly within the Contract provisions. The benefits of the hedge would accrue primarily to Atlantic and, since Atlantic is the party requesting a ███████ price, it is implicitly abandoning any claim to the protection of that hedging function in the future. In fact, Atlantic denies that it ever intended to create a hedge.[15] Under these circumstances, we do not see that GNA has any standing to object to Atlantic's request for a ███████ price on the grounds that it could destroy a hedge.

75.          Fourth, GNA claims that any ███████ based price should not apply to swaps. GNA claims that a swap is fundamentally different from a resale, ███████

███████ GNA claims that in the case of such swaps, the Buyer's end user market is where the swapped LNG is delivered. The Tribunal accepts the logic of this position, and excludes swaps from the ███████ Adjustment.

### 4.    Calculation of a revised Contract Price



77.          In reviewing the pricing data prepared by the parties, the Tribunal noted that there appeared to be timing lags that made it difficult to establish strong correlations between various data categories. The Tribunal has determined to make all its comparisons by computing averages – for the first five years (2000 – 2004) and for the reopener period (2005 – 1Q 2007). Using these averages creates less volatility and improves analysis of data category correlation. Using data values based on the 2005 – 1Q 2007 averages do not completely eliminate timing distortions or other market quirks, but it does make it possible to ___ general trends and permit reasonable comparisons. As a consequence, the Tribunal has d___mined that the 2005 - 1Q 2007 averages are the best available basis for constructing the r___ed price formula.

---

[15]    A___ M ¶ ¶ 73 – 74.

[16]    See e.g. Escudero Witness Statement, ¶ 42; Stehn Reply Witness Statement, ¶ 3.

(a)    Revised Spanish price

78.        GNA has shown that the value of natural gas in Spain has not increased as fast as the Contract Price. There is significant discrepancy in the parties' estimate of Spanish natural gas values, but, even using the highest estimates offered by Atlantic of prices in the liberalized market, natural gas values have increased less than the Contract Price. There are two responses to this situation: (i) adjust the ██ index formula, with the objective of rebasing to current conditions or (ii) adopt a netback pricing formula for Spain.

79.        Although the Tribunal believes that the netback approach is likely to best serve the original intent of the parties, establishing an invoice-based netback system is a complex matter. Since the idea of a Spanish netback was raised after the extensive briefing of this matter and after the evidentiary hearings, the Tribunal is reluctant to venture into this area at the eleventh hour. Consequently, in setting a Spanish price, we confine ourselves to dealing with the initial claim and counterclaim to adjust the ████████ index formula.

80.        Although there is some evidence that the ██ index is no longer the best measure of natural gas prices ███████████████████████████████████████████████████████████████████████████████████████████ Consequently, the Tribunal believes that it is reasonable to continue to use the basic formula in Article 8.1, but with an adjustment to Po to reflect the impact of the liberalized market.

81.        In reaching this conclusion, the Tribunal first considered Atlantic's claim for an adjusted Spanish price. There are two aspects to this request: (i) to delete the reference to ████ in the formula █████████████████████████████████ and (ii) to add an additional ████ to the price to reflect the value of ███████████████████████████ ████████████████████████

82.        The elimination of ████ from the formula is premised on the significant reduction in ████ consumption in Spain. GNA contends that ████ is still burned, although there is a dispute on the precise definition of ████ and, in any event, ████ is still used to index natural gas contracts. The Tribunal calculates that removing ██████████████████████████████████████████████████ Although this is a meaningful amount, it is not of the magnitude that would, in and of itself, support a revision to the price formula. ████████████████████████████████████████





---

[17]    GNA First Post-Hearing Submission, ¶ 264, Table 4.

[18]    ████████████████████████████████████████████████████████████

83.        Atlantic has conceded that GNA's figures show ████████████ but critiques that figure on the ground that it includes power generators, which were not part of the market in 1995 when the original weightings were established.[19]  However, Atlantic's objection is not persuasive, as the price reopener is required to take all new developments that affect value into account; the restructuring of the gas end user market to include power generation is as important as the newly imposed environmental limitation on the consumption of ████

████████████████████████████████████████████████████

84.        Consequently, Atlantic has failed to meet its burden under Article 8.5, to justify a modification of the components or the weightings in the ██ index formula.

85.        The next adjustment requested by Atlantic is a ████ price increase representing ████████████████████ The Tribunal cannot find any basis for such an additional adjustment.

████████████████████████████████████████████████████

86 ████████████████████████████████████████████████

87.        The Tribunal next considered GNA's request that the Po be adjusted by way of a "K factor" to rebase the Contract Price ████████████ The Tribunal is sympathetic to GNA's request. ████████████████████████████████ However, because it was the original intent that the LNG be delivered to Spain, it is consistent with that intent to provide a price that will allow GNA to sell in Spain at the margins contemplated in the original agreement.

88.        The Tribunal recognizes that the actual level of natural gas prices in Spain is difficult to measure. ████████████████████████████████████████

████████████████████████████████████████████████████

---

[19]     A1PHM ¶ 221.

[20]     A1PHM ¶ 109.

89.  This divergence could go either way, to the equal benefit or detriment of the parties. Moreover, tweaking the formula ████████████████████████ does not appear to increase the chances that the formula will correlate with natural gas prices. However, the reopener provision will remain available should there be meaningful divergence in the future.

90.           Based on the above, the Tribunal awards the following formula for the Spanish price ("SP"):

91.           The basis for the revision of



93.    This formula adjustment is intended to preserve the original relationship between the value of natural gas in Spain and the Contract Price.

(b)    █████████ <u>Market Adjustment</u>

94.    The Tribunal finds that ███ indices are not an appropriate method for indexing the value of natural gas in ██████████ The Tribunal is persuaded that ███████████ █████ prices, ███████████████████████████████████████████████████████ ██████████████ can be used to calculate a █████████████████ Adjustment to apply when Train 1 LNG is sold on ██████████ basis for consumption in ███████████



98.     The ███████████ Adjustment ("N") to be applied when buyer's end user market is ██████████ is as follows:



99.

100

101

102



103.

104.

105.

106.

107.

---
22    See footnote 21 *supra.*





112.        The details of the new pricing formula are set out in the Award which shows the changes to the relevant provisions of Article 8.

### 5.        Application of the reasonable rate of return requirement of Article 8.5(c).

113.        As previously discussed, Article 8.5(c) provides that the revised contract price shall allow GNA to achieve "a reasonable rate of return on the LNG delivered hereunder" under conditions of "sound marketing practices and efficient operations," and the Tribunal considers this provision to act as a floor for the protection of GNA.

114.

115.        There has been no showing that GNA's resale arrangements ▮▮▮▮▮ are inconsistent with "sound marketing practices" specified under Article 8.5(c); and therefore Atlantic's proposed price increases must be rejected because, among other reasons, they would deny GNA the "reasonable rate of return" to which it is entitled under Article 8.5(c).

116.        The parties offer differing approaches to the calculation of "reasonable rate of return." GNA argues that "rate of return" refers to a margin over sales. Atlantic argues that "rate of return" refers to a return on investment. The Tribunal is of the view that "rate of return" within the meaning of Article 8.5(c) refers to a profit margin that GNA is entitled to recover on sales of the Train 1 LNG. This interpretation is consistent with the language of Article 8.5(c), which mandates that the revised Contract Price shall allow GNA to achieve a reasonable rate of return "on the LNG delivered hereunder," by GNA's role as natural gas reseller and by the testimony of Messrs. Stehn and Escudero who were involved in the 1995 Contract negotiations.

117.         The new price formula specified in this Award will allow GNA to earn a reasonable rate of return



118



119.         The Tribunal believes that GNA is entitled to a portion of the upside of the energy price environment.  This conclusion is supported by the pricing formula originally chosen for Article 8.1, which was intended to link the rise of the Contract Price to the rise in the value of natural gas.  It is also supported by the history of the 1995 negotiations, where  Atlantic sought GNA as a partner to commit to the off-take of Train 1 LNG under firm take-or-pay terms.  GNA's willingness to participate was one of the key elements permitting the project to proceed.

120

## 6.     Effective date of the Award

121.         The recalculated Contract Price shall be applied to cargoes delivered from and including April 21, 2005 and a net amount due from one party to the other shall be calculated and paid within  ninety (90) days of the date of this Award.  Although the Tribunal recognizes that it is empowered to apply the revised price as of any date from and including April 21, 2005 forward, the Tribunal has decided to apply it retroactively as Atlantic requested.  The Tribunal recognizes that there will be some administrative burden in recalculating cargo invoices since April 2005, but agrees that a party is entitled to retroactive application if it so requests.

### 7.    Interest

122.          The recalculated price shall not bear interest.  The Contract provides for the payment of interest on late payment of invoices but does not include any interest factor for adjustments to provisional invoices (Article 9.1 (e)), nor is there any reference to interest in Article 8.5 with respect to the retroactive adjustment of the Contract Price.  Under these circumstances, the Tribunal concludes that the retroactive adjustments required hereunder shall not bear interest.  However, the parties are allowed ninety (90) days from the date of this Award to calculate the net amounts due for all past deliveries.  Amounts not settled by that date shall bear interest thereafter at the rate established under Article 9.4.

123.

### 8.    The cost submissions of the parties

124.          Both parties have requested an award of their costs of legal representation and assistance.  The Contract makes no specific provision for an award of costs.  The issue of costs therefore is governed by Article 38 of the UNCITRAL Arbitration Rules, which provides that the arbitral tribunal shall fix the reasonable costs for legal representation "of the successful party."  Article 38 (e).  See also Article 40.1 providing for the costs of arbitration to be borne by the "unsuccessful party."  The Tribunal concludes that both Atlantic and GNA are "successful" with respect to a part of their claims or counterclaims and that neither can be regarded as "the unsuccessful party."



125.          Accordingly, each party shall bear its own costs of legal representation.

126.          The total fees and expenses of the Arbitral Tribunal amount to ▉▉▉▉▉ and are set out separately as follows:

127.

          Gerald Aksen
          Eugene A Massey
          Ben H. Sheppard, Jr.

128.          Said fees and expenses incurred by the arbitrators shall also be borne equally by the parties.  The advance deposits by the parties of ▉▉▉▉ and interest of ▉▉▉ on the Escrow Account bring the Account total to ▉▉▉▉ leaving a balance of ▉▉▉ that is due and owing to the Tribunal.

III.    **AWARD**

129.        For the reasons set out above in this Final Award, the Tribunal renders its Award as follows:

130.            1.    **The Tribunal amends Articles 8.1, 8.3 and 8.4 of the Contract, applicable to all deliveries of LNG under the Contract from and including  April 21, 2005, to read as follows:**

ARTICLE 8 - PRICE



██████████████ are the base values of ███████████, respectively, and
have the following values:



For the avoidance of doubt:



8.3    Preliminary Contract Price

If for any reason, any relevant value necessary for the determination of ▓ and/or ▓ and/or ▓ (or, in the case the "N" value in the price formula in Article 8.1 needs to be calculated, the value for �k) is not available at the time an invoice is to be issued, a preliminary Contract Price shall be determined using the monthly values of ▓ and/or ▓ and/or ▓ and/or ▓▓▓▓▓▓ as are then available for the relevant Months of the Reference Period and using for the remaining Month(s) of the Reference Period for which such values are not yet available, the value for the latest Month then available. If there is uncertainty whether the "N" value in the price formula in Article 8.1 will apply to a given ▓▓▓▓, the price formula shall be calculated without including ▓▓▓, if it is subsequently determined that N should be included for that ▓▓▓▓ the price formula shall be recalculated and applied retroactively.

Appropriate adjustments shall be made as soon as reasonably practicable after all values of ▓▓▓▓ ▓▓▓▓ necessary for the computation of the final Contract Price become available (and any redetermination of the applicability of N is made), in the manner provided in Articles 9.1(d) and 9.1(e).

8.4    Problems in Calculation of Contract Price

In the event that on any ▓▓▓▓▓▓▓▓ cannot be calculated as a result of:

    (i)    the failure of the publisher of ▓▓▓▓ ▓▓▓▓▓▓▓▓ to publish relevant index on any day or days within the Reference Period; and/or

    (ii)    the cessation or the suspension of the publication in ▓▓▓ ▓▓▓▓▓▓▓▓▓ of any relevant index;

or if the calculation of the Contract Price is seen to be problematic by either Party due to:

    (iii)    the basis upon which any index is calculated having changed such that the index no longer reflects the value of the commodity to which it refers or the quality or type of commodity to which such index refers has changed materially; and/or

    (iv)    any index has been wrongly computed and published in error;

either Party may notify the other of any of points (i) to (iv) of this Article 8.4 and the Parties shall meet and endeavour to agree upon an amendment

to, or replacement of, such index which amendment or replacement shall achieve as closely as possible the intent and objective of the original index. If within ninety (90) days of the service of such notice no agreement has been reached then at the request of either Party the matter shall be referred to an Expert for determination.

131.        **2. The recalculated Contract Price shall be applied to cargoes delivered from and including April 21, 2005 and a net amount due from one Party to the other shall be calculated and paid within ninety (90) days of the date of this Award.**

132.        **3. Interest on the recalculated price and retroactive adjustments is denied; however, if the amount due as a result of recalculating the Contract Price for past deliveries is not paid within ninety (90) days of the date of this Award, then interest shall accrue at the rate provided in Article 9.4 of the Contract.**

133.        **4. Each party shall bear its own costs as they have already been incurred, including the costs of legal representation and assistance and the fees and expenses of the Tribunal. There is a shortfall in the Escrow Account of US$20,582. Accordingly, each party shall pay an additional US$10,291 to the Escrow Account within twenty-one (21) days of receipt of the Award, to cover the remaining balance of the fees and expenses due to the Tribunal.**

134.        **5. This Award is in full settlement of all claims and counterclaims submitted in this arbitration. All claims for relief not expressly granted above are hereby denied.**

**MADE BY THE ARBITRAL TRIBUNAL**

_____
Gerald Aksen, Chairman

_____
Eugene A. Massey

_____
Ben H. Sheppard, Jr.

New York, New York, U.S.A. (as the Place of Arbitration)

Dated: January 17, 2008

(34)

**EXHIBIT B**

# LNG SALES CONTRACT

## Between

## Atlantic LNG Company of Trinidad and Tobago
## and
## ENAGAS, S.A.

Dated

## 27 July, 1995

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 - DEFINITIONS | | 2 |
| | | |
| ARTICLE 2 - SCOPE | | 10 |
| 2.1 | Sale and Purchase | 10 |
| 2.2 | Natural Gas Supply | 10 |
| 2.3 | Trinidad Facilities | 11 |
| 2.4 | Enagas Receiving Facilities | 11 |
| | | |
| ARTICLE 3 - DURATION OF CONTRACT | | 15 |
| 3.1 | Initial Term | 15 |
| 3.2 | Extension Period | 15 |
| 3.3 | Other Extensions | 16 |
| | | |
| ARTICLE 4 - INITIAL SUPPLY PERIOD OBLIGATIONS | | 17 |
| 4.1 | Date of Initial Supply | 17 |
| 4.2 | LNG Deliveries During Initial Supply Period | 17 |
| 4.3 | Date of First Commercial Supply | 18 |
| | | |
| ARTICLE 5 - QUANTITIES | | 20 |
| 5.1 | Fixed Quantities | 20 |
| 5.2 | Rate of Deliveries | 20 |
| 5.3 | Determination of Quantity Deficiencies and ACQ Adjustments | 21 |
| 5.4 | Make-Up LNG | 24 |
| 5.5 | Excess Quantities | 28 |
| 5.6 | Allocation of Deliveries Between Buyer and Other Purchasers | 30 |
| 5.7 | Special Maintenance ACQ Adjustment | 31 |
| 5.8 | Expansion Quantities | 32 |
| | | |
| ARTICLE 6 - LOADING AND TRANSPORTATION | | 35 |
| 6.1 | Buyer's Obligation to Provide Transportation | 35 |
| 6.2 | LNG Tankers | 35 |
| 6.3 | Loading Port Facilities | 39 |
| 6.4 | Loading Port Obligations | 40 |
| 6.5 | Cargo Loading | 41 |
| 6.6 | Notifications of Estimated Time of Arrival at Loading Port and Cooling Requirements | 41 |
| 6.7 | Notice of Readiness | 43 |
| 6.8 | Tank Temperature for Loading and Statement of Cooling Time | 43 |
| 6.9 | Quantities for Purging and Cooling of Tanks | 44 |
| 6.10 | Loading Time | 44 |

6.11  Demurrage and Excess Berth Occupancy ..................................46
6.12  Effect of Loading Port Delays ...............................................46
6.13  Vessels Not Ready for Loading ..............................................47

ARTICLE 7 - SCHEDULING .............................................................48
7.1   Exchange of Information .......................................................48
7.2   Annual Delivery Programme ..................................................49
7.3   Ninety-Day Schedules .........................................................50
7.4   Adjustments to Scheduled Loading Dates or Scheduled
      LNG Tankers .....................................................................51
7.5   Buyer's Request to Schedule Less than the ACQ .......................52

ARTICLE 8 - PRICE .......................................................................53
8.1   Contract Price ...................................................................53
8.2   Calculations .....................................................................54
8.3   Preliminary Contract Price ...................................................54
8.4   Problems in Calculation of Contract Price ...............................54
8.5   Contract Price Reopener ......................................................55
8.6   Price For Quantity Deficiencies .............................................57

ARTICLE 9 - INVOICING AND PAYMENT ............................................58
9.1   Cargo Invoices and Documents .............................................58
9.2   Invoices for Quantity Deficiencies; Annual Statement ................59
9.3   Other Invoices ..................................................................60
9.4   Invoice Due Dates .............................................................61
9.5   Payment ..........................................................................62
9.6   Seller's Rights Upon Buyer's Failure To Make Payment ..............62
9.7   Disputed Invoices ..............................................................63

ARTICLE 10 - QUALITY ..................................................................64
10.1  Gross Heating Value ...........................................................64
10.2  Components ......................................................................64
10.3  Density ............................................................................64

ARTICLE 11 - MEASUREMENTS, TESTS AND ANALYSIS ..........................65
11.1  Parties To Supply Devices ....................................................65
11.2  Selection of Devices ...........................................................65
11.3  Tank Gauge Tables of LNG Tankers ........................................65
11.4  Gauging and Measuring LNG Volumes Delivered ......................66
11.5  Samples for Quality Analysis ................................................68
11.6  Quality Analysis ................................................................69
11.7  Operating Procedures .........................................................70
11.8  Btu Quantities Sold and Delivered .........................................70
11.9  Verification of Accuracy and Correction for Error ......................72
11.10 Disputes ..........................................................................73
11.11 Costs and Expenses of Test and Verification ............................73

ARTICLE 12 - TITLE AND RISK OF LOSS .............................................74

ARTICLE 13 - FORCE MAJEURE ..................................................................75
   13.1  Events of Force Majeure ............................................................75
   13.2  Notice:  Resumption of Normal Performance ..................78
   13.3  Settlement of Industrial Disturbances ...............................79
   13.4  Seller's Rights Upon Buyer's Force Majeure ...................79
   13.5  Apportionment of Supplies .....................................................79
   13.6  Application of Buyer's Force Majeure Relief ...................80

ARTICLE 14 - DUTIES, TAXES AND OTHER GOVERNMENTAL CHARGES ..................81
   14.1  Seller's Obligation ...................................................................81
   14.2  Buyer's Obligation ...................................................................81

ARTICLE 15 - SELLER'S WARRANTY AND INDEMNITY ...........................................82

ARTICLE 16 - EXPERT ..................................................................................83
   16.1  Scope ............................................................................................83
   16.2  Procedure ...................................................................................83
   16.3  New Expert ..................................................................................84
   16.4  Expert Not an Arbitrator .......................................................84
   16.5  Final and Binding Determination ........................................84
   16.6  Costs .............................................................................................85

ARTICLE 17  - APPLICABLE LAW ...................................................................86

ARTICLE 18  - ARBITRATION .........................................................................87

ARTICLE 19 - LIABILITIES .............................................................................88
   19.1  Consequential Loss or Damage .........................................88
   19.2  Tortious Liability .......................................................................88
   19.3  No Third Party Beneficiaries ................................................88
   19.4  Buyer's Liability for Failure to Take LNG ..........................88
   19.5  Seller's Liability for Failure to Deliver LNG .......................88
   19.6  Liability; Relationship of Shareholders and Affiliates..........90

ARTICLE 20 - CONFIDENTIALITY ...................................................................91

ARTICLE 21 - NOTICES ................................................................................93

ARTICLE 22  - ASSIGNMENT .........................................................................95

ARTICLE 23 - MISCELLANEOUS ....................................................................96
   23.1  Amendment ...............................................................................96
   23.2  Waiver .........................................................................................96
   23.3  Exchange of Information ........................................................96
   23.4  Headings .....................................................................................96

ARTICLE 24 - CONDITIONS PRECEDENT ...................................................................97
    24.1  Required Arrangements and Approvals ..............................................97
    24.2  Mutual Undertakings .............................................................................98
    24.3  Right of Waiver .....................................................................................99
    24.4  Extension of Arrangements Date .........................................................99
    24.5  Termination ...........................................................................................99

SCHEDULES

    A:  LNG TANKER SPECIFICATIONS................................................................101
    B:  TERMS OF CHARTER FEE REIMBURSEMENT.. ..........................................103

# LNG SALES CONTRACT

This **LNG SALES CONTRACT** ("Contract"), dated as of the 27th day of July, 1995, is made by and between

**ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO**, a company incorporated under the laws of the Republic of Trinidad and Tobago with a place of business at Scotia Centre, Port of Spain, Trinidad ("Seller"), on the one hand,

and

**ENAGAS, S.A.**, a corporation organized under the laws of Spain, with a principal place of business at Avda. America, 38, 28028 - Madrid, Spain ("Buyer"), on the other hand. Seller and Buyer are sometimes referred to herein individually as a "Party" or collectively as the "Parties."

In consideration of the mutual agreements contained herein, Seller and Buyer hereby agree as follows:

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 1 - DEFINITIONS

The International System of Units (SI) units used herein are not redefined herein.  The terms or expressions set forth below will have the following meanings when used in the Contract and where the context permits the singular shall include the plural and vice versa:

Affiliate
A company, partnership or other legal entity which controls, or is controlled by, or which is controlled by an entity which controls, a Party.  For the purposes of this definition, control means the ownership directly or indirectly of fifty (50) percent or more of the shares or voting rights in a company, partnership or legal entity.

Actual Loading Time
As defined in Article 6.10.

Allotted Loading Time
As defined in Article 6.10.

Annual Contract Quantity (ACQ)
As defined in Article 5.1.

Annual Delivery Programme
As defined in Article 7.2.

Annual Quantity Deficiency
As defined in Article 5.3(a).

Annual Statement
As defined in Article 9.2(b).

Approvals Date
As defined in Article 24.1.

Arrangements Date
As defined in Article 24.1

Arrival Temperature Requirement
As defined in Article 6.8.

2

**LNG SALES CONTRACT**
**DATED 27 JULY, 1995**
**BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD**
**AND TOBAGO AND ENAGAS**

<u>Base Rate</u>
The rate of interest announced from time to time to the press by Citibank, N.A., New York ("Citibank") as Citibank's base rate, which may not be the lowest rate charged by Citibank to its borrowers. If there is any doubt as to the base rate for any period, a written confirmation signed by an officer of Citibank shall conclusively establish the base rate in effect for such period. In the event that Citibank shall for any reason cease quoting a base rate as described above, then a comparable rate shall be determined using rates then in effect and shall be used in place of the said base rate.

<u>British Thermal Unit (Btu)</u>
One Btu = 1,055.056 Joules.

<u>Business Day in Spain</u>
Every day other than Saturdays on which commercial banks are ordinarily open for business in the city of Madrid, Spain.

<u>Buyer's Transporter(s)</u>
A person or persons engaged by Buyer to provide marine transportation of LNG purchased hereunder.



<u>Calendar Year</u>
A period of twelve (12) Months commencing on January 1 and ending on December 31.

<u>Cargo</u>
As defined in Article 6.5(a).

3

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Commercial Provisions
As defined in Article 5.8.

Contract Price
As defined in Article 8.1.

Contract Year
A period of twelve (12) calendar months commencing on October 1 of one
Calendar Year and ending on September 30 of the following Calendar Year,
except for the first Contract Year, which shall commence on the Date of First
Commercial Supply and end on the following September 30.

Date of First Commercial Supply
As defined in Article 4.3.

Date of Initial Supply
As defined in Article 4.1.

Default Notice
As defined in Article 9.6(a).

Delivery Point
The point at the Loading Port at which the flange coupling of Seller's loading
line joins the flange coupling of the LNG loading manifold on board any LNG
Tanker.

Economic Excess Proved Reserves
As defined in Article 3.2.

Enagas Receiving Facilities
As defined in Article 2.4.

Estimated Cargo Content
As defined in Article 7.2(b).

ETA
Estimated time of arrival as defined in Article 6.6(a).

███████████████████

As defined in Article 2.5.

4

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Expert
As defined in Article 16.

Extension Period
As defined in Article 3.2.

Force Majeure
As defined in Article 13.

Gas Suppliers
As defined in Article 2.2.

Gas Supply Contracts
As defined in Article 2.2.

Gross Heating Value
The quantity of heat, expressed in British Thermal Units, produced by the complete combustion in air of one unit (mass or volume) of anhydrous Natural Gas, at a temperature of 60.0 degrees Fahrenheit (15.55556°C) and an absolute pressure of 14.73 pounds per square inch, with the air at the same temperature and pressure as the Natural Gas, after cooling the products of the combustion to the initial temperature of the Natural Gas and air, and after condensation of the water formed by combustion.

Iberian Receiving Facilities
As defined in Article 2.4.

Initial Supply Period
The period commencing on the Date of Initial Supply and ending on the Date of First Commercial Supply.

Initial Term
As defined in Article 3.1.

Liquefied Natural Gas (LNG)
Natural Gas in a liquid state at or below its boiling point at a pressure of approximately one (1) atmosphere.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

<u>LNG Tanker</u>
An ocean-going vessel, meeting the requirements of Article 6.2, suitable for transporting LNG, which is used by Buyer for transportation of LNG delivered under this Contract.

<u>Loading Port</u>
The port of La Brea where the Trinidad Facilities are located.

<u>Long Term Excess Quantity</u>
As defined in Article 5.5.

<u>Make-Up LNG</u>
As defined in Article 5.4, including Take or Pay Make-Up and Force Majeure Make-Up.

<u>MMBtu</u>
One million (1,000,000) Btus.

<u>Month</u>
A calendar month.

<u>Natural Gas</u>
Any hydrocarbons or mixture of hydrocarbons and other gases consisting predominately of methane which are or is in a gaseous state at atmospheric pressure and a temperature of fifteen (15) degrees Celsius.

<u>Negotiating Period</u>
As defined in Article 5.8.

<u>Ninety-Day Schedule</u>
As defined in Article 7.3.

<u>Notice of Readiness</u>
As defined in Article 6.7.

<u>Other Purchasers</u>
While the Trinidad Facilities capacity consists of only one liquefaction train as defined in Article 2.3, ███████ any entities who assume in whole or part the obligations (other than on a spot sale basis) thereof under the ███████ Contract, and in addition, in the event the capacity of the Trinidad Facilities is expanded beyond a single liquefaction train, all purchasers of LNG from the Trinidad Facilities under contracts having a duration of at least five (5) years.

6

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Primary Tanker
As defined in Article 6.2.

Proved Reserves
Natural Gas reserves which can be estimated with reasonable certainty to be
recoverable under current economic conditions, as determined in
accordance with the definitions for oil and gas reserves established by the
Society of Petroleum Engineers and in effect on the date of execution of this
Contract.

Provisional Invoice
As defined in Article 9.1(d).

Quarterly Price Review Date
As defined in Article 8.1.

Reference Period
As defined in Article 8.1.

Regasified LNG
Natural Gas derived from LNG.

Reserves
As defined in Article 2.2(a).

Reserves Audit Report
As defined in Article 2.2(a).

Round-Up Request
As defined in Article 5.3(a)(vi).

Scheduled LNG Tanker
As defined in Article 7.2(c).

Scheduled Loading Date
As defined in Article 7.3.

Second Train LNG
As defined in Article 5.8.

Second Train Quantity
As defined in Article 5.8.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

<u>Secondary Tanker</u>
As defined in Article 6.2.

<u>Spanish Receiving Facilities</u>
As defined in Article 2.4.

<u>Special Maintenance Adjustment</u>
As defined in Article 5.7.

<u>Spot Excess Quantity</u>
As defined in Article 5.5.

<u>Standard Cubic Foot</u>
As defined in Article 10.1.

<u>Statement of Cooling Time</u>
As defined in Article 6.8.

<u>Substitute LNG Tanker</u>
As defined in Article 6.2(b).

<u>Summer Period</u>
As defined in Article 5.1(a).

<u>Summer Quantity</u>
As defined in Article 5.1(a).

<u>Supply Date</u>
As defined in Article 24.1(b)

<u>Tested Facilities</u>
As defined in Article 2.3.

<u>Winter Period</u>
As defined in Article 5.1(a).

<u>Winter Quantity</u>
As defined in Article 5.1(a).

**LNG SALES CONTRACT**
**DATED 27 JULY, 1995**
**BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD**
**AND TOBAGO AND ENAGAS**

<u>Winter Period Quantity Deficiency</u>
As defined in Article 5.3(a).

Whenever in this Contract a matter is stated to be in the "sole option" or "sole discretion" of a Party, it is acknowledged that the exercise of such option or discretion may not be challenged in any legal or arbitral proceeding whatsoever.

References in this Contract to Articles or Schedules are to the Articles and Schedules of this Contract.  With respect to the definitions contained in this Article 1, a reference to the singular shall include the plural, and vice versa, where the context so requires.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

ARTICLE 2 - SCOPE

2.1    <u>Sale and Purchase</u>

Seller agrees to sell and deliver to Buyer at the Delivery Point, and Buyer agrees to purchase, receive at the Delivery Point and pay for, or to pay for if not taken, LNG in the quantities, at the price and in accordance with the other terms and conditions set forth in this Contract.

2.2    <u>Natural Gas Supply</u>

(a)    Seller has obtained from a supplier of Natural Gas in Trinidad ("Gas Supplier") and shall furnish to Buyer upon execution of this Contract a reserves audit report ("Reserves Audit Report") from an independent petroleum engineering consultant firm of recognized standing in the petroleum industry, qualified by reputation and experience in estimating reserves of Natural Gas in subsurface reservoirs, expressing its estimate of the quantity of Proved Reserves of Natural Gas from various specified reservoirs in the Republic of Trinidad and Tobago ("Reserves").

(b)    Seller covenants that it shall use reasonable endeavours to execute by the Supply Date a contract with a Gas Supplier ("Gas Supply Contract") for the supply of quantities of Natural Gas from the Reserves to be liquefied and sold as LNG hereunder during the Initial Term of this Contract (and, subject to Article 3.2, during any Extension Period) and during the initial term of the ███ Contract, which Gas Supply Contract shall contain the following provisions:

(i)    the quantities of Natural Gas that Seller shall contract for under the Gas Supply Contract shall be sufficient, in Seller's opinion, to allow Seller to satisfy its obligations during the Initial Term of this Contract and during the initial term of the ███ Contract.

(ii)    the Gas Supplier shall have the right pursuant to the Gas Supply Contract to substitute for any portion of the Reserves alternative Proved Reserves, provided that the Gas Supplier provides to Seller a reserves audit report from an independent petroleum engineering consultant firm demonstrating the existence and sufficiency of such

10

alternative Proved Reserves. The Gas Supplier shall also have the right to utilise excess Proved Reserves from the Reserves and to sell to third parties or otherwise dispose of such excess, if it has provided to Seller updated Reserves Audit Reports showing that sufficient Proved Reserves exist in excess of those required to satisfy Seller's rights as purchaser under the Gas Supply Contract. Seller covenants and agrees that the Gas Supplier's exercise of a right to substitute Proved Reserves or to utilise, sell to third parties or otherwise dispose of excess Proved Reserves as aforesaid shall not relieve Seller of its obligations under this Contract.

2.3    Trinidad Facilities

Seller shall construct, and during the Initial Term of this Contract and any extension thereof, own and have access to and use of, and maintain and operate or cause to be maintained and operated, facilities in Trinidad including, without limitation, liquefaction plant facilities, onshore gas transmission pipelines from Abyssinia to the liquefaction plant, gas pre-treatment and processing facilities, storage tanks, utilities, jetty, berthing and loading facilities and all ancillary facilities (as all such facilities may be constructed, modified or expanded from time to time, the "Trinidad Facilities"), for the performance of its obligations under this Contract. All applicable laws and regulations shall apply to the maintenance and operation of such facilities.

2.4    Enagas Receiving Facilities

Enagas has previously constructed and owns LNG receiving terminal facilities at the ports of Barcelona, Huelva and Cartagena, Spain (the "Spanish Receiving Facilities") and contemplates the use of one or more additional LNG receiving terminals which may be constructed in either Spain or Portugal (the "Iberian Receiving Facilities" and, together with the Spanish Receiving Facilities, the "Enagas Receiving Facilities"). Enagas shall, directly or through an Affiliate, during the term of this Contract and any extension thereof, own, operate and maintain, or cause to be operated and maintained, or shall have free access to and use of, the Spanish Receiving Facilities and, if and when constructed (and if accessible on terms deemed commercially reasonable by Enagas), the Iberian Receiving Facilities, for the

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

performance of its obligations under this Contract.  All applicable laws, rules and regulations shall apply to the maintenance and operation of such facilities.



LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS



LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS



LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 3 - DURATION OF CONTRACT

3.1   Initial Term

This Contract shall become effective on the date of its execution and shall continue in effect for an initial term of twenty (20) Contract Years from the Date of First Commercial Supply ("Initial Term"), unless earlier terminated in accordance with Articles 9.6 or 24.5, or extended in accordance with Article 3.2.

3.2   Extension Period

(a)   At least sixty (60) days before the end of the fifteenth (15th) Contract Year, Seller shall obtain from the Gas Supplier and shall provide copies to Buyer of an updated Reserves Audit Report(s) indicating the quantity of Proved Reserves remaining in the Reserves estimated as of the end of the fifteenth (15th) Contract Year.  If the remaining quantity of such Proved Reserves is in excess of the quantity required to satisfy Seller's obligations under this Contract for the remainder of the Initial Term and for the remainder of the initial term under the ▆▆▆ Contract, and (i) the quantity of LNG resulting from the liquefaction can be economically produced and sold by Seller at the Trinidad Facilities in accordance with the terms hereof, and (ii) shipping is available to Buyer, this Contract shall be extended for one (1) extension period ("Extension Period"), the term of which shall correspond to the remaining life of the Proved Reserves satisfying the conditions described above ("Economic Excess Proved Reserves"), but not to exceed five (5) additional Contract Years.

(b)   If it is determined that the Economic Excess Proved Reserves are insufficient to  support production of LNG at the full ACQ under this Contract and ▆▆▆ Contract for the entire Extension Period, the Parties shall agree upon appropriate downward adjustments to the ACQ for all or any portion of the Extension Period and a corresponding adjustment shall be made to the ACQ under ▆▆▆ Contract, taking into account availability of shipping to both Buyer and ▆▆▆ for the reduced quantities. Nothing in this Article 3.2 is intended or shall be construed to limit the Gas Supplier's right(s) under the Gas Supply Contract, as described in Article 2.2(d), to substitute alternative Proved Reserves or to utilise, sell to third parties or otherwise dispose of

15

excess Proved Reserves; provided, however, that Seller represents that the Gas Supplier shall not exercise its right(s) to utilise, sell to third parties or otherwise dispose of excess Proved Reserves after the end of the fifteenth (15th) Contract Year unless and then only to the extent the remaining Economic Excess Proved Reserves at the time are in excess of the reserves required to support production of the full ACQ under this Contract and ██████ Contract for a period of five (5) Contract Years beyond the Initial Term.

3.3     Other Extensions

(a)     This Contract may be extended beyond the Initial Term or, if applicable, beyond the Extension Period, for delivery of Make-Up LNG, as provided in Article 5.4; provided, however that any such extension shall be solely for the purpose of Seller making available to Buyer Make-Up LNG as provided herein.

(b)     In the event, as a result of one or more events of Force Majeure affecting Seller, the initial delivery to Buyer of LNG hereunder is delayed beyond the latest date that would, but for the Force Majeure event(s), have been the Date of First Commercial Supply in accordance with Articles 4.1 and 4.3, each Party shall, within ninety (90) days of the date of the initial delivery to Buyer, notify the other Party whether or not the Initial Term can be extended by the period of delay. In making such notification, each Party shall take into account whether the delay has adversely affected, in the case of Seller, the operation of the Trinidad Facilities or the availability of sufficient Natural Gas pursuant to the Gas Supply Contract, and in the case of Buyer the availability of shipping. In the event either Party does not elect to so extend the Initial Term, quantities of LNG not delivered as a result of the Force Majeure delay shall not be subject to the provisions of Article 5.4 (f)(ii).

(c)     Provisions of this Contract which are intended, whether expressly or by implication, to apply only during the Initial Term or Extension Period, shall not be applicable during any extension pursuant to this Article 3.3 for the delivery of Make-Up LNG.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

<u>ARTICLE 4 - INITIAL SUPPLY PERIOD OBLIGATIONS</u>

4.1    <u>Date of Initial Supply</u>

Seller shall give Buyer periodic notices of its best estimate of the date upon which the first Cargo will be available for loading and delivery from the Trinidad Facilities to either Buyer ███████ in accordance with the procedure set forth in sub-paragraphs (a) through (d) below, with the final notice being given by Seller in accordance with sub-paragraph (d) below, which date so notified ("Date of Initial Supply" or "DIS") shall be the first day of the Initial Supply Period.  As of the date hereof, the Date of Initial Supply is targeted by Seller to be October 1, 1998, but it may be any day in the period from October 1, 1998 through September 30, 1999 ("First Window Period").

(a)    By October 1, 1996, Seller shall notify Buyer of a one hundred and eighty three (183) day window ("Second Window Period") falling within the First Window Period for the DIS.

(b)    By three hundred sixty-five (365) days in advance of the first day of the Second Window Period, Seller shall notify Buyer of a ninety (90) day window ("Third Window Period") falling within the Second Window Period for the DIS.

(c)    By one hundred eighty-three (183) days in advance of the first day of the Third Window Period, Seller shall notify Buyer of a forty-five (45) day window ("Fourth Window Period") falling within the Third Window Period for the DIS.

(d)    By thirty (30) days in advance of the first day of the Fourth Window Period, Seller shall notify Buyer of the Date of Initial Supply falling within the Fourth Window Period.

4.2    <u>LNG Deliveries During Initial Supply Period</u>

(a)    During the Initial Supply Period Seller shall use reasonable endeavors to make available to Buyer and Buyer shall use reasonable endeavors to take

17

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(i)    to the extent that the Initial Supply Period falls within the Winter Period, an amount equal to fifty percent (50%) of, and

(ii)    to the extent that the Initial Supply Period falls within the Summer Period, an amount equal to thirty-one percent (31%) of,

all the quantities of LNG available for loading and delivery from the Trinidad Facilities.

(b)    Seller shall notify Buyer at the end of each Month during the Initial Supply Period of the total quantity of LNG delivered under this Contract and under ▮▮▮▮▮▮Contract and of its good faith estimate of planned LNG deliveries to Buyer and ▮▮▮▮ in the remaining Month(s) in the Initial Supply Period, and shall update Buyer on its good faith estimate of the Date of First Commercial Supply.

4.3    Date of First Commercial Supply

The Date of First Commercial Supply shall be one hundred and twenty-one (121) days after the Date of Initial Supply or such earlier date as may be notified by Seller to Buyer after the Date of Initial Supply, such notice not to be given before the Trinidad Facilities have delivered

(i)    In the case or to the extent that the Initial Supply Period falls within the Winter Period, to each of Buyer and ▮▮▮▮▮▮ approximately five million six hundred thousand (5,600,000) MMBtus, during a period of thirty (30) consecutive days, and

(ii)    In the case or to the extent that the Initial Supply Period falls within the Summer Period, to Buyer approximately three million two hundred thousand (3,200,00) MMBtus, and ▮▮▮▮▮▮ approximately seven million two hundred thousand (7,200,000) MMBtus during a period of thirty (30) consecutive days;

provided, however, that in the event Seller has advised Buyer in accordance with Article 7.1(a) of the expected availability of the aforesaid quantities of MMBtus and has nominated such quantities in accordance therewith, and Buyer has not taken delivery thereof in accordance with Seller's nomination so as to prevent Seller from delivering said quantities within the 30-day period, Seller may notify Buyer of the Date of First Commercial Supply and ending of the Initial

18

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Supply Period when in its reasonable opinion Seller was capable of delivering said quantities within the thirty (30) day period.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 5 - QUANTITIES

5.1    Fixed Quantities

(a)    During each Contract Year, subject to Article 5.1(b) for the first Contract Year, Seller shall sell and deliver to Buyer, and Buyer shall purchase, receive and pay for, or pay for if not taken, at the Contract Price, subject to Article 8.6, a quantity of LNG having a total Btu content of fifty-six million eight hundred thousand (56,800,000) MMBtus ("Annual Contract Quantity" or "ACQ"), of which thirty-five million four hundred thousand (35,400,000) MMBtus ("Winter Quantity") shall be delivered by Seller and purchased, received and paid for by Buyer, or paid for if not taken, in the period October 1 - March 31 of each Contract Year (the "Winter Period") and twenty-one million four hundred thousand (21,400,000) MMBtus ("Summer Quantity") shall be delivered in the period April 1 - September 30 (the "Summer Period").

The ACQ is subject to adjustment as provided in Article 5.1(b), 5.3, 5.5 and 5.7. After giving effect to any such adjustment, the term "ACQ" shall mean the applicable ACQ as so adjusted, and the respective obligations of Seller to sell and deliver, and Buyer to purchase, receive and/or pay for an ACQ in any Contract Year, shall apply to the ACQ as so adjusted.

(b)    In the event the Date of First Commercial Supply is delayed past October 1, 1998, the ACQ for the first Contract Year shall automatically be reduced by the proportionate amount of the ACQ corresponding to the period of delay, taking into account whether the period of delay falls within the Winter Period or the Summer Period.

5.2    Rate of Deliveries

        Within each Contract Year the quantities to be delivered by Seller and received by Buyer at the Trinidad Facilities shall be delivered and received at rates and intervals which, after taking into consideration the downtime and other matters referred to in Article 7, and when considered in conjunction with the quantities, rates and intervals of deliveries to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Contract, shall result as nearly as practicable, in an even production rate at the Trinidad

20

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Facilities and deliveries to Buyer at the Delivery Point at reasonably constant intervals within the Summer Period and Winter Period.

5.3     Determination of Quantity Deficiencies and ACQ Adjustments

(a)     If during any Winter Period, Buyer should fail to take the Winter Quantity, or if during any Contract Year, Buyer should fail to take the full ACQ applicable thereto, Buyer shall pay Seller, at the price determined pursuant to Article 8.6, for the quantities of LNG required to be purchased but which were not taken by Buyer during such Winter Period or Contract Year (any such quantities being called a "Winter Period Quantity Deficiency" or an "Annual Quantity Deficiency", respectively), subject, however, to paragraphs 5.3(b) and (c), and the following:

(i)     If at the end of any Winter Period there is a Winter Period Quantity Deficiency greater than two million eight hundred thousand (2,800,000) MMBtus, Buyer shall be liable to pay Seller in accordance with Article 9.2(a) for each full multiple of two million eight hundred thousand (2,800,000) MMBtus contained therein.

(ii)    If the Annual Quantity Deficiency at the end of any Contract Year is less than one million six hundred thousand (1,600,000) MMBtus, the amount thereof shall be carried forward and added to the ACQ for the next Contract Year, with the allocation of said amount between the Winter Quantity and Summer Quantity of the next Contract Year to be mutually agreed between Seller and Buyer, but failing agreement, to be allocated by Seller to the Period during which any additional Cargo resulting therefrom can be scheduled.  In the event Buyer paid for a Winter Period Quantity Deficiency pursuant to Article 5.3(a)(i), but Seller was able to make available and Buyer was able to take delivery in the Summer Period of quantities of LNG in excess of the Summer Quantity (as a result of normal operational variations in vessel capacity and LNG quality but not as a result of Buyer taking Excess Quantities pursuant to Article 5.5), so that the amount of the Annual Quantity Deficiency at the end of any Contract Year is less than one million six hundred thousand (1,600,000) MMBtus, the amount paid by Buyer pursuant to Article 5.3(a)(i) shall be indicated on the

21

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Annual Statement for the Contract Year and shall be credited in full against the amount invoiced to Buyer for the first Cargo(es) delivered after Buyer's receipt of such Annual Statement.

(iii)    If the Annual Quantity Deficiency at the end of any Contract Year is more than one million six hundred thousand (1,600,000) MMBtus, Buyer shall be liable to pay Seller in accordance with Article 9.2(b), but subject to sub-Article (iv) below, for each multiple of one million six hundred thousand (1,600,000) MMBtus or two million eight hundred thousand (2,800,000) MMBtus, or any combination thereof, contained in the Annual Quantity Deficiency, with the amount of any remainder to be carried forward and added to the ACQ for the next Contract Year. The allocation of any remaining amount between the Winter Quantity and Summer Quantity of the next Contract Year shall be mutually agreed between Seller and Buyer, but failing agreement, Seller shall allocate such amount to the Period during which any additional Cargo resulting therefrom can be scheduled.

(iv)    The portion of any Annual Quantity Deficiency for which Buyer shall be liable to pay Seller in accordance with Article 5.3(a)(iii) above, shall be reduced by the amount of any Winter Period Quantity Deficiency paid for by Buyer during such Contract Year pursuant to Article 5.3(a)(i).

(v)    The Parties acknowledge that since the Annual Delivery Programme for a Contract Year is required to be finalised at least thirty (30) days prior to the end of the previous Contract Year, the Buyer will only have taken delivery of Cargoes scheduled for the first eleven (11) Months of the Annual Delivery Programme for such Contract Year at such time, and thus, the actual amount of any Annual Quantity Deficiency less than one million six hundred thousand (1,600,000) MMBtus required to be carried forward from the previous Contract Year pursuant to Article 5.3(a)(ii) or (iii) and added to the ACQ for such Contract Year can only be estimated and may be subject to change based on Buyer's receipt of Cargoes in the final Month of the previous Contract Year.

22

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

In the event the Annual Delivery Programme established in accordance with Article 7 based on the Parties' good faith estimate of the amount of any such carry-forward quantity would not have resulted in a Winter Period Quantity Deficiency or Annual Quantity Deficiency which Buyer would be liable to pay for in accordance with Articles 5.3(a)(i) or 5.3(a)(iii), but the amount of any such carry-forward quantity which actually results would require the scheduling of an additional Cargo in order for Buyer not to accrue either a Winter Period or Annual Quantity Deficiency which it would be liable to pay for in accordance with Articles 5.3(a)(i) or (iii), Seller shall, upon Buyer's request for Seller to endeavour to make available an additional Cargo, such request to be made in writing by October 12th of the Contract Year in question, use reasonable endeavours to accommodate such request(s) and make such Cargo available, provided that to do so would not interfere with other scheduled deliveries of LNG or other operations at the Trinidad Facilities. In the event Seller cannot accommodate Buyer's request, Seller shall in no event be held to be in default of its obligations to make the ACQ available to Buyer as to said carry-forward quantity and Buyer shall be liable to pay therefore in accordance with Articles 5.3(a)(i) or 5.3(a)(iii) above.

(vi)     If at the time each Annual Delivery Programme is developed the Annual Quantity Deficiency of Buyer for the applicable Contract Year is estimated to amount to less than the quantity of MMBtus contained in a Cargo for either a Primary or Secondary Tanker, Buyer shall have the right to request an increase in the quantities which Buyer wishes to take in an amount sufficient to fill out a Cargo of either LNG Tanker (such right hereinafter referred to as a "Round-Up Request"). Any such Round-Up Request shall not, however, increase the ACQ of Buyer, and if Seller elects not to accommodate such Round-Up Request, such election shall not constitute a failure to make LNG available for sale for the purpose of Article 5.3(b).

(vii)    If at the end of any Contract Year, Buyer has purchased and received quantities of LNG under this Article 5 in

23

excess of the ACQ for such year (other than Make-Up LNG), the excess shall at Buyer's option be applicable to reduce the ACQ for the next Contract Year.

(b)  The obligation (set forth Article 5.3(a) above) of Buyer with regard to any Winter Period or Contract Year to pay for all or portions of the respective Winter Quantity or ACQ not taken, shall be reduced by the quantity of LNG which Buyer did not purchase and receive because of an event of Force Majeure affecting either Seller or Buyer or because of Seller's failure for any other reason to make such quantities available for sale in accordance with this Contract. If Buyer proposes or requests that an Annual Delivery Programme be established or that a Ninety-Day Schedule be adjusted in a manner which will not result in the loading of a sufficient number of Cargoes to allow Buyer to take delivery of the Winter Quantity or ACQ, Seller's compliance with Buyer's proposal or request shall not under any circumstances be considered either to relieve Buyer from its obligations, pursuant to Article 5.3(a), to pay for the relevant quantities, or to be a failure by Seller to make such quantities available.

(c)  Any quantities of LNG which were scheduled in the Ninety-Day Schedule for the last seven (7) days of the Winter Period or Contract Year, as applicable, which were not delivered on schedule for operational reasons of either the Trinidad Facilities or an LNG Tanker, but which were delivered within seven (7) days (or any extension thereof if the delay is due to operational reasons of the Trinidad Facilities) after the Scheduled Loading Date shall be included in calculating the quantity of LNG delivered by Seller and received by Buyer for the applicable Winter Period or Contract Year in which the delivery was scheduled.

5.4  Make-Up LNG

(a)  Buyer shall accrue a right to be allocated Make-Up LNG in accordance with this Article 5.4:

(i)  effective as of the date of payment (together with interest in the case of late payment) for the corresponding Winter Period Quantity Deficiency or Annual Quantity Deficiency

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

in respect of which payment is made, as provided in Article 5.3 and Article 9 ("Take or Pay Make-Up"); and

(ii)  for any quantity of LNG which, during any Contract Year, Seller is obligated to sell and deliver but which is not made available or taken because of Force Majeure affecting either Seller or Buyer ("Force Majeure Make-Up").

(b)  If at the time of developing the Annual Delivery Programme, or any time during a Contract Year thereafter, Seller anticipates the availability of quantities of LNG in excess of the combined ACQ's of Buyer and ▋▋▋▋ and any Other Purchasers and Buyer has outstanding an accrued right to be allocated quantities of Make-Up LNG, Seller shall offer such quantities of LNG to Buyer in accordance with the provisions of this Article 5.4. Subject to the provisions of this Article 5.4, Seller shall schedule in accordance with the provisions of Article 7 any such Make-Up LNG requested by Buyer, provided that:

(i)  Make-Up LNG Cargo(es) shall be scheduled for delivery in a Contract Year only after the scheduled delivery of all Cargoes required to satisfy the ACQ;

(ii)  Buyer shall have a period of five (5) Contract Years following the Contract Year in which Buyer's right to request Make-up LNG accrued in which to take delivery of such Make-up LNG, failing which, such right shall be extinguished; provided however that to the extent for any one of said five (5) Contract Years Seller does not offer to make available to Buyer any or all of said quantities of Make-up LNG, Buyer shall have an additional Contract Year in which to take delivery thereof, with a further Contract Year extension for any Contract Year in which Seller does not offer to make same available.

(iii)  Seller shall be under no obligation to make available to Buyer a scheduled Cargo of Make-Up LNG if Buyer is in default of payment of any invoice for the Cargoes scheduled in accordance with Articles 5.3, 7 and Sub-article (i) above and delivered by Seller, or any invoice pursuant to Article 9.2.

25

(c)     In the event Seller anticipates that uncommitted quantities of LNG will be available in any Contract Year and Buyer at the time either does not have outstanding an accrued right to request Make-Up LNG or did not request Make-Up LNG after Seller's offer to make same available (whether such offer was made at the time of developing the Annual Delivery Programme or at any time during the Contract Year thereafter), such anticipated uncommitted quantities shall be subject to the provisions of Article 5.5 (Excess Quantities).

(d)     Make-Up LNG available to Buyer pursuant to a request under Article 5.4(b) in a Contract Year and quantities requested for similar purposes by ▮▮▮▮ and any Other Purchasers shall be allocated in full Cargo lots by Seller in accordance with the following priorities:

    (i)     first, Take or Pay Make-Up in the chronological order by reference to the Contract Year in which the failure to take occurred; and

    (ii)    second, Force Majeure Make-Up in the chronological order by reference to the Contract Year in which the failure to take or deliver occurred.

If requests having equal priority are made for delivery of Make-Up LNG in the same Contract Year by Buyer and ▮▮▮▮ and/or by any Other Purchasers and sufficient uncommitted quantities are not available from the Trinidad Facilities to meet all such requests, then the quantities of LNG available for such purposes shall be allocated among Buyer, ▮▮▮▮ and/or any Other Purchasers requesting make-up with priority among available quantities given to the requesting entity whose right to request Make-Up LNG accrued earliest (with an accrual in the Winter Period having priority over an accrual in the Summer Period of a Contract Year); where there is more than one entity with rights accrued in the same Contract Year, priority among available quantities shall be given on a rotating Cargo-by-Cargo basis in the order of the respective sizes of the requesting entity's accrued rights to quantities of Make-Up LNG, with the entity with the largest accrued Make-Up LNG right having first priority; and where there is more than one entity with the same accrued right to quantities of Make-Up LNG, priority among available quantities shall be

26

given on a rotating Cargo-by-Cargo basis in the order of the requesting entity's ACQ or similar requirement, with the entity with the largest ACQ or similar requirement having first priority.

(e)    The price to be paid by Buyer for quantities of Force Majeure Make-Up and Take or Pay Make-Up LNG shall be the Contract Price effective on the date on which the Make-Up LNG is taken by Buyer; provided however that in the case of Take or Pay Make-Up LNG, Buyer shall be credited with amounts previously paid by Buyer for such quantities in accordance with Articles 8.6 and 9. If the amount previously paid by Buyer for quantities not taken exceeds the total amount due for the Make-Up LNG quantities delivered, Buyer shall be entitled to a credit of such excess against the next invoice issued by Seller pursuant to Article 9, or in the event this Contract terminates with such an excess payment still outstanding, to a refund thereof.

(f)    In the event that there is Make-Up LNG which has not been delivered by the end of the last Contract Year and subject always to any technical or operational constraints of the Trinidad Facilities, the LNG Tanker(s) and the Enagas Receiving Facilities, this Contract may be extended as follows:

(i)    at Buyer's sole option in the event the remaining Make-Up LNG is Take or Pay Make-Up, for the period of time required for Seller to deliver such quantities, provided that: (aa) deliveries shall be scheduled at a rate consistent with Buyer's shipping capacity but Buyer shall not be required to take delivery at a rate exceeding the average rate of deliveries over the Contract duration and (bb) the extension period shall not exceed twelve (12) months unless Buyer is unable to take all of the outstanding Take or Pay Make-Up during such twelve (12) month extension period as a result of Seller's inability to make such Make-Up LNG available for delivery which is not due to a lack of Buyer's shipping capacity, in which case the extension period shall be further extended for the period of time necessary for Seller to make available same, up to a maximum of twelve (12) additional months; and

(ii)    subject to Article 3.3, at Seller's sole option in the event the remaining Make-Up LNG is Force Majeure Make-Up, for the

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

period of time required for Seller to deliver such quantities and Seller may require Buyer to take delivery at a rate at least equal to the rate of delivery during the last Contract Year.

5.5   Excess Quantities

(a)   Subject to any prior accrued right of Buyer to request Make-Up LNG pursuant to Article 5.4, Seller shall make available to Buyer at the Contract Price and in accordance with the provisions of sub-Articles (b) through (d) below, quantities of LNG which are in excess of the combined ACQ's of Buyer and ███ and which Seller estimates in good faith will be available from the Trinidad Facilities for more than one Contract Year ("Long Term Excess Quantities") due to

(i)   expected sustainable production from the first liquefaction/production train of the Trinidad Facilities in excess of the contractor-guaranteed "Nameplate Capacity" thereof as a result of debottlenecking or otherwise (but not including expansion of the Trinidad Facilities by the construction of additional liquefaction/production train(s), and/or

(ii)   a predicted long term Force Majeure excuse of ███ performance under the ███ Contract.

(b)   Seller shall notify Buyer at the time of providing the information required pursuant to Article 7.1(b) of the annual quantity of Long Term Excess Quantities available to Buyer and shall offer same to Buyer for the duration of its availability.  In the case of sub-Article (i) quantities, Buyer shall be offered its pro rata share thereof determined by comparing its ACQ to the ███ ACQ for the then current Contract Year.

Buyer shall notify Seller in writing at the time of providing the information required pursuant to Article 7.1(c) as to whether it accepts for the duration of its availability the annual quantity of Long Term Excess Quantities offered to Buyer.  In the event Buyer rejects the offer, Seller may sell or otherwise dispose of said quantities freely to any entity and upon terms at its sole discretion.

28

A failure of Buyer to so respond shall be deemed to be a rejection of the offer for any such Long Term Excess Quantities.

(d)   Buyer's written acceptance of said offer shall automatically increase Buyer's ACQ for each Contract Year for which the Long Term Excess Quantities were offered to Buyer by an amount equal to the annual quantity offered.   Promptly following Buyer's acceptance, Seller shall provide Buyer with written confirmation of Buyer's increased ACQ for such period.

(e)   Subject to any prior accrued right of Buyer to request Make-Up LNG pursuant to Article 5.4, Seller shall make available to Buyer at the Contract Price and in accordance with the provisions of sub-Articles (f) and (g) below, quantities of LNG which are in excess of the combined ACQs of Buyer and ███████ and which Seller estimates in good faith will be available from the Trinidad Facilities within a Contract Year ("Spot Excess Quantities") which are

(i)    due to expected production from the Trinidad Facilities in excess of the contractor-guaranteed "Nameplate Capacity" thereof and which Seller became aware of subsequent to providing Buyer the information required pursuant to Article 7.1(b), and/or

(ii)   not predicted by Seller to continue to be available in future Contract Years (such as for example, quantities available as a result of the Trinidad Facilities experiencing less than the amount of down-time predicted for that Contract Year), and/or

(iii)  available as a result of the cancellation by ██████ of the loading of any quantities expected by Seller to be scheduled and/or delivered in satisfaction of ██████ ACQ or make-up rights.

(f)   When Seller becomes aware that the Spot Excess Quantities will become available, Seller shall notify Buyer in writing of the quantities available and the potential date(s) upon which said quantities could be delivered.  Spot Excess Quantities shall be offered by Seller to Buyer on an alternating Cargo-by-Cargo basis with ██████ with the first such Cargo being offered to ██████ and

29

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

if rejected, then to Buyer, and any additional such Cargoes being offered in turn to the entity other than the one who was last offered such a Cargo. Seller shall specify in such notice a reasonable period of time in which Buyer must respond in writing, which time period will enable Seller to market such quantities elsewhere in the event Buyer rejects Seller's offer. Buyer's failure to respond in writing within such time period shall be deemed to be a rejection of said offer.

(g)   Buyer's written acceptance of said offer, including agreed loading date(s) for such Cargo(es), shall automatically increase Buyer's ACQ for the Contract Year (and Winter or Summer Quantity, as applicable) by the amount of the quantity offered to Buyer. Promptly following Buyer's written acceptance, Seller shall provide Buyer with written confirmation of Buyer's increased ACQ. In the event Buyer rejects any Cargo so offered, Seller may sell or otherwise dispose of said quantities freely to any entity and upon terms at its sole discretion.

5.6   Allocation of Deliveries Between Buyer and Other Purchasers

(a)   Whenever deliveries of LNG by Seller under this Contract must be reduced by reason of Force Majeure affecting Seller's ability to deliver LNG from the Trinidad Facilities, an allocation of quantities then available for delivery at the Trinidad Facilities will be made between Buyer, ▮▮▮▮and any Other Purchasers. At such times the total quantities available for delivery from the Trinidad Facilities shall be allocated among the purchasers therefrom (including Buyer) pro rata in the ratio of their ACQs or similar requirements.

(b)   If such Force Majeure does not preclude full delivery of Buyer's ACQ, the ▮▮▮▮ACQ and all similar requirements of Other Purchasers under the allocation formula described in paragraph (a) above, but is of such an extent as to prevent Seller from delivering all Make-Up LNG scheduled for delivery from the Trinidad Facilities to Buyer, ▮▮▮▮and similar make-up quantities scheduled for delivery to Other Purchasers, quantities of such LNG as are available shall be allocated between Buyer, ▮▮▮▮ and such Other Purchasers in proportion to the respective quantities so scheduled.

30

5.7    Special Maintenance ACQ Adjustment

(a)    Seller's obligation to make available for delivery the ACQ shall be subject to a special downward adjustment to the ACQ ("Special Maintenance Adjustment") reflecting downtime of the Trinidad Facilities, if necessary to perform extended maintenance, upon the following conditions:

(i)    The exercise of such downward adjustment shall result in the reduction of the number of Cargoes which would otherwise have been delivered to Buyer during the period of April 1 to September 30 in a Contract Year.

(ii)    Seller may not exercise said adjustment more than once in any five (5) consecutive Contract Year period.

(iii)    Seller may exercise a Special Maintenance Adjustment of a maximum of two (2) Cargoes, which shall be deemed equal to five million six hundred thousand (5,600,000) MMBtus, unless the Parties agree otherwise.

(iv)    Seller shall notify Buyer of its exercise of the Special Maintenance Adjustment as soon as possible after receipt of Buyer's Article 7.1(c) notification for the relevant Contract Year.

(v)    Seller shall keep Buyer informed on an ongoing basis of the anticipated need to exercise the Special Maintenance Adjustment.

(b)    Buyer shall have a corresponding right to exercise a Special Maintenance Adjustment as provided for Seller in sub-Article (a) above, for such period (if any) during the Initial Term as the Huelva Terminal is the only one of the Enagas Receiving Facilities capable of unloading LNG Tankers with a capacity equal to or greater than 125,000 cubic meters, if Buyer demonstrates to Seller that it will be unable to take delivery and dispose of part of the ACQ as a result of extended maintenance requirements at the Huelva Terminal, taking into account Buyer's rights pursuant to Article 2.6, 2.7 and 2.8 and the capacity available to Buyer at the other Enagas Receiving Facilities; provided, however, that Buyer shall notify Seller at least one hundred and five (105) days in

31

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

advance of the relevant Contract Year of its exercise of a Special
Maintenance Adjustment. In the event both Buyer and Seller
wish to exercise the Special Maintenance Adjustment in the same
Contract Year, they shall coordinate the scheduling of the
relevant maintenance so as to result in a maximum cumulative
downward adjustment to the ACQ of two (2) Cargoes.

5.8    Expansion Quantities

(a)    The Parties acknowledge that as of the date hereof, the Trinidad
Facilities involve the construction of a single
liquefaction/production train. If at any time Seller decides to
evaluate the feasibility of constructing a second train at the
Trinidad Facilities and to ascertain the market for the sale of the
corresponding quantities of LNG ("Second Train LNG"), Seller shall
promptly so notify Buyer, who shall have the exclusive right,
(subject only to the corresponding right contained in the ███████
Contract with respect to sixty percent (60%) of the Second Train
LNG) for a period of up to ninety (90) days from the receipt of
such notice ("Negotiating Period"), to negotiate with Seller for the
purchase of forty percent (40%) of the Second Train LNG (such
amount herein referred to as a Buyer's "Second Train Quantity").
The Parties hereby undertake to proceed with negotiations
expeditiously and in good faith; provided, however that either
Party shall be entitled to discontinue negotiations and terminate
the Negotiating Period if both Parties agree that the respective
positions of the Parties cannot be reconciled. During the
Negotiating Period, Seller shall not discuss with any other person
or entity ████████████ the sale of, or seek offers to purchase,
any Second Train LNG.

(b)    If Seller fails to reach agreement with Buyer by the end of the
Negotiating Period, Seller shall be free to negotiate for the sale of
such Buyer's Second Train Quantities to third-party purchaser(s);
provided, however, that Seller shall, before agreeing to sell any of
the Second Train LNG to an entity intending to market such LNG
anywhere ████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████ offer Buyer
the opportunity to match, by written notice answerable within
thirty (30) days of receipt thereof, the material commercial terms

32

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

upon which said entity is willing to purchase and Seller is willing to sell said LNG, including but not limited to pricing provisions, quantity, take-or-pay provisions, duration, security for performance, transportation, force majeure and conditions precedent ("Commercial Provisions"), and indicating any adjustments thereto required if the Commercial Provisions are on a CIF sale basis and Seller's transportation costs would be different if the sale were on a CIF basis to Buyer.

(c)     In the case where Seller is willing to agree to sell any of the Second Train LNG to an entity intending to market such LNG ▮ ▮▮▮▮▮▮▮▮▮▮ with Commercial Provisions including pricing provisions of the type set forth in sub-Article (b) above, and ▮▮▮▮ has declined to exercise its right to match same, Seller shall notify Buyer thereof in the same manner as provided in sub-Article (b) above.

(d)     In the case of an offer made by Seller pursuant to either sub-Article (b) or (c) above, Buyer shall have the right to match such Commercial Provisions exactly subject to applicable CIF shipping cost adjustments, if any.

(e)     Seller and Buyer shall, within seven (7) days of receipt of either Buyer's written acceptance of the Commercial Provisions, pursuant to sub-Article (c) or (d) above commence negotiation of an LNG sales contract incorporating the applicable Commercial Provisions and such other terms which in Seller's opinion do not detract from its perceived value of the Commercial Provisions.  Should Seller and Buyer fail to sign an agreement within sixty (60) days from the receipt of Buyer's notice of its election to match an offer, Seller shall have no further obligation to Buyer in respect of any Second Train Quantities.

(f)     Notwithstanding anything herein provided, Buyer must at the time of signing the Second Train LNG sales contract have demonstrated that it has sufficient marine transportation capacity to take delivery of the contracted quantity of Second Train LNG and either has the ability to receive and distribute the contracted quantity of LNG at its existing terminal(s) or unconditionally commits to expand its facilities and take such other measures as may be necessary to receive and distribute such quantities in a

33

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

time frame consistent with Seller's targeted Second Train LNG
startup date and any corresponding financing requirements.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 6 - LOADING AND TRANSPORTATION

6.1     Buyer's Obligation to Provide Transportation

Buyer shall provide, or cause to be provided, the LNG Tanker(s) required to transport all quantities of LNG to be sold and delivered hereunder from the Loading Port to the Enagas Receiving Facilities or other permitted receiving facilities.

6.2     LNG Tankers

(a)     Prior to the Arrangements Date, Buyer shall designate one (1) LNG Tanker of capacity in the range from approximately eighty-seven thousand (87,000) to one hundred thirty-five thousand (135,000) cubic meters which Buyer shall utilise primarily for the transportation of LNG purchased by Buyer hereunder (the "Primary Tanker") and two (2) additional LNG Tankers of capacity in the range from approximately 65,000 to 135,000 cubic meters which Buyer shall utilise for the transportation of LNG not loaded by the Primary Tanker (the "Secondary Tankers"). The Primary and Secondary Tankers shall either be owned by Buyer or its Affiliate during the Initial Term or shall be chartered to the effect that LNG Tankers sufficient to meet the requirements of Article 6.1 shall be available for at least the first thirteen (13) Contract Years, with Buyer having an irrevocable option to extend the charter on a yearly basis for the remainder of the Initial Term. Before terminating any charter for a Primary or Secondary Tanker during the Initial Term, Buyer shall demonstrate to Seller that arrangements have been made to build or charter another LNG Tanker meeting the requirements of this Contract to replace the Primary or Secondary Tanker(s) for which the charter will be terminated.

(b)     Without prejudice to any other provision of this Contract, Buyer may during the term of this Contract, substitute for the Primary and/or Secondary Tanker other LNG tanker(s) which satisfy the requirements of this Contract for the Primary or Secondary Tanker, as applicable. Buyer may also utilise any other LNG tanker(s), which may or may not be owned by or under long-term charter to Buyer as provided in Article 6.2(a), but which otherwise meet the requirements of this Contract, to take delivery of any Cargo(es) on a short term Cargo-by-Cargo basis, provided that

35

Buyer gives reasonable prior written notice to Seller of such substitution to give Seller a reasonable opportunity to verify that such LNG tanker(s) meet the requirements of this Contract. Buyer and Seller shall use reasonable endeavours to agree in advance of preparing the Annual Delivery Programme for each Contract Year, upon those LNG tankers available to Buyer that would meet the requirements for substitution during the Contract Year. To the extent any LNG tanker is substituted by Buyer in accordance herewith, such LNG tanker shall be referred to as the "Substitute LNG Tanker" for the Cargo(es) for which it is designated to take delivery. Buyer's utilisation of any Substitute LNG Tanker shall not diminish Buyer's obligations under this Contract, and Buyer shall not make any substitution to the extent doing so would impair the ability of Buyer to lift or Seller to deliver the Cargoes scheduled for delivery in the Annual Delivery Programme.

(c)     The Primary Tanker, Secondary Tankers and all Substitute LNG Tankers shall at all times be maintained and safely operated and compatible with the Loading Port facilities. The provisions of this Contract applicable to LNG Tankers shall apply whether any LNG Tanker is owned and operated by Buyer, or owned and/or operated by a third party (including Affiliates of Buyer). All LNG Tankers used by Buyer, whether the Primary or Secondary Tanker or any Substitute LNG Tanker, shall at a minimum and without limitation, at all times comply with the following:

(i)     be equipped so as to permit the safe loading of a Cargo in approximately twelve (12) hours of pumping time and to accept LNG at an approximate pressure at the ship's manifold flange of 3.0 bar absolute and to supply the return gas from the LNG Tanker to the flange of the boil-off gas return line of the Trinidad Facilities. Buyer shall use reasonable endeavors to make return gas available at a pressure no less than that outlined below, at a temperature of minus one hundred and forty degrees Celsius (-140 °C) for the respective flowrates:

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

| Vapour Return Flowrate (m3/hr) | Vapour Return Pressure (Bar, absolute) |
|---|---|
| 6,000 | 1.106 |
| 10,000 | 1.116 |
| 13,600 | 1.20 |
| 18,000 | 1.29 |
| 23,000 | 1.44 |
| 31,400 | 1.80 |

The minimum acceptable vapour return pressure ("P") for any given vapour return flowrate ("Q") falling in the range between any two values of vapour return flowrate quoted in the above table shall be determined from the formula:

$$P = P_L + [(\Delta P_{HL} * \Delta Q) \div \Delta Q_{HL}]$$

Where;

$P_L$  =  the vapour return pressure quoted in the above table that corresponds to $Q_L$;

$P_H$  =  the vapour return pressure quoted in the above table that corresponds to $Q_H$;

$Q_L$  =  the vapour return flowrate quoted in the above table which is nearest in value to, but less than $Q$;

$Q_H$  =  the vapour return flowrate quoted in the above table which is nearest in value to but greater than $Q$;

$\Delta P_{HL}$  =  $P_H - P_L$;

$\Delta Q_{HL}$  =  $Q_H - Q_L$; and

$\Delta Q$  =  $Q - Q_L$.

(ii)    be equipped with communications equipment which shall comply with applicable regulations and permit the LNG Tanker to be in communication with land stations and the Seller's control rooms;

37

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(iii) be equipped with adequate facilities for mooring, unmooring, handling LNG and port navigation;

(iv) be maintained in class with either the American Bureau of Shipping, Lloyds Register of Shipping, Nippon KK or Det Norske Veritas;

(v) be in compliance with all applicable laws, treaties, conventions, requirements and regulations of the country of vessel registry and the Republic of Trinidad and Tobago which relate to seaworthiness, pollution, design, safety, navigation, operation and similar technical and operational matters as they may be promulgated, amended or modified from time to time;

(vi) be manned with a qualified and competent crew including, without limitation, the Master and enough crew members fluent in written and spoken English to co-ordinate with personnel at the Loading Port and a Master, Chief Engineer, Chief Mate and Cargo Engineer (and such other officers having responsibilities associated with the preparation of the LNG Tanker for loading) who are all experienced in LNG Tanker operations;

(vii) be adequately covered by all customary marine insurance policies, including the hull and machinery coverage and protection and indemnity coverage available in the English market (or other major insurance markets which may provide similar marine insurance) in the amounts and at the levels customarily maintained by first class operators.

(d) In the event that Buyer is unable to take delivery of LNG in accordance with the terms of this Contract, whether by reason of Buyer's Force Majeure or otherwise (other than Force Majeure relative to the Primary or Secondary Tankers), and such inability is predicted by Buyer to continue for a significant period of time during which Seller could make alternate sales of LNG produced from the Trinidad Facilities, then upon Seller's request, Buyer shall make the Primary and/or one of the Secondary Tankers available to Seller, to the extent required for the transportation of the amount of the ACQ excused by Force Majeure, on commercially

38

reasonable terms and conditions (taking into consideration the charter rates for LNG tankers of similar size, age and condition), to provide transportation of LNG to other buyers for the predicted period of Buyer's inability to take deliveries of LNG. Buyer shall provide timely notice of Buyer's ability to resume taking deliveries of LNG and Seller shall return such LNG Tanker(s) to Buyer's control, so as to permit an orderly resumption of the interrupted trade between the Parties.

(e) Seller shall have the right to inspect any LNG Tanker proposed to be used by Buyer to take delivery of any LNG under this Contract. Seller shall have the right to reject any LNG Tanker that does not comply with the provisions of this Contract, provided that:

(i) neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise by Seller of such right, shall reduce the responsibility of Buyer, or of the Master or owner of such vessel or any other person, to Seller or third parties in respect of such vessel and her operation, nor increase Seller's responsibilities to Buyer or third parties for the same; and

(ii) without prejudice to Article 19.2, below, Seller shall not be liable for any act, neglect or default by itself, its servants, agents or contractors in agreeing to the use of a vessel as an LNG Tanker or (except to the extent Seller's agreement is unreasonably withheld) in failing to so agree.

6.3    Loading Port Facilities

Seller shall at all times provide, maintain and operate, or cause to be provided, maintained and operated, for its performance under this Contract facilities at the Loading Port, including the following:

(a) A berth and port facilities all capable of receiving LNG Tankers of the dimensions set forth in Schedule A hereto, where such LNG Tankers may safely proceed to, lie at and depart from, always afloat at all times of the tide;

(b) Loading facilities capable of loading LNG at a rate of approximately ten thousand five hundred (10,500) cubic meters per hour at a normal operating pressure of approximately three

(3.0) bar absolute at the Delivery Point. In any event, pressure at the Delivery Point shall not exceed six (6.0) bar absolute;

(c)     A boil-off gas return system capable of receiving boil-off gas from an LNG Tanker at the rate required for the loading of LNG at the rates and pressures specified in Article 6.2(c)(i); and

(d)     Communications equipment which shall comply with applicable regulations and permit Seller's control rooms to be in communication with the LNG Tankers.

Seller shall not be obligated to provide facilities for repair of LNG Tankers.

6.4     <u>Loading Port Obligations</u>

(a)     LNG Tankers shall utilise the Loading Port facilities subject to observance of all relevant port regulations. Any tugs, pilots or escort vessels required (or other support vessels required in connection with the safe berthing of an LNG Tanker) shall be employed by and at the sole risk and expense of Buyer.

(b)     Buyer shall be responsible for payment of amounts due for supplies and services requested by Masters of LNG Tankers and for normal port charges to the extent such charges are uniformly applied to all LNG vessels receiving exports of LNG from the Loading Port.

(c)     Buyer shall obtain or cause to be obtained all approvals required from governmental authorities for each LNG Tanker to enter and travel in the territorial waters of the Republic of Trinidad and Tobago to berth and load its cargo and to depart from the Trinidad Facilities and Loading Port and leave the territorial waters of Trinidad and Tobago. Each LNG Tanker shall comply with all laws, rules, regulations and interpretations to which it is subject in Trinidad and Tobago, including, but not limited to, those for the protection of the environment.

(d)     In the interest of the smooth and timely performance of Buyer's obligation to provide transportation of LNG sold and purchased under this Contract, Seller shall provide reasonable assistance to

Buyer in coordinating delivery of equipment, supplies and services for the LNG Tankers.

(e) Seller shall determine the berthing sequence of the LNG Tankers at the Loading Port in order to best ensure compliance with the overall loading schedule of the Trinidad Facilities (including, without limitation, the Annual Delivery Programme and Ninety Day Schedule of Buyer ███████) and shall notify the Masters of the LNG Tankers of their berthing priority.

6.5    Cargo Loading

(a) The LNG to be sold and purchased hereunder shall be pumped into an LNG Tanker at the expense of the Seller and shall be in full cargo lots, absent agreement of the Parties or unavoidable circumstances ("Cargo").

(b) There shall be no charge to Seller for any Natural Gas boiled off from the LNG Tankers while berthed at the Trinidad Facilities that is returned to shore. Seller shall operate the boil-off gas return system in a manner that will permit the gas pressure in the LNG Tanker's tanks to be maintained within the allowable operating limits of such tanks.

6.6    Notifications of Estimated Time of Arrival at Loading Port and Cooling Requirements

(a) Buyer shall give Seller notice by telex or facsimile of the date and hour on which each LNG Tanker departs from an unloading port, drydock/repair port or other point of departure and the estimated time of arrival ("ETA") at the Loading Port. Such notice shall be submitted immediately after the LNG Tanker's departure from the unloading port, drydock/repair port or other point of departure. Buyer shall include in such notice to Seller a statement of:-

(i) The estimated quantity of LNG that will be required to purge and cool the tanks to permit continuous loading of LNG and the estimated time that will be required for such purging and cooling, both of which will be based upon the the LNG Tanker's Scheduled Loading Date;

41

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(ii)    Any operational deficiencies in the LNG Tanker that may affect its performance in the Loading Port or berth; and

(iii)    Requirements for nitrogen, fuel, water and other utilities which Buyer intends to obtain and take on from third parties.

(b)    Buyer shall arrange for the LNG Tanker's Master to notify Seller immediately after noon of each day at sea of its position in longitude and latitude at noon of that same day, amending any such information previously given to Seller.

(c)    Seventy two (72) hours prior to the LNG Tanker's arrival at the Loading Port, the LNG Tanker's Master shall give notice by telex, facsimile or other mutually agreed form of communication to Seller stating its then ETA. If thereafter this ETA changes by more than six (6) hours, the LNG Tanker's Master shall give notice of the corrected ETA promptly to Seller.

(d)    Forty eight (48) hours prior to the LNG Tanker's arrival at the Loading Port, the LNG Tanker's Master shall give notice by telex, facsimile or other mutually agreed form of communication to Seller confirming or amending the previous ETA notice. If thereafter this ETA changes by more than six (6) hours, the LNG Tanker's Master shall give notice of the corrected ETA promptly to Seller.

(e)    Twenty four (24) hours prior to the LNG Tanker's arrival at the Loading Port, the LNG Tanker's Master shall give notice by telex, facsimile or other mutually agreed form of communication and radio to Seller confirming or amending the last ETA notice. If thereafter this ETA changes by more than two (2) hours, the LNG Tanker's Master shall give notice of the corrected ETA promptly to Seller.

(f)    The LNG Tanker's Master shall give a final ETA notice by telex, facsimile or other mutually agreed form of communication and radio five (5) hours prior to the LNG Tanker's arrival at the Loading Port.

(g)    The LNG Tanker's Master shall give notice by telex, facsimile or other mutually agreed form of communication and radio

42

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

immediately upon the LNG Tanker's arrival at the designated anchorage at the Loading Port.

6.7    Notice of Readiness

As soon as the LNG Tanker has received all necessary port clearances, is securely moored at the berth, and is able to receive LNG for loading or cooling, the Master shall give notice of readiness to Seller ("Notice of Readiness"); provided, however, that in the event an LNG Tanker should arrive at the Loading Port prior to the Scheduled Loading Date (and any adjustment thereof made in accordance with Article 7.4), Notice of Readiness shall be deemed effective at the earlier of:-

(i)    0600 hours local time on the Scheduled Loading Date, or

(ii)    the time loading commences.

6.8    Tank Temperature for Loading and Statement of Cooling Time

After each discharge of a Cargo at an unloading port, Buyer shall retain on board the LNG Tanker sufficient LNG, based on normal operations of the LNG Tanker (subject to making adequate provision for any LNG Tanker mechanical problems of which Buyer is aware), to maintain, for a period of not less than twenty four (24) hours after the later of:-

(i)    the actual arrival of the LNG Tanker at the designated anchorage at the Loading Port, or

(ii)    0600 hours local time on the Scheduled Loading Date (ignoring any revision to such date made after the LNG Tanker has commenced its voyage to the Loading Port)

a temperature in the tanks of the LNG Tanker to permit continuous loading of LNG ("Arrival Temperature Requirement"); provided, however, that the Arrival Temperature Requirement shall not apply upon entry into service or in cases where the LNG Tanker proceeds from a drydock/repair port to the Loading Port. When an LNG Tanker requires cooling, the Master shall so inform Seller first at the time of the first notice under Article 6.6(a) and second at the time of the Notice of Readiness.  After the LNG Tanker has been cooled, the representatives of both Buyer and

43

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Seller shall sign a statement specifying the time period elapsed during the purging and cooling of the LNG Tanker ("Statement of Cooling Time").

6.9   Quantities for Purging and Cooling of Tanks

Quantities of LNG required to purge and cool the Primary and Secondary Tankers (and any other LNG Tanker scheduled in the Annual Delivery Programme or Ninety-Day Schedules) to the temperature that will permit continuous loading of LNG shall be delivered by Seller without charge to Buyer upon the initial loading of such LNG Tanker(s) at the Trinidad Facilities and upon the return of such LNG Tankers to service after each scheduled maintenance period, as required by class; provided, however, that Seller shall not be required to provide LNG free of charge pursuant to this Article 6.9 for the purging and cooling of LNG Tankers more than four (4) times during any consecutive five (5) Contract Year period. All other LNG required by such LNG Tankers or any substitute LNG Tankers for purging and cooling shall be sold, delivered and invoiced by Seller and paid for by Buyer at the Contract Price applicable to such Cargo, except that where any LNG Tanker having met the Arrival Temperature Requirement needs purging or cooldown due to an event which is attributable to Seller, then the LNG required in connection therewith shall be provided without charge. The applicable Contract Price shall be applied to the total liquid quantities delivered for purging and cooling, measured before evaporation of any part thereof occurs. The Parties will determine by mutual agreement the rates and pressures for delivery of LNG for purging and cooling and the method for determining quantities used for such operations. Quantities of LNG used to bring the LNG Tankers to a temperature permitting continuous loading of LNG shall not be applied against the quantities required to be made available for delivery by Seller and taken and/or paid for by Buyer under other provisions of this Contract.

6.10   Loading Time

(a)   The allotted loading time for Seller to load each LNG Tanker ("Allotted Loading Time") shall be twenty-four (24) hours, subject to adjustment as provided in sub-Article (c), below.

(b)   The actual loading time for each LNG Tanker ("Actual Loading Time") shall commence six (6) hours after the time when the

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Notice of Readiness is received or deemed to be effective, and shall end when the loading and return lines of the LNG Tanker are disconnected from the Seller's loading and return lines and all cargo papers necessary for departure required to be furnished by Seller are delivered on board in proper form and the LNG Tanker is permitted to proceed to sea.

(c)     Allotted Loading Time shall be extended to include:

(i)     The period during which proceeding from the anchorage, berthing, loading or clearing of the LNG Tanker to proceed to sea after completion of loading is delayed, hindered or suspended by Buyer, Buyer's Transporter, the LNG Tanker Master, the Port Authority or any third party for reasons of safety, weather or otherwise and over which Seller has no control;

(ii)    The period of any delays attributable to the operation of an LNG Tanker, including the period of time such LNG Tanker: (1) awaits a berth by reason of the exercise by Seller of its rights under Article 6.13, or (2) receives LNG for purging and cooldown (except when: (aa) the LNG Tanker met the Arrival Temperature Requirement, and (bb) the purging and cooldown is not due to an event which extends Allotted Loading Time under this Article 6.10(c));

(iii)   Any period during which berthing or loading of an LNG Tanker is delayed, hindered or suspended by reason of Force Majeure pursuant to Article 13 hereof; and

(iv)    Any period of delay caused by occupancy of the berth

(aa)    by a previous LNG Tanker, provided such occupancy is for reasons attributable to such LNG Tanker; or

(bb)    by any Other Purchaser's LNG tanker that arrived prior to or on its scheduled loading date when the LNG Tanker arrived after its Scheduled Loading Date (ignoring any change in the LNG Tanker's Scheduled Loading Date after departure of the LNG Tanker from an unloading port), except that there shall be no addition to Allotted Loading Time under this sub-

45

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Article (iv)(bb) for any period in excess of the time required for a Cargo to be made available in storage ready for loading at the Trinidad Facilities after the loading of the first arriving LNG tanker.

6.11    Demurrage and Excess Berth Occupancy

(a)    If Actual Loading Time exceeds Allotted Loading Time (as extended in accordance with Article 6.10) in loading any LNG Tanker, Seller shall pay to Buyer demurrage at a daily rate computed by dividing the sum of the capital and operating charges included in Buyer's annual charter rate for the particular LNG Tanker by three hundred and fifty (350) days, for each day, or pro rata for any portion thereof.

(b)    If Actual Loading Time exceeds twenty-four (24) hours, or an LNG Tanker delays in vacating the berth after the end of Actual Loading Time, in either case for reasons not attributable to the Seller, and if as a result of the unavailability of the berth Seller incurs liability to pay demurrage or for excess boil-off, or to provide LNG free of charge to any Other Purchaser for cooling, Buyer shall reimburse Seller for the amount of such demurrage or boil-off payments paid by Seller, or for the value of such LNG.

(c)    Buyer shall invoice Seller, or Seller shall invoice Buyer, as the case may be, for amounts due under this Section 6.11 and the Party invoiced shall pay such invoice in accordance with Article 9.

6.12    Effect of Loading Port Delays

If an LNG Tanker is delayed in berthing and/or commencement of loading for a reason which would not result in an extension of Allotted Loading Time under Article 6.10(c), and if as a result the commencement of loading is delayed beyond twelve (12) hours after Notice of Readiness has been given or deemed effective then for each full hour by which commencement of loading is delayed beyond such twelve (12) hour period, Seller shall pay Buyer for boil-off during such delay at the Contract Price applicable to the Cargo next to be loaded. The hourly Btu boil-off rate to be applied for such purpose shall be determined by actual average boil-off experience of the LNG Tanker as determined at appropriate intervals and under similar circumstances, but the total boil-off during such delay shall never exceed the quantity

46

of LNG on board the LNG Tanker at the commencement of the said twelve (12) hour period.  Buyer shall invoice Seller for amounts due under this Article 6.12 and Seller shall pay the invoice in accordance with Article 9.

6.13    <u>Vessels Not Ready for Loading</u>

(a)    If an LNG Tanker arrives at the Loading Port not ready to load for any reason, Seller may refuse to allow it to berth.  In the case of an LNG Tanker only requiring cooldown to be ready to load, Seller shall not refuse berthing for such reasons if such cooldown was provided for in the Ninety Day Schedule or if it does not cause a disruption to the overall loading schedule of the Trinidad Facilities.  Whenever Buyer notifies the Seller that an LNG Tanker will require cooldown, the Seller shall make provision therefore in the Ninety Day Schedule as soon as the Seller can do so without disrupting the overall loading schedule of the Trinidad Facilities or operations of the Loading Port.

(b)    If any LNG Tanker, previously believed to be ready for loading or cooling, is determined to be not ready after being berthed, the Seller may direct the LNG Tanker's Master to vacate the berth and proceed to anchorage, whether or not other LNG tankers are awaiting the berth, unless it appears reasonably certain to the Seller that such LNG Tanker can be made ready without disrupting the overall loading schedule of the Trinidad Facilities or operations of the Loading Port and the Seller has not concluded that such LNG Tanker is unsafe.

(c)    When an unready LNG Tanker at anchorage becomes ready for loading or cooling its Master shall notify the Seller.  Seller shall assign the berth to such LNG Tanker as soon as Seller is able to do so without disrupting the overall loading schedule of the Trinidad Facilities or operations of the Loading Port.

(d)    Any LNG Tanker which arrives at the Loading Port without its tanks filled with LNG vapour shall arrive with its cargo tanks and piping system inerted and in a dry condition, suitable to commence immediate cooldown.

47

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

<u>ARTICLE 7 - SCHEDULING</u>

7.1    <u>Exchange of Information</u>

 (a) After advising Buyer pursuant to Article 4.1 of the Date of Initial
    Supply and the quantities of LNG expected to be available
    thereafter during the Initial Supply Period, Seller may nominate
    loading dates for Cargoes to be delivered to Buyer by such
    advance notice as is reasonable in the circumstances, and Buyer
    shall use reasonable endeavors to take delivery of such
    nominated quantities on such dates and shall confirm its
    intentions to Seller promptly following Seller's nomination.

 (b) Not later than ninety (90) days prior to the expected beginning of
    the first Contract Year and the beginning of each Contract Year
    thereafter, Seller shall give written notice to Buyer of the
    anticipated quantities of LNG (including Make-Up LNG and/or
    Long Term Excess Quantities, if applicable) in MMBtu per Contract
    Year quarter to be available for delivery to Buyer hereunder and
    to ▮▮▮▮ from the Trinidad Facilities during such period, and any
    scheduled or anticipated downtime of the Trinidad Facilities.

 (c) Not later than seventy-five (75) days prior to the beginning of the
    relevant Contract Year for which such notice is given, Buyer shall
    notify Seller in writing of the quantities of LNG and of the
    corresponding number of Cargoes Buyer wishes to be delivered
    in each Calendar Quarter, any planned downtime for the
    Enagas Receiving Facilities, planned downtime and drydocking
    for the LNG Tanker(s), the name of the LNG Tanker for each
    Cargo, the Estimated Cargo Content of each LNG Tanker to be
    utilised by Buyer, destination for each Cargo and the provisional
    departure date of such LNG Tanker from the Enagas Receiving
    Facilities, drydock/repair port or other permitted point of
    departure, as appropriate.

 (d) The Parties shall regularly provide to each other updates of the
    information exchanged pursuant to this Article 7.1 and Article 7.2
    below to assist in preparing the Annual Delivery Programme and
    the Ninety-Day Schedules.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

7.2    Annual Delivery Programme

(a)    Following the exchange of information pursuant to Article 7.1, Seller and Buyer shall consult together with the intent of reaching agreement not later than thirty (30) days prior to the beginning of the relevant Contract Year on a delivery programme, taking into consideration the above information and any updates thereof. Seller and Buyer shall endeavor to coordinate the anticipated maintenance/drydocking and inspection downtime during the Contract Year of the Enagas Receiving Facilities and of the LNG Tanker(s) with that of the Trinidad Facilities so as to minimize the collective impact of such downtime on the continuous delivery of LNG hereunder.

(b)    The proposed delivery programme shall be designed to ensure that the expected ACQ as well as any available Make-Up LNG shall be supplied in such Contract Year and shall take into account, to the extent reasonably practicable, the information exchanged pursuant to Article 7.1. For the purposes of determining the number of Cargoes required to be scheduled to satisfy the ACQ in any Contract Year, Buyer's good faith estimate of the expected energy content (in MMBtus) of the LNG to be loaded on each of the nominated LNG Tankers shall be used, which estimate shall take account of the volumetric capacity of each such LNG Tanker, the Gross Heating Value of the LNG to be delivered and relevant characteristics and operations of the Trinidad Facilities ("Estimated Cargo Content"). The Estimated Cargo Content of any particular LNG Tanker shall be subject to adjustment by Buyer or Seller from time to time in the event of a change in any relevant variable or in the event that actual experience with such LNG Tanker shows that the Estimated Cargo Content proposed is not the best estimate.

The proposed delivery programme shall detail the expected pattern and order in which deliveries of LNG shall be made, including, for each Cargo, the LNG Tanker to be utilised, (the "Scheduled LNG Tanker"), the destination thereof, the estimated dates of commencement of each loading and the scheduled downtime for the Trinidad Facilities, the Enagas Receiving Facilities and the LNG Tanker(s).

(d)    Buyer agrees that it will use its best endeavours to cooperate with ▮▮▮▮ with the aim of agreeing with ▮▮▮▮ on a joint proposal to be made to Seller regarding the pattern and timing of delivery of their respective Cargoes which shall be reflected in the information provided by Buyer pursuant to Article 7.1(c). Seller and Buyer agree to use their best endeavours to reach agreement with ▮▮▮▮ on rules and procedures for the development of a joint annual delivery programme among them.

(e)    If Seller and Buyer have not agreed a delivery programme for any Contract Year thirty (30) days before the start of that Contract Year, the annual delivery programme shall be issued by Seller, paying due regard to the delivery pattern shown in the previous Contract Year(s), and to the extent reasonably practicable, the information exchanged pursuant to Article 7.1, provided that to the extent that any joint proposal by Buyer and ▮▮▮▮ is incompatible with Seller's operational concerns at the Trinidad Facilities, or in the absence of any such joint proposal having been made, Seller may require that deliveries to Buyer be scheduled on an alternating basis with ▮▮▮▮ deliveries which reflects the proportions that their respective Winter and Summer Quantities bear to the Trinidad Facilities output during the Winter and Summer Periods. Such annual delivery programme shall be delivered to Buyer as soon as reasonably practicable thereafter, but in no event later than five (5) days before the start of that Contract Year.

(f)    The delivery programme agreed between Buyer and Seller pursuant to sub-Article (c) or prepared by Seller pursuant to sub-Article (e) is in this Contract referred to as the "Annual Delivery Programme."

7.3    Ninety-Day Schedules

Not later than the fifteenth (15th) day of each Month in each Contract Year, Seller shall, after discussion with Buyer and taking into account, subject to Article 7.4 and to the extent reasonably practicable, any updated information exchanged by the Parties pursuant to Articles 7.1 and 7.2 above, deliver to Buyer a three-Month forward plan of deliveries (the "Ninety-Day Schedule"), which follows the applicable Annual Delivery Programme as nearly as practicable and sets forth for

each Cargo the expected date of commencement of loading ("Scheduled Loading Date"), the Scheduled LNG Tanker for each Cargo, the receiving facilities which are the destination for each Cargo, and the departure dates of such LNG Tanker from the Enagas Receiving Facilities, drydock/repair port, or other permitted point of departure, for each of the next three (3) Months. Seller shall also provide Buyer with the scheduled loading dates and any other relevant information pertaining to ███████ Each Ninety-Day Schedule shall set forth all adjustments, if any, necessitated by deviation from prior Ninety-Day Schedules so as to maintain as far as practicable the deliveries forecast in the Annual Delivery Programme. The Parties shall cooperate to facilitate smooth performance of the Ninety-Day Schedule. After consultation with Buyer, Seller shall revise the Ninety-Day Schedule when appropriate to meet operational requirements with the overall objective of fulfilling the Annual Delivery Programme.

7.4   Adjustments to Scheduled Loading Dates or Scheduled LNG Tankers

Where an adjustment to a Scheduled Loading Date or a Scheduled LNG Tanker is requested by Buyer for any reason, including a request for an adjustment resulting from a change in the destination of Cargo, or resulting from the late arrival at the Loading Port of the Scheduled LNG Tanker, Seller shall use reasonable endeavours to accommodate such requested adjustment, taking into account its obligation to maintain as far as practicable the deliveries forecast in the Annual Delivery Programme. Seller shall accommodate such Buyer's request if Seller determines that doing so would not detrimentally affect the operation of the Trinidad Facilities or delay any subsequent scheduled deliveries. In the event accommodation of such Buyer's request would not detrimentally affect the operation of the Trinidad Facilities but is predicted by Seller to result in a delay of any subsequent scheduled deliveries to any purchaser(s) of LNG from the Trinidad Facilities, Seller shall accommodate such request provided Buyer provides Seller with prior written concurrence of the affected subsequent purchaser(s) to the resulting changes to its (their) scheduled loading date(s). In the event the accommodation of such Buyer's request would not detrimentally affect the operation of the Trinidad Facilities but is predicted by Seller to result in other costs or liabilities, it shall promptly so notify such Buyer specifying the anticipated amount and/or nature of such costs and or liabilities and shall accommodate such request provided that Buyer agrees to indemnify Seller for all costs and/or liabilities resulting from said accommodation. Buyer shall use

reasonable endeavours to accommodate any request or proposal by Seller to adjust the Ninety-Day Schedule as a result of its inability to make Cargo(es) available to Buyer in accordance with the Scheduled Loading Dates. Where an adjustment to the Scheduled Loading Date is requested by Seller for any reason, Buyer shall use reasonable endeavours to accommodate such requested adjustment. In the event the accommodation of Seller's request is predicted by Buyer to result in costs or liabilities to Buyer, Buyer shall promptly so notify Seller specifying the anticipated amount and/or nature of such costs and/or liabilities and shall accommodate such request provided that Seller agrees to indemnify Buyer for all costs and/or liabilities resulting from such accommodation. Any such adjustments made to Scheduled Loading Date(s) provided for in this Article 7.4 shall not affect, amend, reduce or increase either Party's obligations pursuant to Article 5.

7.5     Buyer's Request to Schedule Less than the ACQ

If Buyer notifies Seller at the time of preparation of the Annual Delivery Programme or thereafter that it does not wish to schedule and does not intend to take delivery of all Cargo(es) required to be scheduled in order to satisfy its ACQ obligations, but at a later date requests Seller to make any such Cargo(es) available, Seller shall use reasonable endeavours to accommodate such request(s) and make such Cargo(es) available; provided that to do so would not interfere with other scheduled deliveries of LNG or other operations at the Trinidad Facilities. In the event Seller cannot accommodate Buyer's request, Seller shall in no event be held to be in default of its obligations to make the ACQ available to Buyer as to said Cargo(es).

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 8 - PRICE

8.1    Contract Price

The Contract Price, P, applicable to each ███████████████ ██████████████████████████████ in US Dollars per MMBtu in accordance with the formula:

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

███████████are the base values of ███████████ respectively, and have the following values:

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

The Contract Price so calculated shall remain in force for the duration ██████████████████████████████████████████████████████████

## 8.2    Calculations

All calculations pursuant to this Article 8 shall be made to eight (8) decimal places without rounding off.  The price so determined shall be rounded to four (4) places of decimals.  In doing this rounding, a figure of five thousand (5000) or more in the last four (4) of the eight (8) decimal places shall cause a rounding up of the fourth decimal place, and a figure of less than five thousand (5000) in the last four (4) of the eight (8) decimal places shall cause the fourth (4th) decimal place to remain unchanged.

## 8.3    Preliminary Contract Price

If for any reason, any relevant value necessary for the determination of ████████████████████ not available at the time an invoice is to be issued, a preliminary Contract Price shall be determined using the monthly values of ████████████ and/or ██ as are then available for the relevant Months of the Reference Period and using for the remaining Month(s) of the Reference Period for which such values are not yet available, the value for the latest Month then available.  Appropriate adjustments shall be made as soon as reasonably practicable after all values of ████████████████ necessary for the computation of the final Contract Price become available, in the manner provided in Articles 9.1(d) and 9.1(e).

## 8.4    Problems in Calculation of Contract Price

In the event that on any ████████████████████████████ cannot be calculated as a result of:

(i)    the failure of the publisher of ████████████████████ ██████████ to publish relevant index on any day or days within the Reference Period; and/or

(ii)    the cessation or the suspension of the publication in █████ ████████████████████████████ of any relevant index;

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

or if the calculation of the Contract Price is seen to be problematic by either Party due to:

(iii)   the basis upon which any index is calculated having changed such that the index no longer reflects the value of the commodity to which it refers or the quality or type of commodity to which such index refers has changed materially; and/or

(iv)   any index has been wrongly computed and published in error;

either Party may notify the other of any of points (i) to (iv) of this Article 8.4 and the Parties shall meet and endeavour to agree upon an amendment to, or replacement of, such index which amendment or replacement shall achieve as closely as possible the intent and objective of the original index. If within ninety (90) days of the service of such notice no agreement has been reached then at the request of either Party the matter shall be referred to an Expert for determination.

8.5   Contract Price Reopener

(a)   If at any time either Party considers ███████████████████ ██████ beyond the control of the Parties, while exercising due diligence, have substantially changed as compared to what it reasonably expected when entering into this Contract or, after the first Contract Price revision under this Article 8.5, at the time of the latest Contract Price revision under this Article 8.5, and the Contract Price resulting from application of the formula set forth in Article 8.1 does not reflect the value of Natural Gas in the Buyer's end user market, then such Party may, by notifying the other Party in writing and giving with such notice information supporting its belief, request that the Parties should forthwith enter into negotiations to determine whether or not such changed circumstances exist and justify a revision of the Contract Price provisions and, if so, to seek agreement on a fair and equitable revision of the above-mentioned Contract Price provisions in accordance with the remaining provisions of this Article 8.5.

(b)   In reviewing the Contract Price in accordance with a request pursuant to sub-Article 8.5(a) above the Parties shall take into account levels and trends in the price of supplies of LNG and Natural Gas ███████████████████████████ such supplies being sold under commercial contracts currently in force

55

on arm's length terms, and having due regard to all characteristics of such supplies (including, but not limited to quality, quantity, interruptibility, flexibility of deliveries and term of supply).

(c)  The Contract Price as revised in accordance with this Article, shall in any event, allow the Buyer to market the LNG supplied hereunder in competition with all competing sources or forms of energy (including, but not limited to, natural gas, fuel oil, gasoil, coal, LPG, district heating and electricity) in the market of the Buyer at the point of consumption, taking into account, inter alia, all appropriate operations, services and risks which are usual within the Natural Gas industry from the points of import for handling and marketing the Natural Gas in all market segments when due regard is given to all characteristics of the LNG supplied under this Agreement (including, but not limited to, delivery point, quality, continuity, flexibility of deliveries and term of supply) and on the basis that sound marketing practices and efficient operations on the part of the Buyer are assumed and such Contract Price shall allow the Buyer to achieve a reasonable rate of return on the LNG delivered hereunder.

(d)  Neither Party shall request a Contract Price revision to be effective as of a date which is earlier than twelve (12) Months following the Date of First Commercial Supply and no Party shall request any further revision to be effective as of a date which is earlier than three (3) Calendar Years after the date as of which such Party has last requested a revision to be effective.

(e)  Unless the Parties agree otherwise, no price revision shall be effective:

(i)  earlier than provided for in (d) above;

(ii)  retroactively before the date of notification of the request of such revision; or

(iii)  earlier than six (6) months before the date on which agreement is reached or arbitration proceedings are initiated on such revision,

whichever is the latest.

56

**LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS**

(f)    If agreement is not reached within six (6) months from the date of notifying the request for Contract Price revision, either Party may submit the matter to arbitration for decision in accordance with the criteria set out in sub-Articles (b) and (c) above.

(g)    While, and notwithstanding, the Parties have not reached agreement and no arbitration award is effective, this Contract shall remain in full force and effect and the rights and obligations of the Parties, including, without limitation, the obligations of the Seller to sell and deliver and the obligations of the Buyer to take and/or pay for LNG at the Contract Price shall remain in effect.

(h)    Each Party shall provide all necessary information to substantiate its own claim. No Party shall be required to disclose any business secrets or breach any confidentiality undertaking nor to provide such information as the other Party may need to substantiate its claim.

## 8.6    Price For Quantity Deficiencies

The price utilised in calculating payments to be made in respect of any Winter Period Quantity Deficiency shall be

The price utilised in calculating payments to be made in respect of any Annual Quantity Deficiency shall be

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 9 - INVOICING AND PAYMENT

9.1    Cargo Invoices and Documents

(a)    Promptly after completion of each loading of an LNG Tanker, Buyer shall furnish copies of all gauging and measurement records to Seller in accordance with Article 11.4. On the basis of such information, Seller, or its representative, shall furnish to Buyer a certificate of volume loaded together with such other documents concerning the Cargo as may be reasonably requested by Buyer for purposes of Spanish customs clearance.

(b)    Seller shall further, within forty-eight (48) hours of completing the loading, cause a laboratory analysis to be completed to determine the quality and Gross Heating Value of the LNG and shall promptly furnish Buyer, or Buyer's representative, with a certificate with respect thereto together with details of the calculation of the number of MMBtus sold.

(c)    Promptly upon completion of such analysis and calculation, Seller, or its representative, shall furnish by facsimile or telex to Buyer an invoice, stated in U.S. Dollars, for the amount of the product of the Contract Price and the number of MMBtus loaded. At the same time, Seller shall send Buyer an original of the invoice and relevant documents showing the basis for the calculation thereof.

(d)    In the event of,

(i)    the failure for any reason by Buyer to provide required gauging and measurement records in accordance with Article 9.1(a), and/or,

(ii)    the inability of Seller to obtain the results of sampling and analysis under Article 9.1(b), and/or,

(iii)    the unavailability of the relevant information necessary to compute the Contract Price,

Seller may issue a provisional invoice ("Provisional Invoice") in an amount calculated in the case of sub-Articles (i) and (ii), by multiplying the Estimated Cargo Content for the relevant vessel,

by the prevailing Contract Price, and in the case of sub-Article (iii), by multiplying the quantity of MMBtus of LNG actually delivered to Buyer by the preliminary Contract Price computed in accordance with Article 8.3. A Provisional Invoice shall be deemed to be an invoice issued pursuant to this Article 9.1 for the purposes of the payment obligations of Buyer, and shall be subject to subsequent adjustment in accordance with the following sub-Article (e).

(e)     If a Provisional Invoice has been issued, Seller shall issue a credit note or debit note, as applicable, as soon as reasonably practicable after,

(i)     notifications have been received by Seller of the results of sampling, analysis and quantity determination in accordance with this Article 9.1, if the Provisional Invoice was issued as a result of sub-Articles (d)(i) or (d)(ii) above; or,

(ii)    the information necessary to compute the Contract Price has been obtained by Seller, if the Provisional Invoice was issued as a result of sub-Article (d)(iii) above.

The Buyer shall settle such debit note and the Seller shall settle such credit note, as the case may be, together with payment of the next Invoice.

9.2     Invoices for Quantity Deficiencies; Annual Statement

(a)     In the event that any amounts are payable by Buyer to Seller pursuant to Article 5.3(a)(i) on account of a Winter Period Quantity Deficiency, Seller shall, no later than sixty (60) days following the end of the Winter Period, submit to Buyer an invoice for such amount and a supporting statement showing the amount of LNG delivered and paid for during the Winter Period, the Winter Period Quantity Deficiency, the portion thereof for which Buyer is liable to pay Seller (in multiples of 2,800,000 MMBtus) and the applicable price therefor, computed in accordance with Article 8.6.

(b)     No later than ninety (90) Days following the end of each Contract Year, Seller shall prepare and submit to Buyer a statement

59

("Annual Statement") showing for the Contract Year the following information, along with an invoice for any amounts that may be payable to Seller on account of an Annual Quantity Deficiency:

(i)     the quantities of LNG delivered and paid for by Buyer;

(ii)    the amount of any Annual Quantity Deficiency, or the amount taken and paid for by Buyer in excess of the ACQ, as the case may be;

(iii)   the amount, if any, of the Winter Period Quantity Deficiency for which Buyer previously was invoiced and paid pursuant to Articles 5.3(a)(i) and 9.2(a);

(iv)   that portion of the Annual Quantity Deficiency, if any, which is to be carried forward and added to the ACQ for the next Contract Year pursuant to Articles 5.3(a)(ii) or 5.3(a)(iii);

(v)    that portion of the Annual Quantity Deficiency, if any, (in multiples of 1,600,000 or 2,800,000 MMBtus, or any combination thereof) for which Buyer is liable to pay Seller pursuant to Articles 5.3(a)(iii) and 5.3(a)(iv);

(vi)   the applicable price computed pursuant to Article 8.6 for that portion of the Annual Quantity Deficiency determined in sub-Article (v) above, for which Buyer is required to pay Seller.

(c)   Any invoice for a Winter Period Quantity Deficiency or Annual Quantity Deficiency pursuant to Articles 9.2(a) or 9.2(b) shall be due and payable within thirty (30) days after receipt by Buyer.

9.3   Other Invoices

In the event that any other moneys are due from one Party to the other hereunder, then the Party to whom such moneys are due shall furnish or cause to be furnished an invoice by facsimile or telex therefor and relevant documents showing the basis for the calculation thereof.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

9.4    Invoice Due Dates

Each invoice to Buyer referred to in Article 9.1 above shall become due and payable by Buyer on the twelfth (12th) calendar day after the date on which the invoice (which may be by facsimile or telex) has been received by Buyer in Spain.

Each other invoice to Buyer hereunder, except invoices for a Quantity Deficiency submitted pursuant to Article 9.2, shall become due and payable by Buyer on the fifteenth (15th) calendar day after the date of Buyer's receipt of such invoice in Spain.

Each invoice to Seller shall become due and payable on the fifteenth (15th) calendar day after Seller's receipt thereof in Trinidad.

In the case of an invoice to Buyer, if any invoice due date is not a Business Day in Spain, such invoice shall become due and payable on the next day which is a Business Day in Spain. In the case of an invoice to Seller, if any invoice due date is not a Business Day in the country in which Seller has notified Buyer its accounts payable banking will be conducted, such invoice shall become due and payable on the next day which is a Business Day in such country.

In the event the full amount of any invoice is not paid when due, any unpaid amount thereof shall bear interest, compounded annually, from and including the day following the due date up to and including the date when payment is made, at an interest rate two percent (2%) greater than the Base Rate in effect from time to time during the period of delinquency. Such interest rate shall be adjusted up or down, as the case may be, to reflect any changes in the aforesaid Base Rate as of the dates of such changes in the Base Rate.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

9.5     Payment

Buyer shall pay, or cause to be paid, in U.S. Dollars in immediately available funds all amounts which become due and payable by Buyer pursuant to any invoice issued hereunder, to a bank account or accounts designated by and in accordance with instructions issued by Seller. Seller shall pay, or cause to be paid, in U.S. Dollars in immediately available funds all amounts which become due and payable by Seller pursuant to any invoice issued hereunder to a bank account or accounts designated by and in accordance with instructions issued by Buyer. The paying Party shall not be responsible for a designated bank's disbursement of amounts remitted to such bank, and a deposit in immediately available funds of the full amount of each invoice with such bank shall constitute full discharge and satisfaction of the obligations to pay such invoice under this Contract. Each payment of any amount owing hereunder shall be in the full amount due without reduction or offset for any reason, including, without limitation, taxes, exchange charges or bank transfer charges.

9.6     Seller's Rights Upon Buyer's Failure To Make Payment

(a)     If Buyer is in default with respect to any payment obligation under this Contract, Seller shall send Buyer a notice of default ("Default Notice"), and Buyer shall have five (5) Business Days following the giving of such Default Notice to cure the default by payment in full of the amount in default, including interest as specified in Article 9.4, by wire transfer to Seller's bank account.

(b)     If payment of any invoice for quantities of LNG sold hereunder or for a Quantity Deficiency is not made in accordance with this Contract within fifteen (15) days after the due date thereof, Seller shall be entitled, upon giving fifteen (15) days' written notice to Buyer, to suspend subsequent sales to Buyer until the amount of such invoice and interest thereon has been paid and Buyer shall not be entitled to any make-up rights in respect of any Cargoes not delivered during such suspension.

(c)     If any such invoice is not paid within sixty (60) days after the due date thereof, then Seller shall have the right, at Seller's election, upon no less than thirty (30) days notice to Buyer, to terminate this Contract, effective upon the date specified in such notice. Any such termination shall be without prejudice to any other rights

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

and remedies of Seller arising hereunder or by law or otherwise, including the right of Seller to receive payment of all obligations and claims which arose or occurred prior to such termination or by reason of such default by Buyer.

9.7    Disputed Invoices

In the event of disagreement concerning any invoice or credit note, the invoiced Party or Party owing the credit, as the case may be, shall make provisional payment or credit of the total amount thereof and shall immediately notify the other Party of the reasons for such disagreement, except that in case of obvious error in computation, the correct amount shall be paid disregarding such error.

Invoices and credit notes may be contested or modified only if, within a period of one hundred eighty (180) days after receipt thereof, Buyer or Seller serves notice on the other, questioning their correctness. If no such notice is served, invoices and credit notes shall be deemed correct, final and accepted by both Parties. Promptly after resolution of any dispute as to an invoice, the amount of any overpayment or underpayment shall be paid by Seller or Buyer to the other, as the case may be, plus interest at the rate provided in Article 9.4 from the date payment was due to the date of payment.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 10 - QUALITY

### 10.1  Gross Heating Value

The LNG, when delivered by Seller to Buyer, shall have, in a gaseous state, a Gross Heating Value of not less than 1030 Btu per Standard Cubic Foot and not more than 1085 Btu per Standard Cubic Foot. For the purposes of this Article 10, a Standard Cubic Foot shall mean the volume of anhydrous Natural Gas that occupies one actual cubic foot at a temperature of sixty (60.0) degrees Fahrenheit (15.55556 degrees Celsius) and an absolute pressure of 14.73 pounds per square inch absolute ("psia").

### 10.2  Components

The LNG when delivered by Seller to Buyer shall, in a gaseous state, contain not less than eighty-eight molecular percentage (88 mol%) of methane ($CH_4$) and, for the components and substances listed below, such LNG shall not contain more than the following:

(A)   Nitrogen ($N_2$), 1.0 mol%.
(B)   Ethane ($C_2$), 8.0 mol%
(C)   Propane ($C_3$), 2.75 mol%
(D)   Isobutane ($iC_4$), 0.47 mol%
(E)   Normal butane ($C_4$), 0.64 mol%.
(F)   Pentanes ($C_5$) and heavier, 0.10 mol%.
(G)   Hydrogen sulphide ($H_2S$), 0.0004 mol%.
(H)   Mercaptan Sulphur, 2.0 mg/Nm$^3$
(I)   Total sulphur content, 35 mg/Nm$^3$
(J)   Carbon Dioxide, ($CO_2$), 0.01 mol%

### 10.3  Density

The LNG when delivered by Seller to Buyer shall, when measured in a liquid state at a temperature of minus one hundred sixty (-160) degrees Centigrade, have a density no less than 431 kg/m$^3$ and no greater than 464 kg/m$^3$.

Should any question regarding quality of the LNG arise, Buyer and Seller shall consult and cooperate concerning such question.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 11 - MEASUREMENTS, TESTS AND ANALYSIS

11.1   Parties To Supply Devices

Unless otherwise agreed, Buyer and Seller shall both supply equipment and conform to procedures that are in accordance with the latest appropriate International Organization for Standards (ISO) documents.

Buyer or Buyer's agent shall supply, operate and maintain, or cause to be supplied, operated and maintained, suitable gauging devices for the LNG tanks of the LNG Tankers, pressure and temperature measuring devices, and any other measurement or testing devices which are incorporated in the structure of LNG tankers or customarily maintained on shipboard.

Seller shall supply, operate and maintain, or cause to be supplied, operated and maintained, devices required for collecting samples and for determining quality and composition of the LNG and any other measurement or testing devices which are necessary to perform the measurement and testing required hereunder at the Trinidad Facilities.

11.2   Selection of Devices

All devices provided for in this Article 11 shall be chosen by mutual agreement of the Parties.  Selection criteria shall include accuracy, reliability and cost.  The required degree of accuracy (which shall in any case be within the permissible tolerances defined herein and in the applicable standards referenced herein) of such devices selected shall be mutually agreed upon by Buyer and Seller.  In advance of the use of any device the Party providing such device shall cause tests to be carried out to verify that such device has the required degree of accuracy.  The provisions of Article 11.9(a) shall apply to such tests.

11.3   Tank Gauge Tables of LNG Tankers

Buyer shall provide Seller, or cause Seller to be provided, with a certified copy of tank gauge tables for each tank of each LNG Tanker verified by a competent impartial authority or authorities mutually agreed upon by the Parties.  Such tables shall include correction tables for list, trim, tank contraction and any other items requiring such tables for accuracy of gauging.  Seller and Buyer shall each have the right to

65

have representatives present at the time each LNG tank on each LNG Tanker is volumetrically calibrated.

If the LNG tanks of any LNG Tanker suffer distortion of such nature as to cause a prudent expert reasonably to question the validity of the tank gauge tables described herein (or any subsequent calibration provided for herein), Buyer or Buyer's agent shall recalibrate the damaged tank(s), and the vessel will not be permitted to load such tank(s) until appropriate corrections are made. If mutually agreed between Buyer and Seller representatives, recalibration of damaged tank(s) can be deferred until the next time they are warmed up for any reason and any corrections to the prior tank gauge tables will be made from the time the distortion occurred. If the time of the distortion cannot be ascertained, the parties shall mutually agree on the time period for retrospective adjustments.

## 11.4    Gauging and Measuring LNG Volumes Delivered

Upon Seller, or Seller's representative, and the independent surveyor, if present, arriving on board the LNG Tanker prior to the commencement of or during loading, Buyer or Buyer's representative shall make available to them a certified copy of tank gauge tables for each tank of the LNG Tanker.

Volumes of LNG delivered pursuant to this Contract shall be determined by gauging the LNG in the tanks of the LNG Tankers before and after loading. Each Cargo tank shall be equipped with two sets of level gauges, each set utilizing a different measurement principle. Comparison of the two systems, designated as Primary and Secondary Measurement Systems, shall be performed from time to time in order to ensure compliance with the acceptable performance tolerances stated herein.

Gauging the liquid in the tanks of the LNG Tankers and measuring of liquid temperature, vapour temperature and vapour pressure in each LNG tank, trim and list of the LNG Tankers, and atmospheric pressure shall be performed, or caused to be performed, by Buyer before and after loading. The Seller or Seller's representative shall have the right to be present while all measurements are performed and shall verify the accuracy and acceptability of all such measurements. All measuring equipment must be maintained, calibrated and tested in accordance with the manufacturer's recommendations. In the absence of a

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

manufacturer's recommendation, the minimum frequency of calibration shall be six (6) months, unless otherwise mutually agreed between the Parties. Documentation of all tests and calibrations will be made available by the Party performing the same to the other Party. Acceptable accuracy and performance tolerances will be:

| | |
|---|---|
| Temperature: | +/- 0.2 degrees Celsius at -160 degrees Celsius |
| Pressure: | +/- 2% of the calibrated span of the measuring device |
| Level Gauge: | +/- 10 millimeter |
| Level Gauge Systems Comparison: | +/- 10 millimeter |

The first gauging and measurements shall be made immediately before the commencement of loading. The second gauging and measurements shall take place immediately after the completion of loading. The liquid level in the LNG Tanker before and after the loading shall be determined by at least two separate tank gaugings to be conducted at least fifteen (15) minutes apart.

Copies of gauging and measurement records shall be furnished to Seller immediately upon completion of loading.

(a)    Gauging the Liquid Level of LNG
The level of the LNG in each LNG tank of the LNG Tanker shall be gauged by means of the primary gauging device installed in the LNG Tanker for that purpose. The level of the LNG in each tank shall be logged or printed.

(b)    Determination of Temperature
The temperature of the LNG and of the vapour space in each tank shall be measured by means of a sufficient number of properly located temperature measuring devices to permit the determination of average temperature. Temperatures shall be logged or printed.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(c)    Determination of Pressure

The pressure of the vapour in each LNG tank shall be determined by means of pressure measuring devices installed in each LNG tank of the LNG Tankers. The atmospheric pressure shall be determined by readings from the standard barometer installed in the LNG Tankers.

(d)    Determination of Density

The LNG density shall be calculated using the revised Klosek-McKinley method described within ISO 6578-91. This method shall be updated to conform to any official published revision of that document. Should any improved data, method of calculation or direct measurement device become available which is acceptable to both Buyer and Seller, such improved data, method or device shall then be used. If density is determined by measurements, the results shall be logged or printed.

11.5    Samples for Quality Analysis

Flow proportional representative liquid samples shall be collected from an appropriate point located as close as practical to the loading line starting two hours after the beginning of transfer and ending two hours before the end of transfer. Samples taken when biphasic or overheated LNG is suspected to be in the main transfer line will be disregarded. These incremental samples will be passed through a vaporizer, and samples of the vaporized liquid will be analyzed by an on line gas chromatograph. The resulting analyses which are proportional to time will be mathematically flow weighted to yield an analysis that is representative of the loaded Cargo. This flow rate weighted analysis shall be used for all appropriate calculations associated with the delivered Cargo. Should the automatic sampling system fail during the loading, manual samples shall be collected and analyzed for accounting purposes.

Prior to the end of the loading cycle, two spot samples shall be collected from the vaporizer. Spot samples shall be collected in accordance with Gas Processors Association (GPA) Standard 2166 - Methods for Obtaining Natural Gas Samples for Analysis by Gas Chromatography - or by other mutually agreeable methods. The samples shall be properly labeled and then distributed to the Buyer and Seller. Seller shall retain one sample for a period of thirty (30) days,

unless the analysis is in dispute. If the analysis is in dispute, the sample will be retained until the dispute is resolved.

11.6    Quality Analysis

Chromatograph calibration gases shall be provided and their composition certified by an independent third party. From time to time, deviation checks should be performed to verify the accuracy of the gas composition mole percentages and resulting calculated physical properties. Analyses of a sample of test gas of known composition resulting when procedures that are in accordance with the above mentioned standards have been applied will be considered as acceptable if the resulting calculated Gross Heating Value is within +/- 0.3% of the known Gross Heating Value of the test gas sample. If the deviation exceeds the tolerance stated, the Gross Heating Value (Btu), Relative Density and Compressibility previously calculated will be corrected immediately. Previous analyses will be corrected to the point where the error occurred, if this can be positively identified to the satisfaction of both parties. Otherwise it should be assumed that the drift has been linear since the last recalibration and correction should be based on this assumption.

All samples necessary to fulfill contractual obligations shall be analyzed by Seller to determine the molar fraction of the hydrocarbon and other components in the sample by gas chromatography using a mutually agreed method in accordance with "G.P.A. Standard 2261 - Method of Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography", published by the Gas Processors' Association (G.P.A.), current as of January 1, 1990 and as periodically updated or as otherwise mutually agreed by the Parties. If better standards for analysis are subsequently adopted by G.P.A. or other recognized competent impartial authority, upon mutual agreement of Buyer and Seller, they shall be substituted for the standard then in use, but such substitution shall not take place retroactively. A calibration of the chromatograph or other analytical instrument used shall be performed by Seller immediately prior to the analysis of the sample of LNG delivered. Seller shall give advance notice to Buyer of the time Seller intends to conduct a calibration thereof, and Buyer shall have the right to have a representative present at each such calibration; provided, however, Seller will not be obligated to defer or reschedule any calibration in order to permit the representative of Buyer to be present.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Seller shall determine the presence of Hydrogen Sulfide ($H_2S$) by use of Gas Processors Standard 2377 - Test of Hydrogen Sulfide and Carbon Dioxide in Natural Gas  Using Length of Stain Tubes.  If necessary, the concentration of $H_2S$ and total sulfur will be determined using one or more of the following methods as is appropriate: gas chromatography, Gas Processors Standard 2265 - Standard for Determination of Hydrogen Sulfide and Mercaptan Sulfur in Natural Gas (Cadmium sulfate - Iodometric Titration Method) or any other method that is mutually acceptable.

11.7    <u>Operating Procedures</u>

Prior to conducting operations for measurement, gauging, sampling and analysis provided in Articles 11.4, 11.5 and 11.6, the Party responsible for such operations shall notify the appropriate representatives of the other Party, allowing such representatives reasonable opportunity to be present for all operations and computations; provided, however, the absence of the other Party's representative after notification and opportunity to attend shall not prevent any operations and computations from being performed.

At the request of either Party any measurement, gauging, sampling and analysis provided for in Articles 11.4, 11.5 and 11.6 shall be witnessed and verified by an independent  surveyor mutually agreed upon by the Buyer and Seller.  The results of such surveyor's verifications shall be made available promptly to each Party.

All records of measurement and the computed results shall be preserved by the Party responsible for taking the same, or causing the same to be taken, and made available to the other Party for a period of not less than three (3) years after such measurement and computation.

11.8    <u>Btu Quantities Sold and Delivered</u>

The quantity of Btus sold and delivered shall be calculated by Seller and verified by the Buyer.  Either Party may, at its own expense, require the measurements and calculations and/or their verification by an independent surveyor, mutually agreed upon by the Parties.  Consent to an independent surveyor proposed by a Party shall not be unreasonably withheld by the other Party.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(a)  Determination of Gross Heating Value

All component values shall be in accordance with the latest revision of GPA Standard 2145 - Table of Physical Constants of Paraffin Hydrocarbons and Other Components of Natural Gas. The Gross Heating Value of the gas delivered shall be determined as described in GPA Preference Bulletin 181 - Tentative Reference Bulletin Heating Value as a Basis for Custody Transfer of Natural Gas. Calculations shall be in accordance with GPA 2172 - Calculation of Gross Heating Value, Specific Gravity and Compressibility of Natural Gas Mixtures from Compositional Analysis, latest revision.

(b)  Determination of Volume of LNG Loaded

The LNG volume in the tanks of the LNG Tanker before and after loading shall be determined by gauging as provided in Article 11.4 on the basis of the tank gauge tables provided for in Article 11.3. The volume of LNG remaining in the tanks of the LNG Tanker before loading shall then be subtracted from the volume after loading and the resulting volume shall be taken as the volume of the LNG delivered to the LNG Tanker.

If failure of the primary gauging and measuring devices of an LNG Tanker should make it impossible to determine the LNG volume, the volume of LNG delivered shall be determined by gauging the liquid level using the secondary gauging and measurement devices. If an LNG Tanker is not so equipped, the volume of LNG delivered shall be determined by gauging the liquid level in Seller's onshore LNG storage tanks immediately before and after loading the LNG Tanker, and such volume shall be reduced by subtracting an estimated LNG volume, agreed upon by the Parties, for boil-off from such tanks during the loading of such LNG Tanker. Seller shall provide Buyer, or cause the Buyer to be provided with, a certified copy of tank gauge tables for each onshore LNG tank which is to be used for this purpose, such tables to be verified by a competent impartial authority.

(c)  Determination of Btu Quantities Sold and Delivered

The quantities of Btus sold and delivered shall be computed by Seller by means of the following formula:

71

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

$$Q = (V_{L2} - V_{L1}) \times D_{L2} \times HV_{L2}$$

in which:

$Q$: represents the quantity of Btus sold and delivered.

$V_{L1}$: represents the volume of LNG in cubic meters on board the vessel prior to loading.

$V_{L2}$: represents the volume of LNG in cubic meters on board the vessel after loading.

$D_{L2}$: represents the density value of the loaded LNG in kilograms per cubic meter.

$HV_{L2}$: represents the Gross Heating Value of the LNG loaded on the vessel in Btus per kilogram.

The units used and reported for Mass and Gross Heating Value will be kilograms and Btus/kilogram, respectively.

11.9    Verification of Accuracy and Correction for Error

(a)    Accuracy of devices used shall be tested and verified at the request of either Party, including the request by a Party to verify accuracy of its own devices. Each Party shall have the right to inspect at any time the measurement devices installed by the other Party, provided that the other Party be notified in advance. Testing shall be performed only when both Parties are represented, or have received adequate advance notice thereof, using methods recommended by the manufacturer or any other method agreed to by Seller and Buyer. At the request of any Party hereto, any test shall be witnessed and verified by an independent surveyor mutually agreed upon by Buyer and Seller. Permissible tolerances shall be as defined herein or as defined in the applicable standards referenced herein.

(b)    Inaccuracy of a device exceeding the permissible tolerances shall require correction of previous recordings, and computations made on the basis of those recordings, to zero error with respect to any period which is definitely known or agreed upon by the Parties as well as adjustment of the device. All the invoices issued during such period shall be amended accordingly to reflect such correction and an adjustment in payment shall be made

72

between Buyer and Seller. If the period of error is neither known nor agreed upon, and there is no evidence as to the duration of such period of error, corrections shall be made and invoices amended for each delivery made during the last half of the period since the date of the most recent calibration of the inaccurate device. However, the provisions of this Article 11.9(b) shall not be applied to require the modification of any invoice that has become final pursuant to Article 9.7.

## 11.10  Disputes

In the event of any dispute concerning the subject matter of this Article 11, including, without limitation, disputes over selection of the type or the accuracy of measuring devices, their calibration, the result of measurement, period of error of a device, sampling, analysis, computation or method of calculation, such dispute shall be submitted to an Expert appointed pursuant to Article 16.

## 11.11  Costs and Expenses of Test and Verification

All costs and expenses for testing and verifying Seller's measurement devices as provided for in this Article 11 shall be borne by Seller, and all costs and expenses for testing and verifying Buyer's measurement devices as provided for in this Article 11 shall be borne by Buyer. The fees and charges of independent surveyors for measurements and calculations as provided for in Articles 11.7, 11.8 and 11.9 shall be borne equally by Seller and Buyer.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 12 - TITLE AND RISK OF LOSS

Delivery shall be deemed completed and title to and risk of loss of the LNG shall pass from Seller to Buyer as the LNG passes the Delivery Point.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 13 - FORCE MAJEURE

13.1    Events of Force Majeure

(a)    Neither Seller nor Buyer shall be liable for any delay or failure in performance hereunder if and to the extent such delay or failure in performance directly results from any of the following causes or events not reasonably within the control of such Party. The foregoing provisions shall not be construed to require a party to observe a higher standard of conduct than that required by the usual and customary standards of the industry as a condition to claiming the existence of Force Majeure. Such events of Force Majeure shall include but not be limited to circumstances of the following kind:-

(i)    Fire, flood, atmospheric disturbance, lightning, storm, hurricane, tornado, earth-quake, landslide, soil erosion, subsidence, washout or epidemics;

(ii)    War, riot, civil war, blockade, insurrection, acts of public enemies or civil disturbances;

(iii)    Strike, lockout or other industrial disturbances;

(iv)    Damage to, loss or failure of Natural Gas reservoirs (other than through natural depletion by production) or production facilities from which the Reserves are produced, the facilities for transportation of Natural Gas from the production facilities to the Trinidad Facilities, or the Trinidad Facilities;

(v)    Damage to, loss or failure of the Enagas Receiving Facilities;

(vi)    Damage to, loss or failure of an LNG Tanker, to the extent to which such LNG Tanker is the Scheduled LNG Tanker for Cargo(es) set forth in the Annual Delivery Programme, Ninety Day Schedule or any agreed amendment thereto for the Contract Year during which the Force Majeure event occurs, and subject to the following:

(aa)    with respect to the Primary LNG Tanker, only when the Force Majeure event occurs while such LNG

75

Tanker is being used in transit between one of the receiving facilities provided for in Articles 2.4, 2.5, 2.7 and 2.8 and the Trinidad Facilities or is in transit between or involved in related maintenance/drydock activities;

(bb)   with respect to a Secondary LNG Tanker, regardless of when or where the Force Majeure event occurred;

(cc)   with respect to any Substitute LNG Tanker, only when the Force Majeure event occurs while such LNG Tanker is being used in transit between one of the receiving facilities provided for in Articles 2.4, 2.5, 2.7 and 2.8 and the Trinidad Facilities for the delivery of the specific Cargo(es) for which it has been substituted as the Scheduled LNG Tanker;

(vii)   Inability of Seller to obtain, or delays in obtaining at reasonable cost such servitudes or rights of way from non-governmental entities, necessary to construct and/or operate the Trinidad Facilities;

(viii)   Delay in completion and testing of any stage of the Trinidad Facilities so as to prevent the same from becoming operational on a continuing basis, which delay is caused by delay in receiving major items of equipment or materials from the manufacturer or vendor thereof, provided that Seller shall have taken all steps reasonably available to obtain timely delivery of such items including the placing of purchase orders within such time as was prudent under then existing circumstances;

(ix)   Acts of government including but not limited to the issuance or promulgation by a governmental body or entity having jurisdiction, of any court order, law, statute, ordinance, rule, regulation or directive, that directly affect the ability of a party to perform any obligation hereunder other than the obligation to remit payments on account of LNG sold and taken or not taken but required to be paid for under this Contract;

(x)    The inability to obtain, or the suspension, termination, adverse modification, interruption, or inability to renew, any servitude, right of way, easement, permit, license, consent, authorization or approval of any governmental entity, agency, national, port or other local authority or of any body or person holding itself out to be or to act for such authority;

(xi)   Inability of one or more of Buyer's customers to take delivery of LNG, Regasified LNG or Natural Gas pursuant to its/their purchase contract(s) with Buyer.

(b)    Notwithstanding the foregoing, events of Force Majeure shall not include:

(i)    the breakdown or failure of machinery caused by (aa) normal wear and tear which should have been avoided by the exercise of reasonable care and diligence, (bb) the failure to comply with the manufacturer's recommended maintenance and operating procedure, or (cc) the non-availability at appropriate locations of standby equipment or spare parts in circumstances where reasonable prudence and foresight would have required that such equipment or spare parts be made available;

(ii)   the non-availability or lack of funds or failure to pay money when due, except for failure to pay money caused by Force Majeure affecting all reasonable means of payment, in which event, on the cessation of such Force Majeure, the affected Party shall pay, in addition to the amounts due hereunder, interest on such amounts due at the Base Rate calculated from the due date to the date of payment;

(iii)  the withdrawal or expiration of or failure to obtain any approval or consent of any national or local governmental authority, agency or entity acting for or on behalf thereof, to the extent the affected Party reasonably can apply for and obtain, maintain or extend or could have reasonably applied for and obtained, maintained or extended, any such approval or consent;

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(iv) the failure to obtain any necessary consent, confirmation, authorisation or other approval of any national or local governmental authority, agency or entity acting for or on behalf thereof, of which the affected Party was aware, or reasonably should have been aware, as of the date of this Contract.

(c) Where an event or condition which primarily affects a third party or third parties (including, without limitation, the operators of the Reserves or the facilities for transportation of Natural Gas from the production facilities to the Trinidad Facilities, the Buyer's Transporter, Buyer's customers, the parties' Affiliates or their subcontractors) prevents or delays Seller's or Buyer's performance hereunder, such event or condition shall constitute Force Majeure hereunder as to Seller or Buyer, as appropriate, only if the event or condition is such that, if it happened to a Party, it would have come within the definition of Force Majeure under this Article 13.1.

13.2 Notice: Resumption of Normal Performance

(a) Immediately upon the occurrence of an event of Force Majeure that may delay or prevent the performance by Seller or Buyer of any of its obligations hereunder, the Party affected shall give notice thereof to the other Party describing such event and stating the obligations the performance of which are, or are expected to be, delayed or prevented, and (either in the original or in supplemental notices) stating:-

(i) Its bona fide good faith estimate of the period during which performance may be suspended or reduced, including to the extent known or ascertainable, the estimated extent of such reduction in performance; and

(ii) The particulars of the programme to be implemented to ensure full resumption of normal performance hereunder.

(b) In order to ensure resumption of normal performance of this Contract within the shortest practicable time, the Party affected by an event of Force Majeure shall take all measures to this end which are reasonable in the circumstances, taking into account the consequences resulting from such event of Force Majeure.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Prior to resumption of normal performance the Parties shall continue to perform their obligations under this Contract to the extent not prevented by such event.

(c)     Upon request of the non-affected Party given no sooner than the second Business Day after the affected Party's notice of Force Majeure, the affected Party shall forthwith use all reasonable endeavours to give or procure access for representatives of the non-affected Party to examine the scene of the event which gave rise to the claim of Force Majeure and such access shall be at the expense of the affected Party.

## 13.3     Settlement of Industrial Disturbances

Settlement of strikes, lockouts or other industrial disturbances shall be entirely within the discretion of the Party experiencing such situations and nothing herein shall require such Party to settle industrial disputes by yielding to demands made on it when it considers such action inadvisable.

## 13.4     Seller's Rights Upon Buyer's Force Majeure

If Buyer is rendered wholly or partially unable to accept deliveries of LNG under this Contract as a result of Force Majeure affecting Buyer, Seller shall have the right to enter into a binding contract to sell and deliver during such period the Cargo(es) which were or would have been scheduled for loading during the estimate of the period of Force Majeure inability to perform given by Buyer in accordance with Article 13.2(i).

## 13.5     Apportionment of Supplies

(a)     If performance of Seller's obligations hereunder to load or sell LNG to Buyer is prevented or excused by reason of Force Majeure, then any quantity of LNG which Seller is able to load and sell from the Trinidad Facilities shall, to the extent permitted by applicable law and subject as provided below, be made available for delivery to Buyer on a pro rata basis determined by multiplying the total quantity of LNG that Seller is able to supply from the Trinidad Facilities (whether for delivery to Buyer or delivery to Other Purchasers) by a fraction the numerator of which is Buyer's ACQ and the denominator of which is the

79

aggregate of Buyer's ACQ and the comparable entitlements of Other Purchasers under contracts existing at the time of the Force Majeure event.

(b)    In the event of an event or circumstance of Force Majeure affecting Buyer and the same event or circumstance affecting in the same way any of Buyer's other existing LNG supply contract(s) as notified to Seller prior to the date of this Contract and existing at the date of the Force Majeure, for the purpose of determining the extent to which Buyer is excused from its obligations hereunder by reason of Force Majeure, (subject to any provision inconsistent herewith in any of Buyer's other existing LNG supply contracts as notified to Seller prior to the date of this Contract and existing at the date of the Force Majeure and to the extent permitted by applicable law) any quantity of LNG (whether LNG produced at the Trinidad Facilities or by another supplier of Buyer) which Buyer is prevented as a result of the Force Majeure event from purchasing, lifting, importing, unloading, storing, regasifying and selling or reselling and transporting as LNG or Regasified LNG (whether produced from LNG supplied hereunder or by another supplier of Buyer), shall be multiplied by a fraction the numerator of which is Buyer's ACQ and the denominator of which is the aggregate of the Buyer's ACQ and the corresponding quantities under Buyer's other LNG supply contract(s) existing at the time of the Force Majeure which is (are) also affected by the same event or circumstance, and the product derived from such calculation shall correspond to the quantity of LNG in respect of which Buyer is relieved from its obligations on account of such Force Majeure (Seller's Force Majeure Share").

13.6    Application of Buyer's Force Majeure Relief

In order for Buyer to be entitled to Force Majeure relief in the form of a reduction to the Winter Quantity and/or ACQ pursuant to Article 5.3(b) with respect to a Cargo or Cargoes otherwise required to be scheduled and taken by Buyer in order for Buyer not to incur a Quantity Deficiency, Seller's Force Majeure Share must amount to at least one million six hundred thousand (1,600,000) MMBtus, with any further Force Majeure relief available to Buyer for each additional cumulative multiple of one million six hundred thousand (1,600,000) MMBtus or two million eight hundred thousand (2,800,000) MMBtus, or any combination thereof.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

### ARTICLE 14 - DUTIES, TAXES AND OTHER GOVERNMENTAL CHARGES

14.1  <u>Seller's Obligation</u>

Seller shall pay (or reimburse Buyer for any such payments made by Buyer or on behalf of Buyer, except as set forth in Article 14.2) all taxes (except for taxes imposed on the net income or receipts of a party other than Seller), royalties, duties or other imposts levied or imposed by the Government of Trinidad and Tobago or any subdivision thereof, or any other governmental authority in Trinidad and Tobago, on the sale or export of LNG under this Contract.

14.2  <u>Buyer's Obligation</u>

Buyer shall pay all port charges, including without limitation, customs clearance and immigration fees and ship's agent fees, or any other fees, duties, taxes or charges imposed by the Government of Trinidad and Tobago or any subdivision or other governmental authority in Trinidad and Tobago on LNG Tankers employed by Buyer for the transportation of LNG from the Republic of Trinidad and Tobago.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 15 - SELLER'S WARRANTY AND INDEMNITY

Seller warrants that it has title to all LNG supplied hereunder, and covenants it has the right to sell the same and that such LNG will be free from liens, encumbrances, adverse claims and proprietary rights at the passing of title at the Delivery Point, and that no circumstances will then exist which could give rise to any such encumbrances, adverse claims or proprietary rights other than those caused by acts or omissions of the Buyer.  Subject to the limitations set forth in Article 19, Seller will indemnify and hold Buyer harmless against all loss, liability, damage and expense of every kind on account of adverse claims or proprietary rights to title in the LNG supplied at the Delivery Point or encumbrances thereon, other than claims, rights, encumbrances caused by Buyer's acts or omissions.  For purposes of this Article 15, the term "encumbrance" shall include, without limitation, any mortgage, pledge, lien, charge, assignment by way of security, security interest, title retention, preferential right or trust arrangement or any other security agreement or arrangement having the effect of security.

**SELLER EXPRESSLY NEGATES ANY OTHER WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY WITH RESPECT TO CONFORMITY TO SAMPLES, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.**

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 16 - EXPERT

16.1    Scope

Whenever in this Contract disputes relating to technical matters are expressly required to be submitted to an Expert, the Parties agree to have recourse, if necessary, to the International Center for Technical Expertise of the International Chamber of Commerce (ICC) in accordance with the ICC's Rules for Technical Expertise.

16.2    Procedure

The procedure for the appointment of an Expert shall be as follows:

(a)    the Party wishing the appointment to be made shall give notice to that effect to the other Party and with such notice shall give details of the matter which it is proposed shall be resolved by the Expert;

(b)    the Parties shall meet and attempt to agree upon a single Expert to whom the matter in dispute be referred for determination;

(c)    if within fourteen (14) days from the service of the said notice the Parties have either failed to meet or failed to agree upon an Expert then the matter may forthwith be referred by the Party wishing the appointment to be made to the International Center for Technical Expertise of the ICC who shall be requested to select an Expert within twenty-one (21) days;

(d)    upon an Expert being agreed or selected under the foregoing provisions of this Article 16.2 the Parties (or either Party) shall forthwith notify such Expert of his selection and the proposed terms of his appointment (such terms to include inter alia a covenant from the Expert that such Expert will not during the term of his appointment accept any duty or acquire or agree to acquire any interest which materially conflicts with or may materially conflict with his function under such appointment, and that such Expert has not acquired or agreed to acquire such an interest) and shall request such Expert to confirm within thirty (30) days whether or not such Expert is willing and able to (and does in fact) accept the appointment on the terms proposed; and

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

    (e)    if such Expert does not accept such appointment on the terms proposed or shall not have confirmed his acceptance of such appointment within the said period of thirty (30) days, then (unless the Parties are able to agree upon different terms with the Expert from those previously proposed or are able to agree upon the appointment of another Expert) the matter may again be referred (by either Party) in the manner aforesaid to the International Center for Technical Expertise of the ICC who shall be requested to make a further selection and the process shall be repeated until an Expert is found who accepts appointment upon terms acceptable to the Parties.

16.3    New Expert

If within a reasonable period (which shall not without the prior consent of the Parties exceed ninety (90) days after the Expert has entered into a contract of appointment) such Expert shall not have rendered a decision then (at the request of either Party) a new Expert shall be appointed under the provisions of Article 16.2 and upon such new Expert entering into his contract of appointment the appointment of the previous Expert shall cease; provided that if the previous Expert shall have rendered a decision prior to the new Expert entering into a contract of appointment then such decision of such previous Expert shall (subject always to Article 16.5) be binding upon the Parties and the instructions (if any) to the new Expert shall be withdrawn.

16.4    Expert Not an Arbitrator

The Expert shall be deemed not to be an arbitrator for the purposes of this Contract.

16.5    Final and Binding Determination

The determination of the Expert shall be final and binding upon the Parties save in the event of fraud or breach by the Expert of his covenant referred to in Article 16.2(d) above and the procedure by which he reaches his determination shall not be subject to, and such determination itself shall not be appealable or subject to, challenge whether under any applicable arbitration statute or otherwise.

84

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

16.6    Costs

The costs and expenses of such Expert shall be borne equally by Seller
and Buyer.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 17   - APPLICABLE LAW

This Contract shall be governed by and interpreted in accordance with the laws of the State of New York, United States of America, excluding any choice-of-law rules which would require the application of the laws of any other jurisdiction.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 18 - ARBITRATION

Any dispute, controversy or claim arising out of or relating to this Contract, or the breach, termination or invalidity thereof (except for those disputes relating to technical matters that are to be submitted to an Expert for resolution in accordance with Article 16), shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules in effect on the date of this Contract. The appointing authority shall be the American Arbitration Association. Arbitration shall be conducted in the English language and shall be held at New York, New York, United States of America, unless another location is selected by mutual agreement of the Parties. The award rendered by the arbitrators shall be final and binding upon the Parties.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

ARTICLE 19 - LIABILITIES

19.1    Consequential Loss or Damage

Notwithstanding anything contained in this Contract, neither Party shall
be liable to the other Party for or in respect of any consequential loss or
damage, including any claim, demand or action made or brought
against the other Party by a third party, or for special or punitive
damages or loss of profits or business interruption, suffered or incurred
by the other Party resulting from breach of or failure to perform this
Contract or the breach of any representation or warranty hereunder,
whether express or implied.

19.2    Tortious Liability

Neither Party shall be liable in tort, including negligence, or otherwise,
to the other Party for any loss or damage suffered or incurred by the
other Party, except for any liability in respect of the costs and expenses
arising in connection with repair or replacement of proximately
damaged property of a Party and damages for personal injury.

19.3    No Third Party Beneficiaries

Nothing in this Contract, express or implied, is intended to confer on any
other person any rights or remedies as a third party beneficiary in or by
reason of this Contract.

19.4    Buyer's Liability for Failure to Take LNG

The Buyer's liability for or arising out of or in connection with any failure
to take delivery of LNG under this Contract shall be limited to its
obligation to make the payments specified in Article 5.3, and (for the
avoidance of doubt but without prejudice to the generality of the
foregoing) the Buyer shall have no liability for any damage to the
Reserves or for any inability on the part of the Seller to produce,
process, transport or sell condensate or natural gas liquids as a result of
any such failure.

19.5    Seller's Liability for Failure to Deliver LNG

(a)    In respect of the Winter Period or the Summer Period, in the event
of Seller's failure to deliver any quantity of LNG ("Shortfall

88

Quantity") for Buyer when required to do so under this Contract, Seller shall be liable (and such liability shall be Buyer's sole and exclusive remedy in such event) as provided below. Under no circumstances shall Seller incur any liability for a Shortfall Quantity if Seller has made available for delivery to Buyer all Cargoes scheduled in the Annual Delivery Programme and Ninety Day Schedules for the Winter Period or the Summer Period, as applicable.

(b)     If there is a Shortfall Quantity in any Contract Year, Seller shall be liable to Buyer, subject to Articles 19.5(c) and (d), for an amount equal to ███████████████████████████████████████

████████████████████████████████████████████████

(c)     The Parties acknowledge that as a result of Seller's failure to deliver LNG when required to do so under this Contract, Buyer may incur loss, damage and expenditure, including without limitation, costs of purchasing alternative fuels, liabilities for the payment of compensation to third parties under contracts for the sale of LNG or Natural Gas and the loss of revenues and/or profits under such contracts and other damages. The Parties acknowledge, however, that it would be impracticable to accurately determine the extent of the loss, damage and expenditure that Buyer would incur in such event. Accordingly, subject only to sub-Article (d) below, the Parties have estimated and agreed in advance that the damages provided for in sub-Article (b) above shall accrue to Buyer as agreed and liquidated compensation for the failure by Seller to deliver such LNG, in lieu of and as full substitute for any actual damages or claims for such breach.

(d)     Seller shall notify Buyer as soon as reasonably practicable when it becomes aware that there will be a Shortfall Quantity and Buyer shall consult with Seller to ascertain whether Seller can arrange delivery of supplies of LNG, Natural Gas and/or alternative fuels to make up some or all of the Shortfall Quantity so as to mitigate Seller's liability hereunder. To the extent such substitute performance by Seller causes Buyer to incur any additional expenses over those which Buyer would have incurred if it had taken delivery for the LNG which gave rise to the Shortfall Quantity, said additional costs (to the extent they are less than

what the Seller's liability would have been pursuant to sub-Article (b) above) shall be credited to Buyer in accordance with sub-Article (e) below, in place of the liability set forth in sub-Article (b) above.

(e)     Seller's liability to Buyer under this Article 19.5 for Shortfall Quantities shall be satisfied by Seller crediting the amount of such liability against the amount payable by Buyer for the quantities of LNG in the next Cargo(es) delivered, which shall permit Seller to discharge its liability hereunder in full within thirty (30) days of the date the Shortfall Quantity accrued. In the event such liability is not discharged in full by the credit of the amount of Seller's liability for Shortfall Quantities against amounts due for delivery of Cargo(es) as aforesaid, Seller shall be liable to pay the undischarged portion of its liability to Buyer within five (5) days.

19.6    Liability; Relationship of Shareholders and Affiliates

Buyer's sole recourse and remedy under this Contract shall be against the Seller and its assets and Seller's sole recourse and remedy under this Contract shall be against Buyer and its assets. No Party shall have any right and each Party hereby expressly waives any right, to pursue any action or claim for liability arising under, relating to, or in connection with this Contract in the case of Buyer against any of the Seller's shareholders, Seller's shareholders' Affiliates or the assets of any of them, and in the case of the Seller, against any of the Buyer's shareholders or Buyer's shareholders' Affiliates or the assets of any of them.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 20 - CONFIDENTIALITY

Save as hereinafter provided, the provisions of this Contract and all information or documents which come into the possession of the Parties in connection with the performance of this Contract may not be used or communicated to third parties without mutual written agreement of the Parties.  However, either Party shall have the right to disclose such provisions, information or document:

(a)     to legal counsel, accountants, other professional consultants, underwriters or providers of finance to either Party in relation to this Contract, and provided such disclosure is solely to assist the purpose for which the aforesaid were so engaged;

(b)     if required by any law, rule or regulation, or if requested by such agency, an agency of any government with jurisdiction over a Party or an Affiliate of such Party and having authority to require such disclosure in accordance with that authority or pursuant to the rules of any recognized stock exchange or agency established in connection therewith;

(c)     to its Affiliates or, in Seller's case, its suppliers of Natural Gas, its shareholders or a shareholder's Affiliate which is not a competitor of Buyer for the importation of LNG into or the sale of Natural Gas in Spain or Portugal, and any employee of a company to which disclosure is permitted pursuant to this Article 20(c); provided that the recipient of any communication under Article 20(a) or Article 20(c) undertakes in writing to keep such information or documents disclosed confidential and to make no use thereof save for the  purpose for which the same were disclosed;

(d)     to the extent any such information or document has entered the public domain other than through the fault or negligence of the Party making the disclosure. For this purpose any disclosure by a permitted recipient of a Party (as aforesaid) shall be deemed to be the fault or negligence of such Party; and,

(e)     to ███████ provided, however, that neither Party shall at any time disclose to ██████ any or all of the provisions of Article 8 (Price) or the Contract Price computed thereunder, without the prior written consent of the other Party.

91

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(f)    as may be reasonably required to vessel owners or operators in connection with negotiations for the provision of marine transportation of LNG from Trinidad; provided that prior to disclosing any such information or documents to vessel owners or operators, the disclosing Party shall obtain and provide a copy to the other Party of a written undertaking from each such vessel owner or operator that it shall comply with the requirements of this Article 20 with respect to such information and documents and shall use the same solely for the purpose of negotiating for the provision of marine transportation services to the Party in connection with the sale and purchase of LNG from the Trinidad Facilities.

Nothing in this Article 20 shall prevent Seller from disclosing information to Other Purchasers in circumstances contemplated in this Contract, including without limitation pursuant to Article 5, Article 7 or Article 13, or in order to demonstrate compliance with the provisions of this Contract.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

ARTICLE 21 - NOTICES

All notices and other communications for purposes of this Contract shall be in writing, which shall include transmission by telex, facsimile or other similar electronic method of written transmission mutually agreed by Seller and Buyer, except that notices given from LNG Tankers at sea may be by radio or telex, unless stated otherwise. Notices and communications shall be directed as follows:

A.     To Seller at the following mail, telex and facsimile addresses:

       Atlantic LNG Company of Trinidad and Tobago
       Scotia Centre
       56-58 Richmond Street
       Port of Spain, Trinidad WI

       Facsimile: (809) 623-6025
       Telex:    (to be provided)

B.     To Buyer at the following mail, telex, and facsimile addresses:

       Enagas, S.A.
       Avenida de América, 38
       28028 Madrid
       España

       Facsimile:   34 1 356.35.02
       Telex:   44448 ENAG E

The Parties may designate additional addresses for particular communications as required from time to time, and may change any addresses, by notice given thirty (30) days in advance of such additions or changes.

Immediately upon receiving communications by telex, facsimile or other similar electronic method of written transmission, or radio, a Party shall acknowledge receipt by the same means if requested in the communication, and may request a repeat transmittal of the entire communication or confirmation of particular matters.

93

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

Without prejudice to the validity of the original notice, the Party receiving any notice given by telex, facsimile or other similar electronic method of written transmission may request the confirmation of the notice by letters and the sending Party shall make such confirmation by letter upon the request.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 22 - ASSIGNMENT

(a)     Neither this Contract nor any rights or obligations hereunder may be
assigned (other than to an Affiliate) by Buyer without the prior written
consent of Seller, or by Seller without the prior written consent of Buyer,
which consent may be withheld at sole option and discretion of the
non-assigning Party.  No assignment shall release the assigning Party
from any of its obligations under this Contract except to the extent
expressly agreed in writing by the other Party.

(b)     Notwithstanding Article 22(a), above, Seller shall be entitled to assign,
mortgage or pledge all or any of its rights, interests and benefits
hereunder to secure payment of any indebtedness incurred or to be
incurred in connection with the construction and term financing of the
Trinidad Facilities, and Buyer shall provide to the persons to whom such
indebtedness is owed such assurances and undertakings as they may
reasonably require in connection with such assignment so long as such
assurances and undertakings in no way diminish Buyer's rights or
expand, extend or amend Buyer's representations, warranties,
obligations and other responsibilities otherwise set forth in this Contract.
It is recognized that the terms of any such assignment, mortgage or
pledge may require Seller to obtain the consent of the lenders before
agreeing to any amendment to this Contract if such lenders consider
that the security available to them would be diminished by such
amendment.

(c)     Either Party shall be entitled to assign all (but not some) of its rights and
obligations under this Contract to any of its Affiliates, provided that,
unless the other Party agrees otherwise in writing, the original assigning
Party under this Article 22(c) and each subsequent Affiliate assignee
from such Party (having itself assigned to an Affiliate) shall be fully liable
under this Contract in the event of non-fulfillment of its obligations
hereunder by the most recent Affiliate to have taken an assignment
pursuant to this Article 22(c).  An unsatisfied arbitration award pursuant
to Article 18 (or any court order made in connection therewith) shall be
immediately enforceable against each of such assignors
notwithstanding the fact that such assignor has not participated in the
arbitration proceedings.  Any assignment pursuant to this Article 22(c)
shall become effective upon delivery to the non-assigning Party of a
valid and enforceable covenant by the assignee Affiliate to observe
and perform all the obligations of the assignor Affiliate under this
Contract.

95

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## ARTICLE 23 - MISCELLANEOUS

### 23.1    Amendment

This Contract constitutes the entire agreement between the Parties and supersedes all prior agreements, written or oral, between the Parties relating to the subject matter hereof.  This Contract shall not be amended, modified, varied or supplemented except by an instrument in writing signed by Seller and Buyer.

### 23.2    Waiver

The failure of any Party at any time to require performance of any provision of this Contract shall not affect its right to require subsequent performance of such provision.  Waiver by any Party of any breach of any provision hereof shall not constitute the waiver of any subsequent breach of such provision.  Performance of any condition or obligation to be performed hereunder shall not be deemed to have been waived or postponed except by an instrument in writing signed by the Party who is claimed to have granted such waiver or postponement.

### 23.3    Exchange of Information

Seller and Buyer will maintain close communication and mutually provide and exchange available information directly relevant to the performance of this Contract.

The Parties will consult together, by having meetings if necessary, to coordinate plans relating to the construction or modification of any stage of the Trinidad Facilities and the identification of the LNG Tankers, so as to assure that the Trinidad Facilities and the LNG Tankers are compatible for all purposes and that progress is being made in accordance with the project timetable agreed to between the Parties.

### 23.4    Headings

The headings of the Articles and sub-Articles of this Contract are for convenience only and shall not be used in the interpretation of this Contract.

96

## ARTICLE 24 - CONDITIONS PRECEDENT

24.1    Required Arrangements and Approvals

The Parties recognise that for the due performance of this Contract, certain arrangements must be made by the Parties and certain approvals and authorisations of various national and local governments or other competent authorities or bodies ("Approvals and Authorisations") must be obtained by the Parties.  Such arrangements, Approvals and Authorisations (collectively referred to as the "Conditions Precedent") are the following:

(a)    By 15 January 1996 (hereinafter referred to as the "Approvals Date") Approvals and Authorisations from the Government of the Republic of Trinidad and Tobago and any relevant governmental entities, ministries, agencies, national, port or other local authorities having jurisdiction, that are necessary for the financing, construction and operation of the Trinidad Facilities, the purchase of Natural Gas from Gas Suppliers and the transportation of such Natural Gas from the delivery point to the Trinidad Facilities and the sale and export of LNG to be purchased and sold hereunder from Trinidad must be issued in form and substance satisfactory to Seller in its sole discretion.

(b)    By 30 September 1995 (hereinafter referred to as the "Supply Date"), the Gas Supply Contract, with terms acceptable to Seller and the Gas Supplier in their sole discretion must be executed.

(c)    By 1 February 1996 (hereinafter referred to as the "Charter Date"), written agreements ("Charter Agreement(s)"), all in a manner acceptable to Buyer in its sole discretion, must be executed between Buyer and one or more third parties owning or operating LNG tankers ("Charterer(s)"), whereby Buyer shall acquire the ownership or use of LNG tankers satisfying the requirements of Article 6.2(a).  Seller shall indemnify and reimburse Buyer in accordance with Schedule "B" attached hereto, with respect to certain termination or lay-up fees that Buyer may incur and pay to Charterer(s) under the Charter Agreement(s).

(d)    By 5 June 1996 (hereinafter referred to as the "Arrangements Date"),

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

    (i)    Seller must have executed written agreements, all in form and substance acceptable to Seller in Seller's sole discretion, as follows:

        (aa)    the ███████ Contract; and

        (bb)    the EPC Contract for the construction of the Trinidad Facilities;

    (ii)    Such agreements must be in force on the Arrangements Date, any conditions precedent with respect to such agreements must have been fulfilled or and any rights of cancellation (other than for breach) by any party to any such agreement other than Seller must have ceased to have effect;

    (iii)    Seller must have taken an affirmative final investment decision, in its sole discretion, to construct, own and operate the Trinidad Facilities, as evidenced by a copy of the resolution of Seller's Board of Directors finally approving the "Level Two Budget" as described in Section 3.5(g) of the Shareholders Agreement among Seller's shareholders and Seller dated 20 July, 1995.

(e)    The term Approvals and Authorisations as used in this Article 24 shall include any certificate, authorisation, approval, judgment, decree or order of any kind (regardless of the formal nomenclature given to any of the foregoing).

24.2    Mutual Undertakings

(a)    Seller shall use all reasonable endeavours to make or obtain, or procure the making or obtaining of all Approvals and Authorisations referred to in Article 24.1(a) without undue delay and in any event prior to the Approvals Date.

(b)    Either Party shall furnish the other upon request with all reasonable assistance in fulfilling the Conditions Precedent referred to in Article 24.1 and shall advise the other upon request, and otherwise as appropriate, of the progress that is being

achieved in fulfilling such Conditions Precedent.  Without prejudice to the foregoing:

(i)     Buyer shall cooperate with Seller and Seller's legal advisers and provide Seller and Seller's legal advisers with such financial, marketing and other information as they may reasonably require in connection with the financing of the Trinidad Facilities;

(ii)    Seller shall provide Buyer as promptly as practicable following the execution of this Contract, with a list of all Approvals and Authorisations required under Article 24.1(a).

24.3    Right of Waiver

Buyer, with respect to those Conditions Precedent set forth in Article 24.1 (b) and (c), and Seller, with respect to those Conditions Precedent set forth in Articles 24.1(a) and (d), shall have the right to waive in whole or in part the requirement that the Conditions Precedent referred to therein be obtained in acceptable form and substance.  If however Buyer or Seller waives such a Condition Precedent then the waiving Party shall thereafter be precluded from relying upon the absence or unacceptability of such Condition Precedent for the purposes of seeking to be excused from performing its obligations pursuant to Article 13.

24.4    Extension of Arrangements Date

In the event the Parties agree to extend the period of time for Seller to satisfy the Conditions Precedent referred to in Article 24.1(d) and to change the Arrangements Date to a later date, then the target date of the DIS of October 1, 1998, the dates of the beginning and end of the First Window Period, the notification date set forth in Article 4.1(a), and the Charter Date set forth in Article 24.1(c) shall each be extended by a number of days equal to the number of days by which the Arrangements Date is extended.

24.5    Termination

If any condition set forth in sub-Articles 24.1(a), (b), (c) and (d) has not been satisfied (or waived in writing by the Party entitled to do so in

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

accordance with Article 24.3) by the Approvals Date, Supply Date, Charter Date or Arrangements Date, as appropriate, then unless by ten (10) Business Days after the relevant date, either (i) Buyer in the case of the condition set forth in sub-Article 24.1(c) or (ii) Seller in the case of a condition set forth in sub-Articles 24.1(a) or (d) gives notice to the other Party of the satisfaction or waiver thereof, or (iii) in the case of the condition set forth in Article 24.1(b), Buyer gives notice of the waiver thereof or Seller gives notice of the satisfaction thereof, this Contract shall terminate, whereupon neither the Seller nor the Buyer shall have any rights, obligations or liabilities under this Contract unless Seller has failed to use reasonable endeavours to obtain the Approvals and Authorisations set forth in sub-Article 24.1(a) or either Party has breached Article 20. If either Party fails to give notice to the other Party as to whether or not it has elected to waive an unsatisfied condition such Party shall be deemed to have elected not to waive such condition.

**IN WITNESS WHEREOF**, each of the Parties has caused this Contract to be executed by its duly authorized officer as of the date first written above.

**SELLER:**
Atlantic LNG Company
of Trinidad and Tobago

**BUYER:**
Enagas, S.A.

By _____

By _____

O:\PBR\DOCUMENT\ENA-LNG9.DOC
26 July, 1995

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

## Schedule "A"

## LNG TANKER SPECIFICATIONS

| Ship Characteristics | Limits | | Units |
|---|---|---|---|
| Length Overall (MAX) | 294.0 | | Metres |
| Beam (MAX) | Unlimited | | |
| Draft (MAX) | 11.5 | | Metres |
| Manifold Height Above Water (MIN/MAX) | MIN:<br>MAX: | 12.4 (Note 3)<br>24.0 | Metres<br>Metres |
| Parallel Midbody Forward of Manifold Centre (MIN)<br>See Note 1 | 25 | | Metres |
| Parallel Midbody Aft of Manifold Centre (MIN)<br>See Note 1 | 25 | | Metres |
| Maximum Deadweight | 90,000 | | Tonnes |
| Cargo Capacity (MIN/MAX) | MIN:<br>MAX: | 34,500<br>135,000 | Cubic<br>Metres |
| Height of Centrepoint of manifold above any obstructions (MIN/MAX)<br>See Note 2 | MIN:<br>MAX: | 0.9<br>1.5 | Metres |
| Distance of Manifold from Ship's Side (MIN/MAX)<br>See Note 2 | MIN:<br>MAX: | 2.9<br>4.0 | Metres |

Note 1: The design of the facilities includes four (4) breasting dolphins. All LNG tankers must be
designed so as to touch a minimum of three (3) of these breasting dolphins while
moored securely alongside the berth.

Note 2: Cargo manifold and drip tray dimensions are to be guided by OCIMF standards as
closely as possible. Vessels which do not meet this standard will need to be reviewed
on a case by case basis to ensure compatibility with loading facilities.

Note 3: If load arm manufacturer is unable to extend range to a minimum of 12.4 M, then the
Buyer will modify the LNG vessel's manifold to match up to 13.4 M manifold height
above water.

101

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

| Cargo Systems | | |
|---|---|---|
| Vapour Return Capacity (MAX) | 31,400 | CbM/Hour at vapour return pressure of 1.8Bar Absolute |
| Vapour Return Manifold Connections (on both Port and Starboard sides) | 1 x 12" | Centered Between Cargo Line Connections Must comply with ANSI 150 |
| Cargo Manifold Connections (on both Port and Starboard sides) | 2 x 12" (1 forward of the Vapour return line and 1 aft of the vapour return line) | Must comply with ANSI 150 |
| Loading Rate | 10,500 (approximately 12 hour loading) | CbM/Hour at normal loading pressure of 3 Bar Absolute and maximum loading pressure of 6 Bar Absolute. |

| Mooring Lines: | 14 lines (Note 4) |
|---|---|
| Mooring lines to be arranged as follows: Headlines | 3 |
| Forward Springs | 2 |
| Breast Lines (Fore/Aft) | 2/2 |
| After Springs | 2 |
| Sternlines | 3 |

Note 4: The LNG berth will require a minimum of 14 mooring lines, preferably mooring wires on drums. No mixed mooring lines to a single point are acceptable.

Additionally, all vessels shall be equipped with suitable emergency shutdown systems, including communications systems, for use during cargo loading operations, which are compatible with the Atlantic LNG terminal.

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

### SCHEDULE "B "

### TERMS OF CHARTER FEE REIMBURSEMENT

As is contemplated in Article 24.1(c) of this Contract, Seller shall indemnify and reimburse Buyer in accordance with the following provisions for termination or Lay-Up Fees that may be incurred and paid by Buyer under the Charter Agreement(s).

1.    If this Contract is terminated by Seller pursuant to Article 24.5 because a Condition Precedent set forth in Article 24.1(d) has not been satisfied by the Arrangements Date or any extension thereof, Seller shall reimburse Buyer within thirty (30) days after written demand, accompanied by evidence of payment by Buyer to Vessel Owner(s), for all amounts required to be paid by Buyer as termination fees under the Charter Agreement(s), up to a maximum of ninety-five thousand US dollars (US $95,000) per month, or pro rata for each portion thereof, for the period commencing on the Charter Date and ending on Buyer's receipt of Seller's notice terminating this Contract pursuant to Article 24.5.

2.    In the event, as a result of one or more events of Force Majeure, Seller determines that the initial delivery of LNG is predicted to be delayed beyond the latest possible date on which the Date of First Commercial Supply could occur, based on the last notice given by Seller pursuant to Article 4.1 of this Contract (the "Latest Date of First Commercial Supply"), Seller shall notify Buyer, in accordance with Article 13.2(a) of the Contract, of the delay ("Force Majeure Delay Notice").   Seller shall state in its Force Majeure Delay Notice whether or not the period of delay is predicted to end within twenty-four (24) months after the Latest Date of First Commercial Supply (such 24-month period being hereinafter referred to as the "Maximum Delay Period") and, subject to Paragraph 4 below, the following shall apply:

(a)    If Seller predicts that the period of delay will be less than the Maximum Delay Period, Buyer shall exercise its right to extend the date of delivery of the LNG Tankers pursuant to the Charter Agreement(s) accordingly and Seller shall be liable to reimburse Buyer for all amounts required to be paid by Buyer under the Charter Agreement(s) while the LNG Tankers are not in use ("Lay-Up Fees"), up to a maximum of ten thousand US dollars (US $10,000) per day for an LNG Tanker of a capacity equal to or greater than 110,000 cubic meters ("Large Tanker") and a

103

maximum of eight thousand five hundred US dollars (US $8500) per day for an LNG Tanker of a capacity of less than 110,000 cubic meters ("Small Tanker"), subject to paragraph (c) below, for the period of delay of initial delivery past the Latest Date of First Commercial Supply.

(b) If Seller predicts that the period of delay will be greater than the Maximum Delay Period, Buyer shall elect by written notice to Seller within thirty (30) days after receipt of Seller's Force Majeure Delay Notice either to,

(i) exercise its option to terminate the Charter Agreement(s) by delivering notice to that effect to the Charterer(s) within thirty (30) days of Buyer's notice to Seller hereabove, in which case Seller shall be liable to reimburse Buyer within thirty (30) days after written demand, accompanied by evidence of payment by Buyer to Charterer(s), for all amounts required to be paid by Buyer for termination fees under the Charter Agreement(s), up to a maximum of twenty million US dollars (US $20,000,000) for termination relative to a Large Tanker and up to a maximum of ten million nine hundred thousand US dollars (US $10,900,000) for termination relative to a Small Tanker; or,

(ii) not terminate the Charter Agreement(s), in which case Seller shall be liable to reimburse Buyer only for Lay-Up Fees as provided in sub-clause (a) above, that may be incurred during the Maximum Delay Period.

(c) If Seller initially predicts that the period of delay will be less than the Maximum Delay Period, but Seller subsequently determines that the period of delay will be greater than the Maximum Delay Period (as the result of the same or additional events of Force Majeure), Seller shall give Buyer notice of Seller's estimate of the additional period of delay as soon as is reasonably practicable after Seller makes such determination. If such notice is given by Seller prior to the Latest Date of First Commercial Supply, the provisions of paragraph (b) above, shall apply as if Seller's notice had been its Force Majeure Delay Notice. If Seller's notice is given after the Latest Date of First Commercial Supply, then with such notice Seller shall either,

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

(i)     request Buyer to terminate the Charter Agreement(s) within fifteen (15) days after Seller's notice, in which case Seller shall be liable to reimburse Buyer within thirty (30) days after written demand from Buyer for the termination fees described in paragraph (b) above, less the cumulative amount of all Lay-Up Fees actually reimbursed by Seller pursuant to paragraph (a) above, during the period from the Latest Date of First Commercial Supply to the date that is fifteen (15) days after Seller's notice, plus interest on such difference computed at an annual rate of six percent (6%) for the period starting on the Latest Date of First Commercial Supply and ending on the date that is fifteen(15) days after Seller requests termination of the Charter Agreement(s); or,

(ii)    request that Buyer not terminate the Charter Agreement(s), in which case Seller shall be liable, in addition to Seller's liability for the Lay-Up Fees as provided in paragraph (a) above, to reimburse Buyer for all amounts that Buyer may be required to pay under the Charter Agreement(s) after the end of the Maximum Delay Period; provided, however, that if Seller gives notice under this paragraph (c)(ii), Seller shall have a right at any time after the end of the Maximum Delay Period, to request Buyer to terminate the Charter Agreement(s) within fifteen (15) days, in which case Seller shall be liable to reimburse Buyer within thirty (30) days after written demand from Buyer for an amount equal to the termination fees described in paragraph (b) above, less the cumulative amount of all Lay-Up Fees actually reimbursed by Seller pursuant to paragraph (a) above, during the Maximum Delay Period, plus interest on such difference computed at an annual rate of six percent (6%) for the period starting on the Latest Day of First Commercial Supply and ending on the date that is fifteen (15) days after Seller requests termination of the Charter Agreement(s).

3.      If Seller is in default of its obligation to make LNG available for delivery on or after the Date of First Commercial Supply, as determined under Article 4.3 of the Contract, and such default is not excused by an event of Force Majeure, Seller shall have no liability to reimburse Buyer for any costs or fees incurred by Buyer under the Charter Agreement(s) with

105

LNG SALES CONTRACT
DATED 27 JULY, 1995
BETWEEN ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO AND ENAGAS

respect to the period during which such default is not excused and the liquidated compensation payable by Seller in accordance with the provisions of Article 19.5 of the Contract shall be the sole recourse and remedy of Buyer for such default.

4.    Seller shall not be obligated to pay to Buyer pursuant to Paragraphs 1 or 2 of this Schedule "B" any amounts for reimbursement of Lay-Up Fees or termination fees unless Buyer is obligated to pay and actually pays such fees to Charterer(s) pursuant to the terms of the Charter Agreement(s). Buyer shall use reasonable endeavours to use either or both of the LNG Tankers covered by the Charter Agreement(s) for other business and the reasonable value of such alternative use shall be taken into account in mitigation of any amounts otherwise payable by Seller to Buyer pursuant to the terms of Paragraphs 2(a), 2(b)(ii) or 2(c)(ii) of this Schedule "B."

# AMENDMENT 1

# ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO

7th Floor, Tatil Building
11 Maraval Road
Port of Spain, Trinidad, W.I.

Tel: (809) 622-6846
Fax: (809) 628-4429

Gerald Peereboom
President


Enagas, S.A.
Avenida de America, 38
28028 Madrid
España

By Facsimile to:  34 1 356.35.02

Dear Sirs:

We refer to the LNG Sales Contract made by and between ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO ("ALNG") as Seller and ENAGAS, S.A. ("Enagas") as Buyer dated as of July 27, 1995 (the "Contract").

Pursuant to the terms of Article 24.1(a) of the Contract, ALNG as Seller is required, as a condition precedent to the performance of the Contract, to have obtained by January 15, 1996 (the "Approvals Date"), the Approvals and Authorisations from the Government of the Republic of Trinidad and Tobago and any relevant governmental entities, ministries, agencies, national, port or other local authorities having jurisdiction, that are necessary for the financing, construction and operation of the Trinidad Facilities, the purchase of Natural Gas from the Gas Suppliers and the transportation of such Natural Gas from the delivery point to the Trinidad Facilities and the sale and export of LNG to be purchased and sold thereunder from Trinidad in form and substance satisfactory to ALNG as Seller in its sole discretion.

Pursuant to the terms of Article 24.1(c), Enagas as Buyer is required to have executed Charter Agreements acceptable to it with Charterers as therein defined, to satisfy the requirements of Article 6.2(a) of the Contract by February 1, 1996 (the "Charter Date").

By January 15, 1996, ALNG will not have obtained the Approvals and Authorisations required by Article 24.1(c) of the Contract and hereby requests that the period for the obtaining of said Approvals and Authorisations be extended and that the Approvals Date be instead February 8, 1996.

Consequent upon such extension, ALNG agrees that the Charter Date referred to in Article 24.1(c) be instead February 25, 1996.

Directors  Dr Kenneth S Julien (Chairman), Antonio Garcia Mateo, Martin J Houston, R Gordon Shearer, David G Wight

# ALNG

Page 2
Enagas, S.A.


Subject only to the variations herein referred to, the LNG Sales Contract shall remain in full force and effect.

If you agree the foregoing, please sign in the space provided and return to us a copy of this letter agreement.

**ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO**

By: _Gerald J. Peereboom_

Name: GERALD PEEREBOOM

Title: PRESIDENT

Date: JAN · 12. 1996


Agreed the above:


**ENAGAS, S.A.**

By: _(signature)_

Name: GREGORIO G. ESCUDERO

Title: PROCUREMENT AREA DIRECTOR

Date: JAN 15, 1996

**AMENDMENT 2**

**LNG SALES CONTRACT**

**Between**

**ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO**

**And**

**ENAGAS S.A.**

**AMENDING AGREEMENT**

This Amending Agreement is made this 17th day of December, 1996 between **ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO** and **ENAGAS S.A.** ("Enagas") with respect to the LNG Sales Contract between Atlantic and Enagas dated July 27, 1995 (the "Contract").

In consideration of the premises and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Atlantic and Enagas hereby agree to amend the Contract as follows:

1. Article 10 of the Contract is amended by adding a new section 10.4 as follows:

"10.4 **Failure to Comply with Quality Specifications**

(a) Seller shall notify Buyer as soon as reasonably practicable of any existing or anticipated failure of LNG available for delivery to conform to the quality specifications set forth in Article 10.1, 10.2 and 10.3 of the LNG Sales Contract ("Off-Spec LNG"), giving details of the nature and expected magnitude of the variance, the cause of the non-compliance and the probable duration, including the Scheduled Loading Date(s) anticipated to be affected thereby.

(b) If Buyer is notified by Seller prior to the commencement of loading of a Cargo that the LNG to be delivered is Off-Spec LNG, it shall, within twenty-four (24) hours of being so notified,

(i) notify Seller that it will take delivery of all or any of the affected Cargo(es), without prejudice to Buyer's rights and remedies with respect to such Off-Spec LNG, other than Buyer's right to reject said Cargo(es); or

(ii) reject all or any of the affected Cargo(es). However, upon Seller's request, Buyer shall use reasonable endeavours to take delivery of any Cargo(es) which it is entitled to reject and if Buyer, being entitled to reject any such Cargo(es), by using its reasonable endeavours is able to, and does, accept

1

such Cargo(es), Seller shall reimburse Buyer for any necessary costs incurred (over and above those normally incurred) in receiving and treating the LNG or Regasified LNG from such Cargo(es) by such means as are appropriate including, without limitation, mixing with different calorific value natural gas, injecting nitrogen or injecting other components.

(c)   If Buyer becomes aware of the existence of Off-Spec LNG after the commencement of loading of a Cargo, Buyer may:

(i)    suspend loading of and reject the Cargo concerned within twenty-four (24) hours of becoming aware of the existence of the Off-Spec LNG; provided, however, that Seller may request Buyer to use reasonable endeavours to take delivery of such Cargo, in which case Buyer's and Seller's rights in connection therewith shall be as set forth in sub-Article (b)(ii) above; or

(ii)   in the case where Buyer has rejected the cargo or is unable to take delivery of such LNG, but it is not possible for the LNG to be safely unloaded again at the Trinidad Facilities, then Buyer shall not unreasonably withhold its consent (and shall so instruct Buyer's Transporter) to comply with reasonable proposals made by Seller in relation to the disposal of such LNG.  Without prejudice to Buyer's other rights and remedies, it is recognized that such proposals shall include compensation to Buyer for any incremental costs incurred in such disposal.  Upon any such rejection of LNG by Buyer, title and risk in the LNG concerned shall revert to Seller.

(d)   If in any Contract Year either

(i)    Buyer's rejection of Off-Spec LNG, or

(ii)   Buyer's accommodation of Seller's requests or proposals with regard to the delivery or disposition of Off-Spec LNG in accordance with sub-Article (c)(ii),

results in failure of Buyer to take delivery of any Cargo(es) scheduled in the Annual Delivery Programme, Ninety-Day Schedule or agreed amendment thereto, any portion of the ACQ not taken by Buyer resulting from such circumstances shall not be a Quantity Deficiency pursuant to Article 5.3."

2.   This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, excluding any choice of law rules which would require the application of the laws of any other jurisdiction.

3.   Subject only to variations herein contained, the Contract shall remain in full force and effect and shall be read and construed and be enforceable as if the terms of this Amending Agreement were inserted therein by way of addition or substitution as the case may be.

OFF-SPEC AG.
17/12/98

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be duly executed by their proper officers as at the day and year first hereinabove written.

ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO

By: _____

Name: A. Frank Cremer

Title: President


ENAGAS, S.A.

By: _____

Name: C. Torranzo

Title: PROCUREMENT DIRECTOR

3

# AMENDMENT 3

**Amending Agreement**
**to**
**July 27, 1995 LNG Sales Contract**
**between**
**Enagas, S.A.**
**and**
**Atlantic LNG Company of Trinidad and Tobago**

**dated**

OCTOBER 25, 2000

WHEREAS, Atlantic LNG Company of Trinidad and Tobago ("Atlantic") and Enagas, S.A. ("Enagas") entered into an LNG Sales Contract dated as of July 27, 1995 ("First Train Contract"); and

WHEREAS, Atlantic LNG 2/3 Company of Trinidad and Tobago Unlimited and Enagas have entered into an LNG sales contract dated June 2, 2000 involving LNG to be produced from the Second Train ("Second Train Contract"); and

WHEREAS, Atlantic and Enagas believe that it is in the best interest of both companies to ensure the compatibility of certain clauses within the contracts;

NOW, THEREFORE, for and in consideration of the agreements and obligations set out in this Amending Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Atlantic and Enagas, intending to be legally bound, hereby stipulate and agree as follows:

I.    **Quality**
Article 10 of the First Train Contract will be deleted in its entirety and replaced with the following:

**"ARTICLE 10.    QUALITY**

10.1    **Gross Real Heating Value**

The LNG, when delivered by Seller to Buyer, shall have, in a gaseous state as tested at the Loading Port, a Gross Real Heating Value of not less than 1010 Btu/SCF and not more that 1085 Btu/SCF.

10.2    **Components**



The LNG when delivered by Seller to Buyer shall, in a gaseous state, contain not less than eighty-eight molecular percent (88 mol%) of methane ($CH_4$) and, for the components and substances listed below, such LNG shall not contain more than the following:

(A)    Nitrogen ($N_2$), 1.0 mol%
(B)    Ethane ($C_2$), 8.0 mol%
(C)    Propane ($C_3$), 2.75 mol%
(D)    Isobutane ($iC_4$), 0.47 mol%
(E)    Normal butane ($C_4$), 0.64 mol%
(F)    Pentanes ($C_5$) and heavier, 0.10 mol%
(G)    Hydrogen sulfide ($H_2S$), 0.0004 mol%
(H)    Mercaptan Sulfur, 2.0 mg/$Nm^3$
(I)    Total sulfur content, 35 mg/$Nm^3$
(J)    Carbon Dioxide, ($CO_2$), 0.01 mol%

10.3    **Density**

The LNG when delivered by Seller to Buyer shall, when measured in a liquid state at a temperature of minus one hundred sixty degrees (-160°) Centigrade, have a density no less than 421 Kg/$m^3$ and no greater than 464 Kg/$m^3$.

10.4    **Wobbe Index**

The LNG when delivered by Seller to Buyer, shall have, in a gaseous state as tested at the Loading Port, a Wobbe Index between 1290 - 1425 Btu/SCF. For the purposes of this Article 10, the Wobbe Index shall be calculated by dividing the Gross Real Heating Value of the vaporized LNG (as tested at the Loading Port) by the square root of the real relative density of the vaporized LNG (as tested at the Loading Port) with both the Gross Real Heating Value and the real relative density determined in accordance with GPA 2172, at base conditions of 14.73 psia and 60 degrees Fahrenheit.

10.5    **Failure to Comply with Quality Specifications**

(a)    Should any question regarding the quality of the LNG arise, the Parties shall consult and cooperate concerning such question, but without prejudice to Buyer's right pursuant to the remainder of this Article 10.5, to reject any LNG which fails to meet the above specifications.

(b)    Seller shall notify Buyer as soon as reasonably practicable of any existing or anticipated failure of the LNG available for delivery to conform to the quality specifications set forth in Articles 10.1, 10.2, 10.3 or 10.4 above ("Off-Spec LNG"), giving details of the nature and expected magnitude of



2

the variance, the cause of the non-compliance and the probable duration, including the Scheduled Loading Date(s) anticipated to be affected thereby.

(c)    If Buyer is notified by Seller prior to the commencement of the loading of a Cargo that the LNG to be delivered is Off-Spec LNG, it shall, within twenty-four (24) hours of being so notified,:

    (i)    notify Seller that it will take delivery of all or any of the affected Cargo(es), without prejudice to Buyer's rights and remedies with respect to such Off-Spec LNG, other than Buyer's right to reject said Cargo(es); or

    (ii)    reject all or any of the affected Cargo(es). However, upon Seller's request, Buyer shall use reasonable endeavors to take delivery of any Cargo(es) which it is entitled to reject and if Buyer, being entitled to reject any such Cargo(es), by using its reasonable endeavors is able to, and does, accept such Cargo(es), Seller shall reimburse Buyer for any necessary costs incurred (over and above those normally incurred) in receiving and treating the LNG or Regasified LNG from such Cargo(es) by such means as are appropriate including, without limitation, mixing with different calorific value natural gas, injecting nitrogen or injecting other components.

(d)    If Buyer becomes aware of the existence of Off-Spec LNG after the commencement of loading of a Cargo:

    (i)    Buyer may suspend loading of and reject the Cargo concerned within twenty-four (24) hours of becoming aware of the existence of the Off-Spec LNG, provided, however, that Seller may request Buyer to use reasonable endeavors to take delivery of such Cargo, in which case Buyer's and Seller's rights in connection therewith shall be as set forth in Article 10.5(c)(ii) above; and

    (ii)    in the case where Buyer has rejected the cargo or is unable to take delivery of such LNG, but it is not possible for the LNG to be safely unloaded again at the Trinidad Facilities, then Buyer shall not unreasonably withhold its consent (and shall so instruct the transporter) to comply with reasonable proposals made by Seller in relation to the disposal of such LNG. Without prejudice to Buyer's other rights and remedies, it is recognized that such proposals shall include compensation to Buyer for any incremental costs incurred in such disposal. Upon any such rejection of LNG by Buyer, title and risk in the LNG concerned shall revert to Seller.



3

(e)        If in any Contract Year either

    (i)       Buyer's rejection of Off-Spec LNG, or

    (ii)      If Buyer's accommodation of Seller's requests or proposals with regard to delivery or disposition of Off-Spec LNG, in accordance with Article 10.5(c)(ii), results in failure of Buyer to take delivery of any Cargo(es) scheduled in the Annual Delivery Program, Ninety-Day Schedule or agreed amendment thereto, any portion of the ACQ not taken by Buyer resulting from such circumstances shall not be an Annual Quantity Deficiency pursuant to Article (5.3)."

## II.    Gross Real Heating Value

References throughout the First Train Contract to "Gross Heating Value" shall be deleted and replaced with "Gross Real Heating Value".

## III.    Loading and Transportation

Articles 6.7 and 6.10 will be deleted in their entireties and replaced with the following:

"6.7    Notice of Readiness

    (a)      As soon as the LNG Tanker has arrived at the Loading Port, is ready to load LNG and to follow Seller's instructions in accordance with the provisions hereof, the LNG Tanker's Master shall so notify Seller, via facsimile or other mutually agreed form of communication (such notification constitutes "Notice of Readiness"). Except as otherwise provided in this Section 6.7, Notice of Readiness shall be effective when tendered by the LNG Tanker's Master to Seller.

    (b)      Notice of Readiness shall not be effective, and the LNG Tanker shall not proceed to berth, prior to the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4) without Seller's prior written agreement. However, should the LNG Tanker arrive at the Loading Port prior to the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4) and tender Notice of Readiness prior to the Scheduled Loading Date, Notice of Readiness shall be deemed effective at the earlier of:

    (i)       the commencement of the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4); or



4

(ii)    the time the LNG Tanker is securely moored at the Trinidad Facilities' berth.

(c)    Notice of Readiness shall not be tendered, nor shall the LNG Tanker proceed to berth, if the LNG Tanker arrives after the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4) until Seller determines that it is reasonably able to load the LNG Tanker without interference to its loading of other LNG tankers. In the event of such late arrival, Seller shall advise Buyer of Seller's reasonable estimate of its ability, from both a timing and a physical perspective, to load the LNG Tanker. In this circumstance, Notice of Readiness shall be deemed effective upon Seller's notice to the LNG Tanker that it is ready to receive the LNG Tanker at its berth, provided the LNG Tanker is then ready to follow Seller's instructions in accordance with the provisions hereof.

### 6.10    Loading Time

(a)    The allotted loading time for Seller to load each LNG Tanker with a capacity of one hundred thirty five thousand (135,000) cubic meters or less shall be twenty four (24) hours; and the allotted loading time for Seller to load each LNG Tanker with a capacity of more than one hundred thirty five thousand (135,000) cubic meters shall be twenty five (25) hours; subject to the adjustments provided in sub-Article 6.10(b) below ("Allotted Loading Time"). Seller and Buyer shall reasonably cooperate and use reasonable endeavors to complete loading of any LNG Tanker within twenty four (24) hours.

(b)    Allotted Loading Time shall be extended to include:

(i)    the period of time elapsed during the LNG Tanker's inward passage until the LNG Tanker is securely moored at the berth including period(s) of time spent moving from the anchorage or waiting area or awaiting pilot(s) or tugs when the berth is available;

(ii)    any period of time during which loading, inward passage or berthing is delayed, hindered or suspended by Buyer, the LNG Tanker's Master, the agent acting on behalf of Buyer, Buyer's Transporter or the LNG Tanker's Master, the Port Authority or any competent third party for reasons of safety, weather or otherwise and over which Seller has no control;



5

(iii)   any period of delays attributable to the operation of an LNG Tanker, including the period of time such LNG Tanker (x) awaits a berth by reason of the exercise by Seller of its rights under Article 6.13, or (y) receives LNG for purging and cool-down (except when: (aa) the LNG Tanker met the Arrival Temperature Requirement, and (bb) the purging and cool-down is not due to an event which extends Allotted Loading Time under this sub-Article 6.10(b));

(iv)   any period during which berthing or loading of an LNG Tanker is delayed, hindered or suspended by reason of Force Majeure pursuant to Article 13 hereof;

(v)   any period of delay caused by occupancy of the berth (x) by a previous LNG Tanker, provided such occupancy is for reasons attributable to such LNG Tanker or (y) by any Other Purchaser's LNG tanker that arrived prior to or on its scheduled loading date when the LNG Tanker arrived after its Scheduled Loading Date (ignoring any change in the LNG Tanker's Scheduled Loading Date after departure of the LNG Tanker from an unloading port), except that there shall be no addition to Allotted Loading Time under this sub Article 6.10(b)(v) for any period in excess of the time required for a Cargo to be made available in storage ready for loading at the Trinidad Facilities after the loading of the first arriving LNG tanker; and

(vi)   any period of delay to the connection or disconnection of the loading lines or delivery of information to Seller that is required to prepare the cargo papers after Seller has completed pumping the LNG on board the LNG Tanker and the loading lines may be safely disconnected, where such period of delay is directly or indirectly attributable to Buyer.

(c)   The period of time commencing six (6) hours after the time when the Notice of Readiness is effective, or deemed to be effective, or three (3) hours after the LNG Tanker is berthed, whichever occurs first, and ending when the loading and return lines of the LNG Tanker are disconnected from the Trinidad Facilities' loading and return lines and all cargo papers necessary for departure required to be furnished by Seller are delivered on board in proper form shall be designated as the "**Actual Loading Time**". The LNG Tanker's Master shall reasonably endeavor to procure the prompt disconnection of the loading and return lines and the prompt delivery of information to Seller that Seller requires to complete the cargo papers."



6

IV.    **Other Revisions to the First Train Contract**

(a)    In Article 1, "Definitions", delete and replace in its entirety the existing definition of "Loading Port" with the following: **"The port of Point Fortin, where the Trinidad Facilities are located, including the areas where LNG Tankers typically anchor or await instructions from Seller to proceed to the berth."**

(b)    In Article 1 "Definitions", delete and replace in its entirety the existing definition of "Standard Cubic Foot" with the following: **""SCF" shall mean "Standard Cubic Foot" which shall mean the volume of anhydrous Natural Gas that occupies one actual cubic foot at a temperature of sixty (60) degrees Fahrenheit (15.55556 degrees Celsius) and an absolute pressure of 14.73 pounds per square inch absolute ("psia")."**

(c)    In Article 1 "Definitions", add the following definition: **""Train" shall mean any natural gas liquefaction unit which constitutes, or is proposed to constitute, a part of the Trinidad Facilities. The term "Train" includes appurtenant facilities and infrastructure of the applicable natural gas liquefaction unit and also includes any Common Assets constructed or acquired in connection with or as part of such Train."**

(d)    In Article 2.3 "Trinidad Facilities", (i) delete and replace the words "own and have access to" in the second line of the Article with the following words: **"own and/or have access to"**; (ii) in the fifth line, delete the words **"from Abyssinia"**; and (iii) rewrite the parenthetical in the eighth and ninth lines, as follows: **"(as all such facilities may be constructed, modified or expanded from time to time, whether by Seller or another party, the "Trinidad Facilities")"**.

(e)    Article 2.6 is amended by deleting the words **"by Seller"**.

(f)    Article 5.6(a) is amended by replacing the words "Seller's ability to deliver LNG from the Trinidad Facilities" with the words **"the ability of the Trinidad Facilities to deliver LNG"**. Further, the following new sentence is added to the end of Article 5.6(a): **"Notwithstanding what is provided within this Article 5.6(a), nothing in this Article 5.6 shall be construed to require the allocation of LNG from the Trinidad Facilities to purchasers from any Train prior to the later of that Train's date of first commercial supply or one hundred twenty (120) days following the initial delivery of LNG from such Train."**

(g)    Article 5.6(b) is amended by replacing the words "Seller from delivering" with the words **"delivery of"**; and, further, replacing the words "in proportion to the respective quantities so scheduled" with the words **"in a manner consistent with that as set out in Article 5.4"**.



7

(h)    A new "Article 5.9 Aggregation of Trains" is added and contains the following language: "The Parties acknowledge that LNG delivered hereunder may be produced in any of the Trains that form part of the Trinidad Facilities. Accordingly, Seller has the right to deliver LNG hereunder regardless of the Train in which such LNG was produced."

(i)    The last sentence of Article 6.2(b) is deleted in its entirety and replaced by the following: "Buyer's utilization of any Substitute LNG Tanker shall not diminish Buyer's obligations under this Contract, and Buyer shall not make any substitution to the extent doing so would unreasonably impair the ability of Buyer to lift or the delivery of Cargoes scheduled for delivery from the Trinidad Facilities in the annual delivery programs of Buyer and Other Purchasers."

(j)    Article 7.2(d) is amended by replacing the word ███████ with "Other Purchasers."

(k)    Article 7.3 is amended by replacing the parenthetical "("Scheduled Loading Date")" with the following: "("Scheduled Loading Date", which shall begin at 0600 hours on the date upon which the Cargo is scheduled to be loaded and end at 0600 hours on the following day, which starting time shall not imply that Seller will not berth LNG Tankers in darkness)".

(l)    Article 13.1(a)(viii) is amended by inserting the words "first liquefaction train of the" in front of "Trinidad Facilities".

(m)    Article 13.5(a) is amended as follows: (i) the words "Seller is able to load and sell" are replaced by the words "is able to be loaded and sold"; and (ii) the words "Seller is able to supply" are replaced by the words "is able to be supplied".

Other than as specifically amended herein, the provisions of the First Train Contract remain in full force and effect.

IN WITNESS WHEREOF, each of the Parties has caused this Amending Agreement to be executed by its duly authorized officer as of the date first written above.

SELLER:
Atlantic LNG Company
of Trinidad and Tobago

BUYER;
Enagas, S.A.

By_____

By_____

TREON TOBQUZA.



8

Amending Agreement
to
July 27, 1995 LNG Sales Contract
between
Enagas, S.A.
and
Atlantic LNG Company of Trinidad and Tobago

dated

*October 25*, 2000

WHEREAS, Atlantic LNG Company of Trinidad and Tobago ("Atlantic") and Enagas, S.A. ("Enagas") entered into an LNG Sales Contract dated as of July 27, 1995 ("First Train Contract"); and

WHEREAS, Atlantic LNG 2/3 Company of Trinidad and Tobago Unlimited and Enagas have entered into an LNG sales contract dated June 2, 2000 involving LNG to be produced from the Second Train ("Second Train Contract"); and

WHEREAS, Atlantic and Enagas believe that it is in the best interest of both companies to ensure the compatibility of certain clauses within the contracts;

NOW, THEREFORE, for and in consideration of the agreements and obligations set out in this Amending Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Atlantic and Enagas, intending to be legally bound, hereby stipulate and agree as follows:

1.  **Quality**
    Article 10 of the First Train Contract will be deleted in its entirety and replaced with the following:

    **"ARTICLE 10.   QUALITY**

    10.1   **Gross Real Heating Value**

        The LNG, when delivered by Seller to Buyer, shall have, in a gaseous state as tested at the Loading Port, a Gross Real Heating Value of not less than 1010 Btu/SCF and not more that 1085 Btu/SCF.

    10.2   **Components**



The LNG when delivered by Seller to Buyer shall, in a gaseous state, contain not less than eighty-eight molecular percent (88 mol%) of methane ($CH_4$) and, for the components and substances listed below, such LNG shall not contain more than the following:

    (A)    Nitrogen ($N_2$), 1.0 mol%
    (B)    Ethane ($C_2$), 8.0 mol%
    (C)    Propane ($C_3$), 2.75 mol%
    (D)    Isobutane ($iC_4$), 0.47 mol%
    (E)    Normal butane ($C_4$), 0.64 mol%
    (F)    Pentanes ($C_5$) and heavier, 0.10 mol%
    (G)    Hydrogen sulfide ($H_2S$), 0.0004 mol%
    (H)    Mercaptan Sulfur, 2.0 mg/$Nm^3$
    (I)    Total sulfur content, 35 mg/$Nm^3$
    (J)    Carbon Dioxide, ($CO_2$), 0.01 mol%

**10.3**    **Density**

The LNG when delivered by Seller to Buyer shall, when measured in a liquid state at a temperature of minus one hundred sixty degrees ($-160^\circ$) Centigrade, have a density no less than 421 Kg/$m^3$ and no greater than 464 Kg/$m^3$.

**10.4**    **Wobbe Index**

The LNG when delivered by Seller to Buyer, shall have, in a gaseous state as tested at the Loading Port, a Wobbe Index between 1290 - 1425 Btu/SCF. For the purposes of this Article 10, the Wobbe Index shall be calculated by dividing the Gross Real Heating Value of the vaporized LNG (as tested at the Loading Port) by the square root of the real relative density of the vaporized LNG (as tested at the Loading Port) with both the Gross Real Heating Value and the real relative density determined in accordance with GPA 2172, at base conditions of 14.73 psia and 60 degrees Fahrenheit.

**10.5**    **Failure to Comply with Quality Specifications**

    (a)    Should any question regarding the quality of the LNG arise, the Parties shall consult and cooperate concerning such question, but without prejudice to Buyer's right pursuant to the remainder of this Article 10.5, to reject any LNG which fails to meet the above specifications.

    (b)    Seller shall notify Buyer as soon as reasonably practicable of any existing or anticipated failure of the LNG available for delivery to conform to the quality specifications set forth in Articles 10.1, 10.2, 10.3 or 10.4 above ("Off-Spec LNG"), giving details of the nature and expected magnitude of the variance, the cause of the non-compliance and the probable duration,

including the Scheduled Loading Date(s) anticipated to be affected thereby.

(c)   If Buyer is notified by Seller prior to the commencement of the loading of a Cargo that the LNG to be delivered is Off-Spec LNG, it shall, within twenty-four (24) hours of being so notified,:

   (i)    notify Seller that it will take delivery of all or any of the affected Cargo(es), without prejudice to Buyer's rights and remedies with respect to such Off-Spec LNG, other than Buyer's right to reject said Cargo(es); or

   (ii)   reject all or any of the affected Cargo(es).  However, upon Seller's request, Buyer shall use reasonable endeavors to take delivery of any Cargo(es) which it is entitled to reject and if Buyer, being entitled to reject any such Cargo(es), by using its reasonable endeavors is able to, and does, accept such Cargo(es), Seller shall reimburse Buyer for any necessary costs incurred (over and above those normally incurred) in receiving and treating the LNG or Regasified LNG from such Cargo(es) by such means as are appropriate including, without limitation, mixing with different calorific value natural gas, injecting nitrogen or injecting other components.

(d)   If Buyer becomes aware of the existence of Off-Spec LNG after the commencement of loading of a Cargo:

   (i)    Buyer may suspend loading of and reject the Cargo concerned within twenty-four (24) hours of becoming aware of the existence of the Off-Spec LNG, provided, however, that Seller may request Buyer to use reasonable endeavors to take delivery of such Cargo, in which case Buyer's and Seller's rights in connection therewith shall be as set forth in Article 10.5(c)(ii) above; and

   (ii)   in the case where Buyer has rejected the cargo or is unable to take delivery of such LNG, but it is not possible for the LNG to be safely unloaded again at the Trinidad Facilities, then Buyer shall not unreasonably withhold its consent (and shall so instruct the transporter) to comply with reasonable proposals made by Seller in relation to the disposal of such LNG.  Without prejudice to Buyer's other rights and remedies, it is recognized that such proposals shall include compensation to Buyer for any incremental costs incurred in such disposal.  Upon any such rejection of LNG by Buyer, title and risk in the LNG concerned shall revert to Seller.

3

(e)        If in any Contract Year either

    (i)      Buyer's rejection of Off-Spec LNG, or

    (ii)     If Buyer's accommodation of Seller's requests or proposals with regard to delivery or disposition of Off-Spec LNG, in accordance with Article 10.5(c)(ii), results in failure of Buyer to take delivery of any Cargo(es) scheduled in the Annual Delivery Program, Ninety-Day Schedule or agreed amendment thereto, any portion of the ACQ not taken by Buyer resulting from such circumstances shall not be an Annual Quantity Deficiency pursuant to Article (5.3)."

## II.    Gross Real Heating Value

References throughout the First Train Contract to "Gross Heating Value" shall be deleted and replaced with "**Gross Real Heating Value**".

## III.    Loading and Transportation

Articles 6.7 and 6.10 will be deleted in their entireties and replaced with the following:

"6.7    <u>Notice of Readiness</u>

    (a)    As soon as the LNG Tanker has arrived at the Loading Port, is ready to load LNG and to follow Seller's instructions in accordance with the provisions hereof, the LNG Tanker's Master shall so notify Seller, via facsimile or other mutually agreed form of communication (such notification constitutes "Notice of Readiness"). Except as otherwise provided in this Section 6.7, Notice of Readiness shall be effective when tendered by the LNG Tanker's Master to Seller.

    (b)    Notice of Readiness shall not be effective, and the LNG Tanker shall not proceed to berth, prior to the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4) without Seller's prior written agreement. However, should the LNG Tanker arrive at the Loading Port prior to the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4) and tender Notice of Readiness prior to the Scheduled Loading Date, Notice of Readiness shall be deemed effective at the earlier of:

        (i)    the commencement of the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4); or

      (ii)   the time the LNG Tanker is securely moored at the Trinidad Facilities' berth.

(c)   Notice of Readiness shall not be tendered, nor shall the LNG Tanker proceed to berth, if the LNG Tanker arrives after the Scheduled Loading Date (or any adjustment thereof made in accordance with Article 7.4) until Seller determines that it is reasonably able to load the LNG Tanker without interference to its loading of other LNG tankers. In the event of such late arrival, Seller shall advise Buyer of Seller's reasonable estimate of its ability, from both a timing and a physical perspective, to load the LNG Tanker. In this circumstance, Notice of Readiness shall be deemed effective upon Seller's notice to the LNG Tanker that it is ready to receive the LNG Tanker at its berth, provided the LNG Tanker is then ready to follow Seller's instructions in accordance with the provisions hereof.

**6.10   Loading Time**

(a)   The allotted loading time for Seller to load each LNG Tanker with a capacity of one hundred thirty five thousand (135,000) cubic meters or less shall be twenty four (24) hours; and the allotted loading time for Seller to load each LNG Tanker with a capacity of more than one hundred thirty five thousand (135,000) cubic meters shall be twenty five (25) hours; subject to the adjustments provided in sub-Article 6.10(b) below ("Allotted Loading Time"). Seller and Buyer shall reasonably cooperate and use reasonable endeavors to complete loading of any LNG Tanker within twenty four (24) hours.

(b)   Allotted Loading Time shall be extended to include:

      (i)   the period of time elapsed during the LNG Tanker's inward passage until the LNG Tanker is securely moored at the berth including period(s) of time spent moving from the anchorage or waiting area or awaiting pilot(s) or tugs when the berth is available;

      (ii)   any period of time during which loading, inward passage or berthing is delayed, hindered or suspended by Buyer, the LNG Tanker's Master, the agent acting on behalf of Buyer, Buyer's Transporter or the LNG Tanker's Master, the Port Authority or any competent third party for reasons of safety, weather or otherwise and over which Seller has no control;

      (iii)   any period of delays attributable to the operation of an LNG Tanker, including the period of time such LNG Tanker (x) awaits a berth by reason of the exercise by Seller of its rights under Article

5

6.13, or (y) receives LNG for purging and cool-down (except when: (aa) the LNG Tanker met the Arrival Temperature Requirement, and (bb) the purging and cool-down is not due to an event which extends Allotted Loading Time under this sub-Article 6.10(b));

(iv)  any period during which berthing or loading of an LNG Tanker is delayed, hindered or suspended by reason of Force Majeure pursuant to Article 13 hereof;

(v)  any period of delay caused by occupancy of the berth (x) by a previous LNG Tanker, provided such occupancy is for reasons attributable to such LNG Tanker or (y) by any Other Purchaser's LNG tanker that arrived prior to or on its scheduled loading date when the LNG Tanker arrived after its Scheduled Loading Date (ignoring any change in the LNG Tanker's Scheduled Loading Date after departure of the LNG Tanker from an unloading port), except that there shall be no addition to Allotted Loading Time under this sub Article 6.10(b)(v) for any period in excess of the time required for a Cargo to be made available in storage ready for loading at the Trinidad Facilities after the loading of the first arriving LNG tanker; and

(vi)  any period of delay to the connection or disconnection of the loading lines or delivery of information to Seller that is required to prepare the cargo papers after Seller has completed pumping the LNG on board the LNG Tanker and the loading lines may be safely disconnected, where such period of delay is directly or indirectly attributable to Buyer.

(c)  The period of time commencing six (6) hours after the time when the Notice of Readiness is effective, or deemed to be effective, or three (3) hours after the LNG Tanker is berthed, whichever occurs first, and ending when the loading and return lines of the LNG Tanker are disconnected from the Trinidad Facilities' loading and return lines and all cargo papers necessary for departure required to be furnished by Seller are delivered on board in proper form shall be designated as the "Actual Loading Time". The LNG Tanker's Master shall reasonably endeavor to procure the prompt disconnection of the loading and return lines and the prompt delivery of information to Seller that Seller requires to complete the cargo papers."

IV.  **Other Revisions to the First Train Contract**

6

(a)   In Article 1, "Definitions", delete and replace in its entirety the existing definition of "Loading Port" with the following:  "The port of Point Fortin, where the Trinidad Facilities are located, including the areas where LNG Tankers typically anchor or await instructions from Seller to proceed to the berth."

(b)   In Article 1 "Definitions", delete and replace in its entirety the existing definition of "Standard Cubic Foot" with the following:  ""SCF" shall mean "Standard Cubic Foot" which shall mean the volume of anhydrous Natural Gas that occupies one actual cubic foot at a temperature of sixty (60) degrees Fahrenheit (15.55556 degrees Celsius) and an absolute pressure of 14.73 pounds per square inch absolute ("psia")."

(c)   In Article 1 "Definitions", add the following definition:  ""Train" shall mean any natural gas liquefaction unit which constitutes, or is proposed to constitute, a part of the Trinidad Facilities.  The term "Train" includes appurtenant facilities and infrastructure of the applicable natural gas liquefaction unit and also includes any Common Assets constructed or acquired in connection with or as part of such Train."

(d)   In Article 2.3 "Trinidad Facilities", (i) delete and replace the words "own and have access to" in the second line of the Article with the following words:  "own and/or have access to"; (ii) in the fifth line, delete the words "from Abyssinia"; and (iii) rewrite the parenthetical in the eighth and ninth lines, as follows: "(as all such facilities may be constructed, modified or expanded from time to time, whether by Seller or another party, the "Trinidad Facilities")".

(e)   Article 2.6 is amended by deleting the words "by Seller".

(f)   Article 5.6(a) is amended by replacing the words "Seller's ability to deliver LNG from the Trinidad Facilities" with the words "the ability of the Trinidad Facilities to deliver LNG".  Further, the following new sentence is added to the end of Article 5.6(a):  "Notwithstanding what is provided within this Article 5.6(a), nothing in this Article 5.6 shall be construed to require the allocation of LNG from the Trinidad Facilities to purchasers from any Train prior to the later of that Train's date of first commercial supply or one hundred twenty (120) days following the initial delivery of LNG from such Train."

(g)   Article 5.6(b) is amended by replacing the words "Seller from delivering" with the words "delivery of"; and, further, replacing the words "in proportion to the respective quantities so scheduled" with the words "in a manner consistent with that as set out in Article 5.4".

(h)   A new "Article 5.9 Aggregation of Trains" is added and contains the following language: "The Parties acknowledge that LNG delivered hereunder may be produced in any of the Trains that form part of the Trinidad Facilities.

7

Accordingly, Seller has the right to deliver LNG hereunder regardless of the Train in which such LNG was produced."

(i) The last sentence of Article 6.2(b) is deleted in its entirety and replaced by the following: "Buyer's utilization of any Substitute LNG Tanker shall not diminish Buyer's obligations under this Contract, and Buyer shall not make any substitution to the extent doing so would unreasonably impair the ability of Buyer to lift or the delivery of Cargoes scheduled for delivery from the Trinidad Facilities in the annual delivery programs of Buyer and Other Purchasers."

(j) Article 7.2(d) is amended by replacing the word ██████ with "Other Purchasers."

(k) Article 7.3 is amended by replacing the parenthetical "("Scheduled Loading Date")" with the following: "("Scheduled Loading Date", which shall begin at 0600 hours on the date upon which the Cargo is scheduled to be loaded and end at 0600 hours on the following day, which starting time shall not imply that Seller will not berth LNG Tankers in darkness)".

(l) Article 13.1(a)(viii) is amended by inserting the words "first liquefaction train of the" in front of "Trinidad Facilities".

(m) Article 13.5(a) is amended as follows: (i) the words "Seller is able to load and sell" are replaced by the words "is able to be loaded and sold"; and (ii) the words "Seller is able to supply" are replaced by the words "is able to be supplied".

Other than as specifically amended herein, the provisions of the First Train Contract remain in full force and effect.

IN WITNESS WHEREOF, each of the Parties has caused this Amending Agreement to be executed by its duly authorized officer as of the date first written above.

SELLER:                                           BUYER:
Atlantic LNG Company                              Enagas, S.A.
of Trinidad and Tobago


By _____               By _____

8

# AMENDMENT 4

## NOTICE OF ASSIGNMENT AND COVENANT

Atlantic LNG Company of Trinidad and Tobago
Tatil Building, 11th Floor
11 Maraval Road
Port of Spain, Trinidad, W.I.

Attention:    Mr. Gerald J. Peereboom
              President

Madrid, December 20th, 2000

Dear Sir,

Please, take notice that Enagas, S.A. ("Enagas") has assigned all of its rights and obligations under that certain LNG Sales Contract between Atlantic LNG and Enagas, S.A. dated July 27, 1995, as amended (the "Trinidad LNG Contract") to Gas Natural Aprovisionamientos Sdg, S.A., a corporation organized under the laws of Spain ("GNA"). GNA is an Affiliate of Enagas and a direct wholly-owned subsidiary of Gas Natural Sdg, S.A.

The assignment shall become effective from January 1st, 2001.

Pursuant to Article 22 (c) of the Trinidad LNG Contract, GNA hereby covenants to observe and perform all of the obligations of Enagas under the Trinidad LNG Contract.

Pursuant to Article 21 of the Trinidad LNG Contract, all notices and other communications for purposes of that contract shall henceforth be directed to Buyer at the following mail and facsimile addresses:



GAS NATURAL APROVISIONAMIENTOS SDG, S.A.
Avenida de América, 38
28028 MADRID
SPAIN
Fax: 34 91 356 35 02

ENAGAS, S.A.

By: ..HECTOR.......SPINNER....

GAS NATURAL
APROVISIONAMIENTOS SDG, S.A.

By: DIRECTOR GENERAL APROV.



## <u>NOTICE OF ASSIGNMENT AND COVENANT</u>

Atlantic LNG Company of Trinidad and Tobago
Tatil Building, 11th Floor
11 Maraval Road
Port of Spain, Trinidad, W.I.

Attention:    Mr. Gerald J. Peereboom
              President

Madrid, December 20th, 2000

Dear Sir,

Please, take notice that Enagas, S.A. ("Enagas") has assigned all of its rights
and obligations under that certain LNG Sales Contract between Atlantic LNG
and Enagas, S.A. dated July 27, 1995, as amended (the "Trinidad LNG
Contract") to Gas Natural Aprovisionamientos Sdg, S.A., a corporation
organized under the laws of Spain ("GNA"). GNA is an Affiliate of Enagas and
a direct wholly-owned subsidiary of Gas Natural Sdg, S.A.

The assignment shall become effective from January 1st, 2001.

Pursuant to Article 22 (c) of the Trinidad LNG Contract, GNA hereby covenants
to observe and perform all of the obligations of Enagas under the Trinidad LNG
Contract.

Pursuant to Article 21 of the Trinidad LNG Contract, all notices and other
communications for purposes of that contract shall henceforth be directed to
Buyer at the following mail and facsimile addresses:



GAS NATURAL APROVISIONAMIENTOS SDG, S.A.
Avenida de América, 38
28028 MADRID
SPAIN
Fax: 34 91 356 35 02


ENAGAS, S.A.                              GAS NATURAL
                                 APROVISIONAMIENTOS SDG, S.A.


By: .DIRECTOR SPUPER.             By: .C.TARRACED...........
                                  DIRECTOR GENERAL


Acknowledged,

    Atlantic LNG


By: ........................
Date: .39 DEC 2000...........

# AMENDMENT 5

## ENAGAS (CLASSIFICATION SOCIETY) AMENDING AGREEMENT

This Amending Agreement is made this 23rd day of January 2001 between Atlantic LNG Company of Trinidad and Tobago ("Seller") and Gas Natural Aprovisionamientos Sdg, S.A. ("Buyer") with respect to the LNG Sales Contract between Seller and Enagas S.A. ("Enagas") dated July 27, 1995 as amended, (the "Enagas LNG Sales Contract"). Enagas assigned all of its rights and obligations under the Enagas LNG Sales Contract to Buyer effective January 1, 2001.

Capitalised terms used herein and not otherwise defined shall have the same meaning ascribed thereto in the Enagas LNG Sales Contract.

In consideration of the premises and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree to amend the Enagas LNG Sales Contract as follows:

1.  Clause 6.2(c)(iv) of the Enagas LNG Sales Contract is deleted and the following clause substituted in its place:

    "6.2(c)(iv)    be maintained in class with either the American Bureau of Shipping, Lloyds Register of Shipping, Nippon KK or Det Norske Veritas or any other classification society that is mutually agreeable to the Parties."

2.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, excluding any choice of law rules which would require the application of the laws of any other jurisdiction.

3.  Subject only to variations herein contained, the Enagas LNG Sales Contract shall remain in full force and effect and shall be read and construed and be enforceable as if the terms of this Amending Agreement were inserted therein by way of addition or substitution as the case may be.

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be duly executed by their proper officers the day and year first hereinabove written.

ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO

By: _____

Name: GERARD PEETEBOOM

Title: PRESIDENT

GAS NATURAL APROVISIONAMIENTOS SDG, S.A.

By: _____

Name: JUAN MAS

Title: GAS PROCUREMENT DIRECTOR

A1 CLASSIFICATION SOCIETY AMENDMENT 4JAN2001

# AMENDMENT 6

THIS AGREEMENT is made this 8ᵗʰ day of *November*, 2004

BY AND BETWEEN

Gas Natural Aprovisionamientos SDG S.A., a company incorporated in Spain, with registered office at 38 Avenida de America, 28028, Madrid, Spain (hereinafter referred to as "GAS NATURAL") and

Atlantic LNG Company of Trinidad and Tobago, a company incorporated under the laws of the Republic of Trinidad and Tobago, with a registered office at Princes Court, Corner Keate and Pembroke Streets, Port-of-Spain, Trinidad (hereinafter referred to as "ATLANTIC LNG").

**WHEREAS:**

1.   ATLANTIC LNG and ENAGAS S.A. ("ENAGAS") entered into a LNG sales and purchase contract on July 27, 1995 that was subsequently validly assigned by ENAGAS to GAS NATURAL on January 1, 2001 (hereinafter referred to as "the LNG Sales Contract").

2.   By letter dated July 28, 2000, ENAGAS requested of ATLANTIC LNG a review of the Contract Price ("the Price Re-opener Request") pursuant to sub-Article 8.5 of the LNG Sales Contract.   A copy of the Price Re-opener Request is attached hereto as "Exhibit A".

3.   Since July 28, 2000, ENAGAS (and subsequent to the assignment and transfer of the LNG Sales Contract mentioned in Whereas 1, GAS NATURAL) and ATLANTIC LNG have engaged in an exchange of correspondence with regard to the Price Re-opener Request, and differing views have been expressed by the Parties regarding, in particular, the sufficiency of the Price Re-opener Request with regard to sub-Article 8.5(a) of the LNG Sales Contract.

4.   The Parties wish to record the agreement that has been reached between them regarding the Price Re-opener Request.

NOW THEREFORE, IN CONSIDERATION OF THE ABOVE PREMISES THE PARTIES HAVE AGREED AS FOLLOWS:

1.   WITHDRAWAL OF NOTICE

In consideration of ATLANTIC LNG's agreement to the sufficiency of the information contained in the Price Re-opener Request as described in Article 2 below, GAS NATURAL hereby withdraws the Price Re-opener Request effective from the date hereof and agrees that the Price Re-opener Request shall be of no further effect under the LNG Sales Contract.   Neither Party shall have any liability for any actions taken or not taken by such Party with regard to the Price Re-opener Request that is hereby withdrawn.

2.   RECOGNITION OF SUFFICIENCY OF NOTICE

In consideration of GAS NATURAL's withdrawal of the Price Re-opener Request as described in Article 1 above, ATLANTIC LNG hereby agrees that, as originally drafted, the terms of the Price Re-opener Request satisfies the conditions of sub-Article 8.5(a) of




the LNG Sales Contract and, each of ATLANTIC LNG and GAS NATURAL hereby agrees that in the future, a price re-opener request containing a similar level of information relative to the request as that contained in the Price Re-opener Request, shall constitute a valid notice under sub-Article 8.5(a) of the LNG Sales Contract.

3.    **EFFECTIVENESS AND COUNTERPARTS**

This Agreement shall be executed in two counterparts, each of which shall be deemed an original, but both of which constitute but one agreement, and shall not be effective unless and until both Parties have signed and received a counterpart.

4.    **SUPPLEMENTAL AGREEMENT**

This Agreement shall be considered supplemental to the LNG Sales Contract and all terms and conditions of the LNG Sales Contract shall be applicable to this Agreement.

Signed for and on behalf of:

**GAS NATURAL APROVISIONAMIENTOS SDG SA**

By: _____

Name: _JUAN MAS_____

Title: _GAS PROCUREMENT DIRECTOR_

Date: _NOVEMBER 8, 2004_

Signed for and on behalf of:

**ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO**

By: _____

Name: _RICHARD CAPE_____

Title: _PRESIDENT_____

Date: _NOVEMBER 8, 2004_

@002

Exhibit A



**isNatural**          **ENAGAS**

Mr. Gerald J. Peareboom
President
Atlantic LNG Company
7ᵗʰ Floor, Tatil Building
11, Maraval Road
Port of Spain (T & T)

Madrid, July 28ᵗʰ 2000

Subject:    **LNG Sale and Purchase Contract between Atlantic LNG and Enagas, S.A. dated 27 July 1995.- Price Review Notice under Clause 8.5**

Dear Sir,

We refer to the LNG Sale and Purchase Contract entered into between Atlantic LNG (Seller) and Enagas S.A. (Buyer) and dated 27 July 1995 and currently in the process of being assigned to Gas Natural Aprovisionamientos SDG, S.A. Pursuant to Clause 8.5 we hereby notify you that we require a review of the Price formula.

Circumstances in ████████ the control of the Parties have induced significant changes in the energy market of the Buyer decreasing the value of natural gas and regasified LNG which had not been reflected in Price formula as compared to such energy market as of the date when entering into this Contract. These include but are not limited to the following:



Additionally, Clause 8.5(b) sets out that levels and trends in the price of LNG and Natural Gas supplies imported ████████████ should be taken into account. Therefore, Price Review shall take into account:

GAS NATURAL sec. s.a.
Avda. América, 38
28028 Madrid
Tel.: (91) 589 36 06
Fax: (91) 736 86 36

@ 003

..12





Due to the significant changes in the energy market outlined above the current Price formula no longer reflects the value of LNG in the Buyer's end users market and we request:

i) 

We request that we commence discussions on the Price formula as soon as mutually convenient date is arranged between us.

Yours faithfully,

Carlos Torralba
Managing Director

EXHIBIT C



# gasNatural
Aprovisionamientos

## TELEFAX

Madrid, Januay 21st 2008       NUMBER OF PAGES INCLUDING THIS: 11

**To:**    ATLANTIC LNG Company of Trinidad and Tobago
      FAX: 00 1 868 624 8057 / 42 27

**From:** Gas Natural Aprovisionamientos SDG, S.A.
       Supply and Marketing Direction
       FAX: 34 91 589 32 42

**SUBJECT:** Balancing Payment under the LNG Sales Contract

Dear Sirs,

Please find attached copy of Balancing calculations and invoice (original and copy) for Atlantic payment pursuant to January 17, 2008 Award. Originals have been sent by Courier.

Yours Sincerely,

Víctor Gayubo

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid
Tel. 91 589 30 00
Fax. 91 356 24 83



# gasNatural
Aprovisionamientos

Atlantic LNG Company of Trinidad and Tobago
P.O Box 1337
Cor. Keate & Pembroke Streets
Port of Spain
Trinidad W.I.

By facsimile to no. 00 1 868 624 8057

Madrid, January 21, 2008

**Subject: Balancing Payment under the LNG Sales Contract**

Dear Sirs,

Reference is made to the Final Award issued by the Arbitral Tribunal in *In the Matter of the UNCITRAL Arbitration between Atlantic LNG Company of Trinidad and Tobago* ("Atlantic") *and Gas Natural Aprovisionamientos SDG, S.A.* ("GNA"), issued on January 17, 2008 (the "Award"), which revised the Contract Price under the LNG Sales Contract between Atlantic and GNA (as successor in interest to ENAGAS, S.A.), dated July 27, 1995 (the "Contract").

As you are aware, Paragraphs 2 and 3 in the Award provide:

a)    The recalculated Contract Price shall be applied to cargoes delivered from and including April 21, 2005 and a net amount due from one Party to the other shall be calculated and paid within ninety (90) days of the date of the Award; and

b)    If the amount due as a result of recalculating the Contract Price for past deliveries is not paid within ninety (90) days of the date of the Award, then interest shall accrue at the rate provided in Article 9.4 of the Contract.

Accordingly, please find attached:

i)    The list of cargoes subject to balancing calculations from April 21, 2005 to January 17, 2008   (including delivery date, name of the tanker, terminal destination, invoice number, energy delivered, invoice amount and former Price) (Exhibit 1);

ii)    The Revised Price Formula calculations as per the Revised Price Formula determined in the Award (Exhibit 2); and

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A
Avenida de América, 38
28028 Madrid

Tel: 91 569 30 00
Fax: 91 356 24 83



**gasNatural**
Aprovisionamientos

iii)    The balancing payment calculations for cargoes delivered (and already paid by GNA) from April 21, 2005 to January 17, 2008 (Exhibit 3).

iv)    The final invoice (original and copy) for balancing payment calculations for cargoes delivered (and already paid by GNA) from April 21, 2005 to January 17, 2008 to be paid by Atlantic to GNA within ninety (90) days of the date of the Award (Exhibit 4).

GNA account details:

Bank Name: BANCO SANTANDER S.A.
Pza. De Canalejas, 1
28014 Madrid

Account Nº: ████████████

IBAN: ████████████

Swift Code: ████████

Yours sincerely,

LNG Supply Director

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 63









**Exhibit 4**

 **gasNatural**
Aprovisionamientos

Avda. America, 39 - 2002d Madrid. Tel: 91 589 33 00. Fax 91 356 24 80



ORIGINAL

**Atlantic LNG**
P.O.Box. Cor.Keate&Pembroke Streets
0000      TRINIDAD W.I.
Port Of Spain

Invoice Nº    Y7-5708100025                Date      21 January 2008

| DESCRIPTION | QUANTITY | PRICE | TOTAL |
|---|---|---|---|
| INVOICE<br>Sales & Purchase Agreement between GNA&ALNG<br>dated July 27, 1995 Balancing period April 21st<br>2005-January17,2008 pursuant Price Reopener final Award | | ███████ | |

**TOTAL AMOUNT DUE :**                                              ████████

DUE DATE: 16 APRIL 2008
Please make payment in U.S.Dollars in accordance with the following instructions:
Please ensure payments are made full without charges to ourselves.

**TERMS OF PAYMENT**
Bank:       BANCO SANTANDER, S.A.
            Plaza Canalejas, 1
            28014 Madrid. Spain
Account No:. ██████████
IBAN:        ███████████
Swift:       ████████

**Gas Natural Aprovisionamientos SDG,S.A.**

GAS NATURAL APROVISIONAMIENTOS SDG, S.A. Dom. Social, Avda. América, 38 - 28028 Madrid. R.M. de Madrid, Tomo 14953, Libro 0, Folio 63, Sección 8ª, Hoja M-249744, Inscripción 1ª CIF A-82531062

**gasNatural**
Aprovisionamientos

Avda. América, 38 - 28028 Madrid. Tel. 91 589 33 00. Fax 91 356 24 63



COPY

**Atlantic LNG**
P.O.Box. Cor.Keate&Pembroke Streets
0000        TRINIDAD W.I.
Port Of Spain

Invoice Nº    Y7-5708100025                    Date        21 January 2008

| DESCRIPTION | QUANTITY | PRICE | TOTAL |
|---|---|---|---|
| INVOICE<br>Sales & Purchase Agreement between GNA&ALNG<br>dated July 27, 1995 Balancing period April 21st<br>2005-January17,2008 pursuant Price Reopener final Award | | | ▉▉▉▉ |

**TOTAL AMOUNT DUE :**                                      ▉▉▉▉

DUE DATE: 16 APRIL 2008
Please make payment in U.S.Dollars in accordance with the following instructions:
Please ensure payments are made full without charges to ourselves.

**TERMS OF PAYMENT**
Bank:        BANCO SANTANDER, S.A.
             Plaza Canalejas, 1
             28014 Madrid. Spain
Account No: ▉▉▉▉▉▉
IBAN:       ▉▉▉▉▉▉▉▉
Swift:      ▉▉▉▉

Gas Natural Aprovisionamientos SDG,S.A.

GAS NATURAL APROVISIONAMIENTOS SDG, S.A. Dom. Social, Avda. América, 38 - 28028 Madrid, R.M. de Madrid, Tomo 14863, Libro 0, Folio 89, Sección 8ª, Hoja M249744, Inscripción 1ª CIF A-62531062

P. 1

x x x Resumen ( 21.Ene. 2008 19:47 ) x x x

1)
2)

(Impresión Manual)

⟨TX⟩

| Fecha | Hora | Destino | Modo | Tmp TX | Pág. | Result | Nombre de usuario | Carp Nº |
|-------|------|---------|------|--------|------|--------|-------------------|---------|
| 9. Ene. | 13:33 | 0915238152 | G3TSM | 0'35" | P. 1 | OK | | 2048 |
| 10. Ene. | 13:50 | 0915238152 | G3TSM | 1'08" | P. 3 | OK | | 2055 |
| 11. Ene. | 9:43 | 0915238152 | G3TSM | 2'13" | P. 6 | OK | | 2058 |
| | 11:43 | 913489410 | G3TESM | 0'20" | P. 1 | OK | | 2061 |
| 14. Ene. | 16:11 | 0917268530 | G3TES | 0'11" | P. 1 | OK | | 2068 |
| 21. Ene. | 9:53 | 916618527 | G3TESM | 0'28" | P. 1 | OK | | 2085 |
| | 19:33 | 00018686248057 | G3TES) | 0'29" | P. 2 | OK | | 2088 |
| | 19:38 | 00018686248057 | G3TES) | 3'19" | P. 7 | E | | 2091 |
| | 19:44 | 00018686248057 | G3TES) | 1'44" | P. 11 | OK | | 2093 |

⟨RX⟩

| Fecha | Hora | Remitente | Modo | Tmp RX | Pág. | Result | Nombre de usuario | Carp Nº |
|-------|------|-----------|------|--------|------|--------|-------------------|---------|
| 18. Dic. | 16:48 | | G3RED | 0'28" | P. 1 | OK | | 2014 |
| | 23:34 | | G3RES | 0'22" | P. 1 | OK | | 2016 |
| 19. Dic. | 9:36 | | G3RES | 0'18" | P. 1 | OK | | 2018 |
| | 10:56 | | G3RES | 0'35" | P. 1 | OK | | 2020 |
| | 14:37 | | G3RED | 0'22" | P. 1 | OK | | 2022 |
| 23. Dic. | 0:22 | | G3RED | 0'20" | P. 1 | OK | | 2024 |
| 26. Dic. | 18:17 | | G3RES | 0'38" | P. 1 | OK | | 2026 |
| 27. Dic. | 11:58 | | G3RES | 0'18" | P. 1 | OK | | 2028 |
| 30. Dic. | 14:04 | | G3RS | 1'01" | P. 2 | OK | | 2030 |
| 2. Ene. | 16:16 | | G3RES | 0'20" | P. 1 | OK | | 2032 |
| 3. Ene. | 9:30 | | G3RES | 0'31" | P. 1 | OK | | 2034 |
| | 17:23 | | G3RES | 0'17" | P. 1 | OK | | 2037 |
| 7. Ene. | 15:34 | | G3RES | 0'20" | P. 1 | OK | | 2039 |
| 8. Ene. | 10:07 | | G3RES | 0'40" | P. 1 | OK | | 2041 |
| | 10:10 | Via Fax | G3RES | 0'36" | P. 1 | OK | | 2043 |
| | 13:25 | | G3RES | 0'26" | P. 2 | OK | | 2045 |
| 9. Ene. | 11:07 | | G3RES | 0'25" | P. 1 | OK | | 2047 |
| 10. Ene. | 7:15 | | G3RES | 1'04" | P. 1 | OK | | 2050 |
| | 10:56 | | G3RES | 0'40" | P. 1 | OK | | 2052 |
| | 11:22 | | G3RES | 0'44" | P. 1 | OK | | 2054 |
| | 14:21 | | G3RES | 0'36" | P. 1 | OK | | 2057 |
| 1. Ene. | 11:26 | | G3RED | 0'37" | P. 1 | OK | | 2060 |
| 5. Ene. | 5:18 | 902367924 | G3RED | 0'19" | P. 1 | OK | | 2070 |
| | 13:55 | | G3RES | 0'33" | P. 1 | OK | | 2072 |
| | 14:23 | | G3RES | 0'36" | P. 1 | OK | | 2074 |
| 16. Ene. | 9:16 | | G3RES | 0'36" | P. 1 | OK | | 2076 |
| 17. Ene. | 17:28 | | G3RED | 0'25" | P. 1 | OK | | 2078 |
| 19. Ene. | 11:34 | | G3RED | 0'23" | P. 1 | OK | | 2080 |
| 21. Ene. | 18:00 | | G3RES | 0'16" | P. 1 | OK | | 2087 |

Cont. TX    000873        Cont. RX    001508

| | | | | |
|---|---|---|---|---|
| # : TX por Lotes | C : Confidencial | $ : Transfer | P : Polling |
| M : Memoria | L : Trans. Retardada | @ : Repetición | E : ECM |
| S : Estándar | D : Detalle | F : Fina | U : Superfina |
| ⟩ : Reducción | H : Almacenado/S.doc | ✱ : LAN Fax | + : Entrega |
| Ω : Solicit. aviso RX | A : Aviso de RX | ⟨✱⟩ : Mail | ⟨+⟩ : IP-FAX |
| ▭ : Carpeta | | | |

**EXHIBIT D**



# gasNatural
Aprovisionamientos

Atlantic LNG Company of Trinidad and Tobago
Princess Court
Corner of Keate and Pembroke Streets
Port of Spain
Trinidad, W.I.

Madrid, 21st January 2008

**Re: New Contract Price applicable to deliveries of LNG under the Contract dated July 27, 1995 based on the Award dated January 17, 2008.**

Dear Sirs,

Reference is made to the Tribunal's Final Award of the Uncitral Arbitration between Atlantic LNG Company of Trinidad and Tobago and Gas Natural Aprovisionamientos SDG, S.A. and its paragraph 130 in witness whereof the Tribunal amends Articles 8.1, 8.3 and 8.4 of the Contract, applicable to all deliveries of LNG under the Contract from and including April 21, 2005.

The Contract Price, P, applicable to the ███████████ shall be ████████████ per MMBtu.

Yours sincerely,

Esther Navarro
LNG Contracts Senior Manager

C.c. Repsol-Gas Natural LNG, S.L.

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel: 91 589 30 00
Fax: 91 386 24 83

# EXHIBIT E



COMPANY OF TRINIDAD AND TOBAGO    P.O. Box 3936,Old Refinery Office, Point Fortin Main Road, Point Fortin, Trinidad, W.I
Tel: (868) 648-2916 Fax: (868) 648-2905

# BILL OF QUANTITY

**Atlantic LNG Co., Port of Point Fortin, LNG Berth 1, Trinidad.**

| | | |
|---|---|---|
| **LNG Vessel:** | LNG/C ▮▮▮▮▮▮ | |
| **Train:** | 1 | |
| **Cargo No.:** | TT-1/1319A | |
| **Destination:** | ▮▮▮▮▮▮ | |
| **Consignee:** | Gas Natural Aprovisionamientos ,SDG, S.A. | |
| **Product Type:** | Liquefied Natural Gas. | |

| | | | |
|---|---|---|---|
| **Start of Loading:** | Date: | 20-01-08 | Time: 1055Hrs. |
| **Completed Loading:** | Date: | 20-01-08 | Time  2225Hrs. |

| Temp. @ -160.00 deg. C | Cubic Meters | Metric Tons | MMBtus | US Barrels |
|---|---|---|---|---|
| Total Cargo Loaded | 46,170.000 | 19,889.03 | 1,042,884 | |

The foregoing is a correct statement of the total cargo quantity delivered to the above-mentioned vessel.

Signed:
Terminal Representative
Atlantic LNG:                                              Date:

Surveyor

Master



**COMPANY OF TRINIDAD AND TOBAGO**    P.O. Box 3936, Old Refinery Office, Point Fortin Main Road, Point Fortin, Trinidad, W.I.
Tel (868) 648-2916 Fax (868) 648-7905

# CERTIFICATE OF QUALITY

### Atlantic LNG Co., Port of Point Fortin, LNG Berth 1, Trinidad.

| | |
|---|---|
| **Train:** | 1 |
| **LNG Vessel:** | LNG/C ███████ |
| **Cargo No.:** | TT-1/1319A |
| **Destination:** | ██████ |
| **Consignee:** | Gas Natural Aprovisionamientos ,SDG, S.A. |
| **Product Type:** | Liquefied Natural Gas. |
| **Date Loaded:** | 20th January, 2008. |

| Test | Unit | Method | Results |
|---|---|---|---|
| **Component Analysis:** | | | |
| $C_1$ | % mol | GPA 2261 | 96.8867 |
| $C_2$ | % mol | GPA 2261 | 2.6373 |
| $C_3$ | % mol | GPA 2261 | 0.4194 |
| $i\text{-}C_4$ | % mol | GPA 2261 | 0.0263 |
| $n\text{-}C_4$ | % mol | GPA 2261 | 0.0188 |
| $C_5+$ | % mol | GPA 2261 | 0.0025 |
| $N_2$ | % mol | GPA 2261 | 0.0090 |
| O2 | %mol | GPA 2261 | 0.0000 |
| $CO_2$ | %mol | GPA 2261 | 0.0000 |
| Density @ - 160.00 deg C | kg / m3 | Modified K.M. Calculation | 430.778 |
| Gross Heating Value | Btu/kg | Calculation Conversion | 52,435.2 |
| | Btu/SCF | | 1,042.0 |
| Wobbe Index | Btu/scf | GPA 2172 @14.73psia & 60 deg F. | 1376.78 |
| Mercaptan Sulphur | mg/Nm3 | GPA 2265 | Nil |
| Hydrogen Sulphide | % mol | GPA 2377 | Nil |
| Total Sulphur | mg/Nm3 | GPA 2265 | Nil |

Signed:
**Atlantic LNG**

Chemist                                                              Date

Surveyor

Master

# B I L L   O F   L A D I N G

COPY
NON-NEGOTIABLE

**B/L #:**  <u>TT-1/1319A</u>
**SCAC#:**  <u>BGDYLAVK52001082</u>

Loaded in apparent good order and condition by **ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO** (hereafter called "Atlantic") and shipped in apparent good order and condition by **GAS NATURAL APROVISIONAMIENTOS, SDG, S.A.** on board the LNG vessel ▮▮▮▮▮▮▮ whereof **GEIR BRATLAND** is Master/Owners Agent, for the present voyage, now lying in the Port of **POINT FORTIN, TRINIDAD W.I.** a cargo of liquefied natural gas of net **46,170.000** cubic metres, **19,889.03** metric tons, **1,042,884** MMBtu to be delivered at the port of ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ or so near thereto as the vessel may safely get and discharge onto **THE ORDER OF GAS NATURAL APROVISIONAMIENTOS, SDG, S.A.** or to their assign as per charter party, all conditions and exceptions of which charter party are deemed incorporated in this Bill of Lading.

In witness whereof the Master/Agent of the said ship has affirmed to **THREE (3) ORIGINAL** Bills of Lading, all of this tenor and date, one of which being accomplished, the others to stand void. One original bill of lading retained on board, against which bill of lading delivery of cargo may properly be made on instruction received from charterers.

## CLEAN ON BOARD

**IN WITNESS WHEREOF, the Master has signed THREE(3) ORIGINALS.**

Dated at **POINT FORTIN**, this 20TH day of JANUARY, 2008.
**TRINIDAD W.I.**

_____
                                                                  **Master**



COMPANY OF TRINIDAD AND TOBAGO     P.O. Box 3936, Old Refinery Office, Point Fortin Main Road, Point Fortin, Trinidad, W.I.
Tel: (868) 648-2916 Fax: (868) 648-2905

## LOADING TERMINAL TIMESHEET/STATEMENT OF FACTS

### Atlantic LNG Co., Port of Point Fortin, LNG Berth 1, Trinidad.

**Train:** 1

**LNG Vessel:** LNG/C ▮▮▮▮▮▮▮▮▮

**Cargo No:** TT-1/1319A

**Destination:** ▮▮▮▮▮▮▮▮

**Consignee:** Gas Natural Aprovisionamientos ,SDG, S.A.

**Product Type:** Liquefied Natural Gas.

**Scheduled Loading Date:** 20th January, 2008.

| EVENT | DATE (DD-MM-YY) | LOCAL TIME (GMT – 4) hrs | Remarks |
|---|---|---|---|
| Arrived at sea-buoy/anchorage | 14-01-08 | 2130 | |
| Notice of Arrival tendered | 14-01-08 | 2130 | |
| Pilot on board | 20-01-08 | 0605 | |
| Anchor Aweigh | 20-01-08 | 0310 | |
| Arrived at berth (first rope ashore) | 20-01-08 | 0710 | |
| Completed mooring | 20-01-08 | 0805 | |
| Gangway on-board | 20-01-08 | 0810 | |
| Free pratique granted | 14-01-08 | 2250 | |
| Arrival inspection commenced | 20-01-08 | 0910 | |
| Arrival inspection completed | 20-01-08 | 0945 | |
| Safety meeting completed | 20-01-08 | 0840 | |
| Commenced loading arm connection | 20-01-08 | 0845 | |
| Completed loading arm connection | 20-01-08 | 0920 | |
| Notice of Readiness to Load (NOR) Tendered /Received | 20-01-08 20-01-08 | 0001 0900 | Is cool down required? No |
| Started cool down of liquid arms | 20-01-08 | 0933 | |
| Completed cool down of liquid arms | 20-01-08 | 1033 | |
| Commenced ESD | 20-01-08 | 1035 | |
| Completed ESD | 20-01-08 | 1040 | |
| Commenced loading | 20-01-08 | 1055 | |



**ATLANTIC LNG**
*COMPANY OF TRINIDAD AND TOBAGO*   P.O. Box 3936,Old Refinery Office, Point Fortin Main Road, Point Fortin, Trinidad, W I
Tel (868) 648-2916 Fax (868) 648-2905

| | | | |
|---|---|---|---|
| Loading at full rate | 20-01-08 | 1157 | |
| Reduced rate for Topping-Off | 20-01-08 | 2112 | |
| Completed loading | 20-01-08 | 2225 | |
| Commenced load arms disconnection | | | |
| Loading arms disconnected | | | |
| Cargo papers received by Master | | | |
| Vessel cleared to depart | | | |
| Gangway off | | | |
| Left Berth ('et-go last mooring) | | | |
| Pilot disembarked | | | |

Remarks:

Signed: _____
*for Terminal Representative/Shift Supervisor*

Date: 20th January, 2008

Signed: _____
*For Master or Agent for Master*

Date: 20th January, 2008

S____ d: _____
*Surveyor*

D 20th January, 2008



SGS Société Générale de Surveillance S.A.
SGS Group of Companies

# LNG QUANTITY REPORT - CARGO # TT - 1 / 1319A

| Atlantic LNG / Point Fortin, Trinidad | Date | 20th January 2008 | | Clients | Atlantic LNG / Gas Natural Aprovision SDG S.A. |
|---|---|---|---|---|---|
| LNG/C | Voyage | 819 | SGS File # | TRD 01039/08 | Reference | TT - 1 / 1319A |

## COMPOSITION CALCULATIONS

| Mole Fraction (%) | Molecular Wt Weight (Mw) | Molar Mass (Xi * Mw) | Molecular Vol mol number (Vi) | Mass Vol mol number (Xi * Vi) | Molecular BTU/LB (Ai) | Mass BTU/LB (Xi * Vw * Ai) | Molecular BTU/S⁶ (Bi) | Mass BTU/SCF (Xi * Bi) | Molecular Summ Factor (Bii) | Mass Summ Factor (Xi² * Bii) | Molecular Mass Ratio (Gi) | Mass Ratio (Xi * Gi) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 96.8667 | 16.0420 | 15.5426 | 0.038149 | 0.036661 | 23892 | 371343 | 1010.0 | 978.6 | 0.01150 | 0.0112 | 0.55397 | 0.53672 |
| 2.6373 | 30.0690 | 0.7930 | 0.047942 | 0.001264 | 22334 | 17711 | 1769.7 | 45.7 | 0.02380 | 0.0006 | 1.03930 | 0.02738 |
| 0.4194 | 44.0980 | 0.1849 | 0.062497 | 0.000262 | 21654 | 4306 | 2516.2 | 10.5 | 0.03490 | 0.0001 | 1.52270 | 0.03639 |
| 0.0263 | 58.1220 | 0.0153 | 0.078352 | 0.000021 | 21132 | 325 | 3252.0 | 0.9 | 0.04440 | 0.0000 | 2.00710 | 0.00053 |
| 0.0198 | 58.1220 | 0.0139 | 0.076875 | 0.000014 | 21300 | 233 | 3262.4 | 0.6 | 0.04710 | 0.0000 | 2.00710 | 0.00038 |
| 0.0017 | 72.1490 | 0.0012 | 0.091721 | 0.000002 | 21044 | 26 | 4003.9 | 0.1 | 0.05720 | 0.0000 | 2.49140 | 0.00004 |
| 0.0006 | 72.1490 | 0.0004 | 0.091583 | 0.000001 | 21065 | 9 | 4008.7 | 0.0 | 0.06000 | 0.0000 | 2.49140 | 0.00001 |
| 0.0002 | 86.1750 | 0.0002 | 0.104890 | 0.000000 | 20944 | 4 | 4756.0 | 0.0 | 0.07920 | 0.0000 | 2.97560 | 0.00001 |
| 0.0080 | 28.0130 | 0.0025 | 0.047019 | 0.000004 | 0 | 0 | 0.0 | 0.0 | 0.00442 | 0.0000 | 0.96730 | 0.00009 |
| 0.0000 | 31.9990 | 0.0000 | 0.000000 | 0.000000 | 0 | 0 | 0.0 | 0.0 | 0.00720 | 0.0000 | 1.10500 | 0.00000 |
| 0.0000 | 44.0100 | 0.0000 | 0.000000 | 0.000000 | 0 | 0 | 0.0 | 0.0 | 0.01950 | 0.0000 | 1.51970 | 0.00000 |
| 100.0000 | | 16.5511 | | 0.038629 | | 393655 | Ideal 1 | 1037.4 | Z = | 0.9979 | SG = | 0.57155 |

## DENSITY CALCULATIONS

$$\Sigma (Xi * Mw)$$
$$\rho = \frac{\Sigma (Xi * Mw)}{\Sigma (Xi * Vi) - Xm * C} \quad \text{with } C = K1 + (K2 - K1) * Xn$$
$$0.0425$$
$$K1 = 0.000111$$
$$K2 = 0.000245$$

$$\rho = 430.778 \text{ kg/m3 at Observed Temperature}$$
$$K1 = 0.000111$$
$$K2 = 0.000245$$

$$\rho = 430.778 \text{ kg/m3 at } -160.0 \text{ Deg C}$$

## HIGHER HEATING VALUES

| | |
|---|---|
| Mass | $Cvm = \dfrac{\Sigma (Xi * Mw * Hi) * 2.20462}{\Sigma (Xi * Mw)}$ | $Cvm = 52435.2$ BTU/kg |
| Volume | $Cvv = \dfrac{\Sigma (Xi * Cvi) * 1.473}{Z * 14.696}$ | $Cvv = 1042.0$ BTU/SCF |
| Wobbe Index | $Wvi = \dfrac{Cvv}{SQRT((Xi * Gi)/Z)}$ | $Wvi = 1376.78$ BTU/SCF |

## BTU QUANTITY DELIVERED

| Total Weight of Cargo Loaded | Weight | Gross Delivered Quantity (Q) = V * D * Cvm | |
|---|---|---|---|
| | Metric Tons | Gross Delivered (Q) = | 1,042,884 MMBTU's |

Total Cargo Volume Loaded: ___ m3

FOR REFERENCE ONLY
Terminal Reproduction



SGS TRINIDAD

ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO LIMITED
and
GAS NATURAL APROVISIONAMIENTOS SDG S.A.

## PRICE APPLICABLE AS OF JANUARY 2008 (Final)

### PRICE CALCULATIONS







**ATLANTIC LNG**
COMPANY OF TRINIDAD AND TOBAGO

10ᵗʰ & 11ᵗʰ Floors, TATIL Building, 11 Maraval Road, Port of Spain, Trinidad, W.I.
Telephone (868) 628-2916  Fax (868) 628-5641

## Fax Transmittal

| To      : Maria Sanchez<br>Account & Administration   Dept<br>CC     : Belen Iozoya | From    : Team Leader<br>Accounting Compliance |
|---|---|
| Company  : GAS NATURAL<br>APROVISIONAMIENTOS SDG, S.A. | Date     : January 22, 2008 |
| Fax No.   : 011-34-91-356-2483 | No. of Pages (including cover) : |
| Subject    : Invoice(s) for your account | Transmittal No. :<br>Ref. No. :<br>File Number : |
| Comments ☐       Reply Requested ☐       For Your Review ☐       For Info. ☒ | |

## Message

Please find attached the following Invoice for your account:

- 17016
- 17017
- 17018

**Kindly acknowledge receipt by signing and re-faxing this transmittal to my attention at**

**Fax No: 868-625-7122.**

Originals will be forwarded via courier as early as possible.

If you should have any queries please do not hesitate to contact me.

Regards,

*Daniel Devaux*
*Team Leader  Accounting  Compliance*

Date Faxed Invoices Received:
Rec'd By:

*This communication is intended for the use of the party to which it is addressed and may contain information that is privileged or confidential under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is not permitted. If you have received this communication in error, please notify us immediately and then destroy this communication. Thank you.

```
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
x                                                                     x
x                    TRANSACTION REPORT                        P.01   x
x                    _____                              x
x                                         JAN-22-2008 TUE 02:20 PM    x
x   FOR:                                                              x
x                                                                     x
x──────────────────────────────────────────────────────────────     x
x   SEND                                                              x
x                                                                     x
x   DATE START   RECEIVER        TX TIME  PAGES TYPE    NOTE    M# DP  x
x──────────────────────────────────────────────────────────────     x
x  JAN-22 02:18 PM 01134913562483   1'57"   11  FAX TX   OK     942   x
x                                                                     x
x                                TOTAL :  1M 57S  PAGES:  11          x
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```



**ATLANTIC LNG**
COMPANY OF TRINIDAD AND TOBAGO

10ᵗʰ & 11ᵗʰ Floors, TATIL Building, 11 Maraval Road, Port of Spain, Trinidad, W.I.
Telephone: (868) 628-2916  Fax (868) 628-5841

## Fax Transmittal

| To      : Maria Sanchez            | From   : Team Leader          |
|         Account & Administration   Dept | **Accounting Compliance** |
| CC      : Belen lozoya             |                               |
| Company : GAS NATURAL              | Date   : January 22, 2008     |
|         APROVISIONAMIENTOS SDG, S.A. |                             |
| Fax No.   : 011-34-91-356-2483     | No. of Pages (including cover) : |
| Subject   : Invoice(s) for your account | Transmittal No. :         |
|                                    | Ref. No. :                    |
|                                    | File Number :                 |

| Comments ☐    Reply Requested ☐    For Your Review ☐    For Info. ☒ |

## Message

Please find attached the following Invoice for your account:



P.O. Box 1337, Cor. Keate & Pembroke Streets, Port of Spain, Trinidad, W.I.
Tel. (868) 624-2916, Fax: (868) 624-8057

## TAX INVOICE
## VAT Registration No.: 113709

**Invoice no. 17016**
Please show this number on your
remittance and confirm via fax.
Attention:

FINANCIAL CONTROLLER

TO: Master of the SS █████████

**GAS NATURAL APROVISIONAMIENTOS SDG S.A.**
NIF: A82531062
Av. America 38 apt 9
28028 MADRID .
SPAIN

| | |
|---|---|
| Invoice date: | **22nd January , 2008** |
| Reference: | **Tariff** |
| Due date: | **Immediate** |

Ex SS.: █████████
Cargo: **Liquefied Natural Gas**
Date In: 20th January , 2008

| | US$ |
|---|---|
| Port Dues | $2,374.00 |
| Invoice Total | $2,374.00 |

Authorised by: _Axatemon_

Please make payment in U.S. DOLLARS in accordance with the following instructions:

| | |
|---|---|
| Bank: | **Citibank N.A., 111 Wall Street , New York** |
| Federal Reserve ABA Number: | **021000089** |
| Credit to account number: | **3617-5021** |
| For the account of: | **Atlantic LNG Company of Trinidad and Tobago** |
| Reference: | **Invoice no. 17016** |



COMPANY OF TRINIDAD AND TOBAGO

P.O. Box 1337, Cor. Keate & Pembroke Streets, Port of Spain, Trinidad, W.I.
Tel. (868) 624-2916. Fax. (868) 624-8057

## TAX INVOICE
### VAT Registration No.: 113709

**Invoice no. 17017**
Please show this number on your remittance and confirm via fax,
Attention:

FINANCIAL CONTROLLER

TO: Master of the SS ▮▮▮▮▮▮

**GAS NATURAL APROVISIONAMIENTOS SDG S.A.**
NIF: A82531062
Av. America 38 apt 9
28028 MADRID .
SPAIN

| | |
|---|---|
| Invoice date: | 22nd January , 2008 |
| Reference: | Tariff |
| Due date: | Immediate |

Ex SS.: ▮▮▮▮▮▮
**Cargo: Liquefied Natural Gas**
Date In: 20th January , 2008

|  | US$ |
|---|---|
| Tug Usage Charge | $15,500.00 |
| Invoice Total | $15,500.00 |

Authorised by: _Akatimon_

Please make payment in U.S. DOLLARS in accordance with the following instructions:

| | |
|---|---|
| Bank: | Citibank N.A.,111 Wall Street , New York |
| Federal Reserve ABA Number: | 021000089 |
| Credit to account number: | 3617-5021 |
| For the account of: | Atlantic LNG Company of Trinidad and Tobago |
| Reference: | Invoice no. 17017 |

# EXHIBIT F

JAN-11-2000 06:37  FROM:ATLANTIC LNG 18686240666            TO:01134913562483    P:3/10
                    18686240666


**ATLANTIC LNG**
COMPANY OF TRINIDAD AND TOBAGO

P.O. Box 1337, Cor. Keate & Pembroke Streets, Port of Spain. Trinidad, W.I.
Tel: (868) 624-2916; Fax: (868) 624-8057

# TAX INVOICE
## VAT Registration No.: 113709

**Invoice no. 17024**
Please show this number on your
remittance and confirm via fax,
Attention:

FINANCIAL CONTROLLER

TO: Master of the SS ███

**GAS NATURAL APROVISIONAMIENTOS SDG S.A.**
NIF: A82631062
Av. America 38 apt 9
28028 MADRID .
SPAIN

| | |
|---|---|
| **Invoice date:** | 25th January , 2008 |
| **Reference:** | Tariff |
| **Due date:** | Immediate |

Ex SS.: ███
Cargo:  Liquefied Natural Gas
Date In: 24th January , 2008

| | US$ |
|---|---|
| Tug Usage Charge | $18,158.00 |
| Invoice Total | $18,158.00 |

Authorised by: _Abzalman_

Please make payment in U.S. DOLLARS in accordance with the following instructions:

| | |
|---|---|
| Bank: | Citibank N.A.,111 Wall Street , New York |
| Federal Reserve ABA Number: | 021000089 |
| Credit to account number: | 3617-5021 |
| For the account of: | Atlantic LNG Company of Trinidad and Tobago |
| Reference: | Invoice no. 17024 |

JAN-11-2000 06:37  FROM:ATLANTIC LNG 18686240666        TO:01134913562483        P:2/10

18686240666



COMPANY OF TRINIDAD AND TOBAGO

P.O. Box 1337, Cor. Keate & Pembroke Streets, Port of Spain, Trinidad, W.I.
Tel: (868) 624-2916; Fax: (868) 624-8057

## TAX INVOICE
### VAT Registration No.: 113709

| | |
|---|---|
| **Invoice no. 17023** | |
| Please show this number on your remittance and confirm via fax, Attention: | |
| **FINANCIAL CONTROLLER** | |

**TO: Master of the SS** ▮▮▮▮▮▮

**GAS NATURAL APROVISIONAMIENTOS SDG S.A.**
NIF: A82531062
Av. America 38 apt 9
28028 MADRID .
SPAIN

| | |
|---|---|
| **Invoice date:** | 25th January , 2008 |
| **Reference:** | Tariff |
| **Due date:** | Immediate |

**Ex SS.:** ▮▮▮▮▮▮▮
**Cargo:** Liquefied Natural Gas
**Date In:** 24th January , 2008

| | US$ |
|---|---|
| Port Dues | $2,782.00 |
| Invoice Total | $2,782.00 |

Authorised by: _Alxatomar_

Please make payment in U.S. DOLLARS in accordance with the following instructions:

| | |
|---|---|
| Bank: | Citibank N.A., 111 Wall Street , New York |
| Federal Reserve ABA Number: | 021000089 |
| Credit to account number: | 3617-5021 |
| For the account of: | Atlantic LNG Company of Trinidad and Tobago |
| Reference: | Invoice no. 17023 |

**EXHIBIT G**



**EXHIBIT H**



# gasNatural
Aprovisionamientos

## TELEFAX

Madrid, Januay 24th 2008         NUMBER OF PAGES INCLUDING THIS: 11

**To:**   ATLANTIC LNG Company of Trinidad and Tobago
FAX: 00 1 868 624 8057 / 625 7122

**From:** Gas Natural Aprovisionamientos SDG, S.A.
Account & Administration Department
FAX: 34 91 356 24 83  / 356 35 02 / 589 32 42

**SUBJECT:** Ref: Invoice No. 17018

Dear Sirs,

Please find attached copy of the letter -and two attachments- referred to your Invoice No. 17018 dated January 22, 2008. Originals have been sent by Courier.

Yours Sincerely,

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid I
Tel. 91 589 30 00
Fax. 91 356 24 83



# gasNatural
Aprovisionamientos

Atlantic LNG Company of Trinidad and Tobago
P.O. Box 1337
Cor. Keate & Pembroke Streets
Port of Spain, Trinidad W.I.

By facsimile to no. 00 1 868 624 8057 / 625 7122

Madrid, January 24, 2008

**Ref: Invoice No. 17018**

Dear Sirs:

We are in receipt of your Invoice dated January 22, 2008 for 1,042,864 MMBtu of LNG priced at ▮▮▮▮ per MMBtu and loaded on January 20, 2008 onto the Vessel LNG/C ▮▮▮▮▮ for a total invoiced price of ▮▮▮▮▮▮

As you are aware, the Arbitral Tribunal issued its Final Award in *In the Matter of the UNCITRAL Arbitration between Atlantic LNG Company of Trinidad & Tobago* ("Atlantic") *and Gas Natural Aprovisionamientos SDG, S.A.* ("GNA") on January 17, 2008 (the "Award"). Among other things, the Award expressly revised the Contract Price Formula for all Train 1 LNG sales to GNA by Atlantic on or after April 21, 2005. As you are also no doubt aware, the Award was made effective immediately by its terms and in accordance with Article 32(2) of the UNCITRAL Arbitration Rules, which provides: "The award shall be made in writing and shall be final and binding on the parties. *The parties undertake to carry out the award without delay.*" (Emphasis added).

Despite the clear wording of the Award and of Article 32(2), the referenced Invoice does not utilize the resulting current Revised Contract Price that is applicable to this cargo according to the Award, notwithstanding that the Invoice relates to a cargo loaded after the date of the Award (and accordingly, is not part of the balancing payment due for the period prior to issuance of the Award). Additionally, GNA has informed Atlantic by fax and courier on January 21, 2008, and by an e-mail of the same date, of the Revised Contract Price for first quarter 2008. Attached hereto is the correspondence and confirmation of its receipt from Atlantic's fax system.

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 63



**gasNatural**
Aprovisionamientos

In view of the foregoing, GNA assumes that the referenced Invoice was issued inadvertently in its present form because it contains an obvious error in calculation. It therefore hereby requests that Atlantic immediately reissue the referenced Invoice with the correct Revised Contract Price, as required by the Award. Upon receipt of the corrected Invoice, GNA will immediately process it for payment in accordance with Article 9.

Kindly acknowledge receipt by signing and re-faxing this transmittal to GNA (fax numbers + 34 91 356 24 83, +34 91 356 35 02 or +34 91 589 32 42).

Name:
Position:

Please note that it is necessary that GNA receive a written response to this letter not later than the close of business tomorrow, Friday 25/01/08, Trinitarian time.

Very truly yours,

Account & Administration Dept.

GAS NATURAL,
APROVISIONAMIENTOS, SDG. S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 83

**Attachment I**

**gasNatural**
Aprovisionamientos

## TELEFAX

Madrid, January 21ˢᵗ 2008                    NUMBER OF PAGES: 2

**To:**   ATLANTIC LNG Company of Trinidad and Tobago

FAX: 00 1 868 624 80 57 / 42 27

**From:** Gas Natural Aprovisionamientos SDG, S.A.
Supply and Marketing Direction
FAX: 34 91 589 32 42

**SUBJECT:**   New Contract Price applicable to deliveries of LNG under the Contract dated July 27, 1995 based on the Award dated January 17, 2008.

Dear Sirs,

Reference is made to the LNG Sales Contract between Gas Natural Aprovisionamientos SDG S.A. ("GNA") and Atlantic LNG Company of Trinidad & Tobago ("ALNG") dated July 27, 1995 ("the Contract") and Tribunal's Final Award in the matter of UNCITRAL Arbitration between Atlantic LNG Company of Trinidad y Tobago and Gas Natural Aprovisionamientos SDG, S.A. dated January 17, 2008 concerning the new Contract Price ███████████

Please, find attached herewith notice of the Contract Price for ████████████

Yours Sincerely,

Esther Navarro
LNG Contracts Senior Manager

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A
Avenida de América, 38
28028 Madrid

Tel: 91 589 30 00
Fax: 91 589 24 83

**gasNatural**
Aprovisionamientos

Atlantic LNG Company of Trinidad and Tobago
Princess Court
Corner of Keate and Pembroke Streets
Port of Spain
Trinidad, W.I.

Madrid, 21st January 2008

**Re: New Contract Price applicable to deliveries of LNG under the Contract dated July 27, 1995 based on the Award dated January 17, 2008.**

Dear Sirs,

Reference is made to the Tribunal's Final Award of the Uncitral Arbitration between Atlantic LNG Company of Trinidad and Tobago and Gas Natural Aprovisionamientos SDG, S.A. and its paragraph 130 in witness whereof the Tribunal amends Articles 8.1, 8.3 and 8.4 of the Contract, applicable to all deliveries of LNG under the Contract from and including April 21, 2005.

The Contract Price, P, applicable to the ███████████ shall be ████████ per MMBtu.

Yours sincerely,

Esther Navarro
LNG Contracts Senior Manager

C.c. Repsol-Gas Natural LNG, S.L.

GASNATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid
Tel. 91 6803960
Fax 91 3502159

P. 1

× × × Resumen ( 21. Ene. 2008 19:47 ) × × ×

(Impresión Manual)

| (TX) Fecha | Hora | Destino | Modo | Tmp TX | Pág. | Result | Nombre de usuario | Carp Nº |
|---|---|---|---|---|---|---|---|---|
| 9. Ene. | 13:33 | 0915238152 | G3TSM | 0'35" | P. 1 | OK | | 2048 |
| 10. Ene. | 13:50 | 0915238152 | G3TSM | 1'08" | P. 3 | OK | | 2055 |
| 11. Ene. | 9:43 | 0915238152 | G3TSM | 2'13" | P. 6 | OK | | 2061 |
| 14. Ene. | 11:43 | 913489410 | G3TESM | 0'20" | P. 1 | OK | | 2068 |
| 16:11 | 0917268530 | G3TES) | 0'11" | P. 1 | OK | | 2068 |
| 21. Ene. | 9:53 | 916613727 | G3TESM | 0'28" | P. 1 | OK | | 2085 |
| 19:33 | 0001868624845?7 | G3TES) | 0'79" | P. 2 | OK | | 2088 |
| 19:38 | 0001868624845?? | G3TES) | 9'19" | P. 2 | E | | 2091 |
| 19:44 | 0001868624845?7 | G3TES) | 1'44" | P. 11 | OK | | 2093 |

| (RX) Fecha | Hora | Remitente | Modo | Tmp RX | Pág. | Result | Nombre de usuario | Carp Nº |
|---|---|---|---|---|---|---|---|---|
| 10. Dic. | 16:48 | | G3RED | 0'28" | P. 1 | OK | | 2014 |
| 23:34 | | G3RES | 0'28" | P. 1 | OK | | 2018 |
| 19. Dic. | 9:36 | | G3RES | 0'40" | P. 1 | OK | | 2020 |
| 10:56 | | G3RES | 0'35" | P. 1 | OK | | 2022 |
| 14:37 | | G3RES | 0'72" | P. 1 | OK | | 2022 |
| 23. Dic. | 9:22 | | G3RED | 0'29" | P. 1 | OK | | 2024 |
| 26. Dic. | 18:17 | | G3RES | 0'38" | P. 1 | OK | | 2026 |
| 27. Dic. | 11:58 | | G3RES | 0'19" | P. 1 | OK | | 2028 |
| 30. Dic. | 11:04 | | G3RS | 1'01" | P. 1 | OK | | 2030 |
| 2. Ene. | 16:16 | | G3RES | 0'20" | P. 1 | OK | | 2032 |
| 3. Ene. | 9:30 | | G3RES | 0'31" | P. 1 | OK | | 2034 |
| 17:23 | | G3RES | 0'40" | P. 1 | OK | | 2037 |
| 7. Ene. | 15:34 | | G3RES | 0'20" | P. 1 | OK | | 2039 |
| 8. Ene. | 10:07 | | G3RES | 0'40" | P. 1 | OK | | 2041 |
| 10:10 | Vía Fax | G3RES | 0'36" | P. 1 | OK | | 2043 |
| 9. Ene. | 13:25 | | G3RES | 0'26" | P. 2 | OK | | 2045 |
| 11:07 | | G3RES | 0'25" | P. 1 | OK | | 2047 |
| 10. Ene. | 7:15 | | G3RES | 1'04" | P. 1 | OK | | 2050 |
| 9:05 | | G3RES | 0'40" | P. 1 | OK | | 2052 |
| 11:22 | | G3RES | 0'44" | P. 1 | OK | | 2054 |
| 14:21 | | G3RES | 0'36" | P. 1 | OK | | 2057 |
| 11:26 | | G3RED | 0'37" | P. 1 | OK | | 2060 |
| 11. Ene. | 5:19 | 902367924 | G3RED | 0'19" | P. 1 | OK | | 2070 |
| 13:55 | | G3RES | 0'33" | P. 1 | OK | | 2072 |
| 14:29 | | G3RES | 0'36" | P. 1 | OK | | 2074 |
| 16. Ene. | 9:16 | | G3RES | 0'36" | P. 1 | OK | | 2076 |
| 17. Ene. | 17:20 | | G3RES | 0'25" | P. 1 | OK | | 2078 |
| 19. Ene. | 11:34 | | G3RED | 6'23" | P. 9 | OK | | 2080 |
| 21. Ene. | 10:00 | | G3RES | 0'35" | P. 1 | OK | | 2087 |

Cant. TX      000373      Cant. RX      001503

S : TX por Lotes      C : Confidencial      #: Transfer      P : Polling
M : Memoria      U : Trans. Retardada      I : ECM      9 : Superfina
S : Estándar      D : Detalle      F : Fina      9 : Superfina
) : Reducción      H : Almacenado/S.doc      ⁎: LAN Fax      E : Entrega
Q : Solicit. Aviso RX      A : Aviso Tr RX      ☆: Mail      <>: TX→RX
C : Cerrado

**Attachment 2**

Mensaje                                                          Página 1 de 3

## Mora Eugenio, Alejandro

**De:**      Mora Eugenio, Alejandro
**Enviado:** lunes, 21 de enero de 2008 19:36
**Para:**    'Michelle C Bodington'
**CC:**      Natalie A Jaimungal; Humphrey Garcia Soto, Carlos; Navarro Morente, Esther
**Asunto:**  RE: ▮▮▮▮▮▮ Prices

Dear Michelle,

Based on the award dated January 17th, please kindly re-confirm the following price for ALNG
Train 1:

▮▮▮▮▮▮▮▮▮▮

Please find attached the calculations.

Regards,

Alejandro Mora Eugenio
Supply & Marketing Analyst
REPSOL-GAS NATURAL LNG
☎ +34 915892962
🖷 +34 915899981
✉ amora@streamrgn.com

-----Mensaje original-----
**De:** Michelle C Bodington [mailto:mbodington@atlanticlng.com]
**Enviado el:** jueves, 03 de enero de 2008 19:23
**Para:** Mora Eugenio, Alejandro
**CC:** Natalie A Jaimungal; Humphrey Garcia Soto, Carlos
**Asunto:** RE: ▮▮▮▮▮▮▮▮▮▮

Thank you very much.
I verified the prices for Trains 1 & 2 and agree with your calculations.

Brgds
Michelle

"Mora Eugenio, Alejandro"                    To "Michelle C Bodington" <mbodington@atlanticlng.com>
<amora@streamrgn.com>                            "Natalie A Jaimungal" <njaimungal@atlanticlng.com>, "Humphrey Garcia
                                              CC Soto, Carlos" <chumphry@streamrgn.com>
01/03/2008 01:03 PM                          Subject RE: ▮▮▮▮▮▮▮

Dear Michelle,

As requested, please find November quotations.

24/01/2008

Mensaje                                                          Página 3 de 3

&#9742; +34 915892962
&#9786; +34 915899981
&#9993; amora@streamrgn.com
-----Mensaje original-----
**De:** Michelle C Bodington [mailto:mbodington@atlanticlng.com]
**Enviado el:** lunes, 31 de diciembre de 2007 18:26
**Para:** Mora Eugenio, Alejandro
**CC:** Andre M Joyeau; Natalie A Jaimungal
**Asunto:** ██████████ Prices

Hi Alejandro,

Season's Greetings.
Please forward the ████████████████ for December when you receive.

Thanks
Michelle

================================================= Esta informacion es privada y
confidencial y esta dirigida unicamente a su destinatario. Si usted no es el destinatario original
de este mensaje y por este medio pudo acceder a dicha informacion por favor elimine el
mensaje y notifique el envio erroneo al remitente. La distribucion o copia de este mensaje esta
estrictamente prohibida. Esta comunicacion es solo para propositos de informacion y no
deberia ser considerada como una declaracion oficial de Repsol-Gas Natural LNG. La
transmision de e-mails no garantiza que el correo electronico sea seguro. Por consiguiente, no
manifestamos que esta informacion sea completa o precisa. Toda informacion esta sujeta a
alterarse sin previo aviso. Este Correo Electronico ha sido procesado por nuestro sistema de
Antivirus corporativo This information is private and confidential and intended for the
recipient only. If you are not the intended recipient of this message you are hereby notified
that any review it and notify the sender immediately, dissemination, distribution or copying of
this message is strictly prohibited. This communication is for information purposes only and
should not be regarded as an official statement from Repsol-Gas Natural LNG. Email
transmission cannot be guaranteed to be secure. Therefore, we do not represent that this
information is complete or accurate and it should not be relied upon as such.All information is
subject to change without notice. This email has been scanned by our Antivirus system
████████████████████████████████████████████████████

================================================= Esta informacion es privada y
confidencial y esta dirigida unicamente a su destinatario. Si usted no es el destinatario original
de este mensaje y por este medio pudo acceder a dicha informacion por favor elimine el
mensaje y notifique el envio erroneo al remitente. La distribucion o copia de este mensaje esta
estrictamente prohibida. Esta comunicacion es solo para propositos de informacion y no
deberia ser considerada como una declaracion oficial de Repsol-Gas Natural LNG. La
transmision de e-mails no garantiza que el correo electronico sea seguro. Por consiguiente, no
manifestamos que esta informacion sea completa o precisa. Toda informacion esta sujeta a
alterarse sin previo aviso. Este Correo Electronico ha sido procesado por nuestro sistema de
Antivirus corporativo This information is private and confidential and intended for the
recipient only. If you are not the intended recipient of this message you are hereby notified
that any review it and notify the sender immediately, dissemination, distribution or copying of
this message is strictly prohibited. This communication is for information purposes only and
should not be regarded as an official statement from Repsol-Gas Natural LNG. Email
transmission cannot be guaranteed to be secure. Therefore, we do not represent that this
information is complete or accurate and it should not be relied upon as such.All information is
subject to change without notice. This email has been scanned by our Antivirus system
████████████████████████████████████████████████████



P. 1

x x x Resumen Personal ( 24.Ene. 2008 19:53 ) x x x

1)
2)

(Impresión Manual)

| ⟨TX⟩ Fecha | Hora | Destino | Modo | Tmp TX | Pág. | Result | Nombre de usuario | Carp Nº |
|---|---|---|---|---|---|---|---|---|
| 24.Ene. | 19:48 | 0018686248057 | G3TES) | 1'24" | P. 11 | OK | | 3393 |

| ⟨RX⟩ Fecha | Hora | Remitente | Modo | Tmp RX | Pág. | Result | Nombre de usuario | Carp Nº |
|---|---|---|---|---|---|---|---|---|

Cont. TX      001300              Cont. RX      003674

| # : TX por Lotes | C : Confidencial | $ : Transfer | P : Polling |
|---|---|---|---|
| M : Memoria | L : Trans. Retardada | @ : Repetición | E : ECM |
| S : Estándar | D : Detalle | F : Fina | U : Superfina |
| ) : Reducción | H : Almacenado/S.doc | × : LAN Fax | + : Entrega |
| Q : Solicit. aviso RX | A : Aviso de RX | ⟨⟩: Mail | ⟨·⟩: IP-FAX |
| ⌂ : Carpeta | | | |

▲

P. 1

× × × Informe del resultado de la comunicación ( 24.Ene. 2008 19:40 ) × × ×

1}
2}

Fecha/Hora: 24.Ene. 2008 19:37

| Carp Nº | Modo | Destino | Pág. | Result | Pág. No env. |
|---|---|---|---|---|---|
| 3386 | TX en memoria | 0018686257122 | P. 11 | OK | |

---

Causa del Error
  E.1)Colgaron o fallo línea      E.2)Comunica
  E.3)No contesta            E.4)No es un fax.
  E.5)Supera el tamaño máx. del e-mail

**gasNatural**
Aprovisionamientos

**TELEFAX**

Madrid, January 24th 2008      NUMBER OF PAGES INCLUDING THIS: 11

To: ATLANTIC LNG Company of Trinidad and Tobago
FAX: 00 1 868 624 8057 / 625 7122

From: Gas Natural Aprovisionamientos SDG, S.A.
Account & Administration Department
FAX: 34 91 356 24 83 / 356 35 02 / 589 32 42

SUBJECT: Ref: Invoice No. 17018

Dear Sirs,

Please find attached copy of the letter -and two attachments- referred to your Invoice No. 17018 dated January 22, 2008. Originals have been sent by Courier.

Yours Sincerely,

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid
Tel 91 556 30 00
Fax 91 556 34 82

# EXHIBIT I

# gasNatural
Aprovisionamientos

## TELEFAX

Madrid, January 30th 2008          NUMBER OF PAGES INCLUDING THIS: 3

**To:**   ATLANTIC LNG Company of Trinidad and Tobago
FAX: 00 1 868 624 8057 / 625 7122

**From:** Gas Natural Aprovisionamientos SDG, S.A.
Account & Administration Department
FAX: 34 91 356 24 83 / 356 35 02 / 589 32 42

**SUBJECT:** Ref: Invoice No. 17025

Dear Sirs,

Please find attached copy of the letter referred to your Invoice No. 17025 dated January 25, 2008. Originals have been sent by Courier.

Yours Sincerely,



GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 83



**gasNatural**
Aprovisionamientos

Atlantic LNG Company of Trinidad and Tobago
P.O. Box 1337
Cor. Keate & Pembroke Streets
Port of Spain, Trinidad W.I.

By facsimile to no. 00 1 868 624 8057 / 625 7122

Madrid, January 30, 2008

**Ref: Invoice No. 17025**

Dear Sirs:

We are in receipt of your Invoice dated January 25, 2008 for 1,363,736 MMBtu of LNG priced at ▇▇▇▇ per MMBtu and loaded on January 25, 2008 onto the Vessel LNG/C ▇▇▇▇▇▇ for a total invoiced price of ▇▇▇▇▇▇▇ As discussed below, that Invoice is incorrect.

As you are fully aware, the Final Award issued by the Arbitral Tribunal in *In the Matter of the UNCITRAL Arbitration between Atlantic LNG Company of Trinidad & Tobago* ("Atlantic") *and Gas Natural Aprovisionamientos SDG, S.A.* ("GNA") on January 17, 2008 (the "Award") provides for a Revised Contract Price formula to be applied to all Train 1 LNG sales from Atlantic to GNA from April 21, 2005 onward, effective immediately. The above-referenced Invoice is incorrect because it does not utilize the Revised Contract Price that is applicable to this cargo according to the Award.

That Atlantic issued another incorrect Invoice is perplexing. GNA has informed Atlantic on several occasions about the Revised Contract Price, including (*i*) by fax and courier on January 2▇ ▇ and by an e-mail of the same date, of the Revised Contract Price ▇▇▇▇▇▇▇▇▇▇▇ (*ii*) by fax and courier on January 24 and 28, 2008 of the obvious error in computation of the previous cargo invoice dated January 22, 2008 ( "Invoice No. 17018"). Thus far, GNA has received no response to any of this correspondence.

In view of the foregoing, and having heard nothing from Atlantic since our first notice on January 21, 2008, GNA can only conclude that the above-referenced Invoice, as well as the Invoice No. 17018, contains an obvious error in computation. GNA thus requests that Atlantic immediately reissue the referenced Invoice and Invoice No. 17018 with the correct Revised

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 83



**gasNatural**
Aprovisionamientos

Contract Price, as required by the Award.  Upon receipt of the corrected Invoices, GNA will immediately process it for payment in accordance with Article 9.

As previously indicated, GNA must receive an immediate reply from Atlantic regarding this issue.  Loadings will continue and the Parties must utilize the correct Contract Price in the current and future invoices.

Kindly acknowledge receipt by signing and re-faxing this transmittal to GNA (fax numbers +34 91 356 24 83, +34 91 356 35 02 or +34 91 589 32 42).

Very truly yours,

Account & Administration Dept

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 83

P. 1

x x x Resumen Personal ( 30. Ene. 2008 19:12 ) x x x

1)
2)

(Impresión Manual)

| ⟨TX⟩ Fecha | Hora | Destino | Modo | Tmp TX | Pág. | Result | Nombre de usuario | Carp Nº |
|---|---|---|---|---|---|---|---|---|
| 30. Ene. | 19:03 | 0018686248057 | G3TES) | 2'09" | P. 3 | OK | | 3423 |

| ⟨RX⟩ Fecha | Hora | Remitente | Modo | Tmp RX | Pág. | Result | Nombre de usuario | Carp Nº |
|---|---|---|---|---|---|---|---|---|

Cont. TX      001335                    Cont. RX      003704

| # : TX por Lotes | C : Confidencial | S : Transfer | P : Polling |
|---|---|---|---|
| M : Memoria | L : Trans. Retardada | @ : Repetición | E : ECM |
| S : Estándar | D : Detalle | F : Fina | U : Superfina |
| ) : Reducción | H : Almacenado/S.doc | ✕ : LAN Fax | + : Entrega |
| Q : Solicit. aviso RX | A : Aviso de RX | ✆ : Mail | ⟨✆⟩ : IP-FAX |
| ⌂ : Carpeta | | | |

**EXHIBIT J**



# gasNatural
Aprovisionamientos



## TELEFAX

---

Madrid, February 1st 2008          NUMBER OF PAGES INCLUDING THIS: 3

---

**To:**   ATLANTIC LNG Company of Trinidad and Tobago
FAX: 00 1 868 624 8057 / 625 7122

---

**From:** Gas Natural Aprovisionamientos SDG, S.A.
Account & Administration Department
FAX: 34 91 356 24 83 / 356 35 02 / 589 32 42

---

**SUBJECT:** Ref: Invoice No. 17070

Dear Sirs,

Please find attached copy of the letter referred to your Invoice No. 17070 dated January 31, 2008. Originals have been sent by Courier.

Yours Sincerely,

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel: 91 589 30 00
Fax: 91 356 24 83



**gasNatural**
Aprovisionamientos


Atlantic LNG Company of Trinidad and Tobago
P.O. Box 1337
Cor. Keate & Pembroke Streets
Port of Spain, Trinidad W.I.


By facsimile to no. 00 1 868 624 8057 / 625 7122


Madrid, February 1, 2008

**Ref: Invoice No. 17070**

Dear Sirs:

We are in receipt of your Invoice dated January 31, 2008 for 2,569,514 MMBtu of LNG priced at ███████ per MMBtu and loaded on January 30, 2008 onto the Vessel LNG/C ████████ for a total invoiced price of ███████████. As discussed below, that Invoice is incorrect.

As you are fully aware, the Final Award issued by the Arbitral Tribunal in *In the Matter of the UNCITRAL Arbitration between Atlantic LNG Company of Trinidad & Tobago* ("Atlantic") *and Gas Natural Aprovisionamientos SDG, S.A.* ("GNA") on January 17, 2008 (the "Award") provides for a Revised Contract Price formula to be applied to all Train 1 LNG sales from Atlantic to GNA from April 21, 2005 onward, effective immediately. The above-referenced Invoice is incorrect because it does not utilize the Revised Contract Price that is applicable to this cargo according to the Award.

That Atlantic issued another incorrect Invoice is perplexing. GNA has informed Atlantic on several occasions about the Revised Contract Price, including (*i*) by fax and courier on January 21, 2008, and by an e-mail of the same date, of the Revised Contract Price for ████████ ████ and (*ii*) by fax and courier on January 24, 28 and 30, 2008 of the obvious error in computation of the previous cargoes invoices dated January 22 and 25, 2008 ("Invoices No. 17018 and No. 17025"). Thus far, GNA has received no response to any of this correspondence.

In view of the foregoing, and having heard nothing from Atlantic since our first notice on January 21, 2008, GNA can only conclude that the above-referenced Invoice, as well as the Invoices No. 17018 and No. 17025, contains an obvious error in computation. GNA thus requests that Atlantic immediately reissue the referenced Invoice and Invoices No. 17018 and

GAS NATURAL,
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 83



**gasNatural**
Aprovisionamientos

No. 17025 with the correct Revised Contract Price, as required by the Award. Upon receipt of the corrected Invoices, GNA will immediately process it for payment in accordance with Article 9.

As previously indicated, GNA must receive an immediate reply from Atlantic regarding this issue. Loadings will continue and the Parties must utilize the correct Contract Price in the current and future invoices.

Kindly acknowledge receipt by signing and re-faxing this transmittal to GNA (fax numbers +34 91 356 24 83, +34 91 356 35 02 or +34 91 589 32 42).

Very truly yours,

Account & Administration Dept

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel.: 91 589 30 00
Fax: 91 356 24 83

x  x  x  Resumen Personal ( 1. Feb. 2008 17:26 ) x  x  x

(Impresión Manual)

⟨TX⟩

| Fecha | Hora | Destino | Modo | Tmp TX Pág. | Result | Nombre de usuario | Carp Nº |
|-------|------|---------|------|-------------|--------|-------------------|---------|
| 1. Feb. | 17:18 | 0018686248057 | G3TES) | 0'41" P. 3 OK | | | 3436 |

⟨RX⟩

| Fecha | Hora | Remitente | Modo | Tmp RX Pág. | Result | Nombre de usuario | Carp Nº |
|-------|------|-----------|------|-------------|--------|-------------------|---------|

Cont. TX      001341          Cont. RX      003721

| # : TX por Lotes | C : Confidencial | S : Transfer | P : Polling |
|---|---|---|---|
| M : Memoria | L : Trans. Retardada | @ : Repetición | E : ECM |
| S : Estándar | D : Detalle | F : Fina | U : Superfina |
| ) : Reducción | H : Almacenado/S.doc | x : LAN Fax | + : Entrega |
| Q : Solicit. aviso RX | A : Aviso de RX | ✆ : Mail | <> : IP-FAX |
| ⊡ : Carpeta | | | |

**EXHIBIT K**

**gasNatural**
Aprovisionamientos

Atlantic LNG Company of Trinidad and Tobago
P.O. Box 1337
Cor. Keate & Pembroke Streets
Port of Spain, Trinidad W.I.

By facsimile to no. 00 1 868 624 8057 / 625 7122

Madrid - February 4, 2008

**Ref: Invoice No. 17018**

Dear Sirs:

Reference is hereby made to Invoice dated January 22, 2008 in respect of a LNG cargo loaded on January 20, 2008 onto the Vessel LNG/C ▮▮▮▮▮▮▮ pursuant to the July 27, 1995 LNG Sales Contract between Atlantic LNG Company of Trinidad & Tobago ("Atlantic") and *Gas Natural Aprovisionamientos SDG, S.A.* ("GNA"), as amended (the "Contract").

By this letter, we notify Atlantic that GNA is paying the full amount invoiced by Atlantic in the referenced invoice on a provisional basis and under protest, as provided in Article 9.7 of the Contract. This provisional payment is made only because Atlantic has refused our repeated requests that Atlantic correctly calculate the Contract Price to be applied in the invoice in accordance with the Contract, as modified by the Final Award issued by the Arbitral Tribunal in *In the Matter of the UNCITRAL Arbitration between Atlantic LNG Company of Trinidad & Tobago and Gas Natural Aprovisionamientos SDG, S.A.* on January 17, 2008 (the "Award"). As you are aware, the Award provides for a revised Contract Price formula to be applied to all Train 1 LNG sales from Atlantic to GNA from April 21, 2005 onward, effective immediately. Despite several prior written and electronic communications, Atlantic has refused to comply with the Award and reissue this invoice with a corrected price.

GNA protests Atlantic's refusal to conform to the Award. GNA strongly believes that it is not obligated to make full payment of the amount shown in this invoice; however, GNA also wishes to avoid any possible claim by Atlantic that GNA is in any way failing to perform as required by Article 9.7 of the Contract governing payments and disputes between the parties regarding payments. Despite this provisional payment, GNA cannot agree to and will not accept Atlantic's current Contract Price calculation because it does not conform to the Award.

GAS NATURAL
APROVISIONAMIENTOS, SDG, S.A.
Avenida de América, 38
28028 Madrid

Tel. 91 589 30 00
Fax. 91 156 21 92

**gasNatural**
Aprovisionamientos

The correct Contract Price calculation for the ████████████ according to the terms of the Award, is ████████ per MMBtu, rather than the ████████ per MMBtu used in the referenced invoice. Accordingly, the correct amount due under the invoice for ████████ MMBtus of LNG loaded is ████████████ not the invoiced price of ████████████ Pursuant to Article 9.7, the excess amount being paid on a provisional basis shall accrue interest from the date of the provisional payment to the date on which Atlantic reimburses GNA for the amounts improperly invoiced.

As a result of Atlantic's intransigence, GNA is left with no choice but to initiate litigation to enforce the Award.

Kindly acknowledge receipt by signing and re-faxing this transmittal to GNA (fax numbers +34 91 356 24 83, +34 91 356 35 02 or +34 91 589 32 42).

Yours sincerely,

LNG Supply Director

GAS NATURAL
APROVISIONAMIENTOS, SDG S.A.
Avenida de América, 38
28028 Madrid
Tel. 91 589 39 00
Fax 91 356 24 83

EXHIBIT L

UNCITRAL ARBITRATION RULES

UNCITRAL ARBITRATION RULES

# CONTENTS

**Section I. Introductory Rules**                                              269
  Scope of Application (Article 1)                                    269
  Notice, Calculation of Periods of Time (Article 2)                  269
  Notice of Arbitration (Article 3)                                   270
  Representation and Assistance (Article 4)                           271

**Section II. Composition of the Arbitral Tribunal**                           271
  Number of Arbitrators (Article 5)                                   271
  Appointment of Arbitrators (Articles 6 to 8)                        271
  Challenge of Arbitrators (Articles 9 to 12)                         273
  Replacement of an Arbitrator (Article 13)                           274
  Repetition of Hearings in the Event of the Replacement of an Arbitrator
    (Article 14)                                             275

**Section III. Arbitral Proceedings**                                          275
  General Provisions (Article 15)                                     275
  Place of Arbitration (Article 16)                                   275
  Language (Article 17)                                               276
  Statement of Claim (Article 18)                                     276
  Statement of Defence (Article 19)                                   277
  Amendments to the Claim or Defence (Article 20)                     277
  Pleas as to the Jurisdiction of the Arbitral Tribunal (Article 21)  278
  Further Written Statements (Article 22)                             278
  Periods of Time (Article 23)                                        278
  Evidence and Hearings (Articles 24 and 25)                          279
  Interim Measures of Protection (Article 26)                         280
  Experts (Article 27)                                                280
  Default (Article 28)                                                281
  Closure of Hearings (Article 29)                                    281
  Waiver of Rules (Article 30)                                        281

**Section IV. The Award**                                                      282
  Decisions (Article 31)                                              282
  Form and Effect of the Award (Article 32)                           282
  Applicable Law, *Amiable Compositeur* (Article 33)                  283
  Settlement or Other Grounds for Termination (Article 34)            283
  Interpretation of the Award (Article 35)                            283
  Correction of the Award (Article 36)                                284
  Additional Award (Article 37)                                       284
  Costs (Articles 38 to 40)                                           284
  Deposit of Costs (Article 41)                                       286

# UNCITRAL ARBITRATION RULES

*Adopted December 15, 1976*

SECTION I. INTRODUCTORY RULES

## Scope of Application

*Article 1*

1. Where the parties to a contract have agreed in writing[*] that disputes in relation to that contract shall be referred to arbitration under the UNCITRAL Arbitration Rules, then such disputes shall be settled in accordance with these Rules subject to such modification as the parties may agree in writing.

2. These Rules shall govern the arbitration except that where any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the parties cannot derogate, that provision shall prevail.

## Notice, Calculation of Periods of Time

*Article 2*

1. For the purposes of these Rules, any notice, including a notification, communication or proposal, is deemed to have been received if it is physically delivered to the addressee or if it is delivered at his habitual residence, place of business or mailing address, or, if none of these can be found after making reasonable inquiry, then at the addressee's last-known residence or place of business. Notice shall be deemed to have been received on the day it is so delivered.

2. For the purposes of calculating a period of time under these Rules, such period shall begin to run on the day following the day when a notice, notification, communication

---

[*] MODEL ARBITRATION CLAUSE

Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules as at present in force.
*Note – Parties may wish to consider adding:*
*(a)* The appointing authority shall be . . . (name of institution or person);
*(b)* The number of arbitrators shall be . . . (one or three);
*(c)* The place of arbitration shall be . . . (town or country);
*(d)* The language(s) to be used in the arbitral proceedings shall be . . .

PERMANENT COURT OF ARBITRATION -- BASIC DOCUMENTS

or proposal is received. If the last day of such period is an official holiday or a non-business day at the residence or place of business of the addressee, the period is extended until the first business day which follows. Official holidays or non-business days occurring during the running of the period of time are included in calculating the period.

**Notice of Arbitration**

*Article 3*

1. The party initiating recourse to arbitration (hereinafter called the 'claimant') shall give to the other party (hereinafter called the 'respondent') a notice of arbitration.

2. Arbitral proceedings shall be deemed to commence on the date on which the notice of arbitration is received by the respondent.

3. The notice of arbitration shall include the following:

    (a)    A demand that the dispute be referred to arbitration;

    (b)    The names and addresses of the parties;

    (c)    A reference to the arbitration clause or the separate arbitration agreement that is invoked;

    (d)    A reference to the contract out of or in relation to which the dispute arises;

    (e)    The general nature of the claim and an indication of the amount involved, if any;

    (f)    The relief or remedy sought;

    (g)    A proposal as to the number of arbitrators (i.e. one or three), if the parties have not previously agreed thereon.

4. The notice of arbitration may also include:

    (a)    The proposals for the appointments of a sole arbitrator and an appointing authority referred to in article 6, paragraph 1;

    (b)    The notification of the appointment of an arbitrator referred to in article 7;

    (c)    The statement of claim referred to in article 18.

270

UNCITRAL ARBITRATION RULES

## Representation and Assistance

*Article 4*

The parties may be represented or assisted by persons of their choice. The names and addresses of such persons must be communicated in writing to the other party; such communication must specify whether the appointment is being made for purposes of representation or assistance.

SECTION II. COMPOSITION OF THE ARBITRAL TRIBUNAL

## Number of Arbitrators

*Article 5*

If the parties have not previously agreed on the number of arbitrators (i.e. one or three), and if within fifteen days after the receipt by the respondent of the notice of arbitration the parties have not agreed that there shall be only one arbitrator, three arbitrators shall be appointed.

## Appointment of Arbitrators (Articles 6 to 8)

*Article 6*

1. If a sole arbitrator is to be appointed, either party may propose to the other:

    (a)  The names of one or more persons, one of whom would serve as the sole arbitrator; and

    (b)  If no appointing authority has been agreed upon by the parties, the name or names of one or more institutions or persons, one of whom would serve as appointing authority.

2. If within thirty days after receipt by a party of a proposal made in accordance with paragraph 1 the parties have not reached agreement on the choice of a sole arbitrator, the sole arbitrator shall be appointed by the appointing authority agreed upon by the parties. If no appointing authority has been agreed upon by the parties, or if the appointing authority agreed upon refuses to act or fails to appoint the arbitrator within sixty days of the receipt of a party's request therefor, either party may request the Secretary-General of the Permanent Court of Arbitration at The Hague to designate an appointing authority.

PERMANENT COURT OF ARBITRATION – BASIC DOCUMENTS

3. The appointing authority shall, at the request of one of the parties, appoint the sole arbitrator as promptly as possible. In making the appointment the appointing authority shall use the following list-procedure, unless both parties agree that the list-procedure should not be used or unless the appointing authority determines in its discretion that the use of the list-procedure is not appropriate for the case:

    (a)    At the request of one of the parties the appointing authority shall communicate to both parties an identical list containing at least three names;

    (b)    Within fifteen days after the receipt of this list, each party may return the list to the appointing authority after having deleted the name or names to which he objects and numbered the remaining names on the list in the order of his preference;

    (c)    After the expiration of the above period of time the appointing authority shall appoint the sole arbitrator from among the names approved on the lists returned to it and in accordance with the order of preference indicated by the parties;

    (d)    If for any reason the appointment cannot be made according to this procedure, the appointing authority may exercise its discretion in appointing the sole arbitrator.

4. In making the appointment, the appointing authority shall have regard to such considerations as are likely to secure the appointment of an independent and impartial arbitrator and shall take into account as well the advisability of appointing an arbitrator of a nationality other than the nationalities of the parties.

*Article 7*

1. If three arbitrators are to be appointed, each party shall appoint one arbitrator. The two arbitrators thus appointed shall choose the third arbitrator who will act as the presid-ing arbitrator of the tribunal.

2. If within thirty days after the receipt of a party's notification of the appointment of an arbitrator the other party has not notified the first party of the arbitrator he has appointed:

    (a)    The first party may request the appointing authority previously designated by the parties to appoint the second arbitrator; or

    (b)    If no such authority has been previously designated by the parties, or if the appointing authority previously designated refuses to act or fails to appoint the arbitrator within thirty days after receipt of a party's request therefor, the first party may request the Secretary-General of the Permanent Court of Arbitration at The Hague to designate the appointing authority. The first party may then request the appointing authority so designated to appoint the second arbitrator.

272

UNCITRAL ARBITRATION RULES

In either case, the appointing authority may exercise its discretion in appointing the arbitrator.

3. If within thirty days after the appointment of the second arbitrator the two arbitrators have not agreed on the choice of the presiding arbitrator, the presiding arbitrator shall be appointed by an appointing authority in the same way as a sole arbitrator would be appointed under article 6.

*Article 8*

1. When an appointing authority is requested to appoint an arbitrator pursuant to article 6 or article 7, the party which makes the request shall send to the appointing authority a copy of the notice of arbitration, a copy of the contract out of or in relation to which the dispute has arisen and a copy of the arbitration agreement if it is not contained in the contract. The appointing authority may require from either party such information as it deems necessary to fulfil its function.

2. Where the names of one or more persons are proposed for appointment as arbitrators, their full names, addresses and nationalities shall be indicated, together with a description of their qualifications.

## Challenge of Arbitrators (Articles 9 to 12)

*Article 9*

A prospective arbitrator shall disclose to those who approach him in connexion with his possible appointment any circumstances likely to give rise to justifiable doubts as to his impartiality or independence. An arbitrator, once appointed or chosen, shall disclose such circumstances to the parties unless they have already been informed by him of these circumstances.

*Article 10*

1. Any arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence.

2. A party may challenge the arbitrator appointed by him only for reasons of which he becomes aware after the appointment has been made.

*Article 11*

1. A party who intends to challenge an arbitrator shall send notice of his challenge within fifteen days after the appointment of the challenged arbitrator has been notified

273

to the challenging party or within fifteen days after the circumstances mentioned in articles 9 and 10 became known to that party.

2. The challenge shall be notified to the other party, to the arbitrator who is challenged and to the other members of the arbitral tribunal. The notification shall be in writing and shall state the reasons for the challenge.

3. When an arbitrator has been challenged by one party, the other party may agree to the challenge. The arbitrator may also, after the challenge, withdraw from his office. In neither case does this imply acceptance of the validity of the grounds for the challenge. In both cases the procedure provided in articles 6 or 7 shall be used in full for the appointment of the substitute arbitrator, even if during the process of appointing the challenged arbitrator a party had failed to exercise his right to appoint or to participate in the appointment.

*Article 12*

1. If the other party does not agree to the challenge and the challenged arbitrator does not withdraw, the decision on the challenge will be made:

    (a)   When the initial appointment was made by an appointing authority, by that authority;

    (b)   When the initial appointment was not made by an appointing authority, but an appointing authority has been previously designated, by that authority;

    (c)   In all other cases, by the appointing authority to be designated in accordance with the procedure for designating an appointing authority as provided for in article 6.

2. If the appointing authority sustains the challenge, a substitute arbitrator shall be appointed or chosen pursuant to the procedure applicable to the appointment or choice of an arbitrator as provided in articles 6 to 9 except that, when this procedure would call for the designation of an appointing authority, the appointment of the arbitrator shall be made by the appointing authority which decided on the challenge.

**Replacement of an Arbitrator**

*Article 13*

1. In the event of the death or resignation of an arbitrator during the course of the arbitral proceedings, a substitute arbitrator shall be appointed or chosen pursuant to the procedure provided for in articles 6 to 9 that was applicable to the appointment or choice of the arbitrator being replaced.

274

UNCITRAL ARBITRATION RULES

2. In the event that an arbitrator fails to act or in the event of the *de jure* or *de facto* impossibility of his performing his functions, the procedure in respect of the challenge and replacement of an arbitrator as provided in the preceding articles shall apply.

**Repetition of Hearings in the Event of the Replacement of an Arbitrator**

*Article 14*

If under articles 11 to 13 the sole or presiding arbitrator is replaced, any hearings held previously shall be repeated; if any other arbitrator is replaced, such prior hearings may be repeated at the discretion of the arbitral tribunal.

SECTION III. ARBITRAL PROCEEDINGS

**General Provisions**

*Article 15*

1. Subject to these Rules, the arbitral tribunal may conduct the arbitration in such manner as it considers appropriate, provided that the parties are treated with equality and that at any stage of the proceedings each party is given a full opportunity of presenting his case.

2. If either party so requests at any stage of the proceedings, the arbitral tribunal shall hold hearings for the presentation of evidence by witnesses, including expert witnesses, or for oral argument. In the absence of such a request, the arbitral tribunal shall decide whether to hold such hearings or whether the proceedings shall be conducted on the basis of documents and other materials.

3. All documents or information supplied to the arbitral tribunal by one party shall at the same time be communicated by that party to the other party.

**Place of Arbitration**

*Article 16*

1. Unless the parties have agreed upon the place where the arbitration is to be held, such place shall be determined by the arbitral tribunal, having regard to the circumstances of the arbitration.

2. The arbitral tribunal may determine the locale of the arbitration within the country agreed upon by the parties. It may hear witnesses and hold meetings for consultation

275

among its members at any place it deems appropriate, having regard to the circumstances of the arbitration.

3. The arbitral tribunal may meet at any place it deems appropriate for the inspection of goods, other property or documents. The parties shall be given sufficient notice to enable them to be present at such inspection.

4. The award shall be made at the place of arbitration.

## Language

*Article 17*

1. Subject to an agreement by the parties, the arbitral tribunal shall, promptly after its appointment, determine the language or languages to be used in the proceedings. This determination shall apply to the statement of claim, the statement of defence, and any further written statements and, if oral hearings take place, to the language or languages to be used in such hearings.

2. The arbitral tribunal may order that any documents annexed to the statement of claim or statement of defence, and any supplementary documents or exhibits submitted in the course of the proceedings, delivered in their original language, shall be accompanied by a translation into the language or languages agreed upon by the parties or determined by the arbitral tribunal.

## Statement of Claim

*Article 18*

1. Unless the statement of claim was contained in the notice of arbitration, within a period of time to be determined by the arbitral tribunal, the claimant shall communicate his statement of claim in writing to the respondent and to each of the arbitrators. A copy of the contract, and of the arbitration agreement if not contained in the contract, shall be annexed thereto.

2. The statement of claim shall include the following particulars:

    (a)    The names and addresses of the parties;

    (b)    A statement of the facts supporting the claim;

    (c)    The points at issue;

276

UNCITRAL ARBITRATION RULES

(d)   The relief or remedy sought.

The claimant may annex to his statement of claim all documents he deems relevant or may add a reference to the documents or other evidence he will submit.

## Statement of Defence

*Article 19*

1. Within a period of time to be determined by the arbitral tribunal, the respondent shall communicate his statement of defence in writing to the claimant and to each of the arbitrators.

2. The statement of defence shall reply to the particulars (b), (c) and (d) of the statement of claim (article 18, para. 2). The respondent may annex to his statement the documents on which he relies for his defence or may add a reference to the documents or other evidence he will submit.

3. In his statement of defence, or at a later stage in the arbitral proceedings if the arbitral tribunal decides that the delay was justified under the circumstances, the respondent may make a counter-claim arising out of the same contract or rely on a claim arising out of the same contract for the purpose of a set-off.

4. The provisions of article 18, paragraph 2, shall apply to a counter-claim and a claim relied on for the purpose of a set-off.

## Amendments to the Claim or Defence

*Article 20*

During the course of the arbitral proceedings either party may amend or supplement his claim or defence unless the arbitral tribunal considers it inappropriate to allow such amendment having regard to the delay in making it or prejudice to the other party or any other circumstances. However, a claim may not be amended in such a manner that the amended claim falls outside the scope of the arbitration clause or separate arbitration agreement.

**Pleas as to the Jurisdiction of the Arbitral Tribunal**

*Article 21*

1.  The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement.

2.  The arbitral tribunal shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part. For the purposes of article 21, an arbitration clause which forms part of a contract and which provides for arbitration under these Rules shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail *ipso jure* the invalidity of the arbitration clause.

3.  A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than in the statement of defence or, with respect to a counter-claim, in the reply to the counter-claim.

4.  In general, the arbitral tribunal should rule on a plea concerning its jurisdiction as a preliminary question. However, the arbitral tribunal may proceed with the arbitration and rule on such a plea in their final award.

**Further Written Statements**

*Article 22*

The arbitral tribunal shall decide which further written statements, in addition to the statement of claim and the statement of defence, shall be required from the parties or may be presented by them and shall fix the periods of time for communicating such statements.

**Periods of Time**

*Article 23*

The periods of time fixed by the arbitral tribunal for the communication of written statements (including the statement of claim and statement of defence) should not exceed forty-five days. However, the arbitral tribunal may extend the time-limits if it concludes that an extension is justified.

278

UNCITRAL ARBITRATION RULES

**Evidence and Hearings (Articles 24 and 25)**

*Article 24*

1. Each party shall have the burden of proving the facts relied on to support his claim or defence.

2. The arbitral tribunal may, if it considers it appropriate, require a party to deliver to the tribunal and to the other party, within such a period of time as the arbitral tribunal shall decide, a summary of the documents and other evidence which that party intends to present in support of the facts in issue set out in his statement of claim or statement of defence.

3. At any time during the arbitral proceedings the arbitral tribunal may require the parties to produce documents, exhibits or other evidence within such a period of time as the tribunal shall determine.

*Article 25*

1. In the event of an oral hearing, the arbitral tribunal shall give the parties adequate advance notice of the date, time and place thereof.

2. If witnesses are to be heard, at least fifteen days before the hearing each party shall communicate to the arbitral tribunal and to the other party the names and addresses of the witnesses he intends to present, the subject upon and the languages in which such witnesses will give their testimony.

3. The arbitral tribunal shall make arrangements for the translation of oral statements made at a hearing and for a record of the hearing if either is deemed necessary by the tribunal under the circumstances of the case, or if the parties have agreed thereto and have communicated such agreement to the tribunal at least fifteen days before the hearing.

4. Hearings shall be held *in camera* unless the parties agree otherwise. The arbitral tribunal may require the retirement of any witness or witnesses during the testimony of other witnesses. The arbitral tribunal is free to determine the manner in which witnesses are examined.

5. Evidence of witnesses may also be presented in the form of written statements signed by them.

6. The arbitral tribunal shall determine the admissibility, relevance, materiality and weight of the evidence offered.

PERMANENT COURT OF ARBITRATION – BASIC DOCUMENTS

**Interim Measures of Protection**

*Article 26*

1. At the request of either party, the arbitral tribunal may take any interim measures it deems necessary in respect of the subject-matter of the dispute, including measures for the conservation of the goods forming the subject-matter in dispute, such as ordering their deposit with a third person or the sale of perishable goods.

2. Such interim measures may be established in the form of an interim award. The arbitral tribunal shall be entitled to require security for the costs of such measures.

3. A request for interim measures addressed by any party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of that agreement.

**Experts**

*Article 27*

1. The arbitral tribunal may appoint one or more experts to report to it, in writing, on specific issues to be determined by the tribunal. A copy of the expert's terms of reference, established by the arbitral tribunal, shall be communicated to the parties.

2. The parties shall give the expert any relevant information or produce for his inspection any relevant documents or goods that he may require of them. Any dispute between a party and such expert as to the relevance of the required information or production shall be referred to the arbitral tribunal for decision.

3. Upon receipt of the expert's report, the arbitral tribunal shall communicate a copy of the report to the parties who shall be given the opportunity to express, in writing, their opinion on the report. A party shall be entitled to examine any document on which the expert has relied in his report.

4. At the request of either party the expert, after delivery of the report, may be heard at a hearing where the parties shall have the opportunity to be present and to interrogate the expert. At this hearing either party may present expert witnesses in order to testify on the points at issue. The provisions of article 25 shall be applicable to such proceed-ings.

280

UNCITRAL ARBITRATION RULES

## Default

*Article 28*

1. If, within the period of time fixed by the arbitral tribunal, the claimant has failed to communicate his claim without showing sufficient cause for such failure, the arbitral tribunal shall issue an order for the termination of the arbitral proceedings. If, within the period of time fixed by the arbitral tribunal, the respondent has failed to communicate his statement of defence without showing sufficient cause for such failure, the arbitral tribunal shall order that the proceedings continue.

2. If one of the parties, duly notified under these Rules, fails to appear at a hearing, without showing sufficient cause for such failure, the arbitral tribunal may proceed with the arbitration.

3. If one of the parties, duly invited to produce documentary evidence, fails to do so within the established period of time, without showing sufficient cause for such failure, the arbitral tribunal may make the award on the evidence before it.

## Closure of Hearings

*Article 29*

1. The arbitral tribunal may inquire of the parties if they have any further proof to offer or witnesses to be heard or submissions to make and, if there are none, it may declare the hearings closed.

2. The arbitral tribunal may, if it considers it necessary owing to exceptional circumstances, decide, on its own motion or upon application of a party, to reopen the hearings at any time before the award is made.

## Waiver of Rules

*Article 30*

A party who knows that any provision of, or requirement under, these Rules has not been complied with and yet proceeds with the arbitration without promptly stating his objection to such non-compliance, shall be deemed to have waived his right to object.

PERMANENT COURT OF ARBITRATION – BASIC DOCUMENTS

SECTION IV. THE AWARD

**Decisions**

*Article 31*

1. When there are three arbitrators, any award or other decision of the arbitral tribunal shall be made by a majority of the arbitrators.

2. In the case of questions of procedure, when there is no majority or when the arbitral tribunal so authorizes, the presiding arbitrator may decide on his own, subject to revision, if any, by the arbitral tribunal.

**Form and Effect of the Award**

*Article 32*

1. In addition to making a final award, the arbitral tribunal shall be entitled to make interim, interlocutory, or partial awards.

2. The award shall be made in writing and shall be final and binding on the parties. The parties undertake to carry out the award without delay.

3. The arbitral tribunal shall state the reasons upon which the award is based, unless the parties have agreed that no reasons are to be given.

4. An award shall be signed by the arbitrators and it shall contain the date on which and the place where the award was made. Where there are three arbitrators and one of them fails to sign, the award shall state the reason for the absence of the signature.

5. The award may be made public only with the consent of both parties.

6. Copies of the award signed by the arbitrators shall be communicated to the parties by the arbitral tribunal.

7. If the arbitration law of the country where the award is made requires that the award be filed or registered by the arbitral tribunal, the tribunal shall comply with this requirement within the period of time required by law.

282

UNCITRAL ARBITRATION RULES

## Applicable Law, *Amiable Compositeur*

*Article 33*

1. The arbitral tribunal shall apply the law designated by the parties as applicable to the substance of the dispute. Failing such designation by the parties, the arbitral tribunal shall apply the law determined by the conflict of laws rules which it considers applicable.

2. The arbitral tribunal shall decide as *amiable compositeur* or *ex aequo et bono* only if the parties have expressly authorized the arbitral tribunal to do so and if the law applicable to the arbitral procedure permits such arbitration.

3. In all cases, the arbitral tribunal shall decide in accordance with the terms of the contract and shall take into account the usages of the trade applicable to the transaction.

## Settlement or Other Grounds for Termination

*Article 34*

1. If, before the award is made, the parties agree on a settlement of the dispute, the arbitral tribunal shall either issue an order for the termination of the arbitral proceedings or, if requested by both parties and accepted by the tribunal, record the settlement in the form of an arbitral award on agreed terms. The arbitral tribunal is not obliged to give reasons for such an award.

2. If, before the award is made, the continuation of the arbitral proceedings becomes unnecessary or impossible for any reason not mentioned in paragraph 1, the arbitral tribunal shall inform the parties of its intention to issue an order for the termination of the proceedings. The arbitral tribunal shall have the power to issue such an order unless a party raises justifiable grounds for objection.

3. Copies of the order for termination of the arbitral proceedings or of the arbitral award on agreed terms, signed by the arbitrators, shall be communicated by the arbitral tribunal to the parties. Where an arbitral award on agreed terms is made, the provisions of article 32, paragraphs 2 and 4 to 7, shall apply.

## Interpretation of the Award

*Article 35*

1. Within thirty days after the receipt of the award, either party, with notice to the other party, may request that the arbitral tribunal give an interpretation of the award.

283

PERMANENT COURT OF ARBITRATION – BASIC DOCUMENTS

2. The interpretation shall be given in writing within forty-five days after the receipt of the request. The interpretation shall form part of the award and the provisions of article 32, paragraphs 2 to 7, shall apply.

## Correction of the Award

*Article 36*

1. Within thirty days after the receipt of the award, either party, with notice to the other party, may request the arbitral tribunal to correct in the award any errors in computation, any clerical or typographical errors, or any errors of similar nature. The arbitral tribunal may within thirty days after the communication of the award make such corrections on its own initiative.

2. Such corrections shall be in writing, and the provisions of article 32, paragraphs 2 to 7, shall apply.

## Additional Award

*Article 37*

1. Within thirty days after the receipt of the award, either party, with notice to the other party, may request the arbitral tribunal to make an additional award as to claims presented in the arbitral proceedings but omitted from the award.

2. If the arbitral tribunal considers the request for an additional award to be justified and considers that the omission can be rectified without any further hearings or evidence, it shall complete its award within sixty days after the receipt of the request.

3. When an additional award is made, the provisions of article 32, paragraphs 2 to 7, shall apply.

## Costs (Articles 38 to 40)

*Article 38*

The arbitral tribunal shall fix the costs of arbitration in its award. The term 'costs' includes only:

    (a)    The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;

284

UNCITRAL ARBITRATION RULES

(b)   The travel and other expenses incurred by the arbitrators;

(c)   The costs of expert advice and of other assistance required by the arbitral tribunal;

(d)   The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;

(e)   The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;

(f)   Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

*Article 39*

1. The fees of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject-matter, the time spent by the arbitrators and any other relevant circumstances of the case.

2. If an appointing authority has been agreed upon by the parties or designated by the Secretary-General of the Permanent Court of Arbitration at The Hague, and if that authority has issued a schedule of fees for arbitrators in international cases which it administers, the arbitral tribunal in fixing its fees shall take that schedule of fees into account to the extent that it considers appropriate in the circumstances of the case.

3. If such appointing authority has not issued a schedule of fees for arbitrators in international cases, any party may at any time request the appointing authority to furnish a statement setting forth the basis for establishing fees which is customarily followed in international cases in which the authority appoints arbitrators. If the appointing authority consents to provide such a statement, the arbitral tribunal in fixing its fees shall take such information into account to the extent that it considers appropriate in the circum-stances of the case.

4. In cases referred to in paragraphs 2 and 3, when a party so requests and the appoint-ing authority consents to perform the function, the arbitral tribunal shall fix its fees only after consultation with the appointing authority which may make any comment it deems appropriate to the arbitral tribunal concerning the fees.

*Article 40*

1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such

PERMANENT COURT OF ARBITRATION – BASIC DOCUMENTS

costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

3. When the arbitral tribunal issues an order for the termination of the arbitral proceedings or makes an award on agreed terms, it shall fix the costs of arbitration referred to in article 38 and article 39, paragraph 1, in the text of that order or award.

4. No additional fees may be charged by an arbitral tribunal for interpretation or correction or completion of its award under articles 35 to 37.

**Deposit of Costs**

*Article 41*

1. The arbitral tribunal, on its establishment, may request each party to deposit an equal amount as an advance for the costs referred to in article 38, paragraphs (a), (b) and (c).

2. During the course of the arbitral proceedings the arbitral tribunal may request supplementary deposits from the parties.

3. If an appointing authority has been agreed upon by the parties or designated by the Secretary-General of the Permanent Court of Arbitration at The Hague, and when a party so requests and the appointing authority consents to perform the function, the arbitral tribunal shall fix the amounts of any deposits or supplementary deposits only after consultation with the appointing authority which may make any comments to the arbitral tribunal which it deems appropriate concerning the amount of such deposits and supplementary deposits.

4. If the required deposits are not paid in full within thirty days after the receipt of the request, the arbitral tribunal shall so inform the parties in order that one or another of them may make the required payment. If such payment is not made, the arbitral tribunal may order the suspension or termination of the arbitral proceedings.

5. After the award has been made, the arbitral tribunal shall render an accounting to the parties of the deposits received and return any unexpended balance to the parties.

**EXHIBIT M**

# UNCITRAL ARBITRATION RULES

In the Matter of the Arbitration Between:

|  |  |
|---|---|
| ATLANTIC LNG COMPANY OF<br>TRINIDAD AND TOBAGO, | )<br>)<br>)<br>) |
| Claimant,<br>- against - | )<br>)<br>)<br>) |
| GAS NATURAL APROVISIONAMIENTOS<br>SDG, S.A., | )<br>)<br>)<br>) |
| Respondent. | )<br>) |

## PROCEDURAL ORDER NO. 8

Tribunal Rulings on Jurisdictional and Evidentiary Issues.

The Tribunal has been asked to resolve a basic term in the long term LNG Sales Contract dated July 27, 1995 ("Contract") – the price. The standards that are to be applied include terms that are quite broad. Under these circumstances the Tribunal believes it is appropriate to admit all potentially relevant testimony and documents in order to have as comprehensive a record as practical in making its determination.

With these principles in mind, we turn to the specific applications pending before us.

1.     GNA's Motion to limit Atlantic's claim to the specific adjustment that Atlantic proposed during the 6 month negotiation period.

This motion is denied.

The Tribunal reads Article 8.5 as a comprehensive description of the Price Reopener process. The arbitration phase of the Price Reopener is the final phase. Positions initially taken can be modified throughout the process. In particular, where, as here, there are complex economic facts and theories, each Party remains free to adjust its position as the process proceeds, up to and including in the post-hearing briefs.

This interpretation of Article 8.5 is also consistent with the Tribunal's reading of its responsibility to apply Article 8.5 objectively to the relevant facts.

2.     Atlantic's Motion to exclude evidence of Settlement Discussions.

This motion is granted.

GNA has claimed that this evidence is necessary to show the limits on the arguments that Atlantic can raise in this proceeding. In denying GNA's Motion (see 1 above), we have rejected GNA's claim that Atlantic is so limited and, thus, the evidence of what was discussed during Price Reopener negotiations is now irrelevant and will not be considered in the formulation of the Tribunal's decision. This exclusion is limited to those documents denoted as settlement documents and to testimony concerning those documents and meetings held to discuss them.

3.     Atlantic's Motion to exclude the Train 2 Contract.

This motion is denied.

Atlantic claims that the submission of the Train 2 contract to this Tribunal violates confidentiality provisions of the Train 2 Contract. Since this arbitration is a confidential proceeding, we do not believe that the submission to this Tribunal breaches confidentiality. With respect to confidential information that counsel for Atlantic has received in connection with this proceeding, we assume that counsel will maintain appropriate controls, and that counsel for GNA will do the same for any confidential information it receives.

Atlantic also requests that the Train 2 Contract be excluded on the ground of irrelevance, citing in particular Article 23.5, which precludes using language differences in the Train 2 Contract as a basis for interpreting provisions in the Contract. However, there are other potential reasons why the Train 2 Contract may be relevant, including its potential relationship to the sale of Train 1 volumes █████ and to the pricing environment in 2000 when it was negotiated. The Tribunal also notes that Atlantic has included Train 2 pricing data on one of the slides it included in its opening statement.

4.     Atlantic's Motion to Dismiss the GNA Counterclaim

This motion is denied.

In a sense, the GNA counterclaim is implicit in the Price Reopener process. Once discussion of a Price Reopener commences, the outcome is to be determined by the application of the standards contained in Article 8.5 of the Contract. If application of those standards requires a lower rather than a higher price, then the Tribunal is required to act in accordance with Article 8.5. In addition, Article 8.5(f) expressly permits either party to initiate the arbitration

proceeding. A party does not have to be the one that filed the Reopener Notice in order to pursue arbitration. Thus, the absence of a GNA Reopener Notice does not limit GNA's ability to pursue its position in arbitration once Atlantic has filed a Reopener Notice and initiated arbitration.


Dated:          May 1, 2007
                New York, New York




                        For the Tribunal

                        _____
                        Gerald Aksen, Chairman
                        Eugene A. Massey
                        Ben H. Sheppard, Jr.