**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GAS NATURAL APROVISIONAMIENTOS, SDG, S.A., )<br><br>Petitioner, )<br><br>- against - )<br><br>ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO, )<br><br>Respondent. ) | 08 Cv. 1109 (DC) |

**ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO**
**VACATE THE ARBITRAL AWARD AND IN OPPOSITION TO**
**GAS NATURAL APROVISIONAMIENTOS SDG S.A.'S**
**PETITION TO RECOGNIZE AND ENFORCE THE AWARD**

MILBANK, TWEED, HADLEY &
MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413
(212) 530-5000

Attorneys for Respondent
ATLANTIC LNG COMPANY OF
TRINIDAD AND TOBAGO

Dated: April 16, 2008
        New York, New York

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................iii

PRELIMINARY STATEMENT ....................................................................................... 1

GENERAL BACKGROUND AND PROCEDURAL HISTORY ................................. 2

I.      THE CONTRACT AND THE RELEVANT PRICING PROVISIONS .......................... 2

II.     THE PRICE REOPENER ARBITRATION.......................................................... 3

        A.      Background................................................................................... 3

        B.      Overview of Claims and Proceedings....................................... 4

        C.      Brief Summary of the Final Award ........................................... 6

III.    CLARIFICATION AND CORRECTION OF THE FINAL AWARD ........................... 8

ARGUMENT ................................................................................................................ 9

I.      APPLICABLE LEGAL STANDARDS ............................................................... 9

        A.      Grounds for Refusing to Recognize and Enforce the Final Award ...................... 9

        B.      Grounds For Vacating the Final Award.................................... 10

II.     THE TRIBUNAL EXCEEDED ITS AUTHORITY BY AWARDING RELIEF
        AFTER DETERMINING THAT NEITHER PARTY HAD SATISFIED A
        MANDATORY PRECONDITION TO RELIEF ................................................... 12

        A.      The Agreed Preconditions to a Price Revision are Clearly Described in
                Article 8.5(a) of the Contract.................................................... 12

        B.      The Tribunal Found that Both Parties Failed to Meet the First
                Precondition, and it Therefore had no Authority to Adjust the Price ................. 15

III.    IN ORDERING A CHANGE TO THE PRICING FORMULA, THE TRIBUNAL
        ALSO IMPERMISSIBLY REWROTE ARTICLE 8.5(a)............................................. 17

IV.    EVEN ASSUMING THAT THE PRECONDITIONS OF ARTICLE 8.5(a) WERE MET, THE TRIBUNAL EXCEEDED ITS AUTHORITY BY AMENDING THE CONTRACT TO IMPOSE ███████ WHERE THE CONTRACT ORIGINALLY CONTAINED A SINGLE PRICE AND THE PARTIES AGREED AND INFORMED THE TRIBUNAL THAT ███████ WAS NOT PERMITTED ................................................................................. 20

    A.    The Tribunal Impermissibly Imposed the ███████ Scheme in Direct Defiance of the Parties' Specific Indication that ███████ was not Permitted ............................................................................. 20

    B.    The ███████ Scheme Effects a Radical Change in the Contract that Extends Far Beyond Price, to Upset the Original Bargain .................................. 26

V.    EVEN IF THE COURT CONFIRMS THE FINAL AWARD, CERTAIN RELIEF SOUGHT BY GNA IS IMPROPER AND MUST BE DENIED .................................. 31

    A.    Injunctive Relief is Not Available, and the Monetary Amount Requested by GNA Is Inflated ............................................................................... 31

    B.    GNA Has No Right to Recover Attorney's Fees .................................................. 33

CONCLUSION ................................................................................................................. 34

# TABLE OF AUTHORITIES

Page(s)

## CASES

*187 Concourse Assocs. v. Fishman,*
  399 F.3d 524 (2d Cir. 2005)................................................................................. 10, 15

*Admart AG v. Stephen and Mary Birch Found., Inc.,*
  457 F.3d 302 (3d Cir. 2006)...................................................................................... 31

*Banco de Seguros Del Estado v. Mut. Marine Office, Inc.,*
  344 F.3d 255 (2d Cir. 2003)...................................................................................... 20

*Besig v. Clinton,*
  539 N.Y.S.2d 208 (N.Y. App. Div. 1989) ................................................................. 12

*Blue Bell, Inc. v. W. Glove Works, Ltd.,*
  816 F. Supp. 236 (S.D.N.Y. 1993)............................................................................ 16

*Constanza Contr. Corp. v. Rochester,*
  537 N.Y.S.2d 394 (N.Y. App. Div. 1989) ................................................................. 19

*Degaetano v. Smith Barney, Inc.,*
  983 F. Supp. 459 (S.D.N.Y. 1997)............................................................................ 11

*Donel Corp. v. Kosher Overseers Ass'n of Am., Inc.,*
  No. 92 Civ. 8377 (DLC), 2001 WL 228364 (S.D.N.Y. Mar. 8, 2001)................ 33, 34

*E.I. DuPont de Nemours & Co. v. Local 900 of Int'l. Chem. Workers Union,*
  968 F.2d 456 (5th Cir. 1992) .................................................................................... 15

*Factor v. Societe Generale N. Am., Inc.,*
  No. 06 Civ. 3480 (HB), 2006 WL 1418609 (S.D.N.Y. May 24, 2006)........................ 9

*First Options of Chicago, Inc. v. Kaplan,*
  514 U.S. 938 (1995).................................................................................................. 24

*Geddes v. Rosen,*
  255 N.Y.S.2d 585 (N.Y. App. Div. 1965) ................................................................. 14

*Hall Street Assoc. v. Mattel, Inc.,*
  No. 06-989, 552 U.S. __, 2008 WL 762537 (Mar. 25, 2008)..................................... 11

*Halligan v. Piper Jaffray, Inc.,*
  148 F.3d 197 (2d Cir. 1998) ..................................................................................... 11

*Hardy v. Walsh Manning Sec., L.L.C.,*
  341 F.3d 126 (2d Cir. 2003)................................................................................ 11, 16

*Hopper v. Lockey,*
  777 N.Y.S.2d 922 (N.Y. App. Div. 2004) ................................................................. 19

*Hunt v. Commodity Haulage Corp.,*
  647 F. Supp. 797 (E.D.N.Y. 1986) ........................................................................... 33

*In re Arbitration between Carina Int'l Shipping Corp. and Adam Maritime Corp.,*
  961 F. Supp. 559 (S.D.N.Y. 1997)...................................................................... 16, 19

*In re Arbitration Between Halcot Navigation Ltd. and Stolt-Nielsen Transp.*
   *Group, BV,*
   491 F. Supp. 2d 413 (S.D.N.Y. 2007)........................................................................ 9

*In re Arbitration Between Melun Indus. and Strange,*
   898 F. Supp. 990 (S.D.N.Y. 1990)........................................................... 10, 16, 20

*Integrity Ins. Co. v. Am. Centennial Ins. Co.,*
   885 F. Supp. 69 (S.D.N.Y. 1995)............................................................................ 24

*Inter-City Gas Corp. v. Boise Cascade Corp.,*
   845 F.2d 184 (8th Cir. 1988) .................................................................................. 19

*Iran Aircraft Indus. v. Avco Corp.,*
   980 F.2d 141 (2d Cir. 1992)................................................................................ 9, 30

*Irving R. Boody & Co., Inc. v. Win Holdings Int'l, Inc.,*
   213 F. Supp. 2d 378 (S.D.N.Y. 2002)..................................................................... 31

*Kaplan v. Alfred Dunhill of London, Inc.,*
   No. 96 Civ. 0258 (JFK), 1996 WL 640901 (S.D.N.Y. Nov. 4, 1996)................... 30

*Katz v. Feinberg,*
   290 F.3d 95 (2d Cir. 2002)...................................................................................... 12

*Kel Kim Corp. v. Central Market, Inc.,*
   519 N.E.2d 295 (N.Y. 1987)................................................................................... 12

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
   424 F.3d 195 (2d Cir. 2005).................................................................................... 19

*Ludgate Ins. Co. v. Banco De Seguros Del Estado,*
   No. 02 Civ. 3653 (DC), 2003 WL 443584 (S.D.N.Y. Jan. 6, 2003)..................... 10

*Lundgren v. Freeman,*
   307 F.2d 104 (9th Cir. 1962) .................................................................................. 15

*Matteson v. Ryder Syst., Inc.,*
   99 F.3d 108 (3d Cir. 1996)...................................................................................... 20

*Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.,*
   409 F.3d 574 (3d Cir. 2005).................................................................................... 22

*Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.,*
   44 F.3d 826 (9th Cir. 1995) .................................................................................... 22

*New York State Nat'l Org. for Women v. Terry,*
   886 F.2d 1339 (2d Cir. 1989).................................................................................. 32

*Parsons & Whittemore Overseas Co. v. Societe General de L'Industrie du Papier,*
   508 F.2d 969 (2d Cir. 1974)............................................................................... 11, 24

*Play Star, S.A. de C.V. v. Haschel Export Corp.,*
   No. 02 Civ. 7364 (LLS), 2003 WL 1961625 (S.D.N.Y. Apr. 24, 2003) ................. 9

*Purgess v. Sharrock,*
   33 F.3d 134 (2d Cir. 1994)...................................................................................... 14

*Sander v. Alexander Richardson Invests.,*
   334 F.3d 712 (8th Cir. 2003) .................................................................................. 19

*Sears, Roebuck & Co. v. Teamsters Local Union No. 243,*
   683 F.2d 154 (6th Cir. 1982) .................................................................................. 19

*Supermarkets Gen. Corp. v. Local 919, United Food & Commercial Workers Union,*
    645 F. Supp. 831 (D. Conn. 1986) .................................................................. 33

*Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,*
    607 F.2d 649 (5th Cir. 1979) .................................................................. 20, 23

*Ulstein Mar., Ltd. v. United States,*
    833 F.2d 1052 (1st Cir. 1987) .............................................................. 31, 32

*United States v. GAF Corp.,*
    928 F.2d 1253 (2d Cir. 1991) .................................................................... 14

*W. Elec. Co., Inc. v. Commc'ns Workers of Am.,*
    450 F. Supp. 876 (E.D.N.Y.) .................................................................... 23

*Wallace v. Buttar,*
    378 F.3d 182 (2d Cir. 2004) ...................................................................... 15

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,*
    126 F.3d 15 (2d Cir. 1997) ...................................................... 9, 10, 11, 19

*Zeiler v Deitsch,*
    500 F.3d 157 (2d Cir. 2007) ...................................................................... 31

*Zorra Transp., Inc. v. Seaboard Trading & Shipping,*
    No. 00 Civ. 2262 (BSJ), 2001 WL 417688 (S.D.N.Y. Apr. 24, 2001) ................ 11

## STATUTES

9 U.S.C. § 1 ............................................................................................... 7, 9
9 U.S.C. § 10 ................................................................................ 9, 10, 11, 30
9 U.S.C. § 12 ................................................................................................. 10
9 U.S.C. § 201 ........................................................................................... 9, 10
9 U.S.C. § 207 ................................................................................................. 9

## OTHER AUTHORITIES

Alan Redfern et al., *Law and Practice of International Commercial Arbitration*
    (4th ed. 2004) ........................................................................................... 32

Convention on the Recognition and Enforcement of Foreign Arbitral Awards of
    June 10, 1958, 21 U.S.T. 2517 .......................................................... 9, 10, 30

David D. Caron et al., *The UNCITRAL Arbitration Rules: A Commentary* (2006) .................. 33

*Fouchard, Gaillard, Goldman on International Commercial Arbitration*
    (Emmanuel Gaillard & John Savage eds., 1999) ........................................ 34

UNCITRAL Arbitration Rules, Article 33 ................................................... 16

UNCITRAL Arbitration Rules, Article 35 ................................................. 8, 33

UNCITRAL Arbitration Rules, Article 36 ..................................................... 8

## PRELIMINARY STATEMENT

Respondent, Atlantic LNG Company of Trinidad and Tobago ("Atlantic"), the claimant in the arbitral proceedings, respectfully submits this memorandum of law: (a) in support of its motion to vacate the Final Award dated January 17, 2008, as subsequently clarified and corrected on March 27, 2008 (the "Final Award")[1]; and (b) in opposition to the February 4, 2008 Petition filed by Gas Natural Aprovisionamientos SDG, S.A. ("GNA"), the respondent and counterclaimant in the arbitration, for an order recognizing and enforcing the Final Award (the "Petition").

