**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| GAS NATURAL APROVISIONAMIENTOS SDG, S.A., | ) ) 08 CV. 1109 (DC) ) |
| Petitioner, | ) ) ) |
| -against- | ) ) |
| ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO, | ) ) ) |
| Respondent. | ) ) ) |

---

**GAS NATURAL APROVISIONAMIENTOS SDG, S.A.'S**
**MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS AMENDED**
**PETITION TO RECOGNIZE AND ENFORCE THE ARBITRAL AWARD AND**
**IN OPPOSITION TO ATLANTIC LNG COMPANY OF TRINIDAD**
**AND TOBAGO'S CROSS-MOTION TO VACATE THE AWARD**

SQUIRE, SANDERS & DEMPSEY L.L.P.
350 Park Avenue, 15th Floor
New York, New York 10022
(212) 872-9800

SQUIRE, SANDERS & DEMPSEY L.L.P.
4900 Key Tower, 127 Public Square
Cleveland, Ohio 44114
(216) 479-8500

SQUIRE, SANDERS & DEMPSEY L.L.P.
6200 Chase Tower, 600 Travis Street
Houston, Texas 77002
(713) 546-5850

Attorneys for Petitioner
GAS NATURAL APROVISIONAMIENTOS
SDG, S.A.

New York, New York
June 16, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ..........................................................................iii

PRELIMINARY STATEMENT ...................................................................... 1

LAW AND ANALYSIS.................................................................................. 9

I.      Judicial Review of Arbitration Awards Is Severely Limited............................ 9

II.     Atlantic's Improper Attempts to Reargue the Merits Provide No Basis for
        Vacating the Final Award ..................................................................... 10

        A.      The Tribunal Did Not Exceed the Scope of Its Authority in the Final
                Award ................................................................................... 11

        B.      The United States Supreme Court's Recent Decision Indicates That
                "Manifest Disregard of the Law" Is Not an Independent Ground for
                Vacatur under the FAA ............................................................... 15

        C.      Atlantic's Public Policy and Due Process Arguments Are Unavailing ............. 17

III.    Based on the Evidence and Arguments Presented, the Tribunal Properly Found
        That a Price Adjustment Was Justified and Imposed the Revised Contract Price........... 19

        A.      The Tribunal Properly Held That the Price Adjustment Was Justified ............... 19

                1.      The Tribunal Concluded That "Rapid Liberalization" Was a
                        Significant and Unexpected Change Resulting in a Disconnect
                        Between the Contract Price and Market Values ....................................... 21

                2.      The Tribunal Concluded That New Price Drivers in the Spanish
                        Natural Gas Market Present Another █████████████████
                        ███████████.................................................. 22

        B.      The Tribunal Imposed a Revised Contract Price That Is Entirely
                Consistent with the Position Advocated by Atlantic and, In Any Event, Is
                Not a "████ Price" ..................................................... 25

                1.      Atlantic Told the Tribunal That It Had Authority to Impose a
                        "████ Price" ............................................................... 25

                        a.      Atlantic Itself Argued That There Could Be Multiple End
                                User Markets under the Contract ................................. 26

                        b.      Atlantic Itself Argued for Specific Valuation of the Article
                                2.6 Destination Flexibility ......................................... 29

2. The Final Award Does Not Impose a '█████ Price" But, Rather, Represents a Rational Implementation of Atlantic's Own Request for a ███████████████████████████████████......... 31

IV. GNA Should Be Awarded Attorney's Fees and Costs .................................................... 33

CONCLUSION.............................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>CASES</u>

*Advance Publ'ns, Inc. v. Newspaper Guild of New York,*
    616 F.2d 614 (2d Cir. 1980)..........................................................................12

*Celsus Shipholding Corp. v. Pt. Pelayaran Kanaka Dwimitra Manunggal,*
    No. 06 CIV. 13598, 2008 U.S. Dist. LEXIS 12842
    (S.D.N.Y. Feb. 21, 2008)..............................................................................9

*Commercial Risk Reinsurance Co. v. Sec. Ins. Co.,*
    526 F. Supp. 2d 424 (S.D.N.Y. 2007).................................................11, 12

*D.H. Blair & Co., Inc. v. Gottdiener,*
    462 F.3d 95 (2d Cir. 2006).............................................................................9

*Donel Corp. v. Kosher Overseers Assoc. of Am., Inc.,*
    No. 92 CIV 8377, 2001 U.S. Dist. LEXIS 2314
    (S.D.N.Y. Mar. 9, 2001) ..............................................................................13

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,*
    333 F.3d 383 (2d Cir. 2003)............................................................9, 16, 17

*Essex Cement Co. v. Italmare, S.p.A.,*
    763 F. Supp. 55 (S.D.N.Y. 1991)................................................................18

*Hall Street Assocs. v. Mattel, Inc.,*
    128 S. Ct. 1396 (2008)........................................................8, 10, 15, 16, 17

*Local 1199, Drug, Hosp. and Health Care Employees Union v. Brooks Drug Co.,*
    956 F.2d 22 (2d Cir. 1992)........................................................................11, 12

*Melun Indus. v. Strange,*
    898 F. Supp. 990 (S.D.N.Y. 1990)..............................................................15

*Meyers v. Parex, Inc.,*
    689 F.2d 17 (2d Cir. 1982)............................................................................9

*NHL Players' Ass'n v. Bettman,*
    No. 93 Civ. 5769, 1994 U.S. Dist. LEXIS 21715
    (S.D.N.Y. Nov. 9, 1994) ..............................................................................13

*Nutrition 21, Inc. v. Wertheim,*
    150 Fed. Appx. 108 (2d Cir. 2005)..............................................................11

*Purgress v. Sharrock,*
    33 F.3d 134 (2d Cir. 1994)............................................................................7

*Saint Mary Home, Inc. v. SEIU, Dist. 1199,*
    116 F.3d 41 (2d Cir. 1997) ............................................................................ 17

*Saudi Iron & Steel Co. v. Stemcor USA, Inc.,*
    No. 97 CIV. 5976, 1997 U.S. Dist. LEXIS 20336
    (S.D.N.Y. Dec. 27, 1997) ............................................................................ 34

*Sunoco, Inc. v. Honeywell Int'l, Inc.,*
    No. 05 CIV 7984, 2006 U.S. Dist. LEXIS 11392
    (S.D.N.Y. Mar. 22, 2006) ....................................................................... 13, 14

*Telenor Mobile Communs. v. Storm LLC,*
    524 F. Supp. 2d 332 (S.D.N.Y. 2007) .............................................. 14, 15, 26

*United States v. GAF Corp.,*
    928 F.2d 1253 (2d Cir. 1991) ........................................................................ 7

*Vaughn v. Leeds,*
    04 CIV 8391, 2007 U.S. Dist. LEXIS 85587
    (S.D.N.Y. Nov. 19, 2007) .............................................................................. 9

*Wall Street Assocs., L.P. v. Becker Paribas, Inc.,*
    27 F.3d 845 (2d Cir. 1994) ............................................................................ 9

*Wallace v. Buttar,*
    378 F.3d 182 (2d Cir. 2004) ........................................................................ 16

*Westerbeke Corp. v. Daihatsu Motor Co.,*
    304 F.3d 200 (2d Cir. 2002) .............................................................. 11, 12, 16

*Wilko v. Swan,*
    346 U.S. 427 (1953) .................................................................................... 16

*Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,*
    103 F.3d 9 (2d Cir. 1997) .............................................................................. 9

*Wise v. Marriott Int'l, Inc.,*
    06 CIV 11439, 2007 U.S. Dist. LEXIS 70512
    (S.D.N.Y. Sept. 24, 2007) ............................................................................ 18

*Yonir Techs., Inc. v. Duration Sys. (1992) Ltd.,*
    244 F. Supp. 2d 195 (S.D.N.Y. 2002) .......................................................... 18

## PRELIMINARY STATEMENT

Petitioner, Gas Natural Aprovisionamientos SDG, S.A. ("GNA"), hereby submits this memorandum of law (*i*) in further support of its amended Petition for an Order Recognizing and Enforcing the Final Award dated January 17, 2008, as subsequently clarified and corrected on March 27, 2008 (the "Final Award");[1] and (*ii*) in opposition to the Cross-Motion to Vacate the Final Award dated April 16, 2008 filed by Atlantic LNG Company of Trinidad and Tobago ("Atlantic").

Atlantic's Cross-Motion to Vacate asks this Court to refuse to enforce and recognize a unanimous Final Award rendered by a highly distinguished and experienced Arbitral Tribunal. For over two years, the Tribunal heard from the Parties on complex issues of pricing liquefied natural gas ("LNG").[2] Pursuant to the broad arbitration clause in the LNG Sales Contract between the Parties (the "Contract"), the Tribunal was charged with a complicated task under a general mandate—*i.e.*, to determine whether a modification to the then-existing Contract Price formula was justified and, if so, to revise the formula in a manner that was "fair and equitable."

The Parties granted the Tribunal broad authority in Articles 8.5 and 18 of the Contract. Under Article 8.5, any price reopener claim that is not resolved through negotiation may be submitted to arbitration under Article 18, which provides generally:

---

[1]     On June 16, 2008, GNA amended its Petition to Enforce and Recognize the Final Award (the "Amended Petition") to reflect the Tribunal's Decision on Clarification and Corrections to the Final Award dated March 27, 2008 (the "Correction Decision").  As authorized by the Stipulation on Briefing Schedule (ECF Doc. 17), approved by the Court on February 27, 2008, GNA filed its Amended Petition *nunc pro tunc*.  Therefore, the Amended Petition has the effect of the earlier date of GNA's original Petition to Enforce and Recognize the Final Award (February 4, 2008).  A true and correct copy of the Final Award is attached as Exhibit A to the Declaration of George M. von Mehren in Support of GNA's Petition for Order Confirming Arbitration Award dated February 1, 2008 (the "von Mehren Declaration").  The Correction Decision is attached as Exhibit 22 to the Declaration of James G. Cavoli dated April 16, 2008 (the "Cavoli Declaration").

