**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GAS NATURAL APROVISIONAMIENTOS
SDG, S.A.,

　　　　　　Petitioner,

　　　-against-

ATLANTIC LNG COMPANY OF TRINIDAD
AND TOBAGO,

　　　　　　Respondent.

08 CV. 1109 (DC)

**REPLY DECLARATION IN FURTHER**
**SUPPORT OF THE PETITION FOR**
**ORDER RECOGNIZING AND**
**ENFORCING ARBITRATION AWARD,**
**AS AMENDED *NUNC PRO TUNC*, AND**
**IN OPPOSITION TO ATLANTIC LNG**
**COMPANY OF TRINIDAD AND**
**TOBAGO'S CROSS-MOTION TO**
**VACATE THE FINAL AWARD**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

George M. von Mehren declares as follows:

1.　　　I am a partner of the law firm of Squire, Sanders & Dempsey L.L.P and an

attorney for petitioner GNA in the above-captioned proceeding. I submit this declaration in

further support of the Petition for Order Recognizing and Enforcing the Final Award, as

amended *nunc pro tunc*, and in opposition to Atlantic's cross-motion to vacate the Final Award.

Capitalized terms used herein are ascribed the meaning as those defined in the Amended Petition

dated June 16, 2008.

2.　　　The Decision on Clarification and Corrections to the Final Award dated March 27,

2008, attached as Exhibit 22 to the Declaration of James G. Cavoli dated April 16, 2008 (the

"Cavoli Declaration"), is a true and correct copy of the decision issued by the Tribunal on March

27, 2008. As it is already part of the record, I will not submit another copy. The purpose of this

declaration is to place before the Court those items referred to in GNA's motion papers that have

not already been made a part of the record.

3.      For clarity, the exhibits hereto are lettered consecutively following those annexed to my declaration dated February 1, 2008.

4.      Attached hereto as Exhibit N is a true and correct copy of relevant pages of transcripts of the arbitral proceedings held before the Tribunal.

5.      Attached hereto as Exhibit O is a true and correct copy of relevant pages from Atlantic's First Post-Hearing Memorandum, dated August 24, 2007.

6.      Attached hereto as Exhibit P is a true and correct copy of relevant pages from Atlantic's Second Post-Hearing Memorandum, dated October 12, 2007.

7.      Attached hereto as Exhibit Q is a true and correct copy of relevant pages from GNA's Value Calculations and Production of Confidential Material, dated May 29, 2007.

8.      Attached hereto as Exhibit R is a true and correct copy of relevant pages from Atlantic's Memorandum of Law in Support of its Statement of Claim, dated December 29, 2006.

9.      Attached hereto as Exhibit S is a true and correct copy of relevant pages from the Expert Statement of Navigant Consulting, Inc., submitted with Atlantic's Memorandum of Law in Support of its Statement of Claim, dated December 29, 2006.

I declare under the penalty of perjury that the foregoing is true and correct and was executed this 13th day of June, 2008 at Cleveland, Ohio.

George M. von Mehren

# EXHIBIT
# N

Page 1

```
 1
 2     ----------------------------------------x
 3     In the Matter of the Arbitration between:
 4     ATLANTIC LNG COMPANY OF
 5     TRINIDAD AND TOBAGO,
 6                         Claimant,
 7
 8            -against-
 9     GAS NATURAL APROVISIONAMIENTOS
10     SDG S.A.,
11                         Respondent.
12     ----------------------------------------x
13                     April 17, 2007
14                     10:19 a.m.
15                     875 Third Avenue, 10th Floor
16                     New York, New York  10022-6225
17     B E F O R E:
18
19         GERALD AKSEN, ESQ. - The Chairman
20         EUGENE A. MASSEY, ESQ. - Panel Member
21         BEN H. SHEPPARD, JR. - Panel Member
22
23             Amy Klein - Hearing Reporter
24
25
```

Page 14

1    -Opening Statement - Claimant-
2    "for the performance of its obligations under the    10:21:33
3    contract."    10:21:36
4    So everything about the contract at the    10:21:37
5    time of the negotiations suggested these cargoes    10:21:41
6    were going to Spain.    10:21:44
7    And indeed four years later, when the    10:21:45
8    Train 1 facility was built and the first cargoes    10:21:50
9    left Trinidad and were delivered to Spain,    10:21:54
10    Enagas -- at that point Enagas's parent company,    10:21:59
11    Gas Natural Group, disclosed in its 1999 annual    10:22:02
12    report the fact of those first deliveries, and    10:22:05
13    described the contract that's at issue here as a    10:22:10
14    20-year contract providing for the import of 14,000    10:22:15
15    million annual thermies of natural gas during 20    10:22:22
16    years.    10:22:25
17    So, again, even four years after the    10:22:25
18    contract was signed, the disclosure that Enagas'    10:22:28
19    parent made to the company was that this LNG was    10:22:33
20    going to Spain.    10:22:35
21    Now, the reality has been that since    10:22:36
22    October 2002, with the exception of basically one    10:22:41
23    cargo, nothing has gone to Spain. None of this LNG    10:22:46
24    has gone to Spain.    10:22:52
25    So in the aggregate, in the period since    10:22:54

Page 15

1    -Opening Statement - Claimant-
2    October 2002, less than 1 percent has gone to    10:22:58
3    Spain.    10:23:03
4    All of it, since October 2002, with the    10:23:04
5    exception of that one cargo that I mentioned, has    10:23:07
6    been resold to ▮▮ which is the successor to    10:23:11
7    ▮▮ and delivered to the ▮▮▮ formerly ▮▮▮    10:23:17
8    receiving facility known as the ▮ ▮ receiving    10:23:24
9    facility, which is just outside ▮▮    10:23:27
10    This is not disputed.    10:23:30
11    It's also undisputed that the LNG that    10:23:33
12    is sold to GNA under this contract is going to    10:23:38
13    continue to go to ▮▮ to the ▮▮ facility    10:23:42
14    until sometime in 2009 at least. Why? Because    10:23:47
15    there's an agreement between ▮▮ and GNA that was    10:23:53
16    entered into apparently sometime in 2004, according    10:23:56
17    to the testimony, that calls for those cargoes to    10:24:00
18    all be resold to ▮▮ until some point in 2009.    10:24:04
19    That's a significant date, 2009, the    10:24:09
20    Panel should keep in mind, for the following    10:24:14
21    reason:    10:24:16
22    Under the contract a price reopener is    10:24:17
23    effective for a minimum period of ▮▮ years from    10:24:20
24    the date on which the reopening party requests that    10:24:25
25    it be effective. In this case Atlantic has    10:24:28

Page 16

1    -Opening Statement - Claimant-
2    requested the price adjustment upward to be    10:24:34
3    effective as of April 21, 2005, and the    10:24:39
4    counterclaim for a price adjustment downward that    10:24:41
5    has been asserted by GNA likewise seeks an April    10:24:45
6    21, 2005 effective date.    10:24:50
7    So what that means is that whatever    10:24:52
8    determination this tribunal makes will take effect    10:24:55
9    as of April 21, 2005, and must run for ▮▮ years.    10:24:58
10    But at the end of ▮▮ years, either party can    10:25:04
11    file another reopener request.    10:25:07
12    So why I say the 2009 date is    10:25:09
13    significant is because what the Panel knows to a    10:25:12
14    certainty is that during the entire period that is    10:25:17
15    covered, necessarily by this reopener, that    10:25:22
16    three-year period, all but one cargo goes to    10:25:26
17    ▮▮▮ None of this is going to Spain.    10:25:30
18    Now, with respect to my colleagues on    10:25:34
19    the other side, I think that fact adds a little bit    10:25:40
20    of an air of unreality to the counter-claim.    10:25:43
21    In the counterclaim GNA is saying the    10:25:49
22    contract price is too high to allow us to sell the    10:25:55
23    Train 1 LNG at a profit in Spain. And, therefore,    10:26:00
24    the contract price needs to be lower to allow us to    10:26:04
25    sell it at a profit in Spain.    10:26:08

Page 17

1    -Opening Statement - Claimant-
2    But, of course, none of it is going to    10:26:10
3    be sold in Spain because it's all contracted    10:26:14
4    through sometime in 2009 to be sold -- resold to    10:26:16
5    ▮▮ for delivery to the ▮▮ facility in    10:26:20
6    ▮▮    10:26:23
7    The net effect of what GNA is asking for    10:26:31
8    is that it be allowed to make still more money on    10:26:37
9    its resales to ▮▮, on its resales to ▮▮ for    10:26:42
10    delivery in ▮▮ and not share a penny of that    10:26:45
11    with Atlantic. Even though under the contract    10:26:48
12    Atlantic is the party that bears the pricing risk.    10:26:51
13    And, therefore, should share in at least the    10:26:56
14    pricing upside.    10:27:00
15    And I'll get into this in a little bit    10:27:01
16    more detail as I go through the opening. But what    10:27:04
17    the Panel will see is that, based on the    10:27:10
18    assumptions that Enagas says it had at the time of    10:27:15
19    the contracting as to what its net sales margin    10:27:20
20    should be, based on circumstances in 1995, the    10:27:23
21    disclosed invoices for the resales to ▮▮ for    10:27:28
22    the resales to ▮▮ show a net profit margin six    10:27:33
23    times what Enagas claims to have intended or    10:27:39
24    expected at the time it entered into the contract.    10:27:45
25    And you can see up on the screen where    10:27:49

5 (Pages 14 to 17)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 18

```
1      -Opening Statement - Claimant-
2    that comes from.                      10:27:54
3        We've done -- taking the information    10:27:55
4    that was supplied by GNA in its memorandum and the   10:28:00
5    Torralba witness statement, we have shown -- this   10:28:07
6    is, again, figures with respect to the resales, the   10:28:11
7    disclosed resales to ██████       10:28:14
8        We've shown what the -- what the net   10:28:19
9    return is. They call it a net return. It's really   10:28:21
10   a net sales margin for the three contract years   10:28:25
11   that are illustrated there.           10:28:30
12       We've reconstructed in Table 6 what GNA   10:28:31
13   presents as the expectation of a net sales margin   10:28:40
14   at the time of contracting.           10:28:45
15       And what you can see is at the time of   10:28:46
16   contracting, according to their own testimony,   10:28:48
17   GNA's expectation, or Enagas' expectation, was for   10:28:52
18   a ██████ sales margin. And what they are   10:28:55
19   achieving, according to what they've disclosed to   10:28:59
20   the tribunal, is a ██████ sales margin.   10:29:02
21       And yet they are asking for an   10:29:05
22   adjustment here that would inflate that sales   10:29:07
23   margin still further.                10:29:10
24       So the tribunal really has a clear   10:29:11
25   choice. It can award a fair and equitable price   10:29:14
```

Page 19

```
1      -Opening Statement - Claimant-
2    revision, which is what Article 8.5 of the contract   10:29:24
3    indicates it should do. The language is on the   10:29:29
4    screen. It's highlighted. The parties have to   10:29:32
5    seek agreement on a fair and equitable revision.   10:29:36
6    And if they can't, it's the tribunal's mandate to   10:29:39
7    impose one, if the circumstances require it.   10:29:42
8        We think a fair and equitable revision   10:29:45
9    of the price necessarily has to reflect the fact   10:29:48
10   that these cargoes are all being resold to ██████   10:29:52
11   to ██ and are all being delivered in ██ and   10:29:56
12   are all being consumed in ██████       10:29:59
13       We think it would be, put it mildly, not   10:30:02
14   a fair and equitable result to reprice this   10:30:07
15   contract in any fashion based on an alleged   10:30:11
16   inability to sell it in Spain because it's -- it   10:30:15
17   just doesn't mesh with the facts.      10:30:19
18       Now, let me speak very briefly in broad   10:30:23
19   terms about the evidentiary burden that, as I   10:30:27
20   understand it, Atlantic bears in the proceeding.   10:30:29
21       Again, in Article 8.5(a) there are   10:30:32
22   really two tests. The first is that Atlantic, as   10:30:40
23   the party seeking the reopener, has to establish   10:30:45
24   ███████████████████████   10:30:50
25   ███████████████████████   :53
```

Page 20

```
1      -Opening Statement - Claimant-
2    have substantially compared -- I'm sorry -- ██████   10:30:56
3    ████████████████████████ c   10:31:01
4    ████████████████████████   10:31:04
5
6        That's the first condition.        10:31:06
7        The second condition, the second burden   10:31:09
8    of proof is that Atlantic must show that the   10:31:11
9    contract price resulting from the application of   10:31:14
10   the pricing formula contained in Article 8.1 does   10:31:17
11   not reflect the value of natural gas in the buyer   10:31:21
12   end user market.                     10:31:26
13       With respect to the first test, Atlantic   10:31:31
14   has shown, we believe, three reasonably ██████   10:31:34
15   ██████████████████████   10:31:41
16       The first is the extraordinarily rapid   10:31:42
17   liberalization of the Spanish natural gas market in   10:31:47
18   the span of just a few years following the   10:31:52
19   execution of the contract.            10:31:55
20       The second is a █████████████   10:31:57
21   in the nature and the business of the purchaser of   10:32:02
22   the LNG under this contract.          10:32:05
23       And the third ████ is the emergence   10:32:07
24   because of international developments, including   10:32:11
25   developments in Spain of a new price driver in   10:32:14
```

Page 21

```
1      -Opening Statement - Claimant-
2    Spain; specifically, the influence of ████   10:32:17
3    ████ between Spain and the ████, the   10:32:22
4    development of an arbitrage in the Atlantic base.   10:32:28
5        Now, all of these changes had the effect   10:32:32
6    of making it possible and economically rewarding   10:32:36
7    for GNA to divert all of these cargoes and resell   10:32:41
8    all of these cargoes to ████       10:32:45
9        None of these circumstances existed in   10:32:47
10   1995.                                 10:32:49
11       And, in fact, as I'll get into it in a   10:32:52
12   little bit more detail, in 1995 there was   10:32:55
13   absolutely no value at all to the concept of   10:32:57
14   reselling these Train 1 cargoes to ████   10:33:00
15       Now, before I get into a little bit more   10:33:05
16   detail about these changes and about the response   10:33:10
17   that the assertion of these changes has engendered,   10:33:13
18   I want to talk just very briefly about, for want of   10:33:18
19   a better word, the metaphysics of ██████ what is   10:33:20
20   meant by the ██████ requirement in   10:33:27
21   Article 8.5(a).                      10:33:36
22       You start with the proposition that   10:33:39
23   whatever Atlantic expected in 1995 when it entered   10:33:44
24   into the contract has proven to be incorrect. If   10:33:50
25   it were not incorrect, we wouldn't be here. We   10:33:56
```

6 (Pages 18 to 21)

Page 688

1

2    -------------------------------------------x

3    In the Matter of the Arbitration between:

4    ATLANTIC LNG COMPANY OF

5    TRINIDAD AND TOBAGO,

6                          Claimant,

7

8         -against-

9    GAS NATURAL APROVISIONAMIENTOS

10   SDG S.A.,

11                         Respondent.

12   -------------------------------------------x

13                    April 24, 2007

14                    10:05 a.m.

15                    875 Third Avenue, 10th Floor

16                    New York, New York  10022-6225

17   B E F O R E:

18

19       GERALD AKSEN, ESQ. - The Chairman

20       EUGENE A. MASSEY, ESQ. - Panel Member

21       BEN H. SHEPPARD, JR. - Panel Member

22

23           Amy Klein - Hearing Reporter

24

25

Page 769

1       -Escudero - Cross-
2       Q.   If there was agreement for exchanges,   12:06:14
3   for example, for the term of that agreement, there   12:06:16
4   is going to be more gas from Algeria going to   12:06:18
5   Spain, right?                   12:06:21
6       A.   Physically, yes.  But when there is a   12:06:22
7   crisis, an oil crisis, then all these exchange   12:06:25
8   agreements can be interrupted.  That's the   12:06:31
9   advantage of making swaps, that the swaps give you   12:06:34
10  savings in transportation costs.  And at the same   12:06:40
11  time, it does not avoid you from taking the   12:06:43
12  original supplier in case of crisis.  That's the   12:06:46
13  advantage.                  12:06:49
14      Q.   In the case of a crisis there could be   12:06:52
15  exceptions to the swap arrangement; is that what   12:06:55
16  your testimony is?                  12:06:57
17      A.   You can -- yes.  There could be   12:06:58
18  provisions in part of the agreements to stop the   12:07:00
19  exchanges as soon as there was an a normal   12:07:05
20  situation in the market.  That's very useful in the   12:07:09
21  part the agreements.                  12:07:16
22      Q.   You used the term "crisis."  What's a   12:07:20
23  "crisis"?                  12:07:23
24      A.   An oil crisis, when there is an   12:07:23
25  insufficient supply of oil or gas or hydrocarbons   12:07:28

Page 770

1       -Escudero - Cross-
2   in general due to many reasons that everybody   12:07:32
3   around this table knows, political -- well, there   12:07:35
4   had been several in the world so far.   12:07:39
5       Q.   In terms of a crisis, you're describing   12:07:42
6   pretty extreme situations, right?   12:07:47
7       A.   Yes.  From the point of view of a supply   12:07:47
8   of gas, yes.  Or oil.                  12:07:51
9       Q.   Mr. Escudero, in 1995 Enagas started --   12:07:54
10  Enagas expected that it would start lifting the   12:08:00
11  Train 1 volumes in about 1999, right?   12:08:04
12      A.   We didn't know exactly.  But, yes.  I   12:08:06
13  don't know what was our guess exact.  But around   12:08:10
14  the end of the century, yes.   12:08:13
15      Q.   So about four or five years from the   12:08:14
16  time the contract was executed?   12:08:17
17      A.   Yes.  Yes.  Correct.  That's what   12:08:18
18  happened.  In fact.                  12:08:20
19      Q.   In fact, lifting started in 1999, right?   12:08:22
20      A.   I was told so.  I was not in Enagas.   12:08:26
21  But I was told it started in '99, yes.   12:08:28
22      Q.   Now, at the time in '95, Enagas planned   12:08:33
23  to import the Train 1 LNG into Spain, right?   12:08:36
24      A.   At the time in '95?  Say it again,   12:08:40
25  please?                  12:08:45

Page 771

1       -Escudero - Cross-
2       Q.   At the time in 1995 Enagas planned to   12:08:45
3   import the Train 1 LNG into Spain?   12:08:49
4       A.   Enagas wanted to exercise the rights of   12:08:51
5   the contract with Atlantic.  And the alternatives   12:08:56
6   given by the contracts were very different --   12:09:00
7   several.  One of them was to send the gas to Spain.   12:09:04
8   The other was send all the gas freely to [REDACTED]   12:09:09
9   The other alternative was swap it with [REDACTED]   12:09:15
10  companies.  And there was a fourth alternative, to   12:09:20
11  have the shippings being done to the [REDACTED]   12:09:23
12  facilities, which include [REDACTED]   12:09:28
13      So we negotiated all these rights, and   12:09:30
14  we wanted to exercise our contract rights.   12:09:32
15      Q.   So your testimony is it wasn't your plan   12:09:39
16  in 1995 to import the LNG into Spain?   12:09:41
17      A.   My testimony is that we were going to   12:09:44
18  optimize our contract rights.  In my testimony   12:09:49
19  I said that we were working for possibilities of   12:09:52
20  exchanges with [REDACTED] through [REDACTED] for shipping   12:09:55
21  advantages.  But that was something which needed to   12:10:02
22  be done on regular basis, which needed a   12:10:07
23  preparation.                  12:10:09
24      To answer your question:  Our only   12:10:11
25  intention regarding this contract was to exercise   12:10:16

Page 772

1       -Escudero - Cross-
2   our contract rights.                  12:10:18
3       Q.   So let me just ask it one more time.   12:10:20
4       Does that mean you didn't have a plan in   12:10:23
5   1995 to import the gas into Spain?   12:10:25
6       A.   We didn't have the plan.  But we didn't   12:10:29
7   have to the contrary.  You yourself, you said that   12:10:33
8   deliveries were supposed to start in '97.  We have   12:10:35
9   several alternatives according to the rights given   12:10:41
10  by the contract.                  12:10:44
11      It was impossible that myself in '95   12:10:45
12  could have a final solution to deliveries started   12:10:48
13  in 2000.                  12:10:53
14      What we were doing was my duty to   12:10:56
15  prepare operations which could optimize the   12:10:59
16  contract of Enagas.                  12:11:05
17      If the tribunal permits me to explain   12:11:07
18  the [REDACTED] operation I would like to,   12:11:11
19  because it is easy to appreciate.  If we were   12:11:15
20  giving to [REDACTED] the volumes contracted by Enagas in   12:11:20
21  Trinidad, we were -- delivery the volumes to [REDACTED]   12:11:27
22  and [REDACTED] was giving us back the volumes contracted   12:11:34
23  by them from [REDACTED] which I remember that [REDACTED]   12:11:38
24  [REDACTED] were on a [REDACTED] in that case they   12:11:42
25  would be physical delivery of the gas in [REDACTED] of   12:11:56

22 (Pages 769 to 772)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 773

-Escudero - Cross-

2  the Trinidad gas, physically in ▮▮▮ and same    12:12:05
3  amount of ▮▮▮▮▮ gas from the ▮▮▮ contract    12:12:18
4  being delivered into Spain.    12:12:25
5      And that was something permitted by the    12:12:29
6  contract and something which interested everybody.    12:12:32
7  Everybody. Even Atlantic could maintain the hedge    12:12:37
8  of risks between ▮▮▮▮ and Atlantic because prices    12:12:46
9  continued to be ▮▮▮▮▮▮▮▮▮    12:12:51
10      So for Atlantic was going on with no    12:12:56
11  problem and having the take-or-pay of Enagas.    12:13:01
12      For ▮▮▮ and Enagas could be a huge    12:13:04
13  savings of transportation cost.    12:13:09
14      So in '95 we were preparing with the    12:13:12
15  knowledge of Atlantic, this operation.    12:13:16
16      What happened after '97 I cannot tell    12:13:19
17  you. What I can tell you is that we were in '95    12:13:22
18  preparing the optimization of the contract using    12:13:27
19  the rights negotiated by Enagas with the knowledge    12:13:31
20  of Atlantic.    12:13:36
21      Q.    What you just described, Mr. Escudero,    12:13:37
22  was exchanges of Enagas Train 1 volumes with    12:13:40
23  ▮▮▮▮▮▮▮ volumes, correct?    12:13:47
24      A.    Yes.    12:13:48
25      Q.    At the end of the day, when you did such    12:13:49

Page 774

-Escudero - Cross-

2  an exchange that you were contemplating in '95, the    12:13:52
3  ▮▮▮▮▮▮ volumes would go to Spain, right?    12:13:56
4      A.    Yes.    12:14:00
5      Q.    And it would be the equivalent volume of    12:14:00
6  Train 1 Enagas that would go to the ▮▮▮    12:14:03
7  receiving facility, right?    12:14:07
8      A.    Yes, right.    12:14:08
9      Q.    So Spain was going to be supplied with    12:14:09
10  the equivalent volumes, right?    12:14:11
11      A.    Yes.    12:14:13
12      Q.    That's what you were contemplating in    12:14:13
13  1995?    12:14:15
14      A.    One of the possibilities was that.    12:14:16
15      At this moment other possibilities were    12:14:18
16  not very easy to be contemplated. Because    12:14:20
17  everybody knew that the ▮▮▮▮▮ market was    12:14:23
18  performing in -- very badly compared to the    12:14:27
19  ▮▮▮▮ market. So other possibilities which in    12:14:31
20  theory were at our rights/possibilities could not    12:14:34
21  be done.    12:14:42
22      Q.    No other possibilities looked feasible    12:14:43
23  at the time, right?    12:14:46
24      A.    No -- not the one selling the gas to    12:14:47
25  ▮▮▮ very clearly.    12:14:50

Page 775

-Escudero - Cross-

2      Q.    Couldn't happen at the time, right?    12:14:52
3      A.    At the time.    12:14:54
4      Q.    Right.    12:14:55
5      A.    At the time.    12:14:56
6      But I insist we were in '95.    12:14:56
7      Q.    We'll get back to that topic in a little    12:15:00
8  bit.    12:15:02
9      I would like to get back to a question I    12:15:02
10  asked you earlier. In that respect, if you could    12:15:05
11  take a look at Exhibit C-308.    12:15:11
12      A.    3-0-8.    12:15:15
13      (The witness complies.)    12:15:18
14      Q.    They may not be in number order.    12:15:32
15      MR. von MEHREN: You can use mine. I'll    12:15:35
16  give you this.    12:15:40
17      THE WITNESS: Thank you.    12:15:41
18      A.    What page?    12:15:41
19      Q.    Page 10, please.    12:15:44
20      A.    Page...?    12:15:49
21      Q.    The page number is at the left.    12:15:50
22      A.    Yes, at the bottom.    12:15:53
23      Q.    Page 10.    12:15:55
24      Now, this is one of GN's annual reports.    12:16:07
25  And on page 10, if you could look at the second    12:16:15

Page 776

-Escudero - Cross-

2  bullet point. That bullet point states that: "The    12:16:18
3  Barcelona regasification plant received the first    12:16:22
4  shipment of liquid natural gas from Trinidad and    12:16:27
5  Tobago four years after the Gas Natural group    12:16:32
6  signed a purchasing contract with Atlantic LNG in    12:16:36
7  which Repsol is a shareholder providing for the    12:16:39
8  import of 14 thousand-million annual thermies of    12:16:42
9  natural gas during 20 years."    12:16:46
10      Do you see that?    12:16:48
11      A.    Yes, I see that.    12:16:48
12      Q.    That volume, 14 million annual thermies,    12:16:49
13  that's about equivalent to the ▮▮▮ under the Train    12:16:53
14  1 contract, right?    12:16:56
15      A.    Uh-hum. Yes.    12:16:57
16      Q.    And by ▮▮▮ you mean that to mean    12:16:58
17  ▮▮▮▮▮▮▮▮▮ right?    12:17:02
18      A.    Yes, I understand.    12:17:03
19      Q.    So this statement by GN, the parent    12:17:04
20  company to Enagas, says that the Train 1 volumes    12:17:06
21  are for import to Spain. You agree?    12:17:10
22      A.    I agree that's what's here I read    12:17:13
23  (indicating).    12:17:17
24      Q.    This is an annual report. So you agree,    12:17:18
25  as you told us earlier, that GN had every reason,    12:17:20

23 (Pages 773 to 776)

| Page 777 | Page 779 |
|---|---|

**Page 777**

1      -Escudero - Cross-
2      it was making sure it was being accurate when it     12:17:24
3      issued this report, right?                          12:17:26
4          A.   Excuse me. I left the natural gas, or I   12:17:27
5      retired from Enagas in '97. The group of Gas        12:17:35
6      Natural says in '99 may be the physical fact of the 12:17:42
7      arrival of the vessel. I knew it by the             12:17:47
8      newspapers. But any other comment from my part      12:17:51
9      about that is not adequate taking.                  12:17:54
10         Q.   I understand that you retired in 1997.     12:18:00
11     All I'm asking you is, having looked at this annual  12:18:04
12     report by Enagas' parent company, you agree that it  12:18:08
13     says the Train 1 contract was for import to Spain,   12:18:12
14     right?                                               12:18:15
15         A.   They say so.                                12:18:16
16         Q.   And you don't have any reason to believe    12:18:18
17     that Gas Natural, Enagas' parent, stopped trying to  12:18:20
18     be accurate in its annual reports after you left,    12:18:26
19     right?                                               12:18:28
20         A.   I don't -- I cannot comment any             12:18:28
21     statement of Gas Natural in '99. I cannot make any   12:18:36
22     comment. I was a person totally outside the          12:18:39
23     company. So they could say whatever they want.       12:18:43
24         Q.   And this is a statement by your former      12:18:47
25     employer that it was going to be for import; yes?    12:18:50

**Page 778**

1      -Escudero - Cross-
2          A.   That's what they say, yes.                  12:18:53
3          Q.   If you could look, now, at Exhibit          12:18:56
4      C-332.                                                12:19:03
5          (The witness complies.)                          12:19:05
6          A.   3-3 -- I think it's not in order here.      12:19:08
7      3-3-2.                                                12:19:15
8          Q.   This is a press release from Repsol         12:19:19
9      dated December 15, 1995.                              12:19:22
10         A.   Yes?                                         12:19:26
11         Q.   That's about three and a half months        12:19:27
12     after the Atlantic Train 1 contract was executed,    12:19:29
13     right?                                                12:19:32
14         A.   Yes.                                         12:19:33
15         Q.   And you were still with Enagas in           12:19:33
16     December 1995, right?                                 12:19:37
17         A.   Yes.                                         12:19:38
18         Q.   And as you said earlier, Repsol was an      12:19:40
19     indirect parent of Enagas at the time?               12:19:43
20         A.   Yes.                                         12:19:45
21         Q.   If you could direct your attention to       12:19:46
22     paragraph 5 --                                        12:19:49
23         A.   Yes?                                         12:19:52
24         Q.   -- which starts, "Contract signed."         12:19:53
25         Do you see that paragraph?                        12:19:57

**Page 779**

1      -Escudero - Cross-
2          A.   Yes, I see.                                 12:19:57
3          Q.   It says: "Contract signed between           12:19:59
4      Atlantic LNG, Enagas and ███████ provide for the    12:20:00
5      total sale of all the plant's production. 60         12:20:04
6      percent to ███████ markets in the ███████ R█        12:20:08
7      ███████ and the other ███████ to Enagas for         12:20:11
8      sale in Spain."                                       12:20:15
9          Do you see that?                                 12:20:17
10         A.   I see that.                                 12:20:20
11         Q.   So here Repsol, one of Enagas' parent       12:20:19
12     companies, a different one, is saying that these     12:20:24
13     Train 1 volumes are to be sold in Spain, right?      12:20:26
14         A.   I think it's not an official statement.     12:20:29
15     It's something saying all about Repsol. I think      12:20:32
16     it's reported by Repsol, but I don't think it's an   12:20:41
17     official report that officially Repsol in December   12:20:44
18     '95 said that ███████ of Enagas commitments in       12:20:47
19     Trinidad were going for sale in Spain. I don't       12:20:53
20     think it is an official statement.                   12:20:56
21         Q.   I'm a little confused.                      12:20:58
22         Is your testimony that you don't think           12:21:01
23     Repsol said this, or you don't think that this is    12:21:03
24     an official statement?                               12:21:06
25         A.   Second. I see that Repsol says that         12:21:07

**Page 780**

1      -Escudero - Cross-
2      through this bulletin.                                12:21:11
3          But I don't think it's an official                12:21:12
4      statement of Repsol at this time.                     12:21:14
5          Q.   What do you mean by "official"?              12:21:17
6          A.   That officially Repsol -- the contract       12:21:21
7      was signed by Enagas and the contract gave many       12:21:22
8      alternatives for the designation, for the             12:21:26
9      flexibility of the destination of the gas.            12:21:29
10         And I don't think even being the parent           12:21:32
11     company Repsol could make an official statement       12:21:35
12     against the rights of Enagas, according to the        12:21:39
13     contract.                                             12:21:42
14         So if you are selling -- telling                  12:21:43
15     me/asking me, I say Repsol could never contradict     12:21:48
16     Enagas' rights regarding to the contract of           12:21:53
17     Trinidad.                                             12:21:57
18         Q.   That's not what I'm suggesting. Maybe I      12:21:58
19     can ask a more clear question.                        12:22:00
20         You would agree that on its face this is          12:22:02
21     a statement by Repsol, correct?                       12:22:13
22         A.   It's a bulletin where they say what we       12:22:15
23     have read. But I think that in this kind of           12:22:20
24     bulletin, which do not commit officially the          12:22:23
25     position of the company, they are not very            12:22:27

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 781

-Escudero - Cross-

1
2  sophisticated and incomplete -- sale to Spain --    12:22:31
3  they do not necessarily -- this kind of bulletins    12:22:36
4  need to comment all the details of the contract    12:22:40
5  signed by Enagas.    12:22:46
6      Q.   You think press releases aren't    12:22:48
7  positions taken by companies; is that your    12:22:50
8  testimony?    12:22:53
9      A.   No. My testimony is what this lady has    12:22:53
10  just said.    12:22:56
11          I said that this bulletin is not an    12:22:57
12  official position of Repsol, at least not a    12:23:01
13  complete official position of Repsol, regarding the    12:23:05
14  Enagas contract in Trinidad.    12:23:09
15          It's a comment, a general comment, about    12:23:11
16  a general aspect, without entering into details.    12:23:14
17  That's what I say.    12:23:17
18      Q.   And the general comment is that the gas    12:23:18
19  is going to be sold in Spain, right?    12:23:20
20      A.   The general comment of this unofficial    12:23:23
21  report of Repsol is such as we have read.    12:23:26
22      Q.   When you were at Enagas did your    12:23:30
23  department issue press releases?    12:23:33
24      A.   Enagas?    12:23:36
25      Q.   At Enagas.    12:23:38

Page 782

-Escudero - Cross-

1
2      A.   The supply direction?    12:23:41
3      Q.   Yes.    12:23:42
4      A.   I don't remember giving press releases.    12:23:43
5  Maybe Enagas there was a direction of    12:23:46
6  communications. But personally I didn't give press    12:23:47
7  releases.    12:23:51
8      Q.   What about the Gas Natural group, did    12:23:51
9  they issue press releases?    12:23:54
10      A.   I don't remember. Sorry, but I don't    12:23:55
11  remember.    12:23:57
12      Q.   Your title involved the term supply    12:24:16
13  director?    12:24:19
14      A.   Managing director of supplies.    12:24:20
15      Q.   What does "supply direction" mean?    12:24:23
16      A.   Maybe not an excellent translation. It    12:24:26
17  means supply manager, I would say better. So    12:24:29
18  manager for supplies. Gas supplies to the company.    12:24:32
19      Q.   And so it's -- it was involved in the    12:24:35
20  direction of where the supplies would go? Is that    12:24:39
21  a correct understanding?    12:24:41
22      A.   No, it's from the purchasing. I was    12:24:42
23  responsible for the purchasing of gas to Spain --    12:24:46
24  not to Spain. To Enagas. I was responsible of    12:24:49
25  supply, in the sale of supplies taken of natural    12:24:55

Page 783

-Escudero - Cross-

1
2  gas, LNG or pipe gas, taken by my company. I was    12:24:58
3  responsible to ensure the supplies to my company.    12:25:02
4      MR. CAVOLI: Pardon me one moment.    12:25:10
5      (Discussion off the record.)    12:25:12
6  BY MR. CAVOLI:    12:25:36
7      Q.   Mr. Escudero, a moment ago you testified    12:25:36
8  that: We, in the supply direction, didn't issue    12:25:39
9  press releases.    12:25:43
10          When you say "supply direction" you were    12:25:43
11  talking about your department within Enagas?    12:25:45
12      A.   Yes.    12:25:49
13      Q.   As you testified earlier, you were on    12:26:04
14  the management committee at Enagas, correct?    12:26:06
15      A.   Correct.    12:26:08
16      Q.   And you were one of the -- fair to say    12:26:10
17  you were one of the senior executives of the    12:26:13
18  company, is that right, in 1995?    12:26:15
19      A.   Yes.    12:26:17
20      Q.   You don't know whether the company    12:26:17
21  issued press releases?    12:26:18
22      A.   Enagas?    12:26:21
23      Q.   Yes.    12:26:22
24      A.   I -- I don't remember. I don't    12:26:23
25  remember.    12:26:27

Page 784

-Escudero - Cross-

1
2      Q.   You reviewed the witness statements of    12:26:30
3  Mr. -- of Roger Stehn; is that right?    12:27:00
4      A.   Yes.    12:27:03
5      Q.   And so you know that Mr. Stehn has    12:27:05
6  testified --    12:27:07
7      A.   Yes.    12:27:08
8      Q.   -- that Enagas told him in '94 and '95    12:27:09
9  that the Train 1 listed under the contract would go    12:27:16
10  to Spain? You know Mr. Stehn has said that, right?    12:27:21
11      A.   Yes.    12:27:23
12      Q.   In fact, that was a big part of the    12:27:24
13  discussions during the negotiations, right?    12:27:26
14      A.   Right.    12:27:28
15      Q.   Because as you said in your witness    12:27:33
16  statement, the general concept, the core concept,    12:27:35
17  was for sales into Spain of this gas, right?    12:27:38
18      A.   No. They were as valid legally or    12:27:42
19  contractually the sales to [      ] as the sales into    12:27:58
20  Spain or the swaps with the [      ] companies.    12:28:03
21          So I said to Roger Stehn and other    12:28:07
22  members that we were trying to optimize our    12:28:13
23  situation according to the exercise of our    12:28:18
24  contractual rights. That's the only thing I    12:28:22
25  remember saying to Roger Stehn.    12:28:25

25 (Pages 781 to 784)

Page 785

-Escudero - Cross-

1
2    I don't remember at all saying to Roger  12:28:27
3  Stehn, or other members of Atlantic, that the only  12:28:31
4  thing we were thinking of was to send the gas to  12:28:37
5  Spain.                              12:28:40
6    Q.  You do agree that the general concept is  12:28:41
7  that the contract is based upon the Spanish market  12:28:46
8  structured and drafted to cover sales into the  12:28:48
9  Spanish market; you agree with that, correct?  12:28:52
10    A.  Say it again?            12:28:55
11    Q.  The general concept is that the contract  12:28:57
12  is based on the Spanish market, structured and  12:29:00
13  drafted to cover sales into the Spanish market; do  12:29:03
14  you agree with that?              12:29:06
15    A.  The last part -- there are many, many  12:29:06
16  things. Based upon the Spanish market --  12:29:09
17    Q.  Mr. Escudero --          12:29:11
18    A.  Sorry.                    12:29:12
19    Q.  I'm just reading from your witness  12:29:13
20  statement.                        12:29:16
21      Do you agree with that statement?  12:29:16
22    A.  Yeah, but it continues. Yes.  12:29:18
23    Q.  Yes, you agree?        12:29:20
24    A.  Yes, I agree. If I say that in my  12:29:22
25  statement. But now I'm explaining my statement.  12:29:24

Page 786

-Escudero - Cross-

1
2    Q.  In 1994, I think you mentioned this  12:29:29
3  earlier, there was a very limited market for LNG in  12:29:32
4  the ▮ right?                    12:29:35
5    A.  Very limited.            12:29:36
6    Q.  So the need for LNG imports into the  12:29:38
7  ▮ at the time was very low, correct?  12:29:43
8    A.  Was very low.            12:29:46
9    Q.  In fact, ▮ in the 1994/1995 time  12:29:47
10  frame, ▮ was unwilling to take the total  12:29:51
11  production of Train 1, right?    12:29:54
12    A.  Yes. They were avoiding, or they could  12:29:55
13  not do, because the market is dormant or they could  12:29:59
14  not do not giving take-or-pay. I think a mix of  12:30:03
15  the two reasons.                  12:30:08
16    Q.  You acknowledge that one of the reasons  12:30:11
17  that ▮ was unwilling to take the entire  12:30:12
18  production was because market circumstances  12:30:15
19  wouldn't allow it, right?        12:30:18
20    A.  Yes.                      12:30:19
21      But also because they could not offer  12:30:19
22  take-or-pay commitments. If they could offer  12:30:22
23  take-or-pay commitments, and they were buying on a  12:30:25
24  net-back basis, they would have purchased the total  12:30:30
25  production.                        12:30:34

Page 787

-Escudero - Cross-

1
2    The question is that I think that it's  12:30:34
3  more unwilling on the side of Atlantic than on the  12:30:37
4  side of ▮ the question of purchasing the total  12:30:40
5  production. That's very important, what I am  12:30:43
6  saying.                            12:30:44
7    Q.  I'm just trying to get an understanding.  12:30:50
8      Were you aware in 1995 that ▮ told  12:30:53
9  Atlantic that it was unwilling to take the entire  12:31:01
10  production of the Train 1 facility? Were you aware  12:31:05
11  of that?                          12:31:09
12    A.  Not as you are saying. What I am aware  12:31:10
13  is that ▮ in the presence of Amoco, in the  12:31:14
14  first meeting in Madrid, said he could not take the  12:31:22
15  whole production because of many reasons. And I  12:31:27
16  gave you the reasons. And one of them is that  12:31:31
17  Atlantic did not approve the financial commitments  12:31:35
18  taken by ▮                      12:31:40
19      So it was a question of an insufficient  12:31:42
20  market or a poor market at this moment. But to my  12:31:47
21  knowledge, it was more a question of financial  12:31:51
22  difficulties which avoided ▮ giving the total  12:31:57
23  pay -- total take-or-pay required by the seller.  12:32:01
24      And without this financial commitment of  12:32:07
25  the total take-or-pay, nobody could go ahead with  12:32:09

Page 788

-Escudero - Cross-

1
2  the Atlantic plan.                  12:32:14
3      So if you ask me again, were you aware,  12:32:15
4  I was aware that the financial difficulties made it  12:32:18
5  impossible for ▮ to take 100 percent of the  12:32:23
6  production.                        12:32:25
7    Q.  And in addition, the market wouldn't  12:32:26
8  have supported ▮ taking 100 percent of  12:32:29
9  production into ▮ is that right? You  12:32:32
10  are aware of that as well, correct?  12:32:35
11    A.  Look, if it was a fixed price contract I  12:32:36
12  would say yes. But if it was under the form of a  12:32:41
13  net-back -- of a net-back sale, then I would say  12:32:46
14  opposition would come from Atlantic as a seller.  12:32:55
15      If I am going to sell you in a ▮  12:32:58
16  ▮ and I'm going to sell you on a ▮  12:33:03
17  ▮ and the final price is going to be low, ▮  12:33:07
18  would receive the margin always. The problem was  12:33:10
19  for Atlantic.                      12:33:12
20      So the question of refusing to sell to a  12:33:14
21  ▮ was based upon the  12:33:16
22  decision of Atlantic.              12:33:20
23      That's my belief. And that's what I  12:33:22
24  heard from them.                  12:33:25
25    Q.  Pardon me for repeating myself.  12:33:27

26 (Pages 785 to 788)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 789

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | Earlier, about three minutes ago, you    12:33:30 |
| 3 | testified that there were several reasons --    12:33:33 |
| 4 | A.    Yes.    12:33:35 |
| 5 | Q.    -- why ▇▇ didn't take the entire    12:33:35 |
| 6 | amount. Correct?    12:33:38 |
| 7 | A.    Yes.    12:33:39 |
| 8 | Q.    And one of them that you stated about    12:33:39 |
| 9 | three minutes ago was that the market in the    12:33:41 |
| 10 | ▇▇ would not support all of those volumes into    12:33:44 |
| 11 | into the ▇▇    12:33:48 |
| 12 | Was that your testimony about three    12:33:49 |
| 13 | minutes ago?    12:33:51 |
| 14 | A.    That's my testimony.    12:33:51 |
| 15 | Q.    Okay, thank you.    12:33:53 |
| 16 | A.    And I repeat my testimony again.    12:33:54 |
| 17 | Q.    I think you're going to get a    12:33:59 |
| 18 | possibility to do redirect and everything else. So    12:34:01 |
| 19 | if you and I can talk about the questions I'm    12:34:03 |
| 20 | asking. You're going to have all the chance -- the    12:34:06 |
| 21 | tribunal is very indulgent. You're going to have    12:34:10 |
| 22 | the chance you need or want to explain yourself.    12:34:13 |
| 23 | Okay?    12:34:16 |
| 24 | A.    Okay.    12:34:16 |
| 25 | Q.    Now, one of the other factors you    12:34:22 |

Page 790

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | mentioned earlier as to the state of affairs in the    12:34:25 |
| 3 | ▇▇ in '95 was that the prices for natural gas in    12:34:28 |
| 4 | the ▇▇ were quite low. Correct?    12:34:33 |
| 5 | A.    Yes.    12:34:35 |
| 6 | Q.    And they had been low for several years,    12:34:36 |
| 7 | to your knowledge; is that right?    12:34:39 |
| 8 | A.    Many questions, sorry, I cannot say yes    12:34:44 |
| 9 | or no. I will have to take my time to explain.    12:34:47 |
| 10 | But if you want only one answer, I say maybe.    12:34:50 |
| 11 | Q.    Okay.    12:34:55 |
| 12 | A.    Because you cannot answer a question of    12:34:56 |
| 13 | how do you see the markets in the ▇▇ n many    12:34:59 |
| 14 | years yes or no. Sorry.    12:35:02 |
| 15 | Q.    No. My question was a little different.    12:35:05 |
| 16 | A.    If you don't let me explain my position,    12:35:08 |
| 17 | is that right?    12:35:14 |
| 18 | Well, depends, maybe.    12:35:14 |
| 19 | Q.    Okay. Maybe I wasn't clear.    12:35:16 |
| 20 | My question was: You had told us that    12:35:18 |
| 21 | prices in '95 were low in U.S.    12:35:22 |
| 22 | And then I asked: And before '95 prices    12:35:26 |
| 23 | had been low.    12:35:32 |
| 24 | Did you understand that, at the time, in    12:35:33 |
| 25 | '95?    12:35:34 |

Page 791

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | A.    What is your question?    12:35:34 |
| 3 | Q.    That prices in the ▇▇▇▇ for    12:35:35 |
| 4 | natural gas were relatively low, even in the years    12:35:37 |
| 5 | prior to '95?    12:35:40 |
| 6 | A.    Yes.    12:35:42 |
| 7 | Q.    Now, Mr. Stehn says in his witness    12:35:44 |
| 8 | statement that those low prices were predicted to    12:35:48 |
| 9 | continue going forward. And I know you've read his    12:35:56 |
| 10 | statement.    12:36:00 |
| 11 | In your rejoinder witness statement you    12:36:00 |
| 12 | don't disagree with that testimony by Mr. Stehn,    12:36:03 |
| 13 | right?    12:36:06 |
| 14 | A.    No.    12:36:06 |
| 15 | What's your question?    12:36:09 |
| 16 | Q.    That at the time in '95 the ▇▇ prices    12:36:10 |
| 17 | for natural gas, the predictions looking forward    12:36:13 |
| 18 | were that they were going to stay low.    12:36:16 |
| 19 | A.    That was the prediction of Roger Stehn.    12:36:18 |
| 20 | Q.    Okay.    12:36:20 |
| 21 | A.    But it was not -- well, I didn't have    12:36:21 |
| 22 | clear ideas, especially when you are speaking of a    12:36:23 |
| 23 | period of time ranging from '95 to 2020.    12:36:29 |
| 24 | Q.    Did Enagas do any analysis --    12:36:33 |
| 25 | MR. von MEHREN: Excuse me. Can he    12:36:35 |

Page 792

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | finish his answer?    12:36:37 |
| 3 | THE CHAIRMAN: Let him finish his    12:36:38 |
| 4 | answer, Mr. Cavoli.    12:36:40 |
| 5 | MR. CAVOLI: Okay.    12:36:42 |
| 6 | Q.    Go ahead.    12:36:43 |
| 7 | THE CHAIRMAN: You were saying,    12:36:45 |
| 8 | Mr. Escudero: "When you are speaking of a period    12:36:47 |
| 9 | of time ranging from '95 to 2020..."    12:36:50 |
| 10 | A.    Yes. Then I say that the prediction of    12:36:55 |
| 11 | Roger Stehn is a very risky prediction, and I think    12:36:58 |
| 12 | he's very shortsighted.    12:37:04 |
| 13 | I say it with very good intention. But    12:37:08 |
| 14 | dealing with a period of more than 25 years to    12:37:11 |
| 15 | speak of a market situation in 25 years as a    12:37:15 |
| 16 | prediction is very risky. My prediction was not    12:37:20 |
| 17 | clear. I didn't have the crystal ball, but I    12:37:26 |
| 18 | expected that the omelette will be the other side    12:37:30 |
| 19 | sooner or later.    12:37:34 |
| 20 | Q.    Did Enagas do any analysis in 1995 of    12:37:35 |
| 21 | forward prices for the ▇▇?    12:37:42 |
| 22 | A.    We had analysis as much as we could have    12:37:45 |
| 23 | in a modest company. And the idea that we had is    12:37:50 |
| 24 | that the situation could reverse very easily once    12:37:56 |
| 25 | the digestion of the reorganization measures were    12:37:59 |

27 (Pages 789 to 792)

Page 793

-Escudero - Cross-

1
2 taken in the ▓▓. And at the same time when the   12:38:04
3 liberalization measures in Europe were going to   12:38:09
4 happen the opposite would happen in Spain.   12:38:12
5     So for me, it was a question of -- of   12:38:15
6 supply and demand of course, but also the measures   12:38:20
7 being adopted, and many internal liberalizations   12:38:23
8 measure which were causing the problem in the   12:38:33
9 States, and digestion would facilitate recovery of   12:38:36
10 prices. That was my analyst's point of view.   12:38:40
11     Q.   Did your analyst address the fact that   12:38:43
12 the ▓ had significant reserves and so its   12:38:45
13 supplies were high relative to demand?   12:38:48
14     A.   I suppose so.   12:38:50
15     Q.   When supplies are high relative to   12:38:51
16 demand, that means that prices are low, right?   12:38:54
17     A.   I suppose my analyst took account of   12:38:56
18 that.   12:38:58
19     Q.   And that was considered, right?   12:38:58
20     A.   Yes.   12:39:00
21     Q.   And the predictions at the time were   12:39:02
22 that the reserves in the ▓▓ were going to   12:39:03
23 continue to grow and out-pace demand in the ▓   12:39:05
24 your analyst knew that, right?   12:39:10
25     A.   But my analyst knew also other things;   12:39:11

Page 794

-Escudero - Cross-

1
2 that demand could boost very rapidly if the growth   12:39:15
3 and the use of natural gas could be -- so it was a   12:39:19
4 question of whose analyst is better.   12:39:24
5     But in my case of course I did not share   12:39:27
6 pessimistic views of evolution of the market   12:39:32
7 regarding evolution of prices.   12:39:38
8     Q.   Just in follow-up to my last question, I   12:39:39
9 had asked whether your analyst knew that the   12:39:42
10 predictions in '95 were that reserves in the   12:39:47
11 ▓ were going to out-pace demand and any demand   12:39:52
12 growth in the ▓   12:39:57
13     Did your analyst take that into account?   12:39:58
14     A.   Take account and the final result was a   12:39:59
15 mix of result. Was not an open result in favor of   12:40:02
16 the continuation of the gas collapse.   12:40:07
17     Q.   And your point, I think, is -- what   12:40:10
18 you're explaining here is that circumstances could   12:40:12
19 change, right?   12:40:14
20     A.   Right.   12:40:15
21     Q.   There could be substantial changes in   12:40:16
22 economic circumstances in various markets that   12:40:20
23 might come to pass, right?   12:40:22
24     A.   Yes, that's right.   12:40:23
25     Q.   But at the time in '95 you and your   12:40:24

Page 795

-Escudero - Cross-

1
2 analyst at least didn't know exactly what those   12:40:35
3 changes might be, right?   12:40:39
4     A.   Nobody.   12:40:40
5     Q.   Nobody did?   12:40:41
6     A.   Nobody knew. All analysts sometimes are   12:40:42
7 right, sometimes are wrong. My analyst was not   12:40:48
8 pessimistic.   12:40:51
9     Q.   Now, just going back to Spain for a   12:41:11
10 moment.   12:41:15
11     In 1995 Enagas distributed its natural   12:41:15
12 gas in Spain in different ways, correct?   12:41:20
13     A.   Yes.   12:41:25
14     Q.   One way was for Enagas to provide supplies   12:41:26
15 directly to industrial customers; is that right?   12:41:30
16     A.   That's right.   12:41:32
17     Q.   And these industrial customers would   12:41:33
18 include companies like ceramic manufacturers; is   12:41:38
19 that right?   12:41:41
20     A.   Yes, that's right.   12:41:41
21     Q.   In fact, in '95 Enagas had over a   12:41:42
22 thousand industrial customers in Spain, right?   12:41:46
23     A.   I don't know the specific number, but it   12:41:48
24 was a big number.   12:41:52
25     Q.   It was a large number?   12:41:52

Page 796

-Escudero - Cross-

1
2     A.   A large number.   12:41:53
3     Q.   A second way that Enagas would   12:41:54
4 distribute its natural gas in Spain was through   12:41:56
5 distribution companies within the Gas Natural   12:41:59
6 group, right?   12:42:02
7     A.   Most of them were the natural gas -- the   12:42:03
8 Gas Natural group. But there were a few which did   12:42:07
9 not belong to this group.   12:42:10
10     Q.   So the second way was through   12:42:11
11 distributors within the Gas Natural group, correct?   12:42:14
12     A.   Yeah.   12:42:16
13     Q.   And then there was a third way, and that   12:42:16
14 was selling Enagas' natural gas through   12:42:18
15 distributors that weren't part of the Gas Natural   12:42:21
16 group?   12:42:23
17     A.   Minor part, but, yes, that's correct.   12:42:24
18     Q.   If you could look at page 25 of Exhibit   12:42:32
19 C-305, which is the annual report, 1995, Enagas.   12:42:36
20     A.   305.   12:42:40
21     Q.   Yes.   12:42:41
22     A.   Page?   12:42:42
23     Q.   Page 25.   12:42:43
24     A.   Okay.   12:42:44
25     (The witness complies.)   12:42:55

28 (Pages 793 to 796)

Page 797

-Escudero - Cross-

1
2  A.  Yes, I think so.                    12:43:00
3  Q.  25 at the bottom should have a flow  12:43:03
4  chart that's entitled "Current Supply and  12:43:06
5  Distribution of Natural Gas."           12:43:10
6  A.  Yes.                                12:43:12
7  Q.  Do you have that?                   12:43:12
8      (The witness reviews document.)     12:43:17
9  Q.  Now, in this flow chart Enagas is listed  12:43:19
10 in the middle, correct?                 12:43:21
11 A.  Yes.                                12:43:23
12 Q.  It's really hard to read --         12:43:23
13 A.  Yes.                                12:43:29
14 Q.  -- pardon the copy, but this is the best  12:43:29
15 we could get.                           12:43:33
16     On the left, the box on the left, below  12:43:34
17 "Enagas" --                             12:43:37
18 A.  The box on the left?                12:43:38
19 Q.  -- below "Enagas," can you see it says  12:43:40
20 "Gas Natural"?                          12:43:43
21 A.  Well, the meaning is that they were the  12:43:45
22 companies belonging to the Gas Natural group. And  12:43:48
23 the other distributors and the companies not  12:43:51
24 belonging to the Gas Natural group. That's my  12:43:52
25 interpretation.                         12:43:55

Page 798

-Escudero - Cross-

1
2  Q.  Okay. Just to round this out, what  12:43:57
3  we're seeing here that -- one, two, three, four --  12:44:01
4  five of the distributors in Spain in 1995 were not  12:44:05
5  members of the Gas Natural group, right?  12:44:08
6  A.  That's correct.                     12:44:09
7  Q.  But nonetheless, Enagas sold its gas  12:44:10
8  through those distributors, right?      12:44:14
9  A.  Yes. Because they could not import  12:44:15
10 gas -- they didn't have facilities.     12:44:20
11     So Enagas was forced by law to sell at a  12:44:22
12 transfer price established by the government the  12:44:28
13 gas destinated to the residential and commercial,  12:44:35
14 and that was at the transfer price to these Gas  12:44:36
15 Natural companies or the nonGas Natural group  12:44:41
16 companies.                              12:44:50
17 Q.  The nonGas Natural group companies that  12:44:50
18 Enagas sold to, that was not an internal transfer  12:44:53
19 price, right?                           12:44:58
20 A.  It was the same price approved by the  12:44:58
21 government.                             12:45:01
22 Q.  That price built in a return for Enagas?  12:45:01
23 A.  That price?                         12:45:05
24 Q.  Built in some profits for Enagas.    12:45:06
25 A.  Enagas -- all companies, as I said   12:45:11

Page 799

-Escudero - Cross-

1
2  before, have to make money. Enagas is a  12:45:15
3  state-owned company at least until '94, ▮▮▮▮ 12:45:20
4  ▮▮▮▮▮▮▮▮▮ It was a company to offer a  12:45:25
5  ▮▮▮▮▮ service, dictated by the government. And  12:45:29
6  the government fixed the tariffs for industrial  12:45:32
7  prices to induce the consumers.         12:45:35
8      All the transfer prices from Enagas to  12:45:39
9  the LDCs according to the interest of the states,  12:45:42
10 no matter if that could mean ▮▮▮▮▮▮      12:45:47
11 for Enagas.                             12:45:52
12     That is very important, because until  12:45:53
13 '94 the main guidelines of Enagas was to obey the  12:45:55
14 structures of the state no matter that could give  12:46:00
15 ▮▮▮▮▮▮▮                                 12:46:04
16 Q.  So your testimony is that the tariffs  12:46:05
17 built in a return on capital for Enagas based upon  12:46:09
18 the state interest rates, right?        12:46:14
19 A.  I didn't understand that.           12:46:16
20 Q.  You mentioned state interest rates a  12:46:18
21 moment ago?                             12:46:21
22 A.  State interest rates? No. State      12:46:21
23 interest, not state interest rates.     12:46:25
24 Q.  In 1995 Enagas was paid based upon a  12:46:27
25 tariff set by the government, right?    12:46:34

Page 800

-Escudero - Cross-

1
2  A.  Correct.                           12:46:36
3  Q.  And did you know in 1995 that that  12:46:37
4  tariff built in a return to Enagas based on  12:46:41
5  interest rates from Bank Espana?        12:46:46
6  A.  I don't remember. What I remember is  12:46:51
7  that the remuneration, if any, was ▮▮▮▮▮ I  12:46:54
8  cannot say now if Enagas -- I think that in the  12:47:01
9  general state of Enagas the profits were very,  12:47:04
10 very, very ▮▮▮ and did not compare to money  12:47:07
11 returned by interest rates. That's my personal  12:47:11
12 opinion.                                12:47:15
13     I was on the supply side. But as making  12:47:16
14 money, the company did ▮▮▮▮▮▮▮▮▮▮▮▮▮     12:47:18
15 Q.  Did you have any knowledge of the tariff  12:47:22
16 structure in 1995?                      12:47:26
17 A.  It was not my business. Even I was in  12:47:27
18 the management committee, I was on the supply side.  12:47:31
19 My duty was to buy gas to supply the system of  12:47:34
20 Enagas, which at this moment were the Spanish  12:47:39
21 system.                                 12:47:42
22     But I don't know very well the state  12:47:42
23 side of Enagas.                         12:47:48
24 Q.  That is your way of saying that you  12:47:51
25 didn't know the details of the tariff structure on  12:47:53

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 801

```
1              -Escudero - Cross-
2    the sales side; is that right?           12:47:55
3        A.    If I am modest and honest, I say yes.  I  12:47:57
4    am not very familiar with that.  And less ten years  12:48:01
5    after that.                             12:48:06
6        Q.    Just to round out my final questions, on  12:48:08
7    this chart, on page 25 of the annual report --  12:48:10
8        A.    25?                           12:48:15
9        Q.    Yes.  You're looking at it right now.  12:48:18
10       A.    This one?                      12:48:21
11       Q.    The companies listed under "Other  12:48:22
12   Distributors," those were companies that sold  12:48:25
13   primarily to the commercial and residential sectors  12:48:28
14   in Spain; is that right?                  12:48:30
15       A.    "Primarily"?  What means?  They were  12:48:31
16   distributors which sold to the commercial financial  12:48:36
17   sector.  And they did not belong to the Gas Natural  12:48:40
18   group.                                 12:48:43
19       Q.    They were separate from the group?  12:48:43
20       A.    They were separate.  They were owned by  12:48:45
21   other private companies.                  12:48:47
22       Q.    Thank you.                     12:48:48
23             The demand for natural gas in Spain in  12:48:55
24   '95 fluctuated with the seasons; is that right?  12:48:58
25       A.    Yes.                          12:49:01
```

Page 802

```
1              -Escudero - Cross-
2        Q.    Demand in the summer months in '95 was  12:49:02
3    lower than demand in the winter months, correct?  12:49:10
4        A.    In '95?  You're right.  Today I'm not  12:49:12
5    anymore in the company.  But I think the situations  12:49:16
6    have changed very much because of the     12:49:19
7    air-conditioning.  Because of the supply to power  12:49:21
8    generation and the use of the air-conditioning in  12:49:25
9    Spain.                                 12:49:27
10            But regarding '95, yes, of course there  12:49:28
11   was low in general in Europe, low consumption of  12:49:33
12   natural gas in summertime.                12:49:39
13       Q.    Now, also in Spain in '95 there was  12:49:42
14   limited -- I understand there was limited storage  12:49:46
15   for natural gas in the country; is that right?  12:49:50
16       A.    Yes.                          12:49:52
17       Q.    If Enagas was able to reduce its  12:49:55
18   deliveries of natural gas to Spain in summer months  12:50:02
19   and increase them in the winter months that would  12:50:03
20   create a delivery profile that is more in line with  12:50:06
21   the demand in 1995, right?                12:50:07
22       A.    Say it again?                   12:50:07
23       Q.    If Enagas was able to reduce its  12:50:09
24   deliveries of natural gas to Spain in the summer --  12:50:13
25       A.    Yeah.                         12:50:17
```

Page 803

```
1              -Escudero - Cross-
2        Q.    -- and increase them in the winter --  12:50:17
3        A.    Yeah.                         12:50:20
4        Q.    -- that would bring the deliveries more  12:50:20
5    in line with the demand profile in '95, right?  12:50:23
6        A.    That would be ideal, yes.  It was needed  12:50:26
7    more in our contracts for flexibility.  Not only in  12:50:28
8    Spain contract but in Europe contract, flexibility  12:50:33
9    meant that there were more supplies in wintertime  12:50:37
10   than summertime.                        12:50:42
11       Q.    And that type of flexibility was  12:50:43
12   valuable because you didn't have to store the gas,  12:50:45
13   right?                                12:50:47
14       A.    Yes, that was very valuable.     12:50:47
15       Q.    That type of flexibility is often called  12:50:50
16   seasonal flexibility; is that right?      12:50:53
17       A.    It's called seasonal flexibility.  It's  12:50:59
18   not the same in ████ or in the ████      12:51:02
19       Q.    Why is that?                    12:51:04
20       A.    I refer in the ████████          12:51:05
21            May I explain why the seasonal    12:51:08
22   flexibility represented different concept to ██ ██ 12:51:11
23   I'm going to do.                        12:51:15
24            For █ they take in summertime the  12:51:16
25   LNG, and they store -- normal -- some of them is  12:51:20
```

Page 804

```
1              -Escudero - Cross-
2    reclassified, but some of the LNG, more or less  12:51:26
3    more than half the LNG they receive, for instance,  12:51:30
4    in summertime, where prices or consumption is very  12:51:33
5    low.  They store it in facilities owned by them or  12:51:37
6    owned in all the many facilities in, you know,  12:51:42
7    ████ -- there are many, many storage facilities  12:51:48
8    which outfit by the LNG received by █ or outfit  12:51:52
9    by the liquification facilities.  But it's more  12:51:59
10   simple to put the LNG into storage.       12:52:03
11            So the summer flexibility is different  12:52:08
12   in the States, because they take, in summertime,  12:52:10
13   the LNG, and they reclassify in wintertimes when  12:52:13
14   prices go up, and that's a very good.     12:52:17
15            So if you ask █ at this moment, do  12:52:19
16   you prefer to receive LNG in wintertime, they would  12:52:23
17   say, no, maybe I prefer to receive in summertime.  12:52:27
18            So we found for the first time in my  12:52:32
19   life somebody which has a close flexibility in  12:52:38
20   mine, and it was easy to present a common  12:52:42
21   scheduling problem from Trinidad by having this  12:52:45
22   cross-flexibility I explained to you.     12:52:49
23       Q.    And █ had that flexibility because  12:52:51
24   they had the storage facilities available in the  12:52:54
25   region around the ████████ right?         12:52:56
```

30 (Pages 801 to 804)

Page 805

-Escudero - Cross-

1
2     A.   Yes, right.                          12:52:59
3     Q.   And as you said earlier, Spain didn't   12:52:59
4  have those facilities?                        12:53:01
5     A.   Spain did not have facilities. But when   12:53:02
6  I speak of ▮ facilities I speak of facilities   12:53:06
7  of LNG. When I speak of facilities to Spain I   12:53:10
8  speak of facilities of natural gas in underground.   12:53:15
9  We didn't have any of them that's sufficient.   12:53:18
10    Q.   You didn't have any sufficient       12:53:21
11 underground natural gas --                    12:53:23
12    A.   Underground or LNG storage capacity.   12:53:25
13    Q.   So both types of storage capacities,   12:53:28
14 either in LNG form or underground in gas form, that   12:53:31
15 wasn't available in Spain?                    12:53:34
16    A.   Not sufficient.                       12:53:35
17    Q.   Not sufficient.                       12:53:36
18    A.   But it was more than sufficient in ▮   12:53:37
19 for the LNG. More than sufficient. Was very   12:53:39
20 abundant to receive LNG in summertime and to take   12:53:43
21 to the LNG storage facilities.                12:53:46
22    Q.   And they would store it and sell it at   12:53:48
23 the higher price in the winter, correct?      12:53:51
24    A.   Yes. That was the reason why we could   12:53:53
25 build a common program where ▮ took more LNG   12:53:56

Page 806

-Escudero - Cross-

1
2  in winter and less in summer and vice versa. And   12:54:01
3  what is the conclusion for Atlantic. Fantastic.   12:54:04
4  The conclusion for Atlantic that they could   12:54:08
5  maintain and evenly spread production all along the   12:54:10
6  year. That's one of the key questions in -- the   12:54:14
7  problem that for the buyers we accepted these close   12:54:18
8  flexibility, but for Atlantic we offered the   12:54:24
9  possibility of a daily off-take of gas evenly   12:54:27
10 spread throughout the year.                   12:54:32
11    Q.   That's from the seller's perspective,   12:54:33
12 right?                                        12:54:37
13    A.   Yes.                                  12:54:37
14    Q.   From Enagas' perspective it wasn't    12:54:37
15 ratable off-take, right? It was seasonal off-take?   12:54:41
16    A.   It was very good, accepted for us.    12:54:45
17    Q.   As you said, that was very valuable to   12:54:46
18 you?                                          12:54:49
19    A.   That was valuable to me. But that was a   12:54:49
20 common question in all supply contracts to Europe.   12:54:51
21         Sonatrach, Troll, Gas Prom, all      12:54:56
22 suppliers to Europe know that the customers, at   12:55:04
23 least in '95, were going to demand same seasonal   12:55:06
24 flexibility. Seasonal flexibility was the rule of   12:55:10
25 all of Europe. Maybe in the ▮, except for   12:55:15

Page 807

-Escudero - Cross-

1
2  those companies as ▮ with LNG storage capacity,   12:55:18
3  which had this cross-flexibility.             12:55:24
4     Q.   The storage facilities for ▮          12:55:38
5  where were they?                             12:55:42
6     A.   I think that -- I am not sure. Because   12:55:42
7  they explained to me that they own it. Some of   12:55:49
8  them. And they rent it, some of them, or have   12:55:50
9  agreements.                                   12:55:53
10         I have seen in the ▮ area plenty of   12:55:53
11 big spheres, facilities. I don't know who is the   12:56:02
12 owners. But I knew that the trucks of ▮   12:56:05
13 day by day went to supply in summer period just to   12:56:10
14 have these spheres complete in the winter peaks.   12:56:16
15    Q.   You said "spheres"; is that correct?   12:56:20
16    A.   Yes. Normally they are --           12:56:22
17    Q.   The tanks?                           12:56:24
18    A.   The tanks. They are spherical.       12:56:24
19    Q.   The tanks you saw were in the ▮      12:56:28
20 area, right?                                  12:56:30
21    A.   Yeah.                                12:56:31
22    Q.   I want to ask you some questions about   12:56:36
23 the Enagas contract in particular.            12:56:37
24    A.   Yes?                                 12:56:39
25    Q.   There's take-or-pay obligation in the   12:56:41

Page 808

-Escudero - Cross-

1
2  Enagas contract, right?                       12:56:50
3     A.   Yes.                                 12:56:51
4     Q.   The overall yearly contract year     12:56:52
5  obligation was for Enagas to take and pay for, or   12:56:59
6  pay for if it couldn't take --              12:57:05
7     A.   Yes.                                 12:57:08
8     Q.   -- ▮ correct?                        12:57:08
9     A.   Yes, I think so.                     12:57:14
10    Q.   Of course, Enagas wanted to be able to   12:57:15
11 not only have to pay for it, but they wanted to   12:57:17
12 take it, right?                               12:57:19
13         You didn't want to be in a situation   12:57:21
14 where you had to pay for something you didn't take,   12:57:22
15 correct?                                      12:57:25
16    A.   Yeah.                                12:57:26
17    Q.   And under the contract, the Enagas    12:57:29
18 contract with Atlantic, if Enagas wasn't able to   12:57:31
19 take a certain amount of the volume it was required   12:57:35
20 to take, it would have to pay roughly ▮ of   12:57:39
21 the contract price on those shortfall volumes,   12:57:42
22 right?                                        12:57:45
23    A.   Yes. In case of defaults, the        12:57:45
24 penalization were ▮ of the price.            12:57:51
25    Q.   Just getting back to this seasonal    12:57:54

31 (Pages 805 to 808)

Page 809

```
1              -Escudero - Cross-
2    notion, the take-or-pay obligations were split   12:57:58
3    about ████████████████ in the summer and   12:58:03
4    ████████████ is that about right?   12:58:10
5        A.   I don't remember.  I suppose you're   12:58:13
6    right.  You want me to be completely sure, I have   12:58:15
7    to check.  But I accept that there was a   12:58:18
8    difference -- yes.  Supposedly you're right.   12:58:21
9        Q.   If you would like to check the contract,   12:58:23
10   you can look at Exhibit C-1, Article 5.1.   12:58:26
11       A.   Okay.  Excuse me, I have to look for it.   12:58:33
12           MR. CAVOLI:  George, did you not get one   12:59:05
13   of these, C-1?   12:59:07
14           MR. von MEHREN:  I did not.  Do you have   12:59:09
15   one for him?   12:59:10
16           THE CHAIRMAN:  Yes.  Do you want a C-1?   12:59:12
17       A.   If I am right for Enagas, it was █ -- I   12:59:15
18   need my glasses -- ████████████████   12:59:20
19   summer, 32.1.  Those are your numbers.   12:59:30
20       Q.   That's not what it says in the contract?   12:59:32
21       A.   No.   12:59:34
22           MR. von MEHREN:  That's a draft.  Let's   12:59:36
23   go to this.   12:59:38
24       Q.   If you could look at Exhibit C-1, so   12:59:40
25   that we're all on the same page.   12:59:42
```

Page 810

```
1              -Escudero - Cross-
2        (The witness complies.)   12:59:45
3        Q.   It's Article 5.1(a).   12:59:55
4        A.   Article point?   12:59:59
5        Q.   5.1(a).   01:00:01
6        A.   Yeah.   01:00:04
7        Q.   On page 20.   01:00:04
8        A.   We have total B -- ████████   01:00:05
9    ████████████ in winter quantity, and ████ in   01:00:14
10   summer quantity.  I read the contract, yes.   01:00:22
11       Q.   That's correct, right?   01:00:24
12       A.   That's correct, sorry.   01:00:25
13       Q.   And that split, that variation between   01:00:26
14   the winter and the summer, that was requested by   01:00:29
15   Enagas, right?   01:00:31
16       A.   Yes.   01:00:34
17       Q.   Atlantic agreed to that term in the   01:00:34
18   contract?   01:00:38
19       A.   It was offered.  The situation was the   01:00:38
20   following:   01:00:44
21       ████ and Enagas examined the situation   01:00:44
22   and said how much you can take of my summer   01:00:49
23   obligations.  And they said -- because what I   01:00:54
24   explained to you -- X.   01:00:57
25       So we came to an agreement, ████ and   01:01:00
```

Page 811

```
1              -Escudero - Cross-
2    Enagas, of what the total volume was split for   01:01:04
3    ████ and Enagas in summer and winter.   01:01:08
4        And once ████ and Enagas had made this   01:01:11
5    effort -- I don't call agreement -- this   01:01:16
6    pre-agreement, we present it to Atlantic.   01:01:21
7        And the reaction of Atlantic was, very   01:01:23
8    good, okay, I don't mind.  You had reached an   01:01:25
9    agreement.  For me, it's okay.   01:01:29
10       But the process was the way I'm telling   01:01:30
11   you.   01:01:35
12       Q.   When you spoke to ████ about the   01:01:36
13   seasonal off-take for Enagas, you told ████ that   01:01:39
14   it was important for Enagas to have about █ █   01:01:42
15   ████ less take responsibilities in the summer   01:01:47
16   than in winter?   01:01:51
17       A.   They knew it.  They knew it.   01:01:52
18       Q.   Is that a yes?   01:01:53
19       A.   Yes.   01:01:54
20       Q.   And that was important to Enagas because   01:01:55
21   that was more in line with the Spanish seasonal   01:01:56
22   demand fluctuations, right?   01:02:00
23       A.   And also for the rest of Europe, yes.   01:02:02
24           MR. CAVOLI:  This is a good spot to   01:02:06
25   stop.   01:02:09
```

Page 812

```
1              -Escudero - Cross-
2            THE CHAIRMAN:  Let's take our hour lunch   01:02:09
3    break and come back a few minutes after 2.   01:02:17
4        Let me remind you, Mr. Escudero, enjoy   01:02:17
5    your lunch and your hour break, but you cannot   01:02:20
6    discuss your testimony with anybody.   01:02:23
7            THE WITNESS:  Of course.  Thank you.   01:02:25
8            THE CHAIRMAN:  You can talk to people,   01:02:28
9    but you may not discuss your testimony.   01:02:30
10           THE WITNESS:  Okay.  Thank you.   01:02:33
11       (Time noted: 1:02 p.m.)   01:02:34
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

32 (Pages 809 to 812)

Page 813

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | A F T E R N O O N   S E S S I O N:    01:02:34 |
| 3 | (Time noted: 2:04 p.m.)    02:04:06 |
| 4 | THE CHAIRMAN: Mr. Cavoli, please    02:04:06 |
| 5 | continue.    02:04:09 |
| 6 | MR. CAVOLI: Thank you.    02:04:09 |
| 7 | G R E G O R I O   G U T I E R R E Z    02:04:12 |
| 8 | E S C U D E R O,    02:04:12 |
| 9 | resumed, having been previously duly sworn,    02:04:12 |
| 10 | was examined and testified further as follows: 02:04:12 |
| 11 | CONTINUED CROSS-EXAMINATION    02:04:12 |
| 12 | BY MR. CAVOLI:    02:04:14 |
| 13 | Q.    Good afternoon, Mr. Escudero.    02:04:14 |
| 14 | Before the lunch break we were talking    02:04:18 |
| 15 | about seasonal flexibility under the Enagas    02:04:23 |
| 16 | contract.    02:04:29 |
| 17 | There were other types of flexibility    02:04:30 |
| 18 | within that same contract, right?    02:04:32 |
| 19 | A.    You referred to what kind of    02:04:36 |
| 20 | flexibilities?    02:04:39 |
| 21 | Q.    For example, there were flexibilities    02:04:42 |
| 22 | within Articles 2.6, 2.7 and 2.8 of the contract?    02:04:45 |
| 23 | A.    Ah, yes, yes, those are different    02:04:50 |
| 24 | flexibilities, yes.    02:04:54 |
| 25 | Q.    And one type -- just focusing on Article 02:04:55 |

Page 814

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | 2.6 for the moment.    02:04:59 |
| 3 | A.    Yes?    02:05:00 |
| 4 | Q.    One type of flexibility under Article    02:05:01 |
| 5 | 2.6 was the ability of Enagas to resell cargoes    02:05:04 |
| 6 | under the contract, right?    02:05:08 |
| 7 | A.    Resale or swap or exchange.    02:05:10 |
| 8 | Q.    There was resale and there was exchange, 02:05:14 |
| 9 | correct?    02:05:17 |
| 10 | A.    Correct.    02:05:17 |
| 11 | Q.    And those are two different things,    02:05:17 |
| 12 | correct?    02:05:20 |
| 13 | A.    Correct.    02:05:20 |
| 14 | Q.    The contract price, Article 8.1, that's 02:05:24 |
| 15 | intended to include the value of Enagas' ability to 02:05:32 |
| 16 | resell the cargoes to ▓▓▓▓▓; that's your testimony, 02:05:37 |
| 17 | right?    02:05:41 |
| 18 | A.    Yes, that's my testimony.    02:05:42 |
| 19 | Q.    In fact, I think you explained that that 02:05:43 |
| 20 | type of flexibility made the Train 1 supply    02:05:51 |
| 21 | contract with Atlantic more valuable than other    02:05:55 |
| 22 | supply contracts Enagas had in 1995, right?    02:05:58 |
| 23 | A.    That's correct.    02:06:01 |
| 24 | Q.    So I take it that at the time when you 02:06:10 |
| 25 | agreed to the contract price, Enagas was of the    02:06:13 |

Page 815

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | view that the price should include this value of    02:06:20 |
| 3 | flexibility under 2.6, right?    02:06:23 |
| 4 | A.    Yes.    02:06:25 |
| 5 | Q.    Before the Enagas contract was executed 02:06:25 |
| 6 | with Atlantic, did Enagas sit down and make any    02:06:33 |
| 7 | calculations as to the value of resale rights under 02:06:38 |
| 8 | Article 2.6?    02:06:42 |
| 9 | A.    No.    02:06:45 |
| 10 | Q.    No calculations whatsoever?    02:06:48 |
| 11 | A.    No,    02:06:51 |
| 12 | Q.    You would agree, I take it, that that    02:06:52 |
| 13 | type of value of resale rights under 2.6, that    02:06:57 |
| 14 | could change over time; is that right?    02:07:01 |
| 15 | A.    The value?    02:07:04 |
| 16 | Q.    Yes.    02:07:04 |
| 17 | A.    Yes.    02:07:05 |
| 18 | Q.    I would like to ask you a few questions 02:07:09 |
| 19 | now about Article 8.5 of the contract.    02:07:13 |
| 20 | A.    Yes.    02:07:18 |
| 21 | Q.    Do you know what Article 8.5 is?    02:07:18 |
| 22 | A.    Price reopener?    02:07:22 |
| 23 | Q.    Yes.    02:07:25 |
| 24 | A.    Yes.    02:07:26 |
| 25 | Q.    Atlantic drafted the first version of    02:07:30 |

Page 816

| | |
|---|---|
| 1 | -Escudero - Cross- |
| 2 | the price reopener, right?    02:07:36 |
| 3 | A.    Yes.    02:07:37 |
| 4 | Q.    But Enagas rejected that version that    02:07:38 |
| 5 | was drafted by Atlantic; is that right?    02:07:42 |
| 6 | A.    Yes.    02:07:45 |
| 7 | Q.    And Enagas proposed a different approach 02:07:45 |
| 8 | basically following other Enagas contracts, right? 02:07:49 |
| 9 | A.    Correct.    02:07:51 |
| 10 | Q.    In fact, Enagas even provided examples    02:07:52 |
| 11 | of price reopener terms to Atlantic, right?    02:07:56 |
| 12 | A.    Yes.    02:07:59 |
| 13 | Q.    And those examples were used to come up 02:08:00 |
| 14 | with what was ultimately agreed to in the contract 02:08:04 |
| 15 | under the price reopener clause; is that right?    02:08:06 |
| 16 | A.    Say it again?    02:08:09 |
| 17 | Q.    Yes. The examples that Enagas provided 02:08:10 |
| 18 | to Atlantic --    02:08:14 |
| 19 | A.    Yes?    02:08:15 |
| 20 | Q.    -- they were used to create the final    02:08:16 |
| 21 | language of the reopener clause in the Train 1    02:08:19 |
| 22 | contract, right?    02:08:22 |
| 23 | A.    As drafted by Atlantic.    02:08:23 |
| 24 | Q.    My question is a little different.    02:08:25 |
| 25 | The examples that Enagas provided, why 02:08:27 |

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 817

-Escudero - Cross-

1
2 did Enagas provide them?                    02:08:29
3    A.   Enagas took -- what you call        02:08:31
4 examples -- took some articles applied by some   02:08:38
5 multinational company. I remember especially,   02:08:42
6 specifically, Shell. Examples, or as you call,   02:08:48
7 maybe they were not known by Amoco, which was an   02:08:53
8 American company, but which usually they were   02:08:56
9 applied by Shell in all -- many, many contracts in   02:08:59
10 Europe. We had, for instance, the contract by   02:09:02
11 Shell with Nigeria, from Norway, Troll. They were   02:09:07
12 known all over Europe.                       02:09:23
13    Q.   And so I take it Enagas provided the   02:09:23
14 examples to Atlantic because those were examples   02:09:26
15 that Enagas thought should be followed in the   02:09:31
16 contract, right?                             02:09:33
17    A.   Yes.                                 02:09:34
18    Q.   And the approach that Enagas was   02:09:37
19 proposing, that was ultimately incorporated into   02:09:41
20 the contract, right?                         02:09:44
21    A.   Not 100 percent, because it was subject   02:09:45
22 to discussion. But when we provided the examples,   02:09:47
23 and we were discussing, and the three paragraphs in   02:09:53
24 8.5, many of them come from Shell contracts. Not   02:09:57
25 exactly the same, because I insist they were   02:10:02

Page 818

-Escudero - Cross-

1
2 subject to discussion.                       02:10:06
3    Q.   So you said it wasn't 100 percent   02:10:07
4 followed by the examples. Was it 95 percent   02:10:10
5 followed?                                    02:10:13
6    A.   I don't remember now.                02:10:13
7    Q.   But the examples were used; is that   02:10:15
8 fair?                                        02:10:17
9    A.   Yes. I think when I revised now the   02:10:18
10 draft -- not the draft -- the content of the   02:10:21
11 article, they are many expressions followed in   02:10:24
12 many, many Shell contracts all over the world.   02:10:29
13    Q.   Mr. Escudero, you know Carlos Torralba;   02:10:49
14 is that right?                               02:10:53
15    A.   Yes, I know him. He was my successor.   02:10:53
16    Q.   He succeeded you in your position at   02:10:56
17 Enagas when you left in 1995?                02:10:59
18    A.   Yes, that's correct.                 02:11:01
19    Q.   In fact, when you were at Enagas from   02:11:02
20 1989 to 1997, Mr. Torralba worked there at the same   02:11:05
21 time, right?                                 02:11:10
22    A.   Yes, right.                          02:11:10
23    Q.   So is it fair to say that you knew each   02:11:11
24 other pretty well?                           02:11:13
25    A.   Yes. You can say that.              02:11:14

Page 819

-Escudero - Cross-

1
2    Q.   In fact, the two of you served on the   02:11:16
3 management committee of Enagas together; is that   02:11:18
4 right?                                       02:11:20
5    A.   At one point, yes. Because at the   02:11:20
6 beginning, no. But at one point when you took the   02:11:22
7 management commitment from the report, the general   02:11:26
8 report, yes, at this moment I was supply manager   02:11:31
9 and he was sales manager.                    02:11:34
10    Q.   And that was in 1995, right?         02:11:36
11    A.   I think so. Yes, yes. At this moment   02:11:38
12 he was sales manager.                        02:11:42
13    Q.   So as sales manager Mr. Torralba wasn't   02:11:44
14 involved in the negotiations with the Train 1   02:11:48
15 contract with Atlantic, was he?              02:11:50
16    A.   No, he wasn't. He was involved in the   02:11:52
17 committee, but he was not involved with that   02:11:54
18 degree.                                      02:12:01
19    Q.   According to your testimony that's   02:12:01
20 before the tribunal, in '95 you expected   02:12:03
21 liberalization of the Spanish market, right?   02:12:08
22    A.   I did.                              02:12:10
23    Q.   When we use the term "liberalization,"   02:12:11
24 it's also called deregulation, right?        02:12:17
25    A.   Personally I prefer liberalization, but   02:12:19

Page 820

-Escudero - Cross-

1
2 I agree with you is deregulation.            02:12:22
3    Q.   They are often used interchangeably,   02:12:26
4 right?                                       02:12:28
5    A.   Yes.                                 02:12:28
6    Q.   In fact, in your testimony you say that   02:12:30
7 in '95 Enagas expected liberalization to occur in   02:12:33
8 the first years of the contract, I think you said?   02:12:38
9    A.   If you want I may revise my exact words.   02:12:43
10 The first testimony? You know the paragraph?   02:12:49
11    Q.   First testimony is paragraph 68.     02:12:50
12    A.   68.                                 02:12:52
13         (The witness complies.)              02:12:54
14    A.   68.                                 02:13:01
15         (The witness reads document.)        02:13:02
16    A.   I don't express my personal opinion.   02:13:10
17 Everyone at the negotiation table was aware that   02:13:16
18 the liberalization would take place. It was only a   02:13:18
19 matter of time, but not much time -- I'm speaking   02:13:21
20 about the negotiation table. And it was likely to   02:13:24
21 happen when the contract was in force and most   02:13:26
22 likely during the first years of the contract.   02:13:28
23         I don't express my opinion in that case.   02:13:30
24 Even I coincide -- maybe coincide. I express here   02:13:33
25 the opinion I have of the generality of the people   02:13:36

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 821

-Escudero - Cross-

1
2 around the table of negotiations.    02:13:40
3    Q.    Was it not your opinion that    02:13:41
4 liberalization would happen most likely -- during    02:13:43
5 the first years of the contract liberalization    02:13:52
6 would occur?    02:13:55
7    A.    Well, that's a new question. It's not    02:13:55
8 in -- but in my opinion, yes. But the word    02:13:58
9 "liberalization" more than comparing with    02:14:02
10 "deregulation," the word "liberalization" means a    02:14:04
11 process. A process, a gradual process,    02:14:09
12 step-by-step, which takes a long time.    02:14:12
13    If you say that if I expected this to    02:14:14
14 happen in the very short time, I would say the    02:14:17
15 beginning, yes.    02:14:22
16    But now we're in the process of    02:14:23
17 liberalization. The process never ends -- never -- 02:14:26
18 it is very long. In Spain, for instance, not yet    02:14:30
19 for the domestic is free, the consumer, to have the 02:14:33
20 choice of the supplier for some kind of -- so what   02:14:38
21 I mean is a long process. What I expected is that   02:14:43
22 the process took place in Spain step-by-step.    02:14:46
23    Q.    Did you expect in '95 that all consumers   02:14:50
24 would have a choice as of January 1, 2003?    02:14:53
25    A.    I don't remember if I expected by this    02:14:56

Page 822

-Escudero - Cross-

1
2 date. I thought that by the end of the century    02:14:59
3 gradually the process would be enlarged first by    02:15:03
4 the industry consumers and then commercial and    02:15:08
5 domestic.    02:15:11
6    Q.    Just so I understand your testimony    02:15:15
7 correctly, is your testimony that you thought    02:15:17
8 liberalization might start during the time of the    02:15:19
9 contract, but not be finished? Is that your    02:15:22
10 testimony?    02:15:26
11    A.    No. No. No. No. I said it might    02:15:26
12 start with the time of the contract, and maybe or   02:15:28
13 may not be finished the contract. I say it's the    02:15:30
14 long process.    02:15:34
15    And even when I signed the contract, in    02:15:35
16 a sense liberalization had already begun.    02:15:39
17    For me the first step for    02:15:42
18 liberalization, maybe only with me or the    02:15:45
19 Arbitrators, is to privatize the companies which    02:15:48
20 exercise monopolies.    02:15:50
21    In Spain we expected a monopoly in    02:15:53
22 Enagas. As you remember this morning, when it was   02:16:01
23 privatized, for me it was a very, very important    02:16:04
24 step towards liberalization. In other countries    02:16:07
25 they continue to be a state-owned company today.    02:16:11

Page 823

-Escudero - Cross-

1
2 So the first step has not yet been accomplished in  02:16:15
3 some other countries. For me the first step meant   02:16:17
4 that we were going ahead.    02:16:20
5    Q.    Did you have an understanding in '95    02:16:27
6 that liberalization would have to occur as a result 02:16:29
7 of legal changes in Spain? Did you understand    02:16:32
8 that?    02:16:36
9    A.    I understand that all liberalization    02:16:36
10 needs legal changes. In Spain, but imposed, excuse 02:16:39
11 me, imposed or according to directives from the    02:16:45
12 European union.    02:16:51
13    Q.    So first there would be European union   02:16:52
14 directives and then the individual counties in    02:16:52
15 Europe would enact them into laws?    02:16:56
16    A.    Yes. Maybe the speed of some European   02:16:56
17 countries is better than others. But in any case   02:17:00
18 the European union gives you a bottom, and you have 02:17:06
19 to follow that bottom.    02:17:12
20    Q.    Spain didn't always follow the European  02:17:13
21 union directives, Spain may, right?    02:17:15
22    A.    Spain was follow it, yes. Were they    02:17:16
23 not? Spain personally I have a big experience    02:17:19
24 because from '86 to '89 I was sent by Repsol to    02:17:23
25 Brussels as a professional of Repsol to observe the 02:17:29

Page 824

-Escudero - Cross-

1
2 liberalization process of the oil market.    02:17:37
3    The oil market and the gas market sooner 02:17:40
4 or later are going to be integrated. And I was an   02:17:43
5 exceptional witness, and also took part in that, of 02:17:47
6 the finalization of the monopoly of oil in Spain,   02:17:51
7 which started in 1927.    02:17:58
8    And after the entrance of Spain in the   02:18:01
9 European union in '86, in three years there was no  02:18:06
10 more monopoly, or at least the first steps of the   02:18:10
11 monopoly of oil.    02:18:14
12    So for me what I observed and negotiated 02:18:16
13 even in the oil business, for me it was very clear  02:18:19
14 that it was going to happen in the gas business.    02:18:24
15    Q.    You testified a moment ago that you    02:18:29
16 believed that any liberalization of the natural gas 02:18:31
17 market would need to be effectuated through laws,   02:18:35
18 right?    02:18:41
19    A.    Through...?    02:18:42
20    Q.    Through legislation.    02:18:43
21    A.    Yes, I think so.    02:18:44
22    Q.    And in 1995 did you expect the enactment 02:18:46
23 of legislation in Spain in the next few years?    02:18:51
24    A.    I did.    02:18:55
25    Q.    You did.    02:18:56

35 (Pages 821 to 824)

Page 825

```
1            -Escudero - Cross-
2        As you say in your rejoinder witness      02:19:10
3    statement, you turned out to be correct, right?    02:19:13
4    A.   You?                          02:19:15
5    Q.   You were right?               02:19:15
6    A.   I was right. Yes.             02:19:16
7         Excuse me, it's a personal satisfaction  02:19:18
8    that they were right at this moment.     02:19:20
9    Q.   So I take it, Mr. Escudero, that you did  02:19:23
10   not believe -- you don't believe that     02:19:29
11   liberalization through legislation could be -- can  02:19:33
12   qualify as a change in circumstance under Article  02:19:38
13   8.5(a), right?                      02:19:41
14   A.   Liberalization I think is the economic  02:19:46
15   circumstance, yes.                 02:19:52
16   Q.   You understand that under Article 8.5(a)  02:19:53
17   in order to seek a price reopener it needs to be  02:19:56
18   unexpected change in circumstance, right?  02:20:00
19   A.   That's what Article 8 says, yes.  02:20:01
20   Q.   And you expected it in 1995, right?  02:20:04
21        You expected liberalization in 1995 when  02:20:06
22   the contract was executed?             02:20:10
23   A.   I am not a contract. I am a person.  02:20:12
24   And my personal ideas do not necessarily have to be  02:20:16
25   the ideas included in the contract. Maybe for the  02:20:20
```

Page 826

```
1            -Escudero - Cross-
2    interpretation of the contract. In the tribunals  02:20:24
3    it was unexpected.                  02:20:28
4         You ask myself, I was a very simple  02:20:30
5    person who took part in the organization. I do not  02:20:34
6    necessarily coincide my opinion what is included in  02:20:39
7    the contract.                      02:20:42
8    Q.   You were a senior executive at Enagas at  02:20:43
9    the time, right?                   02:20:45
10   A.   Yes.                         02:20:46
11   Q.   And you led these negotiations, right?  02:20:46
12   A.   Yes.                         02:20:48
13   Q.   And over time this contract is worth  02:20:48
14   billions and billions of dollars, right?  02:20:50
15   A.   Yeah.                        02:20:53
16   Q.   And Enagas at the time, as a senior  02:20:53
17   executive of Enagas, they listened to your views on  02:20:56
18   business matters, right?             02:20:59
19   A.   Yes.                         02:21:00
20   Q.   Is that right?                 02:21:00
21   A.   Yes.                         02:21:01
22   Q.   And so at the time, in 1995, when you  02:21:02
23   expected liberalization, as you say --  02:21:07
24   A.   Yes.                         02:21:10
25   Q.   -- your personal view was that it  02:21:11
```

Page 827

```
1            -Escudero - Cross-
2    couldn't be a change in circumstance under Article  02:21:15
3    8.5(a) because you expected it, right?  02:21:18
4    A.   Well, now, again, it's a question, my  02:21:22
5    personal beliefs and what the -- according to my  02:21:26
6    personal beliefs it was going to happen. So it was  02:21:31
7    not unexpected.                    02:21:34
8         But from the legal point of view, I  02:21:36
9    don't know if my personal beliefs mind or do not  02:21:38
10   mind. That is something which is relevant, I  02:21:43
11   think.                          02:21:47
12   Q.   You understand as a lawyer that  02:21:47
13   corporations, companies, they only act through  02:21:48
14   individuals, right?                02:21:52
15   A.   Yes.                         02:21:53
16   Q.   And the mindset of a company is made up  02:21:53
17   of the mindset of the individuals at the company,  02:21:55
18   right?                          02:21:58
19   A.   Yes.                         02:21:58
20   Q.   So your mindset mattered in 1995 in  02:21:58
21   terms of whether you expected liberalization or  02:22:01
22   not, right?                        02:22:05
23   A.   Yes.                         02:22:06
24   Q.   If you could take a look at C-349.  02:22:17
25        (The witness complies.)           02:22:23
```

Page 828

```
1            -Escudero - Cross-
2    A.   349, yes, I have that.           02:22:35
3    Q.   This is a letter dated April 15, 2002  02:22:39
4    from Mr. Torralba at Gas Natural to Atlantic LNG  02:22:43
5    Company of Trinidad and Tobago.         02:22:49
6    A.   Yes.                         02:22:53
7    Q.   Do you see that?               02:22:53
8    A.   Yes.                         02:22:54
9    Q.   I understand you were not --      02:22:55
10   A.   Yes.                         02:22:57
11   Q.   -- at Enagas or Gas Natural at this time  02:22:58
12   frame, but I'm just going to ask you a few  02:23:01
13   questions about this letter just to give it some  02:23:03
14   context. I wanted to read into the record the  02:23:06
15   first paragraph. Okay?             02:23:09
16   A.   Yeah.                        02:23:10
17        You have the opportunity in the very  02:23:11
18   near future to ask the writer this letter, but if  02:23:13
19   you want my impression of what is in this letter,  02:23:18
20   which is the first time I see it, okay, with  02:23:21
21   pleasure I will answer you.          02:23:24
22   Q.   Thank you. I just have a few questions  02:23:25
23   on it.                          02:23:26
24   A.   Yeah.                        02:23:27
25   Q.   The first paragraph reads:  "Reference  02:23:28
```

36 (Pages 825 to 828)

Page 829

-Escudero - Cross-

1
2  is made to the LNG sales and purchase contract    02:23:30
3  between Enagas and Atlantic LNG Company of Trinidad 02:23:34
4  and Tobago dated on July 27, 1995 and assigned to   02:23:37
5  Gas Natural Aprovisionamientos on January 1, 2001   02:23:41
6  ('The Contract'), the price reopener notice issued  02:23:47
7  by buyer on July 28th, 2000, and the last meeting   02:23:52
8  held in London last April 10th, 2002, where buyer   02:23:56
9  claimed its price reopener notice was valid and     02:24:00
10 parties agreed buyer was going to detail again      02:24:03
11 seller the economic changes occurred ▉▉▉▉▉         02:24:06
12 beyond the control of the parties that settled the  02:24:09
13 basis for buyer's claim of a price reopener."       02:24:13
14      Did I read that correctly?                     02:24:16
15 A.   Yes.                                02:24:18
16 Q.   This is from Mr. Torralba, and he      02:24:20
17 mentions here that Enagas had issued a reopener     02:24:23
18 notice on July 28, 2000.                     02:24:27
19      Were you contacted by Enagas or anyone   02:24:29
20 at GN about a reopener prior to July 28, 2000?      02:24:33
21 A.   I was retired from Enagas in 1997. I   02:24:37
22 didn't have, not for this question or any other     02:24:42
23 questions, I didn't have any kind of relation with  02:24:45
24 Gas Natural.                             02:24:48
25 Q.   You have been retired since '97 and you  02:24:50

Page 830

-Escudero - Cross-

1
2  were contacted in connection with Atlantic's        02:24:52
3  reopener, right?                         02:24:55
4  A.   I didn't. I wasn't contacted, no.      02:24:55
5  Q.   The company didn't contact you in       02:24:57
6  connection with this arbitration proceeding?        02:24:59
7  A.   Not at all. The only contact with       02:25:02
8  Trinidad that Gas Natural has made to me, and       02:25:04
9  appreciate it very much, has been to come here and  02:25:10
10 interrupt my retirement.                    02:25:13
11      But in 2002 -- from '97 to today, or to  02:25:14
12 the last days, I have never been asked about        02:25:18
13 anything regarding the Trinidad or any other        02:25:21
14 contract. I was totally retired from Enagas.        02:25:26
15 Q.   In connection with this arbitration,     02:25:30
16 this hearing that we're in today, you understand     02:25:31
17 this is a reopener claim by Atlantic, right?        02:25:34
18 A.   I've been told that like that, but I     02:25:36
19 didn't know.                            02:25:40
20 Q.   Before today you were contacted by Gas   02:25:40
21 Natural in connection with that claim by Atlantic,  02:25:42
22 right?                                02:25:45
23 A.   No.                          02:25:45
24 Q.   Who contacted you? How did you know to  02:25:45
25 come here today?                         02:25:48

Page 831

-Escudero - Cross-

1
2  A.   For this I was contacted.            02:25:49
3  Q.   Yes, for this.                   02:25:50
4  A.   To give a statement of witness and to be 02:25:51
5  before the tribunal --                    02:25:54
6  Q.   Who contacted you?                02:25:55
7  A.   For the question which has been done    02:25:57
8  today, because I come to testify about what         02:26:01
9  happened in '94, '95, and even until '97. But       02:26:05
10 after, after '97 I have never been contacted.       02:26:12
11 Q.   Maybe there's a language barrier here.   02:26:16
12      You were contacted in connection with   02:26:18
13 this arbitration to say what happened in '94 and    02:26:20
14 '95, right?                             02:26:23
15 A.   They invited me and they said -- we were 02:26:26
16 colleagues, as you mentioned before, Mr. Torralba   02:26:29
17 and myself. And he knew the core of the question.   02:26:32
18 So he wanted to know if I could testify before the  02:26:38
19 tribunal for this arbitration. And I said yes.      02:26:42
20 Q.   Okay. So Mr. Torralba contacted you,    02:26:45
21 right?                                02:26:50
22 A.   When he invited to come here, yes.      02:26:50
23 Somebody had to contact me.                  02:26:54
24 Q.   Sure.                        02:26:55
25      And now putting this arbitration         02:26:55

Page 832

-Escudero - Cross-

1
2  proceeding aside for a moment, did Mr. Torralba     02:26:57
3  contact you back before July 28th, 2000 about       02:27:00
4  Enagas' price reopener claim?                 02:27:06
5  A.   Never.                        02:27:08
6  Q.   Did anybody at Gas Natural --          02:27:09
7  A.   Never.                        02:27:12
8  Q.   -- contact you about that claim?        02:27:12
9  A.   Never. I would not have accepted. But  02:27:14
10 they never contacted me after '97.             02:27:17
11 Q.   You would not have accepted -- what do   02:27:22
12 you mean by that?                        02:27:25
13 A.   A contact. When you are retired from a  02:27:26
14 company you have nothing to do unless you are       02:27:29
15 requested or you are kindly requested to be a       02:27:32
16 witness of the truth of what happened in the        02:27:37
17 negotiation.                            02:27:40
18      I cannot refuse, because -- but any       02:27:41
19 other contact, what do you think -- no. No. I       02:27:44
20 would never have accepted something regarding my    02:27:47
21 former position.                         02:27:53
22 Q.   That's what you accepted in this case,   02:27:54
23 right? You accepted a contact to talk about your    02:27:56
24 former position, right?                     02:27:58
25 A.   Yes.                         02:27:59

37 (Pages 829 to 832)

Page 833

-Escudero - Cross-

```
1
2    Q.   And --                          02:28:00
3    A.   But I have said that has been the first   02:28:01
4    time. And because I think it was for the interest   02:28:04
5    of everybody to clarify the truth of the intention   02:28:07
6    of what we are discussing here.      02:28:11
7         I cannot only help Torralba, but I can   02:28:13
8    help the question of the truth in this case.   02:28:19
9    Q.   I think we can move on in a moment, but   02:28:24
10   my question is: Mr. Torralba contacted you in this   02:28:26
11   case, but he didn't contact you earlier, before   02:28:29
12   July 28th, 2000, about Enagas' price reopener; is   02:28:34
13   that correct?                        02:28:39
14   A.   That's correct.                 02:28:39
15   Q.   Now, if he had contacted you before July   02:28:41
16   2000 and kindly asked you to talk about what   02:28:45
17   happened in 1995, you would have agreed, right?   02:28:48
18   A.   I don't know. I don't know. It   02:28:52
19   depends. I don't know -- maybe at this moment, no.   02:28:55
20   Because now I am completely retired.   02:28:58
21        In the hypothetical you are mentioning I   02:29:01
22   was working in other things. I would not have   02:29:05
23   accepted.                           02:29:07
24        Today I cannot morally refuse a   02:29:07
25   collaboration with my old company, because I do   02:29:12
```

Page 834

-Escudero - Cross-

```
1
2    nothing except playing golf.         02:29:15
3    Q.   And that was a moral problem, if   02:29:17
4    you accepted it back in July 2000?   02:29:19
5    A.   Yes. Maybe a moral problem. Maybe a   02:29:21
6    moral problem.                      02:29:24
7    Q.   Why is that?                    02:29:25
8    A.   Well, yes, according to my ethics, if I   02:29:27
9    was working for Union Fenosa, it was not very   02:29:30
10   ethical even as a witness to work for Gas Natural.   02:29:35
11   Q.   You told us earlier, at the beginning of   02:29:39
12   the testimony, that you had nothing to do with Gas   02:29:42
13   Natural after 1997, right?           02:29:45
14   A.   Of course.                     02:29:46
15   Q.   Your work was totally separate, right?   02:29:47
16   A.   Of course, I had nothing to do with   02:29:51
17   natural gas after 1997.              02:29:54
18   Q.   I asked you about the date of Enagas'   02:30:01
19   price reopener notice, which is July 28, 2000.   02:30:03
20        Let me ask you about a different date.   02:30:06
21   The date of this letter, Exhibit C-349, is April   02:30:07
22   15, 2002.                           02:30:11
23   A.   Yes.                          02:30:12
24   Q.   Did Mr. Torralba ever contact you before   02:30:13
25   the date of this letter about Enagas' price   02:30:16
```

Page 835

-Escudero - Cross-

```
1
2    reopener notice?                     02:30:21
3    A.   No. I said to you before. Never.   02:30:23
4    Q.   And if he had contacted you at that   02:30:26
5    time, you would have told him that you expected   02:30:27
6    liberalization in 1995, right?       02:30:28
7    A.   If Carlos Torralba contacted me in what   02:30:32
8    month? And what question would he have made to me?   02:30:37
9    I want to be very specific and clear.   02:30:41
10        Carlos Torralba, what month, what year,   02:30:44
11   what question made to me?             02:30:46
12   Q.   If Mr. Torralba contacted you in March   02:30:48
13   of 2002 and asked you, did you expect   02:30:50
14   liberalization in 1995, when you were negotiating the contract   02:30:57
15   with Atlantic, did you expect liberalization in the   02:30:59
16   Spanish natural gas market, you would have said   02:31:02
17   yes, right?                          02:31:05
18   A.   But not only the question by Carlos   02:31:05
19   Torralba.                            02:31:08
20        If somebody asked me in 2002, do you   02:31:09
21   think that your expectations about the gas prices   02:31:13
22   in the ████ or the steps of liberalization in   02:31:16
23   Spain are going to according to your thinking, my   02:31:21
24   answer, yes, more or less, I guess what was going   02:31:25
25   to happen.                           02:31:28
```

Page 836

-Escudero - Cross-

```
1
2    But I think it's not -- I'm not a   02:31:29
3    magician.                            02:31:33
4    Q.   You're saying -- it wasn't a guess in   02:31:34
5    1995; you expected it in 1995.       02:31:36
6         That's your testimony, right?     02:31:39
7    A.   Yeah, I expected.                02:31:40
8    Q.   You would have told that to Mr. Torralba   02:31:41
9    in 2002, had he asked?               02:31:44
10   A.   I would say to Mr. Torralba or to   02:31:46
11   yourself -- you made me the question -- is that   02:31:48
12   things were happening as I expected them to happen.   02:31:52
13        Maybe I was wrong, but I expected.   02:31:56
14   Q.   And when you had that expectation in '95   02:31:59
15   you were an executive at Enagas, right?   02:32:01
16   A.   In '95, yes.                    02:32:04
17   Q.   I would like to talk a little bit with   02:32:25
18   you about Article 8.5(c) of the contract.   02:32:26
19   A.   Yeah. 8.5(c).                   02:32:31
20   Q.   Yes.                          02:32:35
21   A.   Price reopener, (c).             02:32:47
22   Q.   Article 8.5(c), at the bottom of that   02:33:10
23   article -- and you're free to read the whole thing   02:33:14
24   if you want -- it says that any adjustment to the   02:33:17
25   contract price "shall allow the buyer to achieve a   02:33:20
```

38 (Pages 833 to 836)

Page 837

-Escudero - Cross-

1
2  reasonable rate of return on the LNG delivered    02:33:24
3  hereunder." Right?                    02:33:28
4    A.  Yeah. Yeah.              02:33:33
5    Q.  The contract doesn't define "reasonable  02:33:34
6  rate of return"; right?            02:33:37
7    A.  No.                02:33:39
8    Q.  And the contract doesn't include any    02:33:40
9  specific number as to what the parties agreed on as  02:33:42
10 to what a reasonable rate of return for the buyer  02:33:46
11 would be, right?                02:33:49
12   A.  I think that if there was a number, then  02:33:49
13 the adjective "reasonable" would not be necessary.  02:33:52
14     But it seems there is no number, then    02:33:56
15 you use the reasonable rate of return to be    02:33:58
16 interpreted by arbiters or by any other court.    02:34:01
17   Q.  So you agree the contract doesn't    02:34:06
18 specify a number that's a reasonable rate of    02:34:08
19 return, right?                02:34:10
20   A.  Right.                02:34:10
21   Q.  In your witness statements you don't say  02:34:13
22 anywhere that Enagas ever discussed a number with  02:34:16
23 Atlantic for reasonable rate of return during the  02:34:23
24 negotiations, right?              02:34:25
25   A.  I don't remember.            02:34:26

Page 838

-Escudero - Cross-

1
2    Q.  You don't remember if you discussed it?  02:34:28
3    A.  Yeah, I don't remember. I don't    02:34:30
4  remember. Really.              02:34:31
5    Q.  Well, was it your practice at the time  02:34:33
6  to disclose your rate of return during    02:34:43
7  negotiations?                02:34:46
8    A.  Pardon?              02:34:46
9    Q.  Was it your practice -- when you    02:34:47
10 negotiated sales contracts, was it your practice to  02:34:49
11 tell your --                02:34:53
12   A.  No. You never say.          02:34:54
13     I remember that it was said by Atlantic  02:34:55
14 that the rate of return which could be obtained in  02:35:02
15 the Atlantic Trinidad plant, they was so because  02:35:06
16 precondition to sign this contract was to    02:35:16
17 participate in the plant.            02:35:19
18     And I remember at the moment they spoke  02:35:21
19 of it 20 -- around 20 percent rate of return of the  02:35:23
20 LNG plant. Which was a very simple number. You  02:35:33
21 know the investments to be made and the returns to  02:35:36
22 be taken.                02:35:38
23     But regarding what I expected or what I  02:35:38
24 thought reasonable rate of return, any comment, I  02:35:40
25 don't remember to do any comment of this kind to  02:35:45

Page 839

-Escudero - Cross-

1
2  Atlantic.                  02:35:48
3    Q.  You said that you recall a number for  02:35:49
4  the return to the plant.          02:35:55
5    A.  Yes.                02:35:56
6    Q.  That's a different question than a    02:35:57
7  return to Enagas, right?          02:35:58
8    A.  A return of the plant. But Enagas was  02:36:00
9  supposed to be a partner in the plant at this    02:36:03
10 moment.                  02:36:04
11   Q.  And the number that you put in your    02:36:05
12 witness statement for what you understood to be  02:36:07
13 the return of the plant, that was given to you by  02:36:10
14 ▮▮▮▮ right? Not Atlantic?          02:36:12
15   A.  ▮▮▮▮ is a part of Atlantic. But I    02:36:13
16 think it was confirmed by Atlantic. It was given  02:36:16
17 to me by ▮▮▮ a part of Atlantic, but I think it  02:36:20
18 was confirmed -- at least everybody, the common  02:36:23
19 opinion at least, there was ▮▮▮▮▮▮▮▮▮▮ ▮▮  02:36:27
20 ▮▮▮▮▮ I'm not aware of the circumstances today,  02:36:30
21 but I think that today it's a prediction which has  02:36:35
22 been over-passed by far in the reality.    02:36:39
23   Q.  You don't know that, do you?      02:36:45
24   A.  I suppose. I suppose.        02:36:47
25   Q.  That testimony is supposition, right?  02:36:48

Page 840

-Escudero - By the Panel-

1
2    A.  But taking into account the evolution of  02:36:50
3  the market, the market, the American market, and  02:36:53
4  the oil products in the world, I don't think I am  02:36:56
5  very far from the reality. With crude oil at 60,  02:37:00
6  and prices I see off ▮▮▮▮▮▮▮▮▮▮▮ I    02:37:05
7  don't think -- I think the ▮▮▮▮▮▮ this  02:37:11
8  cost in '95 today, you can multiply per penny -- a  02:37:15
9  great number.                02:37:22
10    MR. CAVOLI:  May I have a moment?    02:37:23
11    THE CHAIRMAN:  Sure.          02:37:26
12    (Discussion off the record.)        02:37:28
13    MR. CAVOLI:  I don't have anything    02:37:53
14 further at this time.            02:37:54
15    THE CHAIRMAN:  Mr. von Mehren?      02:37:55
16    MR. von MEHREN:  I have no questions.    02:37:56
17    THE CHAIRMAN:  Do you have any    02:37:59
18 questions?                  02:38:01
19    MR. SHEPPARD:  Yes, I do.        02:38:01
20    Mr. Escudero, in your initial witness    02:38:12
21 statement, a number of places you discuss what I  02:38:17
22 think you call the trade-off between the    02:38:23
23 take-or-pay and the flexibility under 2.6. Do you  02:38:25
24 recall that?                02:38:29
25    THE WITNESS:  Yes. Yes. You are kind  02:38:30

39 (Pages 837 to 840)

Page 841

```
1        -Escudero - By the Panel-
2  to remember the paragraph of my --        02:38:33
3        MR. SHEPPARD: Of course. Of course.    02:38:37
4  Let me find that for you. I realize there have   02:38:38
5  been a number of subjects discussed and this has   02:38:41
6  been a long time ago.                    02:38:43
7        Let me find this for you.            02:38:45
8        Yes. If you will look at your first   02:39:06
9  witness statement, Mr. Escudero, there are a series 02:39:08
10 of paragraphs. Paragraph 36 and following.   02:39:11
11       THE WITNESS: 36 and following...?   02:39:17
12       MR. SHEPPARD: Yes. And if you would   02:39:20
13 like to take a moment to refresh your memory,   02:39:21
14 please take all the time that you need.       02:39:25
15       THE WITNESS: And what's your question? 02:39:28
16       MR. SHEPPARD: My question was this, as 02:39:30
17 best you can remember.                02:39:33
18       You indicate in your statement -- let me 02:39:33
19 just read this.                        02:39:39
20       It says, "Article 2.6, Resales to     02:39:41
21 [    ]' Do you see that heading?          02:39:45
22       THE WITNESS: Yes.                02:39:47
23       MR. SHEPPARD: "Was negotiated and   02:39:48
24 agreed as a trade-off for the acceptance of    02:39:49
25 take-or-pay, but not to be used only to mitigate  02:39:52
```

Page 842

```
1        -Escudero - By the Panel-
2  the risk of take-or-pay."                02:39:55
3        Do you see that?                 02:39:57
4        THE WITNESS: Yes, I see that.        02:39:58
5        MR. SHEPPARD: And then you discuss   02:39:59
6  other ways in which the rights under 2.6 could be 02:40:00
7  used.                            02:40:07
8        THE WITNESS: Yes.                02:40:08
9        MR. SHEPPARD: What I will ask you to   02:40:09
10 do, the best you can recall, is just to elaborate  02:40:10
11 on any discussions that you recall with any of the 02:40:15
12 representatives of Atlantic about that subject.   02:40:17
13       THE WITNESS: We were discussing this   02:40:23
14 question, as I mentioned this morning, the     02:40:27
15 possibilities to use the Article 2.6 not only to  02:40:31
16 mitigate take-or-pay, but also for other reasons. 02:40:35
17 I discussed very widely with [    ]        02:40:38
18       But these discussions were transmitted  02:40:42
19 to Atlantic.                         02:40:46
20       At this moment, as we said this morning, 02:40:48
21 the discussions were centered on the possibility of 02:40:51
22 having transportation savings, because of a    02:40:56
23 possibility of a swap, Sonatrach, Atlantic, [    ] 02:41:02
24 and Enagas. We advanced it very much because the 02:41:12
25 volumes to being purchased at this moment from   02:41:15
```

Page 843

```
1        -Escudero - By the Panel-
2  [    ] to Sonatrach were almost equivalent to the 02:41:20
3  volumes we have been awarded from Trinidad. So it 02:41:24
4  made a lot of sense, economic sense, to do that.  02:41:27
5        This morning I was recalled that maybe  02:41:32
6  it was to increase the risk of Spain from Algeria, 02:41:34
7  but I remember that in the discussions with [   ] we 02:41:38
8  about this matter we said that the barter would be 02:41:42
9  interrupted in case of any problem in Algeria.   02:41:49
10 Because the risk of Algeria was to have a lot of -- 02:41:53
11 at this moment the swap will be cut and we would  02:41:56
12 continue getting gas from Trinidad.          02:41:59
13       But for -- during in normal           02:42:02
14 circumstances when there was a Sonatrach ship going 02:42:06
15 to [    ] and at the same time this ship could be  02:42:09
16 deviated going to Cartagena, Al Maria, 16 hours,  02:42:14
17 instead of going to [    ], which is I think 25   02:42:21
18 days, and at the same time the ship off-takes the 02:42:23
19 liftings, corresponding to Enagas were sent,    02:42:33
20 deviated, to [        ]                  02:42:37
21       So it was in operation very, very clear, 02:42:39
22 which was discussed between [    ] and ourselves,  02:42:41
23 and commented to Atlantic.               02:42:45
24       Atlantic did not make any objection    02:42:49
25 except the question, which is in the contract, was 02:42:51
```

Page 844

```
1        -Escudero - By the Panel-
2  in the discussion, that that could in any case    02:42:55
3  reduce the shipping capacity of Enagas, because we 02:42:58
4  had to ensure that if there was no swap, we will   02:43:02
5  have capacity to take the gas guarantee, and we   02:43:07
6  gave guarantees in case of the construction that it 02:43:14
7  would not happen.                     02:43:18
8        If I may complement your question,     02:43:20
9  because I think it's very important, we were very  02:43:22
10 frustrated when in the early eighties Enagas could 02:43:28
11 not fulfill the commitments with Sonatrach. And we 02:43:34
12 incurred in take-or-pay obligations. It was three, 02:43:40
13 four years -- not only for Enagas. In the States  02:43:45
14 there were American companies also in this      02:43:49
15 question, because of the energy crisis at this    02:43:52
16 moment in Europe.                     02:43:54
17       But in our case, there were hundred or   02:43:55
18 millions of dollars which were paid because we paid 02:43:57
19 the gas even not taken. There was no market in    02:44:02
20 Spain.                            02:44:05
21       And I remember if I could have a        02:44:06
22 mitigation by selling at lower prices the cargo   02:44:09
23 outside, so I said that even for mitigation when   02:44:13
24 there is a crisis you cannot have a demand in Spain 02:44:18
25 to have the possibility to sell to third parties or 02:44:22
```

40 (Pages 841 to 844)

Page 845

1    -Escudero - By the Panel-
2    abroad free destination, that covers you a lot for   02:44:26
3    your responsibilities in the take-or-pay.   02:44:32
4         So it was the mitigation, but also, why   02:44:34
5    not, the new spirit of Gas Natural to make money,   02:44:38
6    to earn money, not because of reasons of   02:44:55
7    take-or-pay but because of reasons of other swaps   02:44:58
8    or resales of LNG earning money. Fulfilling the   02:45:02
9    contract 100 percent. And not giving any problem   02:45:09
10   to Atlantic.   02:45:14
11        So that's -- I have exposed to you my   02:45:15
12   ideas regarding this trade-off between take-or-pay   02:45:21
13   and 2.6.   02:45:25
14        MR. SHEPPARD: Thank you very much.   02:45:27
15   That's all I have, Mr. Chairman.   02:45:28
16        THE CHAIRMAN: Mr. Massey.   02:45:29
17        MR. MASSEY: A couple of topics I would   02:45:33
18   like to review with you, Mr. Escudero. I would   02:45:37
19   like to start by referring to your witness   02:45:40
20   statement, paragraphs 52, 59 and 60.   02:45:42
21        THE WITNESS: 52, 59 and 60. Okay.   02:45:49
22   With pleasure.   02:45:55
23        MR. MASSEY: Starting with 52, you   02:46:00
24   introduced this discussion of, "incoherence, but   02:46:03
25   consistency."   02:46:07

Page 846

1    -Escudero - By the Panel-
2         I was just wondering if you could   02:46:09
3    identify who coined that phrase, and if you could   02:46:13
4    identify who were the parties that discussed that   02:46:17
5    phraseology in connection with -- I assume that   02:46:21
6    this is related to 2.6?   02:46:24
7         THE WITNESS: I remember that, the   02:46:27
8    phrase was -- I have a good memory to remember this   02:46:28
9    phrase. I was not -- I cannot have rights of --   02:46:32
10   copyrights, because my English is not sufficient to   02:46:38
11   take the incoherence, but consistency.   02:46:42
12        But it was pronounced. Who pronounced   02:46:45
13   it, I don't remember. I don't remember.   02:46:49
14        MR. MASSEY: To what degree was it   02:46:53
15   openly discussed, this concept of incoherent, but   02:46:55
16   consistent?   02:47:00
17        THE WITNESS: Even in the table of   02:47:01
18   negotiations what we were saying, look, but we are   02:47:03
19   taking for price reopener the unbiased market,   02:47:06
20   which is Spain of course, but at the same time you   02:47:12
21   are freely accepted to sell the gas to ▮▮▮   02:47:14
22   There is some kind of incoherence.   02:47:18
23        And I said yes, but there is   02:47:22
24   consistency.   02:47:27
25        I did not say incoherence and   02:47:27

Page 847

1    -Escudero - By the Panel-
2    consistency. I'm not so good. Somebody said.   02:47:30
3         We coined the expression because it   02:47:33
4    expressed very much the reality.   02:47:35
5         There was a kind of incoherence, but at   02:47:36
6    the same time it was consistent with the idea of   02:47:40
7    offering to Atlantic a hedging between American   02:47:41
8    /European prices and giving the take-or-pay for   02:47:48
9    these prices, but at the same time leaving one of   02:47:52
10   the buyers to take advantage of the situation.   02:47:55
11        And consistent with -- I think there is   02:47:59
12   a consistency between 2.6 and 8.5.   02:48:02
13        MR. MASSEY: You said in your earlier   02:48:09
14   testimony some of these discussions that were a   02:48:12
15   little bit more wide-ranging took place with ▮▮ ▮▮   02:48:14
16   and that the discussions with Atlantic were a   02:48:20
17   little narrower in terms of 2.6.   02:48:22
18        Was that right, to understand your   02:48:25
19   testimony like that?   02:48:27
20        THE WITNESS: Yes. Yes. But without   02:48:28
21   ever making something secret between ▮▮ ▮▮▮ and   02:48:30
22   ourselves which was not communicated to Atlantic.   02:48:36
23        MR. MASSEY: So my question is: Was   02:48:39
24   this phrase, incoherent but consistent, was that   02:48:41
25   used in the discussions with ▮▮▮ or was that used   02:48:44

Page 848

1    -Escudero - By the Panel-
2    at the discussions with Atlantic face-to-face when   02:48:48
3    ▮▮▮ was not participating?   02:48:52
4         THE WITNESS: As far as I can remember,   02:48:54
5    for sure with Atlantic. But I think that also in   02:48:55
6    other meetings with ▮▮▮ we used the expression.   02:48:59
7    ▮▮▮ was less affected because it was   02:49:03
8    Atlantic which has to discuss with us 2.6 and 8.5.   02:49:06
9         Once, after the letter of April,   02:49:12
10   splitting the contract in two, this question of how   02:49:17
11   we made the price reopener in Enagas interested   02:49:21
12   less -- interested less to ▮▮▮   02:49:27
13        But answering your question, I think   02:49:29
14   that I said that to Atlantic, but also mentioned it   02:49:30
15   to ▮▮▮▮▮▮   02:49:34
16        MR. MASSEY: Is this connected with your   02:49:39
17   recent statement that you considered a mitigation   02:49:40
18   under 2.6 possible by reselling even at a lower   02:49:44
19   price to ▮▮▮   02:49:50
20        THE WITNESS: Yeah.   02:49:52
21        MR. MASSEY: So the incoherence would be   02:49:54
22   that you were paying a Spanish price but you were   02:49:56
23   forced to sell at a lower price in ▮▮▮▮▮ is   02:50:00
24   that the idea?   02:50:04
25        THE WITNESS: That was my risk.   02:50:05

41 (Pages 845 to 848)

Page 849

-Escudero - By the Panel-

1
2    When I said the take-or-pay with the    02:50:06
3  Spanish price, that was my risk, there was no room. 02:50:08
4  It was physically impossible to send the gas to    02:50:11
5  Spain, and I would have to send it to ███ as    02:50:13
6  accepted by the contract. Then I would lose money. 02:50:15
7  But I would not incur 100 percent take-or-pay.    02:50:18
8    MR. MASSEY: Did you have any agreement    02:50:22
9  with ███ at that time that they guarantee that    02:50:23
10  they would take that cargo for you? Were you    02:50:26
11  confident that terminal would be open to you when    02:50:30
12  you needed it?    02:50:34
13    THE WITNESS: I was confident. And    02:50:35
14  there were conversations. And of course they    02:50:37
15  wanted at this moment, Atlantic was aware to have    02:50:39
16  access to Spain because they had the -- all you see 02:50:42
17  one side. There was the other side. They wanted    02:50:46
18  to be confident that also they could take profit of 02:50:49
19  the contract by sending the gas to Spain, which has 02:50:51
20  never happened, because after '99 I don't think it    02:50:57
21  would be a good business opportunity. But we    02:51:00
22  negotiated.    02:51:06
23    MR. MASSEY: Was your confidence with    02:51:07
24  ███ based on any kind of written understanding    02:51:09
25  with them that you would be able to use that    02:51:13

Page 850

-Escudero - By the Panel-

1
2  terminal if you needed it?    02:51:15
3    THE WITNESS: Written? Never. Because    02:51:16
4  there was never an agreement.    02:51:18
5    They said to us that was logical that    02:51:19
6  they could have a capacity for not only -- look, as 02:51:22
7  I explained before, the ███ terminal, the    02:51:25
8  capacity is not capacity of regasification, it's    02:51:28
9  capacity to transporting the LNG for storage, and    02:51:33
10  this capacity is not unlimited.    02:51:37
11    But if you take one capacity and the    02:51:40
12  other, it takes a lot of capacity. And why    02:51:43
13  was going to refuse, we have never written    02:51:47
14  commitment, but I think it was in the interest of    02:51:52
15  both sides to speak of not only swaps, which    02:51:54
16  interested -- the question is how to -- the saving    02:51:58
17  transportation cost, how to share between the two    02:52:05
18  companies, we never discussed.    02:52:07
19    And the question, if we're selling, how    02:52:09
20  much -- what kind of price or whatever, we never    02:52:12
21  discuss it.    02:52:16
22    MR. MASSEY: Going back to the swap, as    02:52:16
23  I'm understanding your testimony, at least in your    02:52:20
24  mind, 2.6 was valuable to you in two ways: One, as 02:52:23
25  a basis for the swap?    02:52:27

Page 851

-Escudero - By the Panel-

1
2    THE WITNESS: Yes.    02:52:29
3    MR. MASSEY: And two, as a mitigation    02:52:30
4  for the take-or-pay, with the assumption that if    02:52:32
5  necessary you could sell into the ███████    02:52:35
6  market, even if it was at a lower price than Spain, 02:52:38
7  because that would be better than take-or-pay?    02:52:42
8    THE WITNESS: Third, without mitigation    02:52:44
9  of take-or-pay, because it was economical    02:52:45
10  interesting. But not to the ███████market.    02:52:50
11  To ███    02:52:53
12    What ██ we knew is he would never    02:52:55
13  accept an open access to its terminals and selling 02:52:59
14  Enagas directly to the end users in ██████ █  02:53:04
15  We knew that we could only sell, by the contract,    02:53:10
16  to ████    02:53:13
17    MR. MASSEY: Right.    02:53:15
18    Now, in terms of your swap, which was, I 02:53:16
19  think -- I think there's been testimony from the    02:53:18
20  Atlantic side also that the concept of swap was --  02:53:22
21  mentioned shipping efficiencies.    02:53:26
22    Did you have any agreement with ███    02:53:30
23  about their commitment to the swap? Or was it your 02:53:32
24  assumption that since it was going to be    02:53:37
25  economically advantageous to both parties,    02:53:38

Page 852

-Escudero - By the Panel-

1
2  something would be worked out when the time came?    02:53:41
3    THE WITNESS: We made some meetings and    02:53:44
4  we made numbers. Nothing written. I remember.    02:53:47
5    The question is that we were in '95, the 02:53:52
6  start of deliveries were supposed to be in 2000 and 02:53:59
7  it was too soon. The important thing, we had a    02:54:02
8  close relation, ████████ and myself, and we    02:54:05
9  were sure that if circumstances did not change, the 02:54:17
10  operation could have been implemented.    02:54:25
11    I left the company, the circumstances    02:54:31
12  changed, I don't know. I don't know if there has    02:54:34
13  been any time any swap between ███ and Enagas or 02:54:37
14  Gas Natural. So left worrying about this matter in 02:54:42
15  '97.    02:54:47
16    MR. MASSEY: All right. Going back now    02:54:48
17  to paragraph 52 again. In the middle of that    02:54:50
18  paragraph you notice that the Spanish price already 02:54:53
19  considers a premium to address the flexibility;    02:54:59
20    I think your testimony is that the    02:55:04
21  flexibility was paid for by a premium over the    02:55:08
22  Spanish price. Is that correct?    02:55:11
23    THE WITNESS: That is correct. My idea    02:55:15
24  is that we could make an economic effort. I was    02:55:16
25  previously questioned how much, if we made some    02:55:20

42 (Pages 849 to 852)

Page 853

1      -Escudero - By the Panel-
2    calculation of what was the value of these premium.  02:55:23
3    I don't remember having made any calculation.  I    02:55:27
4    don't remember any number.  I only remember a    02:55:30
5    phrase that I took notes by Roger Stehn saying,    02:55:34
6    look, as a way of negotiation we are offering you    02:55:40
7    something that can be valued at ███████  My    02:55:43
8    memory is as good as that.  But we never made a    02:55:47
9    calculation.  It was ██████████    02:55:50
10        In any case, it was something which was  02:55:52
11   important to us.  And that represented that we    02:55:56
12   could pay something more for equivalent contracts.  02:56:01
13       MR. MASSEY:  Now that you bring up that  02:56:08
14   █ point, I think if we turn to Exhibit 7 to    02:56:10
15   your statement -- I think it's 7 --    02:56:15
16       MR. CAVOLI:  Annex 7.    02:56:19
17       MR. MASSEY:  -- attached to Annex 7 of    02:56:36
18   your witness statement, I take it these are notes    02:56:39
19   that you made, that this is your -- this is    02:56:41
20   material that you wrote yourself?    02:56:45
21       THE WITNESS:  Yes.  Personally, it's    02:56:47
22   difficult to lead the negotiation and take notes at  02:56:52
23   the same time.  I was with Juan Mas at my right,  02:56:56
24   and we took notes.  And in the night, this woman  02:57:00
25   that were not typing like that, but with a pen ball  02:57:03

Page 854

1      -Escudero - By the Panel-
2    we took notes, and what has happened today, and    02:57:08
3    personally I took notes.    02:57:10
4        The question is when I left Enagas, and    02:57:12
5    in good faith, when I was invited as a witness,    02:57:16
6    because I forgot, I didn't know what happened the    02:57:20
7    12th of March '95, Mr. Humphrey offered me my files  02:57:23
8    of Enagas of this year.  And I found this note.  I  02:57:31
9    found this note which has been typed and written  02:57:35
10   and translated into English.    02:57:38
11       And in good faith I have no other    02:57:40
12   evidence to give to you but my own word that that  02:57:42
13   was said by Amoco, and I think Roger Stehn, who    02:57:46
14   said --    02:57:52
15       MR. MASSEY:  Right.  But just to be    02:57:52
16   clear about the process by which this note was    02:57:54
17   prepared, in other words, you were the main    02:57:56
18   negotiator and you had to spend a lot of time    02:57:59
19   thinking and talking so you couldn't take specific  02:58:02
20   notes.  So you had some support with you who was  02:58:06
21   monitoring what was going on?    02:58:10
22       THE WITNESS:  Yes.    02:58:12
23       MR. MASSEY:  At night, after the meeting  02:58:15
24   was over, you maybe jointly reviewed the    02:58:17
25   information and then somebody else prepared this  02:58:19

Page 855

1      -Escudero - By the Panel-
2    note, but you were familiar with what was in it; is  02:58:22
3    that a correct understanding?    02:58:26
4        THE WITNESS:  You're right.    02:58:28
5        I am not Superman, and I cannot, for    02:58:30
6    instance, attend this meeting and take notes, what  02:58:32
7    is happening.    02:58:34
8        But I was very confident in Juan Mas.  I  02:58:35
9    think -- I don't remember, because it's a long time  02:58:39
10   ago, but I think most of the -- 100 percent is    02:58:42
11   true, but most of this note is due to collaborator  02:58:46
12   called Juan Mas.    02:58:50
13       MR. MASSEY:  Let me ask you one question  02:58:53
14   about it.    02:58:54
15       Were you using these notes just for your  02:58:55
16   own internal record?    02:58:57
17       THE WITNESS:  Yeah.    02:58:59
18       MR. MASSEY:  Or were they part of    02:59:00
19   documents that were being presented to a higher    02:59:02
20   echelon that might be agreeing or not agreeing to  02:59:04
21   these proposals?    02:59:07
22       THE WITNESS:  No.  It wasn't for that.    02:59:09
23   The only use of that is that 10 years after that,  02:59:10
24   or 12 years, we could find that and use it in this  02:59:13
25   tribunal.  But the only -- the question of being a  02:59:16

Page 856

1      -Escudero - By the Panel-
2    tool to be used internally in the negotiation.  But  02:59:21
3    nobody was going to check these notes.    02:59:24
4        MR. MASSEY:  So just looking to the text  02:59:27
5    of this note --    02:59:32
6        THE WITNESS:  Yes.    02:59:36
7        MR. MASSEY:  -- under the various things  02:59:37
8    that Amoco explained to you, the third thing said  02:59:39
9    that "Sellers value ██████████ as the    02:59:44
10   benefit ████ and Enagas will achieve with the    02:59:51
11   flexibility of the swaps."  Right?    02:59:54
12       THE WITNESS:  Yes.    02:59:56
13       MR. MASSEY:  As I heard your testimony  02:59:57
14   before we got to this document, you don't recall  02:59:58
15   the specifics of that discussion, no details were  03:00:02
16   ever presented as to how that number might come up?  03:00:06
17       THE WITNESS:  Yes.    03:00:09
18       MR. MASSEY:  And you don't really know  03:00:09
19   whether there's any economic methodology there?    03:00:13
20       THE WITNESS:  No.  I think, according to  03:00:17
21   this note, my today's interpretation is that it    03:00:18
22   reduced this figure by Roger Stehn as an argument  03:00:23
23   in the price discussion:  Look, we are offering you  03:00:27
24   a gas which for flexibility reasons that we have    03:00:30
25   agreed upon at least is a -- the value is ███████  03:00:33

43 (Pages 853 to 856)

Page 857

-Escudero - By the Panel-

1
2     We took notes of this figure. But I          03:00:40
3  cannot be more specific about that.            03:00:44
4     MR. MASSEY:  This was done on March 7th. 03:00:49
5  When did you reach the final agreement on price?  03:00:52
6     THE WITNESS:  Two days later. I think  03:00:55
7  March 10. I remember ten days in London without  03:00:58
8  any weekend, ten days in negotiations with    03:01:01
9  Atlantic/Enagas, Enagas/███████           03:01:07
10  Enagas ███████ Atlantic, and at the same time  03:01:12
11  somebody coming from the government of Trinidad.   03:01:14
12  So it was very hard days.                     03:01:16
13     What I know, because there is in the     03:01:17
14  annex a letter of 15 of March or something like  03:01:20
15  that, is that price flexibilities and most of the  03:01:23
16  things were agreed by the 10th of March. So two or  03:01:26
17  three days after this note.                   03:01:33
18     MR. MASSEY:  Are there any other notes  03:01:35
19  after this one that further explain -- when you  03:01:37
20  looked in your file, did you find any notes for the  03:01:40
21  8th and the 9th and the 10th?                 03:01:43
22     THE WITNESS:  Yes. I found notes for   03:01:46
23  every day. But I took it for the tribunal, the  03:01:48
24  notes, which could be interesting. But for any of  03:01:51
25  the meetings, I have notes. I have notes.     03:01:54

Page 858

-Escudero - By the Panel-

1
2     MR. MASSEY:  Is there any other        03:01:57
3  discussion in any of those other notes of this  03:01:58
4  ████ or how it might --                       03:02:02
5     THE WITNESS:  No. What is in the notes,  03:02:05
6  I didn't want to burden the tribunal with that.  03:02:07
7  But I said in my statement that for nine times we  03:02:09
8  discussed the freedom of destination, the     03:02:15
9  flexibility of destination.                   03:02:18
10     Why? Because in the notes they started  03:02:20
11  say no. Then five cargoes, then limit -- and  03:02:23
12  finally after nine times going to the table they  03:02:28
13  said, okay, for Enagas there is no limit in  03:02:32
14  delivering cargoes to ███████                 03:02:37
15     At the same time I don't know what     03:02:40
16  happened later on with the contract with ████  03:02:40
17  But for ███████ they imposed limitation in the  03:02:42
18  day of March.                                 03:02:48
19     I show like an annex showing that Enagas  03:02:49
20  was free to deviate all the gas freely to ████  03:02:56
21  But ████ had not the same possibility. Because, I  03:03:04
22  don't know, Atlantic, or Amoco in particular, were  03:03:10
23  very concerned, very worried that ████ would take  03:03:14
24  profit of -- at this moment, the advantage of the  03:03:20
25  Spanish market, and put a limit on them.      03:03:25

Page 859

-Escudero - By the Panel-

1
2     I don't know how many cargoes and I     03:03:29
3  don't know finally it was in the contract. But  03:03:31
4  they put a limit for them for these kind of   03:03:33
5  diversion of cargoes.                         03:03:38
6     MR. MASSEY:  Thank you for all of that. 03:03:40
7     I would like to go, if I could, to the 03:03:44
8  issue of ███████ plant rate of return which you  03:03:48
9  testified about. And specifically ask you to look  03:03:53
10  at witness statement paragraphs 63 and 64.    03:03:56
11     THE WITNESS:  Yes.                     03:04:12
12     MR. MASSEY:  In paragraph 63 you kind of  03:04:14
13  make a parallel between what Enagas wanted and what  03:04:16
14  Atlantic wanted.                              03:04:19
15     THE WITNESS:  Yes.                     03:04:21
16     MR. MASSEY:  In the first bullet you say  03:04:23
17  "Enagas wanted a reasonable rate of return    03:04:26
18  guaranteed under the price reopener."         03:04:28
19     And the next bullet you say "Atlantic   03:04:31
20  obtained a rate of return of 20 percent."     03:04:35
21     And then in the beginning of paragraph  03:04:38
22  64 you say: "Once Atlantic received from Enagas  03:04:41
23  the guarantee of ███████ "                    03:04:44
24     Now, I looked around in all these      03:04:50
25  documents, and I couldn't find any way that Enagas  03:04:52

Page 860

-Escudero - By the Panel-

1
2  guaranteed ███████                            03:04:55
3     THE WITNESS:  In the take-or-pay.       03:05:00
4     What I am saying here is that we made   03:05:05
5  numbers. I think the take-or-pay at this moment  03:05:06
6  represented ███████                           03:05:09
7     So if you compared that with the       03:05:17
8  investments and rough calculation, we checked that  03:05:21
9  the ███████ figure by ███████ to me           03:05:26
10  was a reasonable figure with prices of energy as  03:05:34
11  they were at this moment, that it was a very  03:05:37
12  reasonable figure, the ███████                03:05:41
13     MR. MASSEY:  But if you had a price     03:05:43
14  reopener clause that allowed you to reduce the  03:05:44
15  price, wouldn't that impact what the IRR was?  03:05:48
16     THE WITNESS:  But that would have       03:05:52
17  implied at the same time an increase in the price  03:05:55
18  of gas.                                       03:05:58
19     MR. MASSEY:  Not necessarily?          03:06:01
20     THE WITNESS:  Not necessarily, you're   03:06:02
21  right. You're right. If the price of gas were  03:06:06
22  reduced, then the IRR -- the tier would be much  03:06:08
23  lower. I agree.                               03:06:14
24     But, again, I never expected prices in  03:06:15
25  energy going down. I expected at least keeping at  03:06:18

44 (Pages 857 to 860)

Page 861

1    -Escudero - By the Panel-
2    the level of this moment, which was $18 per barrel.  03:06:23
3         MR. MASSEY:  Why was the price reopener  03:06:28
4    important to you if you didn't expect the    03:06:31
5    possibility of the prices going down?  The price    03:06:32
6    reopener from your perspective would seem only to    03:06:34
7    matter in cases where the prices went down.    03:06:38
8         THE WITNESS:  It was a guarantee, but --  03:06:41
9    it was a guarantee.  If liberalization was going to  03:06:45
10   take place and the question of competition from gas  03:06:48
11   is contemplated in Article 8 of price reopener,    03:06:56
12   then there could be a situation because of hard    03:07:01
13   competition in Spain that our internal prices, the   03:07:05
14   end user buyer market, would go down, even with the  03:07:10
15   same level of prices from Trinidad.  And then we    03:07:13
16   could use the price reopener.    03:07:16
17        It was -- suppose that we didn't use the  03:07:19
18   flexibility of destination and we had to sell in   03:07:23
19   Spain, and at the same time the liberalization   03:07:25
20   process was very in progress, and then we could ask  03:07:28
21   for a price reopener.    03:07:33
22        MR. MASSEY:  And then you would reduce   03:07:35
23   the price?    03:07:37
24        THE WITNESS:  And then I would reduce   03:07:38
25   the price.    03:07:39

Page 862

1    -Escudero - By the Panel-
2         MR. MASSEY:  And then the IRR would go   03:07:40
3    down?    03:07:42
4         THE WITNESS:  You're right.  Yeah.    03:07:42
5    You're right.  I couldn't imagine that at this   03:07:44
6    moment, but you're right.    03:07:48
7         MR. MASSEY:  It seems to me if you could  03:07:49
8    imagine a price reopener, you could imagine that.   03:07:51
9         THE WITNESS:  Yeah.    03:07:54
10        MR. MASSEY:  Because a price reopener   03:07:55
11   would imply the price might go down.    03:07:57
12        THE WITNESS:  Yeah.  You're right.    03:07:59
13        MR. MASSEY:  If I could -- and again,   03:08:06
14   this ████████ wasn't ever discussed with    03:08:11
15   Atlantic; this was only discussions with    03:08:14
16   ████████    03:08:17
17        THE WITNESS:  With Atlantic also.    03:08:17
18        MR. MASSEY:  Really?    03:08:19
19        THE WITNESS:  Really.  I was personally  03:08:20
20   very frustrated.  Enagas was going to be a partner  03:08:22
21   of Atlantic and it was in the contract.    03:08:26
22        Initially, I took the figure of ██    03:08:28
23   ██ from ████████, from ██ but then I  03:08:30
24   made the contract with Phil Ribbeck, with many,   03:08:33
25   many people.  At the moment I was going and it was  03:08:38

Page 863

1    -Escudero - By the Panel-
2    already approved that Enagas would be a partner of  03:08:43
3    Atlantic.  It was at the last moment an internal   03:08:45
4    question of the buyer that the option, to my    03:08:49
5    personal frustration, was exercised by our mother  03:08:53
6    company, as the contract says.  The option was   03:08:58
7    exercised by Repsol.    03:09:01
8         But this was something new to me.  To me  03:09:06
9    the important thing is that we were going to    03:09:08
10   participate in the profits of the project as ███  03:09:11
11   ███████ of the plant.    03:09:15
12        MR. MASSEY:  Well, you were not here to  03:09:20
13   hear Mr. Stehn's testimony, but you probably have  03:09:24
14   read his witness statement.    03:09:28
15        Have you read Mr. Stehn's witness   03:09:30
16   statement?    03:09:32
17        THE WITNESS:  Sí, yes.  What is the   03:09:32
18   question, please?    03:09:34
19        MR. MASSEY:  In paragraph 31 of    03:09:36
20   Mr. Stehn's witness statement he says the   03:09:39
21   following:  "The pricing formula contained in   03:09:41
22   Article 8.1 does not provide for any fixed    03:09:44
23   numerical rate of return to either Atlantic or   03:09:47
24   Enagas.  During contract negotiations neither party  03:09:50
25   sought a fixed rate of return and no such returns  03:09:54

Page 864

1    -Escudero - By the Panel-
2    were ever discussed."    03:09:58
3         THE WITNESS:  Maybe he does not    03:10:02
4    remember.    03:10:04
5         I remember speaking of █████████  03:10:05
6    ████████████████████.  For the  03:10:10
7    rate -- for the reasonable rate of return, I don't  03:10:13
8    remember any discussion.  I'm very sorry that Roger  03:10:16
9    cannot remember that.  But I remember the███  03:10:22
10   ███████being presented by ██████████and  03:10:24
11   discussed with Atlantic.  Sorry that he does not   03:10:27
12   remember.    03:10:31
13        MR. MASSEY:  So your testimony is in   03:10:32
14   addition to ████████████was discussed   03:10:34
15   with Atlantic.    03:10:37
16        Was it discussed with Mr. Stehn?    03:10:39
17        THE WITNESS:  It was commented with   03:10:40
18   Atlantic.  There was no possible discussion    03:10:41
19   because -- I remember that we presented -- I don't  03:10:46
20   know how to say in English -- an evolution of    03:10:51
21   incomes, showing that this was possible, taking   03:10:58
22   investments, all the liabilities -- well, I don't   03:11:02
23   know how to say in English this question.    03:11:08
24        But I saw the piece of paper with the 20  03:11:10
25   years program of the plant with incomes and    03:11:13

45 (Pages 861 to 864)

Page 865

```
1        -Escudero - By the Panel-
2    expenses and the final result.          03:11:19
3        I remember that was offered to me as an   03:11:21
4    internal -- at the moment we were going to   03:11:25
5    participate, and maybe it's in my files and it's   03:11:28
6    showing the ███████. And it was not at this   03:11:33
7    moment count. It was given by somebody in Amoco.   03:11:37
8        MR. MASSEY: Going back to your witness   03:11:47
9    statement, paragraph 64, you say: "Once Atlantic   03:11:48
10   received from Enagas the guarantee of a ██████   03:11:49
11   ██████ which was its first and main priority,   03:11:53
12   Amoco" -- you used Amoco, not Atlantic -- "Amoco   03:11:59
13   was satisfied, and therefore it agreed to Enagas   03:12:04
14   having its free resales and exchanges with ████   03:12:07
15       You were implying in that paragraph that   03:12:11
16   there was a trade-off, you got your rights under   03:12:13
17   2.6 because you guaranteed the ███████?   03:12:16
18       THE WITNESS: Yes. But that was from   03:12:19
19   the beginning. From the dinner meeting in La   03:12:21
20   Dorada. If you make it possible, I give you what you   03:12:27
21   implementation of the plant, I give you what you   03:12:30
22   ask.                                    03:12:32
23       What do you ask.                    03:12:32
24       Then I say, good price, flexibility of   03:12:34
25   destination and participation in the plants.   03:12:39
```

Page 866

```
1        -Escudero - By the Panel-
2        It was a trade-off.                 03:12:41
3        But in the trade-off we lost some   03:12:42
4    pennies. Because finally it was not the   03:12:45
5    participation by Enagas, but by Repsol. At the   03:12:48
6    same time it was not a free destination as we   03:12:54
7    negotiated, it was a limited free destination,   03:12:57
8    because it was limited to ██████ or to a number of   03:13:00
9    cargoes to third parties in sharing profit.   03:13:03
10       What was for them the question, that   03:13:06
11   they could build the plant, because otherwise the   03:13:10
12   plant, if it is not by the take-or-pay plant by   03:13:13
13   Enagas, it was sure the plant maybe would have been   03:13:19
14   built, but 10 or 15 years later. Because at this   03:13:23
15   moment there was no financial possibility, and   03:13:28
16   there were no possibilities in the market to make   03:13:31
17   it possible, this project.               03:13:33
18       So it was a trade-off. And the ████   03:13:35
19   ██████ is something I say, here, look, Atlantic,   03:13:37
20   you are going to have ████████ Give me what I'm   03:13:41
21   asking.                                 03:13:46
22       MR. MASSEY: Let me ask you another   03:13:47
23   question with respect to the price negotiations.   03:13:50
24   And that is: What was the thinking behind the   03:13:53
25   escalation formula. In other words, your pricing   03:13:57
```

Page 867

```
1        -Escudero - By the Panel-
2    formula has ████████████████          03:14:00
3    ████████████████ in 8.1.               03:14:06
4        THE WITNESS: Yeah.                  03:14:10
5        MR. MASSEY: What was the viewpoint of   03:14:11
6    Enagas in coming up with that ██████ formula?   03:14:13
7        THE WITNESS: I would say all contracts   03:14:23
8    of Enagas has a ████████████           03:14:25
9    ████████████                           03:14:27
10       In all the formula exist in existing   03:14:28
11   contracts in Europe there is an ██████████   03:14:35
12   ████████████                           03:14:38
13       At some moment in the market they   03:14:43
14   introduced the other factors, such as the price of   03:14:45
15   coal, the price of electricity, the inflation in   03:14:50
16   the country. But the sellers refused it. The   03:14:54
17   sellers refused. But they trusted more in the   03:14:59
18   evolution of ██████████ than in the evolution of   03:15:03
19   inflation and coal and electricity. So they   03:15:06
20   refused it.                            03:15:09
21       There was an intercost between the ███   03:15:10
22   and the escalators. They would accept escalators   03:15:17
23   more stable, but at this moment they would ask for   03:15:23
24   a higher ████                          03:15:28
25       What we have in this negotiation, as in   03:15:30
```

Page 868

```
1        -Escudero - By the Panel-
2    other negotiations in Europe at this moment, say,   03:15:32
3    let's look for something which can be fair by   03:15:35
4    having a low ████ was reasonable, but we accept   03:15:40
5    for you to give escalation with ████████████   03:15:50
6        Which for the buyer is very dangerous,   03:15:55
7    for the buyer is very dangerous.        03:15:56
8        And that was the reason.            03:15:59
9        The question, then, what to discuss the   03:16:00
10   final numbers of the ████ and the final numbers of   03:16:03
11   the weightings of the ██████████████ because   03:16:08
12   of course there's more sensitive to increases in   03:16:12
13   prices ████████████████ There   03:16:16
14   were discussions of ████ and weightings of the ███   03:16:22
15   █                                      03:16:27
16       And we had the final agreement which   03:16:27
17   included, to my view, a trade-off giving you the   03:16:30
18   realization of the product at the possibility of   03:16:37
19   financing it, and giving us something which   03:16:40
20   included very good things, the participation in the   03:16:43
21   plant and so on, the flexibility of destination.   03:16:46
22       So I was very happy. And I think in the   03:16:50
23   history of gas negotiations in Europe it was the   03:16:53
24   first time, the first time that the ████████ █   03:16:58
25   ████████████████████                   03:17:03
```

46 (Pages 865 to 868)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017



Page 869

-Escudero - By the Panel-

2  So I was very proud. At the same  03:17:08
3  time I was aware that my price or the price  03:17:11
4  accepted by Enagas could have some premium of other  03:17:15
5  contracts. That's my view today.  03:17:22
6  MR. MASSEY: Now, at least one approach  03:17:24
7  to crafting an ▓▓▓▓ is to make an  03:17:33
8  assessment that whatever the ▓▓▓ that you choose,  03:17:39
9  that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  03:17:46
10  ▓▓▓▓  03:17:56
11  For example, the ▓▓▓▓▓  03:17:56
12  ▓▓▓▓▓▓▓  03:18:02
13  ▓▓▓  03:18:05
14  So my question is: Was that one of  03:18:07
15  your objectives, to try to track the gas market in  03:18:09
16  Spain --  03:18:13
17  THE WITNESS: I would like. But Spain  03:18:13
18  as we have discussed this morning, at this moment  03:18:15
19  was not liberalized. Who fixed the gas prices in  03:18:18
20  Spain at this moment? The government. Nobody was  03:18:23
21  going to accept the escalation on gas prices in  03:18:25
22  Spain fixed by the government. Liberalization in  03:18:30
23  the ▓▓ was more rapid than today. We have the  03:18:35
24  ▓▓▓▓▓▓▓ It's different. But in Spain at  03:18:41
25  this moment, the only index of prices were prices  03:18:44

Page 870

1  -Escudero - By the Panel-
2  approved by the official journal of the government.  03:18:50
3  MR. MASSEY: So under those  03:18:57
4  circumstances was it your view that it was not  03:18:58
5  possible to devise an ▓▓▓▓▓▓▓▓▓▓  03:19:00
6  ▓▓▓▓▓  03:19:07
7  THE WITNESS: Not market in Spain.  03:19:10
8  Well, as I said to you, we tried to say  03:19:11
9  let's put the coal international price, or imported  03:19:13
10  coal of Spain, which was used to generate power,  03:19:18
11  let's put international inflation or inflation in  03:19:22
12  Spain. We could not use it in the gas market in  03:19:25
13  Spain, but we tried.  03:19:31
14  And I think that the documents -- I  03:19:31
15  don't know if it's presented to the tribunal --  03:19:35
16  British Gas offered an index to coal, which was  03:19:38
17  very good. We knew very well in the coal market in  03:19:42
18  the United Kingdom. But at the same time they put  03:19:47
19  their ▓▓ at the level, which was unacceptable.  03:19:50
20  So again, if we finally took the  03:19:54
21  numbers, you know, for ▓▓▓▓▓ it  03:19:56
22  was a result of something which could not be  03:20:01
23  otherwise.  03:20:04
24  MR. MASSEY: When you get now to the  03:20:06
25  price reopener clause, it was -- let me ask you,  03:20:07

Page 871

2  was it your assumption that if the ▓▓▓▓▓▓  03:20:14
3  ▓▓▓▓▓  03:20:18
4  ▓▓▓▓▓  03:20:21
5  ▓▓▓▓  03:20:25
6  ▓▓▓
7  THE WITNESS: I think so. We were  03:20:28
8  acting in good faith. Of course we could discuss  03:20:31
9  the meaning of an ▓▓▓▓▓▓▓▓▓▓▓  03:20:36
10  But in any case, if there was a ▓▓▓▓  03:20:40
11  ▓▓▓▓ either party would ask for a  03:20:42
12  price revision.  03:20:47
13  MR. MASSEY: Is it right to think at  03:20:50
14  least a significant part of the assessment of  03:20:51
15  whether there's a ▓▓▓▓▓▓▓▓▓ is  03:20:53
16  whether the prices of the gas have changed at a  03:20:55
17  rate that's different from the market rate?  03:20:58
18  THE WITNESS: Yes.  03:21:00
19  MR. MASSEY: Either higher or lower?  03:21:01
20  THE WITNESS: Yes.  03:21:03
21  MR. MASSEY: ▓▓▓▓▓▓▓▓▓  03:21:04
22  ▓▓▓▓▓▓  03:21:06
23  ▓▓▓  03:21:12
24  ▓▓
25  THE WITNESS: I think so. But it wasn't  03:21:15

Page 872

1  -Escudero - By the Panel-
2  wide in Europe accepted, this principle.  03:21:20
3  I think the wording is similar to  03:21:25
4  hundreds of supplies contracts in Europe: Shall  03:21:27
5  allow the buyer, if economic circumstances. I knew  03:21:30
6  it by heart since I started at Enagas.  03:21:33
7  MR. MASSEY: Let's talk about that for a  03:21:40
8  second. 8.5, the buyers end user market.  03:21:41
9  You said the models came from the Shell  03:21:44
10  contract, correct?  03:21:48
11  THE WITNESS: Most of it came from the  03:21:49
12  Shell contract.  03:21:50
13  MR. MASSEY: But there are other  03:21:51
14  contracts in Europe that are parallel to the Shell  03:21:53
15  contract?  03:21:57
16  THE WITNESS: Yes. Now they are mostly  03:21:57
17  unified, yes.  03:22:01
18  MR. MASSEY: While you were at Enagas up  03:22:02
19  until 1997 and you were buying LNG and pipeline  03:22:05
20  gas, did you ever have occasion to participate in a  03:22:08
21  price reopener under any of these European  03:22:12
22  contracts?  03:22:15
23  THE WITNESS: Yes. I think with Troll  03:22:17
24  we had the revision of prices.  03:22:22
25  MR. MASSEY: When was that?  03:22:25

47 (Pages 869 to 872)

Page 873

```
1        -Escudero - By the Panel-
2          THE WITNESS: I don't remember now.    03:22:28
3    Yes, I think we had the revision of prices. I    03:22:32
4    don't remember. It would be maybe in '93 or '94.    03:22:37
5    But my memory can fail.    03:22:40
6          MR. MASSEY: So anyway, you had an    03:22:43
7    experience with this reopener situation?    03:22:44
8          THE WITNESS: Yes.    03:22:47
9          MR. MASSEY: Before you agreed to the    03:22:48
10   language here?    03:22:49
11         THE WITNESS: Yes.    03:22:50
12         MR. MASSEY: In other words, it was more    03:22:51
13   than just language for you?    03:22:52
14         THE WITNESS: Yes.    03:22:53
15         MR. MASSEY: You had actual experience    03:22:54
16   attempting to apply similar language in other    03:22:55
17   cases?    03:22:58
18         THE WITNESS: Yes. My experience, at    03:22:59
19   least in this case, I mentioned you, is that, well,    03:23:00
20   you can write what you want to. There are very few    03:23:05
21   cases which come to arbitration. My personal    03:23:10
22   experience.    03:23:13
23         Even if the case of Sonatrach, for    03:23:14
24   hundreds of millions of dollars of take-or-pay, we    03:23:20
25   didn't -- and with a close of arbitration in    03:23:24
```

Page 874

```
1        -Escudero - By the Panel-
2    Switzerland, it finally was the vice president of    03:23:27
3    the Spanish government to negotiate with -- my idea    03:23:30
4    is that when the numbers -- especially Enagas, a    03:23:35
5    state-owned company -- when the numbers apply to    03:23:40
6    take-or-pay or even to prices, at the moment of the    03:23:42
7    nineties where Enagas was a state-owned company and    03:23:48
8    didn't make much money, it was a question of    03:23:52
9    political question. And it was in Italy, in the    03:23:55
10   States.    03:24:01
11         My remembrance when the promise of    03:24:02
12   take-or-pay with Sonatrach is that the American    03:24:07
13   companies, I don't know, they have a clause    03:24:10
14   according to which they can retire from the    03:24:13
15   business and not to pay. But Enagas took the    03:24:17
16   vessels and everything in El Paso and Duke Energy    03:24:19
17   and so on.    03:24:24
18         So when the case comes it's useless to    03:24:26
19   apply the clauses, then it's most simple to    03:24:30
20   negotiate by political questions or something like    03:24:36
21   that.    03:24:39
22         MR. MASSEY: Thank you very much. I    03:24:40
23   appreciate your taking the time. You gave me good    03:24:42
24   answers to all my questions. So, thanks.    03:24:45
25         THE WITNESS: Thank you very much.    03:24:47
```

Page 875

```
1        -Escudero - By the Panel-
2          THE CHAIRMAN: So based on that last    03:24:49
3    answer you gave, the tribunal is put in the    03:24:50
4    position of trying to do what the government is    03:24:56
5    trying to do when they try to try to negotiate out    03:24:59
6    of these kind of contracts; is that correct?    03:25:03
7          THE WITNESS: That's correct. That's    03:25:05
8    correct.    03:25:06
9          THE CHAIRMAN: Let me just ask you one    03:25:07
10   or two questions. You've answered a lot of the    03:25:11
11   questions put to you by Mr. Massey. Let me ask    03:25:13
12   you, I think, some simple questions.    03:25:18
13         In 1995 what would Enagas have    03:25:20
14   considered a reasonable rate of return on its LNG    03:25:22
15   business?    03:25:26
16         THE WITNESS: In '95, Enagas, the rate    03:25:29
17   of return in the LNG business was ███████████,    03:25:32
18   ██████████████ But we were changing. I    03:25:37
19   can come back to the question, it depended on    03:25:42
20   prices fixed by the government to the final gas    03:25:47
21   product. Well, tariffs or transfer price.    03:25:52
22         How the -- the ability I could use to    03:25:58
23   have good prices in buying contracts didn't mean    03:26:03
24   really anything. Because for the government to    03:26:08
25   have, ██████ one year in Enagas was nothing. It was    03:26:13
```

Page 876

```
1        -Escudero - By the Panel-
2    more important to have the public service of    03:26:16
3    keeping the gas consumption in Spain at a    03:26:21
4    satisfactory level at the moment. Or there was    03:26:25
5    totally not regulation, intervention, totally.    03:26:28
6    So that's my comments.    03:26:33
7          THE CHAIRMAN: Okay. On that same    03:26:37
8    paragraph that you referred to before, as one reads    03:26:42
9    paragraph 63 and 64 --    03:26:49
10         THE WITNESS: Yes?    03:26:52
11         THE CHAIRMAN: -- of your agreement, it    03:26:53
12   seems to me that three parties had to be satisfied    03:26:55
13   with their rate of return: Enagas, ████ and    03:26:58
14   Atlantic.    03:27:04
15         Is that correct?    03:27:05
16         THE WITNESS: That is correct. I think    03:27:06
17   that is correct.    03:27:09
18         THE CHAIRMAN: So that in effect all    03:27:16
19   three parties had the opportunity in 1995, when    03:27:25
20   they negotiated, to comfort themselves that they at    03:27:29
21   least in their minds were going to get a reasonable    03:27:34
22   rate of return or they wouldn't have done the deal?    03:27:37
23         THE WITNESS: I agreed with you. That's    03:27:42
24   my point.    03:27:44
25         THE CHAIRMAN: What if I were to tell    03:27:48
```

48 (Pages 873 to 876)

Page 877

1  -Escudero - By the Panel-
2  you that this tribunal today is being asked to      03:27:50
3  determine a reasonable rate of return while knowing   03:27:53
4  only two of the parties' prices? Do you think it's   03:27:56
5  possible for us to come up with a reasonable rate   03:28:02
6  of return where we don't have the whole picture of   03:28:05
7  what's going on with the three parties?      03:28:10
8      THE WITNESS: There's one party missing? 03:28:13
9      THE CHAIRMAN: Indeed.      03:28:17
10     THE WITNESS: Indeed?      03:28:18
11     THE CHAIRMAN: There's one party      03:28:20
12 missing.      03:28:22
13     THE WITNESS: You make a difficult      03:28:22
14 question which I cannot answer, sorry. But I know   03:28:24
15 your problem.      03:28:27
16     THE CHAIRMAN: Yes, well said. Well   03:28:27
17 said.      03:28:31
18     Just tell me a little bit about the      03:28:32
19 mechanics. You would come home from one of these   03:28:34
20 eight or nine or ten days of negotiations, go back   03:28:37
21 to your hotel. How could the contract get changed   03:28:41
22 from day-to-day? Was it done by you, by a member   03:28:45
23 of your team, by an inside lawyer, by an outside   03:28:49
24 lawyer? How did the actual words get into this,   03:28:53
25 after the daily negotiations?      03:28:57

Page 878

1      -Escudero - By the Panel-
2      THE WITNESS: Oh, my God.      03:29:01
3      THE CHAIRMAN: Just for you.      03:29:06
4      THE WITNESS: Yeah. Yeah. Yeah. There 03:29:09
5  were two essential points under discussion, the   03:29:10
6  level of price and the kind of flexibility we could   03:29:14
7  obtain. Because the question of participation was   03:29:19
8  accepted.      03:29:23
9      The level of price. In the level of   03:29:25
10 price, in███ and the ████████ like in all   03:29:26
11 negotiations, one party presents a new approach,   03:29:34
12 the other says let's have time to reconsider your   03:29:38
13 offer. Well, let's have two hours to reconsider   03:29:42
14 and we come with a new offer.      03:29:45
15     Well, I remember that they started with   03:29:47
16 ████████ We started with ██ Finally we   03:29:52
17 finalize, after ten days of please let's interrupt   03:29:59
18 for something.      03:30:04
19     After ten days we finalized in ███ PI 03:30:05
20 don't remember the figures, but it was the same.   03:30:12
21 We wanted to have less ████ and so on.      03:30:14
22     And the flexibility of destinations, I   03:30:18
23 made the example that for nine times they were   03:30:20
24 offering -- they wanted to put a limit. And we   03:30:23
25 said no limit. You have put a limit to the third   03:30:26

Page 879

1  -Escudero - By the Panel-
2  parties' sales, which was very difficult to accept. 03:30:30
3  In the ten days, we finally accepted.      03:30:34
4      So the package at the end of the ten   03:30:37
5  days was something that you could sleep this night   03:30:39
6  very well. Because after ten days being nervous of   03:30:42
7  three points: ████████ number of cargoes,   03:30:47
8  for something like that.      03:30:51
9      THE CHAIRMAN: Putting the words of 2.6 03:30:53
10 into the contract, was that taken from another   03:30:59
11 model like a Shell model, or was that something   03:31:03
12 that you just came up with Atlantic?      03:31:06
13     THE WITNESS: For me it was wonderful   03:31:08
14 because it was the first time a buyer could have   03:31:10
15 free destination.      03:31:16
16     Why? Because the gas business, the   03:31:17
17 energy business, is not like the oil business,   03:31:21
18 where you buy a spot cargo, you can resell while   03:31:24
19 the ship is traveling. Four, five times, nothing   03:31:28
20 happens to the product, you call it distressed   03:31:33
21 cargo, it's in distress, but it changes hands many, 03:31:35
22 many -- very often.      03:31:39
23     But for the question of LNG at the      03:31:41
24 moment we were negotiating, there were no at all   03:31:46
25 spot cargoes for many reasons, but especially   03:31:52

Page 880

1      -Escudero - By the Panel-
2  because more than 30 days the LNG is -- very   03:31:57
3  dangerous or loses by the boil off, the qualities.   03:32:04
4  You can't not have fresh cargo LNG.      03:32:09
5      So that's the reason why we could not   03:32:11
6  say, like in the oil business, we're going to have   03:32:13
7  a free destination and we take one cargo and we   03:32:16
8  have the best Rotterdam price for that cargo.   03:32:19
9      No. That was impossible.      03:32:24
10     You have to do it on a regulated way.   03:32:25
11 Having it with the destination. In our case,   03:32:28
12 ████████      03:32:31
13     THE CHAIRMAN: Okay, my final question.   03:32:34
14 I think Mr. Cavoli tried to get to this, but I   03:32:37
15 wasn't clear what the answer was.      03:32:42
16     When was the very first time you were   03:32:45
17 asked to do anything in connection with this   03:32:47
18 arbitration, and who asked you to do it?      03:32:51
19     THE WITNESS: It was -- let me think -- 03:32:56
20 it was a kind invitation by Mr. Torralba --   03:32:58
21     THE CHAIRMAN: Was it in 2007, 2006?   03:33:03
22     THE WITNESS: No. We are in...      03:33:06
23     I think it would be one year ago, more   03:33:08
24 or less.      03:33:11
25     He said to me, we have been asked or   03:33:11

49 (Pages 877 to 880)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 881

1    -Escudero - By the Panel-
2    requested for an arbitration. Since you negotiated  03:33:16
3    the Train 1, they invited me for lunch and they      03:33:21
4    said would you like to -- I didn't have to see any  03:33:25
5    papers because all the question is what I was asked  03:33:28
6    was about the negotiation I had in '94/'95. And     03:33:32
7    they gave me finally the papers of my old files in  03:33:40
8    Enagas.                                          03:33:44
9         But for me it was to say the truth and       03:33:44
10   to have the pleasure to be three or four days in    03:33:46
11   New York. So which for a retired person is very     03:33:50
12   nice. So I said yes.                             03:33:54
13        THE CHAIRMAN: Okay. We have nothing         03:33:56
14   further.                                         03:34:01
15        MR. SHEPPARD: I do. Beg your pardon.        03:34:02
16   I do. Just a follow-up.                          03:34:04
17        Mr. Escudero, would you look at             03:34:06
18   paragraph 63 of your first witness statement. The  03:34:10
19   first bullet point. I will read that so we are on  03:34:12
20   the same page.                                   03:34:17
21        "Enagas was comfortable with the            03:34:17
22   guarantee of the margin ████ it obtained with this  03:34:19
23   formula. In the case of the price reopener, the    03:34:26
24   ████████████████████████████████████"           03:34:28
25        Do you see that?                            03:34:33

Page 882

1    -Escudero - By the Panel-
2         THE WITNESS: Yes.                           03:34:33
3         MR. SHEPPARD: It's really a follow-up       03:34:34
4    to Mr. Aksen's question. What was your           03:34:36
5    understanding of the margin that Enagas was       03:34:43
6    guaranteed under this contract in 1995?          03:34:43
7         THE WITNESS: ███████                        03:34:45
8    We have just in case to discuss what is          03:34:46
9    ██████ But we have the ████████                  03:34:51
10   ████████████████ As a minimum. Because           03:34:55
11   I think that's why I started intending doing swap  03:35:00
12   or other operations to increase that -- but at    03:35:07
13   least we knew that whatever happened we would have  03:35:09
14   the reasonable rate of return. We knew that it    03:35:12
15   would depend on arbitrators such as you to say what  03:35:15
16   is ████████ which is a very difficult question.   03:35:19
17   But at least we have this guarantee as a minimum.  03:35:23
18   ██████████████████████                           03:35:26
19        And that I took from Shell. Shall allow     03:35:28
20   the buyer reasonable rate of return.             03:35:33
21        I remember that we introduced it as         03:35:36
22   something that liberalization was in my mind, but  03:35:38
23   also in Atlantic's mind, that the price, as the   03:35:43
24   Article 8 says, the price would reflect the value  03:35:50
25   of the gas in a market with competing fields, and  03:35:53

Page 883

1    -Escudero - By the Panel-
2    we included the gas to gas competition, which this  03:35:58
3    Article 8.5, which normally was never included in  03:36:03
4    this kind of contracts. That's also not included  03:36:07
5    in Shell model. Because there was not            03:36:12
6    liberalization and one could not imagine a        03:36:16
7    competition from gas to gas, what we call gas to  03:36:18
8    gas competition.                                 03:36:22
9         And we included in 8.5 knowing that even    03:36:23
10   with liberalization and this competition, the     03:36:26
11   comprise would allow the buyer to have ████ ███   03:36:32
12   ████                                             03:36:44
13        MR. SHEPPARD: I think I understand the      03:36:45
14   concept of what you mean by the ████████         03:36:46
15   ████████                                         03:36:50
16        If you can answer this question: What       03:36:52
17   was the margin that you contemplated in 1995 that  03:36:54
18   you would be receiving at the outset of the       03:36:58
19   contract? If you know.                           03:37:00
20        THE WITNESS: There was so many -- no,       03:37:02
21   I cannot answer. That would be improvised. No, I  03:37:07
22   prefer to say maybe I expected more from agreements  03:37:11
23   of Article 2.6, maybe, than for the application of  03:37:20
24   the triple-R in case the gas was destined to      03:37:27
25   Spain. So I thought the opportunity to divert the  03:37:33

Page 884

1    -Escudero - By the Panel-
2    gas to third parties, swaps with ████████ sales to  03:37:38
3    ████ swaps to ████ would give more money to us    03:37:46
4    than simply selling the gas in Spain.            03:37:50
5         And I also thought that the ████████        03:37:53
6    ████████ would give me -- us more money.         03:37:56
7         So answering your question, the ████████    03:38:03
8    was necessary as a guarantee in the price reopener.  03:38:05
9    But personally I trusted much more in our know-how  03:38:08
10   in having the 2.6 responsibilities or in the      03:38:14
11   profits of the Atlantic plant, which I think they  03:38:19
12   are very important.                              03:38:25
13        MR. SHEPPARD: In the negotiation give       03:38:28
14   and take about the ████ and the constituent elements  03:38:30
15   of the oils, were you trying to arrive at a margin  03:38:34
16   like we're going to make ████████████████        03:38:40
17   ████ Can you recall --                           03:38:43
18        THE WITNESS: I cannot recall. I recall      03:38:44
19   questions -- it's very important for the          03:38:47
20   flexibility, it's very important the participation,  03:38:51
21   very important. But how much that's valued and how  03:38:53
22   important the rate of return should be, I can     03:38:57
23   maybe -- you ask me ten years ago, maybe. But I   03:39:01
24   cannot remember.                                 03:39:05
25        MR. SHEPPARD: Fair enough. Thank you        03:39:05

50 (Pages 881 to 884)

Page 885

1        -Escudero - Redirect-
2    very much.                         03:39:07
3         THE WITNESS: Thank you.        03:39:07
4         THE CHAIRMAN: Thank you very much.    03:39:09
5         MR. von MEHREN: Could I just ask one    03:39:12
6    follow-up?                        03:39:14
7         THE CHAIRMAN: You were so good before.  03:39:15
8    I didn't think you were going to have any other   03:39:16
9    ones.                           03:39:18
10        MR. von MEHREN: I'm trying to follow up  03:39:19
11   on a question you were asking, Mr. Chairman.    03:39:23
12   REDIRECT EXAMINATION                03:39:25
13   BY MR. von MEHREN:                 03:39:25
14   Q.   Mr. Escudero, take a look at 2.6.    03:39:25
15   A.   Uh-hum.                      03:39:29
16   Q.   That one sentence.             03:39:29
17        Could you tell the tribunal who made    03:39:32
18   those words, who wrote those words?        03:39:34
19   A.   Yeah. Yeah. The final draft of these    03:39:39
20   words were made, after the long discussions of   03:39:41
21   March in London, the final draft was proposed by  03:39:44
22   the seller. I think it was Phil Ribbeck to make   03:39:49
23   those drafts, knowing the importance of such    03:39:54
24   drafts.                         03:39:57
25        THE CHAIRMAN: We were shown a document  03:39:58

Page 886

1        -Proceedings-
2    that showed that there was a previous draft of that  03:40:00
3    section and then some lines were struck and then   03:40:03
4    this was the compromised wording.         03:40:05
5         Is that how you remember it?        03:40:07
6         THE WITNESS: Yes, I remember. I      03:40:08
7    remember. I remember that it was the -- yeah.    03:40:10
8         THE CHAIRMAN: Thank you once again.    03:40:13
9    You are excused, and have a good trip back to    03:40:16
10   Madrid. But enjoy New York while you're here.    03:40:20
11        THE WITNESS: Thank you very much.     03:40:23
12        (Witness excused.)               03:40:26
13        THE CHAIRMAN: We have to discuss a    03:40:26
14   couple of points -- I'm wondering if I should clear  03:40:28
15   the room -- on the ruling on the ▮▮▮▮ thing and a  03:40:31
16   couple of comments we'd like to make.       03:40:35
17        So could we do that?             03:40:37
18        (A recess was taken.)             04:08:35
19        THE CHAIRMAN: Back on the record.     04:08:35
20   C A R L O S   T O R R A L B A   G A L L E G O,   04:10:22
21        having been duly sworn by the Notary    04:10:22
22        Public, was examined and testified through  04:10:22
23        the interpreter as follows:          04:10:33
24        THE CHAIRMAN: Now, the ground rules are  04:10:33
25   that there can only be no more than two microphones 04:10:38

Page 887

1        -Proceedings-
2    on at a time.                      04:10:41
3         So I would ask at the moment        04:10:43
4    Mr. Hirschfeld to click his off, and the      04:10:45
5    questioner, when he asks the questions, will have  04:10:50
6    his microphone on. And the witness will also have  04:10:53
7    his microphone on.                  04:10:58
8         Push it on.                    04:11:01
9         Let me ask the witness: Are you hearing  04:11:03
10   this in Spanish?                    04:11:06
11        No?                         04:11:11
12        Does he have it on number 2, channel 2?  04:11:12
13        Let's try it again.              04:11:20
14        Mr. Torralba, are you hearing me in     04:11:23
15   Spanish?                        04:11:26
16        THE WITNESS: Yes.                04:11:32
17        THE CHAIRMAN: Welcome to this        04:11:33
18   arbitration.                      04:11:34
19        THE WITNESS: Thank you.            04:11:36
20        THE CHAIRMAN: We have before us two    04:11:38
21   witness statements signed by you. One is dated    04:11:40
22   March 7th, '07, and one is dated April 4, '07.    04:11:47
23        Do you have both of them in front of    04:12:01
24   you?                          04:12:03
25        THE WITNESS: Yes, I do.            04:12:07

Page 888

1        -Proceedings-
2         THE CHAIRMAN: And do you have them in   04:12:08
3    Spanish?                        04:12:10
4         THE WITNESS: I do. I have them.      04:12:18
5         THE CHAIRMAN: Do you prefer to read the  04:12:20
6    Spanish or the English, when the questioner asks   04:12:21
7    you a question?                    04:12:24
8         THE WITNESS: I prefer to read it in     04:12:28
9    Spanish.                        04:12:30
10        THE CHAIRMAN: Okay, very good.        04:12:31
11        Have you had a chance to read these two  04:12:35
12   statements in the past few days?          04:12:38
13        THE WITNESS: Yes.                04:12:42
14        THE CHAIRMAN: You have to take a pause  04:13:18
15   so that the translator can finish, so that Amy can  04:13:20
16   finish. Take the New York rate, cut it down    04:13:23
17   considerably, and then we may get through this.   04:13:29
18        Sir, do you have any changes or        04:13:34
19   corrections to make to either of your two witness   04:13:36
20   statements?                       04:13:43
21        THE WITNESS: No, I have no changes.    04:13:48
22        THE CHAIRMAN: The procedure is that    04:13:51
23   this written testimony is what we call your direct  04:13:53
24   testimony, and now you will be asked some questions 04:13:58
25   about your testimony from the lawyers for Atlantic,  04:14:06

51 (Pages 885 to 888)

Page 889

1      -Torralba - Cross-
2   after which you may be asked some questions by the   04:14:10
3   lawyers for GNA, and then you may be asked some   04:14:18
4   questions by the members of the tribunal.   04:14:25
5      If at any time there is a question you   04:14:32
6   don't understand, please ask for clarification.   04:14:35
7   Okay?   04:14:45
8      THE WITNESS: Yes.   04:14:47
9      THE CHAIRMAN: Mr. von Mehren, put your   04:14:51
10   mic on.   04:14:54
11      MR. von MEHREN: Mr. Chairman, just   04:14:56
12   before we get started, a note: If Mr. Torralba is   04:14:57
13   asked questions that go into the confidentiality   04:15:05
14   areas that ████is asserting, I ask him to simply   04:15:07
15   say that and not to answer. Obviously if things   04:15:10
16   should change we'll address that at that point.   04:15:14
17   But now it's ████ confidentiality privilege, and   04:15:19
18   he's not able to waive it.   04:15:23
19      THE CHAIRMAN: Thank you.   04:15:25
20      Okay, Mr. Hirschfeld, you're now on.   04:15:29
21   CROSS-EXAMINATION   04:15:31
22   BY MR. HIRSCHFELD:   04:15:31
23      Q. Good afternoon, Mr. Torralba. My name   04:15:34
24   is Michael Hirschfeld. I'm one of the attorneys   04:15:36
25   for Atlantic and I'm going to be asking you some   04:15:40

Page 890

1      -Torralba - Cross-
2   questions this afternoon.   04:15:43
3      If you don't understand a question, or   04:15:45
4   you would like me to rephrase it or change it a   04:15:50
5   little bit to make it clearer, please let me know.   04:15:53
6      I also want you to take as much time as   04:15:57
7   you need to read your witness statements and read   04:16:00
8   any documents that I may place in front of you   04:16:06
9   during the course of your testimony. Many of those   04:16:10
10   documents are only in English, and if you have   04:16:14
11   difficulty you'll have to let me know.   04:16:17
12      There are some documents that are in   04:16:21
13   Spanish as well as in English. So I think it might   04:16:22
14   be easier for you.   04:16:25
15      Let me direct your attention,   04:16:29
16   Mr. Torralba, to paragraph 2 of your first witness   04:16:36
17   statement.   04:16:40
18      (The witness complies.)   04:16:43
19      Q. And my question, Mr. Torralba, is could   04:16:55
20   you please describe for the tribunal what your   04:16:58
21   responsibilities were in your capacity as the   04:17:01
22   marketing and commercial director until 1997.   04:17:06
23      A. Are you referring to the director of   04:17:21
24   commercial area in Enagas?   04:17:26
25      Q. I assume so. In English the witness   04:17:32

Page 891

1      -Torralba - Cross-
2   statement refers to -- makes the following   04:17:36
3   statement: "Under GN group I was the marketing   04:17:40
4   and commercial director until 1997." Then it says   04:17:44
5   Enagas.   04:17:51
6      A. I have been the director of the   04:18:03
7   commercial area of Enagas until 1997.   04:18:09
8      Q. And what did you do, what functions did   04:18:16
9   you perform, as the commercial director?   04:18:20
10      A. Well, I managed the commercial area,   04:18:28
11   which was in charge of the sales of -- the gas   04:18:32
12   sales of Enagas in the Spanish system.   04:18:35
13      Q. Were all of your responsibilities   04:18:42
14   relating to sales for Enagas, or did you have   04:18:44
15   responsibilities for sales by some other company?   04:18:49
16      A. The sales -- the totals of Enagas, if I   04:18:59
17   think I understood what the translator said to   04:19:06
18   me -- these Enagas sales for industrial clients or   04:19:10
19   the distributors for the Spanish system.   04:19:14
20      Q. Let me ask the question a little bit   04:19:18
21   differently.   04:19:20
22      Did you have any responsibility in your   04:19:21
23   position as commercial director until 1997 for   04:19:25
24   sales by other companies in the Gas Natural group?   04:19:30
25      A. For other companies in the group of Gas   04:19:39

Page 892

1      -Torralba - Cross-
2   Natural, yes, I did sell for distributors, which in   04:19:46
3   '97 owned to the Gas Natural group pool, which also   04:19:49
4   in '97 were -- belongs to Enagas, were part of   04:19:54
5   Enagas.   04:19:58
6      Q. Which were those companies, if you   04:19:59
7   remember the names.   04:20:02
8      A. I remember some because there were about   04:20:04
9   20 of them. And so there were Gas Castilla la   04:20:09
10   Mancha, Gas de Extremadura, Gas Levante. As a rule   04:20:17
11   Spain is -- has autonomic sections, and as a rule   04:20:23
12   there was distributor for autonomic sections. It   04:20:29
13   corresponds to regions in Spain.   04:20:35
14      Q. Were all of these companies what's   04:20:38
15   referred to as local distribution companies? In   04:20:40
16   other words, other than your sales responsibilities   04:20:44
17   for the Enagas company itself, were the additional   04:20:46
18   companies for which you had overall sales   04:20:51
19   responsibilities all local or regional distribution   04:20:53
20   companies?   04:20:58
21      A. As a director of Enagas I was   04:20:59
22   responsible for sales to the industrial clients of   04:21:09
23   Enagas, there were some great industrial consumers,   04:21:11
24   and to the distributor companies, who in turn sold   04:21:16
25   to the small industrial companies and to the   04:21:22

52 (Pages 889 to 892)

Page 893

-Torralba - Cross-

1
2  residential customers, the clients that -- the          04:21:25
3  domestic clients.                                       04:21:31
4      Q.   Did you supervise the sales by the local       04:21:34
5  companies to the domestic clients and the small         04:21:39
6  industrial clients, or did you just supervise           04:21:42
7  Enagas' sales to the local distribution companies?      04:21:47
8      A.   I did not supervise the sales for the          04:21:53
9  local companies to their customers. Only the sales      04:21:59
10 for -- from Enagas to those local companies. I          04:22:04
11 repeat, Enagas sales to important industrial            04:22:07
12 clients. That's the way the market had been             04:22:12
13 distributed.                                            04:22:14
14     Q.   So that in this period up until 1997 --        04:22:17
15 let me see if I understand you correctly -- Enagas       04:22:22
16 sold directly to some large industrial clients and      04:22:26
17 also sold to some local or regional distribution        04:22:32
18 companies; is that correct?                             04:22:37
19     A.   Yes. You're right.                             04:22:40
20     Q.   As of 1997, when you left the position         04:22:47
21 as commercial director, were all of the industrial      04:22:51
22 consumers to whom Enagas sold directly customers        04:22:55
23 located in Spain?                                        04:23:03
24     A.   Yes, they were located in Spain.               04:23:11
25     Q.   And if I ask you similarly with respect        04:23:14

Page 894

-Torralba - Cross-

1
2  to the sales that Enagas made until 1997 to local       04:23:16
3  or regional distribution companies, were they also      04:23:24
4  all located in Spain?                                    04:23:28
5      A.   I think so, all of them. I was the            04:23:35
6  director during a time period -- during that time       04:23:40
7  period the local distribution companies were            04:23:45
8  located in Spain.                                        04:23:47
9      Q.   When did you first begin to serve as the       04:23:52
10 commercial director for Enagas?                          04:23:55
11     A.   In 1991.                                       04:24:06
12     Q.   So that from 1991 until 1997 is it            04:24:12
13 correct that all of the sales that you supervised        04:24:16
14 for Enagas were sales into Spain?                        04:24:18
15     A.   There were sales in Spain, yes.               04:24:25
16     Q.   Did you have any responsibility for          04:24:27
17 sales by Enagas before assuming the position as         04:24:30
18 director, as commercial director, in 1991?              04:24:35
19     A.   I was responsible for the research for         04:24:45
20 the studies, but not directly over the sales, per       04:24:50
21 se.                                                      04:24:54
22     Q.   Okay. Now, again, referring to               04:24:54
23 paragraph 2 of your first witness statement, you         04:24:58
24 say that after you were the commercial director of      04:25:02
25 Enagas you became the gas supply director and           04:25:06

Page 895

-Torralba - Cross-

1
2  president of Gas Castilla la Mancha and Gas de          04:25:13
3  Extremadura, until 2001.                                 04:25:21
4      A.   Yes.                                           04:25:24
5      Q.   What were your responsibilities in that       04:25:25
6  position?                                                04:25:29
7      A.   Well, as president of Gas Castilla la          04:25:38
8  Mancha, which was one of the distributors, and as a    04:25:46
9  president I was responsible for that company.           04:25:52
10     I was -- I served as the director of the           04:25:56
11 supply area. I was director for supplies at Enagas      04:26:06
12 at the same time, and let me continue here.             04:26:23
13     Q.   Let me see if I understand this. You          04:26:33
14 were, at the same time as you were the president of     04:26:39
15 Gas Castilla la Mancha, which was a local               04:26:44
16 distribution company, you also had responsibilities     04:26:49
17 for all of Enagas, as the gas supply director; is      04:26:54
18 that correct?                                            04:26:59
19     A.   It's partially correct. Let me explain.       04:26:59
20     I stopped being director of the                     04:27:18
21 commercial area and I became president of Gas           04:27:20
22 Castilla la Mancha, Gas de Extremadura, at a period    04:27:28
23 of time whose length I don't remember exactly; it      04:27:33
24 could have been three months, it could have been       04:27:35
25 eight months, I was only president of Gas Castilla     04:27:37

Page 896

-Torralba - Cross-

1
2  la Mancha and Gas de Extremadura. After that,          04:27:42
3  starting on the sixth or the eighth month, I was       04:27:43
4  named director of supplies for Enagas. And in 1997     04:27:47
5  I became director of the supply area for Enagas,       04:27:58
6  but I didn't give up my position as president of       04:28:02
7  Gas Castilla la Mancha until a year later, when I      04:28:06
8  stopped being president of Gas Castilla la Mancha      04:28:10
9  and I remained only as a director for the supply       04:28:14
10 side of Enagas.                                          04:28:17
11     Q.   Is it fair to say that you were in Gas        04:28:18
12 Castilla la Mancha in sort of a caretaker capacity     04:28:23
13 waiting for somebody else to take up that position?    04:28:26
14     A.   Not exactly. There was a director            04:28:45
15 general named for Gas Castilla la Mancha who took      04:28:52
16 charge of the company, and I was president of the      04:28:57
17 board of directors. And I began to be supply           04:28:59
18 director for Enagas.                                     04:29:05
19     Q.   Could you tell us, please, what your          04:29:06
20 responsibilities were as supply director for           04:29:08
21 Enagas?                                                  04:29:12
22     A.   Oversee supplying -- supplies for             04:29:21
23 Enagas.                                                  04:29:25
24     Q.   So what were your responsibilities in        04:29:26
25 overseeing supply for Enagas; what did you do?         04:29:30

53 (Pages 893 to 896)

1

2    ----------------------------------------x

3    In the Matter of the Arbitration between:

4    ATLANTIC LNG COMPANY OF

5    TRINIDAD AND TOBAGO,

6                         Claimant,

7

8         -against-

9    GAS NATURAL APROVISIONAMIENTOS

10   SDG S.A.,

11                    Respondent.

12   ----------------------------------------x

13                    April 27, 2007

14                    9:36 a.m.

15                    875 Third Avenue, 10th Floor

16                    New York, New York   10022-6225

17   B E F O R E:

18

19      GERALD AKSEN, ESQ. - The Chairman

20      EUGENE A. MASSEY, ESQ. - Panel Member

21      BEN H. SHEPPARD, JR. - Panel Member

22

23           Amy Klein - Hearing Reporter

24

25

Page 1359

1
2  agreement with GNA on one side, the ███ agreement 09:39:51
3  with Atlantic on the other side, all of which are 09:39:55
4  matters under consideration at the 09:39:58
5  present moment with your confidentiality agreements 09:40:00
6  and the like, our mindset is that our 09:40:04
7  responsibility here includes having a real picture 09:40:11
8  of what went on in pricing from ██ to the ██ 09:40:18
9  ███████████ And we think we need the prices 09:40:25
10 between Atlantic and ██, and the prices between 09:40:31
11 GNA and ██. We think we need the prices in 09:40:36
12 dollars, and on a yearly average, so that we can 09:40:48
13 make sense of this whole picture, to determine what 09:40:53
14 has gone on from the year the contract was signed 09:41:00
15 until now. 09:41:04
16      We've gotten a little bit of help from 09:41:05
17 one of the recent explanations from one of the ██ 09:41:11
18 reports. But we think both parties should be able 09:41:17
19 to give us -- I'll call it a chart of the ██████ 09:41:21
20 ██ not only of the ██████ but including 09:41:28
21 ███████████████ the 09:41:35
22 Spanish transportation prices both in the ██ 09:41:40
23 ███████████ 09:41:46
24      And if we have all of this in a summary 09:41:50
25 form we think we can do our job in a better way 09:41:54

Page 1360

1
2  and in a way that you will both respect a little 09:42:01
3  bit more. 09:42:06
4      We're trying to avoid any confusion, 09:42:07
5  which is why questions are put to witnesses, which 09:42:10
6  is help that we need to come out to the right 09:42:13
7  decision. 09:42:15
8      Coming out with a right decision in a 09:42:16
9  case like this is very difficult. We think our 09:42:19
10 responsibility at the moment is to set a price for 09:42:23
11 the rest of this contract going forward, even 09:42:26
12 though you have a right to a ██████ in another 09:42:29
13 ██. But our headache and our 09:42:33
14 responsibility, which we take very seriously, means 09:42:35
15 we need all the help we can get. 09:42:38
16      We will try to prepare, maybe, if we're 09:42:40
17 lucky, by the end of the day, a chart to give to 09:42:43
18 both of you that you can give to your experts and 09:42:46
19 they can take a look at it. Tell us what's wrong 09:42:50
20 with our thinking and our chart. It's very 09:42:53
21 simplistic in style. We just want it on a ██████ 09:42:56
22 ██ of all of the relevant items that we think we 09:43:00
23 have to consider. 09:43:03
24      So we'll try to give you a chart at the 09:43:04
25 end of the day with simplistic instructions for 09:43:06

Page 1361

1
2  whoever's going to fill them out to see if that can 09:43:09
3  help us out. 09:43:12
4      And with luck, you'll get it by the end 09:43:12
5  of the day today. It's not a chart written in 09:43:15
6  stone. We need your help in the drafting of the 09:43:20
7  chart and the help of your experts. 09:43:23
8      But what I need is, very simply, a 09:43:25
9  ██, everything converted into ██ a 09:43:28
10 ██ so at the end of the day we can see 09:43:31
11 the whole picture of what happened. 09:43:33
12      And that's what we need and that's what 09:43:37
13 we're going to try to do it. But you won't have 09:43:41
14 any questions on it until we show you what our 09:43:45
15 thinking is in writing. Okay? 09:43:47
16      With that, I'll give you more of a 09:43:50
17 chance to think about your motions, although I will 09:43:53
18 decide them next Tuesday. Unless you have 09:43:55
19 considered the withdrawal? 09:43:59
20      MR. HIRSCHFELD: Well, I thought -- no. 09:44:00
21 I'd like the Tribunal to rule on them. As I 09:44:03
22 said -- 09:44:07
23      THE CHAIRMAN: We will. We'll rule on 09:44:07
24 all three. But I want to get through with the 09:44:09
25 witnesses today and see if we can release the 09:44:12

Page 1362

1      -Tunon - By the Panel- 09:44:14
2  translators. That's my primary focus for today. 09:44:14
3  Mr. Tunon is available? 09:44:20
4      MR. HARRIS: He is. 09:44:24
5      THE CHAIRMAN: Okay. Let's bring 09:44:25
6  him in. 09:44:27
7      (Mr. Tunon enters arbitration room.) 09:45:03
8  VICTOR TUNON, having been 09:45:03
9  previously sworn, resumed the stand and 09:45:03
10 testified further as follows: 09:45:20
11      THE CHAIRMAN: Good morning, Mr. Tunon. 09:45:20
12 Thank you for coming back. It's a rainy day and 09:45:36
13 you're better off indoors today. 09:45:39
14      I think where we were yesterday you were 09:45:42
15 being questioned by the Arbitrators. 09:45:48
16      And let me ask, Arbitrator Massey, if 09:45:51
17 you have any further questions of Mr. Tunon. 09:45:54
18      MR. MASSEY: No further questions. 09:45:58
19      THE CHAIRMAN: Okay. 09:45:59
20      Who was the first person at your company 09:46:07
21 that asked you to get involved with preparing the 09:46:14
22 information that is contained in what we now know 09:46:18
23 as the ██████ report? 09:46:23
24      THE WITNESS: Carlos Humphrey. 09:46:36
25      THE CHAIRMAN: What is your employment 09:46:40

3 (Pages 1359 to 1362)

Page 1514

1

2    ----------------------------------------x

3    In the Matter of the Arbitration between:

4    ATLANTIC LNG COMPANY OF

5    TRINIDAD AND TOBAGO,

6                        Claimant,

7

8            -against-

9    GAS NATURAL APROVISIONAMIENTOS

10   SDG S.A.,

11                   Respondent.

12   ----------------------------------------x

13                   May 1, 2007

14                   10:06 a.m.

15                   875 Third Avenue, 10th Floor

16                   New York, New York  10022-6225

17   B E F O R E:

18

19       GERALD AKSEN, ESQ. - The Chairman

20       EUGENE A. MASSEY, ESQ. - Panel Member

21       BEN H. SHEPPARD, JR. - Panel Member

22

23           Amy Klein - Hearing Reporter

24

25



Page 1563

```
1          -Weale - By the Panel-
2    oil as ███ and you simply change the ████████  11:14:30
3    and it does the job.                    11:14:34
4          Alternatively, you could see at some  11:14:35
5    particular date you choose where does this get you  11:14:37
6    in terms of a new ██ and what are the appropriate  11:14:41
7    reference prices for ██████████████        11:14:46
8    ██ as of that time.                     11:14:49
9          And I believe that mathematically those  11:14:51
10   should be identical.                    11:14:54
11         MR. MASSEY: So that would be        11:14:55
12   equivalent?              11:14:57
13         THE WITNESS: Yes.              11:14:57
14         MR. MASSEY: All right.           11:15:00
15         I told you I was going to ask you a   11:15:04
16   little bit about the ████████ contracts with  11:15:06
17   the ████.                 11:15:09
18         Could you just give us some feel for  11:15:11
19   what percentage of either the ██████████ or  11:15:13
20   the ████████████ would be represented by the  11:15:17
21   ██████████              11:15:21
22         THE WITNESS: By ██████████      11:15:23
23   I think if the European market is -- I would say  11:15:33
24   around about ██████              11:15:40
25         MR. MASSEY: ████████████        11:15:42
```

Page 1564

```
1          -Weale - By the Panel-
2    ████████████████              11:15:44
3          THE WITNESS: Yes.              11:15:44
4          MR. MASSEY: And what percent of the  11:15:46
5    ██████████              11:15:47
6          THE WITNESS: It's quite a ████     11:15:48
7    ████████████████ And I'm citing   11:15:49
8    it not so much because it's a ████       11:15:53
9    ████████ but because, from my         11:15:57
10   understanding of trends and thinking about  11:16:00
11   ████████ the ████████ continue to be    11:16:03
12   quite influential.              11:16:08
13         MR. MASSEY: So actually, if I listen to  11:16:12
14   your total presentation here, we can stick with the  11:16:15
15   existing ██████████████          11:16:22
16   ████ establishing the proper ratios, we could  11:16:30
17   be looking at ██████████            11:16:36
18   ████ and some other reference points in lieu of  11:16:38
19   these ██████, and we could be looking at ████  11:16:40
20   as a reference point for these.           11:16:46
21         Would all of these ████, if they were  11:16:49
22   properly affixed to the right ███ function  11:16:52
23   effectively, do you think?          11:16:54
24         THE WITNESS: Well, I think I should say  11:16:57
25   in the first place, it depends to what extent the  11:17:03
```

Page 1565

```
1          -Weale - By the Panel-
2    ████ of one or more of those -- if we take ████  11:17:07
3    as the -- the price of ████ s the underlying  11:17:10
4    driver, not the precise driver, but, I mean, the  11:17:15
5    kind of mainstream driver, then some prices are --  11:17:19
6    may be more strongly correlated with it and others  11:17:25
7    less strongly correlated.              11:17:28
8          So there are different formulae that you  11:17:30
9    could come up with. They will give different  11:17:33
10   prices according to the relative movement of price  11:17:35
11   of ████████ in relation to ████ and the price  11:17:39
12   of ████████████ Although in saying  11:17:42
13   that I don't want to give the impression that ████  11:17:45
14   ████████              11:17:48
15         In what I've tried to do, I've tried to  11:17:48
16   be simple and as faithful to the original construct  11:17:54
17   of the ████████ as far as possible.    11:17:58
18         I wasn't asked to start with a blank  11:18:05
19   sheet of paper. I was basically asked to  11:18:07
20   about what limited modifications did I recommend  11:18:10
21   based on what I'd seen happen in the ████  11:18:14
22   ████████              11:18:18
23         And the modifications that I've       11:18:18
24   mentioned so far are limited purely to the change  11:18:21
25   in market shares of ████████ and the  11:18:24
```

Page 1566

```
1          -Weale - By the Panel-
2    disappearance of ████████████          11:18:29
3          MR. MASSEY: So when you were explaining  11:18:33
4    the new price drivers, you talked about some  11:18:34
5    ████████████████          11:18:38
6          THE WITNESS: Yes.              11:18:40
7          MR. MASSEY: But you're not proposing  11:18:41
8    that we would take that approach here? You're not  11:18:43
9    suggesting that that would create an appropriate  11:18:47
10   price?              11:18:50
11         THE WITNESS: This isn't the suggestion  11:18:50
12   that I've made here.              11:18:52
13         MR. MASSEY: Okay, all right.        11:18:53
14         I just would point out 9.3.7, paragraph  11:19:00
15   (c).              11:19:05
16         THE WITNESS: Yes. One way in which  11:19:14
17   that's being captured of course is with the  11:19:16
18   proposal to include the ████ to reflect the  11:19:18
19   ████████ and the way in which ████ plays  11:19:25
20   into the value, whether it's captured through the  11:19:35
21   ██████████              11:19:35
22   ████████████████          11:19:38
23   ████              11:19:44
24         MR. MASSEY: That's slightly puzzling to  11:19:46
25   me. In the last three or four years ████ has  11:19:50
```

14 (Pages 1563 to 1566)

Page 1567

-Weale - By the Panel-

1
2  been producing a ███████████ in        11:19:53
3  ████ There certainly have been years where it  11:19:55
4  produced a ████████ And so it doesn't seem to  11:19:59
5  me that a ████████ necessarily is going to  11:20:03
6  correlate with the ████████ movement, the movement  11:20:08
7  of the ████████        11:20:14
8        THE WITNESS: That part of the analysis  11:20:18
9  wasn't part of my assignment, and I believe that  11:20:19
10  Navigant have already given their testimony on  11:20:24
11  that.        11:20:27
12        MR. MASSEY: Okay, Mr. Chairman, that's  11:20:27
13  all that I have.        11:20:30
14        MR. SHEPPARD: I have one question.  11:20:33
15  Mr. Weale, you just said you did not  11:20:36
16  deal with the ████████ issue in this assignment.  11:20:41
17  Have you made similar analyses for other cases?  11:20:44
18        THE WITNESS: I haven't made the type --  11:20:48
19  I'm aware of the principles. I haven't made myself  11:20:52
20  the kind of calculations which have been used in  11:20:55
21  this case.        11:20:57
22        MR. SHEPPARD: With respect to the  11:20:59
23  definition of high sulphur heavy fuel oil, you're  11:21:01
24  aware there's a dispute among the experts about  11:21:07
25  what that is, whether it's a range of ████████  11:21:09

Page 1568

-Weale - By the Panel-

1
2  ████████████████████        11:21:14
3  Let me just ask you if you will  11:21:17
4  elaborate on your statement that the contract  11:21:20
5  definition supports the ████████        11:21:22
6  because of its reference to ████████        11:21:28
7        THE WITNESS: Yes.        11:21:31
8        MR. SHEPPARD: And at page 53 of the  11:21:32
9  contract -- if you would like to take a moment --  11:21:34
10        MR. HIRSCHFELD: I'm going to provide it  11:21:41
11  to the witness in a moment. (Indicating.)  11:21:44
12        (The witness reads document.)  11:21:50
13        MR. SHEPPARD: I would just ask for your  11:21:52
14  explanation, to be sure I understand your opinion.  11:21:54
15  You see the reference there to ████  11:21:57
16  ████████ It says: "For ████        11:22:01
17  ████████ as published in  11:22:07
18  ████████        11:22:11
19  And the question is a contrary view has  11:22:17
20  been submitted, and that is the reference to  11:22:20
21  ████████ -- you understand the  11:22:22
22  argument -- would allow consideration of  11:22:25
23  ████████████████████        11:22:30
24  ████████ And I would welcome your  11:22:34
25  comment on that.        11:22:37

Page 1569

-Weale - By the Panel-

1
2        THE WITNESS: Okay. I believe I'm in a  11:22:38
3  good position to comment on this. Because in the  11:22:42
4  past when I worked at what's now Exxon Mobil, at  11:22:44
5  the refinery, I blended heavy fuel oil myself.  11:22:48
6        It's expensive, meeting a sulphur  11:22:53
7  specification.        11:22:56
8        So when I was responsible for blending  11:22:58
9  it, it was -- if the spec's at ████ it was  11:23:01
10  my job to meet the ████████ as closely as I  11:23:05
11  could. Because to be producing fuel oil where you  11:23:10
12  measure the sulphur is ████████████████  11:23:17
13  ████████████████████        11:23:20
14  ████████████████        11:23:26
15        MR. SHEPPARD: I think I follow that.  11:23:27
16  In terms, then, of just what the  11:23:30
17  contract says to you --        11:23:34
18        THE WITNESS: If I may be allowed to  11:23:35
19  return to this report.        11:23:38
20        MR. SHEPPARD: Please, sure.  11:23:39
21        THE WITNESS: Because we're talking all  11:23:40
22  along about the ████████ of ████████  11:23:42
23  ████████        11:23:46
24  And what I found very helpful, and I  11:23:46
25  replayed, it's on page 7 of the second report,  11:23:50

Page 1570

-Weale - By the Panel-

1
2  paragraph 3.2.2. There are two points which come  11:23:56
3  out here and both of them I believe are directly  11:24:03
4  relevant and should answer very well the question  11:24:06
5  that you've asked.        11:24:10
6        The first point is that what they mean  11:24:12
7  by ████████        11:24:20
8  ████████████████████        11:24:24
9  So they are not talking about just  11:24:29
10  anything ████████        11:24:35
11  ████████████████        11:24:39
12  And then they go further than that in  11:24:39
13  the second is sentence, which I have in bold, and  11:24:44
14  this is quoting directly out of their  11:24:49
15  methodology: "In the past utility companies used  11:24:51
16  to buy ████████ for burning  11:24:55
17  purposes, but limits endorsed by the EU on  11:24:59
18  ████████ mainly the ████ on ████  11:25:01
19  ████████ are rare. Most utilities use ████  11:25:05
20  maximum for burning purposes."        11:25:07
21        MR. SHEPPARD: Thank you.  11:25:12
22        THE WITNESS: I should also say that all  11:25:13
23  of that is confirmed by anecdotal evidence in  11:25:15
24  ████████ One of my colleagues had had discussions  11:25:18
25  with the energy buyers of some of the large power  11:25:22

15 (Pages 1567 to 1570)

Page 1671

-Lapuerta - Cross-

1
2   Q.   You understand in European gas markets   03:05:50
3   that price review and reopener clauses typically   03:05:53
4   operate on two main principles. Those principles   03:05:58
5   are, first: If the seller and the buyer of the gas   03:06:03
6   have agreed or it has been determined by an expert   03:06:06
7   or an arbitration the economic conditions,   03:06:10
8   including the energy market environment in the   03:06:13
9   buyer's gas market area, have changed significantly   03:06:16
10   compared to the time the price adjustment was last   03:06:21
11   agreed and such changes are beyond the control of   03:06:23
12   both the buyer and the seller, then the price   03:06:27
13   arrangement in the contract will be adjusted or   03:06:30
14   changed to reflect the new economic conditions in   03:06:32
15   the buyer's gas market area.   03:06:36
16          That's condition 1.   03:06:38
17          And 2: If the buyer can demonstrate to   03:06:39
18   the seller, or it has been determined by an expert   03:06:43
19   or an arbitration that the buyer, in spite of   03:06:46
20   operating a sound and efficient gas marketing   03:06:49
21   practice, is unable to make a reasonable profit   03:06:53
22   when selling the gas taken delivery of under the   03:06:56
23   gas sales agreement with the seller, the contract   03:07:00
24   will be adjusted or changed to restore the buyer's   03:07:03
25   position in his market.   03:07:06

Page 1672

-Lapuerta - Cross-

1
2          MR. SHEPPARD: Beg your pardon, Counsel.   03:07:10
3   What was your reference there, please, the   03:07:12
4   paragraph?   03:07:13
5          MR. HARRIS: This isn't a paragraph out   03:07:15
6   of his report. This is an article that I am   03:07:17
7   reading to the witness.   03:07:20
8          MR. SHEPPARD: Thank you.   03:07:21
9   BY MR. HARRIS:   03:07:21
10   Q.   Does that two-step analysis ring a bell   03:07:21
11   for you?   03:07:25
12   A.   I couldn't have said it better myself.   03:07:25
13   Q.   You did say it. That's one of your   03:07:27
14   articles.   03:07:30
15          You say that, going on, the second   03:07:30
16   principle, whether the buyer can make a reasonable   03:07:35
17   profit when selling the gas, overrides the first,   03:07:38
18   and, in effect, guarantees the buyer a positive   03:07:43
19   margin on the gas taken delivery of under the gas   03:07:46
20   supply contract concerned, correct?   03:07:51
21          (The witness reads document.)   03:07:54
22   A.   I think that's accurate. That's normal.   03:07:57
23   Q.   Okay. Let me ask you this:   03:07:59
24          How would you have analyzed what to do   03:08:25
25   with the Train 1 gas if it were sold to three   03:08:31

Page 1673

-Lapuerta - Cross-

1
2   different markets by GNA?   03:08:34
3   A.   Yes. You would look at the value that   03:08:44
4   the -- of the gas at the point of consumption in   03:08:48
5   the three different markets. And calculate also   03:08:54
6   from that value the reasonable costs, assuming   03:09:01
7   efficient marketing -- sound marketing practices by   03:09:09
8   the seller. And determine the maximum contract   03:09:12
9   price that would still leave the seller with a   03:09:17
10   reasonable profit in each of those three different   03:09:21
11   destinations.   03:09:26
12          It's no different from a normal   03:09:28
13   contract, where even if the gas, for example, in   03:09:31
14   Spain, is consumed in several different places by   03:09:33
15   several different end users who assign different   03:09:37
16   types of value, some of them assign a high value   03:09:40
17   because their only alternative is to burn diesel,   03:09:43
18   and others assign a relatively low value, so that   03:09:48
19   in spirit you have to perform different   03:09:52
20   calculations even within Spain.   03:09:54
21          And it's exactly the same that you would   03:09:57
22   do if the gas actually went to three different   03:09:59
23   countries.   03:10:01
24   Q.   So in your analysis you always follow   03:10:02
25   the Train 1 gas and you always ignore any other gas   03:10:05

Page 1674

-Lapuerta - Cross-

1
2   sales to any other end users by GNA; is that   03:10:08
3   correct?   03:10:11
4   A.   I think you do that if you can   03:10:16
5   distinguish where the Train 1 gas goes.   03:10:18
6          If you couldn't, for instance, if the   03:10:22
7   Train 1 gas went into Spain, I don't think you can   03:10:24
8   pick which end users are burning that gas because   03:10:28
9   it would mix with all the gases in Spain.   03:10:31
10          What you might look at is that perhaps   03:10:33
11   GN's end-user market in Spain doesn't include, for   03:10:35
12   example, the Basque region, there might be a   03:10:40
13   distinction based on that.   03:10:43
14          But within the particular area of Spain   03:10:45
15   that GN sold to, I don't think you would be able to   03:10:47
16   parse out which gas contract went to which end   03:10:51
17   user.   03:10:55
18   Q.   So you're saying if the Train 1 gas went   03:10:55
19   to an end-user market where GNA mixed it with other   03:10:57
20   supplies, you would mix all those prices together   03:11:01
21   to come up with a calculation of what a fair margin   03:11:05
22   would be because you can't distinguish between the   03:11:10
23   Train 1 gas consumption and other gas consumption?   03:11:14
24   A.   The question just said mix those prices.   03:11:20
25          I would not mix different contract   03:11:23

41 (Pages 1671 to 1674)

Page 2452

1

2        ------------------------------------x

3        In the Matter of the Arbitration

4                    Between

5        ATLANTIC LNG COMPANY OF

6        TRINIDAD AND TOBAGO,

7                              Claimant,

8                    -and-

9        GAS NATURAL APROVISIONAMIENTOS SDG S.A.,

10                             Respondent.

11       ------------------------------------x

12                             875 Third Avenue

13                             New York, New York

14                             June 8, 2007

15                             9:19 a.m.

16

17       B E F O R E:

18            GERALD AKSEN, ESQ. - The Chairman

19            EUGENE A. MASSEY, ESQ. - Panel Member

20            BEN H. SHEPPARD, JR. - Panel Member

21

22

23            Amy Klein, Hearing Reporter

24       Pages 2540 - 2582 were marked "Strictly Confidential

25       Pursuant to Procedural Order No. 9" and separately bound.

Page 2537

1    -Proceedings-
2        MR. MASSEY: I see.
3        MR. BAEZA: And the two bars that you
4    have in each of the charts in each of the pages
5    from page 2 to page 7 -- sorry -- we present the
6    two charts that you have below in page 8 and 9
7    because in page 8 you have the ▮▮▮▮▮▮▮▮▮▮▮
8    that is ▮▮▮▮▮▮ while in page 9 you have the
9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    So
10   that's why you have two columns in each of the
11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12       MR. MASSEY: I see.
13       So if we go like on to page 6, which is
14   the Group ▮▮▮ ▮▮▮▮▮▮▮▮, we would look at page 8
15   and we would go to the ▮▮▮ column. And because
16   it's Group 1 we would take the green line rather
17   than the red line?
18       MR. FIGUEROLA: Yes, that's right.
19       MR. MASSEY: Thank you. I now
20   understand it.
21       MR. FIGUEROLA: Okay, happy to help.
22       THE CHAIRMAN: The headings in Spanish,
23   which one means local taxes?
24       MR. FIGUEROLA: Local taxes are not
25   computed in this chart because, as I said before,

Page 2538

1    -Proceedings-
2    the CNE is not the relevant entity to deal with
3    local taxes. So they don't put it in here.
4        THE CHAIRMAN: That's why I asked the
5    question.
6        MR. FIGUEROLA: We add it on top of the
7    CNE figure.
8        MR. COX: Just to confirm, we're in full
9    agreement with that explanation.
10       MR. FIGUEROLA: Thank you.
11       THE CHAIRMAN: What's up next?
12       MR. HIRSCHFELD: I think that's it with
13   respect to the chart.
14       THE CHAIRMAN: Okay. Now, you have some
15   comments?
16       MR. HIRSCHFELD: I have some comments
17   with respect to the confidential information we
18   received from the other side. So a number of
19   people will have to leave the room.
20       THE CHAIRMAN: Let's rearrange the room
21   so we can get to that portion.
22       (Discussion off the record.)
23       THE CHAIRMAN: Okay, Mr. Hirschfeld,
24   whenever you're ready.
25       MR. HIRSCHFELD: Thank you,

Page 2539

1    -Proceedings-
2    Mr. Chairman.
3        There are a number of comments I wanted
4    to make, and I don't propose to go exhaustively
5    through the contracts that we received between GNA
6    and ▮▮▮ regarding the resale to ▮▮▮ of Train 1
7    and Train 2 volumes. I think some of the comments
8    could fairly wait for the post-hearing briefing.
9        THE CHAIRMAN: Good.
10       (The following portion has been deemed
11   Strictly Confidential Pursuant to Procedural Order
12   No. 9 and bound under separate cover.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2540

2        MR. HIRSCHFELD: But there are a number
3    of matters that relate directly to the chart, in my
4    view, that have to do with pricing.
5        Now, in particular there is a contract
6    that appears as part of Exhibit R-335 that appears
7    behind a page --
8        MR. MASSEY: R 3-3-5?
9        MR. HIRSCHFELD: R 3-3-5, yes.
10       THE CHAIRMAN: Okay. What page?
11       MR. HIRSCHFELD: You're going to have to
12   turn a whole bunch of pages, maybe 30 pages or 25
13   pages into the document, until you come to a page
14   that looks like this and says "Shipping related
15   agreement/amendment BOA" (indicating).
16       THE CHAIRMAN: Is it after amendment 2?
17       MR. HIRSCHFELD: Yes, I believe it is.
18       MR. MASSEY: I have an amendment to the
19   BOA. Is it before that?
20       MR. HIRSCHFELD: It's just before that,
21   yes.
22       MR. MASSEY: "Shipping related
23   agreement/amendment BOA"?
24       MR. HIRSCHFELD: Yes.
25       THE CHAIRMAN: Okay. Got it.

23 (Pages 2537 to 2540)

-Strictly Confidential Pursuant to Procedural Order No. 9-

Page 2541

2       MR. HIRSCHFELD: Now, what I would like
3  to point out to the Tribunal is that if you turn to
4  page 3 of that document, Article 2 deals with
5  ████████████ and it provides essentially
6  an amendment to the existing resale agreement.
7       The Tribunal will recall there was some
8  testimony from Mr. Torralba during the hearing
9  about the penalty that GNA would incur if it sought
10  to recapture some of the cargoes resold to ████ I
11  think the questioning arose in the period
12  ████████, where they were buying ████ cargoes, and
13  somebody asked Mr. Torralba, well, why didn't you
14  just recapture the Train 1 cargoes.
15       And Mr. Torralba's explanation was it
16  would be punitively expensive to do so.
17       The punitive position is provided in the
18  main agreement. This Article 2 in the Business
19  Opportunity Agreement as it's formally named,
20  increases the penalty from ███████████████ to
21  ████████████ for a portion of the ██████
22       It then provides that in return for this
23  amendment there will be a payment per year of $██
24  ████████ computed at the rate of ████████████
25  per MMBtu times ████████ MMBtu's, which is the

Page 2542

2  ACQ under the Atlantic GNA Train 1 contract. The
3  contract that's at issue here.
4       So I would submit to the Tribunal that
5  this is an increase in the contract price. It is
6  not reflected on the invoices that form the basis
7  of what appears on line 4.
8       If you look at Article 3, brokerage fee,
9  again, a very interesting item. There is an
10  additional payment per year to GNA of ████████
11  ████████
12       Now, this one is computed a little
13  differently. It's █████ per MMBtu on ████████
14  Btu's. Which isn't the ACQ under the Train 1
15  contract. But it is the ACQ I believe under the
16  ████ contract.
17       Now, this is why I say it's very
18  interesting.
19       If you turn to the last page, Article
20  6.8 of this Business Opportunity Agreement, it
21  specifically provides in Article 6.8 that a
22  condition precedent to the effectiveness of this
23  agreement is ████████████ entry into
24  agreements with ████ to buy the ████ cargoes.
25       So however you want to style it, whether

Page 2543

2  it's a payment on account on the ████ cargoes or a
3  payment as is styled here, as a brokerage fee,
4  whatever you want to call it, it's an additional
5  component of the price that GNA is receiving from
6  ████ under its contract to resell the Train 1
7  volumes to ████ And again, it's not reflected on
8  the invoices.
9       Now, the Tribunal will recall that I
10  suggested that there was a tripartite arrangement
11  with respect to the ████ cargoes, and I was met with
12  denials, but here it is contractually.
13       What has happened, as the press accounts
14  reported, GNA is ████████ it is supplying
15  cargoes to ████ at a lesser price than ████ would
16  have to pay for those cargoes to Atlantic. ████ is
17  purchasing those cargoes, those Atlantic cargoes,
18  from ████
19       Without a ████ supplied by GNA, ████
20  could not sell those cargoes to ████ because it
21  wouldn't have the natural gas to operate its
22  facilities and to service its customers.
23       In return for arranging this
24  tripartite -- it's role in this tripartite
25  arrangement, ████ is paying a minimum of ████

Page 2544

2  ████████ a year to GNA as part of the consideration
3  under the Train 1 resale contract.
4       Now, another very interesting thing
5  that -- it depends on how you want to look at it,
6  but it's a fairly interesting event.
7       If you look at R-336, which is the Train
8  2 ████████ resale contract -- in other words,
9  this is the contract under which the Atlantic Train
10  2 volumes that are bought by GN are being resold to
11  ████ -- the date of that contract is ████████████
12  ████ which is the same date as the date on the
13  Business Opportunity Agreement, ████████████
14       So there's a very complex transaction
15  that is taking place between ████ and GN and its
16  affiliates on ████████████
17       Interestingly, if you look at Exhibit
18  R-336 and you look specifically in Article 2.1,
19  which gives you the price formula, it provides that
20  the extra amount that ████ pays to GN is ████████
21  above the FOB price that GN pays to ████ .
22       So the total uplift, the total extra
23  payment, is 4 ██████, which is lower significantly
24  than the total extra payment that is being paid
25  under the Train 1 resale contract. Significantly

24 (Pages 2541 to 2544)

-Strictly Confidential Pursuant to Procedural Order No. 9-

Page 2545

2  lower.
3        Interestingly, the Train 2 contract
4  between Atlantic and GN provides for a sharing of
5  the uplift. The Train 1 contract does not provide
6  for such a sharing.
7        So another way to look at all these
8  documents from a pricing point is there was a
9  conscious effort to take what should have been up
10 lift under the Train 2 contract which would have
11 been shared 50/50 with Atlantic and shifted into
12 the Train 1 contract resale, where there was no
13 uplift.
14       These are implications that you could
15 draw.
16       I'm very happy to have the $▇ plus
17 ▇▇▇▇, almost ▇▇▇▇▇▇▇ additional
18 payment be considered as part of the purchase price
19 that ▇▇ pays under the Train 1 contract, because
20 that's the way it's set up here. But I think the
21 Tribunal might want to keep in the back of its mind
22 the interesting circumstance of this pricing.
23       THE CHAIRMAN:  Are you inferring that
24 any of these arrangements in 335 or 336 are in
25 violation of your contract with GNA?

Page 2546

2        MR. HIRSCHFELD:  If there were a
3  conscious --
4        THE CHAIRMAN:  If I was GNA, this stuff
5  makes business, commercial sense.  Their back is up
6  against the wall.  They need every penny that they
7  can get.  To me this makes business sense.
8        My question to you is:  Does this
9  violate your contract with GNA?
10       MR. HIRSCHFELD:  If there was a
11 conscious effort to take monies that was -- that
12 were payable for the Train 2 cargoes and rather
13 than treat them as payable for the Train 2 cargoes,
14 where the uplift would have to be shared is, and
15 shift that payment to another contract where the
16 uplift doesn't have to be shared, I don't know that
17 it's in violation or not.  It' not for the Tribunal
18 to decide.  It just leaves a funny impression.
19 That's all I'm saying.
20       MS. HENNEBERRY:  Is that in violation of
21 the Train 1 contract?  You're throwing out these
22 ideas --
23       MR. HIRSCHFELD:  I'm not suggesting a
24 violation of the contract.
25       THE CHAIRMAN:  We've just cleared the

Page 2547

2  air.
3        MR. HIRSCHFELD:  I'm saying --
4        THE CHAIRMAN:  I already said it's a
5  good business sense for GNA to do that.
6        MR. HIRSCHFELD:  As a factual matter, if
7  there was a conscious decision to say, you know,
8  this is what we'll pay you for the Train 2 cargoes
9  but, you know what, we'll put a portion of it under
10 the Train 1 agreement so you don't have to share
11 it?
12       I'm just not comfortable with that.  I'm
13 not saying that that's a breach of the Train 2
14 contract.  I'm just saying it leaves me with some
15 reservations about the whole scheme.
16       But the fact of the matter is that the
17 payments are now being made under the Train 1,
18 contract and they should be considered as part of
19 the Train 1 contract price.
20       I think the last point I wanted to
21 make -- because again, I think it is relevant to
22 pricing -- is if you look at -- it is really two
23 points.
24       If you look at Article 2.7 of the
25 original LNG sales agreement dated ▇▇▇▇▇▇▇,

Page 2548

2  which is the first document under tab R-335 --
3        MR. SHEPPARD:  What paragraph was that?
4        MR. HIRSCHFELD:  Paragraph 2.7.
5        If you look through paragraph 2.7, what
6  it really is is a transfer of the take-or-pay
7  liability to ▇▇ as the buyer.
8        And there was some discussion, the
9  Tribunal will remember, when Mr. Lapuerta was here.
10 Mr. Lapuerta said it would be very important to see
11 whether or not the take-or-pay risk had been
12 transferred from GNA to ▇▇
13       And my reading of Article 2.7 shows that
14 clearly it has been.
15       There is one more provision that I
16 wanted to draw the Tribunal's attention to, and
17 that is because there was an assertion made that a
18 price increase such as demanded here would result
19 in catastrophic losses to GNA because it couldn't
20 be passed on to ▇▇.  I think that is
21 categorically untrue under this contract.
22       If you read the pricing provisions of
23 the resale contract as initially drafted and as
24 subsequently amended, the obligation that ▇▇ has
25 is to pay based upon the contract price from

25 (Pages 2545 to 2548)

-Strictly Confidential Pursuant to Procedural Order No. 9-



Page 2549

2  Atlantic to GNA. And that is passed through by the
3  simple operation of the pricing mechanism to ▓▓▓
4  as the buyer.
5       So if a contract price goes up, the
6  price ▓▓▓ pays goes up. It gets passed right
7  through.
8
9
10
11
12
13
14       That's a misdescription of what's really
15  going on.
16       In the Train 2 resale agreement, there
17  is a limitation on the ▓▓▓▓▓▓. There is --
18  if you look at Article 7 of Exhibit 336, you will
19  see -- it's on page 8 -- you will see the paragraph
20  7.2 that there is an express limitation on the
21
22
23
24       And there is a further provision that
25  says, ▓

Page 2550

2
3
4
5       So that is a ▓▓▓▓▓▓▓
6
7       MR. MASSEY: I'm sorry to interrupt you.
8  I'm reading it. It says: ▓
9
10       It doesn't have the word "effective" in
11  there.
12       MR. HIRSCHFELD: I meant the date of the
13  award. Not the effective date. The date of the
14  award. As opposed to the date that the award might
15  be effective as between Atlantic and GN.
16       MR. MASSEY: Right.
17       MR. HIRSCHFELD: So this is a clear
18  attempt by ▓▓▓ to limit GN's ability to
19
20       If you go back to the original contract,
21  the first contract under R-335 that deals with the
22  resales of the Train 1 cargoes, and you look at
23  Article 7 which appears on page 10, you will see
24  there's no such limitation.
25

Page 2551

2
3
4
5       And, then, there's one final point that
6  I wanted to bring to the Tribunal's attention, and
7  that is Article 2.3 of the Train 1 resale
8  agreement.
9       It appears at page 3 of the first
10  document under R-335.
11       That article specifically calls --
12       MR. MASSEY: Which one are you on?
13       MR. HIRSCHFELD: 2.3.
14       MR. MASSEY: 2.3, okay.
15       MR. HIRSCHFELD: That provision
16  specifically permits GNA to ▓▓▓▓▓▓▓
17
18
19
20       Upon receiving the price reopener notice
21  from Atlantic in April 2005 GNA could have
22  protected itself, and probably did, 100 percent
23  against a price increase in this reopener by
24  notifying, ▓▓▓▓▓▓▓ that ▓▓▓
25  ▓▓▓▓▓▓▓ amount because of

Page 2552

2  the reopener proceeding having been initiated and
3  being pending.
4
5
6
7
8
9
10       So I don't think we need to be concerned
11  here about GNA being left in the lurch and holding
12  the bag if there is a price increase that is
13  imposed here. ▓▓▓▓▓▓▓
14
15       MR. SHEPPARD: Mr. Hirschfeld, I have a
16  question for you. Are you finished?
17       MR. HIRSCHFELD: Yes.
18       MR. SHEPPARD: This was one of the
19  questions I was going to put to GNA.
20       With respect to the Train 1 contract, I
21  understand your position is that ▓▓▓▓▓▓▓
22
23       MR. HIRSCHFELD: Yes.
24       MR. SHEPPARD: Under the Exhibit 335.
25  Test my understanding on that. Article 2.1, the P

26 (Pages 2549 to 2552)

-Strictly Confidential Pursuant to Procedural Order No. 9-



Page 2553

2 appears to be point █ times the ████ Doesn't
3 that mean that GNA can only recover █ percent of
4 the price increase?
5        MR. HIRSCHFELD:  Well, if you look at
6 the way the rest of the formula operates, including
7 the way it's been amended from time to time, you
8 will see that the remaining 20 percent in fact
9 relates to the ████████
10        And there are some adjustments that are
11 made to the ████████ to reflect a ████████ --
12 basically the ████████
13        If you trace the history of how these
14 adjustments work all the way through, you'll find
15 out that this ████████ results in an additional
16 payment to GNA above the payment that is provided.
17        In other words, it gives them an
18 additional increment.
19        It gets a little complicated, but the
20 way I would describe it is -- let me see if I can
21 show the Tribunal the amendment and how the price
22 operated afterwards.
23        If you look at the second amendment --
24 okay? -- the second amendment which appears as part
25 of our 335 --

Page 2554

2        MR. SHEPPARD:  Is it called Amendment 2?
3        MR. HIRSCHFELD:  The cover page, the
4 lead-in page says Amendment 2.
5        MR. SHEPPARD:  It's after the BOA
6 amendment?
7        MR. HIRSCHFELD:  No.  It's just before.
8        MR. MASSEY:  Before.
9        MR. HIRSCHFELD:  It's the document, and
10 the Exhibit A's are just before the BOA agreement.
11        MR. CAVOLI:  It is the third
12 supplemental document behind the original.
13        MR. MASSEY:  There you go.
14        MR. SHEPPARD:  Thank you.  It's
15 Amendment 2, then?
16        MR. HIRSCHFELD:  Yes.
17        Now, under Amendment 2 and the Exhibit
18 A's attached to it, which are the third and fourth
19 pages, you'll see that the actual pricing formula
20 from ████████████████
21 what you saw in the original contract but what
22 appears in the second amendment. ████████████
23 ████████████████████████
24        So the ████████ there's 100 percent of
25 the ████████ there.

Page 2555

2        MR. MASSEY:  What are the dates that 2.1
3 applies?
4        MR. HIRSCHFELD:  Okay.  Under the first
5 Exhibit A attached to Amendment 2, it applies from
6 ████████████████ And the
7 end value to plug into the formula is agreed at █
8 ████████
9        So the purchase price is ████████ of
10 the ████████████ and ████████ of the
11 plus ████████
12        MR. MASSEY:  Looking at the next one
13 though, that applies to October?
14        MR. HIRSCHFELD:  ████████ until
15 ████████.  And all it does is it increases
16 the M value from ██ cents to a ████████ █
17        MR. MASSEY:  So this -- the period that
18 our award could cover would start in April of 2005?
19        MR. HIRSCHFELD:  Right.  So it would be
20 effectively under this second appendix -- second
21 Exhibit A --
22        MR. MASSEY:  Until March of 2006.
23        MR. HIRSCHFELD:  Right.
24        Then you go towards a little further
25 through it until you get to Amendment Number 3.

Page 2556

2        Now, in Amendment Number 3 you've got a
3 different formula.  And that's why I say it can get
4 a little complicated.
5        THE CHAIRMAN:  I see it.
6        MR. HIRSCHFELD:  Okay, if you look at
7 this Amendment 3, the third amendment to the LNG
8 sales agreement dated ████████ you will find
9 that there is a price formula applicable from ████
10 ████████ to the end of this arrangement, ████████
11 ████ And that looks like the formula that we've
12 seen before that caused our Arbitrator Sheppard to
13 ask the question about, well, it's only ████████
14 d████
15        If you turn to the next page, they have
16 an option to revert to something that looks an
17 awful lot like the formula in the second amendment.
18        MR. SHEPPARD:  Uh-hum.
19        MR. HIRSCHFELD:  Instead of ██ plus
20 ████ cents it's ████ plus ████ cents, but
21 otherwise it looks the same as that.
22        Now, the reason I say it gets a little
23 complicated is if you work only with the first
24 formula appearing on the first page of the third
25 amendment to the LNG sales agreement, what you

27 (Pages 2553 to 2556)

-Strictly Confidential Pursuant to Procedural Order No. 9-

Page 2557

2 really need to focus on is the differential between
3 the ████ price and the ████ price.
4           And essentially, if I understand -- I
5 think I figured out the way this operates -- as
6 long as the ██████████ price is anything less
7 than ██████████ lower than the ████ price, that
8 ████ of the price equation produces profit
9 for GNA. The ██████ always produces profit for
10 GNA.
11          So what I'm saying, if you go into a
12 negative situation, you have to have that much of a
13 difference, ████ or more difference, between a low
14 ████ price and a high ████ price before this
15 equation means that the selling price from GNA to
16 ██████ is lower than GNA's purchase price from
17 Atlantic.
18          MR. SHEPPARD: But back to the earlier
19 point.
20          Do you agree that after the effective
21 date of Amendment Number 3 there is not a
22 █████████████████████████████████████
23 █████; that is, the Atlantic/GNA price?
24          MR. HIRSCHFELD: Well, I think it is a
25 █████████████████████████

Page 2558

2           In other words, they will recover their
3 full ██████ until that point where the ████
4 price is a ████████████████ than the ████
5 ██████
6 ██████ If it's more than a ████████ below the
7 ██████, then they won't recover their entire ████
8 ██████
9           MR. SHEPPARD: So your view of the
10 formula is that in effect there will always be a
11 ████████████ If the price goes
12 up, they are going to get that back from ████
13 that's your view.
14          MR. HIRSCHFELD: There is not that kind
15 of disparity between the contract price and the
16 ████████ price.
17          And if there is for a tiny period, due
18 to some weird aberration in ██████████, that's -- it
19 seems to me that's a risk that they can well accept
20 because the rest of the time it's passed through.
21 It's all passed through.
22          MR. SHEPPARD: But it's not clear a
23 straight ████████ where you have -- during that
24 interim period where you have ████ percent of ████
25 plus ████████████

Page 2559

2           MR. HIRSCHFELD: It's not an absolutely
3 guaranteed ███████████ okay. The ████
4 will cease to work once the disparity between the
5 ████ price and the ████████ price, with the ████
6 price being higher, becomes sufficiently great so
7 that ████ percent of that exceeds ████ percent of
8 ████, basically is the way you do the math.
9           If you look at the formula on the first
10 page of this third amendment, the ████ percent is
11 applied to ████ plus ████ cents. So ████ percent of
12 the ████ gets passed through right away, whatever it
13 is, and ████ percent of ████ cents which is ████
14 cents approximately.
15          So what that means is you've got ████
16 cents in built-in profit from this part of the
17 equation, from the ████ percent part of the equation.
18          So you can lose ████ cents from the ████
19 percent part of the equation and still break even.
20          MR. SHEPPARD: I think I'm addressing a
21 little different point.
22          You're talking about break even in
23 profit. I'm talking about your assertion of
24 straight ████
25          MR. HIRSCHFELD: That's the best I can

Page 2560

2 do under these circumstances.
3           MR. SHEPPARD: Okay, sure.
4           MR. HIRSCHFELD: I don't know whether
5 they are going to agree to the pricing formula
6 reflected on the next page. I mean, there -- at
7 this point I'm speculating. And it wouldn't
8 surprise me if they were all holding their breath
9 to wait and see what happens here.
10          THE CHAIRMAN: Let's look at it from
11 another perspective.
12          Supposing these good people did all of
13 this so that they could withdraw the first demand
14 for arbitration and not have to come after you for
15 a price decrease. Suppose their motives were very
16 pure and they found themselves in a dilemma:
17 Should they file an arbitration against Atlantic or
18 not? They are getting killed.
19          And they come up with this clever
20 business idea to see if they can recover and ████
21 ████████ as much as they can with ████ And they do
22 this and they breathe a sigh of relief and they
23 say, okay, now we don't have to have this dispute
24 with our good friends at Atlantic.
25          Can't you put a spin on this that shows

28 (Pages 2557 to 2560)

-Strictly Confidential Pursuant to Procedural Order No. 9-

Page 2561

2  that they did this in very good faith, a business
3  opportunity, and it kept you out of arbitration
4  until this case?
5      MR. HIRSCHFELD:  I'm not suggesting they
6  did this in bad faith.  I've never suggested they
7  did this in bad faith.  I have suggested that the
8  pricing --
9      THE CHAIRMAN:  You're looking -- your
10  point, I think, is that we shouldn't be concerned
11  that if you get a price increase, it's going to
12  cost them anything because they are going to ████
13  ████
14      I think that's the point of the exercise
15  you just took us through, isn't it?
16      MR. HIRSCHFELD:  Well, I was responding
17  to the assertion --
18      THE CHAIRMAN:  My colleagues are very
19  unsympathetic, two-thirds of the Tribunal, you're
20  wasting your time on this sympathy argument.
21      MR. HIRSCHFELD:  I'm not speaking
22  sympathy, Mr. Chairman.
23      I'm responding to the assertion that was
24  made as a factual assertion that it would
25  effectively bankrupt GNA for this kind of

Page 2562

2  retroactive award -- "retroactive" meaning the way
3  that the contract requires it be applied for this
4  kind of award to be given -- because they have no
5  ability to ████████████████  And they do.
6      That has nothing to do with good faith,
7  with bad faith, whether it was a sound business
8  decision or not.  It is what the contract says.
9      THE CHAIRMAN:  Gotcha.
10      MR. HIRSCHFELD:  That's my only point in
11  going through this.
12      If we're going to consider at all
13  assertions with respect to what the impact might be
14  as a result of their resale contract with ████
15  let's look at the terms of the resale contract.
16  That's all I'm saying.
17      THE CHAIRMAN:  That's very helpful.
18      MR. HIRSCHFELD:  And by the way, this
19  original arrangement was entered into in ████ and
20  the arbitration was not withdrawn at that point.
21  The reopener was not withdrawn.
22      THE CHAIRMAN:  When was it withdrawn?
23      MR. HIRSCHFELD:  The end of 2004.
24      THE CHAIRMAN:  What was the date of this
25  last amendment?

Page 2563

2      MR. HIRSCHFELD:  The last one is June
3  2004.
4      THE CHAIRMAN:  Okay.  You don't have to
5  respond to that.  You can put it in your briefs.
6      You've already heard the Chairman's
7  comments in terms of where you are.  I would be
8  very surprised and disappointed if GNA didn't have
9  a business strategy that kept them as whole as you
10  could be.  So unless you feel compelled to comment
11  on that, there is some sophistication on the Panel,
12  on the part of my colleagues, and so I don't think
13  you have to worry about that.
14      MR. von MEHREN:  I would like to make a
15  short comment.
16      THE CHAIRMAN:  You can make a comment,
17  sir.
18      MR. von MEHREN:  Thank you.
19      My comment is that ████ should hire
20  Mr. Hirschfeld.
21      THE CHAIRMAN:  They may.
22      MR. von MEHREN:  Because ████ --
23      THE CHAIRMAN:  Not all the headaches
24  with these contracts and confidential.
25      MR. von MEHREN:  -- ████ says there is

Page 2564

2  not a ████████████
3      MR. HUMPHREY:  It is not a ████████h.
4      MR. von MEHREN:  And that's what ████
5  says.  Right?
6      MR. HUMPHREY:  Exactly.
7      MR. von MEHREN:  There are comments the
8  other way that Mr. Hirschfeld left out and they
9  say --
10      THE CHAIRMAN:  I will hear them in your
11  post-hearing brief.
12      MR. von MEHREN:  -- and they say there
13  certainly isn't an ability to reach back to 2005.
14      Now, why is this important to me?  And
15  why do I think it should be very important to the
16  Tribunal?
17      And the reason is the Bleak House
18  effect.
19      We started asking, as you were saying,
20  Chairman Aksen, for a price decrease in 2002 so we
21  could sell the gas in Spain.  Didn't get it.  Did
22  the deal, the resale deal with ████ they came
23  along -- and we dropped our price increase request,
24  as you just said, in order to avoid or arbitration.
25      They came along and they started this

29 (Pages 2561 to 2564)

-Strictly Confidential Pursuant to Procedural Order No. 9-

Page 2565

2  price reopener, so we're in an arbitration.
3       Now, if you increase the price, we have
4  another arbitration with ███ Okay?
5       THE CHAIRMAN: Would you be surprised if
6  you learned that the Tribunal actually discussed
7  that?
8       MR. von MEHREN: Excellent.
9       THE CHAIRMAN: One of the things we have
10 to face is: Is that any of our business? We have
11 enough on our plate.
12      This is one arbitrator speaking.
13      We have enough on our plate with the
14 contract between GNA and Atlantic. I'm not
15 interested in ███████ I'm not interested in
16 ██████ or anybody else.
17      Give us a break here. You're taking us
18 through 20 years on the lives of these parties.
19 These guys are young enough to have another
20 arbitration. I'm not.
21      So we're going to finish this case
22 hopefully this year, and I'm not interested in
23 ███████ problems.
24      MR. von MEHREN: If under a contract
25 that urges you to reach a fair and equitable

Page 2566

2  solution between --
3       THE CHAIRMAN: Between these two
4  parties, yes, sir.
5       MR. von MEHREN: Even with these two
6  parties.
7       THE CHAIRMAN: Yes, sir.
8       MR. von MEHREN: You create a situation
9  where one of them is simply sent on to the next
10 arbitration -- I would simply ask you to consider
11 whether that is fair and equitable and appropriate.
12      THE CHAIRMAN: You can put that in your
13 brief. Absolutely.
14      MR. von MEHREN: Thank you.
15      THE CHAIRMAN: I expect you to come in
16 with guns blazing in your brief and your reply
17 brief. It would not surprise me at all to see it
18 in there. We're aware of these things. My
19 colleagues have pointed it out to me. I will
20 continue to say, it's none of our business if there
21 are two or three or four arbitrations no matter
22 which way we go, either way. All right? So we
23 have some awareness of that.
24      Anything else on this point?
25      By the way, this was very helpful.

Page 2567

2       Mr. Hirschfeld, it had to come out.
3       And, Mr. Sheppard, please continue to
4  ask your questions.
5       MR. SHEPPARD: Thank you.
6       And some of the issues I have for your
7  side I have addressed here. And I wanted to follow
8  up a little bit more.
9       What initially triggered that, if you
10 would like to refer to it in paragraph 6 of your
11 introduction, your paper, you compare and
12 contrast -- I mentioned that I would discuss this
13 with you -- you compare and contrast the two resale
14 agreements on Train 1 and Train 2.
15      As I understand the statement, it was
16 that ████████████████████████████████
17 ████████████████████████████████
18 ████████████████████████████████
19 ████████████████████████████████
20      Does that fairly state what you intended
21 to state.
22      MR. HUMPHREY: That's the recollection
23 that we have. I was not present.
24      MR. SHEPPARD: I want to be share I
25 understand how these two contracts work.

Page 2568

2       Mr. Hirschfeld has already addressed the
3  Train 2 contract.
4       My reading of that contract, and it's
5  been elaborated this morning, is that at a minimum
6  GNA would be able to recover ██ percent of a price
7  increase under its resale contract with Train 1.
8       Is that correct?
9       MS. HENNEBERRY: We do not take that
10 view.
11      MR. SHEPPARD: You do not take that
12 view?
13      MS. HENNEBERRY: We do not.
14      THE CHAIRMAN: Then you better explain
15 that in your post-hearing brief.
16      MR. MASSEY: We can hear it. I think it
17 would be helpful.
18      THE CHAIRMAN: Let's hear your
19 explanation.
20      MS. HENNEBERRY: Starting with the
21 principle that if we expect something to be a
22 ████████████████ in a contract, we tend to be fairly
23 specific about it. Just even speaking for myself,
24 in transactions that I do, that is huge, whether or
25 not one is just sort of adopting a formula that's

30 (Pages 2565 to 2568)

-Strictly Confidential Pursuant to Procedural Order No. 9-

Page 2569

2  currently written there, or is that formula as it
3  may be revised under Section 8.5, which is not
4  referred to in the resale contract.
5       To me, from a drafting perspective, that
6  is a huge thing to just be silent on.
7       Furthermore, we have a couple of things
8  come into play here.
9       One of the reasons there are all these
10 Exhibit A placing options and different things is
11 that the risk of the basis differential between
12 European prices and prices that ▮▮ could obtain
13 in the ▮▮▮▮▮▮ market was being shifted in very
14 significant part to ▮▮ ▮▮ under this contract. And
15 to protect themselves against that differential it
16 is our understanding that they intended to at the
17 time and have hedged that exposure.
18      And a hedging mechanism is a financial
19 instrument, is not something that is compatible
20 with a sudden pricing change imposed by a
21 third-party where it's not so clear how that's to
22 be handled.
23      With respect to Mr. Hirschfeld's point
24 on provisional invoicing, provisional invoicing is
25 typical in any sort of commodities contract and

Page 2570

2  it's predicated on either not having definitive
3  volumetric or quality data or heat contract data,
4  or the results of -- index base calculations on a
5  definitive basis. So you use an estimate and then
6  you follow-up with a final invoice.
7       It is not used to protect oneself
8  contractually against something that's not at all
9  clear in the contract.
10      Probably most importantly, of course, is
11 our understanding that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13      MR. HUMPHREY:  Absolutely.
14      MS. HENNEBERRY:  And we would like to
15 point to one other document in the infamous R-335.
16 It's what is called the price letter amendment.
17 And I'm sorry to say it's almost exactly --
18      MR. ANWAY:  It's the first document
19 after the --
20      MS. HENNEBERRY:  Sorry, it's just the
21 second document in there.
22      What we find sort of interesting about
23 this letter and have always understood it to be is
24 in fact ▮▮▮ confirmation ▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 2571

2       What this does is lay out the exact
3  calculation that is to be used to calculate the ▮▮
4  component of the pricing formula in the resale
5  contract.  It is specific as to the averages, the
6  percentages, the P0 and exactly how that formula is
7  to be calculated.
8       Even though the initial contract
9  references ▮▮ as calculated under 8.1 and 8.2, at
10 the end of the day it comes back to this, which is
11 signed by both parties, saying this is the formula
12 that will be used under this agreement to calculate
13 ▮▮ component in this contract."
14      So for those reasons we take a different
15 view from that espoused by Mr. Hirschfeld.
16      MR. MASSEY:  Could I ask you one
17 question on that.
18      This pricing letter applies to the Train
19 1 contract, right?  It doesn't -- is there anything
20 comparable for the Train 2 contract?
21      MR. HUMPHREY:  No.  It is not.  No.
22      MR. MASSEY:  Is that because you have a
23 ▮▮▮▮▮▮▮▮ where you agree to incorporate
24 whatever the actual ▮▮▮ was?
25      MR. HUMPHREY:  Yes, that's correct.

Page 2572

2       MR. MASSEY:  Here ▮▮ doesn't mean ▮▮,
3  means this?
4       MR. HUMPHREY:  This letter.  Which is
5  the existing price.
6       MR. SHEPPARD:  Let me just follow up.
7       Let's suppose hypothetically that there
8  were an award that increased the price by a dollar.
9  Let's put aside the second amendment issue.  Let's
10 just suppose we're dealing with a straight contract
11 as it exists, and let's put aside the question of
12 retroactive.
13      Let's say you're starting to invoice for
14 resales of a Train 1 gas to ▮▮ and the price has
15 gone up a dollar.
16      That formula says that you are entitled
17 to recover from ▮ ▮▮ point ▮ of the ▮▮; that is,
18 ▮ percent of the ▮▮▮
19      Is your view that that calculation would
20 not include the dollar increase?
21      MR. HUMPHREY:  Yes.
22      MS. HENNEBERRY:  Yes.
23      MR. HUMPHREY:  Basically that ▮▮ percent
24 ▮▮▮▮▮▮▮ is this price, is this side letter to the
25 contract.

31 (Pages 2569 to 2572)

-Strictly Confidential Pursuant to Procedural Order No. 9-



Page 2573

2  MR. SHEPPARD: Well, that's...
3  MR. MASSEY: It says that ▮▮ doesn't
4  mean ▮▮▮▮▮ means this.
5  MR. HUMPHREY: Yes.
6  MR. SHEPPARD: Okay.
7  THE CHAIRMAN: This was entered into the
8  same day as amendment number 1.
9  MR. HUMPHREY: Yes. The same day as
10  Amendment Number 1, yeah.
11  MR. SHEPPARD: Your viewpoint is that
12  this ▮▮▮▮▮▮▮ price letter amendment cements
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  MR. HUMPHREY: Yes, certainly.
16  MR. von MEHREN: It's ▮▮▮▮ view.
17  MR. HUMPHREY: It's ▮▮▮▮ view.
18  MR. SHEPPARD: Let me ask you, then,
19  this. I think Mr. Hirschfeld touched on it.
20  In the Train 2 resale agreement, why was
21  there an express limitation? ▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Why was
25  there an express limitation?

Page 2574

2  MS. HENNEBERRY: We look at it the other
3  way around. We look at it the other way.
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮ But the challenge of the ▮▮▮▮▮
6  in any negotiation is when you're the ultimate
7  person who is going to bear that ▮▮▮▮▮▮ and
8  you have no control over the person doing the
9  ▮▮▮▮▮, subjecting you to it. It's always about
10  sort of striking a balance between the parties.
11  And so in this case, we could very
12  easily, absent some sort of provision along those
13  lines, sit down with Atlantic and say, well, you
14  know, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  So typically when negotiating this kind
19  of arrangement counter-parties will sit there and
20  try to strike a balance.
21  So the first thing you do, you either
22  give them the right, sort of like an indemnity to
23  step into the process, which I think no one tends
24  to like.
25  Or you limit it and say you just --

Page 2575

2  we're not going to take the whole thing and it's
3  going to be very limited circumstances under
4  which — basically to avoid of kind of gaming of
5  the upside, where we can do something else and
6  strike a balance along those lines.
7  So for us it's perceived actually as a
8  benefit that we obtained in that contract that we
9  don't think we obtained under the first one.
10  MR. SHEPPARD: And I took the point of
11  your paper to be that the concession you got from
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮ Was that your whole point?
15  MS. HENNEBERRY: Yes.
16  MR. von MEHREN: Uh-hum.
17  MS. HENNEBERRY: Yes.
18  And recognizing the only other comment I
19  would like to make, appreciating that you would
20  prefer not to have a long discourse on the details
21  of what Mr. Hirschfeld outlined, but I do want to
22  note that the items that are mentioned in the
23  Business Opportunity Agreement are all items that
24  we have accounted for. And we have accounted for
25  from the very beginning. They are all addressed in

Page 2576

2  the shipping, savings and losses section.
3  To us, all of these arrangements are
4  tied in, as we've said from day one, Train 1
5  resales, Train 2 resales, shipping optimization,
6  the arrangements relating to the subchartering of
7  the ▮▮▮▮▮▮▮▮▮▮▮ which in turn required ▮▮
8  to contract for additional volumes, for us to
9  transfer over transportation responsibility.
10  All of that is in there. This was
11  not -- has always been accounted for in our
12  revenues and losses, which we consider to be part
13  of evaluating the net benefit of any resale
14  transaction.
15  What under-utilized assets do we have.
16  What revenues do we have.
17  So that's all we'd like to say on that.
18  MR. SHEPPARD: May I ask this question
19  in that regard.
20  By that example Mr. Hirschfeld
21  referenced the ▮▮▮▮▮▮ payment under Article 2.
22  Is that reflected in your column 4, your row 4
23  calculations of the price under the GNA/▮▮▮
24  arrangement?
25  MS. HENNEBERRY: No, it is not. It is

32 (Pages 2573 to 2576)

-Strictly Confidential Pursuant to Procedural Order No. 9-

Page 2577

2  reflected in the full calculation in which we use
3  strictly the invoice prices.
4       Because when we net out all of our
5  revenues and losses and whatnot associated with
6  shipping, which is where all of this has been
7  factored, in fact, it would be a deduction from
8  those numbers.
9       So we refer you to that section of the
10  additional information.  On a net basis, in our
11  view, this would make the row 4 numbers lower.
12       MR. HUMPHREY: Yes.
13       MS. HENNEBERRY:  Therefore, we did not
14  include them in there.  But if you look, for
15  example, at table 2 in Mr. Torralba's witness
16  statement, you will see there is a line there for
17  shipping, savings and losses, and that's where all
18  these items have been calculated in that table.
19       We do not -- in that witness statement
20  we do not provide the detail.  But with the
21  confidentiality protections here we have provided
22  all of that explanation in section --
23       MR. HUMPHREY:  6.
24       MS. HENNEBERRY:  -- 6A.
25       MR. HIRSCHFELD:  I just have an

Page 2578

2  observation.
3       I think that's fairly outrageous, to
4  take something that is clearly a price increase
5  under the contract and another something that is
6  clearly a payment that has nothing to do with this
7  contract but is reflected as a price increase under
8  the contract, and saying that's part of our netting
9  out of shipping costs that we've incurred.
10       I have a separate issue as to how much
11  Atlantic is obliged to bear the results of their
12  shipping operation.  But that's something that I
13  won't address here.  We'll address that in the
14  post-hearing briefs.
15       But just so the Tribunal is aware,
16  Atlantic does not accept the notion that it is the
17  guarantor under this contract of the results of
18  shipping arrangements that are made by GNA.
19       MS. HENNEBERRY:  No one's asking you to
20  be.  What we're saying, Mr. Hirschfeld --
21       MR. HIRSCHFELD:  That's the effect of
22  what you've done.
23       MS. HENNEBERRY:  What we are saying,
24  Mr. Hirschfeld, is twofold.
25       One, you may think these payments have

Page 2579

2  nothing to do with shipping.  But they do in fact
3  have plenty to do with shipping.  They have to do
4  with the ability to subcharter the ███████████
5  in the first place.  Which is the mitigant for the
6  underutilized capacity of our assets that were
7  committed to this contract, that it was, at the
8  time, uncompetitive for us in our home market.
9       While you might not view it that way, we
10  do, and we have attempted to account for it.
11       And as far as whether or not Atlantic is
12  to bear the burden, it is simply -- it's a very
13  simple matter of looking at a transaction as a
14  whole.
15       In any sort of calculation you will see
16  deducted out transportation losses associated with
17  particular transactions with ████████ ███████
18  You look at transportation differentials in valuing
19  the cost of a transaction.
20       We are basically saying we were
21  contractually obligated to contract for these ships
22  to obtain long-term capacity to serve this train.
23  That capacity was underutilized.
24       We did our best to mitigate our price
25  exposure for resales, and we have accounted for

Page 2580

2  that in the overall picture in how profitable or
3  not this transaction is.
4       MR. HIRSCHFELD:  I think it would have
5  been easier for us -- for all of us -- if the
6  actual revenues received were disclosed as such.
7       We can all read the Business Opportunity
8  Agreement.  There are specific provisions in that
9  agreement and specific amounts that are expressly
10  stated as relating to shipping.
11       The two items that I note totalling
12  roughly ████████ have no express or conjurable
13  relation to shipping.  But we can debate that.
14       I just want to say that with respect to
15  this price letter amendment, I mean, I understand
16  the way that Ms. Henneberry is proposing that that
17  be read, and I think that's a fantastic reading of
18  the document and it imports to a document that
19  literally says no more than this is how the
20  Atlantic/GNA contract computes the contract price.
21  We all agree to that.
22       A notion that there is never to be a
23  ████████, I mean that's -- that's a fairly
24  strange reading of that document.  But again, we'll
25  brief that.

33 (Pages 2577 to 2580)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

-Strictly Confidential Pursuant to Procedural Order No. 9-



Page 2581

2  THE CHAIRMAN: Okay. One thing we can
3  do is read a document. Both tell us what it means.
4  MR. SHEPPARD: Thank you both. This
5  really has been very, very helpful.
6  MR. von MEHREN: Since we have
7  Mr. Humphrey here under oath, can I simply ask him
8  for a short explanation of something that
9  Ms. Henneberry said, which was that GNA believes
10  that ███ has hedged.
11  MR. HUMPHREY: Yes.
12  MR. von MEHREN: Why is that?
13  THE CHAIRMAN: ████ has --
14  MR. SHEPPARD: Hedged.
15  THE CHAIRMAN: Hedged.
16  MR. HUMPHREY: Basically ████ view is
17  this contract, it is not a████████████████████
18  And ████████████████████████
19  ████████████████████████████
20  ████████████████████████████
21  ████████████████████████████
22  ████████████████████████████
23  What I mean a "hedging," I mean the
24  difference between I can get in the market minus
25  the price they purchase the LNG.

Page 2582

2  So I cannot believe that a company that
3  has made a hedging of this transaction is going to
4  think this is ████████████. They clearly make
5  the point to us that ████████████
6  THE CHAIRMAN: We've heard it. But this
7  is ████ problem. And Mr. Humphrey doesn't work
8  for ████, so it's hard for me to accept any of
9  this as ████ position. But if this is what
10  Mr. Humphrey believes is ████ position, we will
11  accept that for what that is worth.
12  What's left, Mr. Hirschfeld?
13  MR. HIRSCHFELD: That's it.
14  (Continued in non-confidential portion
15  of transcript.)

Page 2583

1  -Proceedings-
2  MR. MASSEY: We want to have the
3  discussion of the other supplemental data. Each
4  side has submitted that. Can we get a break for
5  lunch now? I think that's the only thing that was
6  left.
7  THE CHAIRMAN: What was left?
8  MR. MASSEY: GNA has given four or five
9  different -- you have given several others, and
10  there's the back of the chart, and there's ████
11  ████prices and all that. So there is other data
12  that has been submitted.
13  THE CHAIRMAN: The second page of the
14  chart.
15  MR. MASSEY: Plus the other materials --
16  we've asked this comparison chart just to be
17  prepared on our definitions, but the parties were
18  free to add additional materials, they have,
19  in both of their charts. And I just want to make
20  sure that if either side has anything to say about
21  that data, that we hear it.
22  MR. von MEHREN: Could we keep going in
23  the interest of that 2 o'clock departure to
24  LaGuardia?
25  MR. MASSEY: It's fine with us to do it

Page 2584

1  -Proceedings-
2  right now. If there's anything to say.
3  You've seen what each side has
4  submitted. And my view is if either of you have
5  anything to say about what you've submitted to help
6  us understand why it should be relevant, we can
7  hear it. And if you have any questions about what
8  the other side has submitted, now's the time to
9  ask it.
10  MR. HIRSCHFELD: I think, Arbitrator
11  Massey, that the additional information that was
12  reflected on the chart that Atlantic submitted was
13  simply an effort in rows 6A, for example, and 3A to
14  provide -- literally to add a couple of columns to
15  provide an easy -- an easy frame of reference.
16  For example, 6A was the ████████
17  pipeline price net back to Trinidad, which is line
18  7 minus line 7 -- line 6 minus line 7 minus a
19  marketing fee.
20  Just for the convenience of the
21  Tribunal.
22  MR. MASSEY: We had some discussion with
23  Mr. Gulick that maybe it would change the way he
24  did that net-back.
25  MR. HIRSCHFELD: I don't believe so, but

34 (Pages 2581 to 2584)



Page 2585

1  -Proceedings-
2  I can check with him and we can supply -- we have
3  to supply a revised chart. So if any of those
4  numbers change -- but I'm not certain that they do.
5        MR. MASSEY: Okay. And then you
6  provided on your second page, you provided the
7  ████████████████████████████████████
8  6 data. And the ███████████████.
9        MR. CAVOLI: ████████ was originally
10  requested.
11        MR. MASSEY: Oh, okay.
12        THE CHAIRMAN: The numbers are the same.
13        MR. MASSEY: These numbers only came
14  from Atlantic. GNA didn't put forward numbers for
15  these items. The question is whether GNA has any
16  observation or comment about this data.
17        MR. HUMPHREY: Yes.
18        MR. MASSEY: Do you?
19        MR. HUMPHREY: This data, no.
20        MR. MASSEY: This data is all fine. And
21  then you submitted some additional data.
22        MR. HUMPHREY: Yes, we did.
23        MR. MASSEY: Is there anything you want
24  to say about that?
25        MR. HUMPHREY: We provide another chart.

Page 2586

1  -Proceedings-
2  It's in page 8 of our submission.
3        THE CHAIRMAN: Page 8?
4        MR. HUMPHREY: 8, yes. This is a very
5  simple chart. This chart tried to replicate which
6  is the following, the 8.5B clause under the
7  contract. Just a trend of the European prices.
8  And we had been able to recollect some prices in
9  the market, what we believe they are the right
10  ones.
11        And we hadn't made the actual comparison
12  between what we get in the market, which is the
13  green line at the top, compared to the price this
14  company had -- for achieving this market, and we
15  get a net margin at the end of the column.
16        So what we can clearly see is that GNA's
17  under the water most of the time, or all of the
18  time, with the existing contract. Which is the
19  first line.
20        MR. HIRSCHFELD: What Atlantic
21  understands is that what GNA has tried to do is
22  take three other contracts -- no, four other
23  contracts, certainly four other contracts -- from
24  Trinidad -- from Atlantic -- Atlantic's Train 2
25  contract with GN, Atlantic's Train 2 contract with

Page 2587

1  -Proceedings-
2  ████████, Atlantic's Train 3 contract with ████
3  and Atlantic's contract with ████- and put the
4  pricing on this chart as representative of trends
5  in pricing into western Europe.
6        It's not representative of trends and
7  pricing into western Europe. It deals with Spain
8  only. None of this LNG has gone to Spain with the
9  exception recently of some under the ████
10  contracts.
11        The █████ contracts, as I believe
12  Mr. Ray testified, were entered into as part of a
13  very complicated transaction between ██ and █████,
14  in part anticipating the joint construction by ███
15  and ████ of CCG facilities in Spain that did not
16  occur.
17        So all of these contracts involving
18  Atlantic or Atlantic-related companies as suppliers
19  are now in pending reopener proceedings.
20        So to rely on these prices as
21  representative of prices into western Europe I
22  think is not proper.
23        THE CHAIRMAN: Okay.
24        MR. HIRSCHFELD: And really doesn't
25  reflect anything other than historical pricing with

Page 2588

1  -Proceedings-
2  respect to some Trinidad contracts, some of which
3  were entered into under particularly unique
4  circumstances and as part of a much broader
5  transaction, and all of which are today the subject
6  of pending price reopeners.
7        MR. HUMPHREY: Although I don't share
8  the view of Mr. Hirschfeld, I am going to continue
9  with the explanation.
10        Basically, here what is very important
11  to see is that the existing contract does not
12  permit GNA to get a margin in Spain. No margin.
13  And the proposal that Atlantic is making for the
14  Spanish market is even worse.
15        THE CHAIRMAN: Does this chart mean made
16  no margins since the year 2000?
17        MR. HUMPHREY: The red line.
18        THE CHAIRMAN: The one that has "LNG
19  sales contract price from 2000 on," it seems to be
20  red, all the way up to the present, from ██
21  cents -- ████████ to now ████████ in the
22  ████████████████ Okay.
23        MR. HUMPHREY: The second line is the
24  Train 2 contract, the one we signed with -- with
25  Atlantic, 2, 3. That contract in some period of

35 (Pages 2585 to 2588)

Page 2599

1

2    ------------------------------------x

3    In the Matter of the Arbitration

4            Between

5    ATLANTIC LNG COMPANY OF

6    TRINIDAD AND TOBAGO,

7                    Claimant,

8            -and-

9    GAS NATURAL APROVISIONAMIENTOS SDG S.A.,

10                    Respondent.

11    ------------------------------------x

12                    875 Third Avenue

13                    New York, New York

14                    November 14, 2007

15                    10:10 a.m.

16

17    B E F O R E :

18        GERALD AKSEN, ESQ. - The Chairman

19        EUGENE A. MASSEY, ESQ. - Panel Member

20        BEN H. SHEPPARD, JR. - Panel Member

21

22

23            Amy Klein, Hearing Reporter

24

25



Page 2840

1          -Proceedings-
2          The suggestion that GNA -- the GN group
3   is like any other number of huge oil and gas
4   companies and we shouldn't think of them as
5   anything extraordinary for purposes of netback
6   pricing, it's true that they are like other
7   companies that have retail as well as pipeline and
8   other operations. What's extraordinary is that
9   we're being asked to accept pricing, netback
10  pricing, based on ████████████████████████
11  ████████████████████ That's what's
12  extraordinary.
13         You put that together with a company of
14  GN's complexity, and that's extraordinary. That's
15  unprecedented.
16         When we did the deal with ████ it was
17  not remotely like GN is today. Not remotely. It
18  was a very simple ████████ company.
19         And then finally, the suggestion that we
20  work out shipping costs all the time under ██████
21  ██ there hasn't been a shipment under ████████
22  from 2002. We haven't worked out any shipping loss
23  ████████
24         THE CHAIRMAN: Let me ask you a
25  question, Mr. Hirschfeld, since I gave you two

Page 2841

1          -Proceedings-
2   minutes. We're more or less on the schedule that
3   we wanted to be on.
4          Is it possible for you to answer
5   Questions 1 and 2 in D in a few minutes? So we can
6   get a head start on tomorrow? Or Mr. Cavoli.
7   Whoever's going to take that part of your
8   presentation.
9          MR. HIRSCHFELD: I can try to get a
10  start on those.
11         THE CHAIRMAN: Yes.
12         Okay, Amy?
13         MR. HIRSCHFELD: With respect to D-1,
14  our fundamental answer is that it posits an inquiry
15  that isn't appropriate for this Tribunal to decide,
16  because what does or doesn't justify continuing
17  application has to be measured by the circumstances
18  in existence at the time, and none of us know what
19  the circumstances will be in 2009.
20         We don't know where these volumes will
21  go. And so we think it's really a totally
22  speculative exercise.
23         THE CHAIRMAN: That's an answer.
24         How about the second one?
25         MR. HIRSCHFELD: With respect to the

Page 2842

1          -Proceedings-
2   second, I guess from our understanding it looks to
3   us like the question is presupposing that there
4   won't be a ████ price ████████████████████
5   and that a ████ price will then be implemented.
6   And I think we have a fundamental issue with that.
7   Because we don't see how the Tribunal can decide a
8   priori today that a ████ price will apply post
9   ████.
10         Based on the track record of all
11  indexation in Spain until now, based on the fact
12  that everybody from both sides agrees that the vast
13  majority of contracts in Spain today continue to be
14  ████████ and that the performance of that
15  ████ even with respect to this contract hasn't
16  been all that bad, that ████████ is likely
17  the way to go.
18         But, again, we're speculating.
19         Obviously for all of the reasons that
20  we've stated we don't think indexation or netback
21  based on ████████ gets you there.
22         I guess one further comment I might
23  offer. I'm not really comfortable offering this,
24  but I'll throw it out --
25         THE CHAIRMAN: You know what they say in

Page 2843

1          -Proceedings-
2   the Army. Never volunteer.
3          MR. HIRSCHFELD: I'm trying to be
4   responsive.
5          If you're looking at post-2009, I think
6   the question is does the buyer's end-user market
7   shift. And that again would be a very
8   fact-intensive question.
9          We heard some talk earlier on many
10  occasions in this proceeding about, well, you could
11  have the gas going to a multiplicity of locations.
12  And that's true. But I guess maybe I would say
13  that as long as the volume of gas going to Spain
14  was not greater than the volume going to ████
15  ████ it would be difficult to see a reason to
16  shift to a ████ formula.
17         I phrase it that way because, for
18  example, ████████ of the volumes could be going
19  to ████████████ So that would --
20  you can't use ████████ as the -- as a cutoff.
21         But, again, based on the remarks I made
22  earlier, that doesn't automatically get you to a
23  result anyway.
24         THE CHAIRMAN: Thank you very much.
25         Do you want to respond to those two

62 (Pages 2840 to 2843)

Page 2844

-Proceedings-

1
2  points only?
3          MR. von MEHREN:  Mr. Harris?
4          MR. HARRIS:  Can you hear me, Amy?
5  I'll yell. I'll speak up.
6          THE CHAIRMAN:  Feel free to agree to
7  those comments.
8          MR. HARRIS:  Not at all.  I'm puzzled --
9  well, actually I'm not puzzled.  I expected
10 Mr. Hirschfeld would come up with a better answer
11 for the first question, even though his witnesses
12 never could.
13         This whole notion of what percentage of
14 Train 1 sales going to ███████████would justify
15 continued application or a ████████based price,
16 we've now heard a new version of 2.6.  And the new
17 version as of about two minutes ago is if more than
18 half is going to ████████████ we get a ██████████
19 price.  If more than half is going to Spain, we
20 guess we get a Spanish price.  If it's 50/50, I
21 don't know what happens.  I guess we fight it out.
22         This is another example of what's wrong
23 with Atlantic's whole approach.
24         Article 2.6 doesn't say any of this, and
25 it can't be read to say anything of this.  It says

Page 2845

-Proceedings-

1
2  we're allowed to do what we've been doing for
3  years, what we were allowed to do right under
4  Mr. Marks' nose, without any objection, for years,
5  without the buyer's end-user market moving.
6          And the Tribunal will recall, Mr. Marks
7  and I had a somewhat painful exchange on this.  He
8  could not ever figure out how to answer the very
9  simple question:  When did the buyer's end-user
10 market move to ████████████
11         He doesn't know.  He never could figure
12 out how to answer that.  Nobody --
13         THE CHAIRMAN:  It was painful for him,
14 not for you.
15         MR. HARRIS:  I don't think it can move.
16 That's obvious.  I said that before.
17         But the fact is this question poses the
18 idea that some percentage of sales to ████████████
19 caused the market to move or some percentage in the
20 future back to Spain may cause the opposite result.
21         To do that in either direction you got
22 to rewrite the contract.
23         The second question:  If a Spanish price
24 is established post-March 2009 should it be based
25 on oil or a netback.

Page 2846

-Proceedings-

1
2          We think a netback.  We explained that
3  at length.
4          THE CHAIRMAN:  Well done.  I think we
5  should adjourn now.  We got back the 15 minutes we
6  lost, Amy, so you're safe.
7          And we'll pick up with the D questions
8  for GNA tomorrow morning.  And I hope we can keep
9  within that framework.
10         I think we're right on target, where we
11 are today.
12         So tomorrow we will start a little
13 earlier.  Instead of 10, we will start at 9:30.
14         So we'll see you all at 9:30 tomorrow
15 morning.
16         (Time noted:  5:43 p.m.)
17
18
19
20   201
21
22
23
24
25

Page 2847

-Proceedings-

1
2          C E R T I F I C A T E
3
4  STATE OF NEW YORK    )
5                       : ss.
6  COUNTY OF NEW YORK   )
7
8          I, AMY KLEIN, a Shorthand Reporter and
9  Notary Public within and for the State of New York,
10 do hereby certify that the foregoing proceedings
11 were taken before me on November 14, 2007;
12         That the within transcript is a true
13 record of said proceedings;
14         That I am not connected by blood or
15 marriage with any of the parties herein nor
16 interested directly or indirectly in the matter in
17 controversy, nor am I in the employ of the counsel.
18         IN WITNESS WHEREOF, I have hereunto set
19 my hand this _14th__ day of __November__, 2007.
20
21
22          _____
23          AMY KLEIN
24
25

63 (Pages 2844 to 2847)

```
 1
 2    -------------------------------x
 3    In the Matter of the Arbitration
 4              Between
 5    ATLANTIC LNG COMPANY OF
 6    TRINIDAD AND TOBAGO,
 7                      Claimant,
 8              -and-
 9    GAS NATURAL APROVISIONAMIENTOS SDG S.A.,
10                      Respondent.
11    -------------------------------x
12                      875 Third Avenue
13                      New York, New York
14                      November 15, 2007
15                      9:30 a.m.
16
17    B E F O R E:
18        GERALD AKSEN, ESQ. - The Chairman
19        EUGENE A. MASSEY, ESQ. - Panel Member
20        BEN H. SHEPPARD, JR. - Panel Member
21
22
23            Amy Klein, Hearing Reporter
24
25
```



Page 2857

-Proceedings-
2 Now, the words that are highlighted at
3 the end of (a) are really where this came from.
4 And where the question came from.
5 It's a ███████████████████████
6 And then it says: ███████████████
7 ████████████████████████████████
8 ████████████████████████████████
9 ████████████████████████████████
10 What does "above-mentioned" mean? I
11 believe that "above-mentioned" means 8.1 through
12 8.4. It cannot mean the above-mentioned part of
13 8.5(a) because, as I've already explained, the
14 parties agreed that that "in ████ requirement,
15 that threshold determination based on "in ████"
16 was going to be used in every ███████████████
17 So you can't preempt the parties'
18 specific agreement on the continuing nature of that
19 requirement.
20 So again, I think it's 8.1 through 8.4.
21 Now, what's absolutely clear is that you
22 can't change the remaining provisions of Article
23 8.5. And that has got to be (b), and it's got to
24 be (c), and it's got to be 8.6.
25 That sentence clearly says you don't

Page 2858

-Proceedings-
2 change those provisions.
3 So the way I come out on this and the
4 way I suggest the contract must be read is that 8.1
5 through 8.4 may be changed, 8.5 and 8.6 may not be
6 changed.
7 And there's nothing to suggest that you
8 go everywhere in the contract and change things.
9 And, again, as I said at the beginning
10 yesterday, Ms. Henneberry will shortly go through
11 the many, many provisions in the contract that
12 would have to be changed. Not only is there not an
13 agreement of the parties that allows you to do
14 that, because as I was saying yesterday, you're
15 inevitably going to get into the business of
16 renegotiating the contract, of making economic
17 decisions, economic trade-offs only the parties can
18 do, and based on incomplete knowledge that you
19 don't have and only the parties have.
20 And so I urge you not to do it.
21 My final point is Atlantic's a party to
22 this contract. They are represented by very
23 capable lawyers. If they thought for one minute
24 that this is what the contract said on November 2nd
25 they would have provided you with all these changes

Page 2859

-Proceedings-
2 to 8.5 and all the rest of the contract. So I
3 think you can -- you should notice that in essence
4 both parties to the contract are on record of
5 saying you don't change 8.5, you don't change other
6 parts of the contract, in connection with the ████
7 ██████████.
8 And of course if you can't change it,
9 you can't have a ████████████████████
10 That is my response to that question.
11 THE CHAIRMAN: Okay.
12 MR. SHEPPARD: Mr. Chairman, I wonder if
13 I can ask a question at this time.
14 Mr. von Mehren, as I read the briefs of
15 both parties, you urge that the fair and equitable
16 standard should inform our determination on the new
17 price; is that correct?
18 MR. von MEHREN: Yes.
19 MR. SHEPPARD: You mentioned this
20 morning that our mandate is actually informed by
21 8.5(f), which says our decision shall be in
22 accordance with the criteria set forth in Articles
23 (b) and (c).
24 The fair and equitable standard is not
25 contained in (b) or (c), is it?

Page 2860

-Proceedings-
2 MR. von MEHREN: It is not.
3 MR. SHEPPARD: It is contained in (a).
4 I want to confirm, in opening statement
5 Mr. Hirschfeld said fair and equitable is a
6 standard that applies; is that correct?
7 MR. HIRSCHFELD: That's correct.
8 MR. SHEPPARD: And you read your latest
9 brief to say that you agree that we should also
10 apply fair and equitable?
11 MR. von MEHREN: Yes.
12 MR. SHEPPARD: Mr. von Mehren, your
13 position has been clear throughout, under 2.6 GNA
14 may freely take the gas to ████████
15 MR. MASSEY: 2.6.
16 MR. HIRSCHFELD: 2.6.
17 MR. von MEHREN: Uh-hum.
18 MR. SHEPPARD: As I understand, that's
19 without restriction or limitation as to volumes or
20 as to time?
21 MR. von MEHREN: Yes.
22 MR. SHEPPARD: Hypothetically, if
23 instead of committing this gas to ████████through
24 March/April of 2009 GNA had committed the full
25 volumes to ████ for the full term of this

4 (Pages 2857 to 2860)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2861

1        -Proceedings-
2    contract, to make sure I understand your position,
3    in that case is it your position that the buyer's
4    end-user's market is still ████
5            MR. von MEHREN: Yes. Because that is
6    what the parties agreed at the time of the
7    contract.
8            Mr. Stehn said so.
9            And because what the parties also agreed
10   at the time of the contract is that we could not
11   sell to end-users in ████████ We could sell to
12   ████ alone, the monopoly effect and so on and so
13   forth that we've talked about so much.
14           So, yeah.
15           Remember, Mr. Sheppard, that back in
16   1995 there was a Train 1 capacity that ████ was
17   able to take 60 and we were able to take 40 and
18   there was the natural hedge. This was all very
19   good for Atlantic because this put them in
20   business.
21           And remember, also, that 2.6 was
22   negotiated no fewer than nine times. This is not
23   in controversy. Mr. Escudero testified to it, and
24   there are contemporaneous documents that show it;
25   that nine times Atlantic tried to impose a

Page 2862

1        -Proceedings-
2    limitation of quantity and of time and nine times
3    we said no, and we ended up with everything.
4            If I could, you touched on a very
5    important point that I should have mentioned
6    before.
7            The fair and equitable standard in (a),
8    the sentence doesn't stop there. It doesn't say to
9    whoever is making this determination that you -- if
10   there's the change, that you do what's fair and
11   equitable. Period.
12           That might well allow you to change the
13   contract very dramatically. It would be -- can do
14   one of those provisions that says that if this
15   doesn't work anymore, come up with a reasonable --
16   you know, a reasonable new set of provisions.
17           What this contract does say, and it says
18   it both in (f) and in (a), is that you've got to
19   follow the criteria in (b) and (c).
20           And so those criteria constrain what you
21   can do.
22           I think it also must be that agreements
23   that are specifically stated to
24   apply to the first ██████████ and all ████
25   ██████ thereafter, cannot be changed by this

Page 2863

1        -Proceedings-
2    Tribunal. Because you would supplant an express
3    agreement of the parties without the authority to
4    do that.
5            MR. SHEPPARD: On your 2.6 right, I
6    really wasn't taking the position or suggestion --
7            MR. von MEHREN: Sure.
8            MR. SHEPPARD: -- that they did have
9    some limitation or it was something they
10   negotiated.
11           I was coming at it hypothetically, the
12   other point of view that yes, in fact as you say
13   you had this negotiated right, take all the gas
14   without limitations to ████████████ I'm really
15   looking at it from the other point of view.
16           So just to be sure I understand the
17   implications of your position, under a
18   hypothetical, if GNA dedicated all of the volumes
19   for the entire term of this contract to █ who
20   would then resell the gas in ████████ your view
21   is the gas ought to be priced for the entire term
22   of the contract at ████████████████████████
23   even though it's consumed in ██████████
24           I want to make sure that's your
25   position.

Page 2864

1        -Proceedings-
2            MR. von MEHREN: Yes. We would not
3    resell the LNG in ████████████ because we cannot
4    under this contract.
5            MR. SHEPPARD: I understand that.
6            MR. von MEHREN: Okay. The way the
7    contract works is that ████████████████████
8    ████████████████████████████████
9            We cannot have end-users, given the
10   contractual restrictions, in ████████████ We have
11   end-users in ████
12           MR. SHEPPARD: Not for this gas, not
13   under our hypothetical.
14           MR. von MEHREN: Pardon?
15           MR. SHEPPARD: Not for this gas.
16           MR. von MEHREN: No. But it does not
17   matter, because in (a), which is the specific
18   reference to end-users in this contract, it talks
19   about natural gas. It does not talk about the LNG
20   sold hereunder. Natural gas is simply the
21   commodity.
22           And if you read the definition and you
23   read the contract, the parties clearly distinguish
24   between that.
25           MR. SHEPPARD: I understand your

5 (Pages 2861 to 2864)

Page 2889

```
1              -Proceedings-
2    choosing to take it elsewhere.  You lose some
3    protections under the contract if you divert.  You
4    share profits on the upside if you divert.  You
5    take the downside of diverting.  If you take a
6    loss, you still pay the core contract price.
7          And those are a lot of the items that
8    we're going to be visiting here.  Because this
9    contract is very much structured, as we've gone
10   through and looked at all the references that
11   wouldn't quite work in the context of either a ███
12   ███████████████████████
13         The sort of overriding sentiment at
14   least that I took from it is, okay, this is a basic
15   contract geared towards Spain and we're going to
16   give you some leeway on some items and some
17   flexibilities, but you take your chances on those.
18   There are some protections that won't apply.  We're
19   not taking downside risk under certain
20   circumstances.  We share the upside.  We limit some
21   rights.  Those kinds of things.
22         And I think that's very fundamental to
23   this contract and it's difficult to fix easily.
24         Is it possible to arrive at a contract
25   that is based entirely on a different pricing
```

Page 2890

```
1              -Proceedings-
2    mechanism?  Yes.  Of course you can draft around
3    different provisions.  There are ways to do these
4    things.  But there are certain risk allocation
5    items that need to be revisited in that context.
6          You had some discussion on one of those
7    over the course of the last half-hour.  Notably,
8    how would 8.5 work if we start changing the
9    pricing.  Do we need to revisit that concept
10   entirely to ensure that it works the way it perhaps
11   is intended to work in the first place under the
12   original conception of the contract?
13         That arises as to any number of topics
14   in this contract.  There are fundamental decisions
15   that have to be made about how you price certain
16   things, who bears what risk under what
17   circumstances.  And while those items can all be
18   negotiated by two parties who want to sit down and
19   structure a contract around a ███████████
20   ████████or that wish to structure a contract
21   around a ███-based market, it's not something
22   that's done without that commercial input, without
23   that negotiating dynamic.  You would do things
24   differently, chances are.
25         So those are some of the things we
```

Page 2891

```
1              -Proceedings-
2    wanted to talk about.  But for purposes of this
3    (indicating), for purposes of my comments, I am
4    assuming that the end-user market follows Train 1
5    LNG from time to time.  Okay, please do not take
6    that assumption to mean a concession of any kind on
7    our part, but we'll just make that assumption and
8    think about the things that would need to be
9    implemented, since I think that's the only way we
10   get to this discussion.
11         So the first comment is a bit of a
12   mechanical item.  If you impose a ███pricing
13   mechanism we'll need to do some work on the
14   definition of contract price.  You'll have to have
15   a ███ price and a Spanish price.  And throughout
16   the contract -- and I'll note it in a number of
17   different areas -- we'll need to be specific about
18   which one covers particular circumstances.
19         Under Section 2.4, which is the
20   provision that obligates GNA to -- that obligates
21   the buyer to maintain terminal capacity in Spain
22   for the life of this contract and adequate amounts
23   to allow the Train 1 LNG into Spain.
24         If we're looking at a ███ price, a
25   ███ end-user market, obviously maintaining
```

Page 2892

```
1              -Proceedings-
2    long-term terminal capacity is an expensive
3    proposition, and to require the buyer to maintain
4    capacity in Spain under a contract where a
5    determination has been made that the market is in
6    the███ wouldn't seem to make sense.
7          On the other hand, in a ███pricing
8    mechanism, for example, do you have to create some
9    sort of balance between either maintaining some
10   contractual relationship with ███ by which they
11   purchase the LNG, or some -- in a certain
12   proportion of Spanish receiving capacity.
13         Those two concepts need to be balanced
14   in some fashion so that essentially our client is
15   not paying a double burden or not incurring a
16   double burden on these items.
17         That takes me to Section 5.4 of the
18   contract, which talks about makeup rights.  And the
19   first item I'm just going to highlight under
20   subclause 8.2 of Section 5.4, that's the clause by
21   which in case a force majeure buyer has makeup
22   rights to the gas -- or to the LNG, which would not
23   apply obviously if we don't get force majeure
24   protection in respect of ███ outages, and we'll
25   talk about that a little bit later on.
```

12 (Pages 2889 to 2892)

Page 2893

-Proceedings-

1
2  The second item I wanted to note is that
3  the take or pay provision in here.  In case there's
4  a ██ formula, a ████ pricing formula, a fair
5  amount of thought needs to be given to how you work
6  take or pay makeup.  Take or pay makeup is
7  basically the principle by which if we had paid for
8  a cargo that we haven't taken we're entitled to get
9  that cargo back later on, in theory, if it were
10  available under the right circumstances.
11      So if I incur a quantity deficiency and
12  therefore a take or pay in respect of a cargo that
13  was priced under a ███ price, I then have to
14  figure out or we have to think about contractually
15  whether my makeup rights are structured such that I
16  can take that cargo anywhere?  I am bound to take
17  it to██ destination?  How do we make the
18  determination about what the quantity deficiency
19  is?
20      And we'll talk about that a little bit
21  more later on as to what price would apply to
22  calculating the quantity deficiency.
23      Again, items the parties usually spend a
24  fair amount of time thinking about and negotiating
25  in these contracts.

Page 2894

-Proceedings-

1
2      We, then, go to Section --
3      MR. MASSEY:  5.4.  On this 5.4, I didn't
4  check that carefully.  At the time of makeup do you
5  get a credit for what you paid, or do you get a
6  quantity for quantity makeup.
7      MS. HENNEBERRY:  I thought it was
8  quantity for quantity, because it's pure -- it's
9  effective -- yes, it's about a quantity deficiency.
10      MR. MASSEY:  But when you make up, do
11  you get credit dollar for dollar?
12      MS. HENNEBERRY:  That's a good question.
13      MR. HARRIS:  I believe it's a credit.
14      MR. HUMPHREY:  It's a credit.
15      MR. MASSEY:  Dollar for dollar credit.
16      So that would seem to me to be a pretty
17  modest issue.  When you're making up a quantity,
18  you got a dollar makeup for it, you get a
19  differential on that invoice.
20      MS. HENNEBERRY:  What if it's a force
21  majeure makeup and you're excused for the
22  payment --
23      MR. MASSEY:  You'll pay the current
24  rate.
25      MS. HENNEBERRY:  What if it was

Page 2895

-Proceedings-

1
2  scheduled to be an ██ delivery --
3      THE CHAIRMAN:  I think it's better if we
4  let Ms. Henneberry finish with some of these things
5  and not have the dialogue with counsel on some of
6  these points.
7      MR. MASSEY:  All right.
8      THE CHAIRMAN:  Go ahead, Ms. Henneberry,
9  please continue.
10      MS. HENNEBERRY:  This next point is a
11  purely technical matter.
12      Under Section 5.4(f), when we look at
13  makeup we are looking at only the operational
14  issues relating to the Trinidad facilities, the LNG
15  tanker and the Enagas receiving facilities.  In
16  making scheduling determinations on makeup we would
17  need to take into consideration ████  Either as
18  a substitute item or as an addition.
19      Under Section 5.7(b) of the contract the
20  buyer under limited circumstances is entitled to a
21  special maintenance adjustment corresponding to the
22  seller's special maintenance adjustment in 5.7(a).
23  That option is -- that right obviously is limited
24  to circumstances relating to the Enagas facilities.
25  And so certainly some discussion would be required

Page 2896

-Proceedings-

1
2  as to what circumstances would entitle them to an
3  █████████████  in
4  respect of maintenance issues at ████
5      MR. SHEPPARD:  What subparagraph was
6  that again?
7      MS. HENNEBERRY:  5.7(b).
8      MR. SHEPPARD:  5.7(b)thank you.
9      MS. HENNEBERRY:  Yes.
10      Section 6.1 we've all talked about
11  probably more than anybody wants.  The buyer's
12  obligated to maintain three tankers under long-term
13  contract.  ██market would not require three
14  tankers to deliver the Train 1 LNG full-time, to
15  deliver all of the quantities of Train 1 LNG.  You
16  can do that with two.
17      That's an item that the parties would
18  spend some time talking about in terms of the
19  serious financial implications of maintaining a
20  long-term charter on the vessel.
21      MR. SHEPPARD:  How have you handled that
22  over the last five or fix years when the gas has
23  been going to ████
24      MS. HENNEBERRY:  We had some losses.  We
25  talked about that at the expert hearings.  You try

13 (Pages 2893 to 2896)

Page 2897

1    -Proceedings-
2    to subcharter them as best you can. But you don't,
3    you know -- and that's something that you factor in
4    to the consequences of your diversion, as we spoke
5    about in the last set of hearings.
6        But there's a difference between
7    factoring it in to the benefit achieved in the
8    context of a resale and simply incurring the loss
9    every day by virtue of an obligation that has no
10   reason for its existence, no purpose.
11       Let's say in the context of a fresh
12   negotiation that's not an undertaking -- that's
13   not an obligation you would assume if you were
14   destined -- if you intended -- you had an entire
15   contract designed around the████ market, you
16   wouldn't assume that additional obligation.
17       MR. SHEPPARD: Thank you.
18       MS. HENNEBERRY: Under Section 6.9 you
19   would make some determination as to the
20   price of LNG applicable to purging and cool-down
21   LNG.
22       That would apply only for a dual pricing
23   mechanism under Section 7.1(c). This generally is
24   about -- in the context setting up the annual
25   delivery program, scheduling, loading dates and the

Page 2898

1    -Proceedings-
2    like, the buyer provides a fair amount of
3    information about expected outage dates, dates
4    where different facilities -- well, both parties
5    provide this information back and forth, dates on
6    which their particular facilities may not be
7    operational or available, and it's an
8    administrative item that's part of the annual
9    schedule and it needs to be factored in.
10       ██████ is not contemplated here in any
11   way because -- I won't say because, but consistent
12   with the overriding theme that what happens at
13   █████ is our problem right now. What happens at
14   Enagas receiving facilities is something that the
15   parties take into account in many ways under this
16   contract.
17       You see the same principle under 7.2(a)
18   and 7.2(c), by which the parties undertake to
19   coordinate down time at their core facility in
20   order to -- well, basically minimize interference
21   with the smooth loading schedule. So you try and
22   coordinate, to minimize down time, as a general
23   matter.
24       The one item we all agree on is Sections
25   8.1, 8.3, and 8.4 would all need to be changed. I

Page 2899

1    -Proceedings-
2    think we proposed the different changes we think
3    are appropriate in that context.
4        And this brings me to Article 8.5. And
5    there are a number of things here that we think
6    if -- assuming we get to the end-user market
7    following Train 1 LNG principle, then there are any
8    number of items that need to be revisited in
9    Article 8.5.
10       First we have the issue that everyone
11   was just discussing, which is the changes in ████
12   as the triggering event.
13       The second of course is 8.5(b) and their
14   references to ███████████████████████
15       The third, frankly, is some need for a
16   determination of if somehow this end-user market is
17   subject to shifting with deliveries of Train 1 LNG,
18   some mechanism needs to be defined to determine
19   when that market is deemed to have shifted.
20       In addition, with the████ pricing
21   mechanism some mechanism would need to be
22   implemented to determine which price is subject to
23   change under what circumstances.
24       MR. ANWAY: Can I just interject one
25   point here.

Page 2900

1    -Proceedings-
2        Relating to 8.5, this was a point that
3    Mr. von Mehren made a moment ago, but I think it
4    bears repeating. It was when he discussed the
5    reversed process. You have to apply the factors in
6    8.5 first before you can change the contract price.
7    So it's not a situation where you change 8.1 first
8    and then can change everything else. 8.5 is a
9    result of the existing standards already in 8.5.
10       So to put 8.1 in first and then change
11   it kind of puts the cart before the horse.
12       I just wanted to state that one more
13   time.
14       MS. HENNEBERRY: Under Section 8.6, in a
15   ████ pricing situation you need to think about
16   what -- which price would apply in the context of a
17   quantity deficiency. There are any number of ways,
18   putting aside the need obviously for a change to
19   the ██████████████████████if the ████
20   ████████ wholesale price were adopted.
21       In a dual pricing mechanism we need to
22   think about how long we'd go about pricing a
23   quantity deficiency. There are two types of
24   deficiencies in here. There's the █████████████
25   deficiency and the █████████████████████

14 (Pages 2897 to 2900)

Page 2901

-Proceedings-

1
2       There are any number of ways you can do
3   this. You can decide that whatever is in the
4   annual delivery program will govern, and just say,
5   well, it was scheduled to go to ███████████ so
6   we're going to price it on the basis of ██
7   ██
8       Or you could say we're going to use the
9   average over the relevant period. The sort of
10  average of the two prices.
11      Or you could -- there are really -- I
12  wouldn't say unlimited, but there are any number of
13  options that the parties could take. They could do
14  a proportional. They could do a straight average.
15  They could base it on the ADP. If the ADP isn't in
16  place, then you have to have some mechanism.
17      In our view, this is the type of item
18  that ultimately a commercial negotiation between
19  the parties as to which way to go on it.
20      Under Section 9.1, again, this is a
21  mechanical item. If we have a dual pricing
22  structure, we need to specify references to the
23  applicable contract price somewhere in there.
24      And then we get to the force majeure
25  clause, which is Article 13.

Page 2902

-Proceedings-

1
2       In the basic definition of force majeure
3   you'll see that there is a specific exemption for
4   damage, loss or failure of the Enagas receiving
5   facilities.
6       Obviously no mention of ████ there.
7       Now, Atlantic takes the position that I
8   should just rely on the general language here, and
9   I have the argument that an outage at ███ would
10  be a force majeure event by virtue of the
11  nonexhaustive definition.
12      But here's the thing: First of all,
13  that has not been our experience in dealing with
14  Atlantic, as we've talked about in a number of our
15  briefs in connection with an outage at ████
16      Secondly, I've tried this approach on
17  force majeure definitions, saying, well, it's the
18  same type of thing, you know...
19      It's not so easily done. Again, as
20  Mr. von Mehren said, I would rather have it
21  written.
22      The third thing is that facility outage
23  in my experience is an item that is heavily
24  discussed, negotiated on behalf of LNG contracts,
25  both short-term and long-term contracts. You spend

Page 2903

-Proceedings-

1
2   a fair amount of time determining how far upstream
3   you go and how far downstream you go in providing
4   force majeure protection. Do you go beyond the
5   receiving terminal. Do you go to the pipeline
6   system. Do you go all the way to the end-user. Do
7   you go to the production facilities, processing
8   pipelines, to the liquefaction facility. How far
9   do you go?
10      This one specifies what facilities there
11  are.
12      So to that end, to the extent we are
13  talking about a contract that is supposed to
14  recognize ████ as part of the end-user market,
15  then it needs to be recognized as an expressed
16  force majeure item.
17      And I also take issue with the notion
18  that it's sort of inherent in here that ██████
19  would be protected. Because when I look at 6(i)
20  and I look at the protection that buyer gets with
21  respect to LNG tanker outages or LNG tanker
22  unavailability, it's interesting to note that with
23  respect to the primary LNG tanker deliveries to
24  ██████ any problem in connection with an ██████
25  delivery is expressly not a force majeure event

Page 2904

-Proceedings-

1
2   here.
3       That in my mind tells me, again, I'm on
4   my own when it comes to ████████ It's, you know,
5   fine, we've got the basic force majeures with
6   respect to the Spanish market. You've got shipping
7   protection, you've got terminal protection, you've
8   got market protection. You take it to █████ you
9   take the risk associated with it not getting there,
10  there being some sort of interruption. Because
11  that interruption has a cost to Atlantic. It's an
12  excused event. They don't get their take or pay.
13      So to us that's pretty indicative of the
14  general idea under this contract.
15      We'll also note that under Section 2.8
16  we also would need to make some determination about
17  what the ███ price is ██████████████████
18  would be measured for a 2.8 █
19      And under Section 19.5 we think the
20  shortfall quantity definition will wind up needing
21  to be destination specific. Along the lines of
22  what we talked about in 8.6. But 8.6 goes to the
23  pricing. But under 19.5 we need to think about the
24  destination.
25      As a whole -- as I noted when we started

15 (Pages 2901 to 2904)

Page 2917

-Proceedings-

1
2 looking at current values. And it also -- the
3 critical point here is it presupposes a retroactive
4 award. So what in fact it's looking at would be
5 the retroactive numbers, if the Tribunal imposed
6 the new price retroactively and they are looking at
7 margin during the recovery period.
8         And that's...
9         MR. CAVOLI: I have two points on that.
10 On the second chart, it does look
11 retroactive. It looks retroactive because GNA has
12 requested that it be imposed retroactively because
13 that's why we gave the snapshot.
14         And secondly, just so the Tribunal
15 understands why we're using a net return rate and a
16 net return number in our first chart here, even
17 adjusted as GNA suggests corrected that it should
18 be ████████████████████ is because
19 that's the metric -- we followed the methodology of
20 ███████████████████
21         So we just used their own metric to put
22 forth, basically make our point that this is going
23 to be ███████████████ what GNA claimed
24 was reasonable, and they agreed to in '95.
25         MS. HENNEBERRY: I'm sorry, it's not

Page 2918

-Proceedings-

1
2 clear to us how this is our metric.
3         We prepare margin, but you either deduct
4 all the cost and come up with a ███████████ that
5 would be a cents per ██████ number, or you define
6 ████████ as the ██████████████
7         You don't define it as a percentage of
8 net revenue.
9         And I don't believe that that
10 methodology has ever been applied by our team.
11         MR. CAVOLI: It's in the appendix.
12         MR. HIRSCHFELD: ████ did what it did.
13 We can move on.
14         THE CHAIRMAN: I thought I had suggested
15 that.
16         Where are we now?
17         Are you finished with your points that
18 you were taking?
19         MS. HENNEBERRY: I am. Now we're up to
20 Atlantic.
21         MR. HIRSCHFELD: We get to comment on
22 their responses.
23         THE CHAIRMAN: Should they have any
24 comments on what they heard from Mr. von Mehren and
25 Ms. Henneberry.

Page 2919

-Proceedings-

1
2         Mr. Hirschfeld?
3         MR. HIRSCHFELD: We have some comments,
4 because we have, I think, equally, if not more
5 important, stuff that I have that I hope to get
6 into with the Tribunal.
7         I'm going to echo a little bit what I
8 said just before we broke.
9         I am extremely concerned and I want
10 desperately that there be an end to this
11 proceeding. And with that in mind, I'm going to
12 say something that goes against a little bit -- a
13 lot of what I've been saying until now, but I think
14 it's a pragmatic comment that needs to be made.
15         It is clear to me, and it's been made
16 clear in the papers, that if the Tribunal either
17 finds a ██████████ is applicable or finds that a
18 ████ pricing arrangement should be applied, that it
19 is the unalterable view of GNA that the Tribunal
20 will have acted in excess of its authority.
21         That's the view that has been stated.
22 That the contract does not permit the Tribunal to
23 do that.
24         And so if the Tribunal does that, I am
25 fully expecting a judicial challenge to the award.

Page 2920

-Proceedings-

1
2         And that's going to take -- I understand
3 that's not the Tribunal's concern.
4         THE CHAIRMAN: That's not the
5 Tribunal's -- we have enough of a problem in
6 construing the contract. At the end of the day we
7 are -- I believe the term is functus officio.
8         What happens -- our task has literally
9 been performed.
10         After that, what happens between the
11 parties, Ms. Henneberry has said numerous times
12 that these -- many of these issues could be
13 resolved by commercial parties.
14         Despite what you're now saying, I still
15 have great respect for the commercial ability of
16 GNA and Atlantic to sit down in a reasonable way
17 and talk to each other.
18         This Tribunal has tried desperately -- I
19 don't know any other Tribunal that gives out
20 questions to the parties in advance of a summation
21 to try and get you to look at these things. I
22 assume that some business people are reading this
23 transcript and know what's going on.
24         Betsy Spomer made an offer years ago
25 that might have made this thing unnecessary. I

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2921

-Proceedings-

1  don't know why the business people then didn't
2  focus. But it's not too late to focus today.
3      My point to you, Mr. Hirschfeld, is, I'm
4  not as pessimistic as you are and the Tribunal will
5  do whatever it has to do. And I assure you this
6  Tribunal is not concerned with what you perceive to
7  be threats by what we can do or can't do. Don't
8  worry about that.
9      We will determine what the contract
10  says, what the contract means and what our
11  jurisdiction says, no matter what you say and no
12  matter what Mr. von Mehren says. I don't know what
13  else to say beyond that.
14      MR. HIRSCHFELD: Let me just get --
15      THE CHAIRMAN: We have three codgers
16  here that are not terrified by either one of you.
17      MR. SHEPPARD: Please note my exception.
18      THE CHAIRMAN: I don't think you have
19  anything else to add.
20      MR. HIRSCHFELD: I do, Mr. Chairman.
21      It has been agreed that Atlantic is
22  entitled ████████████████ It's
23  incorporated in their formulas that have been
24  submitted. It's incorporated in our formulas.

Page 2922

-Proceedings-

1      If it avoids post-arbitral litigation
2  which, while remunerative to the lawyers does
3  nothing for the clients, I would urge the Tribunal
4  to consider keeping a Spanish price and ██████████
5  ████████████ as we have suggested be
6  had.
7      Because that, I don't see how there can
8  be a judicial challenge to that.
9      And I'd line -- I was quite serious,
10  Chairman Aksen. I would like this to be over.
11      Because if it is challenged judicially
12  it's not going to be over in 2009.
13      I don't mean that in any way as a
14  suggestion that the Tribunal should circumscribe
15  its decision or anything like that. But I likewise
16  don't believe Mr. von Mehren has raised his
17  position frivolously. I believe he is sincere when
18  he says that in his view the Tribunal will have
19  exceeded its authority and I believe he will carry
20  through on that.
21      THE CHAIRMAN: He's doing his job as a
22  lawyer.
23      MR. HIRSCHFELD: I'm doing mine. I'm
24  just looking for an end to this process.

Page 2923

-Proceedings-

1      Now, with respect to the actual
2  construction of the contract, I'm not going to
3  debate specific construction. It's all in our
4  briefs.
5      THE CHAIRMAN: Great.
6      MR. HIRSCHFELD: But I have an overview
7  as to what I believe the Tribunal can do, and it's
8  not at all consistent with what Mr. von Mehren
9  said.
10      I believe that there are provisions in
11  this contract that are mechanically driven by the
12  price formula. And whether those provisions reside
13  in Article 8 or whether they reside elsewhere in
14  the contract, the Tribunal, if it changes the
15  pricing formula, is well within its authority to
16  change those mechanical provisions, those
17  provisions that are administrative, ministerial
18  reflections of the pricing formula.
19      It can't change substance in the context
20  of a price reopener, but it can change those
21  provisions in the contract that must be changed in
22  the Tribunal's view because they are administrative
23  or ministerial reflections of the contract price.
24      Now, that doesn't include -- and this is

Page 2924

-Proceedings-

1  a very important point -- one thing that cannot be
2  changed, is the substantive requirement in Article
3  8.5(a). And I want to be clear that I am
4  specifically saying this can't be changed.
5      The substantive requirement in 8.5(a)
6  that the change in circumstances has to be one that
7  was reasonably not anticipated, not expected by the
8  party requesting relief of the Tribunal.
9      That is a substantive provision. It
10  doesn't have anything to do with the specific price
11  formula. It is a threshold, and I'll discuss that
12  in more detail later.
13      But I just wanted to make clear in my
14  assessment what the Tribunal's powers allow it to
15  change. That is one thing that it cannot. It's
16  critically, critically important.
17      With respect to Question 2, I can only
18  endorse what I think was the thrust of the
19  Tribunal's inquiry, which is the words ██████
20  ██████████████ can only have one meaning. ████
21  ███████████████████████████████████████
22  ███████████████████████████████████████
23  ███████████████████████████████████████
24      So I have -- as we have been saying all

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2985

```
1                    -Proceedings-
2         MR. von MEHREN:  We do not have a
3    nutritious lunch, but we have the kind of
4    stuff that will get us through.
5         THE CHAIRMAN:  Can we come back in an
6    hour?
7         MR. von MEHREN:  Yes.
8         (Time noted:  1:06 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2987

```
1                    -Proceedings-
2    perspective of this contract and how it was drafted
3    and what Mr. Stehn and Mr. Escudero were doing back
4    in 1995?  No.
5         So, I would say one thing that you
6    shouldn't do is give these fellas a ▓▓▓▓▓
7    price and not -- and leave all the other problems
8    with ▓▓▓▓▓▓ as our headache.
9         But even more fundamentally, it's not
10   just the economic averse of Atlantic that is
11   preventing them from jumping on the bandwagon that
12   logic mandates.  It is that they know the contract
13   doesn't allow you to do it.  And they persisted in
14   this.
15         And when you asked them, when you asked
16   them to file on November 2nd everything that their
17   contract provisions would require, they didn't do
18   it.  They know you can't do it, and they don't want
19   it.
20         All they want is that outside of that
21   ▓▓▓▓▓▓▓▓▓▓
22         And we'll revisit quickly.  I know
23   you've -- I think you've read eight or nine briefs
24   from each side.  There have been a few more letter
25   briefs along the way.  We've had days of testimony.
```

Page 2986

```
1                    -Proceedings-
2    A F T E R N O O N   S E S S I O N:
3         (Time noted:  2:13 p.m.)
4         THE CHAIRMAN:  Okay, Mr. von Mehren, can
5    you take us through the last lap.
6         MR. von MEHREN:  I hope so.
7         Gentlemen, Atlantic started this case
8    and finished it, almost, I guess, with a request
9    that you impose a ▓▓▓▓▓▓▓▓▓▓▓▓ on GNA.
10   And in the last exchange with Mr. Hirschfeld,
11   despite the fact that they want a ▓▓▓▓▓▓▓▓
12   ▓▓▓▓▓ they said, with respect to all the
13   problems that that would cause under the contract
14   and all the commercial problems, well, ▓▓▓▓▓
15   ▓▓▓▓▓ that's GNA's headache.
16         And, you know, that says it all.  Let's
17   grab that price, but let's not deal with
18   contractual problems, let not deal with real
19   commercial problems, let's just give us that price.
20         They won't agree -- I say you can't do
21   this -- but they won't even say that Atlantic would
22   be happy changing "in Spain" to ▓▓▓▓▓▓▓▓▓ if
23   they get their ▓▓▓▓▓▓▓▓▓
24         Is that logical?  Is that logical from
25   any perspective?  No.  Is it logical from the
```

Page 2988

```
1                    -Proceedings-
2    And we have the two days of the expert proceedings.
3    So I'm not going to try to go all over that.
4         Let me go to the -- first of all, the
5    counterclaim issue.
6         The claim that you are not authorized
7    under this contract to lower the price in this
8    price reopener, if indeed provisions of subarticles
9    (b) and (c), if those criteria direct you to do so,
10   given the evidence that's before you.
11         I would submit to you that you've
12   already decided this.  You decided it in procedural
13   order number 8.  You said in a sense that GNA's
14   counterclaim is implicit in the price reopener
15   process.  Once discussion of a price reopener
16   commences the outcome is to be determined by the
17   application of the standards contained in Article
18   8.5 of the contract.  If application of those
19   standards requires a lower rather than a higher
20   price, then the Tribunal is required to act in
21   accordance with Article 8.5.
22         This isn't a counterclaim in a typical
23   U.S. litigation.  It's a process under this
24   contract.  And this contract directs what happens.
25   And I submit that you were absolutely right when
```

36 (Pages 2985 to 2988)

Page 2989

1        -Proceedings-
2  you rendered that decision. And it applies here
3  today.
4        But --
5        THE CHAIRMAN: We'll take note of that
6  compliment, Mr. von Mehren.
7        MR. von MEHREN: I actually have some
8  others. Spoken or unspoken.
9        But even if there were this burden of
10 proof, in fact we've met it. It isn't -- the
11 change that we've been talking about in this case
12 from the very beginning isn't whether competition
13 was going to occur in some abstract sense. The
14 change is how competition would change the market.
15 How it would change the forces in the market that
16 affect price and value.
17       I'll just read to you from page 861 of
18 the transcript. This is Mr. Escudero explaining
19 what he was thinking when he negotiated the
20 contract. And he was responding, Mr. Massey, to a
21 question from you. And he said: "If
22 liberalization was going to take place, and the
23 question of competition from gas to gas was
24 contemplated in Article 8 of the price reopener,
25 then there could be a situation, because of hard

Page 2990

1        -Proceedings-
2  competition in Spain, that our internal prices, the
3  end-user market value would go down, even with the
4  same level of prices from Trinidad, and then we can
5  use the price reopener."
6        What Mr. Escudero was saying is I
7  thought I had a price that was going to work, but I
8  did not know how hard competition was going to be.
9  And if that competition was hard, well, then I
10 expected to be able to use a price -- the price
11 reopener, if it was hard enough to justify it.
12       That's exactly the situation that we
13 have here today. It's exactly the situation that's
14 existed under this contract (indicating) since the
15 early part of this decade.
16       Atlantic's counsel presented chart 3 to
17 you before the lunch break. And he went through a
18 long explanation of --
19       MR. MASSEY: Did you mean tab 3?
20       MR. von MEHREN: Yes, tab 3, I
21 apologize.
22       He went through a long explanation of
23 how we bamboozled you and left things out and so on
24 and so forth. And he said several times, you know,
25 that this is the way we operate. That Atlantic,

Page 2991

1        -Proceedings-
2  try as it might, is always catching these things.
3        What we didn't disclose is the price
4  that GN Servicios pays to GN Com. And that's an
5  internal transfer price. It's absolutely right, we
6  never factored it into any of our numbers.
7        Those numbers are calculated on the
8  basis of the sales that GN Servicios ultimately
9  makes to the end-users. Those end-users get the
10 tariff.
11       And that's why we excluded the
12 transaction. It's a zero sum gain. The end-user
13 value is there.
14       Another point, the contention that it is
15 unfair to use portfolio value pricing to measure in
16 a high contract.
17       Mr. Hirschfeld told you that, well, the
18 average perpetually goes down, so price goes down.
19       It's not actually how it works. The
20 weighted average of a portfolio goes up, it goes
21 down, it responds to the market given the various
22 periods of the contracts involved.
23       Why did we use all of those contracts
24 from all of those segments of the market into which
25 this LNG can legally be sold? It's because the

Page 2992

1        -Proceedings-
2  contract said so. It's because of what the 8.5(c)
3  standard is. 8.5(C)refers to all market segments.
4  It refers to all competing sources of gas.
5        So we're looking at everything that
6  happens in terms of our ability to get a price.
7        You know, when Atlantic says don't look
8  at everything, just cherry pick, just look at
9  situations where you could get the highest price,
10 or a higher price, they're wanting to change the
11 word "all" in all market segments to some market
12 segments or the highest priced market segments.
13 And they're wanting to change "all" in reference to
14 competing sources of gas in the gas to gas
15 competition with some competing sources of gas.
16 Some situations where we could make a lot of money.
17       But that's not what the contract says.
18       And we've grappled with this issue
19 because, as the Tribunal knows, the only way that
20 Atlantic has ever been able to approach meeting the
21 reasonable rate of return standard in (c) is to
22 exclude parts of the market and pretend that we
23 have to commit this LNG when we sell it in Spain to
24 those high-priced areas.
25       That's not what the contract says.

37 (Pages 2989 to 2992)

# EXHIBIT O

Redacted: For GNA Viewing

**UNCITRAL ARBITRATION RULES**

<u>In the Matter of the Arbitration between</u>:

—————————————————————— )
ATLANTIC LNG COMPANY OF                )
TRINIDAD AND TOBAGO,                    )
                                       )
              Claimant,                 )
                                       )
          – against –                   )
                                       )
GAS NATURAL APROVISIONAMIENTOS          )
SDG S.A.,                              )
                                       )
              Respondent.               )
                                       )
—————————————————————— )


**ATLANTIC LNG COMPANY OF TRINIDAD AND
TOBAGO'S FIRST POST-HEARING MEMORANDUM**


Before:
Mr. Gerald Aksen (Chairman)
Prof. Ben H. Sheppard, Jr.
Mr. Eugene A. Massey


MILBANK, TWEED, HADLEY &
  McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413
(212) 530-5000

Attorneys for Claimant
ATLANTIC LNG COMPANY OF
TRINIDAD AND TOBAGO

Dated:  August 24, 2007
         New York, New York

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

## ARGUMENT

**I.     THE RECORD PROVES THAT SIGNIFICANT, REASONABLY UNEXPECTED ████████████████ HAVE OCCURRED SINCE 1995**

4.      For Atlantic to obtain relief under Article 8.5, this Tribunal must find that two substantive elements have been established:  (a) that "██████████████████ beyond the control of the Parties, while exercising due diligence, have substantially changed as compared to what [the claimant] reasonably expected when entering into this Contract;" and (b) that "the Contract Price resulting from application of the formula set forth in Article 8.1 does not reflect the value of Natural Gas in the Buyer's end user market."  Contract, Article 8.5(a); *cf.* Procedural Order No. 4, at 3.  As to the first element, there can be no doubt on the present record that ██████████████████ have changed substantially since 1995, that those changes were beyond the control of the Parties, while exercising due diligence, and that Atlantic reasonably did not expect such changes, or their consequences, at the time the Contract was executed.

5.      As the Tribunal is aware, Atlantic has identified several substantial, unexpected changes ██████████████ These include, but are not limited to:  (a) full and rapid liberalization of the Spanish natural gas market; (b) the government-mandated assignment of the Contract from Enagas to GNA; and (c) the introduction of U.S. prices as a price driver in the Spanish natural gas market, each of which contributed to and enabled GNA's complete diversion of Train 1 LNG to ████████ which has been the "Buyer's end user market" since 2002.  S*ee* SOC ¶¶ 35-55; Atlantic Mem ¶¶ 42-77, 88-91; Atlantic Reply Mem ¶¶ 23-39; *infra* Section II.[3]

---

[3]  Atlantic has also alleged and established significant, unexpected changes in ██████████████████ ██████ with respect to ████████████ consumption, including the statutorily mandated cessation of consumption of ████████████████ and the increasing value of the resale delivery

In its prior submissions to this Tribunal, Atlantic: (a) fully described and discussed these changes and the fact that Atlantic reasonably did not expect them in 1995; (b) detailed and highlighted the very strong evidence – including documents, fact witness testimony, and expert witness testimony – supporting these changes and Atlantic's expectations; and (c) convincingly rebutted all of GNA's and BCG's strained attacks on this evidence. *See* Atlantic Mem ¶¶ 39-77; Atlantic Reply Mem ¶¶ 23-39.

6.      A review of the testimony adduced at the hearing – from both Atlantic *and* GNA witnesses – clearly confirms that Atlantic has established the requisite changed circumstances beyond any reasonable dispute.

**A.**      ███████████████████████████

7.      In response to questioning from Arbitrator Massey, Atlantic's expert Graham Weale (from Global Insight) summarized the significant changes in ███████████████ ███ since 1995. Weale first focused on what he described as "very radical liberalization" in Spain. *Weale*, 1541:15-16.

### 1.    Full and Rapid Liberalization of the Spanish Natural Gas Market

8.      Unlike GNA's expert – BCG's Ramón Baeza, who revealed little independent knowledge, let alone expertise, on the issue of liberalization – Weale has studied European natural gas market deregulation and liberalization for the past 25 years. *See Weale*, 1543:18-23. By the early 1990s, Weale had "watched the European Commission [EC] year by year continually fail to meet their targets" for reforming natural gas markets. *Weale*, 1544:2-4. While one stated goal (in the 1980s) was to achieve liberalization by 1992, as of 1992, "Europe [was]

---

flexibility afforded by the Contract. *See* SOC ¶¶ 86-92. These changes are discussed in detail in Section VIII, below.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

still a long way from that." *Id.*, 1544:8-10. "They had one [failed] attempt after another," and, as of 1995, when the Contract was executed, "[t]here wasn't political support" for liberalization and "[s]ome of the heavyweights in the [EC] were fighting too hard against it." *Id.*, 1544:11-18. Moreover, by 1995, the EC had failed even to adopt a directive in support of liberalization. *Id.*, 1544:11-14.[4]

9.      In the mid-1990s, in light of the political climate and the persistent failure of progress, Weale himself (an expert in the field) "held *grave doubts* as to what they were going to achieve, *if anything*," and "there were very good reasons for that." *Id.*, 1544:2-7. Weale explained that, against this stark backdrop, it was "perfectly reasonable" for anyone to believe – as Atlantic in fact did, *see* Stehn Stmt ¶¶ 41-43; Stehn Reply Stmt ¶¶ 10-11[5] – that liberalization would possibly not occur at all during the term of the Contract, and certainly not the rapid, full liberalization that in fact took place. *Id.*, 1544:19-22 ("So in my view it was perfectly reasonable for either of the parties to take the view either this isn't going to happen, or it's sometime in the indefinite future."); *see id.*, 1544:22-24. Indeed, it strains credulity to suggest that Atlantic's expectation (in 1995) that full liberalization would not occur during the term of the Contract was

---

[4]  A full explanation of the background of European natural gas market liberalization attempts, and the EC's persistent failures, is set forth in Weale's written reports. *See* Spanish Market Report ¶¶ 3.1, 3.2.1; Supp Spanish Market Report ¶¶ 2.2.5-2.2.6.

[5]  Stehn's testimony that Atlantic did not expect full liberalization during the course of the Contract is fully corroborated by contemporaneous documentation. An internal 1995 memorandum of the Amoco Corporation (the largest sponsor of the Trinidad LNG project and largest shareholder in Atlantic through 1998) confirms that Atlantic did not expect deregulation to occur, stating, among other things: "'*What potential threats exist in the Spanish Market?'* Since ENAGAS currently operates as a monopoly, the greatest threat is government legislation mandating an open market in Spain. **This is not likely to occur** …." *See* e-mail from Kim X. McMillan to Phil B. Ribbeck, Amoco Corporation, attaching memorandum entitled *Trinidad: Field Development and LNG Plant: Issues and Answers*, Item 3.4 (Dec. 1, 1995) (emphasis added), Exhibit C-344.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

unreasonable when the EC itself evidenced the *same* expectation *three years later*, in 1998, when the EC finally implemented the first legal steps towards liberalization.[6]

10.    Weale summarized the very unexpected events, detailed in Weale's written reports, that later took place.  Between 1996 and 2003, "extremely unexpectedly," the Spanish natural gas market "completely liberalized," changing from a market that previously had "no competition of any kind."  *Weale*, 1541:21-1542:4.

> [W]e move from a situation where Spain … had a single monopoly buyer, and Enagas was the sole buyer of all the gas and was selling directly to the industrial sector and also selling to the distributors. *There was no competition of any kind. Then what happened, extremely unexpectedly in my view, is within a period of seven years from the point in time when a new government had come to power – this takes us from 1996 to 2003 – the market had been completely liberalized*…. So what we've had in Spain is *radical liberalization.*  Liberalization which stands out amongst all other continental European countries …. So the liberalization stands out in terms of its speed, its thoroughness, its comprehensiveness.

*Weale*, 1541:15-1542:13.  Weale testified further that these unexpected events are enduring: there are "absolutely no signs" that anyone will "turn[ ] the clocks back" on deregulation.  *Id.*, 1542:14-19; 1543:3-5.

11.    In sum, the record is quite clear that liberalization of the Spanish natural gas market has been a significant change in ███████████████ since 1995, that Atlantic did not expect such a change at that time, and that Atlantic's expectations in that regard were reasonable.[7]

---

[6]  *See* Spanish Market Report ¶¶ 3.3.2-3.3.3; 3.3.9 (explaining that the First Gas Directive (98/30/EC) was adopted in June 1998, entered into force as of August 2000, and contemplated that less than 50% of the natural gas market would be liberalized by 2018 – close to the end of the term of the Contract).

[7]  Nothing in the BCG Report even purports to rebut these facts.  BCG simply concludes that "the Spanish natural gas market liberalization process *could have been anticipated* in 1995."  3/7/07 BCG Report, Section C.1, p. 10; *see also id.* Section C.1.1.3 ("market liberalization *could have been* already envisaged in 1995") (emphasis added).  This careful phrasing does not address the relevant question.  The contractual inquiry that is mandated here is not what "could have been" expected, but only whether Atlantic's actual, subjective expectation in 1995 was reasonable.  Whether liberalization "could have been

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

12.    The hearing testimony forecloses GNA's earlier claim that liberalization cannot qualify as an unexpected change in ███████████████ under Article 8.5(a). GNA's claim that liberalization was a legal, not an economic, change, *see* GNA's SOD and CC ¶ 102, is contrary to the plain meaning of "███████████████" *See* Atlantic Mem ¶ 53 & n.28. More importantly, it is contrary to the testimony of GNA's own witnesses. Gregorio Escudero testified, in no uncertain terms, that liberalization was, in fact, a change in ████████ ████████████. *See Escudero*, 825:9-15 ("Liberalization I think is the████████ ████████ yes."). Carlos Humphrey, referring to Spanish liberalization and the price reopener provision, said the same thing. *See Humphrey*, 682:25-683:4 ("Yeah" – "when you get right down to it there has been a change in ████████████).

13.    Nor can GNA successfully contend, as it attempted to do by offering testimony from Escudero, that liberalization does not qualify under Article 8.5(a) because it was unreasonable for Atlantic not to have expected it in 1995.[8] Weale's testimony – which was never the subject of cross-examination – is, standing alone, a more than sufficient basis to reject GNA's contention that the full and rapid deregulation that actually occurred in Spain should have been expected by Atlantic. But there is more. As Atlantic has highlighted, Enagas and GNA

---

anticipated" is not the test and, accordingly, BCG's conclusion is irrelevant. *Cf. Black's Law Dictionary*, p. 649 (6th ed. 1990) ("Foreseeability" defined as "[t]hat which is objectively reasonable to expect, *not merely what might conceivably occur*.") (emphasis added).

[8]  Escudero testified that "[e]veryone at the negotiation table was aware that the liberalization would take place" and would likely happen "during the first years of the Contract." Escudero Stmt ¶ 68. As a matter of law, such conclusory allegations as to the state of mind of others has no probative value. *See People v. O'Donnell*, 64 N.Y.S. 256 (N.Y. App. Div. 1900) ("a layman ... could not properly give an opinion as to the mental capacity of [another] . . .[but only] state the acts and conversations of which he ha[s] personal knowledge"); *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) (rejecting conclusory lay testimony about "a party's knowledge"). Moreover, Escudero's after-the-fact testimony regarding the Parties' purported view of liberalization should be rejected as not credible. First, it is directly contrary to contemporaneous documentation making clear that Atlantic had no such expectation and that others (including the EC) shared that view. *See supra* n.5. Second, it is directly contrary to the position taken by Enagas and GNA in pursuing Enagas's price reopener filed in 2000. *See infra*.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

themselves relied on Spanish market liberalization – and, in particular, the enactment of the core

Spanish legislation implementing liberalization, RD 34/1998 and RDL 6/2000 – as the trigger for

the Article 8.5 price reopener initiated by Enagas in July 2000.  GNA specifically referred to and

described such legislation as the ███████████████████ upon which its price reopener

was founded in a letter to Atlantic in 2002.[9]  It is quite clear, from that letter alone, that GNA

itself believes that liberalization qualifies as an unexpected change in ███████████████

███████ within the meaning of Article 8.5(a).

14.    The testimony at the hearing fully confirmed this fact.  Victor Tuñon testified,

"Yes.  Yes." – "one of the purposes of this [April 2002] letter was to inform Atlantic of the

███████████████ beyond the control of the parties that were the basis for the [Enagas]

price reopener." *Tuñon*, 991:1-993:3.  He explained further that liberalization in Spain is "one of

the facts" cited as a basis for the reopener, and that liberalization "has had some results, some

impacts, and that's what's important." *Tuñon*, 993:4-18; *accord Humphrey*, 680:6-10 (what

Enagas "claim[ed] is that … the effect of the liberalization was causing a downward pressure in

the end user market, in the prices of the end user market, of the liberalized sector").[10]

---

[9]  *See* April 15, 2002 Letter from Gas Natural, SDG, S.A. to Atlantic LNG Company of Trinidad and Tobago, p. 2 (providing "detail" to Atlantic as to the *"basis for Buyer's claim for a Price Reopener"* and stating that "the international trend towards a greater *de-regulation* of the natural gas industry and more precisely Laws and Decrees approved by the Spanish Government, *Hydrocarbons Act Law 34/1998* dated October 7th 1998, with the intention to create a deregulated market in Spain has meant a substantial change in ███████████████ …," and citing Royal Decree Law 6/2000 as a further unexpected change under Article 8.5(a)) (emphasis added), Exhibit C-349.

[10]  During the hearing, Tuñon strained to distance GNA from the obvious position it had taken in 2002 regarding liberalization.  Specifically, Tuñon appeared to suggest that it was the *result* of liberalization – reduction in prices due to the elimination of regulated pricing in certain portions of the end user market – not liberalization itself, that was the unexpected change in ███████████████ identified by GNA in its April 2002 letter.  *See Tuñon*, 994:16-996:6.  This position not only splits hairs, it is patently inconsistent with the statements in the April 15, 2002 letter.  GNA itself has argued that liberalization naturally leads to price reductions.  *See* GNA Mem ¶ 38.  Thus, by GNA's own logic, if one expects liberalization, one expects price reductions.  The attempt by GNA to suggest that it did not claim liberalization as an unexpected change in e███████████████ in 2002 should be swiftly rejected.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

15.    The evidence proves further, as Atlantic has maintained from the outset, *see* SOC ¶¶ 52-55, that Spanish liberalization resulted in early price competition, followed by significant price increases in the Spanish liberalized market.  Weale testified that:

> From early 2004 to the end of the 3rd quarter, immediately following the expiration of the Gas Release Program, there was a period of strong competition which [led] to some significant discounts in the price of gas sold in the liberalised market.  This was followed by a rapid reverse when prices increased significantly starting from late 2004 and then continued to firm up during 2005.  Indeed so strong was this revers[al] that many end buyers sought to move back from the liberalised to the regulated market, where the price was lower.

Spanish Market Report ¶ 5.3.5.  Weale confirmed at the hearing that gas-to-gas competition does not necessarily result in a price decline, and it is evident that in Spain "for a majority of the period, it's led to a significant premium."  *Weale*, 1548:24-1549:6.

16.    Likewise, Atlantic's expert Carlos Barberán testified that there were discounts in the market during the "first steps in liberalisation," but "the increase in natural gas prices in Spain was dramatic in 2005 and 2006, due, mainly, to the combined effects of the global international energy price environment, the end of the price wars in Spain (mainly in 2004), and the consequent recovery of the prices and margins in end user markets."  3/21/07 Barberán Report ¶¶ 5-6; *see Barberán*, 1384:12-1385:14 (there "was an inflection point" in the middle of 2004; prices started to increase "going up to the figures that appear on my table … for 2005 and 2006").  And Pöyry Energy Consulting's Steven Taylor, another Spanish market expert, stated, based on market survey data, that "the end of 2004 onwards has seen a sharp price rise in the gas contracts offered by a number of suppliers to the liberalised power and industrial & commercial gas markets over and above the regulated [Spanish] tariff."  3/21/07 Pöyry Report, Executive Summary; *see also id.*, ¶¶ 1.1-1.2.2; *Taylor*, 1619:12-1620:23 (beginning in late 2004, large

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

customers began switching to tariff market because liberalized prices were rising higher than tariff prices).

### 2.    The Assignment of the Contract from Enagas to GNA

17.    Another major change detailed by Atlantic in its earlier submissions and summarized by Weale at the hearing was the change in the identity of the Buyer, from Enagas to GNA.  As Weale explained, in 1995, Enagas was a "thoroughbred Spanish company, whose job was Spain and nothing else."  *Weale*, 1552:16-18.  Historically, Enagas had been 100% directly owned by the Spanish Government.  The Government maintained a 91% direct ownership interest in Enagas at the time that negotiations on the Contract began, and a significant ownership interest – both direct (9%) and indirect, through the government's ownership of Repsol – at the time the Contract was executed.  *See Escudero*, 722:17-726:20.  In 1995, Enagas "had responsibility for serving the whole [Spanish] market" and it thus made "calculations in terms of contracting gas … in terms of the need … to cover the Spanish market.  So that's where we began."  *Id.*, 1552:19-24.

18.    This all changed in 2000-2001, when the Contract was taken out of the hands of Enagas, which still focused exclusively on the Spanish market, and was assigned to GNA.  The assignment was mandated by the Hydrocarbons Act of 1998, RD 34/1998, which, as part of the liberalization process, prohibited Enagas from continuing to import LNG to Spain.  *Weale*, 1552:25-1553:6.[11]  Quite reasonably, Atlantic never expected such a significant and fundamental

---

[11]  The Hydrocarbons Act specifies that "regulated activities" within the Spanish gas market – which include the regasification of LNG and the transportation of natural gas in Spain – must be provided as distinct services, and cannot be bundled with other, non-regulated activities, such as importation of LNG and marketing of gas in the liberalized sector.  *See Hydrocarbons Act*, Law 34/1998, Chapter II, Articles 60-63, Exhibit C-321.  Thus, as Enagas itself noted, "between 1998 and 2000, our natural gas distribution, real estate and import activities were spun-off to Gas Natural" as a result of the Hydrocarbons Act.  Enagas, S.A., *Offering Circular*, p. 68 (June 24, 2002), Exhibit C-306.  Effective

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

change.  *See, e.g.*, Stehn Stmt ¶ 43 ("I expected that Enagas, with a continuing focus on supplying the Spanish natural gas market, would remain the Buyer … for the entire 20-year term."); Spanish Market Report ¶ 4.5.2 ("There was no reason in 1995 to believe that Spanish legislation would require Enagas to assign the Contract to a different Buyer which had no responsibility to supply the Spanish market.").

19.    The assignment of the Contract from Enagas to GNA is not a corporate technicality.  There are "very critical differences in the nature, role and the job of Enagas as it was in 1995, and GNA as it stood in 2000 and the way it developed" going forward.  *Weale*, 1553:7-11.  "Basically, [Atlantic] was now selling to an international gas trading company.  The annual reports of Gas Natural make it very clear that their business had become international gas trading," *id.*, 1553:12-16, and that market dynamics in the newly liberalized environment – including a market-share cap on the GN Group in Spain, and multiple additional suppliers to Spain – mandated that the GN Group, unlike Enagas in 1995, look beyond the limited Spanish market for its sales base, *see id.*, 1553:24-1554:3; *see also id.* 1553:19-23 (this change is "durable" as well, with no danger that Gas Natural might "retrench and become a [purely] Spanish company.").[12]

20.    Indeed, in stark contrast to Enagas, international trading is a stated corporate purpose of GNA.  The GN Group describes GNA as the "Gas Natural Group Company responsible for … performing trading operations," and explains that GNA "manages the natural gas contracts with the aim of optimising gas supplies … to other Group affiliates on the international market," while itself engaging in "***commercialising LNG on the international gas***

---

January 1, 2001, Enagas assigned its rights and obligations under the Contract to GNA.  *See* Contract, Amendment No. 4 (Exhibit C-1 to SOC).

[12]  The 70% market share cap on GN was imposed by RDL 6/2000.  *See* Royal Decree-Law 6/2000, Chapter II, Article 7, Section 4, Exhibit C-322.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

*markets* ...."[13]  Wholly consistent with GNA's purpose, Gas Natural SDG, S.A., GNA's parent company, stated in 2000, after liberalization was under way, that "[t]he objectives of the Gas Natural Group *within the new liberalizing context* are to reach ... interannual growth of 13%, as well as to have enough supply contracts to meet domestic demand, *to supply other operators outside Spain*, and to continue developing new activities in the *trading* and commercialisation of gas."[14]

21.    GNA has previously argued that the assignment of the Contract from Enagas to GNA was of no moment because, even before the Contract was executed, Enagas too engaged in "abundant international activities."  GNA Mem ¶ 40.  This is not a sustainable contention. Certainly Enagas purchased gas from international sources to supply Spain; it had to, because Spain has almost no indigenous natural gas.  The relevant question is whether Enagas, in 1995 and before, engaged in international LNG trading to *supply markets other than Spain, or to earn profits through trading activities*.  The answer is a resounding "no."  Escudero admitted on cross-examination that, while Enagas (of course) purchased LNG on international markets in 1995 and before:

- Its stated corporate mission was to "import and purchase natural gas *in the Spanish market*," *Escudero*, 732:4-9; 732:22-733:14;[15]

- Its "sole" focus and responsibility was in fact *to supply Spain*, *id.*, 740:6-9;

- All of its sales of natural gas were made in the *Spanish market*, *see id.*, 738:7-13; *id.*, 738:24-739:2; and

---

[13]  Gas Natural SDG, S.A., Natural Aprovisionamientos, http://portal.gasnatural.com/servlet/ ContentServer?gnpage=3-10-1&centralassetname=3-10-Bloque HTML-710 (last visited Dec. 10, 2006), Exhibit C-296.

[14]  Gas Natural SDG, S.A., Annual Report 2000, p. 34, Exhibit C-309.

[15]  *See also*, Enagas, S.A., *Annual Report 1995*, p. 40 (Company's "*objects are the importation and purchase of natural gas in the Spanish market and the industrial treatment, storage, transportation, distribution and sale thereof*"), Exhibit C-305 (emphasis added).

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

- The purpose of each and every LNG "swap" with international market players "was to supply ***the Spanish market***," *id.*, 739:3-740:5.

22.     The impact of the legally mandated assignment of the Contract from Enagas to GNA, and the starkly differing objectives of the companies, are not merely theoretical. They mean that Atlantic is now selling to a Buyer whose stated purpose – in direct contrast to Enagas's stated purpose in 1995 (or its purpose today, for that matter) – is to supply other markets, in addition to Spain, with LNG and to optimize LNG supplies on an international basis. *See* Spanish Market Report ¶¶ 4.4-4.5.[16]  That is precisely what GNA has done, and that is something that Atlantic reasonably did not expect to see from Enagas in 1995.

### 3.     New Price Drivers in the Spanish Market

23.     In addition, the statistical evidence submitted by Weale (and nowhere rebutted by GNA) establishes that LNG prices in the United States became significantly higher than prices in Spain several years ***after*** the Contract was executed, and, as a result, U.S. prices for natural gas and LNG became a significant new price driver in Spain with a direct impact on supply of and demand for LNG being imported into Spain. *See*, *e.g.*, Atlantic Mem ¶¶ 72-77; Spanish Market Report ¶ 5.4.  The evidence makes equally clear that Atlantic did not expect these developments in 1995, *see* Stehn Stmt ¶ 40, and that such an expectation was reasonable at the time.  *See* Spanish Market Report ¶ 5.4.

24.     Weale explained that, in 1995, "there were a small number of contracts to the Spanish market with simple mechanical indexation" – "[s]ome of them just ▮▮▮▮▮▮▮" and others "a combination of ▮▮▮▮▮▮▮▮▮▮" *Weale*, 1545:6-11.  While price formulas varied to a certain extent, they were consistent in the sense that they were designed "to make the

---

[16]  *See also*, Gas Natural SDG, S.A., Natural Aprovisionamientos, Exhibit C-296.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

gas on the one hand competitive in the [Spanish] market and on the other hand to enable the

producers of the gas to capture the market value." *Id.*, 1545:12-18. "So apart from the fact that

Spain, like all countries, was subject to world ██████ there was nothing else, internal or

external, that was driving the price in Spain." *Id.*, 1545:19-22.

      25.    This changed dramatically as a result of events in the ██████ market,

coupled with the very radical liberalization process in Spain. *See id.*, 1545:23-1546:5. The

"██████ LNG market … vastly increased over the period from 1995 to [around] about

2005," with the volume of trade doubling, and a significantly increased number of buyers and

sellers. *Id.*, 1546:9-14. As Weale put it, what was, in 1995, merely a "collection" of "bilateral

deals" focused on specific geographic regions like Spain (not really an overall market), grew into

the ██████ market because "there [were] new degrees of freedom which [] simply didn't

exist … in 1995, which gave the parties the option[] to use their LNG much more flexibly." *Id.*,

1546:15-1547:3. "What's happened," as a result, is that LNG cargoes can "go[] either to the

██████ And most of the time … it's

been the price which has determined which way the cargo's pointed." *Id.*, 1547:6-12.

      26.    "It takes us, and I think the evidence of this is very compelling, [to the fact] that

the United States price … has come to be an important driver in the Spanish market." *Id.*,

1547:14-17.[17] In short, U.S. prices are "influencing the gas markets," *id.*, 1548:18-20, and

"Spain is being subjected to completely new market conditions which simply didn't exist in

---

██████████████████████████████████████

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

1995," *id.* 1549:8-9.  These new price drivers are "unquestionably a durable development."  *Id.*, 1550:21-22.[18]

27.      Other record testimony fully corroborates Weale's analysis.  Carlos Torralba, for example, explained on cross-examination that, in Spain, ███████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

("[W]e used the Henry Hub reference.  Not only as a reference for arbitrage in order to sell gas to Spain or to the United States, but also as a final formula that was submitted to more than one client."); *id.*, 1393:2-19 (same).[19]  And GNA's expert James Jensen confirmed on cross-examination that, in 2003, "the [U.S.] gas price shock [spike] of 2000, the winter of 2000/2001, was two years old.  The start-up of Trinidad and Nigeria supply was three years old.  So you — those two elements provided the first basis – the whole idea of ████████ arbitrage," *Jensen*, 1797:16-21, leading to interregional price competition that previously was "unthinkable," *id.*, 1800:2-15.

---

[18]  In addition to discussing these changed circumstances facing the natural gas market in Spain, during the hearing, Weale also explained that Spain has undergone dramatic, unexpected changes in ████████ consumption and the disappearance of ██████████████████████ in Spain.  *See, e.g., id.*, 1555:3-25; 1556:13-1574:24.

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

natural gas industry form the points of import for handling and marketing the natural gas," in my experience this type of language is intended to ask a tribunal in a price reopener to look at all the costs along the chain, even if the buyer himself isn't doing that because intermediaries are doing some of that work. So, for example, imagine in the Troll contract the Norwegian producer sells to Gasunie who then sells to a distribution company. This sort of language would say, you can't just think about cost incurred by Gasunie, but you also have to think to get the gas all the way to the end user there's somebody there who's undertaking other appropriate operations and providing services. And that has to be considered. And that allows you to start from the end-user value and then start working backwards to a price that would be reasonable for … a buyer like Gasunie, who sells to intermediaries.

*Id.*, 1681:19-1682:18.[43] If one looked solely to the activities and functions of the buyer, Lapuerta continued, it would make the contract "unworkable." *Id.*, 1687:12-23.

## IV. TWO DIFFERENT PRICES BASED ON TWO DIFFERENT MARKETS IS NOT JUSTIFIED UNDER THE ATTENDANT FACTS AND CIRCUMSTANCES

89.     Among other questions posed by the Tribunal after the hearing, the Tribunal has asked "[w]hether it is possible to have two different prices based on two different markets." *See* 6/20/07 Letter from Chairman Aksen, on Behalf of the Tribunal, to Counsel for the Parties, Item 4. By this, we understand the Tribunal to be asking whether an award in this proceeding could and should include two different pricing formulas – one to apply to Train 1 LNG delivered to the ████████████████ and consumed in ██████████ and one to apply to Train 1 LNG delivered to and consumed in Spain. We respond below.

---

[43] During cross-examination, Lapuerta acknowledged, of course, that Article 8.5(c) does not expressly refer to ███ as an intermediary, or the fact that ███ activities should be considered. He explained, however, that Article 8.5(c) makes reference to "all appropriate operations, services and risks which are usual within the natural gas industry. And that is the language that I think is quite clear, that makes you look at the whole chain." *Lapuerta*, 1685:24-1686:9; *see also id.*, 1685:16-23 ("Yes" – under Article 8.5(c) – "[r]egardless of whether the buyer incurs these costs or the intermediary . . . they should be considered in coming up with a contract price."); 1687:8-10 (same).

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

90.     As established, the fundamental purpose of Article 8.5 is to ensure that the Contract Price for Train 1 LNG reflects the value of natural gas in the end user market where that LNG is consumed – *i.e.*, where it actually competes.  Given this purpose, Atlantic believes that it might be theoretically "possible" to operate under two separate pricing formulas – one designed to result in a Contract Price that reflects the value of natural gas in ▮▮▮▮▮ and the other designed to result in a Contract Price that reflects the value of natural gas in Spain.[44]  The imposition of such a pricing scheme, however, is not necessary, and therefore would be unwarranted, under the present facts and circumstances.  In particular, the Spanish market component of such dual pricing, if determined now, would have no current practical import and no utility in the future.

91.     The only circumstances under which it might, in theory, be possible to "have two different prices based on two different markets" is if the facts show that, during the period that is covered by a price review, GNA was simultaneously reselling significant volumes of GNA's Train 1 LNG to ▮▮ and delivering significant volumes of its Train 1 LNG to Spain.  But that is not the case.  All of GNA's Train 1 LNG will be delivered to the ▮▮▮▮▮▮▮▮ and consumed in ▮▮▮▮▮ through at least March 2009 – none of it will be consumed in Spain.  Accordingly, on the present facts, there is no justification for imposing two pricing mechanisms.[45]

---

[44]  The terms of Articles 8.5 and 18 do not appear to expressly limit this Tribunal's award to the imposition of a single pricing formula.

[45]  Even if, in the future, GNA simultaneously resold significant volumes of GNA's Train 1 LNG to ▮▮ and delivered significant volumes of its Train 1 LNG to Spain, two separate pricing formulas, based on two distinct end user markets, would likely not be appropriate.  In such a case, GNA would have the option of sending Train 1 LNG to the lower priced market, while sending other, non-Atlantic, cargoes to the higher priced market, thereby benefiting GNA but unilaterally depriving Atlantic of value.  Instead, in the unlikely event that such facts – significant volumes of Train 1 LNG simultaneously going to both Spain and ▮▮▮▮▮ – should present themselves, the proper approach, Atlantic submits, would be to

## VII.    THE GNA TRAIN-1 RESALE CONTRACT PRESENTS NO OBSTACLE TO THE RELIEF REQUESTED BY ATLANTIC

### A.    Preliminary Remarks

141.    Before presenting a detailed analysis of the GNA T-1 Resale Contract, some preliminary observations are in order to clear the air about Atlantic's position concerning GNA's decision to embark upon full resale of the Train 1 LNG to █████ and enter into the GNA T-1 Resale Contract.

142.    First, Atlantic has never suggested that GNA's decision to engage in the resales was wrongful, undertaken in bad faith, or unauthorized contractually.  The provisions of Article 2.6 of the Contract plainly permit resales to █████ Atlantic has said, however, that the continuous resale of all cargoes was not expected at the time the Contract was negotiated, and the testimony of the lead negotiators from both sides confirms that this was so.  *See, e.g., infra* Sections VIII.B.2. and 3.

143.    Second, Atlantic does not believe, and neither should the Tribunal, GNA's contention that it was compelled to enter into the GNA T-1 Resale Contract in order to avoid severe economic hardship, because Atlantic refused voluntarily to lower the Contract Price to a level that would have allowed the Train 1 LNG to be sold at a "reasonable rate of return" in Spain.  Atlantic believes the severity of the "peril" confronting GNA in 2002, when it first signed the GNA T-1 Resale Contract, and in 2004, when it amended that agreement to extend its resale commitment for an additional three years, until April 2009, has been vastly overstated.

- The ACQ under the Contract, the annual amount that GNA was obligated to buy from Atlantic, is 56,800,000 MMBtus.  In 2002, the GN Group's total reported gas sales were 1,065,864,444 MMBtus, meaning that the LNG purchase obligation imposed by the Contract corresponded to slightly more than 5% of total sales for that year.  In 2002, the GN Group

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

reported profits of $762,267,704 (€805,865,000), on sales of $$4,982,906,610 (€5,267,900,000).[77]

- In 2003, the GN Group's total reported gas sales were 1,203,426,048 MMBtus; the ACQ represented less than 4.8% of this total. In 2003, the GN Group reported profits of $643,537,668 (€568,456,000), on sales of $5,963,846,119 (€5,268,043,000).

- In 2004, the GN Group's total reported gas sales were 1,303,315,760 MMBtus; the ACQ represented less than 4.4% of this total. In 2004, the GN Group reported profits of $788,508,975 (€633,921,000), on sales of $7,793,837,693 (€6,265,848,000).

144.    The BCG Report attempts to quantify the losses that GNA allegedly would have suffered if it had sold the Train 1 LNG in the Spanish liberalized market. For the Contract Year beginning in October 2003 (the earliest period for which BCG supplied data), which covers the date (June 30, 2004) of GNA's decision to extend the GNA T-1 Resale Contract for an additional three years, BCG asserts that GNA would have realized a negative net return of $(0.24)/MMBtu if it had sold the Train 1 LNG in Spain. *See* 3/7/07 BCG Report ¶ 83 & Table 3. Assuming the accuracy of this figure – and that is an entirely unwarranted assumption – it would translate into a loss during the Contract Year of $13.6 million on sales of the ACQ.[78]

145.    When viewed against the profit figures for the GN Group in the years 2002-2004 – €806 million, €644 million and €789 million, *see supra* – the potential $13.6 million annual loss that BCG suggests GNA would have suffered does not constitute the sort of "crisis of survival" that GNA has sought to portray.

146.    Finally, far from being undertaken in desperation, as the purported "only" alternative to incurring substantial losses, GNA's entry into the GNA T-1 Resale Contract was a

---

[77] These and the others statistics listed in the bullet points are a matter of public record and are taken directly from the public filings of the GN Group.

[78] The BCG Report uses the higher figure of 67,403,800 MMBtu for that Contract Year, but that number includes Excess Quantities, which GNA was under no obligation to buy, and presumably would not have bought if its resales of Train 1 LNG were producing losses.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

carefully evaluated and considered business decision by GNA to align itself with ██ and reject

other options.  The evidence clearly establishes that a senior Atlantic negotiator in the initial, and

subsequently abandoned, price reopener filed by Enagas in July 2000, offered GNA a resolution

that would have addressed its claimed problems in the Spanish market by modifying Article 2.8

of the Contract to allow GNA to resell the entire Train 1 ██ to buyers anywhere in the world.

*See Torralba*, 1002:17-1005:15.  GNA rejected this proposal, because it would have eliminated

GNA's right to resell Train 1 volumes to ██ without sharing the upside with Atlantic.  *See id.*,

1009:11-1010:23.  Clearly, GNA believed that there was more money to be made through

dealings with ██, despite ██ purported "monopoly" position at the ████████,

████████ formidable negotiating skills, and GNA's purported lack of leverage over ██.

*See id.*, 1012:1-1014:10.

147.    The implementation of GNA's decision to align with ██ extends far beyond the

resale of the GNA Train 1 cargoes, and neither Atlantic nor this Tribunal knows the full extent of

the ongoing dealings between GNA and the GN Group, on the one hand, and ██ and its

affiliates, on the other.  In its pre-hearing submissions and in its opening statement, Atlantic

referred to the resale by GNA's parent, Gas Natural SDG, S.A., of additional Trinidad LNG to

██ for delivery to ████ and to the highly profitable three-party arrangements between

██ the GN Group, and Gas de Euskadi ("GdE"), under which Trinidad LNG purchased by

GdE was similarly resold to ██ and delivered to ████ with the GN Group supplying

replacement gas to GdE.  *See* Atlantic Reply Mem ¶¶ 62-74; Tr. 63:21-66:16 (Atlantic opening

statement).

148.    GNA belittled these remarks, suggesting that they were "without any evidence."

Tr. 125:21-126:2 (GNA opening statement).  But the evidence was all there, and it all came out

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

in the hearing.  There *is* an agreement by which Gas Natural SDG, S.A. resells all its Trinidad LNG to ▌▌▌ for delivery in ▌▌▌▌▌▌▌  *See* Annexes R-335 & 336.  The Business Opportunity Agreement (the "BOA"), executed by GNA and ▌▌▌ on ▌▌▌▌▌▌, as an adjunct to the GNA T-1 Resale Contract, specifically references and is conditioned upon the effectiveness of agreements between ▌▌▌ and ▌▌▌ for ▌▌▌ to sell all of its Trinidad LNG to ▌▌▌  *See* Annex R-335.  Indeed, the BOA specifically recites GNA's "capability to find new LNG suppliers to [▌▌▌ subsidiary] ▌▌▌ through GNT's [Gas Natural Trading, then an affiliate of GNA which subsequently merged with GNA] trading and commercial activities, *see* Annex R-335, BOA p. 1, 4th WHEREAS clause, and it provides that GNT will receive ▌▌▌ per year from ▌▌▌ as a "brokerage fee" for arranging the availability of the ▌▌▌ volumes, *see id.,* Article III.[79]

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌  *See supra*

Section III.A.  Torralba testified to still other links and other business dealings between affiliates of ▌▌▌ and GN SDG, S.A.  *See Torralba,* 1022:17-1024:23.  The point is simple:  GNA does not merit sympathy from the Tribunal because it entered into the GNA T-1 Resale Contract.  It made a business decision that was not forced upon it, and while it has enjoyed substantial

---

[79] The Tribunal should note that ***GNA is not a party*** to the GNA T-1 Resale Contract; the contracting entity for the GN Group is Gas Natural Trading SDG, S.A.  The GNA T-1 Resale Contract is thus, ***on its face, in violation of Article 2.6 of the Contract***, whose right of resale it purports to implement.  Article 2.6 provides that the LNG delivered to GNA under the Contract ▌▌▌▌▌▌▌▌▌▌▌▌  Gas Natural Trading SDG, S.A. is not the Buyer, so its sales to ▌▌▌ are not authorized under Article 2.6.  Atlantic, moreover, has not waived this violation.  It does not know about it.  Atlantic has never seen the GNA T-1 Resale Contract, and its counsel saw it for the first time, in this arbitration, ▌▌▌▌▌▌ when it was disclosed ▌▌▌  ▌▌▌▌▌▌▌▌▌▌▌  Small wonder, then, that ▌▌▌ and GNA ▌▌▌▌▌▌▌ of this agreement so vigorously and insisted on conditions that would prevent Atlantic from learning of this clear breach of the Contract.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

advantages as a result of that decision, it also must be held to account when the consequences of its choices are not so favorable.

### B.  GNA Did Not Report All the Payments Received from ▮▮ as a Result of the Decision to Resell All Train 1 Cargoes

149.    GNA has not accurately reported its gains from its resales of Train 1 LNG to ▮▮ Initially, GNA declined to produce a copy of the agreements governing the resales. Instead, it introduced copies of the invoices it had rendered to ▮▮ claiming that the amounts shown on the invoices represented GNA's total receipts from the resales to ▮▮ *See* Annexes R-55 to R-184; GNA Mem ¶¶ 13-14 & Table 3.  Indeed, GNA pointedly asserted that its presentation was accurate, because it had supplied the actual invoices, whereas Atlantic, according to GNA, offered only speculation.[80]

150.    A rather different picture emerged, however, once GNA was obliged to produce to Atlantic and make available to the Tribunal the actual agreements governing the resales. These agreements show substantial additional payments to GNA that are not reflected on the GNA invoices to ▮▮ GNA explains the discrepancy by asserting that these other payments were considered as part of GNA's computations relating to "shipping losses" arising from the resales, through which GNA purports to *reduce* the gain realized through the resales to ▮▮ *See, e.g,* GNA Mem ¶ 13 & Table 3; GNA Value Calculations Binder ¶¶ 108-152 .  This position does not withstand scrutiny; indeed, it is farcical since, with one minor exception, the additional payments have nothing at all to do with shipping costs.

---

[80]  *See, e.g.,* Tr. 125:16-20 (GNA opening statement) ("Which party, when it comes to the economics, gives you invoices showing what it gets for sales to ▮▮ , and has a high ranking official state under oath that, adjusted for transportation costs, that is what we get"); *id.,* 153:3-7 ("To illustrate why that was wrong, we produced the invoices.  We matched the invoices up.  One for one.").

151.    The additional payments arise under the aforementioned Business Opportunity Agreement, or BOA, dated ████████. The history of GNA's dealings with ███ shows that this was a critical date, because it was the date when GNA's dealings with ███ with respect to Trinidad LNG expanded dramatically. The original GNA T-1 Resale Contract is dated ████████, and provides for the resale of all of GNA's Train 1 LNG to ███ starting on ████████ *See* Annex R-335, Article 1.1. A first amendment to the GNA T-1 Resale Contract was executed on August ████. *Id.*, Amendment 1. It provided that the pricing formula in the original contract could be changed if ███ so elected by ████████ and also indicated an intention to extend the term of the GNA T-1 Resale Contract by one year, to ████████ *Id.*, Amendment 1 ¶¶ 1-2.

152.    ███ did not make the election provided in the first amendment, and the parties thereafter entered into a second amendment to the GNA T-1 Resale Contract, dated ████████ *See id.*, Amendment 2. The second amendment provided that the parties could in the future alter the pricing formula in the original GNA T-1 Resale Contract by entering into a ████████ *See id.*, Amendment 2, ¶ 1. ████████ ████████ the first on ████████ and a second on ████████ *See id.*, Amendment 2, Exhibit A. ████████ ████████ Under ████████ premium was fixed at ███/MMBtu; under ████████ the premium was fixed at ████/MMBtu. The premium of ████/MMBtu remained in effect from ████████

153.    ███ and GNA entered into the BOA on ████████ This was the same day that Gas Natural SDG, S.A. entered into an agreement to resell to ███ all the LNG that Gas

- 85 -

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

Natural SDG, S.A. (as assignee of Enagas) had contracted to purchase from the Train 2

production facility in Trinidad, by agreement date June 2, 2000.  *See* Annex R-336.  The BOA

specifically mentions the GNA T-1 Resale Contract in its opening recitals, and states that the

BOA is being executed "to improve the implementation and enhance the value" of the GNA T-1

Resale Contract.  *See* Annex R-335, BOA, p. 1, 3rd WHEREAS Clause.  The BOA was to take

effect on ████████ and to expire on ████████

154.    The BOA provides for additional payments to GN, over and above those made

pursuant to the GNA T-1 Resale Contract, as amended.  These payments are as follows:

- An additional payment of $████/MMBtu for ceding to ████ primary authority to coordinate with Atlantic LNG tanker loadings in Trinidad under the Contract and under the ████ Contract, for a total annual payment to GNA of $████████ computed by multiplying ████/MMBtu by the ACQ amount of ████████ MMBtus.  *See id.*, BOA ¶ 1.1.  The invoices that GNA supplied to the Tribunal ***did not bill for or disclose*** this additional payment.

- An additional payment of ████/day to reimburse GNA for costs of "'positioning'" certain LNG tankers in connection with charters by ████ for a total annual payment to GNA of ████████  *See id.*, BOA ¶ 1.2.  The invoices that GNA supplied to the Tribunal ***did not bill for or disclose*** this additional payment.

- An additional payment of ████/MMBtu in return for GNA's agreement to an increase in the "diversion fee" penalty that ████ could charge under Article 6.2 of the GNA T-1 Resale Contract if GNA diverted any of GNA's Train 1 LNG cargoes away from ████████, for a total annual payment to GNA of ████████  *See id.*, BOA ¶ 2.1.  The invoices that GNA supplied to the Tribunal ***did not bill for or disclose*** this additional payment.

- An additional payment of ████/MMBtu if, as already mentioned, the three-way arrangements among GNA, ████████ under which ████ would sell all of the LNG it had contracted to purchase from the ████ production facility in Trinidad, by agreement date ████████ were implemented, for a total annual payment to GNA of ████████ computed by multiplying ████/MMBtu by ████████ MMBtus (the Annual Contract Quantity under ████ agreement to purchase Train 3 LNG).  *See*

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

id., BOA, Article III.  The invoices that GNA supplied to the Tribunal ***did not bill for or disclose*** this additional payment.

The BOA was amended on ▮▮▮▮▮▮ to extend its term until ▮▮▮▮▮▮ and the payments specified in the BOA have, accordingly, continued.  *See* Annex R-335, Amendment to the BOA.

155.    Also on ▮▮▮▮▮▮ the parties to the GNA T-1 Resale Contract entered into a letter agreement that, in part, amended the GNA T-1 Resale Contract.  *See* Annex R-335 ("Price Letter Amendment").  Specifically, this letter agreement provided that on resales of "▮▮▮▮▮▮ ▮▮▮▮▮▮" purchased by GNA under the Contract, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  However, the letter agreement also provided that ▮▮ would pay the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



156.    On ▮▮▮▮▮▮ the parties executed a third amendment to the GNA T-1 Resale Contract.  *See* Annex R-335, Amendment 3.  This third amendment provided for a ▮▮▮▮▮▮ ▮▮▮▮▮▮ of the GNA T-1 Resale Contract, from ▮▮▮▮▮▮ through ▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See id.*, ¶¶ 1-2.  A minor change to a deadline in the third amendment was effected by a letter agreement dated ▮▮▮▮▮▮  *See* Annex R-335, "Price Letter Agreement."

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

157.    Finally, on ███████ a fourth amendment to the GNA T-1 Resale Contract

was signed by ████ and "Gas Natural SDG, S.A., … the successor by assignment to Gas Natural

Aprovisionamientos SDG, S.A."[81]  *See* Annex R-335, Amendment 4.  ████████████

███████████████████████████████████████████████████████████████████

158.    As noted, none of the additional payments made pursuant to the BOA are

reflected on the invoices GNA offered to the Tribunal.  At least two of these additional payments

should have been.  The largest additional payment – ████/MMBtu in return for revisions to

Article 6.2 of the GNA T-1 Resale Contract, cannot be described as anything other than an

increase in the price payable to GNA for the Contract's ACQ volumes resold to ████ under the

GNA T-1 Resale Contract.  GNA's suggestion that this belongs as part of a consideration of

shipping costs and savings makes no sense at all.  The additional payment of ████/MMBtu on

ACQ volumes is likewise expressly denominated as being in return for an amendment of the

GNA T-1 Resale Contract – Section 4.1, specifically.  It, too, represents an increase in the price

payable to GNA under the GNA T-1 Resale Contract.

159.    The additional payment denominated as a brokerage fee in connection with the

arrangements for ████ to resell to ████ the ████████ MMBtus of LNG that it purchases from

the ████ facility likewise does not appear to have anything to do with shipping.  Although

Article III of the BOA, headed "Brokerage Fee," mentions that ████████ wished to make use of

---

[81]  GNA has not produced any document constituting an assignment of the GNA T-1 Resale Contract to
Gas Natural SDG, S.A.  The invoices GNA introduced for periods after ████████ are not different
from those rendered earlier.  *Compare* Annexes R-162 to R-172 *with* Annexes R-173 to R-184.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

spare shipping capacity under the Shipping Agreement for additional purchases of LNG," the

actual motivation is expressed in the introduction to the BOA, which recites that ▋▋▋▋▋ in

interested in purchasing and receiving additional LNG volumes for its market, and GNT has the

ability to find new LNG suppliers for ▋▋▋▋." Annex R-335, BOA, p. 1, 4[th] WHEREAS

Clause. The ▋▋▋ volumes have gone to the ▋▋▋▋▋▋▋ which services

▋▋▋▋▋. Significantly, despite the express linkage between the

▋▋▋▋▋ transaction and the GNA T-

1 Resale Contract – the amendments to the GNA T-1 Resale Contract that are effected by the BOA are conditioned upon the agreement by ▋▋▋

resell the Trinidad ▋▋▋ LNG to ▋▋ *see id.*, BOA ¶ 6.8 – GNA has not presented the

complete economics of the ▋▋▋/GNA arrangement, particularly the gains achieved by the

GN Group through its backfill of ▋▋ for the ▋▋ volumes resold to ▋▋

160.     Finally, the remaining additional payment of $3,916 per day, *see id.*, BOA ¶ 1.2,

is the only additional payment that is related to shipping, and perhaps should be considered as

part of an analysis of shipping costs incurred and savings or revenue earned by GNA.  That

analysis is the subject of separate comment.  For present purposes, however, the Tribunal should

conclude that throughout the period that is the subject of this price review, the premium paid by

▋▋▋▋▋/MMBtu greater than is disclosed in the GNA invoices to ▋▋  Thus, for

example, while those invoices show a premium of ▋▋▋/MMBtu for ACQ volumes resold

from ▋▋▋▋ through ▋▋▋▋▋, the premium actually paid by ▋▋ was at least

▋▋▋/MMBtu – ▋▋ higher than reflected on the invoices.[82]

---

[82]  Because the premium paid by ▋▋ after ▋▋▋▋ was no longer fixed, the percentage variance from the premium disclosed on the GNA invoices changes as well.  On an absolute basis, however, it remains an additional ▋▋▋/MMBtu for ACQ volumes.



Article 8.5; *see also* Stehn Stmt ¶¶ 45-46; *Weale*, 1558:21-1559:16 (in reopener proceeding, can ██████████ and/or ██████████ ).

### 3.   In ███ the Value of the Flexibility to Resell Cargoes to ███ for Delivery to the ████████ Was Essentially ███ and, Consequently, the ████████ Value Agreed at That Time Includes Little or No Increment for This Type of Delivery Flexibility

238.   There are ████████████████████ afforded by Article 2.6:  GNA may engage in exchanges (swaps) with ████, and GNA may engage in resales to ███ GNA concedes that that these transactions "are two different things."  *Escudero*, 813:25-814:13; *see Humphrey*, 661:7-662:5.[114]  While the Parties may have recognized the possibility of swaps or exchanges during contract negotiations, they also recognized that there was essentially little or no value to the resale right at the time, because natural gas prices were and traditionally had been higher in Spain than in the ███, and thus ███ includes little or no increment for this type of flexibility.

239.   Enagas's chief negotiator, Escudero, testified when cross-examined concerning Article 2.6, that during negotiations in 1995 Enagas was actually contemplating the "possibilities

---

[114] The significant feature of the exchange transaction is that, despite the swap of cargoes, Enagas/GNA would still be taking essentially the same volume of LNG to Spain, and paying for it, under the Contract, at a price based on the Spanish market.  In an exchange, GNA provides one of its Train 1 LNG cargoes to ████████ for delivery at the ███████████ and ████████ provides one of its (typically Algerian) cargoes to GNA for delivery in Spain. *Humphrey*, 656:17-659:4.  The upside for the participants was a shipping cost saving and/or freeing-up shipping capacity that could be sub-chartered at a profit, but there was no "economic transaction" between the exchanging parties – meaning neither party bought LNG from the other, but rather each party paid its own supplier for the LNG it contributed to the exchange transaction. *See id.*, 657:15-659:19.  Under an exchange, Enagas/GNA would supply to Spain the same volume of LNG it would have had the exchange not occurred. *E.g.*, *Escudero*, 739:21-24, 773:21-774:11.

Resales under Article 2.6 are quite different.  As Humphrey testified, a resale of Train 1 LNG from GNA to ████████ does indeed involve an "economic transaction." ████████ pays GNA for the LNG, and GNA does not receive a reciprocal volume from ███ to deliver into Spain. *See Humphrey*, 661:17-662:5.  The resale of all Train 1 LNG by GNA to ████████ – as has been the case since late 2002 – severs any and all ties between Train 1 LNG and the Spanish market and its dynamics.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

of ***exchanges*** with ███████████ through ████ for shipping advantages." *Escudero*,

771:18-21; *see id.* 772:3-7.[115]  He admitted, by contrast, that Enagas was ***not*** contemplating

resales to ████ at the time:

> Because everybody knew that the ███████market was
> performing ... very badly compared to the ███████ market.  So
> other possibilities which in theory were at our rights/possibilities
> could not be done.

*Escudero*, 774:16-21; *see also id.*, 774:22-25 ("very clearly" selling "the gas to ██████" was not

feasible); 789:8-16 ("the market in the ████ would not support all of those volumes going into

the ████").  Escudero testified further that Enagas did not attempt in 1995 to assign a particular

value to the option to resell Train 1 LNG to ████ under Article 2.6.  *Escudero*, 815:5-11.

240.    Stehn, the lead Atlantic negotiator, likewise said that the parties did not in 1995

attempt to value Enagas's right to resell Train 1 LNG to ██████ and thus did not include any

increment for such value in the Contract Price.  *See* Stehn Reply Stmt ¶ 9.  This was so, Stehn

noted, because there simply was no value associated with such resales:

> there was no discussion or agreement regarding the 'value' that
> might arise from differentials between the price of natural gas in
> the ███████and Spain.  At the time, prices in the ██████
> ████ were low relative to Spain and were predicted to remain that
> way, so there would have been no value to the ability to resell
> Train 1 LNG to ████, except possibly to mitigate ███████████
> liability.

*Id.*[116]  In testimony that echoes Escudero's, Stehn explained that market and economic

circumstances in ███████████ "would ***not*** have supported a 'full resale' of the Enagas cargoes

---

[115]  Escudero explained that, pursuant to such exchanges, "the ███████████volumes would go to
Spain," and an "equivalent volume of Train 1 [LNG] would go to the █████████████████" so "Spain
was going to be supplied with equivalent volumes."  *Escudero*, 773:25-774:11.

[116]  In a related vein, Stehn testified:

> Under the circumstances prevailing at the time – among others, the
> limited market for LNG in the ████; quantity limitations at the LNG

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

to ████, and the resale of all cargoes was not a stated plan of Enagas." Stehn Reply Stmt ¶ 3

(emphasis added); *see also* Stehn Stmt ¶ 40.[117]

241.    Gulick similarly testified that, in 1995, the "option" to resell all Train 1 cargoes to

████████ had zero value. *Gulick*, 1460:23-1461:14. As part of his expert report, Gulick

actually performed a standard ████████████████████, using ████████



████████  That exercise fully confirms Escudero's and Stehn's that the resale right had

essentially no value in 1995. *See* 12/29/06 Navigant Report ¶ 79 (due largely to historical price

differentials between the ████ and Spanish markets, GNA's option to divert Train 1 LNG to the

████████ effectively had no value in 1995).

242.    Taken together, the testimony of each side's chief negotiator makes clear that,

while the Parties considered Article 2.6 delivery flexibility in agreeing to the current pricing

formula, that formula does not include a value element associated with resale delivery flexibility,

---

receiving and regasification terminal owned by ████ affiliate, ████████████ natural gas prices that were lower in the ████ than in Spain and low prices in the ████ were predicted to continue; and forecast strong growth in demand for natural gas Spain – I would have found it unfeasible from a marketing or economic standpoint for anyone to suggest that all the Enagas cargoes would be resold to ████  Indeed, if Enagas has indicated such a plan, I would have been forced to re-evaluate the fundamentals of the contractual arrangements then being negotiated.

Stehn Reply Stmt ¶ 2.

[117] Stehn testified that Enagas never mentioned or suggested during negotiations that it intended or sought to use Article 2.6 to resell all Train 1 LNG to ████  Stehn Reply Stmt ¶ 2; Stehn Stmt ¶¶ 39-40. Enagas, in particular Escudero, requested the resale flexibility provided in Article 2.6 as a means of avoiding or mitigating potential short-term take-or-pay liability, and for no other purpose. *See* Stehn Stmt ¶¶ 32-39; *Stehn*, 470:9-472:20 ("the role that Article 2.6 was to play with respect to Enagas's take or pay liability" was "brought up by [Enagas] and insisted upon by them as a method of mitigating . . . the take-or-pay obligation."). Thus, Atlantic properly understood that the resale right in Article 2.6 was in no way included to exploit price differentials between ████████ and Spain (which, in any event, did not exist), *see* Stehn Stmt ¶ 40, but rather was meant to provide Enagas with a means to avoid or minimize take-or-pay penalties in the event of unexpected fluctuations in Spanish demand, *see id.* ¶¶ 32-38.

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

because its value in ███████████ Importantly, however, Escudero conceded on cross-examination that the value associated with resale flexibility "could change over time," *Escudero*, 815:12-17, and that no one was able to predict with any certainty (in 1995) whether economic circumstances would change such that Spanish prices would lag behind ███ prices, *see id.*, 794:17-795:8.

4.    **The Value of the Resale Flexibility in Article 2.6 Has ██████████ ████████████████████ and the Pricing Formula Must Be Revised to Reflect That ████████**

243.    The current pricing mechanism does not capture an ██████ in the value of the Article 2.6 resale delivery flexibility. The value of this flexibility ██████ dramatically after ████, due to the reversal of the historical relationship between Spanish and ███ gas prices and the wholly unexpected large differentials between market prices for natural gas in the ███ and market prices for natural gas in Spain. *See* Spanish Market Report ¶¶ 5.2.8, 5.2.11. In keeping with Article 8.5(c), the pricing formula should be revised to capture this value.

244.    As summarized above, *see* Section I.A., and discussed in detail in several previous submissions to this Tribunal, *see* SOC ¶¶ 52-60; Spanish Market Report ¶¶ 2.4, 2.6.1-2.6.2, 2.6.6 & Exhibit 1, 5.1-5.5, 6.1-6.3; Atlantic Mem ¶¶ 72-77, 88-102; Atlantic Reply Mem ¶¶ 23-26, 44-50, the evidence shows that several years after the Contract was executed, natural gas and LNG prices in the ███ and Spanish markets unexpectedly diverged, with Spanish prices lagging far and consistently behind ███ prices starting in 1999. The evidence also establishes that the price disparity between these two markets created a strong and lucrative Atlantic Basin arbitrage dynamic under which cargoes otherwise destined for Spain were and continue to be delivered to the ███ instead. *See supra* Section I.B. This price disparity made it very lucrative for GNA to forego taking Train 1 LNG to Spain and instead resell all of it to ███, and that, of

- 133 -

# EXHIBIT
# P

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

# UNCITRAL ARBITRATION RULES

<u>In the Matter of the Arbitration between</u>:

| | |
|---|---|
| _____ | ) |
| ATLANTIC LNG COMPANY OF | ) |
| TRINIDAD AND TOBAGO, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| – against – | ) |
| | ) |
| GAS NATURAL APROVISIONAMIENTOS | ) |
| SDG S.A., | ) |
| | ) |
| Respondent. | ) |
| | ) |
| _____ | ) |

## ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO'S SECOND POST HEARING MEMORANDUM

Before:
Mr. Gerald Aksen (Chairman)
Prof. Ben H. Sheppard, Jr.
Mr. Eugene A. Massey

MILBANK, TWEED, HADLEY &
  McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413
(212) 530-5000

Attorneys for Claimant
ATLANTIC LNG COMPANY OF
TRINIDAD AND TOBAGO

Dated:  October 12, 2007
     New York, New York

UNCITRAL ARBITRATION RULES

In the Matter of the Arbitration between:

```
                                                    )
ATLANTIC LNG COMPANY OF                             )
TRINIDAD AND TOBAGO,                                )
                                                    )
                    Claimant,                       )
                                                    )
              – against –                           )
                                                    )
GAS NATURAL APROVISIONAMIENTOS                      )
SDG S.A.,                                           )
                                                    )
                    Respondent.                     )
                                                    )
                                                    )
```

## ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO'S SECOND POST HEARING MEMORANDUM

### PRELIMINARY STATEMENT

1.     Two and one half years after this reopener began, having claimed a small forest along the way, the issues are exactly as they were at the start.  As it has since October 2002, GNA still buys Train 1 LNG from Atlantic at a Spanish price, resells it all to ▮▮▮ for delivery in ▮▮▮ and makes an extraordinary profit for what is, on GNA's part, purely a paper transaction. The Spanish price that GNA pays is still supposed to include an increment that reflects the value of the delivery flexibility that permits the resales to ▮▮▮, and still it does not.  The result is that Atlantic continues to give away tens of millions of dollars of LNG value each year to GNA and ▮▮▮ although that certainly is not what is intended by the Contract.

2.     Atlantic approached the reopener with a very simple and very just position:  pay us a fair value for the Train 1 LNG as measured, logically, by the market that demands it, and in which it is sold.  Perhaps understandably, given that its economic interests would be affected

adversely if it did so, GNA declined the invitation, opting instead for a scorched earth defense, noteworthy as much for the politeness and civility with which it was executed as for the intransigence that was its substance.  But as inexorably occurs when a protagonist clings doggedly to a position at all costs, the accuracy, if not the veracity, of the position begins to erode.

3.      So, as the evidence was offered at the beginning of this proceeding, GNA submitted copies of its invoices to ███, and represented that these invoices reflected the entire payment received in connection with the resale of the Train 1 LNG to ███  But that representation was not completely truthful.  In addition to the premium of ███/MMBtu that GNA receives on resales of Train 1 LNG to ███, GNA receives additional payments from ███ – not revealed in the invoices – of at least ███MMBtu relating to those sales.

4.      Similarly, as the evidence was offered at the beginning of the matter, GNA coolly dismissed as "newspaper gossip" Atlantic's contention that there were dealings between GNA and ███that extended beyond the resale of Train 1 LNG, including a tri-partite arrangement with ███ another Spanish buyer of Trinidad LNG, under which ███ Trinidad LNG cargoes were resold to ███ and GNA supplied replacement gas to ███.  Here, again, GNA's position was not really accurate.  The Business Opportunity Agreement, it turned out, showed that GNA had been engaged to act as ███ agent in locating additional LNG, and that GNA was receiving a commission for having done so.  And, as Atlantic had indicated, GNA was providing ███

5.      The erosion eventually reached the evidence GNA had repeatedly portrayed as the core of its case:  the historical prices GNA had obtained in sales to its customer portfolio.  With great pride, GNA regularly reminded the Tribunal that it was the Party providing "real, actual

*Strictly Confidential: Contains Information Subject to Procedural Order No. 9*

than the prices at which newer contracts are being written. *See* Atlantic PHB ¶¶ 321-330. The effect is ***not*** a smoothing of transient price anomalies effected by the current pricing formula's reference to ███████████████████████████████ in the escalator, but rather a consistent understatement of value.

214.    Atlantic did not agree to accept such timing-reduced compensation for the Train 1 LNG in 1995, and it should not be forced to do so now. Indeed, where the Contract terms afford a price revision when the requesting Party can show, *inter alia*, that the Contract Price does not reflect the value of natural gas in the Buyer's end user market, it would defeat the purpose and intent of that provision to adopt a revised formula that ***ensures*** that the Contract Price will ***not*** reflect the value of natural gas.

### 5.    The Proposed Spanish Netback Prices Would Overcompensate GNA Substantially

215.    Article 8.5(c) affords GNA the opportunity to achieve a "reasonable rate of return" – nothing less, nothing more. *See Lapuerta*, 1729:3-14; *Weale*, 1594:14-16. GNA argues that Enagas "agreed" in ████ that it would earn a reasonable rate of return if it realized a ████/MMBtu (██%) "net margin" on the sale of its Train 1 LNG. *See* Atlantic PHB ¶ 286 n.143.[108] However, by selling all of its Train 1 LNG to ████ for delivery in ██████████ GNA has realized – based on GNA's own numbers – the following net margins since ████ (per MMBtu): ████████████████████████████████████, for an average net margin rate over this period of nearly ██%. *Id.* ¶ 287 n.144 & Table 2. And these ██████████ net margins understate the margins actually received, because they do not include

---

[108]    In fact, as Atlantic has previously demonstrated, there was no such "agreement," and one is simply conjured by GNA to justify its baseless claims. But, as explained above, even if Atlantic accepted GNA's claim (solely for the sake of argument), the evidence shows that GNA earns far more than Enagas "agreed" was reasonable.

███/MMBtu actually realized by GNA on its resales of Train 1 LNG to ███, but not reflected on GNA's invoices to ███. *See* Atlantic PHB ¶¶ 149-160.  Accordingly, even using GNA's numbers, GNA has no basis (let alone a commercial need, as it claims) for seeking a price decrease in light of its actual performance.  Recognizing this, GNA has instead based its entire claim on the complete fiction that the Tribunal should evaluate the Contract Price as though Train 1 LNG was being sold in Spain.  There is no possible basis, in fairness or equity (or, for that matter, in law or common sense) for the Tribunal to impose a retroactive price reduction that would only serve to further increase GNA's already bloated margins on sales to ███.

216.    Of course, Atlantic has separately discredited GNA's arguments that it is unable to sell the Train 1 LNG in Spain, so even GNA's fictional argument does not work.  The degree by which GNA's margins would increase if the Tribunal adopted one of GNA's Spanish Netback proposals is not revealed in GNA's presentation, but with a simple bit of math it is possible to tease this information out of the numbers that are disclosed.  For example, assuming that the Train 1 LNG was sold in Spain (a false assumption), the Spanish Netback to Tailgate Price, for ███ would produce, in GNA's nomenclature, *see* 3/7/07 BCG Report ¶¶ 216-217, a GRR on Spanish market value of roughly ███ and a "Net Return" ("NR") rate of ███.  *See* GNA PHB ¶¶ 270-71, Tables 6 and 7.[109]  This NR rate is over *five times* larger than the NR rate that GNA claims Enagas accepted as reasonable in ███ under the original pricing formula.  As is apparent from Tables 8 and 9 in GNA's First Post Hearing Brief, *see* GNA PHB ¶¶ 275-276, for ███ the Netback to FOB formula would produce a GRR of 25% and a NR rate of 13%, the latter a figure similarly out of proportion to what GNA claims Enagas was to receive under the original pricing formula.  Tables 5 and 6, below, show this.

---

[109]  The same is true for prior periods.  We present ███ data by way of example.

# EXHIBIT
# Q

# UNCITRAL ARBITRATION RULES

In the Matter of the Arbitration Between:

|  |  |
|---|---|
| ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO, | ) ) ) |
| Claimant, | ) ) |
| - against - | ) ) |
| GAS NATURAL APROVISIONAMIENTOS SDG, S.A., | ) ) ) |
| Respondent. | ) ) ) |

## GAS NATURAL APROVISIONAMIENTOS SDG S.A.'S
## VALUE CALCULATIONS AND PRODUCTION OF CONFIDENTIAL MATERIAL
## (UNREDACTED)

May 29, 2007

Before:
Mr. Gerald Aksen (Chairman)
Prof. Ben H. Sheppard, Jr.
Mr. Eugene A. Massey



(d) ████████████████████████

(e) ████████████████████████

## A.   GNA'S SHIPPING SAVINGS AND LOSSES ON ITS RESALES TO ██████

108.   To evaluate the true value associated with GNA's resales of Train 1 LNG to ████, all of the costs and revenues associated with effecting such transactions must be taken into account.  In connection with long-term purchases of LNG, a buyer must secure shipping capacity that, if the LNG is resold to a third party, may remain unutilized, which is a cost that is accounted for in calculating the net revenue obtained from such resale. Conversely, to the extent there are benefits associated with the sub-chartering of such shipping capacity, or optimization value secured from the purchaser of the diverted cargoes or another party, then this revenue must be accounted for as revenue in evaluating the profitability of the resale transactions as a whole.  Although there might be some periods of saving realized as a result of shipping, GNA faces a severe uncertainty, (as already explained in GNA's previous submissions) regarding whether the █ small tankers would be sub-chartered.   This risk means that GNA's loss may reach ████ $/MMBtu (on Contractual Years this reaches ███ $/MMBtu).  GNA's view is that that is value of ███ $MMBtu is what should be discounted to the actual GNA-████ resale Price.

109.   Indeed, GNA has experienced transportation-related gains and losses in connection with its resales to ████.   The amounts were factored into GNA's analysis of its net return obtained from the ████ resales in Table 2 of Carlos Torralba's Witness Statement dated March 7, 2007 are broken down in detail below.

### 1.   Shipping Obligations Under the LNG Sales Contract

110.   Article 6 of the LNG Sales Contract obligates GNA to charter and maintain ██████ ██████████████ a fleet of █ vessels ██████████████████████████ ranging from 65,000 to 135,000 m$^3$ LNG), to ensure sufficient capacity to transport the LNG purchased under Train 1 (56.8 TBtu/annum: ████████████████████ ████████████████████████) to the Enagas Receiving Facilities.   As a





consequence, GNA obtained a fleet of █ vessels—████████████████ ████████████████████ and dedicated them to the transportation of the Train 1 volumes. *See* Appendix 13. Initial deliveries of Train 1 LNG commenced in May 1999.

111.   Similarly, Article 6 of the Train 2 Contract between Atlantic and GN (the Train 1 and Train 2 Contracts are collectively referred to herein as the "Atlantic Contracts") obliges GN to obtain (and maintain) enough shipping capacity to transport the Train 2 LNG purchased (35 TBtu/annum) to the Enagas Receiving Facilities. As a consequence, GNA secured long-term rights to ████████████████ the transportation of the Train 2 volumes. For this purpose, GN chartered the LNG Tanker ████████ (formerly ████████). Initial deliveries of Train 2 took place in September 2002.

**2.     Resale of Train 1 Volumes**

112.   For the reasons explained by Mr. Torralba in his Witness Statement dated March 7, 2007, GNA was forced to resell the LNG volumes it purchased from Atlantic 1 ████ because of the deteriorating situation in the Spanish market. Ultimately, GNA and █████ signed the GNA-███ Resale Contract for the Train 1 volumes (██ TBtus/annum) on August 1, 2002.

113.   During the negotiations, GNA sought to resell the LNG volumes to ████ on a DES basis to fully utilize the ██LNG tankers it had chartered as required under the LNG Sales Contract. ██████ insisted, however, on purchasing Train 1 volumes FOB Trinidad instead of DES (with the right to request that some cargoes might be delivered CIF[34]). Therefore, the GNA-████ Resale Train 1 Contract became essentially an FOB contract.[35]

---

[34]   In fact, from November 2002 until March 2003, ████ requested that sales under the ████ Contract 1 be made on a CIF basis. For these deliveries, GNA used the ████████ (formerly ████████).

[35]   At that time, ████ had enough transportation capacity in the long run to cover its own volumes (88 TBtu/annum under the Atlantic-███ Train 1 Contract and █ TBtus/annum from the Atlantic-███ Train 2 Contract) plus the volumes purchased from GNA under ████ Contract 1 ██ TBtus/annum). In addition to the chart of the LNG ████████████ for potential routes other than Trinidad, ████ had chartered the Tankers ████████ TBtus) and ████████████ TBtus), which provided a cumulative shipping

### 3.    Economic Implications of Underutilization of the Fleet

114.    As a consequence of the resale of Train 1 volumes to ███ on an FOB basis, GNA was left with severe underutilization (and the costs associated therewith) of the █Tanker fleet it was required to maintain under the LNG Sales Contract.   This created a financial burden (approximately ███ M$/year) for GNA, which it was only partially able to offset through limited sub-chartering opportunities.

115.    As explained by Mr. Torralba in his Witness Statement dated March 7, 2007, GNA had a verbal commitment to sell███ both its Train 1 volumes and its Train 2 volumes.[36]

116.    In negotiating with ███ for the resale of Train 2 LNG after August 1st 2002, GNA sought a means not only to resell the LNG, but also to try to solve (or at least minimize) the impact (cost/losses) of further fleet underutilization.   Had GNA agreed simply to resell Train 2 LNG to ███ on an FOB basis, it would then have had to deal with fleet underutilization related to the ███ vessels and the ████████

---

capacity for 153 TBtus/annum—basically enough to transport the 162 TBtus under the referenced contracts, as shown in the following chart:

| Volume to be transported | | |
|---|---|---|
| Atlantic-███Train 1 Contract | ██ | TBTus |
| Atlantic-███Train 2 Contract | ██ | TBTus |
| LNG Sales Contract | ██ | TBTus |
| **TOTAL volume** | **162** | **TBTus** |
| Transportation capacity | | |
| ████████ | ██ | TBTus |
| ████████ | ██ | TBTus |
| **TOTAL Transportation Capacity** | **153** | **TBTus** |
| Deficit transportation capacity | -9 | TBtus |

---

[36]    Torralba, D5:P1074:L3-13.

### 4.    Resale of Atlantic Contract 2/3 Volumes and Related Shipping Arrangements

117.  On February 7, 2003, GNA and ███ signed a contract for the resale of the Train 2 volumes to ███ TBTu/y) (the "Train 2 Resale Contract").  At the time, and for the reasons already explained, GNA was looking for ways to mitigate the impact of the resulting fleet underutilization.    The negotiation and execution of agreements to accomplish this was a condition for GNA for the resale of the Train 2 volumes.

118.  During these negotiations, GNA had a certain amount of bargaining leverage with ███ because ███ wanting to control the shipping of the resale volumes, needed additional transportation capacity for the new Train 2 volumes it wanted to purchase from GNA.[37] GNA again offered its ███ tankers but ███ insisted on chartering the larger ████████[38]

119.  Simultaneously, ███ made to GNA the representation that it needed additional volumes of LNG, which, in addition to the volumes from Train 2 purchased from GNA, optimized at the same time the capacity of the ██████ GNA offered to explore with ███ the possibility of acting as broker (i) to bring additional volumes to ███ from ███ and (ii) to arrange the transportation of those volumes for ███[39]

120.  As a result of the foregoing, GNA and ███ signed related agreements aimed to resell the Train 2 volumes, to minimize the impact of the resales on GNA's fleet

---

[37]    As mentioned in the footnote immediately above, ███ had already filled its available vessels (████████ and did not have transportation capacity for the volumes it was purchasing from GNA.

[38]    GNA preferred to sub-charter the ███ vessels to ███ because the opportunities available to otherwise sub-charter them were quite limited in the shipping market (since the transport cost per-unit of energy was higher than in a ███ vessel and their ███ size limited their access to certain loading and unloading facilities).  The possibility of sub-chartering the ███ size vessel (such as the ██████ in the market was more feasible.

[39]    ████████████████████████████████████

underutilization, and to permit ███ to optimize the capacity of the █████████ by means of:[40]

(a)     The Train 2 Resale Contract;

(b)     A Time Charter of the █████████[41]

(c)     A contract referred to by the parties as the "Business Opportunity Agreement" or "BOA," which provided certain compensation paid by ███ to GNA to minimize the costs of fleet underutilisation and other financial consequences that GNA would be facing in the future with the ███ vessels no longer used to transport LNG from Trinidad.

121.    In particular, GNA obtained the following:

---

[40]    The following chart shows the optimisation of the Cabot fleet with Catalunya Spirit:

| Volume to be transported | | |
|---|---|---|
| Atlantic 2/3-███ Train 1 Contract | | TBTus |
| Atlantic 2/3-███ Train 2 Contract | | TBTus |
| LNG Sales Contract | | TBTus |
| Atlantic 2/3-GN Train 2 Contract | | TBTus |
| Atlantic 2/3-███ Train 3 Contract | | TBTus |
| **TOTAL volume** | | **236  TBTus** |
| Transportation capacity | | |
| ███████ | | TBTus |
| | | TBTus |
| | | TBTus |
| **TOTAL Transportation Capacity** | | **234  TBTus** |
| Deficit transportation capacity | | 2  TBTus |

[41]    In fact, one of the conditions precedent of the Time Charter agreement of the ███████ is the resale to ███ volumes FOB to ███. *See* Subcharter █████████ as amended, **Annex R-345**. During the first months of the time charter of the ███████ the vessel used was the ███████ because ███████ was not yet available.

- 48 -

(a) "Scheduling Function:" As explained under Article 1.1 of the BOA, Article 4.1 of the GNA-███ Resale Contract granted to GNA certain rights regarding approval or denial and modification of the Annual Delivery Program ("ADP") as proposed by ████ Given that GNA sold all of its Train 1 LNG to ████ on an FOB basis, GNA did not need to make use of this right. Thus, GNA was able to give up this right in exchange for certain consideration from ████ As a result, GNA is paid $██/MMBtu x ████████ MMBtu = $███████ per year.

(b) Positioning Costs and Trading Costs:

  (i) Positioning Costs: As explained above, after agreeing to sell all Train 1 LNG to ████ FOB Trinidad, GNA was left with a fleet of ████████ vessels (that it was required to maintain under the LNG Sales Contract), with few possibilities for sub-chartering the vessels to third parties. It was believed to be most likely that these vessels would be laid up for long periods in dry dock or in a Spanish anchorage. This would have imposed significant maintenance costs (*e.g.*, anchored fees, bunker costs) as well as significant positioning costs (*e.g.*, cool-down costs, boil-off costs) whenever the vessels were actually sub-chartered. Therefore, GNA requested that ████ compensate GNA for anticipated fleet underutilization costs related to the ████ vessels' charter-fees. ████ claimed, however, that the only vessel that would be susceptible of being chartered was the████ one. Hence, ████ only agreed to a payment related to the charter-fees of the ████████ GNA accepted this because such figure was very similar to the combined Time Charter costs of the ████ Tankers.

  (ii) Loss of Trading Costs: Because of the lack of demand in the market generally for ████ LNG vessels and limitations on their potential use in some loading/unloading ports, GNA, by sub-chartering the ████████ to ████ in lieu of the ████ vessels, lost potential LNG trading opportunities that it could have covered using the ████████ Thus, GNA requested from ████ compensation that at least partially

- 49 -



covered this cost.  GNA's initial proposal was an amount related to the charter-fees of the ▇▇▇ vessels, as noted above.  Again, however, ▇▇▇ only agreed to compensate GNA for lost opportunities related to the charter of the ▇▇▇ vessel—the ▇▇▇▇▇—because it viewed that as the only realistic possibility for sub-charters on a regular basis.  GNA accepted this for the reasons already explained above.  As a result of these two issues, GNA is paid ▇▇▇ x ▇▇▇ per day x ▇▇▇ days/year = ▇▇▇▇

(c)    <u>Diversion of Cargoes</u>:  As explained in Article 2.1 of the BOA, Article VI of the GNA-▇▇ Resale Contract granted GNA the right to divert to Spain certain LNG cargoes—for a price consisting of a diversion fee.  ▇▇▇ argued that this right imposed on ▇▇ a significant risk in terms of logistical, operational and economic effects, potential loss of market, and political risk of under-supply. Therefore, ▇▇▇ requested an increase in the penalties that GNA would have to pay under Article 6.2 if it ever exercised its right to divert cargoes away from ▇▇▇  The increased diversion fee was intended to discourage GNA from using its right to divert cargoes to Spain.  As consideration for this adverse change to GNA's rights, ▇▇▇ agreed to pay GN ▇▇▇ /MMBtu x ▇▇▇▇ MMBtu = $▇▇▇▇

122.   These revenues are reflected in the figures that GNA previously presented to the Tribunal.  In particular, they were taken into account in calculating the net cost associated with "shipping risk" in the second line of Table 1 of GNA's Statement of Defense, Table 3 of GNA's Memorandum of Law, and Tables 1 and 2 of the Witness Statement of Carlos Torralba.  The following explains in detail how GNA arrived at the numbers in those tables.

### 5.    Computation and Economics of Shipping Savings/Losses

123.   The concepts explained above are monetized by computing all incomes and costs associated to the shipping-related arrangements. Essentially, it is necessary to look at the

actual use of the ■-tanker fleet of the GN Group in any year and to look at the revenues and costs associated with use and non-use of the fleet.

124.    In any given year, any LNG tanker in the fleet could be:

    (a)    Sub-chartered to a third party;

    (b)    Sub-chartered for internal use;

    (c)    Anchored with no use;

    (d)    Under way for positioning, or

    (e)    Off-hire.

125.    Taking internal voyage reports of the LNG tankers as a starting point, to evaluate the economics on a dollar per-MMBtu basis, GNA computes the actual annual use (starting from October 1, 2002), the revenues and costs of the 4 LNG vessels, and the compensation obtained by GNA, as follows: (i) taking the difference between revenues and expenses, and (ii) dividing that difference by the actual volumes of Train 1 and Train 2 to obtain a $/MMBtu figure.

126.    To make these calculations, GNA has used invoice data wherever possible. In some cases this has not been feasible (costs/revenues for internal use, boil off costs or positioning costs) and GNA has used estimated figures.[42] In the following paragraphs, GNA first calculates the "Revenues" and then the "Costs."

    **a.    Revenues Considered Expressed in Dollars Resulting From:**

        **(1)    Sub-Charter to Third Parties of Any of the**  **Sized LNG Tankers**

127.    GNA has included all revenues obtained by the GN Group when these LNG tankers were sub-chartered during any calendar year to third parties.

---

[42]    Because of the extent of data required, GNA has not considered the off-hires for the calculations relating to the use of the ▬ LNG tankers, boil off costs suffered by GNA during positioning, or costs assumed by GNA with the ▬ Spirit during November 2002-March 2003.

| (1) Sub-charter Incomes for ▮▮▮ (USD Millions) | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| | 2.85 | 22.55 | 0.36 | 11.22 | 22.00 | 3.57 |

128.   For a detailed list of invoices for the ▮▮▮▮▮▮, and the ▮▮▮▮ ▮▮▮ see Appendices 14, 15 and 16, respectively.



129.   GNA has included all revenues obtained by the GN Group from ▮▮▮ for sub-chartering the (▮▮▮▮ or the ▮▮▮▮▮

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| Sub-charter ▮▮▮▮ ( USD Millions) | 4.88 | 23.39 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sub-charter ▮▮▮▮ ( USD Millions) | 0.00 | 8.95 | 32.00 | 32.29 | 32.32 | 9.38 |
| (2) Sub-charter of ▮▮▮ And ▮▮▮▮ (USD Millions) | 4.88 | 32.34 | 32.00 | 32.29 | 32.32 | 9.38 |

130.   For a detailed list of invoices, see Appendixes 17 and 18, respectively.

### (3)    Internal use made by GN of the ▮▮▮ LNG tankers.

131.   GNA has calculated the value obtained from the internal use of the ▮▮▮LNG tankers by analysing the internal voyage reports of these LNG tankers from the actual start day of the resale period (October 2002).  GNA has derived the following number of voyages performed by these ▮▮▮ tankers:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| $RT_1$ - Round trip Algeria-Spain | 8.0 | 67.0 | 62.0 | 1.0 | 2.0 | 0.0 |
| $RT_2$ - Round trip Qatar-Spain | 0.0 | 2.0 | 5.0 | 4.0 | 14.0 | 0.0 |
| $RT_3$ - Round trip Trinidad-Spain | 2.0 | 1.0 | 0.0 | 3.0 | 2.5 | 5.0 |
| $RT_4$ - Round trip Trinidad-USA | 6.5 | 6.0 | 0.0 | 0.0 | 0.0 | 1.0 |
| $RT_5$ – Other short round trip | 0.0 | 1.0 | 4.0 | 7.0 | 1.0 | 0.5 |
| $RT_6$ – Other long round trip | 0.0 | 5.0 | 4.0 | 1.0 | 1.0 | 1.0 |

132.  For each type of trip, GNA has assigned a number of days employed in the round trip voyage as follows:

| Shipping Routes | Duration (days) |
|---|---|
| $D_1$ - Round trip Algeria-Spain | 3.00 |
| $D_2$ - Round trip Qatar-Spain | 28.00 |
| $D_3$ - Round trip Trinidad-Spain | 20.00 |
| $D_4$ - Round trip Trinidad-USA | 15.00 |
| $D_5$ - Other short round trip | 4.00 |
| $D_6$ - Other long round trip | 27.00 |

133.  Finally, to derive the revenues received from internal charters, a daily charter rate of 31.000 \$/day (which is the average daily Time Charter hire rate in the year 2003 for the fleet) has been considered for each of the three vessels during the period. The revenues derived are obtained as follows:

$$I_1 = \frac{\left( \sum_i RT_i * D_i \right) * 31,000 \, USD/day}{1,000,000}$$

Where:

$I_1$  =  the revenues expressed in USD Millions for a given calendar year

$RT_i$  =  the number of round trips for route $i$ for a calendar year

$D_i$  =  the duration for the round trips of the route $i$

Obtaining the following results for each of the years:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| (3) Internal use  (USD Millions) | 5.01 | 15.69 | 13.95 | 7.13 | 14.85 | 4.46 |

**(4)    Compensation for Fleet Underutilization**

134.   GNA has included all of the amounts received from ███ under "Article I: Operational Flexibility" and "Article II: Diversion of Cargoes" of the BOA, starting on February 7, 2003.

For 2003:

Revenues (USD Millions)= █ $/MMBtu * (███ MMBtu * █ + ███ MMBtu) + ███ * █ + ███ $/MMBtu * (███ MMBtu * ██ + ███ MMBtu) = █ MM$

For 2004, 2005, 2006:

Revenues (USD Millions)$_i$ = (█ $/MMBtu * ███ MMBtu) + ██+ (██ $/MMBtu * ███ MMBtu)= ██ MM$/year

For 2007 (1Q):

Revenues (USD Millions)$_i$ = █ $/MMBtu * (███ MMBtu * █) + ███ * ███ $/MMBtu * (███ MMBtu * ██) = █ MM$

Obtaining the following results:

| (4) Compensation for Fleet (USD Millions) | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| | - | 10.73 | 11.94 | 11.94 | 11.94 | 3.63 |

**(5)    Payments from**  **for the Transport of its Volumes**

135.   Since June 2003, the GN Group has received from ███ $/MMBtu for the transport of ███ volumes from Trinidad.  The total amounts for each contract year, which are the result of the invoices presented in Appendix 19, are shown in the table below:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| **(5) Payments from** ██████ **(USD Millions)** | - | 1.70 | 2.78 | 2.55 | 2.55 | 0.70 |

**b.    Costs Considered Expressed in Dollars Generated By:**

**(1)    Charter Cost of the ██████ LNG Tankers.**

136.    GNA has taken into account the time charter costs borne by the GN Group for ██████ ██████████████████████████ For the sake of simplicity, GNA has used, for the periods during which the ██████████████████████ were sub-chartered, the invoices listed in Appendices 20, 21, and 22 and, for the rest of the periods, the data set forth in the following table, which represents the contractual time charter hire rate of those ██████ size vessels:

| LNG Tanker | From | Until | Charter Rate (USD/month) |
|---|---|---|---|
| ██████████████ | 9/21/2002 | 9/20/2003 | 924,724 |
| | 9/21/2003 | 9/20/2004 | 941,066 |
| | 9/21/2004 | 9/20/2005 | 957,898 |
| | 9/21/2005 | 9/20/2006 | 975,235 |
| | 9/21/2006 | 9/20/2007 | 993,092 |
| | 9/01/2002 | 9/01/2003 | 951,045 |
| | 9/01/2003 | 9/01/2004 | 982,847 |
| | 9/01/2004 | 9/01/2005 | 1,016,239 |
| | 9/01/2005 | 9/01/2006 | 1,051,301 |
| | 9/01/2006 | 9/01/2007 | 1,088,116 |

137.    Adding the time charter annual cost of the ██████ LNG tankers, the following annual results are obtained:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| **(1) Charter Costs for** ██████ **Tankers  (USD Millions)** | -7.93 | -36.62 | -35.20 | -36.26 | -37.96 | -9.49 |



138.  For the period between November 2002 and March 2003 when GNA delivered Train 1 LNG on a CIF basis to ███ at a fixed rate of ███ $/MMBtu utilizing the ███████ ████ GNA has included all invoices related to time charter, bunker, port cost, and the like.

139.  For the period from April 2003 to September 2003, when GNA sub-chartered the ████████████ GNA has considered the time charter cost of the ████████ with additional related minor invoicing.  All other concepts related to shipping cost, such as bunker, port cost, boil-off, and the like are borne directly by ████

140.  For the period between September 2003 and March 2007, when GNA sub-chartered the ████████ to ████ GNA has considered the Time Charter cost of the ████████ ████ with additional minor invoicing.  All other concepts related to shipping cost, such as bunker, port cost, boil-off, and the like are borne directly by ████

141.  For a detailed list of invoices please refer to Appendices 23 and 24 for the ████████ and Appendices 25 and 26 for the ████████

142.  The following table represents the actual cost from the ████████ and ████████ ████

|  | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| Charter ████████ ( USD Millions) | -5.47 | -19.01 | - | - | - | - |
| Other cost from ████████ ( USD Millions) | -1.42 | -1.08 | -0.27 | - | - | - |
| Charter ████████ ( USD Millions) | - | -9.88 | -25.84 | -26.71 | -26.85 | -6.85 |
| Other cost from ████████ ( USD Millions) | - | -1.55 | -0.03 | 0.00 | - | - |
| **(2) Charter of ████████ & ████████ (USD Millions)** | **-6.89** | **-31.52** | **-26.13** | **-26.71** | **-26.85** | **-6.85** |

**(3)    Inactivity Periods of the ███████ LNG Tankers: Anchored Costs, Bunker Costs and Cool-Down Costs.**

143.    These are costs generated during the periods when the LNG Tankers have no activity and are either anchored or layed up for a period waiting for service.  These costs are categorized as (1) anchorage costs, (2) bunker costs or (3) cool-down costs.  The following addresses each cost in turn.

**(i)    Anchorage Costs**

144.    Anchorage costs are the result of multiplying the anchorage fee, which has been estimated at 900 $USD per day, by the number of days that the vessels were anchored. The number of days during which the LNG Tankers have been anchored is derived from internal GN shipping information.

|  | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| Anchored days for ███████ Tankers | 0 | 19 | 115 | 356 | 28 | 13 |
| (3)(i) Anchored costs (USD Millions) | 0.00 | -0.02 | -0.10 | -0.32 | -0.03 | -0.01 |

**(ii)    Bunker Costs**

145.    The figures for bunker costs have been obtained by multiplying the number of days that the tankers were anchored by an estimated bunker consumption of 34 ton/day (based on the shipping experience of the GN Group) during these days and by the average bunker price for each year.  The index used for the bunker price is the IFO 380 cst Algeciras as it is quoted by Paws.  This leads to the following results:

|  | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| Anchored days for ███████ Tankers | 0 | 19 | 115 | 356 | 28 | 13 |
| Average Bunker Price: IFO 380 cst Algeciras (USD/ton) | 144.99 | 162.62 | 168.81 | 249.37 | 310.28 | 278.68 |
| (3)(ii) Bunker costs (USD Millions) | 0.00 | -0.10 | -0.66 | -3.02 | -0.29 | -0.13 |

### (iii)     Cool-Down Costs

146.     Due to long periods of inactivity, the vessels need to cool their tanks to the temperature that will permit continuous loading of LNG prior to loading.  Essentially, when a LNG Tanker is not in service and is stopped more than15 continuous days, GNA considers that it requires a cool-down before resuming service.  To calculate these costs, GNA uses the following formula:

$$CD_i = \frac{N_i * \left[ (V * P_i) \right]}{1,000,000}$$

Where:

$CD_i$     =     the cool-down costs expressed in USD millions for any given year $i$

$N_i$     =     the number of cool-downs during any given year $i$

$V$     =     the volume of LNG consumed for each cool-down, which it has been estimated using the GNA internal data in 25,000 MMBtu

$P_i$     =     is the price of the LNG used for the cool-downs, which it has been considered to be the arithmetic average price of Train 1 Contract during the year $i$

This leads to the following results for each of the following years:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| $N_i$ - Number of cool-downs | 0 | 1 | 2 | 6 | 1 | 0 |
| $P_i$ - Average Contract Price  ( USD/MMBtu) | | | | | | |
| (3)(iii) $CD_i$ - Cool-down costs  (USD Millions) | 0.00 | -0.08 | -0.18 | -0.78 | -0.17 | 0.00 |

**(4)    Bunker Costs of the ███████-Sized LNG Tankers Related to Positioning Voyages.**

147.    Position voyages occur when the LNG tanker moves from one traffic area to another without any specific assignment or due to inefficiency of logistics. The amount of time when an LNG Tanker is in positioning generates a bunker cost for GNA that is not covered by the relevant sub-charter (either internal or with a third party).

148.    To evaluate the actual cost of positioning, it is necessary to account for the number of days in which the LNG vessel has been used. "Other Uses Number of Days" includes sub-charter to a third party, sub-charter for internal use, and anchorage with no use. The difference between 365 (total number of days in a year) and "Other Uses Number of Days" results in the positioning days. These number of days shall be multiplied by the consumption of bunker (Ton/day) and the Cost of Bunker ($/Ton). A figure of $75 Ton/day of bunker consumption has been assumed (which is the average fuel consumption of ███████). The index used for bunker is IFO 380 cst Algeciras.

149.    The positioning days (Pd$_i$) have been obtained through the following formula:

$$Pd_i = (3 * Y_i) - Sd_i - Id_i - Ad_i$$

Where:

Pd$_i$    =    the positioning days for the year *i*

Y$_i$    =    the days in the year *i*

Sd$_i$    =    the days that these ███████ have been sub-chartered to third parties during the year *i*

Id$_i$    =    the number of days that these vessels have been used in transport operations for Gas Natural Group during the year *i*

Ad$_i$    =    the number of days that these vessels were anchored without work in the year *i*

The results for each of the contractual years are the following:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| $(3 * NY_i)$ – Days for each period | 276 | 1.095 | 1.098 | 1.095 | 1.095 | 270 |
| $Sd_i$ – Sub-charter days | 89 | 406 | 6 | 318 | 468 | 90 |
| $Id_i$ – Internal use days | 162 | 506 | 450 | 230 | 479 | 144 |
| $Ad_i$ – Anchored days | 0 | 19 | 115 | 356 | 28 | 13 |
| $Pd_i$ – Positioning days | 25 | 164 | 527 | 190 | 120 | 23 |
| Average Bunker Price: IFO 380 cst Algeciras ( USD/ton) | 144.99 | 162.62 | 168.81 | 249.37 | 310.28 | 278.68 |
| 4) Positioning costs (USD Millions) | -0.27 | -2.00 | -6.67 | -3.56 | -2.80 | -0.47 |

(5)     **Payments to** ▮▮▮ **for the Assignment of its Right to Transport the Volumes from** ▮▮▮

150.     Since June 2003, Gas Natural has paid ▮▮▮ for the right to transport the quantities of ▮▮▮ from Trinidad ▮▮▮ $/MMBtu.  The total amounts for each contract year, which are the result of the invoices presented in Appendix 27, are shown in the table below:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| 5) Payments to ▮▮▮ (USD Millions) | 0.00 | -2.53 | -4.13 | -3.79 | -3.78 | -1.04 |

151.     When all of the foregoing concepts are netted out, the following results for each of the calendar years:

| | 2002 (4Q) | 2003 | 2004 | 2005 | 2006 | 2007 (1Q) |
|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | |
| 1) Sub-Charter Incomes for ▮▮▮ & ▮▮▮ (USD Millions) | 2.85 | 22.55 | 0.36 | 11.22 | 22.00 | 3.57 |
| 2) Sub-Charter of ▮▮▮ and ▮▮▮ (USD Millions) | 4.88 | 32.34 | 32.00 | 32.29 | 32.32 | 9.38 |
| 3) Internal Use (USD Millions) | 5.01 | 15.69 | 13.95 | 7.13 | 14.85 | 4.46 |
| 4) Compensation for the Fleet(USD Millions) | - | 10.73 | 11.94 | 11.94 | 11.94 | 3.63 |
| 5) Payments from ▮▮▮ (USD Millions) | - | 1.70 | 2.78 | 2.55 | 2.55 | 0.70 |
| **COSTS** | | | | | | |
| 1) Charter Costs for ▮▮▮ & ▮▮▮ Tankers (USD Millions) | -7.93 | -36.62 | -35.20 | -36.26 | -37.96 | -9.49 |
| 2) Charter of ▮▮▮ & ▮▮▮ (USD Millions) | -6.89 | -31.52 | -26.13 | -26.71 | -26.85 | -6.85 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3) Inactivity Costs (USD Millions) | 0.00 | -0.20 | -0.95 | -4.13 | -0.49 | -0.14 |
| 4) Positioning Costs (USD Millions) | -0.27 | -2.00 | -6.67 | -3.56 | -2.80 | -0.47 |
| 5) Payments to Repsol (USD Millions) | 0.00 | -2.53 | -4.13 | -3.79 | -3.78 | -1.04 |
| **[I] Shipping Savings & Losses (USD Millions)** | **-2.36** | **10.12** | **-12.05** | **-9.31** | **11.78** | **3.75** |
| [II]Quantities lifted by GN from Train 1 + Train 2 (MMBtu) | 24,820,705 | 98,442,222 | 109,549,206 | 109,903,081 | 94,186,265 | 29,188,288 |
| **Savings/Losses per MMBtu = ([I] * 10⁶)/[II]  (USD/MMBtu)** | **-0.09** | **0.10** | **-0.11** | **-0.08** | **0.13** | **0.13** |

152.   Mr. Torralba presented this table in his Witness Statement dated March 7, 2007 divided into contract years instead of calendar years.  *See* Appendix 28.

**B.**   

153.

154.

155.

Appendix 13

Volumes lifted from Train 1



**Appendix 13**





**Appendix 13**



**Appendix 13**



**Appendix 13**



**Volumes lifted from Train 2**



**Appendix 13**



**Appendix 14**



**Appendix 15**





Appendix 16





**Appendix 17**



**Appendix 18**



**Appendix 18**

Appendix 19





**Appendix 19**





**Appendix 20**



**Appendix 21**



**Appendix 22**



**Appendix 23**



**Appendix 24**



**Appendix 24**



Appendix 25



**Appendix 25**



Appendix 26



Appendix 27



**Appendix 27**

2005



**Appendix 28**

**Explanation to Table 2 from Witness Statement of Carlos Torralba**

a.    **Revenues Considered Expressed in Dollars Resulting From:**

(1)    **Sub-Charter to Third Parties of Any of the  Sized LNG Tankers**

GNA has included all incomes obtained by GN Group when these LNG Tankers were sub-chartered during any contractual year to third parties.

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| (1) Sub-charter Revenues for ▮▮▮▮▮▮▮▮▮▮ Tankers (USD Millions) | 22.83 | 2.93 | 6.79 | 22.90 |

For a detailed list of invoices for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ please refer to Appendices 14, 15 and 16, respectively.

(2)    **Sub-Charter to ▮▮▮▮▮▮▮▮ Vessel (▮▮▮▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮▮ , as the case may be)**

GNA has included all incomes obtained by GN Group from ▮▮▮▮ for the sub-chartering the ▮▮▮▮▮▮ or ▮▮▮▮▮▮▮▮

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| Sub-charter ▮▮▮▮▮ ( USD Millions) | 28.27 | 0.00 | 0.00 | 0.00 |
| Sub-charter ▮▮▮▮▮ ( USD Millions) | 0.97 | 32.02 | 32.04 | 31.25 |
| (2) Sub-charter of ▮▮▮▮▮ and ▮▮▮▮▮ (USD Millions) | 29.24 | 32.02 | 32.04 | 31.25 |

For a detailed list of invoices please refer to Appendices 17 and 18, respectively.

(3)    **Internal use made by GN of the ▮▮▮ LNG tankers.**

GNA has calculated the internal use of the medium LNG tankers by analysing the internal voyage reports of these LNG Tankers from October 2002. GNA has derived the following number of trips performed by these ▮▮▮ Tankers:

1

**Appendix 28**

| Contract Year | 10/01/02– 9/30/03 | 10/01/03– 9/30/04 | 10/01/04– 9/30/05 | 10/01/05– 9/30/06 |
|---|---|---|---|---|
| $RT_1$ - Round trip Algeria-Spain | 51.0 | 72.0 | 15.0 | 2.0 |
| $RT_2$ - Round trip Qatar-Spain | 1.0 | 4.0 | 4.5 | 9.0 |
| $RT_3$ - Round trip Trinidad-Spain | 3.0 | 1.0 | 1.0 | 4.0 |
| $RT_4$ - Round trip Trinidad-USA | 12.0 | 0.5 | 0.0 | 0.0 |
| $RT_5$ - Other short round trip | 1.0 | 7.0 | 4.0 | 0.5 |
| $RT_6$ - Other long round trip | 0.5 | 11.0 | 0.0 | 0.0 |

For each type of trip, GNA has assigned a number of days employed in the round trip voyage as follows:

| Shipping Routes | Duration (days) |
|---|---|
| $D_1$ - Round trip Algeria-Spain | 3.00 |
| $D_2$ - Round trip Qatar-Spain | 28.00 |
| $D_3$ - Round trip Trinidad-Spain | 20.00 |
| $D_4$ - Round trip Trinidad-USA | 15.00 |
| $D_5$ - Other short round trip | 4.00 |
| $D_6$ - Other long round trip | 27.00 |

Finally, in order to derived the revenues received by internal charters, a daily charter rate of 31.000 \$/day (which is the average daily Time Charter in year 2003 for the fleet) has been considered for each of the 3 vessels during the period. The revenues derived are obtained as follows:

$$I_1 = \frac{\left( \sum_i RT_i * D_i \right) * 31{,}000\ USD/day}{1{,}000{,}000}$$

Where:

$I_1$ are the Incomes expressed in USD Millions for a given contractual year,

$RT_i$ is the number of round trips for route $i$ for a contractual year,

$D_i$ is the duration for the round trips of the route $i$,

Obtaining the following results for each of the years:

| Contract Year | 10/01/02– 9/30/03 | 10/01/03– 9/30/04 | 10/01/04– 9/30/05 | 10/01/05– 9/30/06 |
|---|---|---|---|---|
| (3) Internal use  (USD Millions) | 13.59 | 21.10 | 6.42 | 10.54 |

Appendix 28

### (4)    Compensation for fleet underutilisation

GNA has included all the amounts perceived under *"Article I: Operational Flexibility"* and *"Article II: Diversion of Cargoes"* of the BOA, starting on February 7, 2003.

For the contractual year from October 2002 to September 2003

Incomes (USD Millions)= ███ $/MMBtu * (█████ MMBtu * █+█████ MMBtu)
+ █████ * ██+ ███ $/MMBtu * (█████ MMBtu * █+ █████ MMBtu)
=███ MM$

For the rest of contractual years:

Incomes (USD Millions)ᵢ = (███ $/MMBtu * █████ MMBtu) + ████ + (███
$/MMBtu * █████ MMBtu)= ███ MM$

Obtaining the following results:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| (4) Compensation for the fleet (USD Millions) | 7.09 | 11.94 | 11.94 | 11.94 |

### (5)    Payments from █████ for doing the transport of its volumes

Since June 2003, Gas Natural has received from █████ $/MMBtu from the transport of ███ volumes from Trinidad. The total amounts for each contract year, which are the result of the invoices presented in Appendix 19, are shown in the table below:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| 5) Payments from █████ (USD Millions) | 1.08 | 2.80 | 2.37 | 2.72 |

### b.    Costs Considered Expressed in Dollars Generated By:

### (1)    Charter Cost of the █████ LNG tankers.

GNA has taken into account the Time Charter Costs borne by GN for █████
███ and █████ In order to avoid complexity, GNA has used during the periods when █████ and █████ were sub-chartered the invoices listed in Appendices 20, 21 and 22, and for the rest of the periods GNA has used the following table where it is representing the contractual Time Charter of those medium size vessels:

**Appendix 28**

| LNG Tanker | From | Until | Charter Rate (USD/month) |
|---|---|---|---|
| | 9/21/2002 | 9/20/2003 | 924,724 |
| | 9/21/2003 | 9/20/2004 | 941,066 |
| | 9/21/2004 | 9/20/2005 | 957,898 |
| | 9/21/2005 | 9/20/2006 | 975,235 |
| | 9/21/2006 | 9/20/2007 | 993,092 |
| | 9/01/2002 | 9/01/2003 | 951,045 |
| | 9/01/2003 | 9/01/2004 | 982,847 |
| | 9/01/2004 | 9/01/2005 | 1,016,239 |
| | 9/01/2005 | 9/01/2006 | 1,051,301 |
| | 9/01/2006 | 9/01/2007 | 1,088,116 |

Adding the time charter annual cost of the █ LNG tankers, the following contractual year results are obtained:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| **(1) Charter Costs for** ███ **Tankers (USD Millions)** | -35.27 | -35.52 | -36.00 | -37.62 |

**(2) Time Charter Cost of** ███████ **(formerly** ███████ **and** ██████████ **)**

For the period between November 2002 to March 2003 when GNA provided delivery on CIF basis to ███ of Train 1 resale volumes at a fix rate of ███ $/MMBtu with the ████████ ████ in order to evaluate de cost GNA has included all invoices related to time charter, bunker, port cost, etc.

For the period between April 2003 to September 2003 when GNA sub-chartered the ███████ ████ to ████, GNA has considered the Time Charter Cost of the ███████████ with additional minor invoicing. All other concepts related shipping cost such as bunker, port cost, boil off are borne directly by ██████.

For the period between September 2003 to March 2007, when GNA sub-chartered the ██████████ to █████, GNA has considered the Time Charter Cost of the ████████ with additional minor invoicing. All other concepts related shipping cost such as bunker, port cost, boil off are borne directly by ██████.

For a detailed list of invoices please refer to: Appendices 23 and 24 for the █████████ and Appendices 25 and 26 for the ████████████.

The following table represents the actual cost from the █████████ and █████████

4

**Appendix 28**

| Contract Year | 10/01/02– 9/30/03 | 10/01/03– 9/30/04 | 10/01/04– 9/30/05 | 10/01/05– 9/30/06 |
|---|---|---|---|---|
| Charter ███████ (USD Millions) | -24.48 | - | - | - |
| Other costs from █████ (USD Millions) | -2.72 | -0.04 | - | - |
| Charter █████ (USD Millions) | -3.76 | -25.24 | -26.85 | -26.48 |
| Other cost from █████ (USD Millions) | -1.54 | -0.04 | 0.00 | - |
| **(2) Charter of ████ & ████ (USD Millions)** | **-32.50** | **-25.32** | **-26.85** | **-26.48** |

 

(3)      **Inactivity periods of the ███████ LNG Tankers: anchored costs, bunker costs and cool-down costs.**

These are costs generated during the periods when the LNG Tankers have no activity and they are either anchored or lay down for a period waiting for service. These are deemed costs and are listed as follows: anchored costs, bunker costs and cool-down costs.

 

(i)      **Anchorage Costs**

These costs are the result of multiplying the anchor fee, which it has been estimated in 900 USD per day, by the number of days that the vessels were anchored. The number of days the LNG Tankers have anchored derive from internal GN shipping information.

| Contract Year | 10/01/02– 9/30/03 | 10/01/03– 9/30/04 | 10/01/04– 9/30/05 | 10/01/05– 9/30/06 |
|---|---|---|---|---|
| Anchored days for █████ Tankers | 19 | 68 | 385 | 46 |
| **(3).(i) Anchored costs (USD Millions)** | **-0.02** | **-0.06** | **-0.35** | **-0.04** |

 

(ii)      **Bunker Costs**

The figures for this concept have been obtained multiplying the number of days that the tankers were anchored by an estimated bunker consumption of 34 ton/day (based on shipping experience of GN) during these days and by the average bunker price for each contractual year. The index used for the bunker price is the IFO 380 cst Algeciras as it is quoted by Paws.

Thus, it is obtained the following results:

| Contract Year | 10/01/02– 9/30/03 | 10/01/03– 9/30/04 | 10/01/04– 9/30/05 | 10/01/05– 9/30/06 |
|---|---|---|---|---|
| Anchored days for █████ Tankers | 19 | 68 | 385 | 46 |
| Average Bunker Price: IFO 380 cst Algeciras ( USD/ton) | 160.41 | 164.65 | 222.22 | 310.40 |
| **(3).(ii) Bunker costs (USD Millions)** | **-0.10** | **-0.38** | **-2.91** | **-0.49** |

**Appendix 28**

### (iii)    Cool-Down Costs

Due to long periods of inactivity, the vessels need to cool their tanks to the temperature that will permit continuous loading of LNG for a future loading. Essentially, when a LNG Tanker is not in service and stopped more that 15 continuous days, GNA considers that it requires a cool down. In order to calculate these costs it has been considered the following formula:

$$CD_i = \frac{N_i * \left[\left(V * P_i\right)\right]}{1,000,000}$$

Where:

$CD_i$ are the cool-down costs expressed in USD Millions for any given contractual year $i$,

$N_i$ is the number of cool-downs during any given contractual year $i$,

V is the volume of LNG consumed for each cool-down, which it has been estimated using the GNA internal data in 25,000 MMBtu,

$P_i$ is the price of the LNG used for the cool-downs, which it has been considered to be the arithmetic average price of Train 1 Contract during the contractual year $i$,

Obtaining the following results for each of the following contractual years:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| $N_i$ - Number of cool-downs | 1 | 1 | 6 | 2 |
| $P_i$ - Average Contract Price  (USD/MMBtu) | ███ | ███ | ███ | ███ |
| (3).(iii) $CD_i$ - Cool-down costs  (USD Millions) | -0.08 | -0.08 | -0.70 | -0.33 |

### (4)    Bunker Costs of the ███████████ LNG Tankers Related to Positioning Voyages.

Position voyages occur when the LNG Tankers vessel moves from one traffic to another without any specific assignment or due to inefficiency of logistics. The amount of time when a LNG Tanker is in positioning generates a bunker cost for GNA which is not cover by the relevant sub-charter (either internal or with a third party).

In order to evaluate the actual cost of positioning it is necessary to account for the number of days in which the LNG vessel has been used in order services "Other Uses Number of Days" (Sub-charter to a third party, Sub-charter for internal use, anchorage with no use). The difference between 365 (total number of days in a year) and "Other Uses Number of Days" results in the positioning days. These number of days shall be multiplied by the consumption of bunker (Tonnes/day) and the Cost of Bunker ($/Tonne). A figure of 75 Tonne/day of bunker consumption has been assumed (which is the average fuel consumption of ███████ ███████). The index used for bunker is  IFO 380 cst Algeciras.

**Appendix 28**

The positioning days (Pd$_i$) have been obtained through the following formula:

$$Pd_i = (3 * CY_i) - Sd_i - Id_i - Ad_i$$

Where:

Pd$_i$ are the positioning days for the contractual year $i$,

CY$_i$ are the days in the contractual year $i$,

Sd$_i$ are the days that these ▮ vessels have been sub-chartered to third parties during the year $i$,

Id$_i$ is the number of days that these vessels have been used in transport operations for Gas Natural Group during the contractual year $i$,

Ad$_i$ is the number of days that these vessels were anchored without work in the contractual year $i$,

The results for each of the contractual years are the following:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| (3 * CY$_i$) – Days for each period | 1.095 | 1.098 | 1.095 | 1.095 |
| Sd$_i$ – Sub-charter days | 461 | 41 | 206 | 490 |
| Id$_i$ – Internal use days | 439 | 681 | 207 | 340 |
| Ad$_i$ – Anchored days | 19 | 68 | 385 | 46 |
| Pd$_i$ – Positioning days | 177 | 309 | 297 | 219 |
| Average Bunker Price: IFO 380 cst Algeciras ( USD/ton) | 160.41 | 164.65 | 222.22 | 310.40 |
| **(4) Positioning costs  (USD Millions)** | **-2.13** | **-3.81** | **-4.95** | **-5.09** |

**(5) Payments to ▮ for the Assignment of its Right to Transport the Volumes from ▮**



Since June 2003, Gas Natural has paid to ▮ for the right to transport the quantities of ▮ from Trinidad ▮ $/MMBtu. The total amounts for each contract year, which are the result of the invoices presented in Appendix 27, is shown in the table below:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| (5) Payments to ▮ (USD Millions) | -1.61 | -4.15 | -3.51 | -4.04 |

**Appendix 28**

Finally, adding these ten concepts it is obtained the following results for each of the contractual years:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| **REVENUES** | | | | |
| (1) Sub-charter Revenues for ▮ Tankers (USD Millions) | 22.83 | 2.93 | 6.79 | 22.90 |
| (2) Sub-charter of ▮ and ▮ (USD Millions) | 29.24 | 32.02 | 32.04 | 31.25 |
| (3) Internal use (USD Millions) | 13.59 | 21.10 | 6.42 | 10.54 |
| (4) Compensation for the Fleet(USD Millions) | 7.09 | 11.94 | 11.94 | 11.94 |
| (5) Payments from ▮ (USD Millions) | 1.08 | 2.80 | 2.37 | 2.72 |
| **COSTS** | | | | |
| (1) Charter Costs for ▮ Tankers (USD Millions) | -35.27 | -35.52 | -36.00 | -37.62 |
| (2) Charter of ▮ (USD Millions) | -32.50 | -25.32 | -26.85 | -26.48 |
| (3) Inactivity costs (USD Millions) | -0.20 | -0.53 | -3.96 | -0.87 |
| (4) Positioning costs (USD Millions) | -2.13 | -3.81 | -4.95 | -5.09 |
| (5) Payments to Repsol (USD Millions) | -1.61 | -4.15 | -3.51 | -4.04 |
| **[I] Shipping Savings & Losses (USD Millions)** | **2.10** | **1.44** | **-15.72** | **5.23** |
| [II]Quantities lifted by GN from Train 1 + Train 2 (MMBtu) | 94,478,600 | 102,900,565 | 109,337,663 | 101,662,205 |
| **Savings/Losses per MMBtu = ([I] \* $10^6$)/[II] (USD/MMBtu)** | **0.02** | **0.01** | **-0.15** | **0.05** |

The Table 2 was calculated using all these concepts, but grouping them under two epigraphs as it is shown in the following table:

| Contract Year | 10/01/02–9/30/03 | 10/01/03–9/30/04 | 10/01/04–9/30/05 | 10/01/05–9/30/06 |
|---|---|---|---|---|
| [a] Savings/Losses from ▮ Tankers (USD Millions) = REVENUES [(1) + (3) + (4)] + COSTS [(1) + (3) + (4)] | 5.90 | -3.90 | -19.77 | 1.79 |
| [b] Savings/Losses from Subcharter ▮ (USD Millions) = REVENUES [(2) + (5)] + COSTS [(2) + (5)] | -3.80 | 5.34 | 4.04 | 3.44 |
| [1] Shipping Savings & Losses (USD Millions) | 2.10 | 1.44 | -15.72 | 5.23 |
| [2]Quantities lifted by GN from Train 1 + Train 2 (MMBtu) | 94,478,600 | 102,900,565 | 109,337,663 | 101,662,205 |
| **Savings/Losses per MMBtu = ([1] \* $10^6$)/[2]** | **0.02** | **0.01** | **-0.15** | **0.05** |

8

**Appendix 28**

The last column of the Table 2, has been calculated in order to reflect the maximum potential loss that the Gas Natural Group will have to bear in the future considering that the situation that forced the resale of Trains 1 and 2 to ▮▮▮▮▮ continue in force:

i.   The figure under epigraph "[a] Savings/Losses from Primary&Secondary Tankers" is the result of adding the maximum contractual charter cost of these vessels (define in the relevant Time Charters ≈ 47.5 USD Millions) to the compensation for fleet;

ii.  The second row of the last column are the average of savings realized from the sub-charter of ▮▮▮▮▮▮ for the four contractual years reflected in the previous columns;

iii. The third row is the sum of the two concepts explained in points (i) and (ii);

iv.  And the fourth is the average quantities lifted by GN Group from Trains 1 and 2 during the contractual years covered by the Table 2.

This calculation has given the result of ▮▮▮▮ **$/MMBtu** as the maximum potential loss that the GN Group will have to face.

# EXHIBIT
# R

## UNCITRAL ARBITRATION RULES

<u>In the Matter of the Arbitration between:</u>

| | |
|---|---|
| ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO, | ) ) ) |
| Claimant, | ) ) ) |
| - against - | ) ) |
| GAS NATURAL APROVISIONAMIENTOS SDG S.A., | ) ) ) |
| Respondent. | ) ) ) |

## ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO'S MEMORANDUM OF LAW IN SUPPORT OF ITS STATEMENT OF CLAIM

Before:
Mr. Gerald Aksen (Chairman)
Prof. Ben H. Sheppard, Jr.
Mr. Eugene A. Massey

MILBANK, TWEED, HADLEY &
McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413
(212) 530-5000

Attorneys for Claimant
ATLANTIC LNG COMPANY OF
TRINIDAD AND TOBAGO

Dated: December 29, 2006
New York, New York

the ███████████████ – would be rendered "ineffectual" or "nonsensical" if the

revised Contract Price were based on the ███████ market.  SOD ¶ 131.  Because the

Contract permits GNA to ship to Spain or ██████████ damage to the Enagas Receiving

Facilities would eliminate or curtail one of the Buyer's contractual options and therefore

could reasonably be viewed as a Force Majeure event.  Moreover, the list of "events of

Force Majeure" in Article 13.1 of the Contract is, by its express terms, non-exclusive, and

would in theory permit GNA to claim that damage to the ████████████████ is

an event of Force Majeure.[87]

> **B.    The Contract Price Does Not Reflect the Value of Natural Gas
> in the "Buyer's End User Market," and a Revised Pricing
> Formula is Therefore Warranted**

119.    The second element that must be established under Article 8.5(a) is that

the Contract Price does not "reflect the value of Natural Gas in the Buyer's end user

market."  Contract, Article 8.5(a).  This element is established here. The current pricing

formula, agreed upon in 1995, does not reflect the value of natural gas in the Buyer's end

user market: ████████████

> **1.    The Current Contract Price Does Not Reflect the Value
> of Natural Gas In ████████████**

120.    The current pricing formula was negotiated with the expectation that

Enagas would deliver and resell Train 1 LNG primarily in Spain.  *See* Stehn Stmt ¶¶ 19-

---

[87] That the Parties specifically identified loss of the Enagas Receiving Facilities, but not the
████████████████ as an event of Force Majeure also shows that the Parties fully
expected the vast majority of Train 1 LNG would be delivered to Spain.  Had Enagas, in 1995,
actually viewed Article 2.6 as a means to divert all Train 1 LNG to ██████████ and actually
expected to do so – as GNA now contends, *see, e.g.*, SOD ¶¶ 101, 136 (characterizing ████
██████████ "secondary market" for Train 1 LNG) – then Enagas would no doubt have insisted
that Force Majeure events at the ████████████████ be specifically listed.

23.[88]  The formula is, accordingly, indexed to the ███████████ products that

competed with natural gas in Spain in 1995.  It does not purport to reflect the value of

natural gas in █████████ the actual destination for ████████ all Train 1 LNG since

October 1, 2002.  *See supra* Section IV.A. (establishing destination of Train 1 LNG);

Navigant Report ¶ 22.  Thus, the current formula must be revised so that it reflects the

value of natural gas in ██████████ Navigant Report ¶ 31.

121.    The value of natural gas in ██████████ can be appropriately identified

and reflected in the Contract Price by revising the pricing formula to incorporate

"netback" pricing.  Netback pricing is a widely used methodology that determines the

value of LNG at a particular point along its distribution chain by subtracting – or "netting

back" – from a known end price (*i.e.*, a known "value" of natural gas) the costs and

margins associated with each activity along the distribution chain between the end point

and the valuation point.  *See* Navigant Report ¶¶ 32-36; *see* SOC ¶¶ 63, 65.  The pricing

formula should be revised to incorporate a netback pricing approach.

122.    The netback pricing or valuation methodology employed by Atlantic

begins by averaging the publicly reported (and widely accepted) prices of natural gas at

the final common distribution points, known as "city gates," on the interstate pipelines

owned by Algonquin Gas Transmission, LLC ("Algonquin") and Tennessee Gas Pipeline

Company ("Tennessee").  Together, these pipelines supply more than 80% of the natural

gas delivered to █████████████, and the average of their respective city gate

prices (referred to by Atlantic as the "█████████Wholesale Price") constitutes an

entirely reasonable weighting of the two most prominent measures of the wholesale value

---

[88] *See also* Gas Natural SDG, S.A., *Annual Report 1999*, p. 10 (noting that Train 1 LNG is to be
***imported*** into Spain), Exhibit C-318..

**B.    The Contract Pricing Formula Also Should be Revised to Account for the Value of the Destination Flexibility of GNA's Train 1 LNG**

155.    Article 8.5(c) of the Contract provides, *inter alia*, that any Contract Price that is revised pursuant to Article 8.5, must "tak[e] into account ... all characteristics of the LNG supplied under this Agreement ... including, but not limited to ... *flexibility of deliveries* and term of supply ...." (emphasis added).  The value of GNA's ability to divert Train 1 cargoes to the Everett Receiving Facilities pursuant to Article 2.6 of the Contract has increased dramatically since 1995, when it had essentially no value.  The pricing formula must be revised to capture this value.  *See* SOC ¶¶ 90-93.

156.    As already demonstrated, several years after the Contract was executed, natural gas and LNG prices in the U.S. and Spanish markets unexpectedly diverged, with Spanish prices lagging far and consistently behind U.S. prices starting in 1999.  As also demonstrated, the evidence clearly establishes that the price disparity between these two markets created a strong and lucrative Atlantic Basin arbitrage dynamic under which cargoes otherwise destined for Spain are delivered to the U.S.  *See supra* Section III.A.5. These changed circumstances are clearly economic in nature, and plainly occurred "in Spain" as they directly impacted the supply of LNG to the Spanish market, and the price of that commodity in Spain.  *See*, *e.g.*, Spanish Market Report ¶¶ 5.4.2-5.4.3.

157.    The methodology for calculating the value of GNA's option to direct Train 1 LNG cargoes to either ████████████ or Spain is set forth in detail in the Navigant Report.  *See* Navigant Report ¶¶ 71-79 (explaining standard "spread option" methodology employed, and modeling inputs).  Due largely to the historical price differentials between the U.S. and Spanish markets, GNA's option to divert Train 1 LNG to the ████████████████ effectively had no value in 1995, when the Contract

86

was executed.  *Id.* ¶ 79.  Because of pricing differentials that subsequently developed (and are projected to continue), GNA's ability to divert to the ███████████████ has assumed significant value.  For the three-year period beginning on April 21, 2005 – the effective date for any price revision, *see* Contract, Article 8.5(e) – the levelized value of the option is approximately ██████/MMBtu.  SOC ¶ 92; Navigant Report ¶ 78.  GNA does not dispute this value.  *See* SOD ¶ 172.

158.  As mandated by Article 8.5(c) of the Contract, the option value associated with GNA's ability to divert Train 1 cargoes to the ███████████████████ – ██████/MMBtu – should be added to the value resulting from application of the revised formula, adjusted as described above to reflect the current mix of ██████████████████ in the Spanish market.  In full, the revised formula requested by Atlantic – if the Tribunal should determine that Spain is the "Buyer's end user market" under Article 8.5(a) – is as follows (per MMBtu):

███████████████████████████████████████

159.  In its SOD, GNA argues that the inclusion of an option value – to reflect the value of GNA's contractual right under Article 2.6 to divert cargoes to the Everett Receiving Facilities – is improper, because that "right was granted in 1995, and its value *expressly* imbedded in the Contract Price at that time."  SOD ¶ 171 (emphasis added).  There is, however, nothing in Article 8.1 or anywhere else in the Contract that "expressly" embeds the value of this delivery flexibility in the Contract Price, and it is impermissible under New York law to add to a contract terms that are not there.[118]

---

[118] *See Reiss v. Financial Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001) ("courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing") (quotations and citations omitted).

160.    GNA's contention is also contrary to the factual record.  There was no discussion in 1995 of a Contract Price component to reflect the value of the option to divert the Enagas Train 1 LNG to ███████████  In fact, such value was essentially zero when the Contract was negotiated and signed, and the Parties never discussed the possibility that pricing differentials could arise such that complete diversion from Spain to the ████████████████ might become economically feasible – let alone economically preferable – in the future.  Enagas never indicated to the Atlantic negotiators that it entertained full diversion as a commercial possibility.  Stehn Stmt ¶¶ 39-40.[119]  As set forth above, inclusion of an option value now is not only proper, it is mandated by Article 8.5(c).[120]

161.    Finally, the addition of the option element to the Contract Price will not prevent GNA from earning a reasonable rate of return on the Train 1 LNG in Spain – assuming that it is ever again sold there.[121]  Since late 2004, GN has had to purchase

---

[119] Thus, Atlantic properly understood that Article 2.6 was not intended to permit Enagas to exploit price differentials between ██████████ and Spain, *see* Stehn Stmt ¶ 40; its sole purpose was to provide Enagas with a means to avoid or minimize take-or-pay penalties in the event of unexpected fluctuations in Spanish demand, *see id.* ¶¶ 32-38.

[120] GNA also contends that inclusion of an option value is contrary to Atlantic's position – set forth in its September 18, 2006 Opposition to GNA's Motion to Dismiss and its October 6, 2006 Letter to the Tribunal – that "its claim is not predicated on unexpected diversions" to the ██████ ████████  *See* SOD ¶ 170.  In so doing, GNA yet again misstates Atlantic's position.  Atlantic specifically explained that "it is not the fact of diversion, but the economic changes that prompted them, that is significant" in evaluating the first element of Article 8.5(a).  9/18/06 Opp. Br. ¶ 28 n.7.  That is precisely the case here.  Atlantic's request to include an option value is not based on GNA's diversion to ██████ but rather on the fact that changes in economic circumstances have invested the option to divert with substantial value that did not exist in 1995.

[121] On a conceptual level, Atlantic should not be required to demonstrate that Train 1 LNG, priced to include the option value, could be sold in Spain at a reasonable rate of return.  It is not reasonable to expect to make money by purchasing an option that is not exercised, even though it is "in the money."  Indeed, Article 8.5(c) mandates that, in determining a revised Contract Price, "sound marketing practices and efficient operations on the part of the Buyer are assumed . . . ."  As established in the Navigant Report, if GNA purchased Train 1 LNG at the alternative Contract Price set forth in Paragraph 158, *supra*, GNA could make a reasonable return on the sale of that

increasing quantities of LNG on the high-priced spot market in order to meet demand in the Tariff sector of the Spanish market.[122]  This, in turn, has been reflected increasingly in ███████████████████████████████████████ In fact, the Spanish Government just recently proposed that the ████ for 2007 be based upon the assumption that nearly ████ of all natural gas supplies to the Spanish Tariff sector will be ███████████████████████████ The estimated volume of these ███████████████ exceeds the total ACQ under the Contract.[123]

162.    GN's ██████████ purchases have occurred, and have increased, despite the fact that GN appears to have contracted for natural gas and LNG supplies in excess of its requirements in Spain.  *See* Spanish Market Report ¶ 5.2.13 & Exhibit 13.  The recourse to the ████ LNG market has developed in part because of GNA's decision to divert the Train 1 LNG from Spain to the ████████████████████ The Train 1 LNG diverted to ██████████ is being replaced in the Spanish market by ████ LNG purchases, made at prices linked to ██████████████████[124]  Conversely, were the Train 1 LNG returned to

---

LNG in ███████████ assuming sound marketing practices and efficient operations.  *See* Navigant Report ¶¶ 81-82.

[122]  *See, e.g.,* Gas Natural SDG, S.A., *First Quarter Results 2005*, p. 14, Exhibit C-313.  GN is the exclusive supplier of natural gas, through Enagas, to the regulated market in Spain.  *See* Spanish Market Report ¶ 2.3.

the Spanish market, it would effectively replace volumes that GN is currently willing to

purchase at ███████████ prices, and should be valued accordingly.  *See* Spanish

Market Report ¶ 9.3.7 & Exhibit 25.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

_____

[125] As noted above, *see supra* Section III.D., in ███████████████ for a particular year, the
Spanish authorities make an estimate of the likely volume that will be required to serve the Tariff
market, and then determine the sources of natural gas it assumes will supply that need. ███████
is then set using the prices for the assumed or predicted sources.  *See* Spanish Market Report,
███████████████████████████████████████████████████████
███████████████████████████████████████████  *Id.*, Appendix I,
¶¶ 5.1-5.4 & Exhibit 27.  As noted, GNA diverted the Trinidad LNG to the ████, where prices
were higher.  Currently, the ████ is based in part upon assumed ████ market purchases, which is
███████ expensive source of LNG.  *Id.*, Appendix I, ¶¶ 3.4-3.5.  Accordingly, there is room
███████████████████████████████████████████████

# EXHIBIT S



# EXPERT REPORT PREPARED FOR THE ARBITRATION BETWEEN

## ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO

– AND –

## GAS NATURAL APROVISIONAMIENTOS SDG, S.A.

December 29, 2006

Prepared by:

Christopher G. Gulick
Director

Navigant Consulting, Inc.
3100 Zinfandel Drive, Suite 600
Rancho Cordova, CA 95670

916.631.3200
www.navigantconsulting.com



72. The LNG received by the Buyer under the Contract ███████████ ███████████████████████████████████████████████ ████████████████████████████████████ Accordingly, under the existing Contract Price structure, the Buyer holds an option to deliver the Train 1 LNG into the ████ ██████████ rather than to the ██████████ Article 8.5(c) requires explicitly that the ██████████ ████████████████████████████████████████████████████

73. In the event the Tribunal declines to adopt the ██████████████████ and the current structure (though not necessarily values) of the original ████████████ is maintained, then the revised ██████████ based on the ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

## A. Assessment of the Option Value in the Buyer's Right to Divert LNG Cargoes

74. To calculate the value of this delivery flexibility, I estimated the value of the option to sell LNG purchased at Pt. Fortin into either the ████████████████████ Since the ████████████ ██████████ changes monthly, and three years must elapse before Atlantic could seek another change in the ██████████ the embedded option value in the Contract was considered to be a stream of ██████████ each open from April 1, 2005, until their respective expirations in each successive month. A total of ██████████ corresponding to the ██████████ of the period from ██████████ to ██████████ were valued. I considered the use of ██████ was considered to be both reasonable and conservative given that the value of the option declines over time, and using a shorter term would have resulted in a higher option value. [65]

---

[65] Because the ██████████ were determined using available first-of-month data, and because the effective date of any ██████████████ would be ██████████████ was used as the first option month. Accordingly, the computed option value includes the entire month of ████, rather than the period beginning ██████████. Conversely, the option value does not include the period from ██████████ I consider this slight temporal incongruity acceptable, in that it would yield only a minimal distortion of the total value I determined for the flexibility. Interest on unpaid option payment amounts would begin on ██████████. The first cargo date after ██████ ██████████ and the invoice is paid fifteen days later (June 4, 2005).

75. The standard methodology for valuing options originally was developed in the early-1970s by two economists, Fischer Black and Myron Scholes, who developed methods for valuing warrants for equities. Options on futures contracts share many of the same fundamental characteristics as stock options, except that the underlying asset is a futures contract involving a commodity. According to the Black-Scholes model, the major determinants of the value of an option are the difference between the exercise price of the option and the underlying asset price, the time until the option expires, the volatility of the returns to the underlying asset, and the prevailing risk-free interest rate. In order to estimate the value of the option embedded in the Contract, a standard option pricing model developed by Financial Engineering Associates ("FEA") was used.[66]

## B. Model Inputs

76. Inputs for the FEA model were the forecasted Revised Contract Price ▮▮▮▮ the forecasted



prior to adding the value of the option (which I refer to as ▮ the risk-free ▮▮▮▮▮▮[67] the volatilities of both the ▮▮▮▮ and the ▮▮▮ w/o Option, and the correlation between the ▮▮▮▮ ▮▮▮▮ w/o Option. A description of these inputs is contained in Exhibit 13.

77. Options contain intrinsic value and extrinsic value. Intrinsic value is the face value, or the amount by which an option is "in the money," at a given point in time. Extrinsic value is the value associated with the uncertainty of returns and the length of time an option is open. These two components are the essence of the value of an option as specified by the Black-Scholes model. Generally, higher levels of volatility and longer times to expiration increase the extrinsic value of an option.

78. Using the above inputs in the FEA model, the present value of each of the 36 options at each of the option expiration dates was estimated. From this data, the average intrinsic value of the 36 options embedded in the Contract, on a levelized[68] basis, was calculated to be ▮▮▮▮▮▮ while the levelized extrinsic value was calculated to be ▮▮▮▮▮▮ These values are additive.

---

[66] FEA licenses @ENERGY, a set of energy derivatives analytics and valuation techniques commonly used and accepted in the energy industry worldwide, and uses the Black-Scholes options valuation algorithm.

[67] Federal Reserve Statistics.

[68] A levelized value is a constant value that provides the same present value as the stream of individual values.

Accordingly, the value of the option due the Buyer as of April 1, 2005, is ███████████████  ████████████ Figure 8 shows the intrinsic plus extrinsic option values, as well as the levelized option value for each of the 36 months.

**Figure 8 – Intrinsic, Extrinsic, and Levelized Option Values**



79. I also conducted a separate analysis from the perspective of 1995, the year the Contract was executed. I used forward ████████████ as of the date of the Contract, and volatilities at that time. Due to the low future ████████████ prices, and low price volatility in 1995, there was no (zero) value associated with the option of delivering Train 1 LNG to ██████████ when the Contract was executed.

## C. Application to the Revised Contract Price Formula

80. In the event the Tribunal declines to revise the Contract Price formula to reflect the value of natural gas in the ████████████████ but instead chooses to retain a price formula based upon ████████████████████ then the ████████████████ should include the value of the embedded option as of April 1, 2005. Article 8.5(c) requires that "[t]he Contract Price as revised in accordance with this Article, shall in any event, allow the Buyer to market the LNG supplied

---

[69] The original Contract Price is lower than the ████████████████ w/o Option for each of the 36 months. As a result, using the original Contract Price would lead to a higher intrinsic value each month.