**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GAS NATURAL APROVISIONAMIENTOS, SDG, S.A., | ) ) ) ) 08 Cv. 1109 (DC) |
| Petitioner, | ) ) |
| - against - | ) ) ) |
| ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO, | ) ) ) |
| Respondent. | ) ) ) |

**DECLARATION OF JAMES CAVOLI IN SUPPORT OF**
**RESPONDENT ATLANTIC LNG COMPANY OF TRINIDAD AND**
**TOBAGO'S MOTION TO VACATE THE ARBITRAL AWARD**
**AND IN OPPOSITION TO GAS NATURAL APROVISIONAMIENTOS**
**SDG S.A.'S AMENDED PETITION TO RECOGNIZE AND ENFORCE THE AWARD**

James G. Cavoli declares, pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Milbank, Tweed, Hadley & McCloy LLP,

attorneys for Respondent Atlantic LNG Company of Trinidad and Tobago ("Atlantic"), and a

member of the Bar of this Court.

2.      I submit this declaration in support of Atlantic's Reply Memorandum of Law in

Support of its Motion to Vacate the Arbitral Award and in Opposition to Gas Natural

Aprovisionamientos SDG S.A.'s Amended Petition to Recognize and Enforce the Award.

3.      Attached hereto as Exhibit 29 is a true and correct copy of excerpts of Gas

Natural Aprovisionamientos SDG S.A.'s Memorandum of Law in Support of its Statement of

Defense and Counterclaim, dated March 7, 2007 ("3/7/07 GNA Mem"). For clarity, the exhibit

hereto is numbered consecutively following those annexed to my declaration dated April 16,

2008.

4.    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 30, 2008
        New York, New York.

_____
James Cavoli (JC 7487)
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413

NY2:#4795417v1

2

Exhibit 29

# UNCITRAL ARBITRATION RULES

In the Matter of the Arbitration Between:

| | |
|---|---|
| ATLANTIC LNG COMPANY OF TRINIDAD AND TOBAGO, | ) ) ) |
| Claimant, | ) ) |
| - against - | ) ) |
| GAS NATURAL APROVISIONAMIENTOS SDG, S.A., | ) ) ) |
| Respondent. | ) ) ) |

## GAS NATURAL APROVISIONAMIENTOS SDG S.A.'S MEMORANDUM OF LAW IN SUPPORT OF ITS STATEMENT OF DEFENSE AND COUNTERCLAIM

March 7, 2007

Before:
Mr. Gerald Aksen (Chairman)
Prof. Ben H. Sheppard, Jr.
Mr. Eugene A. Massey



# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     TWO   DISPOSITIVE   ECONOMIC   FACTS   ARE   FATAL   TO
        ATLANTIC'S CLAIMS ..................................................................................... 4

        A.      Economic Fact No. 1:  The Invoices From ███████
                Conclusively  Show  That  GNA  Would  Suffer  A
                Devastating  Loss  Under  Atlantic's  Proposed  Contract
                Price Based On The ███████ Market. .............................................. 6

        B.      Economic Fact No. 2:  The Expert Report of The Boston
                Consulting Group Conclusively Shows That GNA Would
                ███████ If It Sold Train 1 LNG In The
                Spanish Market Under The Current Contract Price. ............................... 11

        C.      These  Two  Economic  Facts  Are  Also  Dispositive  Under
                Article 8.5(a) Because Atlantic Cannot Allege That It Did
                Not  Reasonably  Expect  GNA  Would  Use  Article 2.6  To
                Avoid Liability Under The Take-Or-Pay Provisions .............................. 14

III.    ATLANTIC  DISTORTS  THE  PURPORTED  CHANGES  IN  THE
        SPANISH MARKET AND THEIR IMPACT ON THE BUYER'S END
        USER MARKET ................................................................................................. 15

        A.      Supply  And  Demand  Economics  Mandate  A  Price
                Response To Changes In Market Conditions ........................................... 16

        B.      GNA Today Enjoys The Same Economic Benefit From
                The Spanish End user Market As Enagas Did In 1995 ............................ 19

        C.      Atlantic's  Alleged  "Changes"  To  Support  Its  Price
                Reopener Are Meritless .......................................................................... 24

                1.      Atlantic Has Failed To Establish The Causal
                        Nexus Between The Alleged Changes And
                        The Revision It Seeks .................................................................. 24

                2.      The  Liberalization  Of  The  Spanish  Market
                        And  Its  Consequences  Were  Reasonably
                        Foreseeable ................................................................................ 25