The Final Award may not be confirmed, and must be vacated, because the arbitral tribunal ("Tribunal") acted in excess of its authority under the pertinent agreement and under applicable law. *First,* the Tribunal improperly awarded relief after expressly finding that neither Party had satisfied the contractual conditions precedent necessary to obtain relief. The Parties were in full agreement that meeting these conditions was a necessary first step before the Tribunal could proceed to impose any adjustment to the existing pricing formula. The Tribunal's finding that the Parties failed to meet them rendered the Tribunal powerless to enter a substantive award. *Second,* instead of limiting itself to changing the Contract's price formula, as would have been permitted by the Contract's price reopener provision had the conditions precedent been met, the Tribunal impermissibly rewrote the Contract. In place of a single price formula and single contract price that were a key feature of the Contract, the Final Award substitutes a ███████ ██████████████████ – something the Parties specifically told the tribunal it was not empowered to do. By imposing this ██████ scheme, the Final Award introduces new rules

---

[1] A copy of the January 17, 2008 Final Award is attached as Exhibit A to the February 1, 2008 Declaration of George M. von Mehren, counsel for GNA (the "von Mehren Declaration").

and new risks that completely alter the commercial terms of the Contract (well beyond price), exceeding the authority conferred in a price reopener.

## GENERAL BACKGROUND AND PROCEDURAL HISTORY

## I.   THE CONTRACT AND THE RELEVANT PRICING PROVISIONS

In July 1995, Atlantic entered into a long-term liquefied natural gas ("LNG") sales contract with Enagas, S.A., a Spanish company and GNA's predecessor in interest (the "Contract").[2]  The Contract provides for Atlantic to sell LNG produced by it at a natural gas liquefaction facility in the Republic of Trinidad and Tobago ("Train 1 LNG") to GNA over a 20-year period.  *See* Contract, Articles 3.1, 5.1; Final Award ¶ 2.  Because the Parties initially anticipated that the Train 1 LNG was destined for Spain, the Contract originally provided that the price for the Train 1 LNG was to be determined by a formula consisting of a base price adjusted quarterly by a multiplier that reflected changes in publicly reported European prices ███████ ██████████ that compete with natural gas.  *See* Contract, Article 8.1, Final Award ¶¶ 9, 23 & n.7.  ████████ the Contract permitted GNA either to take the Train 1 LNG to Spain or resell it ██████████████████████████████████ for delivery at ███████████████████ ███████████████████.  *See* Contract, Article 2.6, Final Award ¶¶ 9, 37. ███████████████████████████████████████████████████.[3]

The Contract contains a "price reopener" provision that allows either Party to request a change to the price formula.  A "price reopener" is a common feature of long term supply contracts, as the parties recognize that it is all but impossible to agree in advance to a pricing formula that will remain accurate over a 20-year term.  *Cf.* Final Award ¶ 3.  The right to a price review is, however, *not automatic*.  Rather, the Contract requires the reopening Party to

---

[2]  A copy of the Contract is attached as Exhibit B to the von Mehren Declaration.

[3]  Capitalized terms not defined herein have the meaning ascribed to them in the Contract.

establish that:  (a) ███████████████████████████████████
███████████████████████ and (b) the price produced by the existing formula does not

reflect the value of natural gas in the Buyer's end user market.  Thus, Article 8.5(a) of the

Contract provides:

> If at any time either Party considers ████████████████
> ████████ beyond the control of the Parties, while exercising due
> diligence, have substantially changed as compared to what it
> reasonably expected when entering into this Contract or, after the
> first Contract Price revision under this Article 8.5, at the time of
> the latest Contract Price revision under this Article 8.5, and the
> Contract Price resulting from application of the formula set forth in
> Article 8.1 does not reflect the value of Natural Gas in the Buyer's
> end user market, then such Party may, by notifying the other Party
> in writing and giving with such notice information supporting its
> belief, request that the Parties should forthwith enter into
> negotiations to determine whether or not such changed
> circumstances exist and justify a revision of the Contract Price
> provisions and, if so, to seek agreement on a fair and equitable
> revision of the above-mentioned Contract Price provisions in
> accordance with the remaining provisions of this Article 8.5.

*See also* Final Award ¶ 4; Petition ¶ 7.  As is set forth herein, vacatur is sought, in part, because

the arbitral panel granted relief despite finding that neither party had satisfied these preconditons.

The Contract is governed by New York law and provides generally for arbitration

in New York City under the Arbitration Rules of the United Nations Commission on

International Trade Law (the "UNCITRAL Arbitration Rules").  *See* Contract, Articles 17-18.[4]

## II.    THE PRICE REOPENER ARBITRATION

### A.    Background

On April 21, 2005, citing unexpected changes ████████████████████

████ that made it attractive for GNA to enter into a long term arrangement to resell ████ of the

Train 1 LNG to ████████████████ Atlantic notified GNA that it sought a revision to

---

[4]  A copy of the UNCITRAL Arbitration Rules is attached as Exhibit L to the von Mehren Declaration.

the original pricing formula (the "4/21/05 Notice").[5]  Atlantic requested a revised pricing

formula that would reflect the "increased value" of natural gas ███████████, where the

Train 1 LNG was being consumed, and which, in Atlantic's view, had thus become the "Buyer's

end user market." *See* 4/21/05 Notice.[6]  Atlantic and GNA were unable to agree on a revised

price and, accordingly, Atlantic commenced arbitration on October 21, 2005.[7]  A three-person

arbitral panel (the "Tribunal") was constituted on July 26, 2006 to hear the dispute.

### B.    Overview of Claims and Proceedings

Atlantic filed a Statement of Claim on August 15, 2006 ("SOC").[8]  To satisfy the

preconditions in Article 8.5(a), Atlantic stated that ██████████████████████ including

the liberalization and deregulation of the Spanish natural gas market and the impact thereof, had

changed in ways that Atlantic reasonably did not expect in 1995, *see* SOC ¶¶ 43-51; that GNA's

end user market for Train 1 LNG had become ████████████████████Train 1 LNG

was being delivered to and consumed there, *see id.* ¶¶ 53-60; and that the Contract Price did not

reflect the value of natural gas in ████████████, *see id.* ¶¶ 61-82 & p. 54 ¶ 3.  As its preferred

relief, Atlantic sought to replace the ████████ pricing formula negotiated in 1995 with a

formula tied to the value of natural gas in ██████████, effective April 21, 2005.  *See id.* ¶¶ 84-

85 & p. 54-55 ¶¶ 3-4.  Alternatively, in the event the Tribunal did not find that the Buyer's end

user market had changed ████████████████, Atlantic requested a revised ████████ price

---

[5]  *See* Atlantic's Price Reopener Notice, dated April 21, 2005, attached as Exhibit 1 to the April 16, 2008
Declaration of James G. Cavoli (the "Cavoli Declaration").

[6]  Since the end of 2002, GNA has resold ████████Train 1 LNG to ████████ for delivery to the ████████
████████████████████████  Such resales will continue through at least early 2009.  *See* Final
Award ¶¶ 8, 10.

[7]  *See* Demand for Arbitration, dated October 21, 2005 ("10/21/05 Demand"), attached as Exhibit 2 to the
Cavoli Declaration.  Article 8.5(f) of the Contract provides that if the Parties are unable to reach
agreement on a new price within six months, either Party may submit the matter to arbitration.

[8]  The SOC is attached as Exhibit 4 to the Cavoli Declaration.

formula that, *inter alia*, included an added component to accurately reflect the value of ████

████████████ to the higher-value ████████ market. *See id.* ¶¶ 86-93 & p. 55 ¶ 6.

On October 13, 2006, GNA filed a Statement of Defense and Counterclaim

("SOD and CC").[9]  GNA alleged that Atlantic had not satisfied the preconditions of

Article 8.5(a).  *See* SOD and CC ¶¶ 98-115.  GNA also asserted a Counterclaim, claiming that its

end user market is always ████ and that a reduced price was justified based on market factors

████ *See id.* ¶¶ 117-132, 133-134, 173, 186, 189.[10]  GNA's Counterclaim was pled

"conditionally," to be considered only in the event the Tribunal concluded that *Atlantic* had met

the preconditions of Article 8.5(a).  *Id.* ¶¶ 173, 189(c).

From December 15, 2006 through April 4, 2007 – after initial attempts by GNA to

dismiss Atlantic's claims[11] were denied[12] – the Parties filed and exchanged evidentiary and legal

submissions in the form of written witness statements (both fact and expert), documents, and

memoranda of law in support of their respective positions.[13]  The Tribunal conducted 12 days of

---

[9]  *See* GNA's Statement of Defense and Counterclaim, dated October 13, 2006, attached as Exhibit 8 to the Cavoli Declaration.

[10]  Atlantic filed a Statement of Defense opposing GNA's Counterclaim on November 13, 2006.

[11]  *See* Memorandum in Support of GNA's Motion to Dismiss, dated August 14, 2006 ("8/14/06 GNA Mem"); Atlantic's Memorandum of Law in Opposition to Respondent's Motion to Dismiss, dated September 18, 2006 ("9/18/06 Atlantic Mem"); GNA's Reply Memorandum in Support of Its Motion to Dismiss, dated October 2, 2006 ("10/2/06 GNA Mem"), attached, respectively, as Exhibits 3, 5, and 6 to the Cavoli Declaration.

[12]  *See* Procedural Order No. 4, dated October 30, 2006, attached as Exhibit 7 to the Cavoli Declaration.