[2]     Capitalized terms not defined herein have the meaning ascribed to them in the Contract.

> Any dispute, controversy or claim arising out of or relating to this Contract, or the breach, termination or invalidity thereof (except for those disputes relating to technical matters that are to be submitted to an Expert for resolution in accordance with Article 16), shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules in effect on the date of this Contract. The appointing authority shall be the American Arbitration Association. Arbitration shall be conducted in the English language and shall be held at New York, New York, United States of America, unless another location is selected by mutual agreement of the Parties. The award rendered by the arbitrators shall be final and binding upon the Parties.[3]

The mandate of the Tribunal[4] in rendering its decision is set forth in Article 8.5(f), which calls for a "decision in accordance with the criteria set out in sub-Articles (b) and (c) above." In addition, Article 8.5(a) of the Contract provides that any revised Contract Price must be "fair and equitable." Atlantic opened the evidentiary hearings by stating that the "fair and equitable" standard applied to the Tribunal:

| | |
|---|---|
| ATLANTIC'S COUNSEL: | So the tribunal really has a clear choice. ***It can award a fair and equitable price revision, which is what Article 8.5 of the contract indicates it should do.*** The language is on the screen. It's highlighted. ***The parties have to seek agreement on a fair and equitable revision. And if they can't, it's the tribunal's mandate to impose one, if the circumstances require it.*** |

---

[3]    A copy of the Contract is attached as Exhibit B to the von Mehren Declaration.

[4]    Precisely because the Parties appreciated the extraordinarily complicated nature of the Tribunal's charge, each Party nominated an arbitrator—Professor Ben H. Sheppard for Atlantic and Mr. Eugene A. Massey for GNA—possessing a wealth of experience not only in international arbitration but also in LNG contracts and energy pricing disputes. Those two arbitrators then selected the chairman of the Tribunal, Mr. Gerald Aksen, a New York lawyer and one of the most experienced and well-respected international arbitrators in the world. Chairman Aksen has more than thirty years of experience as an arbitrator and as an adjunct professor of law at New York University School of Law teaching courses on commercial and international arbitration. He has chaired and acted as sole or co-arbitrator in more than 150 international arbitration cases in 18 countries. *See* http://www.thecca.net/bio.aspx?id=3 (last visited on June 13, 2008).

(Hearings Tr. at pp. 18-19 (emphasis added)).[5]  At the conclusion of the hearings, the Tribunal

confirmed both Parties' understanding that, if the preconditions to a revised Contract Price were

satisfied, Article 8.5(a) vested the Tribunal with the power to impose a "fair and equitable"

result:

| | |
|---|---|
| ARBITRATOR SHEPPARD: | [The fair and equitable standard is contained in Article 8.5](a).  I want to confirm, in opening statement *[counsel for Atlantic] said fair and equitable is a standard that applies; is that correct?* |
| ATLANTIC'S COUNSEL: | *That's correct.* |
| ARBITRATOR SHEPPARD: | And [I] read [GNA's] latest brief to say that *you agree that we should also apply fair and equitable?* |
| GNA'S COUNSEL: | *Yes.* |

(Hearings Tr. at p. 2860 (emphasis added)).

Operating under this general grant of authority, the Tribunal carefully analyzed and

considered over 1,000 pages of combined legal briefing and several thousand pages of witness

statements and fact documents.  (*See* ECF Doc. 19, Atlantic's Letter to J. Cote dated April 10,

2008, at p. 1).  It conducted a nine-day evidentiary hearing with live testimony from seven fact

witnesses and five experts.  It then held a two-day evidentiary hearing on a numbers-intensive

"Value Chart"[6] designed to isolate distinctions between the Parties' assessment of natural gas

---

        [5]        Relevant pages of the hearing transcripts are attached as Exhibit N to the Reply
Declaration of George M. von Mehren dated June 13, 2008 (the "Reply von Mehren Declaration").

        [6]        To demonstrate how complex the evidence was before the Tribunal, each Party was
required, as part of the preparation of the Value Chart, to submit evidence in support of its calculations
and as to all costs and revenues factored into net revenue calculations, including the cost of purchasing
the LNG, transportation costs, inland regasification and pipeline transportation costs, end user prices, and
actual revenues from the resale of Train 1 LNG reflected in invoices, as supplemented by additional
sources of revenue and net of additional costs for both sales into the Spanish market and the ██████
██████ (*See* Atlantic's First Post-Hearing Memorandum, dated August 24, 2007 ("Atlantic PHB1"),
¶¶ 148-160, attached as Exhibit O to the Reply von Mehren Declaration; Atlantic's Second Post-Hearing
Memorandum, dated October 12, 2007 ("Atlantic PHB2"), ¶¶ 3, 215, attached as Exhibit P to the Reply

values in the relevant markets and to minimize methodological differences in each Party's calculations.  Finally, the Tribunal concluded with a two-day closing argument to test the Parties' reasoning with respect to a number of fundamental issues (in advance of which the Tribunal provided the Parties a list of questions that it would ask at the closing argument[7]).  All told, the Tribunal considered over twenty written submissions and heard 3,034 pages of live testimony and argument.  (*See id.* at p. 2).

In the end, the Tribunal reached a unanimous decision.  It issued its Final Award, which resolved some issues in favor of Atlantic and some issues in favor of GNA.  More fundamentally, the Final Award solved the commercial problem at the heart of this dispute by imposing a revised Contract Price.  In application, the revised Contract Price results in a higher price during some periods (thus benefiting Atlantic) and a lower price during others (thus benefiting GNA), depending on fluctuating market conditions.  For example, during the entire year in which Atlantic filed the Price Reopener Notice (2005), the revised Contract Price is significantly higher than the old Contract Price.

---

von Mehren Declaration).  To that end, GNA provided all documentation and related information available and compiled it into a 164-page submission.  (*See* GNA's Value Calculations and Production of Confidential Material, dated May 29, 2007, ¶¶ 108-152 and appendices 13-28, attached as Exhibit Q to the Reply von Mehren Declaration).  Demonstrating how open and transparent GNA was with its pricing information before the Tribunal, GNA also provided Atlantic and the Tribunal with all the explanations and details related to that submission and as requested by both Atlantic and the Tribunal, including information about alleged related transactions.  For two days, the Tribunal was actively engaged in hearing and questioning the evidence and submissions on these technical matters and on Atlantic's baseless accusation that GNA was achieving additional revenue related to Train 1 value through related transactions.  (*See* Hearings Tr. at pp. 2542-2587).  This Court does not have the benefit of all this evidence.

[7]     The letter from the Tribunal listing questions for the Parties to address at the closing argument, sent in an email dated November 7, 2007, is attached as Exhibit 18 to the Cavoli Declaration.

On February 15, 2008 (two weeks after GNA had filed its Petition to Recognize and Enforce the Final Award[8]), Atlantic requested that the Tribunal "correct" the Final Award by substituting its use of ██████████████ prices for ████████████ adjustment calculation embedded in the revised Contract Price.[9]  On March 27, 2008, the Tribunal granted the request in its Correction Decision, shifting ████████████ of the retroactive balancing payment back to Atlantic.  (Correction Decision ¶¶ 27-32).  GNA, however, has not sought to vacate the Correction Decision because both Parties agreed in the Contract that such decisions belong to the Tribunal—and the Tribunal alone.

Despite this modification, Atlantic seeks to vacate the Final Award.  It accuses the Tribunal of exceeding its authority, manifestly disregarding the law, violating public policy, and depriving Atlantic of due process.  (Cross-Motion to Vacate at 12, 16 n.38, 19 n.41, 30).  The Tribunal did all of these things, says Atlantic, by supposedly (*i*) revising the Contract Price after it concluded that the preconditions in Article 8.5(a) were not satisfied and (*ii*) imposing a "████ price."  In fact, the Tribunal did neither.

***First***, Atlantic claims that the Tribunal was not permitted to revise the Contract Price because it concluded that the "preconditions" to doing so were not satisfied.  That is simply not true.  Atlantic's argument proceeds on the false premise that the Tribunal concluded the "██████████████████ Article 8.5(a) was the general concept of "liberalization" of the Spanish natural gas market and that both Parties expected that event when they executed the Contract in 1995.  Because the Tribunal found that "liberalization" was expected, so the

---

[8]    On several occasions in its Cross-Motion to Vacate, Atlantic oddly appears to criticize GNA for claiming ████████████ for the balancing payment in its Petition, calling that claim "wildly inflated."  (Cross-Motion to Vacate at 7 n.18).  But Atlantic never disputes that, as of the date that GNA filed its original Petition, that was the amount of the balancing payment.

[9]    Atlantic's Request for Clarification and/or Correction with Respect to Certain Aspects of the Final Award, dated February 15, 2008, is attached as Exhibit 19 to the Cavoli Declaration.

argument runs, it could not have also found that ███████████████████████████ under Article 8.5(a).