                3.      Atlantic's  Alleged  "Change"  To  Support  Its
                        Spanish-Based Claim Is Also Meritless ...................................... 29

a.  Any "Disappearance" of ████ or Replacement of ████ ████ Would Already Be Taken Into Account By The Discounted Market Price.................................30

b.  Atlantic's Argument Distorts The Function Of ████ In Determining Market Prices In Spain ...............................................31

c.  ████ Is Being Consumed In Spain, And ████ Has Not Replaced ████ ...........................34

IV.   THE "BUYER'S END USER MARKET" IS THE RETAIL NATURAL GAS MARKET IN SPAIN SERVED BY THE BUYER .....................37

A.  The Contract Language Requires the Buyer's End User Market To Be In Spain.................................................39

B.  Buyer's End User Market Refers To A Market Segment, Not Geography.......................................................46

C.  Atlantic Had Incentive To Agree To A Spanish Price Even When ████ The Train 1 LNG Is Resold To ████ ................49

D.  GNA's Actual Sales To ████ F.O.B. Trinidad Under Article 2.6 Have No Connection To Atlantic's Purported "████ End user" Market .......................................51

1.  The ████ Is A "Closed-Access" Terminal That Affords No Means For GNA To Transact Business With Any End user Or Other Intermediary In The U.S. Natural Gas End user Markets ..............................................52

2.  Article 2.6 Actually Prohibits Sales Of Train 1 LNG By GNA To "████ End users" .............................54

3.  The Resales To ████ Are Made F.O.B. Trinidad and Tobago...........................................................55

E.  Cargo Diversions To ████ Pursuant To Article 2.6 Were The Only Sustainable Options Available To GNA......................55

V.  REAL ECONOMIC ANALYSIS DEMONSTRATES THAT THE
    CURRENT CONTRACT PRICE MUST BE LOWERED ................................ 58

    A.  GNA Cannot Sell Train 1 LNG In the Spanish Regulated
        Market ................................................................................................ 59

    B.  Train 1 LNG Is Not Even Marketable In The Buyer's End
        User Market (The Spanish Liberalized Market) ................................ 62

    C.  GNA Could Therefore Not Market Train 1 LNG Under
        Either Of Atlantic's Proposed Contract Prices In Spain ................. 65

    D.  GNA Would Lose Money On Its Resales To ███ Under
        Atlantic's Proposed █████████ Contract Price ............................... 67

    E.  Atlantic's "Destination Flexibility" Argument Distorts and
        Disregards the Express Terms of the Contract and Ignores
        the Clear Restrictions Placed on GNA by ███ ................................. 71

    F.  Atlantic's Rate Of Return Methodology Is Wholly
        Unacceptable In The Context Of Natural Gas Transactions
        And, In Evaluating The Appropriate Contract Price To Be
        Applied, A Proper Methodology Should Be Applied ......................... 79

VI. THE ARBITRAL TRIBUNAL IS NOT CONTRACTUALLY
    EMPOWERED TO HEAR ATLANTIC'S NEW CLAIMS ............................ 83

    A.  The Parties Agreed To Negotiate Prior To Arbitration .................... 83

        1.  The Difference Between "Promises" and
            "Conditions Precedent" Is A Distinction Without
            A Difference In Article 8.5 ..................................................... 85

        2.  Article 8.5 Of The Contract Plainly Contains A
            Mandatory Negotiation Requirement ...................................... 87

            a.  Article 8.5(e)(iii) Only Permits
                "Such Revision" As Is Negotiated
                To Be Arbitrated ...................................................... 90

            b.  Article 8.5(f) Only Permits "The
                Matter" That Is Negotiated To Be
                Arbitrated. ................................................................ 91

        c.  The Term "May" In Article 8.5(a) Refers To The Option Of The Requesting Party To Bring A Price Reopener, Not To Refuse To Negotiate Once It Has Brought A Reopener ............................................................. 92

    3.  Atlantic's "Forfeiture" Argument Has Been Rejected By New York Law .......................................... 94

    4.  Atlantic's So-Called "Futility Exception" Is Disingenuous .............................................................. 95

  B.  Atlantic's Claims Significantly Differ From The Matters Raised In The Price Reopener Notice And In The Mandatory Negotiations ................................................. 97