[13]  *See, e.g.*, Atlantic's Memorandum of Law in Support of Its Statement of Claim, dated December 29, 2006 ("12/29/06 Atlantic Mem"); GNA's Memorandum of Law in Support of Its Statement of Defense and Counterclaim, dated March 7, 2007 ("3/7/07 GNA Mem"); Atlantic's Reply Memorandum of Law in Support of Its Statement of Claim, dated March 21, 2007 ("3/21/07 Atlantic Mem"); and GNA's Rejoinder Memorandum of Law, dated April 4, 2007 ("4/4/07 GNA Mem"), extracts of which are attached, respectively, as Exhibits 9, 10, 11 and 12 to the Cavoli Declaration.

evidentiary hearings in New York City in April, May and June 2007.  *See* Final Award ¶ 15.[14]
After receiving from the Tribunal a list of questions to address,[15] the Parties simultaneously
submitted post-hearing briefs in August 2007 and again in October 2007.[16]  Final argument was
heard in mid-November 2007.  *See* Final Award ¶¶ 16-17.  The Tribunal issued the Final Award
on January 17, 2008.  The Tribunal clarified and corrected the Final Award on March 27, 2008.

### C.   Brief Summary of the Final Award

In place of the single Contract Price that applied regardless of where the Train 1
LNG was delivered, the Tribunal effectively rewrote the Contract to impose a ███████ scheme,
tied to ██████████ end user markets – despite the fact that the Parties had agreed and informed
the Tribunal that it could not do so.  This is Atlantic's second basis for vacatur.



*See generally* Final Award ¶ 130. ████████████

---

[14] The hearings were transcribed.  The transcripts are cited herein in the following form: S[x], P[y]:L[y], where "S" is the speaker, "P" is the page, and "L" is the line.  All cited portions of the transcripts are attached as Exhibit 28 to the Cavoli Declaration.

[15] *See* Letter from Tribunal Listing Questions for the Parties to Address in Post-Hearing Briefs, dated June 20, 2007 ("6/20/07 Tribunal Letter"), attached as Exhibit 13 to the Cavoli Declaration.

[16] *See* Atlantic's First Post-Hearing Memorandum, dated August 24, 2007 ("8/24/07 Atlantic PHB1"); GNA's First Post-Hearing Submission, dated August 24, 2007 ("8/24/07 GNA PHB1"); Atlantic's Second Post-Hearing Memorandum, dated October 12, 2007 (Revised 10/16/07) ("10/12/07 Atlantic PHB2"); GNA's Second Post-Hearing Submission, dated October 12, 2007 ("10/12/07 GNA PHB2"), extracts of which are attached, respectively, as Exhibits 14, 15, 16 and 17 to the Cavoli Declaration.

[17]

- ██████████████████████████████████████████

The ████ price scheme takes effect from April 21, 2005, and will continue unless changed through another reopener. The Parties must recompute all invoices from April 21, 2005 to the date of the Final Award, with the amount of any net overpayment or underpayment to be paid by the obligated Party by April 16, 2008. *Id.* ¶¶ 121, 131.

By its Petition, GNA initiated this proceeding on February 4, 2008, seeking an order recognizing and enforcing the Final Award under Section 207 of the United States Arbitration Act (the "FAA," *see* 9 U.S.C. §§ 1, *et seq.*). *See* Petition ¶¶ 15-17. GNA also asks this Court to enter judgment "in conformity" with the Final Award, although much of the relief GNA seeks – including (1) a money judgment in favor of GNA "for the balancing payment of ███████████; (2) an injunction requiring "Atlantic to sell, deliver, ship and invoice Train 1 LNG to GNA during the term of the Contract at Contract Prices which comply with the" Final Award; and (3) reimbursement by Atlantic of GNA's "costs of suit, including reasonable attorney's fees incurred in bringing this action," *id.* ¶ 18 – is not contained in the Final Award.[18]

---

████████████████████████████████████████
(see further discussion in paragraphs 109-112 below)").

[18] The Final Award makes no provision for injunctive relief, nor does it mention the ██████████ figure. That figure was advanced by GNA as the purported amount owed by Atlantic to GNA for cargoes sold during the retroactive period. *See* Petition ¶ 13; von Mehren Decl. ¶ 9, Exhibit C. As shown below, that figure is now wildly inflated given the Tribunal's correction of the Final Award on March 27, 2008.

## III.    CLARIFICATION AND CORRECTION OF THE FINAL AWARD

On February 15, 2008, pursuant to Articles 35 and 36 of the UNCITRAL

Arbitration Rules, Atlantic requested that the Tribunal clarify and correct the Final Award in

certain respects.[19] Most significantly, Atlantic sought correction of the Final Award with respect

to the Tribunal's directive that the Parties use ███████████████████ for natural

gas in ████████ when determining the ████ in a given calendar ████. Just for the period

April 21, 2005 to December 31, 2007, the use of ███████████████████ produced a

variance in favor of GNA of ████████. *See* 2/15/08 Atlantic Request ¶¶ 19-31.[20]

On March 27, 2008, the Tribunal issued a Decision on Clarification and

Corrections to the January 17, 2008 Final Award (the "Correction Decision")[21] in which, among

other things, it determined that its use of ████████████ was an inadvertent, unintentional

error that required correction, and thus directed that ██████████ be used to calculate the

████ for the retroactive period of the Final Award from April 21, 2005 through December 31,

2007. *See* Correction Decision ¶¶ 23-30. As a result, the amount due GNA for the retroactive

period is ████████, not ████████, as GNA asserts in its Petition.[22]

---

[19] *See* Atlantic's Request, Pursuant to Articles 35 and 36 of the UNCITRAL Arbitration Rules, for Clarification and/or Correction with Respect to Certain Aspects of the Final Award Dated January 17, 2008, dated February 15, 2008 ("2/15/08 Atlantic Request"), attached as Exhibit 19 to the Cavoli Declaration.

[20] GNA opposed Atlantic's requests on February 25, 2008, and Atlantic replied in further support on February 29, 2008. *See* GNA's Memorandum in Opposition to the Request for Clarification and Correction of the Final Award, dated February 25, 2008 ("2/25/08 GNA Mem"); Atlantic's Reply Memorandum in Support of its Request for Clarification and/or Correction with Respect to Certain Aspects of the Final Award dated January 17, 2008, dated February 29, 2008 ("2/29/08 Atlantic Mem"), attached as Exhibits 20 and 21 to the Cavoli Declaration.

[21] The Correction Decision is attached as Exhibit 22 to the Cavoli Declaration.

[22] *See* Letter from Atlantic to GNA dated April 7, 2008 ("4/7/08 Atlantic Letter"), attached as Exhibit 24 to the Cavoli Declaration.

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

While arbitral awards are entitled to deference, they are not exempt from meaningful judicial review. *See Play Star, S.A. de C.V. v. Haschel Export Corp.*, No. 02 Civ. 7364 (LLS), 2003 WL 1961625, at *2 (S.D.N.Y. Apr. 24, 2003) ("To ensure meaningful judicial review, an arbitrator's award is not immune from scrutiny.").

#### A.    Grounds for Refusing to Recognize and Enforce the Final Award

The Final Award is subject to the New York Convention.[23] Thus, via the FAA, this Court may deny GNA's Petition for enforcement and recognition on any of the grounds in Article V of the Convention, *see* 9 U.S.C. § 207, which include where:

- An award "deals with a difference [*i.e.*, a dispute] not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . . .";[24]

- The "party against whom the award is invoked was . . . unable to present his case";[25]

---

[23] The "New York Convention" (or "Convention") refers to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, *see* 21 U.S.T. 2517, reprinted at 9 U.S.C. § 201, which was promulgated and opened for signature in New York, New York. *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 18 & n.1 (2d Cir. 1997) (hereinafter, "*Toys "R" Us*"). The Convention applies to awards that are "not considered as domestic awards in the State where their recognition and enforcement are sought." *Id.* (quotations omitted). Because the Final Award involves non-U.S. parties and foreign commerce, it is a non-domestic award. *See id.* at 19. The FAA also applies here because the Contract evidences transactions "involving commerce" – *e.g.*, the purchase, sale and shipment of LNG between the United States and foreign nations and/or between foreign nations. *See* 9 U.S.C. § 1; *Factor v. Societe Generale N. Am., Inc.*, No. 06 Civ. 3480 (HB), 2006 WL 1418609 (S.D.N.Y. May 24, 2006); Petition ¶ 3.

[24] This basis for refusing to recognize an award "mirrors" Section 10(a)(4) of the FAA (exceeding powers), discussed below. *In re Arbitration Between Halcot Navigation Ltd. and Stolt-Nielsen Transp. Group, BV*, 491 F. Supp. 2d 413, 420 (S.D.N.Y. 2007).

[25] This ground for declining confirmation embodies the fundamental requirement of due process. The Second Circuit recognizes "that the defense provided for in Article V(1)(b) essentially sanctions the application of the forum state's standards of due process, and that due process rights are entitled to full force under the Convention as defenses to enforcement. Under our law, [t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner. Accordingly, if [a party is] denied the opportunity to be heard in a meaningful time or in a meaningful manner, enforcement of the Award should be refused pursuant to Article V(1)(b)." *Iran Aircraft Indus. v.*

- "The . . . arbitral procedure was not in accordance with the agreement of the parties . . . ."; and/or

- "The recognition or enforcement of the award would be contrary to the public policy of" the country where recognition and enforcement is sought.

N.Y. Convention, Article V.1(b)-(d) and V.2(b), 21 U.S.T. 2517, reprinted at 9 U.S.C. § 201.

### B.    Grounds For Vacating the Final Award

Because the Final Award was issued in New York, this Court may grant

Atlantic's motion to vacate – pursuant to 9 U.S.C. §§ 10, 12 – on any of the grounds recognized

under the FAA. The FAA provides for vacatur of an award where, *inter alia*, the arbitrators:

- "[E]xceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). An arbitrator exceeds his powers where he "has ruled on issues not presented to him by the parties, or otherwise exceeded the scope of the authority granted to him . . ." under the contract. *In re Arbitration Between Melun Indus. and Strange*, 898 F. Supp. 990, 992 (S.D.N.Y. 1990); *see also 187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005); and/or

- Are "guilty of misconduct in . . . refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3).

Moreover, an award will be vacated under the FAA if it was rendered in manifest

disregard of either the law or the agreement. *See Toys "R" Us*, 126 F.3d at 23-25.[26] Manifest

disregard of the law exists where: "(1) the arbitrators knew of a governing legal principle yet

---

*Avco Corp.*, 980 F.2d 141, 145-146 (2d Cir. 1992) (quotations and citations omitted) (affirming denial of confirmation where party denied opportunity to submit evidence on material issues).