Contrary to Atlantic's misreading of the Final Award, the Tribunal plainly found ██████ ███████████████████████████████████████████████████ (*i*) the unexpected *economic effects* of liberalization, which included ████████████████████ ██████████████████" (Final Award ¶ 45); and (*ii*) the smaller increase in natural gas prices in Spain relative to those in ██████████, which resulted in GNA entering into a firm resale contract with █████ to place substantially all Train 1 LNG in █████████ The Tribunal explained that the latter change was unexpected because in 1995 "the price formula was structured around the Spanish market with the expectation that Spain would be the primary market for the Train 1 LNG." (*Id.* ¶¶ 44-45).

It can hardly be questioned that the Tribunal had the authority to make these findings or that *either* of them suffices as a precondition to revising the Contract Price under Article 8.5(a). Indeed, Atlantic itself told the Tribunal that the evidence at the hearings "has established the requisite changed circumstances beyond any reasonable dispute." (Atlantic PHB1 ¶ 6).

***Second***, Atlantic argues that, if the Tribunal properly concluded that the preconditions were satisfied, it nevertheless improperly imposed a '██████' (Cross-Motion to Vacate at 20). Even assuming that the Tribunal imposed a '██████' (it did not, as discussed below), Atlantic conceded that such a price was within the authority of the Tribunal. The following is a direct quote from Atlantic's First Post-Hearing Brief in response to a question from the Tribunal about whether it had the authority to impose a '██████':[10]

---

[10]    *See* Letter from Tribunal Listing Questions for the Parties to Address in the post-hearing briefs, dated June 20, 2007, attached as Exhibit 13 to the Cavoli Declaration.

> Atlantic believes that it might be theoretically "possible" to operate under ████████████████████—one designed to result in a Contract Price that reflects ████████████ and the other designed to result in a Contract Price that reflects the value of natural gas in Spain. . . . ***The terms of Articles 8.5 and 18 do not appear to expressly limit this Tribunal's award to the imposition of a*** ████ ***pricing formula***.

(Atlantic PHB1 ¶ 90, n.44 (emphasis added)).  As Atlantic itself says in its Cross-Motion to Vacate, such statements are "binding admissions." (*See* Cross-Motion to Vacate at 14 n.35 (citing *Purgress v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994); *United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991))).

Nor did the Tribunal impose a "████████" at all.  Rather, the Tribunal imposed a ████ ████████████████████████████████████████████████ if any, of diversion of cargoes from Spain, ████████████  Atlantic's complaint about this approach is particularly disingenuous because Atlantic's counsel *asked* the Tribunal to impose that pricing structure on the final day of the closing argument.  He did so, ironically enough, in an attempt to avoid a "████████" that he supposedly thought would be appealed by GNA if adopted by the Tribunal.  For that reason, he stated that if the Tribunal adopted such a ████████████████████ ████, it could not be subject to a "judicial challenge":

> It has been agreed that Atlantic is entitled to ██████████████  It's incorporated in their formulas that have been submitted. It's incorporated in our formulas.  If it avoids post-arbitral litigation which, while remunerative to the lawyers does nothing for the clients, *I would urge the Tribunal to consider keeping* ████████ ███████████████████████ *as we have suggested be had.  Because that,* ***I don't see how there can be a judicial challenge to that***.

(Hearings Tr. at pp. 2921-2922 (emphasis added)).

The Tribunal listened to Atlantic.  On January 17, 2008, the Tribunal rendered its Final Award, explicitly referencing the foregoing statement from Atlantic's counsel and adopting that

proposal with a "variation." (Final Award ¶ 76). In effect, the Tribunal adopted Atlantic's

proposal for a ██████████████████████████████████ but made a

"variation" to the proposal by providing a ████████████████████████

████████ (as Atlantic had proposed).

The revised Contract Price adopted by the Tribunal is very different from ████████

████████ Indeed, the reason that GNA objected to ████████████ was *avoided* by

the Tribunal's adoption of a ████████████████████ which applies

during ████████ in which a ████████████████████████████

████ In particular, GNA objected to ████████████ because they would conflict

with numerous provisions in the Contract. For example, the application of ████████████

████████████████████████████████████

██████████████████ would render the contractually-required ████████████

████████ provision meaningless or incomprehensible. (*See* Hearings Tr. at p. 2900). That

problem, however, was avoided by the Tribunal's adoption of a ████████████████

████████████

In sum, the Tribunal was specifically empowered to decide the very two issues that

Atlantic claims were outside its jurisdiction to decide: (*i*) whether a revised Contract Price was

justified; and (*ii*) if so, the determination of a "fair and equitable" revised Contract Price.

Because Atlantic's Cross-Motion to Vacate fails to satisfy its heavy burden of showing that

vacatur is warranted, it should be denied and GNA's amended Petition for Recognition and

Enforcement of the Final Award should be granted.[11]

---

[11]    *See Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396, 1402 (2008) ("Under the terms of § 9 [of the Federal Arbitration Act ("FAA")], a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11.").

## LAW AND ANALYSIS

**I.      JUDICIAL REVIEW OF ARBITRATION AWARDS IS SEVERELY LIMITED.**

The Second Circuit has described the scope of judicial review of an arbitration award as "severely" and "extremely" limited.  *See Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997); *Wall Street Assocs., L.P. v. Becker Paribas, Inc.,* 27 F.3d 845, 849 (2d Cir. 1994); *see also Vaughn v. Leeds*, 04 CIV 8391, 2007 U.S. Dist. LEXIS 85587, at *12 (S.D.N.Y. Nov. 19, 2007) (Cote, J.) (noting that the Second Circuit has rejected the "invitation" to expand the grounds for vacatur in the way some other Circuits have).  Therefore, "an arbitration award will not be vacated when the arbitrator explains his decision 'in terms that offer *even a barely colorable justification for the outcome reached,' even if the arbitrator's interpretation of the contract is clearly erroneous.*"  *Meyers v. Parex, Inc.*, 689 F.2d 17, 18 (2d Cir. 1982) (internal citations omitted) (emphasis added).

In accord with the limited judicial review and strong policies favoring enforcement, the showing required to avoid confirmation of an arbitral award is "very high."  *Celsus Shipholding Corp. v. Pt. Pelayaran Kanaka Dwimitra Manunggal*, No. 06 CIV. 13598, 2008 U.S. Dist. LEXIS 12842, at *4 (S.D.N.Y. Feb. 21, 2008) (Cote, J.) (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).  "[A] party moving to vacate an award bears 'the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law.'"  *Id.* (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003)).  In particular, "[g]iven the strong public policy in favor of international arbitration, review of arbitral awards under the New York Convention is very limited."  *Id.* (citations omitted).

Against the heavy presumption in favor of recognizing and enforcing the Final Award, Atlantic relies on four grounds for vacatur:  (*i*) the Tribunal exceeded the scope of its authority;

(*ii*) the Tribunal manifestly disregarded the law; (*iii*) the Tribunal's Final Award contravenes

public policy; and (*iv*) the Tribunal deprived Atlantic of due process. Section II below addresses

each alleged basis for vacatur in turn, demonstrating that this Court would be required to enforce

and recognize the Final Award *even if* Atlantic were correct that the Tribunal made substantive

errors. Section III then explains that, in any event, the Tribunal did not err at all.

## II.    ATLANTIC'S IMPROPER ATTEMPTS TO REARGUE THE MERITS PROVIDE NO BASIS FOR VACATING THE FINAL AWARD.

The law is clear that vacatur on any ground sought by Atlantic requires far more than

alleged substantive errors in the Tribunal's interpretation of the Contract. *See Hall Street Assoc.,*

*L.L.C. v. Mattel, Inc.,* 128 S. Ct. 1396, 1402 (2008). There can be no dispute that the Tribunal

was authorized to decide both whether the conditions for a price reopener were satisfied and, if

so, how to adjust the Contract Price formula. Indeed, that was precisely the Tribunal's charge.

The Tribunal's authority to decide both issues derives directly from the Contract. Article 8.5(a)

provides that, once a Price Reopener is initiated, the Parties "should forthwith enter into

negotiations to determine whether or not such changed circumstances exist and justify a revision

of the Contract Price provisions and, if so, to seek agreement on a fair and equitable revision of

the above mentioned Contract Price provisions in accordance with the remaining provisions of

this Article 8.5."

In the event that the Parties do not reach agreement within six months on those two issues

(the same issues on which Atlantic bases its Cross-Motion to Vacate), Article 8.5(f) provides that

"either Party may submit the matter to arbitration for decision." Atlantic did precisely that. At

no time during the ensuing proceedings did Atlantic challenge the Tribunal's authority to decide

the two issues it now says were beyond the scope of the Tribunal's jurisdiction. In fact, Atlantic

specifically asked the Tribunal to decide both of these issues. The law does not permit Atlantic

to raise a nominal *ex post* challenge to the Tribunal's authority to obtain judicial review of the merits of the very determinations that the Tribunal was impaneled to make.

**A.    The Tribunal Did Not Exceed the Scope of Its Authority in the Final Award.**

Atlantic first argues that the Tribunal exceeded its scope of authority in rendering the Final Award.  This argument is predicated on Section 10(a)(4) of the FAA, which authorizes vacatur of an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).  The Second Circuit has "consistently accorded the narrowest of readings to the Arbitration Act's authorization to vacate awards [pursuant to § 10(a)(4)] especially where that language has been invoked in the context of arbitrators' alleged failure to correctly decide a question which all concede to have been properly submitted in the first instance." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 220 (2d Cir. 2002) (citation omitted).  In fact, "[c]hallenges to arbitration awards on the ground that the arbitrators exceeded their powers are subject to the same rigorous test that governs allegations of arbitration misconduct." *Commercial Risk Reinsurance Co. v. Sec. Ins. Co.*, 526 F. Supp. 2d 424, 432 (S.D.N.Y. 2007).