VII.  THE TRIBUNAL SHOULD REJECT ATLANTIC'S ARGUMENT THAT IT DOES NOT HAVE JURISDICTION TO LOWER THE CONTRACT PRICE .................................................. 100

VIII.  CONCLUSION .................................................. 104

APPENDIX I:  EVIDENCE OF MATTERS THAT ATLANTIC DID NOT RAISE DURING THE MANDATORY NEGOTIATIONS IS ADMISSIBLE ....................................................... A-1

APPENDIX II:  THE EVIDENCE SUBMITTED BY GNA IN ITS STATEMENT OF DEFENSE AND COUNTERCLAIM IS RELEVANT TO ITS DEFENSE ...................................... A-9

APPENDIX III:  GNA DID NOT VIOLATE CONFIDENTIALITY AGREEMENTS, AND ATLANTIC HAS NO STANDING TO ARGUE THAT IT DID ........................................ A-13

APPENDIX VI:  THE GOVERNMENT OF TRINIDAD AND TOBAGO HAS STATED THAT THE PURPOSE OF THIS ARBITRATION IS TO CLOSE A "LOOPHOLE" ................................... A-24

## I.    INTRODUCTION

1.    This Memorandum of Law is submitted on behalf of Respondent Gas Natural Aprovisionamientos SDG, S.A. ("GNA") in support of GNA's Statement of Defense and Counterclaim filed on October 13, 2006.    It is submitted in accordance with the procedural timetable contemplated in Procedural Order No. 1 and confirmed in Procedural Order No. 3, as varied by the Chairman's e-mail dated December 8, 2006. Defined terms in GNA's Statement of Defense and Counterclaim are also used in this Memorandum of Law. [1]

2.    This is a contract case.    Many, if not all, of the matters in dispute are resolved by reference to the language in the LNG Sales Contract.    Despite that fact, Atlantic's Statement of Defense to GNA's Counterclaim dated November 13, 2006 and its Memorandum of Law dated December 29, 2006 have injected a high level of complexity into this case, which requires a detailed response by GNA.    The length of this Memorandum of Law is a function of the need to respond to the many and varied allegations in those submissions.

3.    This Memorandum of Law is accompanied by the witness statements of (in alphabetical order):

    (a)    Gregorio Gutiérrez Escudero, the Gas Procurement and International Projects Director at Enagas when the Parties executed the LNG Sales Contract in 1995 and the lead negotiator on behalf of Enagas for the Contract ("Witness Statement of Gregorio Escudero");

    (b)    Carlos Humphrey, the Gas Supply Manager of Gas Natural ("GN") and later of Repsol-Gas Natural LNG S.L.[2] during negotiations for Atlantic's Price Reopener that is the subject of this arbitration ("Witness Statement of Carlos Humphrey");

---

[1]    For the avoidance of doubt, GNA hereby reaffirms all statements made in its Statement of Defense and Counterclaim.

[2]    Repsol-Gas Natural LNG, S.L. is a joint venture company established in 2005 between Repsol YPF, S.A. ("Repsol") and GN.

# Pages 2 – 24 omitted
(not referenced or relied upon by Atlantic)

52.    In support of its ill-conceived argument, Atlantic relies heavily on its belief that Article 8.5(a) does not contain any language requiring such a causal nexus. But it clearly does. Article 8.5(a) provides that the Parties must decide whether the alleged changes "*result[ ]* [in] application of the formula set forth in Article 8.1 . . . not reflect[ing] the value of Natural Gas in the Buyer's end user market . . . ."[68] The Parties must then "determine whether or not such ███████████ exist and *justify* a revision of the Contract Price."[69] That the ███████████ that supports a Price Reopener must "justify" the revision necessarily means *that the revision must reflect the* ███████████. Further, Article 8.5 provides that there must be a "fair and equitable" revision. Obviously it would not be "fair and equitable" to revise the Contract Price in a way that did not reflect the very change that triggered the revision in the first place.

53.    In its submissions to this Tribunal, Atlantic has utterly failed to explain the causal nexus between the "changes" on which it relies—liberalization and its effects—and the alleged increase in the market price of natural gas. Indeed, Atlantic has entirely failed to explain why a change that occurred five years ago has only manifested its effects now. The answer, of course, is *that liberalization is not the change that caused the alleged need for an increase in prices* (either in Spain or in the ███). Atlantic's strategy appears to have been to identify a high market price, to look back in time to find some "change" in Spain, and to seize on that "change" as a basis for a revision to reflect the high price—regardless of whether the change *caused* the high price or not.