[26] Citing no authority, GNA asserts that "[t]he sole grounds for refusal or deferral of recognition or enforcement of an award are listed in Article V of the" New York Convention. Petition ¶ 15. But in *Toys "R" Us*, the Second Circuit **rejected** the notion that a court sitting in the country where an award was made "may refuse to enforce the award *only* on the grounds explicitly set forth in Article V of the [New York] Convention." To the contrary, the Court held that the "Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be *free to set aside* or modify an award *in accordance with its domestic arbitral law and its full panoply of express and implied* grounds for relief." 126 F.3d at 23 ("We read Article V(1)(e) of the Convention to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award.") (emphasis added); *accord Ludgate Ins. Co. v. Banco De Seguros Del Estado,* No. 02 Civ. 3653 (DC), 2003 WL 443584, at *3 (S.D.N.Y. Jan. 6, 2003).

refused to apply it or ignored it all together, and (2) the law ignored by the arbitrators . . . [was] well defined, explicit, and clearly applicable." *Hardy v. Walsh Manning Sec., L.L.C.*, 341 F.3d 126, 129 (2d Cir. 2003); *see Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998); *Degaetano v. Smith Barney, Inc.*, 983 F. Supp. 459, 462 (S.D.N.Y. 1997) (Tribunal "acted in manifest disregard of the law in failing to award attorney's fees") (Cote, J.).[27]  Also, "awards may be vacated . . . where the arbitrator's award is in manifest disregard of the terms of the agreement." *Toys "R" Us*, 126 F.3d at 23.  A court should "overturn an award where the arbitrator merely mak[es] the right noises – noises of contract interpretation – while ignoring the clear meaning of contract terms." *Id.*; *see Zorra Transp., Inc. v. Seaboard Trading & Shipping*, No. 00 Civ. 2262 (BSJ), 2001 WL 417688, at *2 (S.D.N.Y. Apr. 24, 2001).

As established below, the Final Award cannot stand when evaluated under the applicable legal standards described above.  GNA's Petition should be denied, and Parts 1, 2 and 3 of the "Award" Section of the Final Award should be vacated.[28]

---

[27]  The Supreme Court's decision in *Hall Street Assoc. v. Mattel, Inc.*, No. 06-989, 552 U.S. __, 2008 WL 762537 (Mar. 25, 2008), supports the vitality of the "manifest disregard" standards.  In *dicta*, the *Hall Street* Court indicated that "manifest disregard" may properly be construed as the cumulative effect of all of the grounds listed in Section 10 of the FAA, or simply a refinement of the grounds listed in Section 10 that permit vacatur when an arbitral tribunal exceeds its authority or engages in misconduct. *Id.* at **5.  This guidance is consistent with the holdings of the Second Circuit describing "manifest disregard" as falling under the purview of the FAA and "implied" within Section 10.  *E.g.*, *Parsons & Whittemore Overseas Co. v. Societe General de L'Industrie du Papier*, 508 F.2d 969, 977 (2d Cir. 1974) (Section "10 has been read to include an implied defense to enforcement where the award is in manifest disregard of the law") (citations omitted); *Toys "R" Us*, 126 F.3d at 18, 23 (describing "manifest disregard" grounds for setting aside award as "implied" within Sections 10 and 11 of FAA).

[28]  The Final Award is divided into three sections, Sections I, II, and III.  Section III, which itself is divided into Parts 1-5, is entitled "Award," and is the operative Section of the Final Award in that it sets forth the "order" of the Tribunal (certain amendments to the Contract and retroactive monetary relief). *See* Final Award ¶¶ 129-134.  Atlantic does not challenge Parts 4 and 5 of the Award, relating to the award of costs and full and final settlement of the Parties' dispute, respectively.

II.     **THE TRIBUNAL EXCEEDED ITS AUTHORITY BY AWARDING RELIEF AFTER DETERMINING THAT NEITHER PARTY HAD SATISFIED A MANDATORY PRECONDITION TO RELIEF**

A.     **The Agreed Preconditions to a Price Revision are Clearly Described in Article 8.5(a) of the Contract**

Article 8.5(a) sets forth two conditions precedent to a Party's right to seek and obtain relief via the price reopener procedure.  A Party must show <u>first</u>, that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ … have substantially changed as compared to what **_it_** reasonably expected when entering into [the] Contract," **_and_** <u>second</u>, that "the Contract Price resulting from application of the formula set forth in Article 8.1 does not reflect the value of Natural Gas in the Buyer's end user market."  Contract, Article 8.5(a) (emphasis added).[29]  If the Parties are unable to agree that these predicates have been met, then the arbitral panel must, as its first order of business, determine whether these gate-keeping elements have been satisfied.  If the arbitral panel determines that either one is not met, the request for relief via the reopener process fails *ab initio*, and the panel has no authority to consider a request for, much less order, a price change.[30]

---

[29]  The first precondition of Article 8.5(a) embodies the fundamental principle that a party should not be permitted to escape its contractual obligation because of the materialization of a risk or an event that the party recognized or anticipated at the time of contracting.  *See Kel Kim Corp. v. Central Market, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987); *Besig v. Clinton*, 539 N.Y.S.2d 208, 209 (N.Y. App. Div. 1989).  Thus, Article 8.5(a) requires a Party to show that the circumstances giving rise to its claim for a price revision were reasonably not anticipated by that Party when it signed the Contract.  *See* 8/14/06 GNA Mem ¶ 15 (reopener clause is "intended to protect the parties against substantial changes in the buyer's end user market that … the requesting party could not have reasonably expected when it agreed to the Contract Price.").  The Tribunal failed to give effect to the first precondition of Article 8.5(a) and, in so doing, it not only far exceeded its authority, *see infra*, it also offended this basic principle of contract formation and enforcement.

[30]  Article 18 of the Contract contains a general arbitration clause, but Article 8.5 of the Contract contains more specific arbitration provisions relating to reopener proceedings.  It is the more specific provisions that governed the arbitral proceedings as to the issues discussed herein.  *See Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) ("When an agreement includes two dispute resolution provisions, one specific (a valuation provision) and one general (a broad arbitration clause), the specific provision will govern those claims that fall within it.") (citations omitted); 10/2/06 GNA Mem ¶¶ 49-50 & n.53 ("Article 18 confers authority on the . . . Tribunal to decide a Price Reopener claim, however, the . . . Tribunal's . . . jurisdiction in a Price Reopener proceeding is plainly limited to matters that fall within Article 8.5.").

The Parties were in complete agreement that Article 8.5(a) contains mandatory conditions precedent.[31]  With respect to the first requirement, to show that ████ ████████████████ had changed substantially from what the Party seeking relief reasonably expected when it signed the Contract, Atlantic listed a number of circumstances arising from or precipitated by the liberalization of the Spanish natural gas market.  *See* 12/29/06 Atlantic Mem ¶¶ 42-77.[32]  Atlantic's chief negotiator in 1995 testified that he did not expect liberalization, and his testimony was supported by contemporaneous documentation.  *See, e.g.*, 3/21/07 Atlantic Mem ¶¶ 27-28 & n.14.[33]

GNA disputed that these events were reasonably unexpected, contending that, in 1995, liberalization and its consequences were widely expected in the Spanish natural gas sector.  *See* SOD and CC ¶¶ 102, 111 (GNA "expressly anticipate[d] that the Spanish market would become liberalized and allow for gas-to-gas competition").  Indeed, the former Enagas executive who led the Contract negotiations in 1995 testified unequivocally that he knew full well at the

---

[31] For Atlantic, *see, e.g.*, SOC ¶ 28 (describing distinct elements of Article 8.5(a)); 12/29/06 Atlantic Mem ¶ 39 ("In order for Atlantic to obtain relief under Article 8.5(a), this Tribunal *must* find that two substantive elements have been established . . . ."); 10/12/07 Atlantic PHB2 ¶¶ 158-176 (explaining mandatory preconditions); *Atlantic Counsel*, 2935: 7-2939:6 (highlighting elements during argument).

For GNA, *see, e.g.*, 8/14/06 GNA Mem ¶ 37 ("Under Article 8.5, the Arbitral Tribunal *must* determine whether the . . . grounds set forth thereunder have been satisfied before it exercises its extraordinary power to substitute a new Contract Price . . . .") (emphasis added); 10/2/06 GNA Mem ¶ 55 ("preconditions under Article 8.5(a)" are "prerequisite[s] to the Arbitral Tribunal considering a revised Contract Price."; "whether the alleged change . . . was unanticipated" is "necessary, threshold element"); SOD and CC ¶¶ 98-99 ("Failure to satisfy even one of these conditions is fatal to a Price Reopener claim.").

[32] Atlantic separately listed as a ████████████████████████ precipitated by unexpected environmental legislation.  *See, e.g.*, SOC ¶¶ 86-93 & p. 55.  However, these alleged changes were submitted only as a basis for imposing a new, increased Spanish market price, *see id.*, and were rejected by the Tribunal, *see* Final Award ¶¶ 81-86.

[33] The 3/21/07 Atlantic Mem recites testimony that Atlantic "did not expect that full opening of the Spanish gas market to competition would happen during the term of the . . . Contract" and quotes from an internal 1995 document from an Atlantic sponsor (Exhibit C-344) which states that "government legislation mandating an open market in Spain . . . is not likely to occur . . . ." *Id.* ¶¶ 27-28 & n.14.

time that liberalization was coming and expected exactly the market consequences that followed

from it.[34]  And in opening statements, GNA's counsel argued as follows:

> The fundamental ████████████████████
> the . . . change that [Atlantic alleges] has occurred, is that Spain
> has moved from a totally regulated market in 1995 to one that is
> largely unregulated now.… *And the only real question ... is*
> *whether that was anticipated at the time.  We say that it was .…*
> *Now, if there is no unanticipated change that is taking place,*
> *because liberalization was anticipated, this case is over.  A*
> *condition precedent hasn't been satisfied.  You don't go on.*

*GNA Counsel*, 161:13-163:5 (emphasis added).[35]

When seeking relief on its counterclaim, GNA was unable to point to any

unexpected changes in economic circumstances.  Thus, in order to "satisfy" the first condition

imposed by Article 8.5(a), GNA essentially argued that if the Tribunal agreed with Atlantic's

claim that *Atlantic* reasonably had not expected liberalization, then GNA should be permitted to

"piggyback" off *Atlantic's* expectation in order to assert its counterclaim.  *See* SOD and CC

¶¶ 8/24/07 ¶¶ 173, 189(c); GNA PHB1 ¶¶ 124-25.  Putting aside the question of whether the

Contract permits GNA to so proceed (it does not),[36] it was thus clear that unexpected

liberalization of the Spanish natural gas market was key to each Party's effort to satisfy the first

---

[34]  *Escudero*, 819:19-22; 835:12-836:7.

[35]  *See also* 8/14/06 GNA Mem ¶ 38 ("the first precondition" to a revised price is "the requirement that the requesting party must not have reasonably expected the alleged change"); *id.*, ¶ 18 ████████ ██████████████████████████████████████████ that was not anticipated by the requesting party"); *id.*, ¶ 42 (same).  These statements by counsel are binding admissions of GNA.  *See Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994); *United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991).