The question of whether the Tribunal exceeded the scope of its authority "focuses on whether the [Tribunal] had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the [Tribunal] correctly decided that issue." *Westerbeke*, 304 F.3d at 220 (citation omitted).  The Second Circuit has repeatedly explained that "an arbitrator acts within the scope of her authority *as long as the arbitrator is even arguably construing or applying the contract.*" *Nutrition 21, Inc. v. Wertheim*, 150 Fed. Appx. 108, 109 (2d. Cir. 2005) (citing *Local 1199, Drug, Hosp. and Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 25-26 (2d Cir. 1992)) (emphasis added).  Further, courts must

11

"give the arbitral judgment the most liberal reading possible." *Westerbeke*, 304 F.3d at 212 n.8; *see also Local 1199*, 956 F.2d at 26 ("Our task, however, is not to review the accuracy of the arbitrator's construction of the [contract term] . . . [w]e need only determine whether he arguably was interpreting the [contract term]"). Atlantic cannot seriously contend here that the Tribunal was not *at the very least* "arguably" construing or applying the Contract in determining that the conditions for a Price Reopener had been satisfied and in establishing a "fair and equitable" revised Contract Price.

Indeed, even assuming that the Tribunal misinterpreted the Contract as Atlantic argues, vacatur of the Final Award would still be unwarranted. *See, e.g.*, *Commercial Risk*, 526 F. Supp. 2d at 432 ("[T]o the extent Commercial Risk's challenge rests on the panel's alleged misinterpretation or misapplication of the Treaties, its motion to vacate must fail. The interpretation of contractual terms by arbitrators is not subject to judicial challenge, even when the award may be grounded on an erroneous construction of the parties' agreement"); *Advance Publ'ns, Inc. v. Newspaper Guild of New York*, 616 F.2d 614, 618 (2d. Cir. 1980) ("But it must be remembered that the parties to a contract containing a broad arbitration clause . . . have agreed to accept the judgment of an arbitrator, not that of a judge. By doing so, each party also accepts the risk that the arbitrator's interpretation of the contract will disagree with its own and may, in fact, be wrong").

This Circuit has consistently rejected attempts to obtain vacatur of an award by recasting disagreement with the merits of an award as an argument that the arbitrators exceeded their authority or manifestly disregarded the law. *See, e.g.*, *Westerbeke*, 304 F.3d at 211 ("Although [the] appeal ostensibly challenges the arbitrator's manifest disregard of New York's law of damages, a closer examination of the arguments . . . reveals that, in fact, Daihatsu contests the tribunal's allegedly impermissible reading of the CSA as a contract with condition precedent.");

*Donel Corp. v. Kosher Overseers Assoc. of Am., Inc.*, No. 92 CIV 8377, 2001 U.S. Dist. LEXIS 2314, at *14 (S.D.N.Y., Mar. 9, 2001) (Cote, J.) (rejecting argument that arbitrator exceeded the scope of his authority because the party's "real objection appears to be that the arbitrator committed a legal error . . . . The Court does not, however, review an arbitration award for legal errors"); *NHL Players' Ass'n v. Bettman*, No. 93 Civ. 5769, 1994 U.S. Dist. LEXIS 21715, at *105-106 (S.D.N.Y., Nov. 9, 1994) (finding no basis for challenge to award on ground that arbitrator exceeded the scope of his authority and noting that "[i]n substance, Miller's real complaint is that he disagrees with [the arbitrator's] interpretation of this provision, but that is not a basis for vacating the decision").

In *Sunoco, Inc. v. Honeywell Int'l, Inc.*, No. 05 CIV 7984, 2006 U.S. Dist. LEXIS 11392 (S.D.N.Y. Mar. 22, 2006) (Cote, J.), this very Court rejected arguments strikingly similar to those advanced by Atlantic here. In *Sunoco*, Honeywell sought confirmation of arbitration awards rendered in connection with a "damages arbitration" arising from Sunoco's manipulation of a pricing formula to overcharge for a certain commodity. *Id.* at *1-2. In addition to awarding damages for the years 2003 and 2004, the arbitrator determined that it was appropriate to award ongoing damages for the year 2005 as the arbitration proceeded and to determine a "reasonable price" for the commodity to be in effect until an anticipated "Reopener Arbitration" commenced at the beginning of 2006. *Id.* at *4-6.

Despite the fact that it submitted to the arbitrator the question of whether damages were limited to the period prior to 2005, Sunoco claimed that the arbitrator exceeded the scope of his authority by "setting a new pricing methodology" without authority in the contract. *Id.* at *7-8, 13-14. Rejecting that argument, this Court explained that "[h]aving thus agreed to submit such matters to the Arbitrator, Sunoco cannot now be heard to argue that the Arbitrator's decision is entitled to less deference merely because Sunoco dislikes the outcome." *Id.* at *11. This Court

likewise concluded that it was obliged to confirm the award because the applicable arbitral rules

(in that case, the American Arbitration Association Arbitration Rules) delegated issues

concerning the scope of the arbitrators' authority to the arbitrators themselves.  *Id.* at *10.

Similarly, in the instant case, Article 21 of the UNCITRAL Arbitration Rules[12] provides:

> The arbitral tribunal shall have the power to rule on objections that
> it has no jurisdiction, including any objections with respect to the
> existence or validity of the arbitration clause or of the separate
> arbitration agreement.

Thus, like the respondent in *Sunoco*, Atlantic here agreed under the applicable arbitration rules to

submit the issue of arbitrator authority to the arbitrators *themselves.*  And like the respondent in

*Sunoco*, Atlantic cannot now be heard to argue that the Tribunal's Final Award is entitled to less

deference merely because it dislikes the outcome.  This is especially so where, as here, both

Parties expressly acknowledged that, if the preconditions to a revised Contract Price were

satisfied, the Tribunal had the authority to impose what it considered a "fair and equitable"

result.

Similarly analogous to this case is *Telenor Mobile Communs. v. Storm LLC*, 524 F. Supp.

2d 332 (S.D.N.Y. 2007).  In *Telenor*, the party seeking vacatur argued that the arbitrators

exceeded the scope of their authority by awarding certain remedies, including conditional

divestiture of shares and an anti-suit injunction.  *Id.* at 358-59.  The court flatly rejected that

request, explaining:

> 'Arbitrators . . . enjoy broad discretion to create remedies unless
> the parties' agreement specifically limits this power.'  'While an
> arbitrator's award must "draw its essence" from the parties'
> agreement . . . the effectiveness of arbitration in resolving
> complicated commercial disputes would be severely undermined if
> arbitrators were limited to the mechanical application of contested
> contractual provisions.'  If the arbitration clause does not include

---

[12]    A copy of the UNCITRAL Arbitration Rules is attached as Exhibit L to the von Mehren Declaration.

> any limit on the arbitrators' powers to craft a remedy, a respondent
> must 'overcome a powerful presumption that the arbitral body
> acted within its powers.' Accordingly, while an arbitrator may not
> award relief expressly forbidden by the agreement of the parties,
> an arbitrator may award relief not sought by either party, so long as
> the relief lies within the broad discretion conferred by the FAA.

*Id.* at 359 (internal citations omitted). The court thus found that the arbitrators did not exceed the

scope of their authority, as the agreement between the parties did not limit the arbitrators'

remedial powers and, in fact, provided them with "*the power to grant any remedy or relief that*

*they deem just and equitable.*" *Id.* (internal quotations omitted) (emphasis added).[13] Likewise,

the Tribunal here was empowered by the Parties with broad authority to fashion a "fair and

equitable" Contract Price if the preconditions were satisfied. It did just that. Accordingly,

Atlantic's contention that the Tribunal exceeded the scope of its authority is without merit.

**B.    The United States Supreme Court's Recent Decision Indicates That "Manifest Disregard of the Law" Is Not an Independent Ground for Vacatur under the FAA.**

Atlantic next asserts in a footnote that the Final Award should be vacated because the

Tribunal manifestly disregarded the law. (Cross-Motion to Vacate at 16 n.38). Atlantic cites to

no law that the Tribunal could have manifestly disregarded. In any event, a recent March 25,

2008 opinion from the United States Supreme Court indicates that "manifest disregard of the

law" is not an independent ground for vacatur under the FAA. *Hall Street Assoc., L.L.C. v.*

*Mattel, Inc.,* 128 S. Ct. 1396, 1400-01 (2008).

In *Hall Street*, the petitioner made the same argument that Atlantic makes here: that in

addition to vacating a tribunal's arbitration award on the basis of the statutory grounds for

---

[13]    In footnote 38 of its Cross-Motion to Vacate, Atlantic quotes from a case in which the
court concluded that an arbitrator exceeded its authority because the contract "d[id] not empower the
arbitrator . . . to determine a 'fair' sale price for the company." Cross-Motion to Vacate at 16 n.38
(quoting *Melun Indus. v. Strange*, 898 F. Supp. 990, 992 (S.D.N.Y. 1990)). In sharp contrast, the
Contract at issue in this case explicitly *does* empower the Tribunal to determine a "fair and equitable"
revised Contract Price. Thus, Atlantic's reliance on *Melun Indus.* undermines, rather than supports, its
position that vacatur is appropriate in this case.

vacatur in Section 10 of FAA, the award can be vacated based on errors of law.  The petitioner in

*Hall Street* relied on explicit language in an arbitration contract providing for "general review for

an arbitrator's legal errors." *Id.* at 1404.  As support for its position, the petitioner argued that

the "manifest disregard of the law" standard—which is not expressly set forth in the FAA—had

been a judicially-created ground for vacatur since *Wilko v. Swan*, 346 U.S. 427 (1953).  The

petitioner therefore argued that, because judges can add grounds to vacate under the FAA, so can

contracting parties.  *Id.* at 1403.