2.    **The Liberalization Of The Spanish Market And Its Consequences Were Reasonably Foreseeable**.

54.    Further, the consequences of liberalization—and liberalization itself—were reasonably foreseeable when the Parties executed the Contract. In its Statement of Defense and Counterclaim,[70] GNA made clear that Atlantic's "unforeseeability" argument is impossible because the Contract itself contemplates future *gas-to-gas competition in*

---

[68]    LNG Sales Contract, Article 8.5(a) (emphasis added).

[69]    *Id.*

[70]    Statement of Defense and Counterclaim ¶¶ 109–15

*Spain*.[71]  For gas to compete with other gas, the market in Spain had to be liberalized (because a monopolistic gas seller cannot compete against itself).[72]  GNA made this point in its Statement of Defense and Counterclaim.[73]  It is more than telling that in its 11-page response on this issue, Atlantic never once responds to this point.  Atlantic remains silent on this argument because it cannot change the reality that the Parties openly declared in Article 8.5(c) that gas-to-gas competition (*i.e.*, liberalization) was expected in 1995.  Such silence falls well short of it meeting its burden of proof.

55.   In addition, the language of Article 2.4 makes it clear that the Parties envisioned the possibility, during the life of the Contract, that the Buyer under the Contract may not directly own, or have access to, the Spanish Receiving Facilities, which are defined as those LNG receiving facilities owned by Enagas in 1995 in Barcelona, Huelva, and Cartagena, Spain.  Article 2.4 provides in relevant part that the Buyer "shall, directly *or through an Affiliate*, during the term of this Contract . . . own, operate and maintain . . . or *shall have free access to and use of*, the Spanish Receiving Facilities[.]"[74]  Thus, Article 2.4 contemplates the express possibility that the Buyer may not be the actual owner of the Spanish Receiving Facilities but, rather, that an affiliate of the Buyer may own those facilities.  That would mean that the parties understood the possibility that Enagas may be restructured over the term of the Contract such that its regasification facilities may not be owned by the same entity as the supply portfolio used to serve the Spanish market.

56.   Article 2.4 further indicates that the Parties envisioned the possibility that regasification facilities in Spain could become open access and allowed that the Buyer could own them, an affiliate could own them, or an unrelated third-party entirely could own them, so long as the Buyer or its affiliate at all times has "free access and use of" those facilities

---

[71]   LNG Sales Contract, Article 8.5(c) (providing that any revised Contract Price shall allow Enagas to market Train 1 LNG "in competition with all competing sources or forms of energy . . . including, but not limited to, natural gas . . . .").

[72]   Further, as confirmed by the Witness Statement of Gregorio Escudero, one (but only one) of the reasons that Enagas insisted that the parties include Article 2.6 was to provide Enagas flexibility for any circumstance.  *See* Witness Statement of Gregorio Escudero ¶ 37.

[73]   Statement of Defense and Counterclaim ¶ 111.

[74]   LNG Sales Contract, Article 2.4 (emphasis added).

(meaning it has secured capacity in those facilities). There would have been no need to contemplate open access facilities absent some expectation that the Spanish market would be liberalized during the term of the Contract, since the purpose of open access facilities is to permit multiple suppliers non-discriminatory access to terminal, storage, and transportation facilities necessary to access the market. Again, Atlantic fails to provide any explanation as to how these provisions are reconcilable with its position in this case.

57.    Moreover, the Parties' expectations of the coming liberalization were reasonable in 1995. GNA cited numerous public pronouncements made prior to 1995 from institutions such as the Council of Europe, the European Commission, and the European Parliament predicting the liberalization of the Spanish market in the near future.[75] It additionally cited abundant evidence from other sources that it was well known in the gas industry in 1995 that the liberalization of the Spanish market was on the horizon.[76] And if that were not enough, GNA showed that Atlantic *itself* would have been well aware of how quickly liberalization can occur—and its effects (including reorganization of the prior monopoly company)—based on the experience of its shareholder, BG, when the UK gas market liberalized in the early 1990s.[77]

58.    The Expert Report of The Boston Consulting Group now confirms GNA's position. It sets forth copious amounts of irrefutable evidence that liberalization was objectively foreseeable when the Parties entered into the Contract in 1995 and that liberalization would occur well within the life of the Contract (*i.e.*, before 2019).[78] With equal force, the Expert Report of The Boston Consulting Group confirms that the deregulation of the UK market was a well-known precedent in 1995, which clearly indicated the manner in which the deregulation would proceed in other European countries. It further demonstrates that liberalization of the Spanish market was—contrary to Atlantic's

---

[75]    Statement of Defense and Counterclaim ¶ 109.