[36]  The text of Article 8.5(a) is quite clear that in order to obtain relief, a party must show that "████████ ████████ … have substantially changed as compared to what *it* reasonably expected ..."  A counterclaimant must make this showing with respect to its *own* expectations, and cannot "borrow" the expectations of the counterparty.  The Tribunal sought to evade the import of this language by *rewriting* the text.  Thus, the Tribunal replaced the words "it expected" with "[was] expected," entirely altering the meaning of Article 8.5(a).  *See* Final Award ¶¶ 5, 24.  It is evident from the Tribunal's use of brackets that it was aware that it was altering the contractual language, but felt free to amend the Contract, and thereby distort its plain meaning.  In so doing, the Tribunal sought to evade, as well, the strictures of governing New York law, which require a counterclaim to stand entirely on its own, as an independent claim.  *See, e.g., Geddes v. Rosen*, 255 N.Y.S.2d 585, 588 (N.Y. App. Div. 1965) ("test is whether the counterclaim is *itself* sufficient to support an *independent* cause of action against plaintiff") (emphasis added).

- 14 -

precondition of Article 8.5(a). The Tribunal specifically so found. *See* Final Award ¶ 42 ("the parties have based their arguments on the degree to which liberalization was expected, the speed with which it was to be applied, and the scope of its impact....").[37]

### B. The Tribunal Found that Both Parties Failed to Meet the First Precondition, and it Therefore had no Authority to Adjust the Price

The Tribunal found that *both* Parties had expected liberalization of the Spanish gas market: "the liberalized market *was foreseen by both sides* ...." Final Award ¶ 44 (emphasis added). This determination – clearly articulated – rendered the Tribunal powerless to impose a revised Contract Price of any sort. Having evaluated the evidence submitted by the Parties to establish compliance with the first precondition, and having *unambiguously found* that evidence to be insufficient, the Tribunal could advance no further in the price reopener process. The Tribunal's efforts should have ended, and its duty under the Contract, at that point, was to dismiss both the claim asserted by Atlantic and the counterclaim asserted by GNA. For this reason, Parts 1, 2 and 3 of the Award, *see* Final Award ¶¶ 130-132, should be vacated. *See 187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005) (affirming vacatur for excess of authority because arbitrator ruled that contractually specified precondition to relief had not been satisfied, but nonetheless granted relief); *E.I. DuPont de Nemours & Co. v. Local 900 of Int'l. Chem. Workers Union,* 968 F.2d 456, 458 (5th Cir. 1992) (same).

The Tribunal was not free to ignore or alter the clear limitations placed upon its power by the Parties in Article 8.5(a). It is settled law that "[t]he scope of the arbitrators' power rests ultimately on the agreement of the parties," *Lundgren v. Freeman*, 307 F.2d 104, 109-110

---

[37] This and other factual findings are not subject to review. *See Wallace v. Buttar*, 378 F.3d 182, 193 (2d Cir. 2004) ("To the extent that a federal court may look upon the evidentiary record of an arbitration proceeding at all, it may do so only for the purpose of discerning whether a colorable basis exists for the panel's award so as to assure that the award cannot be said to be the result of the panel's manifest disregard of the law. A federal court may not conduct a reassessment of the evidentiary record....").

(9th Cir. 1962), and that "[a]n arbitrator's authority ... is at all times restricted by the Parties'

agreement," *In re Arbitration between Carina Int'l Shipping Corp. and Adam Maritime Corp.*,

961 F. Supp. 559, 565 (S.D.N.Y. 1997) (citing *Harry Hoffman Printing, Inc. v. Graphic*

*Commc'ns Int'l Union, Local 261*, 950 F.2d 95, 98 (2d Cir. 1991)).

> Hence ... an arbitrator is not entitled to do anything unauthorized by the parties: arbitrator nihil extra compromissum facere potest. An arbitral award rendered within the framework of the common agreement of the parties is itself part of the contract and hence binding on them. ***Conversely, a purported award which is accomplished in ways inconsistent with the shared contractual expectations of the parties is something to which they had not agreed. The arbitrator has exceeded his power*** .... Without [excess de pouvoir], arbitration would lose its character of restrictive delegation and the arbitrator would become a decision maker with virtually absolute discretion; whatever limits may have been prescribed by the parties would become meaningless because the arbitrator would be answerable effectively to no one.

*Blue Bell, Inc. v. W. Glove Works, Ltd.*, 816 F. Supp. 236, 240 (S.D.N.Y. 1993) (emphasis

added) (quoting W. Michael Reisman, *The Breakdown of the Control Mechanism in ICSID*

*Arbitration*, 1989 DUKE L.J. 739, 745 (1989)).[38]

---

[38] *See also In re Arbitration Between Melun Indus., Inc. v. Strange*, 898 F. Supp. 990, 992 (S.D.N.Y. 1990) (arbitrator exceeded authority; contract "does not empower the arbitrator to . . . determine a 'fair' sale price for the company. Rather, it envisions arbitration solely about" post-closing adjustment).

For the same reasons that the Tribunal exceeded its authority by revising the price in the absence of the first precondition having been satisfied, it also manifestly disregarded the law, a recognized basis for vacatur. *See supra* Argument, Section I.B. The UNCITRAL Arbitration Rules contain a provision entitled "*Applicable law*, amiable compositeur" providing that "[i]n *all* cases, the arbitral tribunal *shall decide* in accordance with the *terms of the contract* . . . ." UNCITRAL Arbitration Rules, Article 33(3) (emphasis added). By setting forth the requisite preconditions (*i.e.*, elements) for a price change, Article 8.5(a) provided the "law" that governed the reopener proceeding. As made clear above, the preconditions of Article 8.5(a) are "well defined, explicit, and clearly applicable"; the arbitrators were well aware of this law "yet refused to apply it or ignored it all together." *Hardy v. Walsh Manning Sec., L.L.C.*, 341 F.3d at 129.

### III.   IN ORDERING A CHANGE TO THE PRICING FORMULA, THE TRIBUNAL ALSO IMPERMISSIBLY REWROTE ARTICLE 8.5(a)

Despite its finding that neither Party had satisfied the first precondition of Article 8.5(a), the Tribunal went on to impose a new price – exactly what the foregoing case law states it could not do.  In plain defiance of the governing law and its limited powers under the reopener provision, the Tribunal impermissibly rewrote Article 8.5(a) to create a ***different first precondition***.  The Tribunal sought to justify its actions by minimizing – to the point of extinction – the importance of the first precondition, and instead emphasizing the purported significance of the second:  "[a]lthough the parties have based their arguments on the degree to which *liberalization was expected* … ***the Tribunal believes that the crucial test is whether the formula agreed in 1995 continues to track the value of natural gas*****.**"  Final Award ¶ 42 (emphasis added).[39]

Casting aside the controlling language of the Contract, the Tribunal posited that a disparity between the value of natural gas and the price produced by the contractual pricing formula – *i.e.*, the showing required to satisfy the second precondition – ***also*** could satisfy the Tribunal's revised version of the "change" requirement of Article 8.5(a):  "a meaningful departure from the relationship between the Contract Price and the price of natural gas in the Buyer's end user market *would* constitute the type of change that Article 8.5(a) was intended to address."  *Id.* ¶ 25 (emphasis added).  In offering this hypothesis, the Tribunal notably employed the conditional form "*would* constitute" because ***neither Party had advanced this theory***.

Proceeding on the basis of its admitted hypothesis, the Tribunal purported to overcome Article 8.5(a) as follows:

---

[39] *See* Final Award ¶ 44 ("although the liberalized market was foreseen by both sides, the ***real test*** is whether those developments significantly disrupted the expected relationship between the Contract Price and the value of natural gas.") (emphasis added).

> The Tribunal finds that the change in the value of natural gas since 1995 when the Contract was signed has not been in accord with what either party expected. ... Whether the "value of natural gas" is measured in ███████ its change in value has not been proportionate to the change in the value of the index in the formula used in Article 8.1. *Id.*

Although it thus purported to satisfy both preconditions of Article 8.5(a), it is clear that, as reformulated by the Tribunal, there no longer is a separate and distinct first precondition, as the Contract mandates, and as the Parties agreed. *See, e.g.,* SOD and CC ¶¶ 98-99; 12/29/06 Atlantic Mem ¶¶ 39-136. Instead, it has been swallowed and displaced by the second. Under the Tribunal's reformulation, the fact that the Contract Price does not reflect the value of natural gas in the Buyer's end user market – the showing required to satisfy the *second* precondition of Article 8.5(a) – is also sufficient to satisfy the *first* precondition. In this manner, the Tribunal has made a price reopener automatically available if the price produced by the formula does not "match" the value of natural gas in the Buyer's end user market. There is no longer any inquiry into reasonably unexpected changes ██████████████████. This cannot be squared with the text of the Contract. As a matter of law, the Tribunal was not permitted to thus rewrite the Contract, and its conduct in doing so is a well recognized grounds for vacatur. *See* cases cited *infra.*

Adding to the error, the Tribunal's revision to Article 8.5(a) is internally inconsistent and flawed – *under the Tribunal's own reasoning.* The Tribunal found that, under Article 8.5(a), the unexpected change in circumstances that satisfies the first precondition ***must cause*** the divergence between Contract Price and value of natural gas in the Buyer's end user market that satisfies the second precondition.[40] But the Tribunal's rewriting of Article 8.5(a)

---

[40] The Tribunal twice articulated this causation requirement, stating that "Article 8.5(a) entitles either party to request a revision to the price formula where '██████████████████ have substantially changed compared to what [was] reasonably expected,' ***resulting in*** a formula no longer

treats the same "fact" – ████████████████████████████████████

████████████████████████████████ – as *both* the cause *and* the effect.

Clearly, the same event cannot satisfy both preconditions. An event cannot be the cause of itself.

Because the Tribunal improperly amended and rewrote critical terms of the Contract in order to impose a new pricing scheme, it exceeded its authority for this separate, additional reason. Parts 1, 2 and 3 of the Award, *see* Final Award ¶¶ 130-132, should be vacated on this basis as well. *See Toys "R" Us*, 126 F.3d at 23 (court should "overturn an award where the arbitrator merely mak[es] the right noises – noises of contract interpretation – while ignoring the clear meaning of contract terms"); *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187-88 (8th Cir. 1988) (if arbitrator "interprets unambiguous language in any way different from its plain meaning, [the arbitrator] amends or alters the agreement and acts without authority.") (citations omitted); *Sears, Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 155-56 (6th Cir. 1982) ("arbitrator exceeded his authority by amending the express terms of the agreement negotiated by the parties."); *Carina Int'l Shipping Corp. v. Adam Mar. Corp.*, 961 F. Supp. at 565 ("arbitrator cannot disregard or modify unambiguous contract provisions").[41]

---

reflecting 'the value of Natural Gas in the Buyer's end user market.'" Final Award ¶¶ 5, 24 (bracket alteration in original; emphasis added).