　　The Supreme Court rejected the argument, stating that "there is vagueness in *Wilko*'s

phrasing.  Maybe the term 'manifest disregard' was meant to name a new ground for review, but

maybe it merely referred to the § 10 grounds collectively, rather than adding to them."  *Id.* at

1404.  Focusing on the ambiguous language in *Wilko*, the Court concluded that "now that its

meaning is implicated, we see no reason to accord [*Wilko*] the significance that Hall Street

urges," *id.*, and held that "the grounds for vacatur and modification provided by §§ 10 and 11 of

the FAA are exclusive," *id.* at 1400.  Indeed, the exclusivity of the statutory grounds in Sections

10 and 11 of the FAA is the Supreme Court's principal holding, repeated throughout its *Hall

Street* opinion.[14]

---

[14]　　Even prior to *Hall Street*, courts characterized this ground for vacatur as "a doctrine of
last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety
on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Duferco*,
333 F.3d at 389 (2d Cir. 2003); *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) ("Our cases
demonstrate that we have used the manifest disregard of law doctrine to vacate arbitral awards only in the
most egregious instances of misapplication of legal principles."); *Westerbeke*, 304 F.3d at 208.  Because
the standard for vacating an award on the ground of manifest disregard of the law was "so very high," a
court reviewed "*only for a clear demonstration that the panel intentionally defied the law.*" *Duferco*, 333
F.3d at 393 (emphasis added).

　　In the specific context here—*i.e.*, interpretation of a commercial contract—this ground for
vacatur was "appropriate only if the arbitral award contradicts an express and unambiguous term of the
contract or if the award so far departs from the terms of the agreement that it is not even arguably derived
from the contract." *Westerbeke*, 304 F.3d at 222.  In this case, the Final Award *itself*—which repeatedly
references and interprets the Contract—is sufficient evidence to rebut any claim that the Final Award is
"not even arguably derived from the contract."  Nor has Atlantic demonstrated that the Tribunal failed to

Accordingly, *Hall Street* indicates that "manifest disregard of the law" is not an independent ground for seeking vacatur under the FAA. It therefore should not be considered independent of Atlantic's other arguments for vacatur.

## C. Atlantic's Public Policy and Due Process Arguments Are Unavailing.

The final two grounds on which Atlantic purports to seek vacatur—public policy and due process—are rare and difficult to establish. Vacatur of an arbitral award on the ground of public policy is appropriate "only in those rare cases when enforcement of the award would be directly at odds with a well defined and dominant public policy resting on clear law and legal precedent." *Saint Mary Home, Inc. v. SEIU, Dist. 1199*, 116 F.3d 41, 46 (2d Cir. 1997).

In view of this controlling authority, Atlantic's public policy argument must fail. To obtain vacatur of an arbitral award on the ground of public policy, a party must show (*i*) that there is a clearly defined public policy and (*ii*) that enforcement of the award would be "directly" at odds with it. *Id.* Atlantic claims that enforcement of the Final Award would contravene the public policy that "a contract be applied and enforced *as written*." (Cross-Motion to Vacate at 19, n.41). Atlantic cannot contend, however, that the Tribunal relied on evidence outside the Contract or disregarded the relevant contractual provisions altogether. The Tribunal quoted the ███████████████████ provision in Article 8.5(a) and expressly found that ██████l ████████████████████████████ when the Contract was executed. (Final Award ¶ 45). At bottom, Atlantic's argument is nothing more than that the Tribunal erred in its interpretation of contractual language—an argument that falls far short of meeting the high standard to vacate an arbitral award on public policy grounds.

---

follow any particular "clearly governing legal principle"—much less that it did so intentionally. In short, this ground for vacatur was reserved for "egregious impropriety on the part of the arbitrators"—something Atlantic can hardly demonstrate here. *See Duferco*, 333 F.3d at 389.

Atlantic's due process argument is similarly unmoving. Vacatur is not available on due process grounds where, as here, the party seeking vacatur has been given ample opportunity to be heard. *See Essex Cement Co. v. Italmare, S.p.A.*, 763 F. Supp. 55, 58 (S.D.N.Y. 1991) ("[I]n the face of a record which indicates that the arbitrators held five separate hearings, heard testimony from eight witnesses, and accepted eighty-six exhibits, post-hearing and reply briefs . . . respondent's due process claim borders on the frivolous"); *Yonir Techs., Inc. v. Duration Sys. (1992) Ltd.*, 244 F. Supp. 2d 195, 208-209 (S.D.N.Y. 2002); *Wise v. Marriott Int'l, Inc.*, 2007 U.S. Dist. LEXIS 70512, at *15-16 (S.D.N.Y. Sept. 24, 2007).

On the heels of a proceeding in which Atlantic made more than ten written legal submissions (several in excess of 100 pages) and participated in nine days of witness and expert testimony, two additional hearing days to address discrepancies between experts, and two days of closing arguments (before which the Parties were presented with a list of questions the Tribunal would ask), it is hard to understand how much more "due process" Atlantic could have received. Indeed, *every* element of the revised Contract Price formula was argued by the lawyers and the experts to the Tribunal. There was no part of the formula—***none***—that was not fully vetted by the Parties and the Tribunal prior to the issuance of the Final Award. And when asked by the Tribunal whether it could impose a "██████," Atlantic answered *in the affirmative*. (*See* Atlantic PHB1 ¶ 90, n.44). In effect, Atlantic's argument is that due process required the Tribunal to circulate the Final Award to the Parties for their comments prior to its issuance. The Tribunal is under no such requirement any more than a court is required to submit its decisions for comment before their issuance.

III.    **BASED ON THE EVIDENCE AND ARGUMENTS PRESENTED, THE TRIBUNAL PROPERLY FOUND THAT A PRICE ADJUSTMENT WAS JUSTIFIED AND IMPOSED THE REVISED CONTRACT PRICE.**

Although it should not be necessary under the applicable standard of review established by the Second Circuit and the Supreme Court to argue the details of Atlantic's arguments, GNA is reluctant to leave Atlantic's inaccurate assertions uncorrected. GNA therefore explains below that, in any event, the Tribunal did not make substantive errors in rendering the Final Award.

A.    **The Tribunal Properly Held that the Price Adjustment Was Justified.**

Atlantic's first allegation of a substantive error in the Final Award is that, because the Tribunal found that the "liberalized market was foreseen by both sides," the Tribunal was prohibited from finding that either Party had satisfied the precondition of Article 8.5(a). To make this argument, Atlantic wrenches out of context certain of the Tribunal's statements while substantially ignoring the language of the Contract and the evidence of economic change presented *by both Parties* and accepted by the Tribunal.

Article 8.5(a) does not require any finding as to "liberalization" in order to adjust the Contract Price. What Article 8.5(a) says is that a revised Contract Price is justified if "█████████ ████████████████████████████████████████████" from what the requesting Party reasonably expected when the Contract Price was last established. The evidence and argument in the extensive hearings before the Tribunal allowed the arbitrators to determine that there were such ██████████████████ and that they were beyond the expectations of the requesting Party. Inasmuch as the Tribunal made findings of fact based on evidence establishing ██████████ ████████████████████, it cannot be said that it exceeded its authority.

In point of fact, both Atlantic and GNA argued in the proceedings below that there had been ████████████████████████████ under Article 8.5(a). Atlantic's First Post-Hearing Memorandum advised that "there can be no doubt on the present record that ████████

19

███████████████████ have changed substantially since 1995." (Atlantic PHB1 ¶ 4).  GNA's

First Post-Hearing Memorandum said the same thing:  "The liberalization of the Spanish natural

gas market and its effects (*i.e.*, gas-to-gas competition and the ████████████████████

██████████████████████) were █████████████████ that substantially

changed as compared to when the Parties executed the Contract in 1995."[15]

Indeed, Atlantic advocated two independent grounds for finding that the "preconditional"

showing of a ███████████████████ had been satisfied: (*i*) the speed and intensity

of liberalization of the natural gas market in Spain and (*ii*) changes in ███████████████

██████ had impacted the value of natural gas in Spain.  (Atlantic PHB1 ¶ 5).  As detailed below,

the Tribunal took evidence on, and essentially adopted elements of, both grounds proffered by

Atlantic.  The Tribunal explained:

> At the time the Contract was signed in 1995, Spain priced natural gas
> ██████████████████████████████████████████████
> *The price formula was structured around the Spanish market with the*
> *expectation that Spain would be the primary market for the Train 1*
> *LNG. . . .*
>
> ██████████████████ *have occurred since 1995.  First, the*
> *Spanish natural gas market has been substantially liberalized, resulting*
> *in natural gas prices* ████████████████████  *Second,*
> *because of the attractiveness of the* █████████████ *GNA has*
> *entered into long term resale contracts with* ████████ *. . . As a result*
> *changes in* ███████████████████ *are significantly different from*
> *changes in the actual value of natural gas in* ████████████

(Final Award ¶¶ 44-45 (emphasis added)).  As discussed below, the Tribunal's conclusions were

entirely consistent with the evidence and arguments proffered by the Parties.

---

[15]    (GNA's First Post-Hearing Submission ("GNA PHB1") ¶ 124, attached as Exhibit 15 to
the Cavoli Declaration).