[76]    *Id.* ¶ 110.

[77]    *Id.* ¶¶ 112–14.

[78]    Expert Report of The Boston Consulting Group ¶¶ 1–34.

contention[79]—a gradual, four-stage process that was fully developed by 2001.[80]  GNA relies on this and other evidence in the Expert Report of The Boston Consulting Group for the undeniable fact that the liberalization of the Spanish market was objectively foreseeable in 1995.  The Witness Statement of Gregorio Escudero confirms this point with regard not only to Atlantic but to "everybody" at the negotiating table.[81]

59.    Atlantic brushes aside this evidence, instead preferring to place reliance on the witness statement of Roger Stehn, who states that GNA's position is wrong because of an internal memorandum of the Amoco Corporation generated in 1995.  That memorandum, says Atlantic, is evidence that liberalization was not objectively foreseen in Spain until after 2019.  Of course it says nothing of the sort.  Quite the opposite, it *specifically recognizes* that there was a "threat [of] government legislation mandating an open market in Spain."[82]  More to the point, evidence of *what Atlantic believed* does not answer the question.  The Parties have already debated whether the "unexpectedness" requirement is a subjective or an objective standard, with Atlantic ultimately conceding that it was an objective standard.[83]  Thus, the real question is whether this purported belief was *reasonable* in view of the copious amounts of evidence indicating that deregulation was, in fact, likely.  On any view, it was not—particularly when the Contract itself reflects the parties' expectation that deregulation would take place.

60.    Left with little else, Atlantic musters the weak argument that, even if it expected that liberalization would occur during the life of the Contract (as Article 8.5(c) confirms it did), it did not expect that it would occur so rapidly.[84]  GNA has already answered this argument.  In its Statement of Defense and Counterclaim, GNA stated that it is entirely irrelevant under Article 8.5 whether deregulation occurred in 2000 rather than 2006—or

---

[79]    Memorandum of Law ¶¶ 47–50.

[80]    Expert Report of The Boston Consulting Group ¶¶ 19–38.

[81]    Witness Statement of Gregorio Escudero ¶ 68.

[82]    E-mail from K. McMillan to P. Ribbeck, attaching memorandum dated Dec. 1, 1995 (emphasis added), **Annex C-344**.

[83]    Letter from M. Hirschfeld to Tribunal dated Oct. 6, 2006 ¶ 2.n. 2 ("[R]easonableness [as used in Article 8.5(a)] is determined by an objective standard.").

[84]    Memorandum of Law ¶¶ 47–50.

2009.[85]   If it *were* relevant, then Atlantic's argument would only make sense if it sought a new Contract Price *but only until such time as it did expect deregulation would occur, at which time the original Contract Price would apply again*.   Even Atlantic does not argue this.   And, indeed, such a bizarre theory reveals the underlying problem with Atlantic's contention in the first place:  so long as deregulation was reasonably expected during the life of the Contract, it is of no moment that Atlantic expected the change to occur *later* in the Contract.   Atlantic has provided no response in its Memorandum of Law.   GNA submits that, given Atlantic's unwillingness to even respond to these arguments, the Tribunal should summarily reject all of Atlantic's arguments regarding the (incorrect) allegation that it was reasonable to expect a "slow and deliberate" liberalization of the Spanish market.[86]   Mr. Escudero also confirms in his Witness Statement that Atlantic was aware that liberalization would occur in the near future and, in any case, within the life of the Contract.[87]

### 3.    Atlantic's Alleged "Change" To Support Its Spanish-Based Claim Is Also Meritless.

61.   Finally, to support its alternative, Spanish-market claim, Atlantic argues that the Tribunal should adopt a revised Contract Price "to reflect significant and unexpected changes in the ▮▮▮▮▮▮▮▮▮▮▮▮ [in the markets]."   Atlantic alleges that ▮▮▮▮▮▮▮ ▮▮▮▮▮ has been "eliminated" in the Spanish market and that higher priced ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.[88]   That argument, however, fails for three independent reasons:

(a)    The issue is moot because the effect of any "disappearance" of ▮▮▮▮▮▮ replacing ▮▮▮▮ would already be reflected in the market price, which, as the Expert Report of The Boston Consulting Group confirms, is *below* what GNA already pays Atlantic;

---

[85]    Statement of Defense and Counterclaim ¶ 115.