[41] In rewriting Article 8.5(a), the Tribunal also violated public policy, a separate and compelling basis for refusing to recognize the Final Award. *See supra* p.10. In the United States, there exists a fundamental and well established public policy that a contract be applied and enforced *as written*. *See, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, words and phrases ... should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.") (quotations omitted); *Sander v. Alexander Richardson Invests.*, 334 F.3d 712, 719 (8th Cir. 2003) (where ordinary commercial relationships exist, there is "strong public policies of recognizing parties' liberty to contract and enforcing contracts as written"); *Hopper v. Lockey*, 777 N.Y.S.2d 922, 923 (N.Y. App. Div. 2004) ("public policy favors enforcement of ... agreements as written"); *Constanza Contr. Corp. v. Rochester*, 537 N.Y.S.2d 394, 396-97 (N.Y. App. Div. 1989) ("Strong policy consideration require that contracts be enforced as written....") (Doerr, J.P & Lawton, J. dissenting in part).

**IV.    EVEN ASSUMING THAT THE PRECONDITIONS OF ARTICLE 8.5(a)
WERE MET, THE TRIBUNAL EXCEEDED ITS AUTHORITY BY
AMENDING THE CONTRACT TO IMPOSE ██████████
██████████, WHERE THE CONTRACT ORIGINALLY CONTAINED A
██████ PRICE AND THE PARTIES AGREED AND INFORMED THE
TRIBUNAL THAT ████████████████████████████████
████████, WAS NOT PERMITTED**

**A.    The Tribunal Impermissibly Imposed the ██████████ Scheme in
Direct Defiance of the Parties' Specific Indication that ██████
was not Permitted**

Even if one were to assume, for the sake of argument, that the preconditions of

Article 8.5(a) had been satisfied (they were not), the Tribunal still was not empowered to impose

the ███ pricing structure that it did.  When assessing whether an arbitral panel has exceeded its

authority, a court's inquiry "focuses on whether the arbitrators had the power based on the

parties' submissions or the arbitration agreement, to reach a certain issue, not whether the

arbitrators correctly decided that issue." *Banco de Seguros Del Estado v. Mut. Marine Office,*

*Inc.*, 344 F.3d 255, 262 (2d Cir. 2003) (quotations and citations omitted); 8/14/06 GNA Mem

¶ 32 ("It is well settled in international arbitration, hardly in need of authority, that the subject

matter jurisdiction of an Arbitral Tribunal *is **limited to the claims submitted to it**.*") (emphasis

added).  An "arbitrator has the authority to decide only the issues actually submitted." *Matteson*

*v. Ryder Syst., Inc.*, 99 F.3d 108, 112-113 (3d Cir. 1996).  A court must decide whether the

arbitral tribunal acted "within the scope of [its] authority, or whether the arbitral award is merely

the arbitrators' own brand of justice." *Banco de Seguros Del Estado*, 344 F.3d at 262.  An award

should be vacated where an arbitral panel rules on an issue that was not presented, *see In re*

*Arbitration Between Melun Indus., Inc. v. Strange*, 898 F. Supp. at 992, or imposes a remedy that

was not requested, *see Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649,

651 (5th Cir. 1979).

Here, the Tribunal was confronted with a straightforward price reopener, a common procedure under supply contracts in the oil and gas business that allows for periodic adjustment of the Contract Price to reflect relevant changed circumstances.  Neither the price reopener procedure nor the Parties' submissions empowered the Tribunal to rewrite the Contract by turning a ▮▮-price contract, with one price for all LNG sold to the buyer, into a ▮▮ price contract, with pricing determined ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.  Worse still, not only did neither Party request the destination pricing scheme that the Tribunal imposed, ***both Parties indicated that such a*** ▮▮ ***price scheme should not be imposed as part of the Tribunal's final award.***  In ignoring the Parties' positions, the Tribunal exceeded its authority and inappropriately imposed its own brand of justice.

In the arbitration, Atlantic argued that because GNA had diverted ▮▮ Train 1 LNG since October 2002 to ▮▮▮▮ and would continue to do so until at least 2009, the "Buyer's end user market," as that term was used in the Contract, had switched from ▮▮▮▮▮▮▮▮▮▮.  See SOC ¶¶ 56-60; 8/24/07 Atlantic PHB1 ¶¶ 33-88; Final Award ¶¶ 8, 10, 47-51.  Accordingly, Atlantic asserted, throughout the arbitration, that the price *for all the Train 1 LNG* should be a ▮▮▮▮▮▮ price, rather than a ▮▮▮▮ price, *see* SOC ¶¶ 63, 84-85 & p.55, ¶ 4; 10/12/07 Atlantic PHB2 ¶ 237, just as the original ▮▮▮▮ price had applied to all LNG, regardless of whether delivered ▮▮▮▮ ▮▮▮▮.  *See also* Final Award ¶ 57.[42]  GNA disputed that its end user market had changed, and argued that the Spanish based price (albeit lowered to reflect purported Spanish market conditions) should continue to apply to all LNG – again, regardless of

---

[42]  In the event that the Tribunal found that the "Buyer's end user market" ▮▮▮▮, Atlantic alternatively requested a specific, revised pricing formula to reflect various changes in the value of natural gas and the Train 1 LNG in Spain, as evidenced by changes in competing ▮▮▮▮ and the increased value associated with GNA's ▮▮▮▮▮▮▮▮▮▮.  *See* SOC ¶¶ 86-92 & pp. 54-55, ¶¶ 5-6.  Here too, however, Atlantic did not request a "dual" pricing structure; its alternative request was to apply to all of the Train 1 LNG sold under the Contract based upon the value of natural gas and Train 1 LNG vis-à-vis a single end user market, ▮▮▮▮▮▮▮▮▮▮.

████████. SOD and CC ¶¶ 117-138; 3/7/07 GNA Mem ¶¶ 80-112; GNA PHB2 ¶¶ 44-88; Final Award ¶ 59.[43]  Simply put, neither Party proposed or sought ████ pricing.

GNA's insistence on a ████ Contract Price was clear.  GNA argued before the Tribunal that "the Contract clearly contemplates a ████ end user market and a ████ Contract Price," SOD and CC ¶ 129, and "the Parties always understood that there would be just ████ Contract Price...."  4/4/07 GNA Mem ¶¶ 51-54.  GNA asserted, correctly, that ████████ ████████████████████████████████████████████████████ and should not be imposed because it would stray too far from the original terms.  8/24/07 GNA PHB1 ¶ 72 (emphasis added).[44]  Both Parties consistently maintained that a revised Contract Price, if imposed by the Tribunal, should be a ████ price for all LNG sold under the Contract, and that that price should be based on the value of natural gas in a ████ end user market: *either* ████ ████████, but *not* both.

In revising the pricing terms to replace the ████ price contract structure with a new and materially different ████ price structure, the Tribunal ignored the submissions of the Parties and granted a type of relief that neither had requested.  Thus, it exceeded its authority.  *See Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.,* 409 F.3d 574, 578 (3d Cir. 2005) ("arbitration panel has the authority to decide only the issues that have been submitted for arbitration by the parties."); *Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.,* 44 F.3d 826, 830

---

[43]  In its Statement of Defense and Counterclaim, GNA asserted that ████████ the "Buyer's end user market," and requested a pricing formula tied to that market.  *See* SOD & CC ¶¶ 132, 189(c).  While its proposed formulas changed over time, GNA consistently requested relief in the form of a ████ contract price based on a ████ end user market.  *See, e.g., GNA Counsel,* 3005: 4-14.

[44]  *See also,* 8/24/07 GNA PHB1 ¶ 74 ████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████.

(9th Cir. 1995) ("When arbitrators rule on a matter not submitted to them … the arbitrators exceeded the scope of their authority."); *Totem Marine Tug & Barge, Inc.,* 607 F.2d at 652 ("*It is anomalous for the arbitration panel to award an unrequested item of damages ….*"; by doing so "the arbitrators ignored the arbitral dispute submitted by the parties and dispensed their own brand of industrial justice.") (emphasis added); *W. Elec. Co., Inc. v. Commc'ns Workers of Am.,* 450 F. Supp. 876, 881 (E.D.N.Y.).

But the Tribunal's departure from what was permitted is more egregious, still. Undoubtedly sensing that it was about to tread where it should not, the Tribunal inquired of the Parties whether it was empowered to impose a █████ pricing scheme, and then ignored the uniform response from both Parties that it could not do so. Specifically, after the hearings were complete, but before final briefing, the Tribunal asked the Parties whether "it is possible to have ████████████████████████████████."[45] GNA responded with a blunt "No," and devoted 50 paragraphs of post-hearing briefing to support its position. *See* GNA 8/24/07 PHB1 ¶ 70; *id.* ¶¶ 70-120. Atlantic argued that there was no room even to consider the question, since it was undisputed that █████ GNA's Train 1 LNG would be delivered to █████ during the minimum three-year period covered by the reopener proceeding (April 2005 – April 2008) and beyond,[46] and any effort to divine the location of future deliveries would be entirely speculative. *See* 8/24/07 Atlantic PHB1 ¶¶ 89-93.[47]

---

[45] 6/20/07 Tribunal Letter, Item 4, attached as Exhibit 13 to the Cavoli Declaration.

[46] Article 8.5(d) of the Contract provides that "no Party shall request any further revision to be effective as of a date which is earlier than three (3) Calendar Years after the date as of which such Party has last requested a revision to be effective." Both Atlantic and GNA requested that any price revision be effective April 21, 2005. Thus, the minimum period covered by any award is April 21, 2005 through April 21, 2008. GNA committed to resell the LNG to █████ through March 2009. *See* Final Award ¶ 8.

[47] Atlantic also noted that, even if the future saw significant volumes of Train 1 LNG simultaneously going ██████████ ██████████, "██████ separate pricing formulas, based on █████████ end user markets, would likely not be appropriate" – in such circumstances, the "proper approach … would be to develop a

Both Parties repeated their opposition to a ███ pricing scheme during final oral argument in November 2007. *See GNA Counsel*, 2642:12-2646:8 (opposing ███ pricing structure); *id.*, 2845:15-22 ("you got to rewrite the contract" to do that); *id.*, 2888:6-2908:25 (arguing that a dual pricing is contrary to the Contract); *id.*, 3005:4-5 ("under the contract, all you can do is impose a new Spanish price"); *Atlantic Counsel*, 2841:13-22 (answering Tribunal's question "what percentage of Train 1 sales going to ███ would justify the continued application of a ███ based price" by stating: "our fundamental answer is that it posits an inquiry that isn't appropriate for the Tribunal to decide … none of us know what the circumstances will be in 2009").[48]

The Parties were thus of one mind, and the Tribunal was bound to follow their agreed views; it was not free to ignore the agreed position of Atlantic and GNA that a ███ pricing structure should not be imposed. Arbitration is, at bottom, a creature of agreement among the Parties, and a tribunal must comply with such agreement. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("arbitration is simply a matter of contract between the parties; it is a way to resolve those *disputes* – but only those *disputes* – that the parties have agreed to submit to arbitration.") (emphasis added); *Parsons & Whittemore Overseas Co., Inc. v Societe Gen. de L'Industrrie Du Papier*, 508 F.2d 969, 977 (2d Cir. 1974) (where agreement silent on issue of award of certain expenses, "the request by each [party] for such an award for expenses amounts to tacit agreement on this point," and thus conferred power upon the tribunal to award costs); *Integrity Ins. Co. v. Am. Centennial Ins. Co.*, 885 F. Supp. 69,

---

███ *pricing formula* based on the average value of natural gas in ███ end user markets." 8/24/07 Atlantic PHB1 ¶ 91 & n.45 (emphasis added).