1.     **The Tribunal Concluded That "Rapid Liberalization" Was a Significant and Unexpected Change Resulting in a Disconnect Between the Contract Price and Market Values.**

The evidence from both Parties was that the *economic impact*—including the speed and intensity—of liberalization of the Spanish natural gas market was a ████████████████████ ████████████████. Atlantic's expert Graham Weale summarized the ████████████ ████████████████████████████. In Atlantic's own words:

> Weale first focused on what he described as "*very radical liberalization*" in Spain. *Weale* 1541:15-16. . . . In sum, the record is quite clear that liberalization of the Spanish natural gas market has been a ████████████ ████████████████████████1995, that Atlantic did not expect such a change at that time, and that Atlantic's expectations in that regard were reasonable.

(Atlantic PHB1 ¶¶ 7, 11 (emphasis added)).

The evidence from GNA witnesses was not much different. Although GNA opened the nine-day evidentiary hearing questioning whether the mere fact of *legal* "liberalization" (*i.e.*, a change in the "law books") could satisfy the ████████████████████requirement, the evidence presented at hearing supported the Tribunal's finding that the speed and extent of the impact of liberalization reflected unexpected,█████████████████████████████

Indeed, Atlantic *itself* stated that GNA's witnesses provided evidence of a "████████ ████████" for purposes of Article 8.5(a) that justified a revised Contract Price.

> GNA's claim that liberalization was a legal,████████████████ . . . is contrary to the plain meaning of "████████████████" More importantly, it is contrary to the testimony of GNA's own witnesses. [GNA's witness] Gregorio Escudero testified, in no uncertain terms, that liberalization was, in fact,███████████████████
> *See Escudero,* 825:9-15 ("liberalization I think is ████████████ ████████yes."). [GNA's witness] Carlos Humphrey, referring to Spanish liberalization and the price reopener provision, said the same thing. *See Humphrey,* 682:25-683:4 ("Yeah . . . when you get right down to it there has been ████████████████████").

(Atlantic PHB1 ¶ 12).

The Tribunal ultimately concluded that both Parties foresaw the possibility of liberalization of the Spanish gas market, ***but also concluded that the Parties did not foresee its economic impact***—*i.e.*, that natural gas prices ████████████████████ ████████████████████ and that this ████████████████ would drive GNA's end user market from Spain to ██████████.[16] By focusing on the ████████ import of these changes, rather than the label of "liberalization," the Tribunal thus focused on the ████████ ████████████████—precisely as Article 8.5(a) requires. The Tribunal observed that "[a]lthough the liberalization market was foreseen by both sides, the real test is whether those developments ████████████████████████████████████████ ████████████████" (Final Award ¶ 44). This is hardly "rewriting" the Contract, as Atlantic wrongly alleges; it is simply interpreting it—as was the Tribunal's charge to do.

> **2.    The Tribunal Concluded That New Price Drivers in the Spanish Natural Gas Market Present Another '████████████████████████████**

Atlantic also argued during the arbitration that the introduction of gas-to-gas competition in Spain and ████ market forces radically changed the ████████████████████ Atlantic told the Tribunal that "LNG prices in the ██████████ became significantly higher than prices in Spain several years *after* the Contract was executed, and, as a result, ████ prices for

---

[16]    In fact, the Tribunal chided the Parties for their use of the "liberalization" label to attack, inconsistently, the ████████████████████ as advanced by each other, stating:

> Both parties have taken somewhat contradictory positions on whether this threshold requirement has been met. GNA claims that Atlantic should have expected both the impact of liberalization in Spain and the use by GNA of its right to divert unlimited volumes continuously to ████ and thus is not entitled to an adjustment based on '████████████' Atlantic responded that the fast pace of liberalization could not have been anticipated in 1995 and that certainly continuous diversion to ████ was not expected. However, with respect to GNA's counterclaim, Atlantic claims that GNA should have expected liberalization and, thus, there are ████████████████

(Final Award ¶ 24).

natural gas and LNG became a significant new price driver in Spain with a direct impact on

supply of and demand for LNG being imported into Spain." (Atlantic PHB1 ¶ 23). In particular,

Atlantic argued that "███ prices are 'influencing the gas market,'" that "Spain is being subjected

to completely new market conditions which simply didn't exist in 1995," and that these new

price drivers are "unquestionably a durable development." (Atlantic PHB1 ¶ 26 (quotations

omitted)). Thus, Atlantic argued that the Spanish market had become unattractive relative to the

████████ market.

Moreover, Atlantic argued in its First Post-Hearing Brief that GNA's witnesses and

evidence "fully corroborate[d]" this proposition:



> [GNA's witness] Carlos Torralba, for example, explained on cross-
> examination that, in Spain, there has been a convergence toward
> international prices, admitting that "████████████████████
> ████████████████████████████████ *Torralba*, 1060:12-1061:18. Likewise, [Atlantic's expert]
> Barberan testified that ██████████████████████████
> ████████████████████████████████████ *See,*
> *e.g., Barberan*, 1391:9-14 ("[W]e used the ████████████████
> ████████████████████████████████
> ████"); *id.*, 1393:2-19 (same). And GNA's expert James Jensen
> confirmed on cross-examination that, in 2003, "███████████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> ██████████ *Jensen*, 1797:16-21, leading to ████████████
> that previously was "unthinkable," *id.*, 1800:2-15.

(Atlantic PHB1 ¶ 27 (footnotes omitted)). In short, both Parties presented evidence as to

████████████████████ For that reason, Atlantic represented to the Tribunal:

"A review of the testimony adduced at the hearing—from both Atlantic *and* GNA witnesses—

clearly confirms that Atlantic has established the requisite ████████████ beyond any

reasonable dispute." (Atlantic PHB1 ¶ 6).

Faced with this evidence from both Parties, the Tribunal held "the change in the 'value of

23

natural gas' since 1995 when the Contract was signed has not been in accord with what either party expected . . . ." (Final Award ¶ 42).  In these circumstances, it is disingenuous for Atlantic to pretend that the extent of the Tribunal's analysis under Article 8.5(a) was limited to its statement that "although the parties have based their arguments on the degree to which liberalization was expected . . . the Tribunal believes that the crucial test is whether the formula agreed in 1995 continues to track the value of natural gas." (*Id*.)  Both Parties told the Tribunal that market forces *resulting from* liberalization had produced ███████████████████ ████████████  And both Parties told the Tribunal that those market forces were unexpected, durable in character, and profoundly impacted the value of natural gas in Spain such that the Contract Price no longer reflected market values in Spain or ████████████ (*See* Hearings Tr. at pp. 773-894; *see also* Hearings Tr. at pp. 2989-2990).  A check on that changed value was, and is, part and parcel with the very argument for change advanced by Atlantic.  Thus, the Tribunal's finding that "the change in the 'value of natural gas' since 1995 when the Contract was signed has not been in accord with what either party expected" is amply supported by both the Contract and the record.[17]

---

[17]    During the hearings below, Atlantic suggested that the Tribunal did not have authority to lower the Contract Price because GNA's claim for a price decrease was made "conditionally"—*i.e.*, to be considered only in the event that the Tribunal concluded that Atlantic had met the preconditions of Article 8.5(a).  Atlantic argued that the Tribunal only has jurisdiction to *increase* the Contract Price because, under Article 8.5(a), a party must show that '████████████████████ . . have substantially changed as compared to what *it* reasonably expected . . . ."  (Emphasis added).

Although Atlantic stops short of arguing that this is a basis for vacatur (because it is not), it sprinkles statements throughout its Cross-Motion to Vacate regarding the Tribunal's authority to lower, rather than raise, the Contract Price.  (*See, e.g.*, Cross-Motion to Vacate at 5, 12, 14).  The Tribunal fully considered and rejected this argument in Procedural Order No. 8:

> In a sense, the GNA counterclaim is implicit in the Price Reopener process.  Once discussion of a Price Reopener commences, the outcome is to be determined by the application of the standards contained in Article 8.5 of the Contract.  If application of those standards requires a lower rather than a higher price, then the Tribunal is required to act in accordance with Article 8.5.  In addition, Article 8.5(f) expressly permits either party to initiate the arbitration proceeding.

**B.    The Tribunal Imposed a Revised Contract Price That Is Entirely Consistent With the Position Advocated by Atlantic and, In Any Event, Is Not a ▇▇▇▇▇▇**

Atlantic's second and final basis for vacatur is that the Tribunal allegedly exceeded its authority by imposing a "▇▇▇▇▇." (Cross-Motion to Vacate at 20). This argument is wrong both legally and factually. *Legally*, the Tribunal was—by Atlantic's own admission—empowered to impose the revised Contract Price and did so on the basis of the evidence and arguments submitted by the Parties themselves. *Factually*, the Final Award does not impose a "▇▇▇▇▇" GNA addresses each flaw with Atlantic's argument *seriatim*.

**1.    Atlantic Told the Tribunal That It Had Authority to Impose a "▇▇▇▇▇▇"**

Contrary to Atlantic's argument that a "▇▇▇▇" was beyond the Tribunal's scope of authority, Atlantic told the Tribunal it was empowered to impose such a price. Atlantic stated in its First Post-Hearing Submission: "***The terms of Articles 8.5 and 18 do not appear to expressly limit this Tribunal's award to the imposition of a*** ▇▇▇▇▇▇▇" (Atlantic PHB1 ¶ 90 n.44 (emphasis added)). Atlantic should not be permitted to reverse course now simply because it does not like the outcome of the arbitration. As Atlantic itself states, "these statements by counsel are binding admissions." (*See* Cross-Motion to Vacate at 14 n.35).

Even putting aside this *volte face*, Atlantic's position is based on the incorrect statement that "[t]he Parties were thus of one mind, and the Tribunal was bound to follow their agreed views; it was not free to ignore the agreed position of Atlantic and GNA that a ▇▇▇▇▇

---

(Procedural Order No. 8 at p. 2, attached as Exhibit M to the von Mehren Declaration).