[86]    *See, e.g.*, Memorandum of Law ¶¶ 47–54.

[87]    Witness Statement of Gregorio Escudero ¶ 68.

[88]    Memorandum of Law ¶¶ 142, 143.

(b) The more applicable inquiry for determining these products' effect on market prices is not whether it is consumed in Spain but, rather, whether the products are still used to set market prices in the Spanish natural gas market, and ██ is used *more* now for that purpose than it was in 1995; and

(c) Any reduction in ██ consumption is irrelevant because it is still a key price driver in the Spanish natural gas market, and, in any event, ██ is still being consumed in Spain.

62. GNA explains each of these independent bases for rejecting Atlantic's Spanish-market claim below.

   a. **Any "Disappearance" of ██ or Replacement of ████ ██ Would Already Be Taken Into Account By The Discounted Market Price.**

63. The basis for Atlantic's Spanish-based claim is that Royal Decree 287/2001 caused a "*de facto* outlawing of ██ . . ."[89]    Even assuming the factual accuracy, the unexpectedness, and the significance of this alleged change, the issue is moot. The effect of this change is already reflected in the obtainable market price for natural gas in the liberalized Spanish market. That is to say, if the alleged "disappearance" of ██ had any effect on the "value of Natural Gas in the Buyer's end user market"[90] (either upward or downward), then that change would be merely one of the factors that would affect what a willing buyer would pay a willing seller.

64. As discussed above, the Expert Report of The Boston Consulting Group establishes that the price in the weighted average price in the Spanish liberalized market, during the period from October 2003 to December 2006, is approximately ██[91] below the price that GNA pays Atlantic for Train 1 LNG.[92]    The actual market price, by definition, must take into account any price change caused by the alleged "*de facto* outlawing of

---

[89] Statement of Claim ¶ 87.

[90] LNG Sales Contract, Article 8.5(a).

[91] This calculation excludes distribution, transportation, regasification, and shipping costs.

[92] *See supra.*

████ ,"[93]  The market price—whatever level it is at—must be taking into account any reduction in the consumption of ████. For this same reason, Atlantic's allegation that ██████████████ has partially replaced ██████ is also moot because its effect on the value of Natural Gas would already be reflected in the lower market price.

    **b.**    **Atlantic's Argument Distorts The Function Of ██████ In Determining Market Prices In Spain.**

65.    Even putting aside the fact that any reduction in ██████ would already be reflected in the lower value of Natural Gas in the market (and thus could not be the basis for an *upward* price revision), Atlantic's arguments relating to these products also must be rejected because Atlantic has failed to explain how these alleged changes "result[ ] [in] application of the formula set forth in Article 8.1 . . . not reflect[ing] the value of Natural Gas in the Buyer's end user market," as required by Article 8.5(a). Atlantic's argument is comprised of two steps: first, it argues that ██████ is no longer being consumed in Spain (which is factually wrong); and second, it leaps from that factually faulty premise to the conclusion that—*ipso facto*—the Contract Price no longer reflects the value of Natural Gas in the market.

66.    The obvious problem with this theory is that Atlantic never explains *why* marketers could demand a higher price from their customers because ██████ is allegedly not being consumed in the market. In other words, Atlantic has not explained *the causal nexus* between the alleged lack of ██████ consumption and the fact that the Contract Price no longer reflects the market price. And, as discussed below, that is no accident.

67.    The fundamental misunderstanding in Atlantic's theory lies in its failure to appreciate the function that ██████ plays in determining the value of natural gas in the end user market. The Witness Statement of Víctor Tuñón explains that the customers in the liberalized Spanish market (with whom Mr. Tuñón himself negotiates prices) demand a price with a reference to the ████████████████████████████████████ ████████████████████████████████████████

---

93    Statement of Claim ¶ 87.

██████.[94]  The customers do this because the ████ is not set by the seller but, rather, by an independent body in the Spanish Regulator.