[48] The Tribunal circulated a list of questions to be addressed at final oral argument, including the question set forth in the above parenthetical. *See* Tribunal Questions, dated November 7, 2007, attached as Exhibit 18 to the Cavoli Declaration.

71 (S.D.N.Y. 1995) ("Arbitrators can exert no more control over parties than that which the parties, through their agreements, granted to the arbitrators.").

   Aware that it was rewriting the Contract in defiance of the Parties' express wishes, the Tribunal attempted to mask the fact that it was imposing a ███ price scheme by euphemistically referring to the ███ as an "adjustment." The Tribunal indicates that it has established a "████████████████████████████████████████████████ ███████████████████████████████████" Final Award ¶ 76.[49] But the "adjustment" is not an adjustment at all. It is an outright substitution of the ███████████, and thereby imposes exactly the ███ price scheme the Parties agreed was off limits. *See supra* n.17.

   In sum, having solicited the views of the Parties on the specific issue of ███ pricing, the Tribunal ignored those views. With no warrant under the reopener procedure, and contrary to the Parties' agreement, the Tribunal abandoned the ███price structure and imposed a ███████ pricing concept with ███ pricing formulas based on ███████ end user markets.

---

[49] The Tribunal purported to find authority for its actions in a statement by Atlantic's counsel on the last day of the proceedings, which the Tribunal characterized as a "suggest[ion] [that] the Tribunal consider an approach based on a revised Spanish price ██████████" Final Award ¶ 76. The statement by counsel – specifically, that "the Tribunal consider keeping a Spanish price █████████████████, *as we have suggested*," *Atlantic Counsel*, 2922: 4-7 (emphasis added) – was prompted by GNA's threat to challenge any award that included a ███ based price as being in excess of the Tribunal's authority. *See* 10/12/07 GNA PHB1 ¶¶ 8-9, ¶ 33; *Atlantic Counsel*, 2919:1-2922:25. This remark referred to the alternative form of relief that Atlantic suggested in its SOC in the event the Tribunal concluded that the "Buyer's end user market" was still Spain. In such circumstances, Atlantic proposed to add a value of ████████████ to the pricing formula, as follows: ██████████████████████████ SOC ¶ 93. Importantly, Atlantic proposed this as the ███ price formula under the Contract, applicable *at all times* to *all* of the LNG, ███ ████████████████████████ *Id.* Atlantic most certainly did not authorize a ███ price scheme.

**B.**    **The ███ Pricing Scheme Effects a Radical Change in the Contract that Extends Far Beyond Price, to Upset the Original Bargain**

When the Parties executed the Contract in 1995, it was expected that the Train 1 LNG would be delivered to and used in Spain and, accordingly, the Parties provided a price they believed was appropriate for the Spanish market. *See* Final Award ¶ 9.  They agreed that the Contract Price ("P") would be a base price revised ███ by a multiplier reflecting changes in the reported European prices of █████ that compete with natural gas, determined in accordance with the following formula: ███████████ *See* Contract 8.1; Final Award ¶ 23.[50]

It was also agreed, *inter alia*, that GNA could resell or deliver all or any part of the LNG sold to it under the Contract to ██████████ for delivery at ████████ ███████████████. *See* Contract ████; Final Award ¶¶ 2, 9, 37.  The agreed Contract Price, determined by the aforementioned "Spanish" formula, applied regardless of whether GNA delivered the LNG ████████. *See* Contract 2.6, 8.1; *GNA Counsel*, 134:2-4 ("So the fundamental structure of this contract is the LNG can go to ████, it can go ████. There's a Spanish price.").

The New Pricing scheme drastically restructures this pricing mechanism.  Under the revised scheme, the price of Train 1 LNG is determined by ████ formulas, a so-called ██████████████████ Final Award ¶ 90, and a so-called ██████████ *Id.* ¶ 98. The ████████ applies to all LNG sold under the Contract

---

[50]   The Contract Price is represented in US Dollars per MMBtu.  ████████████████
████ *See* Contract, Article 8.1; Final Award ¶ 23 & n.7.

- 26 -



███████ Final Award ¶ 111. *See also, id.* ¶¶ 109 & 130, p. 32.  In all other circumstances, the ███████ applies.  *Id.*  Under the new regime, ██████ is determined using ████████ ████████████████████████████████████████████ *See id.* ¶¶ 98-104, 130, p. 31.  ██████ is determined based upon a formula ████████████████████████████ ████████████████████████████████. *See id.* ¶¶ 90-93, 130 p. 32.

The ██ pricing scheme imposed by the Tribunal is fundamentally inconsistent with the original ████ price scheme, is fundamentally at odds with the original agreement, and structurally rewrites the Contract.  Under the original, ████ price scheme, Atlantic enjoyed (i) relative certainty about the revenues it would receive for its LNG and (ii) an equal sharing of risk with GNA that the pricing formula might prove beneficial or disadvantageous in the future.  With respect to the first item, Atlantic knew that no matter where the LNG was delivered, as between ████████████, the price for all of the LNG was tied to a ████ market, with a single risk profile.[52]  With respect to the second item, it understood that market factors might make the price favorable to it, or favorable to GNA, and that each Party bore similar risks in that regard.  Finally, as a corollary to these two items, Atlantic understood that the risks and rewards associated with periodically making deliveries to different markets were born by the Buyer,

---

[51] ███████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████ Final Award ¶ 98.

[52] Initially, it was understood that that the Buyer's end user market ████████, where GNA's predecessor operated as the exclusive importer of LNG, and where Atlantic anticipated the LNG would be delivered.  The identity of the Buyer's end user market could, however, change, and such change could be addressed through the reopener process, which could occur only at pre-determined intervals.

GNA.  GNA might profit, or it might lose, through delivery to ████████, but Atlantic would continue to receive the price agreed.

The ███ pricing scheme introduces a price uncertainty and associated risks (including cash flow uncertainty) that were never part of the original bargain.  ██████████████ ██████████████████████████████████ so Atlantic has no long term price expectation, and is faced with a price based upon a market that can change ██████.  Critically, determination of which price will apply – ██████████████████████████████████ – is controlled entirely by GNA.  Atlantic can no longer count upon a revenue stream representing a single, known market.  Instead, its revenue stream is entirely a function of GNA's arbitrage.

In addition, the risk of loss stemming from a shifting of deliveries from one market to the other has been lessened for GNA and increased for Atlantic.  Thus, to use just one illustration, when the ████ is lower than the ███, GNA can arrange to have ████ of the LNG resold to ██████████████, and pay the lower ███ price on all volumes, including the ████ delivered to ████  Conversely, when the ███ is lower, GNA can arrange to have ████ of the LNG delivered to ████, and pay the lower ██ on all volumes, including the ████ delivered to ████  The modest differences in delivery volumes needed to effect a swing from ████ to ████ are easily achieved, allowing GNA to ensure that it will always pay ██████████ ██████.  Moreover, because both the ██ and the ███ for a calendar ████ are determined by reference to prices published ████████████████████,[53] GNA is able to determine in advance which of the ██████ will be more beneficial.  So whereas the Contract, as originally drafted, imposed upon GNA a level of risk when deciding between ████

---

[53] ████████████████████████████████████████████████████████
████████████████████████████████████ *See* Contract, Article 8.1 (defining "Reference Period"); Final Award ¶ 130.

- 28 -

and ██ as the destination of Train 1 LNG, the ██ price structure eliminates the risk, and greatly increases the likelihood that GNA will make a profit and Atlantic will lose revenue it might otherwise have received.[54]

Exposing Atlantic to this and other arbitrage risks was not part of the Contract negotiated by the Parties and represents a major change in the Contract terms.  Moreover, under the ██ price formulation agreed by the Parties, GNA did not enjoy the ability that the ██ price structure gives it to maximize profits ████████████████.  As GNA indicated to the Tribunal, *see* 8/24/07 GNA PHB1 ¶ 74, the ██ pricing structure substantially alters the balance of risks reflected in the original Contract.[55]  If Atlantic had been asked in 1995 to agree to the type of ██-market destination pricing structure now imposed by the Tribunal, where GNA could determine the price of all cargoes through small variations in delivery destination between ████████████, Atlantic undoubtedly would have insisted upon some

---

[54] In every long-term LNG supply contract, there is a risk that, over time, the pricing formula might not accurately reflect the value of natural gas in the Buyer's end user market.  When entering into the Contract, GNA logically would have hoped that any such inaccuracy would work to its benefit by understating the price in comparison to the value of natural gas, while Atlantic logically would have hoped that any inaccuracy would cause the formula to overstate price in comparison to value.  Although one Party might thus benefit at the expense of the other until the next price reopener, this risk was symmetrical because the Contract contained a single price formula.  Each Party was exposed to the same risk, based upon factors beyond their control.  The situation was like a one-time coin toss, with 50/50 odds.  The Tribunal's introduction of a concurrently available ██ price formula significantly skews the odds in GNA's favor.  Because GNA controls ████████, and because the actual prices that would apply under each price formula ████████ can be determined ahead of time, GNA has ██ chances to pick a price that will be low relative to the value in the market.  The Tribunal's decision has created a situation where GNA can toss a coin once, and then can toss the coin a second time if it does not like the result of the first toss.  GNA wins as long as one of the two coin tosses comes out in its favor.  GNA's odds have improved from 50/50 to 75/25 in its favor, while Atlantic's odds have deteriorated.

[55] *See also GNA Counsel*, 2888:6-2909:5 (stating multiple reasons for impropriety of ██ pricing structure); *id.*, 2890:4-5 ("there are certain risk allocation items that need to be revised" if ██ pricing imposed); *id.*, 2890:17-24 (contract terms "can all be negotiated by two parties who want to sit down and structure a contract around a ██ pricing mechanism . . . , [but] its not something that's done without that commercial input, without that negotiating dynamic.  You would do things differently ...."); *id.*, 2908:21-23, 2909:2-4 ("You have a core market, and you take your chances with whatever diversion rights you have"; If we're going to change that dynamic in this contract [via ██ pricing], then a wholesale revisiting of some core items we believe would be appropriate.").