Hence, the Tribunal's Final Award did not consider GNA's "counterclaim" as an independent claim because—in the Tribunal's words—it was "implicit in the Price Reopener process." (*Id.*) Instead, the Tribunal, having determined that the preconditions for a price adjustment were satisfied, simply applied the standards set forth in the rest of Article 8.5. The Tribunal's language is consistent with the conclusion that the "fair and equitable" revised Contract Price in the Final Award was established regardless of GNA's counterclaim, not because of it. The result is a Contract Price that is more favorable to Atlantic than the old Contract Price at some times and less favorable at others, depending on market conditions. Indeed, the Contract Price is always fluctuating and therefore is never "higher" or "lower" as an absolute matter—a fact that alone shows that Atlantic's argument is without merit.

████████should not be imposed." (Cross-Motion to Vacate at 24). In effect, Atlantic's argument appears to be that the Tribunal was obliged simply to accept or reject the proposed revised Contract Price formulae suggested by the Parties—a concept known as "baseball" arbitration. A Price Reopener arbitration under the Contract, however, is not a "baseball" arbitration, and no Party has ever suggested that it is. Rather, the Contract required the Tribunal to impose, if justified, a revised Contract Price in accordance with the other requirements in Article 8.5—regardless of the various formulae that either Party proposes. *See Telenor Mobile Communs. v. Storm LLC*, 524 F. Supp. 2d 332, 359 (S.D.N.Y. 2007) ("[A]n arbitrator may award relief not sought by either party, so long as the relief lies within the broad discretion conferred by the FAA.").

In fact, Atlantic sought precisely what the Tribunal ultimately awarded—a revised Contract Price formula that recognized the impact of what Atlantic termed GNA's shifting "end user market." In seeking that relief, Atlantic made two arguments that ultimately led to the Tribunal's adoption of a ████████████████████████████████████████ (*i*) that the "Buyer's end user market" was susceptible to change (and thus that there could be multiple end user markets); and (*ii*) that there should be a separate valuation of GNA's "optionality" rights under Article 2.6 (████████████████████). GNA discusses each of these arguments—and identifies where in the record Atlantic *itself* proposed them—separately below.

### a. Atlantic Itself Argued That There Could be Multiple End User Markets Under the Contract.

Atlantic's first argument that led to the Tribunal's adoption of the revised Contract Price was its request for a formula based on the value of natural gas in the market where regassified Train 1 LNG is consumed. Atlantic made this argument on the basis that the existing Contract

Price ██████████████ failed to reflect "█████████████████████████"
which had become the relevant end user market.  (Atlantic's Memorandum of Law in Support of
its Statement of Claim, dated December 29, 2006, ¶¶ 119-120 ("Atlantic Mem. of Law");[18]
Atlantic's Statement of Claim, dated August 15, 2006, ¶¶ 56-60).[19]

In particular, Atlantic presented extensive testimony from fact and expert witnesses for
the proposition that the "Buyer's end user market" was wherever Train 1 LNG was ultimately
sold to end users (whether directly or through one or more intermediaries).  Because the Contract
permits Train 1 LNG to be sold in multiple locations simultaneously, Atlantic's theory required
examination of more than one end user market in evaluating the Contract Price.  Atlantic's own
expert, Carlos Lapuerta, endorsed the idea of multiple end user markets at the hearings:

| | |
|---|---|
| GNA'S COUNSEL: | Okay. Let me ask you this:  ***How would you have analyzed what to do with the Train 1 gas if it were sold to three different markets by GNA?*** |
| MR. LAPUERTA: | ***Yes. You would look at the value that the— of the gas at the point of consumption in the three different markets.***  And calculate also from that value the reasonable costs, assuming efficient market—sound marketing practices by the seller.  And determine the maximum contract price that would still leave the seller with a reasonable profit in each of those three different destinations. |

(Hearings Tr. at pp. 1672-1673 (emphasis added)).

The Tribunal agreed with Atlantic's analysis and concluded that the "Buyer's end user
market" was not necessarily static under the Contract but, instead, could change periodically.

---

[18]    Relevant excerpts of Atlantic's Memorandum of Law are attached as Exhibit R to the
Reply von Mehren Declaration.

[19]    Relevant excerpts of Atlantic's Statement of Claim are attached as Exhibit 4 to the Cavoli
Declaration.

Nevertheless, it diverged from Atlantic's request for a ██████████████ by recognizing the possibility that the end user market could shift back to Spain (given GNA's contractual right to shift volumes between ███████ and Spain). Accordingly, the Tribunal defined a framework for determining which market would be considered the "Buyer's end user market" at any point in time.

To implement such a formula, the Tribunal adopted a "majority test," in which the Buyer's end user market would effectively be ████████████████████████ ██████████████████████████████ In response to a question from the Chairman of the Tribunal, Atlantic's counsel acknowledged that a "██████████" would be appropriate:

> ATLANTIC'S COUNSEL:  But I guess maybe I would say that *as long as the volume of gas going to Spain was* ██████ ██████████████████ *it would be difficult to see a reason to shift to a* ████████

(Hearings Tr. at p. 2843 (emphasis added)).[20]

In sum, Atlantic's "changing or multiple end user market" theory leads to a revised Contract Price that considers and accounts for movement of Train 1 LNG ████████████

---

[20]    Despite agreeing to the notion at the hearings, Atlantic now argues that the "majority test" imposed by the Tribunal creates opportunities for arbitrage over which GNA has sole control. In the proceedings below, however, Atlantic stated that Train 1 LNG was under contract for resale to ██████ ████████████—which covers the minimum period during which the revised Contract Price would apply—in support of its position that there was no need to look beyond ████████ as the appropriate market for pricing purposes. Applying that same logic here, GNA cannot exploit the arbitrage opportunity during that same time period. Moreover, to the extent that there is an arbitrage opportunity, it was created by virtue of Article 2.6 itself, which gave GNA the ████████████████████████ ████ Contract Price and thus take advantage of higher market values available through resales to ████ rather than to Spain. It was, in fact, Atlantic's frustration that it did not get a "piece" of this value that led it to bring the Price Reopener in the first place. It now receives part of the upside associated with GNA exercising this option (which it did not previously enjoy), but the corollary to that benefit is that it must bear some risk as well. That is the balance that the Tribunal's Final Award—with its "fair and equitable" mandate—achieves.

█████████████████████████████ Yet it is this precise feature of the revised

Contract Price that Atlantic now says is an impermissible *ultra vires* act by the Tribunal.

### b.    Atlantic Itself Argued for Specific Valuation of the Article 2.6
█████████████████

Atlantic's second argument that led the Tribunal to adopt the revised Contract Price was

that the Tribunal should adopt one of two results: ██████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████ (*See* Atlantic Mem. of Law ¶¶ 155-163).  The

Tribunal ultimately adopted a variation of these two options.  It did so because Atlantic's ████

████████████ pricing formula was only viable if the Tribunal concluded that there was ████

████████████ The Tribunal concluded, however, that the end user market was ████████

██████ (precisely as Atlantic had argued) and that, as such, a pure ██████████████ model

was not appropriate.

To fully appreciate the relevance of Atlantic's proposed ██████████████ Contract

Price, it is instructive to understand the methodology by which Atlantic arrived at the value of its

██████████████ As explained in the Navigant Expert Report submitted by Atlantic, Navigant

computed an ██████████ predicated on the difference between ███████████████

██████████████ (as referenced above) and the purported market value of LNG in Spain over

a three-year period.  (Navigant Report, dated December 29, 2006, ¶¶ 74-79).[21]  This, in industry

---

[21]    The relevant pages of the Navigant Report are attached as Exhibit S to the Reply von Mehren Declaration.  The three-year period used to compute the option value is the period from 2005 to 2008.  Atlantic relied on this period of time on the basis that this would be the "effective period" of the new Contract Price.  Atlantic's position is misleading, however, because it fails to recognize that the effectiveness of the new Contract Price is *not* limited to three years; it simply has a three-year *minimum* applicable period.  This theme permeates Atlantic's Cross-Motion to Vacate and is the predicate for several of its arguments.  It completely ignores the fact that for either Party to trigger a new Price Reopener, the conditions precedent of Article 8.5 must be satisfied.  Absent such an event, the Contract Price reflected in the Final Award will remain in effect for the remaining life of the Contract.

terms, is known as the "███████████"—the difference in the ███████████████████ ███████████

  Atlantic calculated this ███████████████ (and not coincidentally at the point in time during which the positive difference between ████████████ natural gas prices was at its highest point in years).  The weakness inherent in Atlantic's use of a ████ ███████ was highlighted in the following exchange between one of the arbitrators and one of Atlantic's experts, Graham Weale:

> MR. WEALE:   One way in which ████████████ ████████ of course is with the proposal to include the ██████████████████ plays into the value, whether it's captured through the ███ ████████████████ or whether it's captured through ██████████████████ in Spain.
>
> ARBITRATOR MASSEY:  That's slightly puzzling to me. In the last three or four years ████████ has been producing a higher price than the price in Spain. There certainly have been years where it produced a lower price. And so it doesn't seem to me that a fixed increment necessarily is going to correlate with the ████████ movement, the movement of the price on ██████████.
>
> MR. WEALE:   That part of the analysis wasn't part of my assignment . . . .