68.  Thus, in determining whether the alleged "disappearance" of ████ or replacement of ████████ has resulted in the formula no longer reflecting the market price, the relevant question is not whether ████ (and, if so, to what extent) is actually consumed in Spain.  The relevant question is *whether (and, if so, to what extent)* ████████ ████—the benchmark by which the GN Group's end users negotiate prices in the liberalized Spanish market.  Indeed, it is precisely because ████████ ████████, Enagas negotiated with Atlantic LNG the introduction of such ████████.  At that moment of time ████████ ████ was a compromise between the parties, without the intention of exactly matching ████████ in the primary market sectors, as Atlantic alleges.[95]

69.  The salient question, then, is whether ████ has "disappeared" from, and whether ████ ████████████ (not the market).  In fact, it has done precisely the opposite.  Not only is ████████████, *but it is more important now* ████ ████ *than it was when the Parties signed the Contract in July 1995.*[96]  Further, the Expert Report of The Boston Consulting Group makes clear that the ████ ████████ has also increased since 2002.  In February 2002, the combined ████ ████████████████ ████████.[97] ████████████████[98]  Thus, the ████████████████ ████████████.[99]  Under these circumstances, the Tribunal

---

[94]    Witness Statement of Víctor Tuñón ¶ 14.

[95]    Statement of Claim ¶ 24.

[96]    *Compare* Royal Decree 16839, Order dated July 3, 1995, **Legal Authority No. 68**, *with* Order ITC/4101/2005 dated Dec. 30, 2005, **Legal Authority No. 69**.

[97]    Expert Report of The Boston Consulting Group ¶¶ 147–48.

[98]    *Id.*

[99]    *Id.*

- 32 -


should, if anything, revise the Contract Price to *increase* the ███████████ rather than eliminate it, as Atlantic proposes.

70.    Nor does Atlantic find solace in its argument that ███████████████, thus causing the price of natural gas to increase in the Spanish market.[100] Even putting aside the fact that the lower market price already takes this alleged "change" (discussed *supra*), this theory makes the incorrect assumption that natural gas ██████████████. It does not. Since the Spanish natural gas market is liberalized, ***gas competes with other gas***—█████████████ It is only because there is no reliable gas index in Spanish that the █████████████████████████████████████████████████████. Thus, actual consumption of ████████ simply has no proximate causal relationship with the price of natural gas in Spain.

71.    Consistent with this fact, other major European gas players with an active presence in the Spanish market have reported ██████ as a price index included in their gas price formulas.[101] Furthermore, the European Commission has stated that ██████ is typically included as a price index in long-term natural gas supply contracts in the European Union.[102] Indeed, the European Commission has reported that ██████ has an approximate ████████████████████████████████████████. Thus, it would hardly be "fair and equitable" to ██████████████████████████ in Article 8.1, as required by Article 8.5(a). According to data provided by the European Commission, it would be eminently more fair and equitable ████████████████████████████.[103]

---

[100]    Memorandum of Law ¶ 143.

[101]    Expert Report of The Boston Consulting Group ¶¶ 149–51.

[102]    *Id.* ¶¶ 152–55.

[103]    Indeed, from 2001 until 2003, the Spanish Government auctioned a significant volume of piped gas from the Maghreb contract to enhance competition. The auctioned price was █████████████. *See id.* ¶¶ 156–59. Atlantic's Train 1 LNG had to compete with the Maghreb auctioned pipeline gas during those years.

c.    ███████ **Is Being Consumed In Spain, And** ███████ **Has Not Replaced**
███████.

72.    In any event, Royal Decree 287/2001 has not resulted in the "*de facto* outlawing of
███████," as Atlantic asserts.[104]  In its Memorandum of Law, Atlantic seeks to distort that
reality by *redefining* "███████" to suit its own purposes.  Atlantic states for the first time in
its Memorandum of Law that ███████ is "███████████████████
███████,"[105]  Then—as has become its practice—Atlantic harshly criticizes GNA for
asserting to the contrary, calling GNA's assertion that ███████████████████
███████████████████ to be "disingenuous[]" and then accuses GNA of
"ignor[ing] the text of the pricing formula in Article 8.1 . . . ."[106]

73.    It is ironic that Atlantic would accuse GNA of "ignor[ing] the text of the pricing formula
in Article 8.1" when Atlantic's own position is directly at odds with the definition of
███████ in the Contract itself.  Article 8.1 defines ███████ has having a "***maximum*** [of]
███████,"[107]  The term "maximum" defines the ███████ figure to be the *upper limit*, thus
indicating that ███████████████████ are also considered to be
███████.  Article 8.1 then defines ███████████████ as having a "maximum [of]
███████"  Because there is no intermediary category between ███████ and ███████, it
follows that ███████████████████████████.