*quid pro quo* for the benefit thus conferred upon GNA, which *quid pro quo* could have been reflected in any number of ways in the very complex structure of the Contract – including in non-monetary terms that are entirely beyond the reach of the price reopener process.[56]

The Tribunal, of course, did not attempt to revise the Contract to reflect the type of negotiated compromises that would pertain had the Parties negotiated for a ▆▆ pricing scheme. By imposing such a scheme, the Tribunal has fundamentally changed the Contract in a way that exceeded its authority under the price reopener provision. Article 8.5 permits an arbitral panel to revise the existing Contract Price; it does not permit the panel to impose a completely new pricing structure that completely alters the Contract's risk profile. *See* Contract, Article 8.5(a) (contemplating "revision of the Contract Price provisions" in Article 8.1).

Finally, and of critical import, it is clear that the circumstances of the Tribunal's imposition of the ▆▆ pricing mechanism violated Atlantic's due process rights, which are protected under the New York Convention and the FAA. *See* Convention, Article V.1(b); 9 U.S.C. § 10(a)(3). Specifically, Atlantic was denied "the opportunity to be heard at a meaningful time and in a meaningful manner," a recognized basis for denying recognition of an award, *see Iran Aircraft Indus.*, 980 F.2d at 146, and for vacating an award, *see Kaplan v. Alfred Dunhill of London, Inc.*, No. 96 Civ. 0258 (JFK), 1996 WL 640901, at *5 (S.D.N.Y. Nov. 4, 1996). The Tribunal never disclosed any terms of the ▆▆ pricing scheme prior to issuing the Final Award, and, as such, Atlantic was unable to present evidence or argument regarding that scheme. Indeed, in a separate context, the Tribunal recognized that "the specific ▆▆▆▆

---

[56] For example, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Atlantic could have demanded ▆▆▆▆▆▆▆. Alternatively, it could have demanded changes to the reopener provision itself, to make it easier for Atlantic to seek a price adjustment, or it could have demanded the ability to reduce its deliveries under certain circumstances. Atlantic submits that neither these matters, nor the matters set forth in Argument, Section IV.B, above, can, in good faith, be disputed. Atlantic reserves its right to submit testimony (expert and or fact) on these subjects should the need arise.

contained in the Final Award *was not discussed* during the proceedings," and that it "did *not*

have all available pricing data and was not able to assess the actual impact of the retroactive

calculation" using the ▮▮▮. Correction Decision ¶ 24 (emphasis added).  This statement applies

to all aspects of the specific ▮▮▮ pricing mechanism imposed by the Tribunal, because it

remained a secret until the Final Award was delivered.  It violates the most basic concept of due

process to require Atlantic to adhere to a fundamental Contract revision that both Parties told the

Tribunal it should not order, and that was never offered to the Parties for analysis or comment.

## V.    EVEN IF THE COURT CONFIRMS THE FINAL AWARD, CERTAIN RELIEF SOUGHT BY GNA IS IMPROPER AND MUST BE DENIED

### A.    Injunctive Relief is Not Available, and the Monetary Amount Requested by GNA Is Inflated

GNA seeks a judgment "manditorily enjoining Atlantic to sell, deliver, ship and

invoice Train 1 LNG to GNA during the term of the Contract at Contract Prices which comply

with the Award, as recognized and enforced herein," and requiring a "balancing payment of

▮▮▮▮▮▮▮▮▮▮▮" Petition ¶ 18.b.  This relief is not available.

"[C]onfirming an arbitration award does little more than give the award the force

of a court order."  *Zeiler v Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007).  "The confirmation of an

arbitration award" simply "converts the final arbitration award into the judgment of the court."

*Irving R. Boody & Co., Inc. v. Win Holdings Int'l, Inc.*, 213 F. Supp. 2d 378, 380 (S.D.N.Y.

2002).  Courts have little ability to "modify execution of an award without altering its substance"

– the "leeway . . . is very small and is available only in limited circumstances . . . ."  *Admart AG*

*v. Stephen and Mary Birch Found., Inc.*, 457 F.3d 302, 309 (3d Cir. 2006).

"An injunction is a coercive order by a court directing a party to do or refrain

from doing something, and applies to future actions."  *Ulstein Mar., Ltd. v. United States*, 833

F.2d 1052, 1055 (1st Cir. 1987).  It is an extraordinary remedy, awarded only when the

requesting party establishes irreparable harm and inadequacy of remedies at law, *inter alia*. *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989). GNA never requested injunctive relief before the Tribunal, much less made these necessary showings. Thus, the Final Award contains two forms of relief: (1) amendments to the pricing provisions of the Contract, effective April 21, 2005,[57] and (2) a monetary award, in an amount to be computed by the Parties, to adjust billings under the Contract for the period April 21, 2005 though January 17, 2008.[58] The Final Award contains no injunctive relief, as it does not direct either party to take, or refrain from taking, any action – it simply provides for a money payment for the retroactive period and declares the new pricing terms of the Contract.[59] Because injunctive relief was neither requested nor awarded, the issuance by this Court of an injunction would impermissibly expand the terms of the Final Award.[60]

A money judgment in the amount of ███████ would also impermissibly expand the terms of the Final Award. Plainly, the Final Award is the award issued by the

---

[57] *See id.* ¶ 130 ("The Tribunal amends Articles 8.1, 8.3 and 8.4 of the Contract, applicable to all deliveries of LNG under the Contract from and including April 21, 2005, to read as follows:").

[58] *See* Final Award ¶ 131 (the new "Contract Price shall be applied to cargoes delivered from and including April 21, 2005 and a net amount due from one Party to the other shall be calculated and paid within ninety (90) days . . .").

[59] The revision of pricing terms is akin to the granting of declaratory relief, which, "states the existing legal rights in a controversy but does not, in itself, coerce any party to enjoin any future action." *See Ulstein Marine, Ltd.*, 833 F.2d at 1055. The declaratory aspect of the Final Award "is not itself capable of enforcement; for the purposes of enforcement an award must also involve an obligation to pay compensation or to take, or refrain from taking, a particular course of action." Alan Redfern et al., *Law and Practice of International Commercial Arbitration* ¶ 8-18 (4th ed. 2004). If, in the future, either Party fails to comply with the revised content of the Contract, a claim for breach of contract and damages would lie, a legal remedy that is clearly adequate.

[60] GNA's request for injunctive relief is, moreover, substantively improper. The requested injunction requiring Atlantic to sell Train 1 LNG, through the end of the Contract's term (2019), at the new price is directly contrary to the terms of the Contract, which expressly permit the Contract Price to be reset *every three years* if Article 8.5(a) is satisfied. *See* Contract, Article 8.5(d). Likewise, GNA's request for an injunction requiring Atlantic to "ship" the Train 1 LNG cannot be squared with the Contract, which provides *that GNA*, not Atlantic, is responsible for shipping and transport. *See id.*, Article 6.1.

- 32 -

Tribunal on January 17, 2008 *as corrected and clarified* on March 27, 2008.[61]  Under the "final"

Final Award – assuming that it is confirmed – Atlantic owes GNA ███████████ for the

retroactive period.  *See* 4/7/08 Atlantic Letter.  The amount requested by GNA, which is

███████████ higher, is based on the Final Award prior to correction and clarification, and that

no longer applies.[62]  More importantly, on April 16, 2008, Atlantic *paid* GNA the proper amount

due (while reserving its rights).[63]  GNA has no basis to seek an order requiring the payment of

moneys already paid.

### B.    GNA Has No Right to Recover Attorney's Fees

Nor should this Court award the cost of suit and attorney's fees, as GNA requests.

*See* Petition ¶ 18.c.  The FAA makes no provision for the award of litigation costs or attorney's

fees.  *Donel Corp. v. Kosher Overseers Ass'n of Am., Inc.*, No. 92 Civ. 8377 (DLC), 2001 WL

228364, *4 (S.D.N.Y. Mar. 8, 2001) (Cote, J.).  While ignored by GNA, attorney's fees can be

awarded *only* if Atlantic failed to comply with the Final Award "without justification" *and*

opposed confirmation in "bad faith, vexatiously or wantonly."  *Hunt v. Commodity Haulage

Corp.*, 647 F. Supp. 797, 799 (E.D.N.Y. 1986); *Supermarkets Gen. Corp. v. Local 919, United

Food & Commercial Workers Union*, 645 F. Supp. 831 (D. Conn. 1986).

Although it strongly believes that vacatur is warranted, Atlantic has *complied*

with the Final Award in all respects:  it has invoiced Train 1 LNG under the new Contract Price

since January 17, 2008, and paid the retroactive amount on April 16 2008.  Moreover, Atlantic's

---

[61]  *See* UNCITRAL Arbitration Rules, Article 35(2) ("The interpretation *shall form part of the award*") (emphasis added); David D. Caron et al., *The UNCITRAL Arbitration Rules: A Commentary* 895-96 (2006) ("A correction forms part of the award and thus may be enforced . . . along with the award.").

[62]  In a letter from GNA to Atlantic dated April 8, 2008, attached as Exhibit 25 to the Cavoli Declaration, GNA agreed that the amount is ███████████.

[63]  *See* 4/15/08 Citibank Transaction Initiation Payment Details Report, attached as Exhibit 27 to the Cavoli Declaration.

arguments in opposition to confirmation and in support of its motion to vacate are not only made

in good faith, they should prevail under the applicable facts and law.  The circumstances here do

not come close to justifying an award of fees.  *See Donel Corp.,* 2001 WL 228364, at *4.[64]

<u>CONCLUSION</u>

For the reasons stated above, GNA's Petition should be denied, Atlantic's motion

for vacatur should be granted, and this Court should enter an order requiring GNA to refund

████████ to Atlantic, the amount previously paid pursuant to the Final Award as clarified

and corrected on March 27, 2008.  In the event that this Court grants GNA's Petition, injunctive

relief and attorney's fees and costs should not be awarded to GNA, and any request by GNA for

a money judgment should be denied as moot.

Dated:  April 16, 2008

MILBANK, TWEED, HADLEY & McCLOY LLP

By: *Michael L. Hirschfeld / JGC*

Michael L. Hirschfeld (MH 6799)
James G. Cavoli (JC 7487)
Tamieka Spencer Bruce (not yet admitted)
John K. White, Jr. (JW 3488)

1 Chase Manhattan Plaza
New York, New York 10005-1413
(212) 530-5000

Attorneys for Respondent
ATLANTIC LNG COMPANY OF
TRINIDAD AND TOBAGO

NY2:#4785671

---

[64] Indeed, GNA has no basis to recover *any* costs, since its Petition was unnecessary because:
(1) Atlantic has complied fully with the Final Award; and (2) the law renders confirmation in the U.S.
against Atlantic, which is based in Trinidad, superfluous.  *Fouchard, Gaillard, Goldman on International
Commercial Arbitration* ¶ 1677 (Emmanuel Gaillard & John Savage eds., 1999) ("to obtain the benefit of
the New York Convention, a party applying for recognition or enforcement of an award is **not required** to
initiate proceedings in the country of origin of the award. This is one of the main advances made by the
Convention, which thus abolished the requirement . . . to establish that 'the award [had] become final in
the State where it [had] been made'") (emphasis added).

- 34 -