(Hearings Tr. at pp. 1566-1567).  Thus, the Tribunal recognized that the differential between the ██████████████████████ could vary over time—an economic fact not addressed by Atlantic's request ████████████.  Indeed, Atlantic itself recognized this ████████ ██████ by asserting that the value of diversion rights to ██████████ in 1995 was ███████████████████████████████

(Atlantic PHB1 ¶¶ 238-242).

Accordingly, the Tribunal crafted a revised Contract Price formula that reflected ███████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████[22]  As a result, the revised Contract Price formula ███████████

███████████ and will more properly reflect the value of natural gas █████████████████

███████" where Train 1 LNG is ████████████████ (as argued by Atlantic).  In effect, this

flexibility component does what Atlantic requested; it just does it more accurately.  Having

invited the Tribunal to adopt such a formula, Atlantic cannot be heard to complain that the

Tribunal exceeded its authority simply because it does not like the outcome.

**2.    The Final Award Does Not Impose a "█████████" But, Rather, Represents a
Rational Implementation of Atlantic's Own Request for a ██████████
████████████████████**

The second flaw in Atlantic's "██████" argument is that the Final Award does not

impose a ██████ at all.  Rather, it imposes a █████████████████████████████████

██████████████████, if any, of diversion of cargoes from Spain ██████████  In

so doing, it incorporates a means to value the █████████████████████████

Spanish prices by including an adjustment during ██████████████████████████████

██████████████████████████  There is never a "██████" requiring

concurrent payments for cargoes going to Spain at one price and ██████████████████

████  Rather, GNA continues to pay Atlantic a Contract Price based on a ██████████ formula

*in all cases*, with the ████████████████████████████████████  The ████ revised

_____

[22]    Indeed, the only reason that Atlantic argued there should not be a "██████" was
because it believed all of the natural gas was being delivered to ████████████████  The Tribunal,
however, concluded that "our responsibility at the moment is to set a price *for the rest of this contract
going forward*, even though you have a right to a reopener in another ████████" (Hearings Tr. at p.
1360 (emphasis added)).  To do that, the Tribunal needed to account for the fact that, after the expiration
of the resale contract ██████████████████████████

Contract Price is adjusted ██████ (as was the old Contract Price) in order to yield an adjusted

and singular Contract Price for all sales of Train 1 LNG to GNA in the following ██████[23]

By contrast, a "██████" formula would impose ██████████████ on the

Parties for ██████ sales of LNG cargoes to multiple markets. Such a structure would

require that there be ██████████ applicable in any given ████████, with the price to be

paid for each cargo to be determined by ████████████████ And it was to

*that* aspect of a "██████" that GNA objected, particularly because of the many changes that

would be required to other provisions of the Contract in order to effectively implement such a

structure. (*See* Hearings Tr. at p. 2900).

The other problem with a "██████" is that the pricing under the "██████" feature

of the Contract would become unworkable.[24] (*See* Hearings Tr. at p. 2893). The ████████

██████ in the Contract ████████████████████ applied to all

volumes (including volumes included in the ██████████████████████

██████ and applies that ████████ to the ██████████████ to yield a ████

████████ for the ████████ Had the Tribunal adopted ████████████

████████ instead of a ████ Contract Price for all volumes, any ████████████

██████ would have become impossible to price. The Tribunal's revised Contract Price,

however, avoids this problem as well.

In essence, Atlantic received what it asked for—*i.e.*, a revised Contract Price formula that

accounted for any ████████████████████ and the price available to

---

[23] Atlantic's complaints as to Contract Price uncertainty from ██████████ are equally
misplaced because (*i*) the Contract Price formula moved with the price of ██████████ and (*ii*) its
own proposed Contract Price was based on a rather volatile ████████████.

[24] ████████████ are incurred under the Contract when the Buyer (GNA) fails to
take an ████████████████████████████████
████████████████

GNA from any resales of Train 1 LNG to ████ Although the Tribunal did not agree with

Atlantic's precise formulation, it wholly accepted Atlantic's proposed approach—an approach

that Atlantic now emphatically argues was beyond the Tribunals' authority to impose.  Atlantic

cannot now complain that this approach to revising the Contract Price was either beyond the

bounds of the Contract or outside Atlantic's contemplation prior to or during the Hearings.[25]

## IV.    GNA SHOULD BE AWARDED ATTORNEY'S FEES AND COSTS.

GNA is entitled to attorney's fees and costs associated with the recognition and

enforcement of the Final Award and its opposition to the Cross-Motion to Vacate.  Atlantic's

argument that the Tribunal exceeded its authority (Atlantic's only real challenge to the Final

Award) is frivolous because (*i*) the arbitration clause is general and broad, (*ii*) the UNCITRAL

Arbitration Rules leave it to the Tribunal, not the courts, to determine the scope of its authority,

and (*iii*) Atlantic conceded at the hearing that the Tribunal could impose what it considered a

"fair and equitable" revised Contract Price if the preconditions were satisfied.  Given these facts,

there was no basis for Atlantic to initially refuse to abide by the Final Award (which forced GNA

---

[25]    Atlantic contends that the ████████ structure eliminates any risk to GNA because the "Tribunal's decision has created a situation where GNA ████████████████████████████████████ (Cross-Motion to Vacate at 28-29).  In support of that contention, Atlantic offers a hypothetical in which GNA can ████████████████████████████████████████ " (*Id*. at 28).  Atlantic's hypothetical, however, is misguided in four independent respects.  ***First***, the ████████████ resulting in ████████████████████ Thus, Atlantic's hypothetical is not only hypothetical, but for the last ████████ (and the next year) is also counter-factual.  ***Second***, under Article 8.5(d), the revised Contract Price must only apply for ████████—here, from ████████—before Atlantic has the right to seek a new revised Contract Price.  ***Third***, Atlantic's hypothetical exists in a vacuum because it fails to account for real world constraints on GNA's alleged ability to ████████████ Unlike the hypothetical ████████████ that face no such constraints, LNG in the real world has to be delivered.  Atlantic's hypothetical ignores the advance arrangements and commitments to tankers for shipping, nomination of pipeline space for transport, and other real world arrangements that preclude that kind of unfettered bottom-line ████████████ ***Fourth***, Atlantic's argument is a classic example of an improper attempt to reargue the substantive determinations in an arbitral award.

to file the original Petition) or to later resist enforcement by cross-moving to vacate the Final

Award.

Counsel for Atlantic stated at the closing arguments that "[i]f it avoids post-arbitral

litigation which, while remunerative to the lawyers[,] does nothing for the clients, I would urge

the Tribunal to consider ███████████████████████████████████ as we

have suggested be had. . . .  I don't see how there can be a judicial challenge to that." (Hearings

Tr. at p. 2922).  The Arbitrators did exactly what Atlantic asked, and then Atlantic challenged the

Final Award anyway.  GNA should not be required to bear the cost of Atlantic's initial refusal to

abide by the Final Award, which was without justification, and its subsequent judicial challenge,

which has absolutely no basis in law or fact.  In such cases, this Court has recognized that the

party seeking to enforce the award may be entitled to attorney's fees and costs.  *See Saudi Iron &*

*Steel Co. v. Stemcor USA, Inc.*, No. 97 CIV. 5976, 1997 U.S. Dist. LEXIS 20336, at *6-7

(S.D.N.Y. Dec. 27, 1997) (Cote, J.) (awarding attorney's fees and costs to the petitioner because

the adverse party's "refusal to abide by the arbitrator's awards was without justification" and

because the arguments advanced in opposition to enforcement, including the public policy

exception to the New York Convention, had "absolutely no basis in law or fact").

## CONCLUSION

Atlantic asks this Court to grant what the law does not permit: a second bite at the apple.

The Tribunal's authority to decide the two issues raised by Atlantic could not be plainer—it is

expressly granted by the Contract and, indeed, was the very reason for the proceedings below.

Recognizing that the law does not permit vacatur merely because a party does not like the

outcome, Atlantic attempts to frame its arguments with language drawn from the few, limited

grounds for vacatur of an arbitral award.  That effort cannot save Atlantic's arguments—

particularly where, as here, the law imposes a highly restrictive judicial scope of review of

arbitral awards and the evidence reveals that Atlantic's arguments are simply wrong.

The Tribunal found multiple independent grounds on which the preconditions for a price reopener had been met. Having done so, the Tribunal fulfilled its charge and determined a "fair and equitable" revised Contract Price, guided always by the relevant Contract provisions and the evidence offered by the Parties. Atlantic's disagreement with the merits of the Tribunal's decision cannot extinguish the deference it is owed. Accordingly, this Court should deny Atlantic's Cross-Motion to Vacate, and should grant GNA's Amended Petition for Confirmation and Recognition of the Final Award.

New York, New York
June 16, 2008

SQUIRE, SANDERS AND DEMPSEY L.L.P.

By: _____
    Howard J. Nicols (HN 3594)
    Richard L. Mattiaccio (RM 4764)
    Steven Skulnik (SS 7821)
    SQUIRE, SANDERS & DEMPSEY L.L.P.
    350 Park Avenue, 15th Floor
    New York, New York  10022
    (212) 872-9800

    George M. von Mehren (*pro hac vice*)
    Stephen P. Anway (*pro hac vice*)
    SQUIRE, SANDERS & DEMPSEY L.L.P.
    4900 Key Tower
    127 Public Square
    Cleveland, Ohio 44114
    (216) 479-8500

    Steven B. Harris (*pro hac vice*)
    SQUIRE, SANDERS & DEMPSEY L.L.P.
    6200 Chase Tower
    600 Travis Street
    Houston, Texas 77002-3000
    (713) 546-5850

    Attorneys for Petitioner
    GAS NATURAL APROVISIONAMIENTOS
    SDG, S.A.