74.    Indeed, Atlantic *admitted* that ███████████████████████████
the Price Reopener negotiations.  In Slide 12 to its PowerPoint presentation dated June 2,
2005, Atlantic specifically defined ███████ to mean "███████████████████
███████,"[108]  Nor did Atlantic take a different position in its Statement of Claim.  It was only
after GNA submitted its Statement of Defense and Counterclaim—in which it put the lie

---

[104]    Statement of Claim ¶ 87.
[105]    Memorandum of Law ¶ 139.
[106]    *Id.* ¶ 147.
[107]    LNG Sales Contract, Article 8.1 (emphasis added).
[108]    Atlantic Presentation dated June 2, 2005, Slide 12, **Annex R-31(B)**.

to Atlantic's statement that there had been a "disappearance" of ███████████ ████████[109]—did Atlantic decide to change it story.

75.    Not coincidentally, the definition of █████ in Article 8.1 is also used by official agencies and the general practice in the industry.  The International Energy Agency (the OECD energy body) defines ██████████████████████████████████████████,"[110] The Spanish Government also passed an Order dated September 30, 1999, in which it defined █████████████████████████, thus indicating that ██████ would include ████████████████████████████.[111]  Indeed, the very legislation that Atlantic claims to have caused the "disappearance" of █████ defines ████████████████████████████████████████[112] And that is precisely how Atlantic interpreted the legislation in the Price Reopener negotiations, stating in writing: "Spanish Royal decree 287/2001 effective Jan 2003 [is a] virtual ban on █████████████████████[113]

76.    Thus, the question is not, as Atlantic has framed it,[114] whether █████████████████ ██████████████ is no longer consumed in Spain.  Rather, the question is whether ████████ ██████████████████ is no longer consumed.  With the issue properly so framed, many of Atlantic's arguments simply fall away.  The primary thrust of its remaining arguments is that Spanish legislation (Royal Decree 287/2001) has caused █████ to "no longer [be] burned in Spain."[115]  That is incorrect.  █████ is still consumed in Spain.[116]  The Expert Report of The Boston Consulting Group provides data on the consumption of █████ from 1998 until 2006 in Spain.[117]  A review of that data reveals

---

[109]    Statement of Defense and Counterclaim ¶¶ 157–61.

[110]    Expert Report of The Boston Consulting Group ¶ 164.

[111]    *Id.* ¶ 165.

[112]    Royal Decree 287/2001, Article 1.1, **Annex C-323.**

[113]    Atlantic Presentation dated June 2, 2005, Slide 12, **Annex R-31(B)**.

[114]    Memorandum of Law ¶ 147.

[115]    *Id.* ¶ 142.

[116]    Expert Report of The Boston Consulting Group ¶¶ 178–82.

[117]    *Id.* ¶ 179.

the evolution in ███ consumption—which has not been eliminated[118]—since the legislation became effective. Years when consumption has been lower have been due to a significant decreases in the electricity volume produced ██████ and increases in rainfall when compared with the precedent year (*i.e.*, 2003 and 2006).[119] The average consumption for the last three years has been above ████ metric tons per year.[120]

77.  The reason for the continuous consumption of ████ in Spain in the face of Royal Decree 287/2001 and Royal Decree 61/2006 is because the legislation carves out four significant exceptions where ████ can, in fact, be burned. ████████



.[121]

78.  Nor is that all. The Expert Report of The Boston Consulting Group provides other evidence that ████ is still being produced and consumed in Spain. Among such evidence, the Expert Report of The Boston Consulting Group explains that ████ is used in most ████ and ██████ plants in the Spanish power sector,[122] six of ten Spanish refineries have reported the combustion of ████,[123] and major ██████ companies manufacture lubricants specifically aimed at ████ users.[124] In view of these facts (among others), Atlantic has demonstrated a lack of candor when it says that ████ has

---

[118]    Memorandum of Law ¶ 142.

[119]    Expert Report of The Boston Consulting Group ¶ 181.

[120]    *Id.* ¶ 178.

[121]    *Id.* ¶ 170–72.  Combustion plants with thermal power of 50 MW or above are considered large combustion plants according to European and Spanish regulations.  *Id.*

[122]    *Id.* ¶¶ 193–96.

[123]    *Id.* ¶ 197

[124]    *Id.* ¶¶ 198–201.

# Pages 37 – 51

included in Exhibit 10 to the Cavoli Declaration,
dated April 16, 2008

# Pages 52 – 106 & A1 – A28 omitted
(not referenced or relied upon by Atlantic)